James E. Cecchi
Lindsey H. Taylor
Donald A. Ecklund
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700

*Attorneys for Plaintiff and the proposed Class*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| TIMOTHY M. FORDEN, Individually and On Behalf of All Others Similarly Situated, | Civil Case No. _____ |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |
| ALLERGAN PLC, BRENTON L. SAUNDERS, PAUL M. BISARO, MARIA TERESA HILADO, and R. TODD JOYCE, | |
| Defendants. | |

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................2

II.   JURISDICTION AND VENUE ............................................................................5

III.  PARTIES ...............................................................................................................6

    A.    Plaintiff....................................................................................................6

    B.    Defendants ...............................................................................................6

        1.    Allergan plc ..................................................................................6

        2.    The Individual Defendants ...........................................................6

IV.   SUBSTANTIVE ALLEGATIONS ........................................................................7

    A.    Defendants' Materially False or Misleading Statements and Omissions Issued During the Class Period ................................................................7

    B.    The Truth Emerges................................................................................26

V.    CLASS ACTION ALLEGATIONS .....................................................................28

VI.   CAUSES OF ACTION ........................................................................................31

VII.  PRAYER FOR RELIEF ......................................................................................36

Plaintiff, Timothy M. Forden ("Plaintiff"), by and through his undersigned counsel, brings this action individually and on behalf of all other persons and entities who purchased or otherwise acquired the securities of Allergan plc[1] between February 25, 2014 and November 2, 2016, both dates inclusive (the "Class Period"), and were injured thereby (the "Class"). Plaintiff alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters. Plaintiff's information and belief are based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Allergan, analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     INTRODUCTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Allergan securities during the Class Period, seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

---

[1]     Prior to June 15, 2015, Allergan plc was known as Actavis plc. Allergan plc and Actavis plc are collectively referred to herein as "Allergan" or the "Company."

2.      Allergan is a specialty pharmaceutical company that develops, manufactures, markets, and distributes medical aesthetics, biosimilar, and over-the-counter pharmaceutical products worldwide. Allergan has operations in more than 100 countries.

3.      Founded in 1983, the Company was formerly known as Actavis plc. In November 2014, Actavis plc announced its intention to acquire Allergan Inc. In March 2015, Actavis plc completed its acquisition of Allergan Inc. and changed its name to Allergan plc in June 2015. Allergan is headquartered in Dublin, Ireland, and its administrative headquarters are located in Parsippany, New Jersey. The Company's common stock has traded on the New York Stock Exchange ("NYSE") under the ticker symbol "AGN" since June 15, 2015. Prior to June 15, 2015, the common stock of Actavis plc traded on the NYSE under the ticker symbol "ACT."

4.      On July 26, 2015, Allergan entered into a master purchase agreement, under which Teva Pharmaceutical Industries Ltd. ("Teva") agreed to acquire Actavis, the Company's global generic pharmaceuticals business unit. On August 2, 2016, the companies announced the completion of the acquisition.

5.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies, and financial results. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Allergan's Actavis unit and several of its pharmaceutical industry peers colluded to fix generic drug prices; (ii) the foregoing conduct constituted a violation of federal antitrust laws; (iii) consequently, Allergan's revenues during the Class Period were in part the result of illegal conduct; and (iv) as a result of the foregoing, Allergan's public statements were materially false and misleading at all relevant times.

6.     On August 6, 2015, Allergan disclosed in a filing with the SEC that it had received a subpoena from the U.S. Department of Justice.   Media outlets reported on this disclosure, stating that "Allergan Plc's Actavis unit got a subpoena from the U.S. Justice Department seeking information on the marketing and prices of its generic drugs, becoming the biggest company yet to draw scrutiny in the government's widening antitrust probe of the industry," and noting that Allergan joined other companies who "have made similar disclosures in the past several months."

7.     On this news, of Allergan's share price fell $17.17 per share, or approximately 5%, from its previous closing price to close at $319.47 per share on August 6, 2015.

8.     On November 3, 2016, media outlets reported that U.S. prosecutors might file criminal charges by the end of 2016 against Actavis and several other pharmaceutical companies for unlawfully colluding to fix generic drug prices.   In an article titled "U.S. Charges in Generic-Drug Probe to Be Filed by Year-End," *Bloomberg* reported, in relevant part:

> U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion, a fresh challenge for an industry that's already reeling from public outrage over the spiraling costs of some medicines.
>
> The antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs, according to people familiar with the matter.  The grand jury probe is examining whether some executives agreed with one another to raise prices, and the first charges could emerge by the end of the year, they said.
>
> Though individual companies have made various disclosures about the inquiry, they have identified only a handful of drugs under scrutiny, including a heart treatment and an antibiotic.  Among the drugmakers to have received subpoenas are industry giants Mylan NV and Teva Pharmaceutical Industries Ltd. ***Other companies include Actavis, which Teva bought from Allergan Plc in August***, Lannett Co., Impax Laboratories Inc., Covis Pharma Holdings Sarl, Sun Pharmaceutical Industries Ltd., Mayne Pharma Group Ltd., Endo International Plc's subsidiary Par Pharmaceutical Holdings and Taro Pharmaceutical Industries Ltd.

All of the companies have said they are cooperating except Covis, which said last year it was unable to assess the outcome of the investigation.

. . .

Allergan, Impax and Sun declined to comment beyond their filings. Representatives of Endo, Covis, Taro and Lannett didn't respond to requests for comment. A Justice Department spokesman declined to comment.

(Emphasis added.)

9.     On this news, Allergan's share price fell $9.07, or approximately 4.58%, to close at $188.82 on November 3, 2016.

10.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

11.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

12.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and under 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), because Defendant Allergan conducts business in this District and also maintains its administrative headquarters in this District.

14.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III.    PARTIES

### A.    Plaintiff

15.    As set forth in the attached Certification, Plaintiff acquired Allergan stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

### B.    Defendants

#### 1.    Allergan plc

16.    Defendant Allergan is incorporated in Ireland, and the Company's principal executive offices are located at Clonshaugh Business and Technology Park, Coolock, Dublin, D17 E400, Ireland.   The Company's administrative headquarters are located at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey.   Allergan's common stock trades on the NYSE under the ticker symbol "AGN".

#### 2.    The Individual Defendants

17.    Defendant Brenton L. Saunders ("Saunders") has served as Allergan's Chief Executive Officer ("CEO") and President since July 2014.   Saunders is located in Parsippany, New Jersey.

18.    Defendant Paul M. Bisaro ("Bisaro") served as Allergan's CEO and President between September 2007 and July 2014.   Bisaro is currently the CEO of Warner Chilcott and is located in Dublin, Ireland.

19.    Defendant Maria Teresa Hilado ("Hilado") has served as Allergan's Chief Financial Officer ("CFO") since December 2014.  Hilado is located in Parsippany, New Jersey.

20.     Defendant R. Todd Joyce ("Joyce") served as Allergan's CFO between October 2009 and December 2014.  Joyce is currently the president of Forest Laboratories LLC and is located in New York, New York.

21.     The Defendants referenced above in ¶¶ 17-20 are referred to herein as the "Individual Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

22.     Allergan, a specialty pharmaceutical company, develops, manufactures, markets, and distributes medical aesthetics, biosimilar, and over-the-counter pharmaceutical products worldwide.  Founded in 1983, the Company was formerly known as Actavis plc and changed its name to Allergan plc in June 2015 after Actavis plc acquired Allergan Inc.

### A.     Defendants' Materially False or Misleading Statements and Omissions Issued During the Class Period

23.     The Class Period begins on February 25, 2014, when Allergan filed an Annual Report with the SEC for the quarter and year ended December 31, 2013 on Form 10-K (the "2013 10-K").  For the quarter, Allergan reported a net loss of $148.4 million, or $0.86 per diluted share, on net revenue of $2.78 billion, compared to net income of $28.0 million, or $0.21 per diluted share, on net revenue of $1.75 billion for the same period in the prior year.  For 2013, Allergan reported a net loss of $750.4 million, or $5.27 per diluted share, on net revenue of $8.68 billion, compared to net income of $97.3 million, or $0.76 per diluted share, on net revenue of $5.91 billion for 2012.

24.     In the 2013 10-K, Allergan stated, in part:

### Business Strategy

We apply three key strategies to achieve growth for our Actavis Pharma and Actavis Specialty Brands pharmaceutical businesses: (i) internal development of differentiated and high-demand products, including, in certain circumstances, challenging patents associated with these products, (ii) establishment of strategic

alliances and collaborations and (iii) acquisition of products and companies that complement our current business. Our Medis third-party business has a broad portfolio of over 175 developed products for out licensing to approximately 330 customers, primarily in Europe. Our Anda Distribution business distributes products for approximately 400 suppliers and is focused on providing next-day delivery and responsive service to its customers. Our Anda Distribution business also distributes a number of generic and brand products in the U.S. Growth in our Anda Distribution business will be largely dependent upon FDA approval of new generic products in the U.S. and expansion of our base of suppliers.

25.     In the 2013 10-K, Allergan further stated, in part:

We believe that we are able to effectively compete in the distribution market, and therefore optimize our market share, based on three critical elements: (i) competitive pricing, (ii) high levels of inventory for approximately 12,725 SKUs for responsive customer service that includes, among other things, next day delivery to the entire U.S., and (iii) well established telemarketing relationships with our customers, supplemented by our electronic ordering capabilities.

26.     In the 2013 10-K, Allergan further stated, in part:

**Competition**

The pharmaceutical industry is highly competitive. In our Actavis Pharma and Actavis Specialty Brands businesses, we compete with different companies depending upon product categories, and within each product category, upon dosage strengths and drug delivery systems. Such competitors include the major brand name and generic manufacturers of pharmaceutical products. In addition to product development, other competitive factors in the pharmaceutical industry include product quality and price, reputation and service and access to proprietary and technical information. It is possible that developments by others will make our products or technologies noncompetitive or obsolete.

We actively compete in the generic pharmaceutical industry. Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors. As patents and regulatory exclusivity for brand name products expire or are successfully challenged, the first off-patent manufacturer to receive regulatory approval for generic equivalents of such products is generally able to achieve significant market penetration. As competing off-patent manufacturers receive regulatory approvals on similar products, market share, revenues and gross profit typically decline, in some cases dramatically. Accordingly, the level of market share, revenues and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market pricing and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. Consequently, we must continue to develop and introduce new products in a timely and cost-effective manner to maintain our

revenues and gross profit.  In addition to competition from other generic drug manufacturers, we face competition from brand name companies in the generic market.  Many of these companies seek to participate in sales of generic products by, among other things, collaborating with other generic pharmaceutical companies or by marketing their own generic equivalent to their brand products as Authorized Generics.  Our major competitors include Teva Pharmaceutical Industries, Ltd., Mylan Inc. and Sandoz, Inc. (a division of Novartis AG). Refer to "ITEM 1A.  RISK FACTORS — Risks Related to Investing in the Pharmaceutical Industry — The pharmaceutical industry is highly competitive and our future revenue growth and profitability are dependent on our timely development and launches of new products ahead of our competitors" in this Annual Report.

Competing in the brand product business requires us to identify and bring to market new products embodying technological innovations.  Successful marketing of brand products depends primarily on the ability to communicate their effectiveness, safety and value to healthcare professionals in private practice, group practices and receive formulary status from managed care organizations. We anticipate that our brand product offerings will support our existing areas of therapeutic focus.  Based upon business conditions and other factors, we regularly reevaluate our business strategies and may from time to time reallocate our resources from one therapeutic area to another, withdraw from a therapeutic area or add an additional therapeutic area in order to maximize our overall growth opportunities.  Our competitors in brand products include major brand name manufacturers of pharmaceuticals.  Based on total assets, annual revenues and market capitalization, our Actavis Specialty Brands segment is considerably smaller than many of these competitors and other global competitors in the brand product area.  Many of our competitors have been in business for a longer period of time, have a greater number of products on the market and have greater financial and other resources than we do.  If we directly compete with them for certain contracted business, such as the Pharmacy Benefit Manager business, and for the same markets and/or products, their financial strength could prevent us from capturing a meaningful share of those markets.

In our Anda Distribution business, we compete with a number of large wholesalers and other distributors of pharmaceuticals, including McKesson Corporation, AmerisourceBergen Corporation and Cardinal Health, Inc., which distribute both brand and generic pharmaceutical products to their customers. These same companies are significant customers of our Actavis Pharma and Actavis Specialty Brands pharmaceutical businesses.  As generic products generally have higher gross margins than brand products for a pharmaceutical distribution business, each of the large wholesalers, on an increasing basis, are offering pricing incentives on brand products if the customers purchase a majority of their generic pharmaceutical products from the primary wholesaler.  As we do not offer as broad a portfolio of brand products to our customers as some of our competitors, we are at times competitively disadvantaged.  Increased competition in the generic industry as a whole may result in increased price erosion in the pursuit of market share.

27.    The 2013 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Bisaro and Joyce, stating that the financial information contained in the 2013 10-K was accurate and that these Defendants disclosed any change to the Company's internal control over financial reporting that materially affected or was reasonably likely to materially affect the Company's internal control over financial reporting.

28.    On April 30, 2014, Allergan issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended March 31, 2014 (the "Q1 2014 8-K"). For the quarter, Allergan reported net income of $96.5 million, or $0.55 per diluted share, on net revenue of $2.66 billion, compared to a net loss of $102.8 million, or $0.79 per diluted share, on net revenue of $1.9 billion for the same period in the prior year.

29.    In the press release attached to the Q1 2014 8-K, Defendant Bisaro stated, in part:

> Overall revenue growth of 36 percent in our commercial pharmaceutical business benefitted from the continued strength of our generics business, resulting from the launch of our generic Micardis® in the U.S. and continued strong sales of the generic versions of Lidoderm® and Cymbalta®. Our North American Brands, which includes the benefit of the expanded portfolio resulting from the acquisition of Warner Chilcott in October 2013, saw continued strong sales of core products in the U.S., including Rapaflo® and Generess® Fe. We also saw growth in international operations, driven by strong sales and new product launches in key countries including the UK, Russia and Sweden.
>
> Along with solid performance that exceeded our forecast, we continued to focus on future growth drivers through investment in R&D across the business, and within the U.S. generic business, the announcement of a patent settlement for our generic version of Daytrana®, and initiation of patent challenges on a number of products, including generic forms of Treanda®, Multaq® and Colcrys®. Additionally, on April 1, 2014, we completed the divestiture of our generics commercial operations in seven markets in Western Europe to Aurobindo Pharma Limited.

30.    On May 5, 2014, Allergan filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q1 2014 8-K and

reporting in full the Company's financial and operating results for the quarter ended March 31, 2014 (the "Q1 2014 10-Q").

31.     The Q1 2014 10-Q contained signed certifications pursuant to SOX by Defendants Bisaro and Joyce, stating that the financial information contained in the Q1 2014 10-Q was accurate and that these Defendants disclosed any change to the Company's internal control over financial reporting that materially affected or was reasonably likely to materially affect the Company's internal control over financial reporting.

32.     On August 5, 2014, Allergan issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014 8-K"). For the quarter, Allergan reported net income of $48.7 million, or $0.28 per diluted share, on net revenue of $2.67 billion, compared to a net loss of $564.8 million, or $4.27 per diluted share, on net revenue of $1.99 billion for the same period in the prior year.

33.     In the press release attached to the Q2 2014 8-K, Defendant Bisaro stated, in part:

Our exceptional performance during the second quarter resulted from double digit revenue growth in both our North American brand and generics businesses and Anda Distribution[.]

Overall revenue growth of 31 percent in our commercial pharmaceutical business was supported by our North American Brands business, which benefitted from the expanded portfolio resulting from the acquisition of Warner Chilcott in October 2013, as well as continued strong sales of core products in the U.S. We also saw strong growth within our generics business, powered by our strong base business along with continued strong sales of the generic versions of Lidoderm® and Cymbalta®. Revenue in our international operations reflected the divestiture of our generics commercial operations in seven markets in Western Europe to Aurobindo Pharma Limited in April 2014.

34.     On August 5, 2014, Allergan also filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q2 2014 8-K

and reporting in full the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014 10-Q").

35.     The Q2 2014 10-Q contained signed certifications pursuant to SOX by Defendants Saunders and Joyce, stating that the financial information contained in the Q2 2014 10-Q was accurate and that these Defendants disclosed any change to the Company's internal control over financial reporting that materially affected or was reasonably likely to materially affect the Company's internal control over financial reporting.

36.     On November 5, 2014, Allergan issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014 8-K"). For the quarter, Allergan reported a net loss of $1.04 billion, or $3.95 per diluted share, on net revenue of $3.68 billion, compared to net income of $65.6 million, or $0.49 per diluted share, on net revenue of $2.01 billion for the same period in the prior year.

37.     In the press release attached to the Q3 2014 8-K, Defendant Saunders stated, in part:

> Our 53 percent year-over-year growth in non-GAAP EPS reflects the strong contributions of our new brand pharmaceutical portfolios, resulting from the acquisitions of Warner Chilcott and Forest, as well as the continued strong performance of our U.S. Generics and International businesses and the Anda Distribution business[.]   During the quarter, our North American Brands business was driven by strong sales from key products including our Namenda® products, Bystolic®, Linzess®, Lo Loestrin® Fe, Estrace® Cream, Daliresp® and Tudorza™. During the quarter we completed the harmonization of our U.S. brand sales and marketing functions, and we now have a fully operational sales team in place to support our seven core therapeutic categories across all prescriber audiences. Within our North American Generics business, we capitalized on continued strength across the business.  We also saw strong commercial performance in key international markets, particularly the UK and Russia.

* * *

> When I outlined our roadmap for accelerated growth last quarter, we committed to driving balanced performance across brands and generics, retaining our commitment to invest in organic growth and accelerating integration and synergy capture. We can report substantial progress across the board.

38.     On November 5, 2014, Allergan also filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q3 2014 8-K and reporting in full the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014 10-Q").

39.     The Q3 2014 10-Q contained signed certifications pursuant to SOX by Defendants Saunders and Joyce, stating that the financial information contained in the Q3 2014 10-Q was accurate and that these Defendants disclosed any change to the Company's internal control over financial reporting that materially affected or was reasonably likely to materially affect the Company's internal control over financial reporting.

40.     On February 18, 2015, Allergan issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "2014 8-K").  For the quarter, Allergan reported a net loss of $732.9 million, or $2.76 per diluted share, on net revenue of $4.06 billion, compared to a net loss of $148.4 million, or $0.86 per diluted share, on net revenue of $2.78 billion for the same period in the prior year.  For 2014, Allergan reported a net loss of $1.63 billion, or $7.42 per diluted share, on net revenue of $13.06 billion, compared to a net loss of $750.4 million, or $5.27 per diluted share, on net revenue of $8.68 billion for 2013.

41.     In the press release attached to the 2014 8-K, Defendant Saunders stated, in part:

> Our fourth quarter results demonstrate our laser-like commitment to drive strong growth and sustainable value creation across our businesses, while simultaneously executing transformative business development initiatives[.]   In our North American Brands business, six of our top ten brand products saw double-digit growth, including our strongest performers Namenda® franchise, Linzess®, Estrace® Cream, Teflaro® and Bystolic®.   In our North American Generics

business, strong results were driven by continued performance of our generic versions of Lidoderm® and Concerta®, and fourth quarter launches of generic versions of Intuniv™ and Celebrex®.  We continue to invest in expanding our brand and generic portfolios, with nine new product and line extension launches planned in 2015, and industry-leading expansion of our generic pipeline, with 44 Abbreviated New Drug Applications (ANDAs) submitted in 2014.  At year end, we had more than 65 first-to-file Abbreviated New Drug Applications (ANDAs) and approximately 230 ANDAs in total pending at the U.S. Food and Drug Administration (FDA).  Internationally, our business continues to grow and expand through new product launches, and we have more than 1,200 Marketing Authorization Applications (MAAs) pending outside of North America.

42.     On February 18, 2015, Allergan also filed an Annual Report on Form 10-K with the SEC, reiterating the financial and operating results previously announced in the 2014 8-K and reporting in full the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "2014 10-K").

43.     In the 2014 10-K, Allergan stated, in part:

**Business Strategy**

We apply three key strategies to achieve growth for our North American Brands and North American Generics and International businesses: (i) internal development of differentiated and high-demand products, including, in certain circumstances as it relates to generics, challenging patents associated with these products, (ii) establishment of strategic alliances and collaborations and (iii) acquisition of products and companies that complement our current business. The Company also develops and out licenses generic pharmaceutical products through its Medis third party business. Our Anda Distribution business distributes products for approximately 340 suppliers and is focused on providing next-day delivery and responsive service to its customers. Our Anda Distribution business distributes a number of generic and brand products in the U.S. Growth in our Anda Distribution business will be largely dependent upon customer expansion, FDA approval of new generic products in the U.S. and expansion of our base of suppliers.

44.     In the 2014 10-K, Allergan further stated, in part:

We believe that we are able to effectively compete in the distribution market, and therefore optimize our market share, based on three critical elements: (i) competitive pricing, (ii) high levels of inventory for approximately 12,650 SKUs for responsive customer service that includes, among other things, next day delivery to the entire U.S., and (iii) well-established telemarketing relationships with our customers, supplemented by our electronic ordering capabilities.

45.     In the 2014 10-K, Allergan further stated, in part:

**Competition**

The pharmaceutical industry is highly competitive.   In our North American Brands and North American Generics and International businesses, we compete with different companies depending upon product categories, and within each product category, upon dosage strengths and drug delivery systems.   Such competitors include the major brand name and generic manufacturers of pharmaceutical products.   In addition to product development, other competitive factors in the pharmaceutical industry include product quality, price, reputation, service and access to proprietary and technical information.   It is possible that developments by others will make our products or technologies noncompetitive or obsolete.

Competing in the brand product business requires us to identify and bring to market new products embodying technological innovations.   Successful marketing of brand products depends primarily on the ability to communicate their effectiveness, safety and value to healthcare professionals in private practice, group practices and receive formulary status from managed care organizations. We anticipate that our brand product offerings will support our existing areas of therapeutic focus.   Based upon business conditions and other factors, we regularly reevaluate our business strategies and may from time to time reallocate our resources from one therapeutic area to another, withdraw from a therapeutic area or add an additional therapeutic area in order to maximize our overall growth opportunities.   Our competitors in brand products include major brand name manufacturers of pharmaceuticals.   Many of our competitors have been in business for a longer period of time, have a greater number of products on the market and have greater financial and other resources than we do.   If we directly compete with them for certain contracted business, such as the Pharmacy Benefit Manager business, and for the same markets and/or products, their financial strength could prevent us from capturing a meaningful share of those markets.

We actively compete in the generic pharmaceutical industry.   Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors.   As patents and regulatory exclusivity for brand name products expire or are successfully challenged, the first off-patent manufacturer to receive regulatory approval for generic equivalents of such products is generally able to achieve significant market penetration.   As competing off-patent manufacturers receive regulatory approvals on similar products, market share, revenues and gross profit typically decline, in some cases dramatically.   Accordingly, the level of market share, revenues and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market, pricing and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches.   Consequently, we must continue to develop and introduce new products in a timely and cost-effective manner to maintain our

15

revenues and gross profit. In addition to competition from other generic drug manufacturers, we face competition from brand name companies in the generic market. Many of these companies seek to participate in sales of generic products by, among other things, collaborating with other generic pharmaceutical companies or by marketing their own generic equivalent to their brand products as "Authorized Generics". Our major competitors include Teva Pharmaceutical Industries, Ltd., Mylan Inc. and Sandoz, Inc. (a division of Novartis AG). Refer to "ITEM 1A. RISK FACTORS — Risks Related to Investing in the Pharmaceutical Industry — The pharmaceutical industry is highly competitive and our future revenue growth and profitability are dependent on our timely development and launches of new products ahead of our competitors" in this document.

In our Anda Distribution segment, we compete with a number of large wholesalers and other distributors of pharmaceuticals, including McKesson Corporation, AmerisourceBergen Corporation and Cardinal Health, Inc., which distribute both brand and generic pharmaceutical products to their customers. These same companies are significant customers of our North American Brand and North American Generics and International businesses. As generic products generally have higher gross margins than brand products for a pharmaceutical distribution business, each of the large wholesalers, on an increasing basis, are offering pricing incentives on brand products if the customers purchase a majority of their generic pharmaceutical products from the primary wholesaler. As we do not offer as broad a portfolio of brand products to our customers as some of our competitors, we are at times competitively disadvantaged. Increased competition in the generic industry as a whole may result in increased price erosion in the pursuit of market share.

46. The 2014 10-K contained signed certifications pursuant to SOX by Defendants Saunders and Hilado, stating that the financial information contained in the 2014 10-K was accurate and that these Defendants disclosed any change to the Company's internal control over financial reporting that materially affected or was reasonably likely to materially affect the Company's internal control over financial reporting.

47. On May 11, 2015, Allergan issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 8-K"). For the quarter, Allergan reported a net loss of $512.0 million, or $1.85 per diluted share, on net revenue of $4.23 billion, compared to

net income of $96.5 million, or $0.55 per diluted share, on net revenue of $2.66 billion for the same period in the prior year.

48.     In the press release attached to the Q1 2015 8-K, Defendant Saunders stated, in part:

> Our first quarter performance was highlighted by strong revenue growth from Namenda XR®, Linzess®, Bystolic®, Viibryd®/ Fetzima®, LoLoestrin® Fe, Saphris®, Estrace® Cream as well as continued growth within our generics business, powered by strong sales of the generic versions of Concerta®, Intuniv® and the recent launch of our generic version of OxyContin®.

49.     On May 11, 2015, Allergan also filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q1 2015 8-K and reporting in full the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 10-Q").

50.     The Q1 2015 10-Q contained signed certifications pursuant to SOX by Defendants Saunders and Hilado, stating that the financial information contained in the Q1 2015 10-Q was accurate and that these Defendants disclosed any change to the Company's internal control over financial reporting that materially affected or was reasonably likely to materially affect the Company's internal control over financial reporting.

51.     On July 26, 2015, Allergan entered into a master purchase agreement, under which Teva agreed to acquire, among other assets, the Company's global generic pharmaceuticals business.

52.     On August 6, 2015, Allergan issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 8-K"). For the quarter, Allergan reported a net loss of $243.1 million, or $0.80 per diluted share, on net revenue of $5.76 billion, compared to

net income of $48.70 million, or $0.28 per diluted share, on net revenue of $2.67 billion for the same period in the prior year.

53.     In the press release attached to the Q2 2015 8-K, Defendant Saunders stated, in part:

> In our first full quarter as a combined Company, Allergan delivered exceptional results. Our performance was powered by operational excellence and double-digit growth across our Brands and Global Generics businesses, while continuing outstanding momentum on the integration of Actavis and Allergan.  We also achieved important R&D milestones that will help fuel both our branded and generics businesses in the future[.]
>
> * * *
>
> Allergan also recently made the bold decision to divest its generics business to Teva and to streamline its operations with laser sharp focus on its future as a branded Growth Pharma leader.

54.     On August 6, 2015, Allergan also filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q2 2015 8-K and reporting in full the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 10-Q").

55.     The Q2 2015 10-Q contained signed certifications pursuant to SOX by Defendants Saunders and Hilado, stating that the financial information contained in the Q2 2015 10-Q was accurate and that these Defendants disclosed any change to the Company's internal control over financial reporting that materially affected or was reasonably likely to materially affect the Company's internal control over financial reporting.

56.     On November 4, 2015, Allergan issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 8-K"). For the quarter, Allergan reported net income of $5.30 billion, or $13.29 per diluted share, on net revenue of $4.09 billion,

compared to a net loss of $1.04 billion, or $3.95 per diluted share, on net revenue of $2.15 billion for the same period in the prior year.

57.     In the press release attached to the Q3 2015 8-K, Defendant Saunders stated, in part:

> Allergan delivered exceptional performance across the board in the third quarter that exceeded expectations.   These strong results were driven by our continued focus on customers, fueling volume-driven year-over-year growth in our U.S. Brands, Medical Aesthetics, International Brands and Anda Distribution segments, while also executing pre-integration activities ahead of the divestiture of the Generics business to Teva, which remains on track to be completed in the first quarter of 2016[.]

58.     On November 6, 2015, Allergan filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q3 2015 8-K and reporting in full the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 10-Q").

59.     The Q3 2015 10-Q contained signed certifications pursuant to SOX by Defendants Saunders and Hilado, stating that the financial information contained in the Q3 2015 10-Q was accurate and that these Defendants disclosed any change to the Company's internal control over financial reporting that materially affected or was reasonably likely to materially affect the Company's internal control over financial reporting.

60.     On February 22, 2016, Allergan issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 8-K").  For the quarter, Allergan reported a net loss of $630.9 million, or $1.78 per diluted share, on net revenue of $4.2 billion, compared to a net loss of $732.9 million, or $3.34 per diluted share, on net revenue of $2.42 billion for the same period in the prior year.  For 2015, Allergan reported net income of $3.92

billion, or $10.01 per diluted share, on net revenue of $15.07 billion, compared to a net loss of $1.63 billion, or $7.42 per diluted share, on net revenue of $6.74 billion for 2014.

61.     In the press release attached to the 2015 8-K, Allergan stated, in part:

As a result of the announced proposed divestiture of Allergan's Global Generics business to Teva on July 27, 2015, the financial results of the Company's Global Generics business are being reported as discontinued operations in the condensed consolidated statements of operations beginning with the third quarter 2015. These portions of the Company's results will continue to be reported as discontinued operations until the close of that transaction.   The Global Generics business delivered solid performance during the fourth quarter.   Continuing operations includes the U.S. Brands, U.S. Medical, International Brands and Anda Distribution segments.   All prior year results have been recast to reflect continuing operations results.

62.     In the press release attached to the 2015 8-K, Defendant Saunders stated, in part:

We have also made important progress with Teva on the planned divestiture of our Global Generics business.   And in November, Pfizer and Allergan announced the proposed combination of the two companies.   This bold step brings together the best strengths of both companies – adding Allergan's leading products across seven therapeutic areas and robust mid-to-late stage R&D pipeline to Pfizer's leading innovative and established businesses, vast worldwide commercial operations and discovery R&D leadership to create a new biopharma leader[.]

63.     On February 26, 2016, Allergan filed an Annual Report on Form 10-K with the SEC, reiterating the financial and operating results previously announced in the 2015 8-K and reporting in full the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 10-K").

64.     In the 2015 10-K, Allergan stated, in part:

**Business Strategy**

We apply three key strategies to achieve growth for our US Brands, US Medical Aesthetics and International Brands businesses: (i) internal development of differentiated and high-demand products, (ii) establishment of strategic alliances and collaborations and (iii) acquisition of products and companies that complement our current business.   Our Anda Distribution business distributes products for approximately 340 suppliers and is focused on providing next-day delivery and responsive service to its customers.   Our Anda Distribution business distributes a number of branded products in the United States.   Growth in our

Anda Distribution business will be largely dependent upon customer expansion, FDA approval of new generic products in the U.S. and expansion of our base of suppliers.

65.    In the 2015 10-K, Allergan further stated, in part:

We believe that we are able to effectively compete in the distribution market, and therefore optimize our market share, based on three critical elements: (i) competitive pricing, (ii) high levels of inventory for approximately 13,200 SKUs for responsive customer service that includes, among other things, next day delivery to the entire U.S., and (iii) well-established telemarketing relationships with our customers, supplemented by our electronic ordering capabilities.

66.    In the 2015 10-K, Allergan further stated, in part:

**Competition**

The pharmaceutical industry is highly competitive.   In our US Brands, US Medical Aesthetics and International Brands businesses, we compete with different companies depending upon product categories, and within each product category, upon dosage strengths and drug delivery systems.   Such competitors include the major brand name manufacturers of pharmaceutical products.   In addition to product development, other competitive factors in the pharmaceutical industry include product quality, price, reputation, service and access to proprietary and technical information.   It is possible that developments by others will make our products or technologies noncompetitive or obsolete.

Competing in the brand product business requires us to identify and bring to market new products embodying technological innovations.   Successful marketing of brand products depends primarily on the ability to communicate their effectiveness, safety and value to healthcare professionals in private practice, group practices and receive formulary status from managed care organizations. We anticipate that our brand product offerings will support our existing areas of therapeutic focus.   Based upon business conditions and other factors, we regularly reevaluate our business strategies and may from time to time reallocate our resources from one therapeutic area to another, withdraw from a therapeutic area or add an additional therapeutic area in order to maximize our overall growth opportunities.   Our competitors in brand products include major brand name manufacturers of pharmaceuticals.   Many of our competitors have been in business for a longer period of time, have a greater number of products on the market and have greater financial and other resources than we do.   If we directly compete with them for certain contracted business, such as the Pharmacy Benefit Manager business, or for the same markets and/or products, their financial strength could prevent us from capturing a meaningful share of those markets.

In our Anda Distribution segment, we compete with a number of large wholesalers and other distributors of pharmaceuticals, including McKesson

Corporation, AmerisourceBergen Corporation and Cardinal Health, Inc., which distribute both branded and generic pharmaceutical products to their customers. These same companies are significant customers of our US Brands and US Medical Aesthetics businesses.   As generic products generally have higher gross margins than branded products for a pharmaceutical distribution business, each of the large wholesalers, on an increasing basis, are offering pricing incentives on branded products if the customers purchase a majority of their generic pharmaceutical products from the primary wholesaler.   As we do not offer as broad a portfolio of branded products to our customers as some of our competitors, we are at times competitively disadvantaged.   Increased competition in the generic industry as a whole may result in increased price erosion in the pursuit of market share.   Refer to "ITEM 1A. RISK FACTORS — Risks Related to Our Business — Our Anda Distribution operations compete directly with significant customers of our generic and branded businesses" in this document.

As a result of the Teva Transaction, the Company's global generics business is classified as discontinued operations.   Our discontinued operations actively competes in the generic pharmaceutical industry.   Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors.   As patents and regulatory exclusivity for brand name products expire or are successfully challenged, the first off-patent manufacturer to receive regulatory approval for generic equivalents of such products is generally able to achieve significant market penetration.   As competing off-patent manufacturers receive regulatory approvals on similar products, market share, revenues and gross profit typically decline, in some cases dramatically.   Accordingly, the level of market share, revenues and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market, pricing and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches.   We face competition from other generic drug manufacturers and from brand name companies in the generic market.   Many of these companies seek to participate in sales of generic products by, among other things, collaborating with other generic pharmaceutical companies or by marketing their own generic equivalent to their brand products as "Authorized Generics".

67.    The 2015 10-K contained signed certifications pursuant to SOX by Defendants Saunders and Hilado, stating that the financial information contained in the 2015 10-K was accurate and that these Defendants disclosed any change to the Company's internal control over financial reporting that materially affected or was reasonably likely to materially affect the Company's internal control over financial reporting.

68.     On May 10, 2016, Allergan issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q1 2016 8-K"). For the quarter, Allergan reported net income of $255.70 million, or $0.47 per diluted share, on net revenue of $3.8 billion, compared to a net loss of $512 million, or $1.85 per diluted share, on net revenue of $2.56 billion for the same period in the prior year.

69.     In the press release attached to the Q1 2016 8-K, Allergan stated, in part:

**Discontinued Operations**

As a result of the proposed divestiture of Allergan's Global Generics business to Teva on July 27, 2015, the financial results of the Company's Global Generics business are being reported as discontinued operations in the condensed consolidated statements of operations.  These portions of the Company's results will continue to be reported as discontinued operations until the close of that transaction.  Continuing operations includes the U.S. Brands, U.S. Medical, International Brands and Anda Distribution segments.  All prior year results have been recast to reflect continuing operations results.

70.     On May 10, 2016, Allergan also filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q1 2016 8-K and reporting in full the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q1 2016 10-Q").

71.     The Q1 2016 10-Q contained signed certifications pursuant to SOX by Defendants Saunders and Hilado, stating that the financial information contained in the Q1 2016 10-Q was accurate and that these Defendants disclosed any change to the Company's internal control over financial reporting that materially affected or was reasonably likely to materially affect the Company's internal control over financial reporting.

72.     On August 2, 2016, Allergan and Teva announced the completion of Teva's acquisition of Actavis from Allergan.

73.    On August 8, 2016, Allergan issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q2 2016 8-K").  For the quarter, Allergan reported a net loss of $501.7 million, or $1.44 per diluted share, on net revenue of $3.68 billion, compared to a net loss of $243.1 million, or $0.80 per diluted share, on net revenue of $3.63 billion for the same period in the prior year.

74.    In the press release attached to the Q2 2016 8-K, Defendant Saunders stated, in part:

> 2016 has been a year of significant, positive transition for Allergan. On August 2, we announced the completion of the divestiture of our Global Generics business, and on August 3, announced the proposed divestiture of our Anda distribution business, to Teva.   These steps position Allergan as a pure branded focused business able to maximize the power of its therapeutic areas and the promise of its leading Open Science pipeline of 65+ mid-to-late stage development programs[.]

75.    The press release attached to the Q2 2016 8-K, also stated, in part:

**Discontinued Operations and Continuing Operations**

> As a result of the decision to hold for sale our Anda Distribution business as of June 30, 2016, which we subsequently announced we are selling to Teva, and the now completed divestiture of the Company's Global Generics business to Teva on August 2, 2016, the second quarter 2016 financial results of these businesses are being reported as discontinued operations in the condensed consolidated statements of operations.   The Company's Anda Distribution results will be reported as discontinued operations until the close of that transaction.   A portion of the third quarter 2016 Global Generics business results will be reported as discontinued operations in Allergan's third quarter 2016 earnings report. Included in segment revenues are product sales that are sold by the Anda Distribution business once the Anda Distribution business has sold the product to a third party customer.   These sales are included in segment results and are excluded from total continuing operations revenues through a reduction to Corporate revenues.  Cost of sales for these products in discontinued operations is equal to our average third-party cost of sales for third-party brand products distributed by Anda Distribution.

76.     On August 8, 2016, Allergan also filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q2 2016 8-K and reporting in full the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q2 2016 10-Q").

77.     The Q2 2016 10-Q contained signed certifications pursuant to SOX by Defendants Saunders and Hilado, stating that the financial information contained in the Q2 2016 10-Q was accurate and that these Defendants disclosed any change to the Company's internal control over financial reporting that materially affected or was reasonably likely to materially affect the Company's internal control over financial reporting.

78.     On November 2, 2016, Allergan issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended September 30, 2016 (the "Q3 2016 8-K").  For the quarter, Allergan reported net income of $15.22 billion, or $38.58 per diluted share, on net revenue of $3.62 billion, compared to net income of $5.30 billion, or $13.29 per diluted share, on net revenue of $3.47 billion for the same period in the prior year.

79.     The press release attached to the Q3 2016 8-K stated, in part:

**Discontinued Operations and Continuing Operations**

As a result of the completed divestiture of the Company's Global Generics business to Teva on August 2, 2016, and the completed divestiture of the Company's Anda distribution business to Teva on October 3, 2016, the third quarter 2016 financial results of these businesses are being reported as discontinued operations in the condensed consolidated statements of operations. Included in segment revenues are product sales that were sold by the Anda Distribution business once the Anda Distribution business had sold the product to a third party customer.  These sales are included in segment results and are excluded from total continuing operations revenues through a reduction to Corporate revenues.  Cost of sales for these products in discontinued operations is equal to our average third-party cost of sales for third-party brand products distributed by Anda Distribution.

80.     On November 4, 2016, Allergan filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q3 2016 8-K and reporting in full the Company's financial and operating results for the quarter ended September 30, 2016 (the "Q3 2016 10-Q").

81.     The Q3 2016 10-Q contained signed certifications pursuant to SOX by Defendants Saunders and Hilado, stating that the financial information contained in the Q3 2016 10-Q was accurate and that these Defendants disclosed any change to the Company's internal control over financial reporting that materially affected or was reasonably likely to materially affect the Company's internal control over financial reporting.

82.     The statements referenced in ¶¶ 23-50, 52-71, and 73-81 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies, and financial results.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Allergan's Actavis unit and several of its pharmaceutical industry peers colluded to fix generic drug prices; (ii) the foregoing conduct constituted a violation of federal antitrust laws; (iii) consequently, Allergan's revenues during the Class Period were in part the result of illegal conduct; and (iv) as a result of the foregoing, Allergan's public statements were materially false and misleading at all relevant times.

**B.     The Truth Emerges**

83.     In the Company's Q2 2015 10-Q filed on August 6, 2015, Allergan disclosed that, "[o]n June 25, 2015, the Company received a subpoena from the U.S. Department of Justice ("DOJ"), Antitrust Division seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."

84.     Also on August 6, 2015, *Bloomberg* published an article titled "Allergan Brought Into Widening U.S. Probe of Generic Drug Prices," revealing that "Allergan Plc's Actavis unit got a subpoena from the U.S. Justice Department seeking information on the marketing and prices of its generic drugs, becoming the biggest company yet to draw scrutiny in the government's widening antitrust probe of the industry," and noting that Allergan joined other companies who "have made similar disclosures in the past several months."

85.     On this news, Allergan's share price fell $17.17 per share, or approximately 5%, from its previous closing price to close at $319.47 per share on August 6, 2015.

86.     On November 3, 2016, media outlets reported that U.S. prosecutors might file criminal charges by the end of 2016 against Actavis and several other pharmaceutical companies for unlawfully colluding to fix generic drug prices.  In an article titled "U.S. Charges in Generic-Drug Probe to Be Filed by Year-End," *Bloomberg* reported, in relevant part:

> U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion, a fresh challenge for an industry that's already reeling from public outrage over the spiraling costs of some medicines.
>
> The antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs, according to people familiar with the matter.  The grand jury probe is examining whether some executives agreed with one another to raise prices, and the first charges could emerge by the end of the year, they said.
>
> Though individual companies have made various disclosures about the inquiry, they have identified only a handful of drugs under scrutiny, including a heart treatment and an antibiotic.  Among the drugmakers to have received subpoenas are industry giants Mylan NV and Teva Pharmaceutical Industries Ltd. Other companies include Actavis, which Teva bought from Allergan Plc in August, Lannett Co., Impax Laboratories Inc., Covis Pharma Holdings Sarl, Sun Pharmaceutical Industries Ltd., Mayne Pharma Group Ltd., Endo International Plc's subsidiary Par Pharmaceutical Holdings and Taro Pharmaceutical Industries Ltd.
>
> All of the companies have said they are cooperating except Covis, which said last year it was unable to assess the outcome of the investigation.

* * *

Allergan, Impax and Sun declined to comment beyond their filings. Representatives of Endo, Covis, Taro and Lannett didn't respond to requests for comment.  A Justice Department spokesman declined to comment.

87.     On this news, Allergan's share price fell $9.07, or approximately 4.58%, to close at $188.82 on November 3, 2016.

88.     As a result of Defendants' wrongful acts and omissions, and the precipitous declines in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## V.     CLASS ACTION ALLEGATIONS

89.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Allergan securities during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are the Defendants named herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

90.     The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Allergan securities were actively traded on the NYSE.   While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by Allergan or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

91.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of the federal securities laws that is complained of herein.

92.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

93.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

- whether Defendants violated the federal securities laws through their acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Allergan;

- whether the Individual Defendants caused Allergan to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Allergan securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

94.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because the members of the Class are so numerous that joinder of all members is impracticable.   Furthermore, because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation

make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein. There will be no difficulty in the management of this action as a class action.

95. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- at all relevant times, Allergan securities traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Allergan securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

96. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

97. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## VI.  CAUSES OF ACTION

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated
### Thereunder Against All Defendants

98.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

99.  This Count is brought against all Defendants pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78(j)(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, on behalf of Plaintiff and all other members of the Class.

100.  During the Class Period, Defendants:  engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and/or maintain the market price of Allergan securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Allergan securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Allergan and the Individual Defendants, took the actions set forth herein.

101.  Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents

31

described above, including statements made to securities analysts and the media that were designed to influence the market for Allergan securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Allergan's finances and business prospects.

102.   By virtue of their positions at Allergan, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions by Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

103.   Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Allergan securities from their personal portfolios.

104.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is uniquely within Defendants' knowledge and control. As the senior managers and/or directors of Allergan, the Individual Defendants had knowledge of the details of Allergan's internal affairs.

105.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of

Allergan.   As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Allergan's businesses, operations, future financial condition and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Allergan securities was artificially inflated throughout the Class Period.   In ignorance of the adverse facts concerning Allergan's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Allergan securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants,  and were damaged thereby.

106.   During the Class Period, Allergan securities were traded on an active and efficient market.   Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Allergan securities at prices artificially inflated by Defendants' wrongful conduct.   Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.   At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Allergan securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.   The market price of Allergan securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

107.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

108.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II
### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

109.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

110.   This Count is brought against the Individual Defendants pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Plaintiff and all other members of the Class.

111.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Allergan's financial condition and results of operations, and to correct promptly any public statements issued by Allergan which had become materially false or misleading.

112.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Allergan disseminated in the marketplace during the Class Period concerning Allergan's results of operations. Throughout the Class Period, the Individual

Defendants exercised their power and authority to cause Allergan to engage in the wrongful acts complained of herein.    The Individual Defendants therefore, were "controlling persons" of Allergan within the meaning of Section 20(a) of the Exchange Act.    In this capacity, they participated in the unlawful conduct alleged which artificially inflated and/or maintained the market price of Allergan securities.

113.    Each of the Individual Defendants, therefore, acted as a controlling person of Allergan.    By reason of their senior management positions and/or being directors of Allergan, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Allergan to engage in the unlawful acts and conduct complained of herein.    Each of the Individual Defendants exercised control over the general operations of Allergan and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

114.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Allergan.

VII.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.   Determining that this action is a proper class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.   Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.   Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: December 22, 2016                    Respectfully submitted,

                                             /s/ James E. Cecchi
                                            CARELLA, BYRNE, CECCHI,
                                            OLSTEIN, BRODY & AGNELLO, P.C.
                                            5 Becker Farm Road
                                            Roseland, New Jersey 07068
                                            Telephone: (973) 994-1700

                                            *Attorneys for Plaintiff and the proposed Class*

36