James E. Cecchi
Donald A. Ecklund
**CARELLA, BYRNE, CECCHI, OLSTEIN,**
  **BRODY & AGNELLO P.C.**
5 Becker Farm Road
Roseland, NJ  07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
decklund@carellabyrne.com

*Liaison Counsel for Lead Plaintiffs*
*and the Class*


Matthew L. Mustokoff
Kimberly A. Justice
Margaret E. Onasch
Jonathan F. Neumann
**KESSLER TOPAZ**
  **MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
mmustokoff@ktmc.com
kjustice@ktmc.com
monasch@ktmc.com
jneumann@ktmc.com

*Co-Lead Counsel for Lead Plaintiffs*
*and the Class*

James M. Hughes
Lance Oliver
**MOTLEY RICE LLC**
28 Brightside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
jhughes@motleyrice.com
loliver@motleyrice.com

-and-

William H. Narwold
One Corporate Center
20 Church St., 17th Floor
Hartford, CT 06103
Phone: (860) 882-1681
Fax: (860) 882-1682
bnarwold@motleyrice.com

*Co-Lead Counsel for Lead Plaintiffs*
*and the Class*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| IN RE ALLERGAN GENERIC DRUG PRICING SECURITIES LITIGATION | Civil Action No. 2:16-9449 (SDW) (LDW) |
| | **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |
| | **JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................1

II.   JURISDICTION AND VENUE ........................................................................14

III.  PARTIES ...........................................................................................................14

    A.    Plaintiffs.................................................................................................14

    B.    Defendants .............................................................................................15

        1.    Allergan plc..................................................................................15

        2.    The Individual Defendants ..........................................................16

        3.    The Director Defendants..............................................................18

    C.    The Co-Conspirators .............................................................................20

IV.   FACTUAL ALLEGATIONS .............................................................................20

    A.    By Law, the Generic Drug Market in the United States is Designed for
        Drugs to Reach Equilibrium Price Points ..............................................20

    B.    The Distribution and Manufacture of Generic Drugs ............................23

    C.    The Markets for Allergan's Generic Drugs Were Susceptible to Price-
        Fixing .....................................................................................................24

        1.    Market Concentration ..................................................................25

        2.    Barriers to Entry..........................................................................25

        3.    Lack of Available Substitutes ......................................................26

        4.    Standardized Product with High Degree of
        Interchangeability .......................................................................26

        5.    Absence of Competitive Sellers...................................................27

        6.    Inter-competitor Contacts and Communications at
        Trade Association Events .............................................................27

            (a)    The Generic Pharmaceutical Association .....................................29

i

| | | | |
|---|---|---|---|
| | (b) | The Healthcare Distribution Alliance | 31 |
| | (c) | The National Association of Chain Drug Stores | 33 |
| | (d) | Informal Events and Meeting Also Facilitated Allergan's Price-Fixing Schemes | 37 |
| D. | | Propranolol | 37 |
| | 1. | The Co-Conspirators' Price Hikes | 37 |
| | 2. | No Commercial Justification for Price Hikes | 43 |
| | 3. | The Markets for Generic Propranolol HCL 10mg, 20mg, and 80mg Tablets Were Susceptible to Anti-Competitive Conduct | 44 |
| | | (a) Market Concentration | 44 |
| | | (b) Barriers to Entry | 48 |
| | | (c) Lack of Substitutes | 48 |
| | | (d) High Degree of Interchangeability | 48 |
| | | (e) Absence of Competitive Sellers | 48 |
| E. | | Ursodiol | 49 |
| | 1. | The Co-Conspirators' Price Hikes | 49 |
| | 2. | No Commercial Justification for Price Hikes | 51 |
| | 3. | The Market for Generic Ursodiol 300mg Capsules Was Susceptible to Anti-Competitive Conduct | 52 |
| | | (a) Market Concentration | 52 |
| | | (b) Barriers to Entry | 53 |
| | | (c) Lack of Substitutes | 53 |
| | | (d) High Degree of Interchangeability | 53 |
| | | (e) Absence of Competitive Sellers | 53 |

F.   Doxycycline ....................................................................................54

   1.   The Co-Conspirators' Price Hikes .................................. 54

   2.   No Commercial Justification for Price Hikes ................... 59

   3.   The Markets for Generic Doxycycline 50mg and 100mg Capsules and 100mg Tablets Were Susceptible to Anti-Competitive Conduct ................ 60

        (a)   Market Concentration .......................................... 60

        (b)   Barriers to Entry ................................................. 62

        (c)   Lack of Substitutes .............................................. 62

        (d)   High Degree of Interchangeability ...................... 63

        (e)   Absence of Competitive Sellers ........................... 63

G.   Desonide .........................................................................................63

   1.   The Co-Conspirators' Price Hikes .................................. 64

   2.   No Commercial Justification for Price Hikes ................... 66

   3.   The Market for 15gm Tubes of Generic Desonide 0.05% Cream Was Susceptible to Anti-Competitive Conduct ................................................................. 66

        (a)   Market Concentration .......................................... 66

        (b)   Barriers to Entry ................................................. 68

        (c)   Lack of Substitutes .............................................. 68

        (d)   High Degree of Interchangeability ...................... 69

        (e)   Absence of Competitive Sellers ........................... 69

H.   Government Investigations into Allergan's Anti-Competitive Conduct ..............69

V.   DEFENDANTS' MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS ........................................74

A.   Statements Regarding Competitive Nature of the Generic Drug Market and Source of Revenues ..........................................74

B.      Financial Statements ........................................................................83

C.      False Certifications ..........................................................................86

D.      Code of Conduct ..............................................................................88

VI.     THE TRUTH EMERGES:  ALLEGATIONS OF LOSS CAUSATION.........................89

VII.    SUMMARY OF SCIENTER ALLEGATIONS ....................................................92

VIII.   CLASS ACTION ALLEGATIONS ........................................................101

IX.     CAUSES OF ACTION ........................................................................103

X.      PRAYER FOR RELIEF .......................................................................111

Lead Plaintiffs Sjunde AP-Fonden ("AP7") and Union Asset Management Holding AG ("Union," and together with AP7, "Plaintiffs"), by and through their undersigned counsel, bring this action individually and on behalf of all other persons and entities who purchased or otherwise acquired the common and preferred stock of Allergan plc between October 29, 2013 and November 2, 2016, both dates inclusive (the "Class Period"), and were injured thereby (the "Class"). Before June 15, 2015, Allergan plc was known as Actavis plc. Allergan plc and Actavis plc are collectively referred to herein as "Allergan" or the "Company."

Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based upon, among other things, the investigation conducted by and through their attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Allergan, analysts' reports and advisories about the Company, IMS pricing data for various generic drugs, various civil complaints alleging violations of federal and state antitrust and unfair competition laws by Allergan and/or certain of its subsidiaries, and information readily obtainable on the Internet. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    Plaintiffs bring this federal securities class action on behalf of a class consisting of all persons other than Defendants (defined below) who purchased or otherwise acquired Allergan common and preferred stock during the Class Period, seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under

Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rules 10b-5 and 14a-9.

2.     This action arises out of Allergan's participation in an overarching generic pharmaceutical price-fixing conspiracy that is the focus of investigations by Congress, the U.S. Department of Justice Antitrust Division ("DOJ"), and several state Attorneys General.

3.     Allergan is a specialty pharmaceutical company that develops, manufactures, markets, and distributes medical aesthetics, biosimilar, and over-the-counter pharmaceutical products worldwide.  Allergan has operations in more than 100 countries.  Founded in 1983, the Company was formerly known as Actavis plc.  In November 2014, Actavis plc announced its intention to acquire Allergan Inc.  On March 17, 2015, Actavis plc completed its acquisition of Allergan Inc. and changed its name to Allergan plc on June 15, 2015.  Allergan is headquartered in Dublin, Ireland, and its administrative headquarters are located in Parsippany, New Jersey. The Company's common stock has traded on the New York Stock Exchange ("NYSE") under the ticker symbol "AGN" since June 15, 2015 and its preferred stock trades on the NYSE under the ticker symbol "AGN.PA."  Before June 15, 2015, the common stock of Actavis plc traded on the NYSE under the ticker symbol "ACT."  On July 26, 2015, Allergan entered into a Master Purchase Agreement, under which Teva Pharmaceutical Industries Ltd. ("Teva") agreed to acquire the Company's global generic pharmaceuticals business unit.  On August 2, 2016, the companies announced the completion of the acquisition.

4.     Generic drugs are a key component of the United States healthcare system, accounting for approximately 88% of all prescriptions written in the U.S.  Generic drugs are biologically equivalent to brand-name pharmaceuticals and save consumers and the American healthcare system hundreds of billions of dollars each year because such drugs must be

substituted for the branded product at the point of sale by a pharmacist under substitution laws, which exist in the vast majority of states.

5.     Generic drugs are typically less expensive than the branded counterpart.  When the first generic drug manufacturer enters a branded market, the generic pharmaceutical is priced slightly lower than the branded pharmaceutical.  The entrance of a second generic drug manufacturer reduces the average generic price to nearly half the brand price.  Generic drugs generally can be priced at 30% to 80% less than branded drugs, lowering prescription costs for patients, employers, and healthcare providers.  For this reason, generic drugs have long been referred to as one of the few "bargains" in the U.S. healthcare system, and historically, healthcare experts have commented that cost savings from the growing generic drug market have gone a long way toward containing overall increasing healthcare costs.  This was the way the generic drug market was intended to work, and has worked, since the passage of the Hatch-Waxman Act in 1984.

6.     Over the last few years, however, prices for several commonly prescribed generic drugs have skyrocketed without legitimate economic reasons, sparking outrage from consumers whose costs have doubled, tripled or in some cases increased more than ten-fold.  Normal market forces cannot explain these astronomical hikes.  A series of acquisitions has reduced the number of market participants, and these highly concentrated markets have created opportunities for industry rivals to conspire with one another to hike prices for generic drugs far beyond what they would otherwise be in a competitive market.

7.     Allergan's anti-competitive conduct impacted at least four generic drugs: Propranolol, Ursodiol, Doxycycline, and Desonide.  As graphically presented below (*see* ¶¶ 104, 107, 110, 123, 137, 140, 143, 156), for each of these drugs, there is a clear pattern of an industry

3

conference attended by Allergan and its competitors, followed by an abrupt and unprecedented spike in the Allergan price, closely timed with spikes in Allergan's competitors' prices. These patterns are undeniable and provide clear evidence of a price-fixing conspiracy, particularly because there is no evidence of contemporaneous supply shortages, increased costs, or increases in demand to otherwise explain the drastic price increases for *all* of these drugs. What is more, the price increases operated as a "one-way ratchet": as the graphs below depict, the drug prices never decreased following the initial price increases to the extent one would expect if the sudden price increases reflected temporary supply shortages, cost increases, or other benign market explanations. (¶¶ 104, 107, 110, 123, 137, 140, 143, 156).

8.     Allergan's extraordinary and historic price increases for these generic drugs would have been against Allergan's economic self-interest absent the existence of a price-fixing scheme. Generic drugs are commodity products. Absent price collusion, if one manufacturer raises the price of a given drug, its competitors will seek to increase their own market share by selling the drug to the first manufacturer's customers at lower prices. Indeed, under the "maximum allowable cost" ("MAC") pricing regime that governs much of the U.S. generic pharmaceutical market, drug cost reimbursements from insurance companies are capped at a certain price, and if a drug manufacturer raises its prices above this cap while its competitors do not, the reimbursements for the higher-priced drug will cease. Thus, it would not be in any drugmaker's unilateral self-interest to increase the prices of its generic drugs unless it had an agreement with the other drugmakers that they would do the same.

9.     As discussed below, witnesses—including Allergan's former Associate Director of Finance and a former management-level marketing employee—confirmed that Allergan

officials who attended the industry conferences preceding these historic and stratospheric price increases were responsible for generic drug pricing at the Company during the Class Period.

10.     The suspicious price increases by Allergan and others have spawned investigations by the DOJ and several state Attorneys General.  These investigations have begun to reveal a broad, well-coordinated, and long-running series of schemes to fix prices for a number of generic drugs.  They have also revealed that collusion on generic drugs was centered around meetings of trade associations, such as the Generic Pharmaceutical Association ("GPhA"), and other industry gatherings attended by senior Allergan officials, including some of the Individual Defendants (defined below).

11.     These investigations trace back to January 2014 when the National Community Pharmacists Association ("NCPA") wrote to the U.S. Senate Health Education Labor and Pensions ("HELP") Committee and the U.S. House Energy and Commerce Committee requesting hearings on the significant spike in generic pharmaceutical pricing.  The NCPA's news release states:

> Pharmacy acquisition prices for many essential generic drugs have risen by as much as 600%, 1,000% or more, according to a survey of more than 1,000 community pharmacists conducted by NCPA. The same survey found that patients are declining their medication due to increased co-pays (or total costs for the uninsured) and that the trend has forced more seniors into Medicare's dreaded coverage gap (or "donut hole") where they must pay far higher out-of-pocket costs.

> Over the last six months I have heard from so many of our members across the U.S. who have seen huge upswings in generic drug prices that are hurting patients and pharmacies ability to operate," NCPA CEO B. Douglas Hoey, RPh, MBA wrote in a letter to the panels' respective leaders, Chairman Tom Harkin (D-Iowa)

and Ranking Member Lamar Alexander (R-Tenn.) and Chairman Fred Upton (R-Mich.) and Ranking Member Henry Waxman (D-Calif.).[1]

12.    On October 2, 2014, U.S. Senator Bernie Sanders and U.S. Representative Elijah E. Cummings sent letters to Allergan (then Actavis) and thirteen other generic drug companies asking for detailed information on various generic drug price hikes.[2]   On November 20, 2014, during a Senate committee held a hearing entitled, "Why Are Some Generic Drugs Skyrocketing In Price?," various witnesses discussed the price hikes for generic pharmaceuticals.

13.    In November 2014, the DOJ, as part of its ongoing investigation, convened a grand jury in the Eastern District of Pennsylvania.   On November 3, Lannett Co. Inc. ("Lannett")—one of the companies that hiked the prices of their generic drugs at or close to the same time that Allergan raised its prices—reported that its Senior Vice President of Sales and Marketing had received a subpoena from the DOJ in connection with the federal investigation of the generic pharmaceutical industry requesting information on Lannett's generic drug pricing and communications with competitors.   On December 5, 2014, Lannett itself received a subpoena requesting similar information.   This grand jury has issued subpoenas and requests for information to at least ten other generic drug manufacturers as well, including Heritage Pharmaceuticals Inc. ("Heritage"), Impax Laboratories, Inc. ("Impax"), and Mylan Pharmaceuticals Inc. ("Mylan")—companies that also raised the prices of some of their generics at or close to the same time as Allergan's price increases.

---

[1]    News Release, NCPA, *Generic Drug Price Spikes Demand Congressional Hearing, Pharmacists Say* (Jan. 8, 2014), http://www.ncpanet.org/newsroom/newsreleases/2014/01/08/generic-drug-price-spikes-demand-congressional-hearing-pharmacists-say.

[2]    U.S. Senator Bernie Sanders Senate Website, *Congress. Investigating Why Generic Drug Prices Are Skyrocketing* (Oct. 2, 2014), https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing

14.     According to a June 26, 2016 article by Policy and Regulatory Report, the DOJ's investigation is wide-ranging:  "A PaRR source says prosecutors see the case much like its antitrust probe of the auto parts industry, which has gone on for years and morphed into the department's largest criminal antitrust probe ever.  Like in that case, prosecutors expect to 'move from one drug to another in a similar cascading fashion.'"

15.     On August 6, 2015, Allergan disclosed in a filing with the SEC that it had received a subpoena from the DOJ in June 2015.  Media outlets reported on this disclosure, stating that "Allergan Plc's Actavis unit got a subpoena from the U.S. Justice Department seeking information on the marketing and prices of its generic drugs, becoming the biggest company yet to draw scrutiny in the government's widening antitrust probe of the industry," and noting that Allergan joined other companies who "have made similar disclosures in the past several months."  On this news, Allergan's common share price fell $17.17 per share, or approximately 5%, from its previous closing price to close at $319.47 per share on August 6, 2015, and its preferred share price fell $39.24 per share, or approximately 3.5%, from its previous closing price to close at $1,084.00 per share on August 6, 2015.

16.     The fact that the DOJ sent a subpoena to Allergan *after* sending subpoenas to certain of its competitors strongly suggests that evidence learned in those other investigations led the DOJ to believe that Allergan was also participating in a price-fixing conspiracy.  Moreover, the DOJ has filed motions to intervene in at least six civil antitrust actions alleging price-fixing in violation of the Sherman Act against Allergan and/or the Actavis generic drug unit sold to Teva in August 2016, as well as other sellers of the generic drugs mentioned above.  In these cases, the plaintiffs have requested that the various generic drug company-defendants produce all documents produced to the DOJ in the criminal investigation.  In one such motion to intervene,

the DOJ explained that the "action presents a risk to the United States' interest in ensuring the integrity of its ongoing criminal investigation" because, among other reasons, "its ongoing criminal antitrust investigation shares common questions of law and fact with the civil claims" and because the plaintiffs have sought the same documents produced to the federal prosecutors.[3] The DOJ's intervention in these civil actions implicating Allergan's price-fixing activities gives rise to a strong and credible inference that the allegations of price-fixing are supported (at least in part) by documents and other information provided to the DOJ.

17.    On November 3, 2016, media outlets reported that U.S. prosecutors might file criminal charges against Allergan and several other pharmaceutical companies for unlawfully colluding to fix generic drug prices.  In an article titled "U.S. Charges in Generic-Drug Probe to Be Filed by Year-End," *Bloomberg* reported, in relevant part:

> U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion, a fresh challenge for an industry that's already reeling from public outrage over the spiraling costs of some medicines.
>
> The antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs, according to people familiar with the matter.  The grand jury probe is examining whether some executives agreed with one another to raise prices, and the first charges could emerge by the end of the year, they said.
>
> Though individual companies have made various disclosures about the inquiry, they have identified only a handful of drugs under scrutiny, including a heart treatment and an antibiotic.  Among the drugmakers to have received subpoenas are industry giants Mylan NV and Teva Pharmaceutical Industries Ltd.  ***Other companies include Actavis, which Teva bought from Allergan plc in August***, Lannett Co., Impax Laboratories Inc., Covis Pharma Holdings Sarl, Sun Pharmaceutical Industries Ltd., Mayne Pharma Group Ltd., Endo International

---

[3]    *FWK Holdings, LLC v. Actavis Elizabeth, LLC, et al*, 1:16-cv-09901-JSR (S.D.N.Y. Jan. 30, 2017), ECF No. 72 at 5, 7.  The district court in this action denied the defendants' motion to dismiss the complaint on April 6, 2017.  *See id*., ECF No. 134.

Plc's subsidiary Par Pharmaceutical Holdings and Taro Pharmaceutical Industries Ltd.

All of the companies have said they are cooperating except Covis, which said last year it was unable to assess the outcome of the investigation.[4]

On this news, Allergan's common share price fell $9.07, or approximately 4.58%, to close at $188.82 on November 3, 2016, and its preferred share price fell $30.03, or approximately 4.1%, to close at $708.45 on November 3, 2016.

18.     On December 12 and December 13, 2016, the DOJ filed the first criminal charges stemming from its ongoing investigation (the "Heritage Indictments"). *See United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Dec. 12, 2016); *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Dec. 13, 2016). These cases allege that two former senior executives of generic drugmaker Heritage violated the Sherman Act by participating in conspiracies to fix prices, rig bids, and allocate customers for, among other generic pharmaceuticals, Doxycycline hyclate, which was one of the drugs sold by Allergan at historically high prices during the Class Period.

19.     According to Count One of the Heritage Indictments, "[t]he charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among the defendant and co-conspirators, the substantial terms of which were to allocate customers, rig bids, and fix and maintain prices for doxycycline hyclate sold in the United States." The Heritage Indictments allege that Glazer and Malek, along with co-conspirators, carried out the conspiracy by engaging in anti-competitive conduct, including the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to allocate customers, fix prices or rig bids for Doxycycline hyclate sold in the United States.

---

[4]     Unless otherwise noted herein, all emphasis is added.

20.     On January 9, 2017, Glazer and Malek pleaded guilty to conspiring to manipulate prices of Doxycycline hyclate between April 2013 and December 2015, as well as other generic drugs.   At the plea hearing, DOJ prosecutors stated that the conspiracy also involved rival companies.

21.     Besides the ongoing DOJ investigation, on December 15, 2016, the Attorneys General of 20 states, including Connecticut, filed a civil complaint in the U.S. District Court for the District of Connecticut against various generic pharmaceutical manufacturers, including Teva Pharmaceuticals USA, Inc. ("Teva USA"), Mayne Pharma (USA) Inc. ("Mayne"), and Mylan, also alleging price-fixing, market allocation, and bid rigging of generic pharmaceuticals (the "AG Complaint").   Teva's Actavis unit (part of Allergan before July 26, 2015) received a subpoena from the Connecticut Attorney General in connection with its price-fixing investigation.   The AG Complaint states that the Attorneys General "have uncovered a wide-ranging series of conspiracies implicating numerous different drugs and competitors, which will be acted upon at the appropriate time."   The Attorneys General describe these conspiracies as "schemes to fix and maintain prices, allocate markets and otherwise thwart competition" and explain that they are carried out by generic drug companies through their senior executives who "exploit their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements."

22.     The Connecticut Attorney General's December 15, 2016 press release regarding the AG Complaint states that the Connecticut Attorney General "has dedicated significant resources to this investigation for more than two years and has developed compelling evidence of collusion and anti-competitive conduct across many companies that manufacture and market generic drugs in the United States."   The Connecticut Attorney General's press release further

states that "*[w]e have evidence of widespread participation in illegal conspiracies across the generic-drug industry*."

23.     Throughout the Class Period, Defendants failed to disclose that: (i) Allergan's generics unit and several of its pharmaceutical industry peers colluded to fix generic drug prices; and (ii) consequently, Allergan's revenues during the Class Period were in part the result of illegal conduct.  As a result of these omissions, Allergan's public statements were materially false and misleading at all relevant times.  Defendants also issued false and misleading statements during the Class Period regarding the purportedly competitive nature of Allergan's pricing conduct and the generic drug markets in which it operated.  These false and misleading statements also disguised the true source of Allergan's income from generic drug sales, i.e., price collusion.

24.     During the Class Period, revenue from the manufacture and sale of generic pharmaceuticals was vital to Allergan.  In its 2013 Annual Report filed on February 25, 2014, Allergan reported that Actavis Pharma, the segment that included the Company's generic drug business, generated $6.35 billion in revenues in 2013, or approximately *73% of the Company's total revenues*.  The Company also told its investors that "market share, revenues and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market [and] *pricing*" and emphasized that Allergan "*actively compete[s]* in the generic pharmaceutical industry."

25.     Allergan reiterated statements about the Company's success in the generics market in its 2014 Annual Report dated February 18, 2015, and in its 2015 Annual Report dated February 26, 2016.  In each of these annual reports, Allergan also reported sustained revenues

11

attributable to its generic pharmaceutical business, with revenues for the generic drug segment peaking at $6.75 billion in 2014.

|  | **2013** | **2014** | **2015** |
|---|---|---|---|
| **Revenues from Segment Including Generics Business[5]** | $6.35 billion (73.2% of total revenues) | $6.75 billion (51.7% of total revenues) | $6.37 billion (42.2% of total revenues)[6] |

26.     During this period of significant sustained revenues, Allergan's cost of sales for the generic drug segment actually *declined*.  In 2014, for example, the Company's revenues increased by $400 million over the prior year, but the cost of sales declined by $90 million.

|  | **2013** | **2014** | **2015** |
|---|---|---|---|
| **Cost of Sales for Segment Including Generics Business** | $3.29 billion | $3.20 billion | $3.05 billion |

27.     During the Class Period, Allergan also touted its ability to both raise and maintain generic drug prices, without ever mentioning the price-fixing it was engaged in with its rival drugmakers.  For example, during an analyst conference on May 29, 2014, Defendant Paul M. Bisaro, the Company's then-CEO, explained that Allergan is seeing more "sustainable and longer-term higher pricing in the generic industry than people are generally used to" as companies are increasingly "taking those price increases and those price increases are sticking." Similarly, during Allergan's August 5, 2014 conference call with analysts and investors,

---

[5]     This segment was named "Actavis Pharma" in 2013 but was subsequently renamed "North American Generics and International."

[6]     As a result of Allergan's July 27, 2015 announcement that the Company had agreed to sell its global generics business to Teva, Allergan reported net revenues from its global generics business in the "Income from discontinued operations" portion of the Company's February 26, 2016 Form 10-K.

Defendant Brenton L. Saunders, the Company's current CEO, stated that "there are more opportunities to take price [increases], particularly as we leverage our strong supply chain and the reliability of high-quality supply that we can offer customers."   During the Company's second quarter 2015 conference call on May 11, 2015, Saunders similarly explained that while "the model for generics is price decreases as more competitors come into the market . . . the environment has remained pretty stable and favorable."

28.     Through these representations, Defendants led investors to falsely believe that higher generic drug pricing was sustainable and that the Company's success was the result of its active competition in the industry.  Defendants' misleading statements voluntarily put the source of Allergan's revenue from generic drugs at issue while concealing the use of illegal anti-competitive conduct to drive that revenue.   The Company's income statements were also misleading, because they conveyed a sense of strong profitability without mentioning the price-fixing collusion which fueled that profitability.

29.     As Allergan and the Individual Defendants made these false statements and omissions throughout the Class Period—during a time in which they had knowledge of (or recklessly disregarded) the Company's price-fixing conduct—some of them, including Defendants Bisaro, Buchen, Joyce, and Olafsson, made substantial sales of their Allergan stock totaling millions of dollars.  These insider sales further evidence Defendants' intent to defraud the investing public.

30.     As a result of Defendants' acts and omissions, and the precipitous decline in the market value of Allergan's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II.      JURISDICTION AND VENUE

31.     The claims asserted herein arise under Sections 10(b), 14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and 78n(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9.

32.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and under 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

33.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), because Defendant Allergan conducts business in this District and also maintains its administrative headquarters in this District.

34.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## III.     PARTIES

### A.      Plaintiffs

35.     Plaintiff AP7 is a state pension fund in Sweden that manages approximately $33 billion in premium pension assets on behalf of Swedish investors.  As set forth in the attached Certification (Exhibit A), AP7 acquired Allergan stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.  Some of the shares acquired by AP7 during the Class Period were acquired in connection with Allergan's July 1, 2014 acquisition of Forest Laboratories, Inc. ("Forest") (the

"Forest Merger") and Actavis plc's March 17, 2015 acquisition of Allergan, Inc. (the "Actavis Merger").

36.     Plaintiff Union is the holding organization of the Union Investment Group and is based in Frankfurt am Main, Germany.  The Union Investment Group ranks among the leading German investors by market share.  As set forth in the attached Certification (Exhibit B), two of the investment management companies of the Union Investment Group, namely Union Investment Privatfonds GmbH ("UIP") and Union Investment Luxembourg S.A. ("UIL"), manage the relevant funds that acquired Allergan stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.  UIP and UIL have assigned the claims of the funds to Union.  *See* ECF No. 10-3.

**B.     Defendants**

**1.     Allergan plc**

37.     Defendant Allergan is incorporated in Ireland, and the Company's principal executive offices are located at Clonshaugh Business and Technology Park, Coolock, Dublin, D17 E400, Ireland.  The Company's administrative headquarters are located at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey.  Allergan's common stock trades on the NYSE under the ticker symbol "AGN" and its preferred stock trades on the NYSE under the ticker symbol "AGN.PA."

38.     On February 17, 2014 Allergan entered into an Agreement and Plan of Merger (the "Forest Merger Agreement") with Forest.  Pursuant to the Forest Merger Agreement, Allergan acquired Forest through a series of merger transactions (the "Forest Merger").  Allergan solicited and received shareholder approval of the Forest Merger through a joint proxy statement and prospectus filed on Form 424B3 with the SEC on May 6, 2014 (the "May 6, 2014 Proxy").  Allergan announced the completion of its acquisition of Forest on July 1, 2014.

39.     Actavis plc and Allergan, Inc. announced on November 17, 2014 that they had entered into a definitive agreement under which Actavis would acquire Allergan for a combination of cash and stock in a transaction valued at approximately $66 billion.  Actavis solicited and received shareholder approval of the Actavis Merger through a joint proxy statement and prospectus filed with the SEC on January 27, 2015 (the "January 27, 2015 Proxy").  On March 17, 2015, Actavis announced the completion of the Actavis Merger.  On June 15, 2015, Actavis announced that the Company had adopted Allergan plc as its new global name and would begin trading on the NYSE under the "AGN" ticker, abandoning the Company's prior "ACT" ticker.

40.     On July 27, 2015, Teva announced that it had entered into a definitive agreement with Allergan to acquire Allergan's generics business in exchange for $33.75 billion in cash and $6.75 billion in Teva stock, amounting to just under a 10% ownership.  In connection with this deal, Teva agreed to sell the rights and assets related to 79 pharmaceutical products following Federal Trade Commission ("FTC") charges that Teva's acquisition of Allergan's generics business would be anti-competitive.  On August 2, 2016, Teva announced that the acquisition was complete.

### 2.     The Individual Defendants

41.     Defendant Paul M. Bisaro ("Bisaro") served as Allergan's Chief Executive Officer ("CEO") and President between October 2013 and July 2014.  Bisaro also served on Allergan's Board of Directors ("Board") when the May 6, 2014 Proxy and January 27, 2015 Proxy were issued.  On March 27, 2017, Bisaro was appointed as President and CEO of Impax. Bisaro signed certifications pursuant to Sarbanes-Oxley Act ("SOX") and Rule 13a-14(a) under the Exchange Act ("Rule 13a-14(a)") for the Company's 3Q 2013 and 1Q 2014 Forms 10-Q and 2013 Form 10-K, which contained false and misleading statements and omissions; he also made

16

false and misleading statements and omissions in the Company's 3Q 2013, 4Q 2013, 1Q 2014, and 2Q 2014 Forms 8-K, at a healthcare conference, and during a Company earnings call.[7]

42.     Defendant Brenton L. Saunders ("Saunders") has served as Allergan's CEO and President since July 2014.  Saunders is located in Parsippany, New Jersey.  Saunders also served on Allergan's Board when the January 27, 2015 Proxy was issued.   Saunders signed certifications pursuant to SOX and Rule 13a-14(a) for the Company's 2Q 2014, 3Q 2014, 1Q 2015, 2Q 2015, 3Q 2015, 1Q 2016, 2Q 2016, and 3Q 2016 Forms 10-Q and 2014 and 2015 Forms 10-K statements, which contained false and misleading statements and omissions; he also made false and misleading statements and omissions during the Company's earnings calls.

43.     Defendant R. Todd Joyce ("Joyce") served as Allergan's Chief Financial Officer ("CFO") from October 2009 to December 2014.  Joyce signed certifications pursuant to SOX and Rule 13a-14(a) for the Company's 3Q 2013, 1Q 2014, 2Q 2014 and 3Q 2014 Forms 10-Q and 2013 Form 10-K, which contained false and misleading statements and omissions.  Joyce also signed Allergan's 3Q 2013, 4Q 2013, 1Q 2014, 2Q 2014, and 3Q 2014 Forms 8-K, which contained false and misleading statements and omissions.

44.     Defendant Maria Teresa Hilado ("Hilado") has served as Allergan's CFO since December 2014.  Hilado is located in Parsippany, New Jersey.  Hilado signed certifications pursuant to SOX and Rule 13a-14(a) for the Company's 1Q 2015, 2Q 2015, 3Q 2015, 1Q 2016, 2Q 2016, and 3Q 2016 Forms 10-Q and 2014 and 2015 Forms 10-K, which contained false and misleading statements and omissions.  Hilado also signed Allergan's 4Q 2014, 1Q 2015, 2Q 2015, 3Q 2015, and 4Q 2015 Forms 8-K, which contained false and misleading statements and omissions.

---

[7]     Each of the Company's Class Period SEC filings is defined below.

45.     Defendant Sigurdur O. Olafsson ("Olafsson") served as a director of Allergan and the President of Actavis Pharma, the Allergan segment that included the Company's generics business, between April 2012 and June 2014.  Olafsson also served on Allergan's Board when the May 6, 2014 Proxy was issued.  Olafsson subsequently served as the President and CEO of the Global Generic Medicines Group at Teva Pharmaceutical Industries Ltd. before stepping down in early 2017.  Olafsson made a false and misleading statement and omission during a Company earnings call and also signed the Company's 2013 Form 10-K.

46.     Defendant David A. Buchen ("Buchen") served as Allergan's Chief Legal Officer (Global) and Secretary from April 2012 to July 2014 and then served as the Executive Vice President Commercial, North American Generics and International, from July 2014 to May 1, 2015.  Upon his termination, Buchen served as a consultant for the Company until May 1, 2016.  Buchen made a false and misleading statement and omission on one of the Company's earnings calls.

47.     The Defendants referenced above in ¶¶ 41-46 are referred to herein as the "Individual Defendants."

### 3.     The Director Defendants

48.     Defendant James H. Bloem ("Bloem") served on Allergan's Board when the May 6, 2014 Proxy and January 27, 2015 Proxy were issued.

49.     Christopher W. Bodine ("Bodine") served on Allergan's Board when the May 6, 2014 Proxy and January 27, 2015 Proxy were issued.

50.     Tamar D. Howson ("Howson") served on Allergan's Board when the May 6, 2014 Proxy and January 27, 2015 Proxy were issued.

51.     John A. King, Ph.D. ("King") served on Allergan's Board when the May 6, 2014 Proxy and January 27, 2015 Proxy were issued.

52.     Catherine M. Klema ("Klema") served on Allergan's Board when the May 6, 2014 Proxy and January 27, 2015 Proxy were issued.

53.     Jiri Michal ("Michal") served on Allergan's Board when the May 6, 2014 Proxy and January 27, 2015 Proxy were issued.

54.     Jack Michelson ("Michelson") served on Allergan's Board when the May 6, 2014 Proxy was issued.

55.     Patrick J. O'Sullivan ("O'Sullivan") served on Allergan's Board when the May 6, 2014 Proxy and January 27, 2015 Proxy were issued.

56.     Ronald R. Taylor ("Taylor") served on Allergan's Board when the May 6, 2014 Proxy and January 27, 2015 Proxy were issued.

57.     Andrew L. Turner ("Turner") served on Allergan's Board when the May 6, 2014 Proxy and January 27, 2015 Proxy were issued.

58.     Fred G. Weiss ("Weiss") served on Allergan's Board when the May 6, 2014 Proxy and January 27, 2015 Proxy were issued.

59.     Bisaro, Olafsson, Bloem, Bodine, Howson, King, Klema, Michal, Michelson, O'Sullivan, Taylor, Turner, and Weiss are referred to herein as the "2014 Board of Directors."

60.     Nesli Basgoz, M.D. ("Basgoz") served on Allergan's Board when the January 27, 2015 Proxy was issued.

61.     Christopher J. Coughlin ("Coughlin") served on Allergan's Board when the January 27, 2015 Proxy was issued.

62.     Bisaro, Bloem, Bodine, Howson, King, Klema, Michal, O'Sullivan, Taylor, Turner, Weiss, Basgoz, and Coughlin are referred to herein as the "2015 Board of Directors."

19

C.      **The Co-Conspirators**

63.     Various other persons, firms, corporations, and entities participated as co-conspirators (the "Co-Conspirators") with Allergan in the anti-competitive conduct alleged herein.  The Co-Conspirators include, but are not limited to:  Lannett; Impax; Heritage; Mylan; Epic Pharma, LLC ("Epic"); West-Ward Pharmaceutical Corporation ("West-Ward"); Mutual Pharmaceutical ("Mutual"); Perrigo Company plc ("Perrigo") and Taro Pharmaceutical Industries Ltd. ("Taro").  To engage in this anti-competitive conduct, the Co-Conspirators performed acts in furtherance of the anti-competitive practices and conspiracies alleged herein.

IV.   **FACTUAL ALLEGATIONS**

A.      **By Law, the Generic Drug Market in the United States is Designed for Drugs to Reach Equilibrium Price Points**

64.      Since the implementation of the Drug Price Competition and Patent Term Restoration Act (known as the "Hatch-Waxman Act") in 1984, generic drugs have had a significant impact on healthcare in the U.S., resulting in tens of billions of dollars in annual savings for consumers and the overall healthcare system.  The Hatch-Waxman Act was initially enacted to simplify the regulatory hurdles for bringing generic drugs to market and eliminated the prior requirement that generic drug companies file costly New Drug Applications ("NDA") to obtain U.S. Food and Drug Administration ("FDA") approval.  The Hatch-Waxman Act is designed to get less expensive generic drugs into the hands of consumers expeditiously.  Under the revised process, generic drug companies can instead file an Abbreviated New Drug Application ("ANDA").  A generic drug company that submits an ANDA generally is not required to include clinical trial data to establish the safety and efficacy of the drug.  Instead, the generic drug company can "piggy-back" on the safety and efficacy data supplied by the original NDA holder for a given drug.

20

65.     Generic drugs must meet certain bioequivalence and pharmaceutical equivalence standards set by the FDA to ensure that the generic drug is essentially an exact substitute for the brand-name drug.  To receive FDA approval through an ANDA, a generic drug must contain the same active ingredient, in the same dosage form, in the same strength, to be bioequivalent to the reference listed drug (i.e., the original brand-name version approved by the FDA through an NDA).  The FDA uses a review process to ensure that brand-name and generic drugs that are rated "therapeutically equivalent" have the same clinical effect and safety profile.  According to the FDA: "[p]roducts classified as therapeutically equivalent can be substituted with the full expectation that the substituted product will produce the same clinical effect and safety profile as the prescribed product."[8]  The FDA assigns generics that are deemed to be therapeutically equivalent to their brand-name counterparts an "AB" rating.  Even drugs that are bioequivalent, but that do not share the same dosage form, are not AB-rated.

66.     The Hatch-Waxman Act also provides a 180-day exclusivity period for the first generic drug company that files an ANDA and simultaneously challenges the validity of the patent for a brand-name drug.  This exclusivity period, which allows the generic drug company to market its generic version free from competition, is intended to spur generic drug companies to provide alternatives to brand-name drugs.  When generic drugs enter the market, they are often priced well below the brand-name drugs and quickly take a large market share from the brand-name drug company.  The first generic drug will generally be priced 15% to 20% below the brand-name drug.  Once the exclusivity period ends and more generic versions enter the market, the price of the generic drugs continues to fall and their combined share of the market for

---

[8]     *See* Approved Drug Products with Therapeutic Equivalence Evaluations ("Orange Book"), 37th Ed., 2017, U.S. Department of Health and Human Services – Food and Drug Administration, at vii.

that drug, relative to the brand-name equivalent, continues to grow.  The price of the generic versions of a given drug can fall to as little as 10% to 20% of the original price for the brand-name drug.  This competition allows purchasers to buy the generic equivalent of a brand-name drug at substantially lower prices.  As Stephen W. Schondelmeyer, Professor of Pharmaceutical Care & Health Systems at the University of Minnesota, College of Pharmacy, explained in his testimony before the Senate HELP Committee:

> The Congressional Budget Office has credited the Hatch-Waxman Act and, importantly, the process for easy and routine A-rated generic substitution by pharmacists with providing meaningful economic competition from generic drugs, and with achieving billions of dollars of savings for drug purchasers such as consumers and employers.[9]

67.     The price differential between a brand-name drug and the generic equivalents, and the proportion of the market captured by the brand-name versus the generics, generally follows a predictable pattern.  Specifically, as mentioned above, the first generic to enter the market is generally priced 15% to 20% lower than the brand-name drug.  As more approved generics enter the market, the price of the generics generally declines in both absolute terms and in relation to the brand-name drug for around five years.  Eventually, the price of the generic drugs reaches an equilibrium price point, at or close to the manufacturers' marginal production costs, resulting in significant savings for consumers, insurers, and employers.

68.     Between 2005 and 2014, generic drugs saved the U.S. healthcare system more than $1.6 trillion dollars.  However, the cost savings engendered by generic drugs has been eroded in recent years by steep price spikes in certain generic drugs.  A December 2016 analysis conducted by the U.S. Government Accountability Office found that more than 300 of the 1,441

---

[9]     *Why Are Some Generic Drugs Skyrocketing in Price?: Hearing Before the S. Comm. on Health, Education, Labor and Pensions*, 113th Cong. (Nov. 20, 2014) (Statement by Stephen W. Schondelmeyer)

established generic drugs examined by the study had one or more instances of "extraordinary price increases"—i.e., "periods of prices at least doubling over the five-year study period."  In 2014 alone, more than 100 generic drugs experienced these extraordinary price increases.  For 48 of these 100 drugs, the price increases were 500% or higher.

69.    The Maximum Allowable Cost ("MAC") pricing regime also serves to control drug prices.  Under this regime, individual States or pharmacy benefits managers ("PBMs")—third party administrators of prescription drug programs—establish an MAC for drug products using a variety of different inputs and formulas.  If the cost for a pharmacy to dispense a given drug exceeds the MAC, the pharmacy will either opt to substitute a less expensive version, if available, or sell the drug at a loss to service the patient.  This MAC framework incentivizes pharmacies to fill prescriptions with the least expensive, therapeutically equivalent version of a drug to maximize their potential profits.

### B.    The Distribution and Manufacture of Generic Drugs

70.    Unlike brand-name drug manufacturers, which develop novel drug compounds and spend years conducting clinical trials and efficacy studies to obtain NDA approval, generic drug manufacturers typically do not develop new drugs.  Some generic drugs are manufactured by companies that also produce brand-name drugs, while others are manufactured by companies that exclusively produce generic drugs.   Drugs sold in the U.S. may be manufactured domestically or abroad and many of the manufacturers that produce generic drugs for the U.S. market are foreign companies or are owned by foreign companies.  For example, Defendant Allergan has its global headquarters in Dublin, Ireland.

71.    Generic drug manufacturers also control the sale of drugs to many different drug wholesalers, distributors, retailers, and group purchasing organizations.   Wholesalers and distributors purchase drugs from the manufacturers and distribute them to customers such as

23

pharmacies, hospitals, and medical facilities.  Some of the larger wholesalers and distributors of generic drugs include Cardinal Health, Inc. and AmerisourceBergen Corporation.  Retailers of generic drugs include retail or supermarket chain pharmacies (such as Walgreens and Walmart), mail-order or specialty pharmacies, hospitals, healthcare plans, and group purchasing organizations ("GPOs").   GPOs are membership-based entities that negotiate with manufacturers, wholesalers, and distributors on behalf of a group of purchasers to obtain optimal prices and terms for their members.  GPOs can represent retail, governmental or healthcare groups.  Some of the larger GPOs include Vizient and Premier, Inc.

72.    Because the various generic drugs produced by different drug manufacturers are all therapeutically equivalent, the competition between manufacturers to sell generic drugs to wholesalers, distributors, retailers, and GPOs is largely based on each manufacturer's price and ability to provide supply for that drug.   Allergan and the Co-Conspirators are all drug manufacturers and/or suppliers such that they should be competing directly with each other for the sale of the generic drugs discussed herein to U.S. consumers.

C.    **The Markets for Allergan's Generic Drugs Were Susceptible to Price-Fixing**

73.    As demonstrated by publicly available data, the markets for the generic drugs discussed below were highly susceptible to cartelization by Allergan and the Co-Conspirators. Factors that indicate market susceptibility to collusion include:  (i) a high degree of industry concentration; (ii) significant barriers to entry; (iii) the lack of available substitutes for the goods involved; (iv) a standardized product with a high degree with interchangeability between the goods of the cartel participants; (v) absence of a competitive fringe of sellers; and (vi) inter-competitor contacts and communications.  As discussed in more detail below, each of these

factors was present in the markets for certain dosages of Propranolol, Ursodiol, Doxycycline, and Desonide.

### 1. Market Concentration

74.     Industry or market concentration is a function of the number of firms in a given market and their respective market shares.  Market concentration is commonly measured through the Herfindahl-Hirschman Index ("HHI"), which is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers.  Through this calculation, the HHI factors in the relative size distribution of the firms in a given market.  The HHI approaches zero when a market is occupied by a large number of firms of relatively equal size and reaches the 10,000 point maximum when a market is controlled by a single firm.  The HHI increases as (i) the number of firms in a given market decreases; and (ii) the disparity in size between those firms increases.

75.     As noted by the DOJ, markets in which the HHI is between 1,500 and 2,500 points are generally considered moderately concentrated, and markets in which the HHI exceeds 2,500 points are considered highly concentrated.  A more highly concentrated market is more susceptible to anti-competitive behavior, such as price-fixing.  This increased susceptibility is due, in part, to the relative ease with which co-conspirators can monitor each other's pricing behavior to ensure adherence to the price-fixing agreement, especially when only two or three competitors have the majority of the market share.  In addition, in a highly concentrated market, there is a lower probability that each firm has different production costs, which facilitates the formation and maintenance of a price-fixing scheme.

### 2. Barriers to Entry

76.     Barriers to entry into a market can delay, diminish or even prevent the attraction and arrival of new market participants, which is the usual mechanism for checking the market

power—i.e., the ability to set prices above market costs—of existing participants.  Entry barriers include things like: trade secrets, patents, licenses, capital outlays required to start a new business, pricing elasticity, and difficulties buyers may have in changing suppliers.  If there is no significant threat that new firms will enter a market, a single firm with a dominant market share—or a combination of firms with a significant percentage of the market—is able to engage in anti-competitive conduct, such as restricting output and raising prices to the detriment of consumers.  Barriers to entry in the markets for generic drugs include, among other things, high manufacturing costs and regulatory and intellectual property requirements.  For example, the requirement that companies file an ANDA and receive FDA approval can delay entry into the market by an average of thirty-six months.

### 3. Lack of Available Substitutes

77.     The presence of alternative products that can easily be substituted for a given product serves to undermine anti-competitive behavior.  Conversely, the absence of available substitutes increases the susceptibility of a market to anti-competitive behavior because consumers have no alternative but to purchase the product, notwithstanding any price increases. In the context of prescription drugs, a pharmacist presented with a prescription for a given drug can only substitute another drug if that drug has an "AB" rating.  Only generic and brand-name versions of a drug are AB-rated to one another.  Therefore, a pharmacist can only fill a prescription for a given drug with the brand-name version or one of the AB-rated generic versions and cannot substitute another drug.

### 4. Standardized Product with High Degree of Interchangeability

78.     A standardized, commodity-like product with a high degree of interchangeability between the goods of the participants in an anti-competitive conspiracy also increases the susceptibility of a given market to anti-competitive conduct.  By their very nature, all generic

versions of a given drug are interchangeable, as every generic version of a drug must be bioequivalent to the original, brand-name drug.

### 5.   Absence of Competitive Sellers

79.   The presence of firms that manufacture the same product but are not part of the anti-competitive conspiracy—also called fringe sellers—can erode the conspirators' market share by offering the product at lower, more competitive prices.  This reduces the conspirators' revenue and makes it more difficult to sustain the conspiracy.  By contrast, the absence of fringe sellers can increase the susceptibility of a given market to anti-competitive conduct.

### 6.   Inter-competitor Contacts and Communications at Trade Association Events

80.   Representatives from Allergan and the Co-Conspirators routinely attended conferences, meetings, and trade shows sponsored by various pharmaceutical trade associations. These events provided frequent opportunities for individuals from Allergan and the Co-Conspirators to interact with each other and discuss their respective businesses and customers. Social events and other recreational activities—including golf outings, lunches, cocktail parties, and dinners—were also organized in conjunction with the trade association events and provided further opportunities for representatives from the drug manufacturers to meet outside of the traditional business setting.  These trade associations and the related formal and informal events, discussed in more detail below, provided representatives from Allergan and the Co-Conspirators with ample opportunities to meet, discuss, devise, and implement the price-fixing schemes set forth herein.

81.   The Allergan representatives who attended the majority of these trade meetings were Andrew Boyer ("Boyer"), Senior Vice President of Generic Sales, Marketing, and National Accounts, Marc Falkin ("Falkin"), Vice President of Marketing, Pricing, and Contracts, and

Richard Rogerson ("Rogerson"), Executive Director of Pricing & Business Analytics.  Boyer, Falkin and Rogerson comprised the management team for Allergan's generics business during the Class Period.

82.     Confidential Witness No. 1 ("CW1"), an Associate Director of Finance at Allergan from March 2011 to March 2016, confirmed that Boyer was responsible for the Company's pricing decisions and that Falkin and Rogerson were members of Boyer's management team.  According to CW1, Boyer ran the generics business at Allergan and made all decisions regarding generic drugs, including pricing decisions.

83.     Confidential Witness No. 2 ("CW2"), a management-level marketing employee at Allergan between 2013 and 2016, corroborated CW1's account.  CW2 stated that Allergan's Generic Pricing Department was headed by Boyer.  Falkin reported to Boyer, and Rogerson reported to Falkin.  CW2 further stated that Rogerson "blessed" all pricing decisions and his team maintained all of the pricing models.  All generic pricing was generated using the models maintained by Rogerson's team, but Boyer "had trumping ability" over both Falkin and Rogerson in terms of final pricing decisions.  CW2 also indicated that Boyer, Falkin and Rogerson frequently attended industry events, such as meetings of the National Association of Chain Drug Stores ("NACDS"), and socialized with competitors at these events.

84.     CW2 further stated that Rogerson micromanaged the pricing system and ensured that it was kept compartmentalized.  Specifically, Rogerson and the head of marketing refused to allow CW2's direct report to have access to IMS pricing data for Allergan and its competitors.[10]

---

[10]     IMS pricing data contains the average monthly price by manufacturer for a given generic drug.

85.     The generics management team of Boyer, Falkin and Rogerson reported to Olafsson, as President of Actavis Pharma, the Allergan segment that included the Company's generics business.  Olafsson in turn reported to CEO Bisaro.  When Olafsson left the Company, Boyer, Falkin and Rogerson began reporting to Buchen, who reported to Bisaro and then Saunders when Bisaro departed in July 2014.

### (a)     The Generic Pharmaceutical Association

86.     The Association for Accessible Medicines (formerly known as the Generic Pharmaceutical Association) ("GPhA") is, according to its website, "the national leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry."   The GPhA was formed in 2001 following the merger of three industry trade organizations:   the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance.

87.     In describing its members, the GPhA's website states: "GPhA member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year. Our membership includes the world's largest generic finished dose manufacturers and active pharmaceutical ingredient suppliers."  The GPhA's website further states: "By becoming part of GPhA, you can participate in shaping the policies that govern the generic industry and help secure the future of this vital pharmaceutical market segment.  In addition, GPhA provides valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."

88.     Senior executives and corporate officers from Allergan and the Co-Conspirators served on the GPhA's Board of Directors before the Class Period.  For example, the 2012 Board of Directors included Tony Mauro, President of Mylan North America; Douglas Boothe

("Boothe"), CEO of Actavis; and Jeffrey Glazer, CEO of Heritage. The 2013 Board of Directors included Tony Mauro, President of Mylan North America; Jeffrey Glazer, President and CEO of Heritage; and Charlie Mayr, Chief Communications Officer at Actavis.

89.    Representatives from Allergan and the Co-Conspirators regularly attended GPhA meetings before and during the Class Period, including the following meetings:

- October 1-3, 2012 GPhA 2012 Fall Technical Conference in Bethesda, Maryland, attended by representatives from Allergan, Heritage, Impax, Lannett, Mylan, Perrigo, Sun[11] and Taro.

- February 20-22, 2013 GPhA 2013 Annual Meeting in Orlando, Florida, attended by representatives from Allergan (including Olafsson), Heritage, Impax, Mylan, Perrigo, Taro, and URL.

- June 4-5, 2013 GPhA 2013 CMC Workshop in Bethesda, Maryland, attended by representatives from Allergan, Heritage, Impax, Lannett, Mylan, Perrigo, Sun, and Taro.

- October 28-30, 2013 GPhA 2013 Fall Technical Conference in Bethesda, Maryland, attended by representatives from Allergan, Heritage, Impax, Lannett, Mylan, Perrigo, Sun, and Taro.

- December 9-11, 2013 16th Annual IGPA Conference in Brussels, Belgium, attended by representatives from Allergan, Hikma[12], and Mylan.

- February 19-21, 2014 GPhA 2014 Annual Meeting in Orlando, Florida, attended by representatives from Allergan, Epic, Heritage, Impax, Mylan, Perrigo, Sun, and Taro.

- June 3-4, 2014 GPhA 2014 CMC Workshop in Bethesda, Maryland, attended by representatives from Allergan, Heritage, Impax, Lannett, Mylan, Perrigo, Sun, and Taro.

- October 27-29, 2014 GPhA 2014 Fall Technical Conference in Bethesda, Maryland, attended by representatives from Allergan, Heritage, Lannett, Mylan, Perrigo, Sun, Taro, and West-Ward.

---

[11]    Sun purchased URL from Takeda in 2012, and Mutual Pharma is a subsidiary of URL.

[12]    Hikma Pharmaceuticals PLC is the parent company of West-Ward.

- November 19-21 2014, 17th Annual IGPA Conference in Miami, Florida, attended by representatives from Allergan (including Buchen), Hikma, and Mylan.

- February 9-11, 2015 GPhA 2015 Annual Meeting in Miami Beach, Florida, attended by representatives from Allergan, Epic, Heritage, Mylan, Perrigo, Taro, and West-Ward.

- June 9-10, 2015 GPhA 2015 CMC Workshop in Bethesda, Maryland, attended by representatives from Allergan, Heritage, Impax, Lannett, Mylan, Perrigo, Sun, Taro, and West-Ward.

- November 2-4, 2015 GPhA 2015 Fall Technical Conference in Bethesda, Maryland, attended by representatives from Allergan, Heritage, Impax, Lannett, Mylan, Perrigo, Sun, Taro, and West-Ward.

#### (b)    The Healthcare Distribution Alliance

90.    The Healthcare Distribution Alliance ("HDA") was originally founded as the Western Wholesale Druggists' Association ("WWDA") in 1876.  The first WWDA meeting was called to "remedy the existing evils in the wholesale drug business, and enable the merchants to carry on business on a more profitable basis."  After a series of name changes, the association became known as the HDA.  As the HDA's website explains, the association "represents 34 distribution companies—national, regional, and specialty—as well as more than 145 manufacturer and more than 50 service provider/international members, respectively."  The HDA's mission "is to protect patient safety and access to medicines through safe and efficient distribution; advocate for standards, public policies and business processes that enhance the safety, efficiency and value of the healthcare supply chain; and, create and exchange industry knowledge and best practices."

91.    The HDA's website states that HDA "membership provides access to networking opportunities, research, member-developed education and resources for the healthcare supply chain."  The association's membership includes domestic and international drug distributors, drug manufacturers, service providers, and health, beauty, and wellness/consumer manufacturers.

31

92.   The HDA describes its Business and Leadership Conference ("BLC") as "the healthcare distribution industry's signature annual conference, developed by and for healthcare supply chain leaders and innovators."  The HDA further states: "Exclusive to HDA member companies, the conference brings together high-level executives, thought leaders and influential managers from across the healthcare supply chain to hold strategic business discussions on the most pressing industry issues.  This forum offers unmatched opportunities to network with your peers and trading partners at all levels of the healthcare distribution industry."  The BLC events provided Allergan and the Co-Conspirators with opportunities to meet one-on-one and engage in collusive conduct.

93.   Representatives from Allergan and the Co-Conspirators attended the BLC events set forth below, among others:

| Date | Meeting | Allergan Attendees | Co-Conspirator Attendees |
|------|---------|--------------------|--------------------------|
| June 1-4, 2014 | HDA 2014 BLC in Phoenix, AZ | Anthony Giannone (Executive Director, Sales); Marc Falkin (Sr. VP Sales, U.S. Generics) | **Mylan:** Richard Isaac (Sr. Manager, Strategic Accounts); Lance Wyatt (Director, National Accounts) |
| | | | **Heritage:** Neal O'Mara (Sr. Director, National Accounts); Anne Sather (Sr. Director, National Accounts) |
| June 7-10, 2015 | HDA 2015 BLC in San Antonio, TX | Andrew Boyer (Sr. VP, Generic Sales, Marketing, National Accounts); Marc Falkin (VP Marketing, Pricing and Contracts); Richard Rogerson (Executive Director Pricing & Business Analytics) | **Mylan:** Todd Bebout (VP NA Supply Chain Management); Janet Bell (Director, National Accounts); Richard Isaac (Sr. Manager, Strategic Accounts); Stephen Krinke (National Account Manager); Robert O'Neill (Head of Sales Generic, NA); Sean Reilly (National Account Manager); John Shane (Trade Relations); Erik Williams (VP NA Pricing & Contracts); Lance Wyatt (Director, National Accounts) |
| | | | **Heritage:** Jeffrey Glazer (CEO and Chairman); Jason Malek (Sr. VP, Commercial Operations); Neal O'Mara (Sr. Director, National Accounts); Anne Sather (Sr. Director, National Accounts); Matthew Edelson (Associate Director, National Accounts) |

(c)      The National Association of Chain Drug Stores

94.      According to its website, the NACDS states that its four strategic goals are to:  (i) "Foster an advantageous business and political environment in which NACDS chain member companies are better able to achieve their business objectives"; (ii) "Promote the role and value of chain community pharmacy as an integral component of the healthcare system, thus helping to preserve its viability"; (iii) "Provide effective channels of communication, involvement and forums for members and other stakeholders"; and (iv) "Ensure that NACDS internally operates as a cutting edge association, effectively meeting the needs of its membership."

95.      The NACDS describes the membership benefits for suppliers as including: "Access to the NACDS Annual Meeting, NACDS Regional Chain Conference and NACDS Total Store Expo"; "Online Membership Directory listing and access chain member, sales and marketing, peer, and other B2B solution contacts"; and "Popular 'Meet the Retailer' and 'Meet the Market' programming at NACDS events with preparatory webinars throughout the meeting cycle."  The NACDS lists as another benefit for supplier members, "NACDS-Nielsen Company Syndicated Data Program," which it describes as providing "syndicated data to help those members gain a better understanding of the competitive marketplace and to position their products accordingly."

96.      The NACDS holds several events including an Annual Meeting and Total Store Expo.   The NACDS describes its Annual Meeting as association's "signature event," highlighting, "the results . . . relationships . . . [and] member service."   According to the NACDS's website, "[p]articipants at the Annual Meeting include Retail Chairmen, CEOs, Presidents, and Senior Vice Presidents of Marketing, Merchandising, Operations, and Pharmacy and their executive-level counterparts and decision makers from supplier companies."   In

addition, the NACDS represents that the "Annual Meeting provides numerous opportunities to meet and discuss strategic issues with key trading partners."

97.     The NACDS describes its Total Store Expo as "the industry's largest gathering of its most influential leaders."  The NACDS further states: "It is a combination of both strategic and tactical business meetings between existing and new trading partners and is attended by industry decision makers. It will give you and your company a unique opportunity to gain new insights into today's evolving marketplace and set your course for the future."

98.     The NACDS describes the Foundation Dinner as "a premier event that brings together the NACDS Board of Directors and senior executives of NACDS Chain and Associate Members, as well as many friends."

99.     Before and during the Class Period, representatives from Allergan and the Co-Conspirators attended the NACDS events, which provided opportunities for these representatives to meet in-person, in furtherance of the collusive conduct alleged herein.  Representatives from Allergan and the Co-Conspirators attended the NACDS events set forth below, among others:

| Date | Meeting | Allergan Attendees | Co-Conspirator Attendees |
|---|---|---|---|
| April 20-23, 2013 | NACDS 2013 Annual Meeting in Palm Beach, FL | Paul Bisaro (Board Member); Andrew Boyer (Sr. VP, Generic Sales, Marketing, National Accounts); Michael Reed (Executive Director of Trade Relations); Michael Baker (Executive VP of Trade Sales and Development); Paul Reed (Sr. Director of Trade Sales and Development); Robert Stewart (Chief | **Mylan:** Joe Duda (President); Tony Mauro (Chief Commercial Officer); Robert Potter (Sr. VP of North America National Accounts and Channel Development); Jeffrey May (VP of North America Product Strategy); Jim Nesta (VP of Sales) |

| Date | Meeting | Allergan Attendees | Co-Conspirator Attendees |
|---|---|---|---|
| | | Operating Officer) | |
| August 10-13, 2013 | NACDS 2013 Total Store Expo in Las Vegas, NV | Andrew Boyer (Sr. VP, Generic Sales, Marketing, National Accounts); Marc Falkin (VP Marketing, Pricing and Contracts); Richard Rogerson (Executive Director, Pricing & Business Analytics) | **Mylan:** Mike Aigner (Director National Accounts); Kevin McElfresh (Executive Director National Accounts) Joe Duda (President); Robert Potter (Sr. VP North America National Accounts and Channel Development); Rob O'Neill (Head of Sales); Lance Wyatt (Director National Accounts) |
| | | | **Heritage:** Jeffrey Glazer (CEO and Chairman); Matthew Edelson (Sr. Director of Sales); Jason Malek (Sr. VP, Commercial Operations); Gina Gramuglia (Commercial Operations); Neal O'Mara (Sr. Director, National Accounts); Anne Sather (Sr. Director, National Accounts) |
| December 3, 2013 | NACDS 2013 NYC Week and Annual Foundation Dinner in New York, NY | Andrew Boyer (Sr. VP, Generic Sales, Marketing, National Accounts); Marc Falkin (VP Marketing, Pricing and Contracts) | **Mylan:** Joe Duda (President); Tony Mauro (Chief Operating Officer); Robert Potter (Sr. VP of North America National Accounts and Channel Development); Rob O'Neill (Head of Sales) |
| April 26-29, 2014 | NACDS 2014 Annual Meeting in Scottsdale, AZ | Andrew Boyer (Sr. VP, Generic Sales, Marketing, National Accounts); Marc Falkin (VP Marketing, Pricing and Contracts) | **Mylan:** Joe Duda (President); Tony Mauro (President); Robert Potter (Sr. VP of North America National Accounts and Channel Development); Rob O'Neill (Head of Sales) |
| | | | **Heritage:** Jeffrey Glazer (CEO and Chairman) |
| August 23-26, 2014 | NACDS 2014 Total Store Expo in Boston, MA | Andrew Boyer (Sr. VP, Generic Sales, Marketing, National Accounts); Marc Falkin (VP Marketing, Pricing and Contracts); Richard Rogerson (Executive Director of Pricing & Business Analytics) | **Mylan:** Joe Duda (President); Tony Mauro (President); Robert Potter (Sr. VP of North America National Accounts and Channel Manager); Mike Aigner (Director, National Accounts); Kevin McElfresh (Executive Director, National Accounts); Gary Tighe (Director, National Accounts); Lance Wyatt (Director, National Accounts) |
| | | | **Heritage:** Jeffrey Glazer (CEO and Chairman); Jason Malek (Sr. VP, Commercial Operations); Heather Beem (National |

| Date | Meeting | Allergan Attendees | Co-Conspirator Attendees |
|---|---|---|---|
| | | | Account Manager, Institutional); Katie Brodowski (Associate Director Institutional Sales); Matthew Edelson (Senior Director of Sales); Gina Gramuglia (Commercial Operations); Neal O'Mara (Sr. Director, National Accounts); Anne Sather (Sr. Director, National Accounts) |
| December 3, 2014 | NACDS 2014 NYC Week and Annual Foundation Dinner in New York, NY | Brent Saunders (President, CEO and Chairman); Andrew Boyer (Sr. VP, Generic Sales, Marketing, National Accounts); Marc Falkin (VP Marketing, Pricing and Contracts) | **Mylan:** Mike Aigner (Director National Accounts); Tony Mauro (Chief Operating Officer); Robert Potter (Sr. VP of North America National Accounts and Channel Development) |
| April 25-28, 2015 | NACDS 2015 Annual Meeting in Palm Beach, FL | Andrew Boyer (Sr. VP, Generic Sales, Marketing, National Accounts); Marc Falkin (VP Marketing, Pricing and Contracts) | **Mylan:** Tony Mauro (President); Robert Potter (Sr. VP of North America National Accounts); Rob O'Neill (Head of Sales); Gary Tighe (Director National Accounts) |
| August 22-25, 2015 | NACDS 2015 Total Store Expo in Denver, CO | Andrew Boyer (Sr. VP, Generic Sales, Marketing, National Accounts); Marc Falkin (VP Marketing, Pricing and Contracts); Richard Rogerson (Executive Director Pricing & Business Analytics) | **Mylan:** Mike Aigner (Director National Accounts); Tony Mauro (President); Robert Potter (Sr. VP of North America National Accounts); Kevin McElfresh (Executive Director, National Accounts); Robert O'Neill (Head of Sales) |
| | | | **Heritage:** Jeffrey Glazer (CEO and Chairman); Jason Malek (Sr. VP, Commercial Operations); Neal O'Mara (Sr. Director, National Accounts); Anne Sather (Sr. Director, National Accounts); Matthew Edelson (Sr. Director of Sales); Gina Gramuglia (Commercial Operations) |

100.    In addition, representatives from Allergan and the Co-Conspirators also attended

the NACDS 2016 Total Store Expo on August 19-22, 2016 in San Diego, California.

(d)     **Informal Events and Meeting Also Facilitated Allergan's Price-Fixing Schemes**

101.    In addition to the conferences and other events sponsored by pharmaceutical trade associations, representatives from Allergan and the Co-Conspirators were also able to participate in informal face-to-face meetings in furtherance of their price-fixing schemes.  In fact, senior executives from these drugmakers periodically got together for "industry dinners."

D.     **Propranolol**

102.    Discovered in the 1960s, Propranolol is a beta blocker used to treat high blood pressure and certain types of irregular heart rates and to prevent migraines as well as further heart problems in individuals who suffered a previous heart attack or have angina.  Beta blockers work by blocking the effects of epinephrine, causing a patient's heart to beat slower and with less force, thereby reducing blood pressure.  Propranolol is included as a preventative anti-migraine medicine on the Core List within the World Health Organization's ("WHO") Model List of Essential Medicines—a list "of minimum medicine needs for a basic health-care system, listing the most efficacious, safe, and cost-effective medicines for priority conditions."

1.     **The Co-Conspirators' Price Hikes**

103.    Allergan and the Co-Conspirators engaged in anti-competitive conduct by colluding to improperly raise and maintain the prices of Propranolol, beginning in late 2014 and into 2015.  For example, as demonstrated by the charts and graphs below, Allergan, Heritage, Impax, and Mylan raised the price of generic Propranolol HCL 10mg, 20mg, and 80mg tablets by as much as *1,200%* between December 2014 and December 2015.

104.    The graph below shows the average monthly price per unit of Propranolol HCL 10mg tablets manufactured by Allergan, Heritage, Impax, and Mylan from December 2010 to November 2016:



105.   The table below shows the average monthly price per unit of Propranolol HCL 10mg tablets manufactured by Actavis, Heritage, Impax, and Mylan between December 2014 and November 2015:

**Propranolol HCL 10mg Tablets**

|  | Dec. 2014 | Jan. 2015 | Feb. 2015 | March 2015 | April 2015 | May 2015 | June 2015 | July 2015 | Aug. 2015 | Sept. 2015 | Oct. 2015 | Nov. 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ACTAVIS | $0.013 | $0.017 | $0.038 | $0.062 | **$0.061** | **$0.092** | **$0.110** | **$0.150** | **$0.169** | **$0.168** | **$0.171** | $0.172 |
| HERITAGE | $0.019 | $0.022 | $0.038 | $0.057 | **$0.039** | **$0.037** | **$0.111** | **$0.025** | **$0.022** | **$0.045** | **$0.027** | $0.027 |
| IMPAX | $0.020 | $0.027 | $0.135 | $0.160 | **$0.200** | **$0.147** | **$0.144** | **$0.128** | **$0.190** | **$0.193** | **$0.197** | $0.201 |
| MYLAN | $0.021 | $0.030 | $0.031 | $0.032 | **$0.033** | **$0.032** | **$0.039** | **$0.064** | **$0.131** | **$0.125** | **$0.147** | $0.147 |

106.     This drastic increase in the price of Propranolol HCL 10mg tablets occurred

shortly after and/or in conjunction with the following trade association meetings:

- GPhA 2015 Annual Meeting in February 2015 attended by representatives from Allergan, Heritage, Mylan, and other Co-Conspirators (¶ 89);

- NACDS 2015 Annual Meeting in April 2015 attended by representatives from Allergan (including Boyer and Falkin) and representatives from Mylan, along with representatives from other Co-Conspirators (¶¶ 99-100);

- GPhA 2015 CMC Workshop in June 2015 attended by representatives from Allergan, Heritage, Impax, Mylan, and other Co-Conspirators (¶ 89);

- HDA 2015 BLC in June 2015 attended by representatives from Allergan (including Boyer, Falkin, and Rogerson) and representatives from Mylan and Heritage, along with representatives from other Co-Conspirators (¶ 93); and

- NACDS 2015 Total Store Expo in August 2015 attended by representatives from Allergan (including Boyer, Falkin, and Rogerson) and representatives from Mylan and Heritage, along with representatives from other Co-Conspirators (¶¶ 99-100).

107.     The graph below shows the average monthly price per unit of Propranolol HCL

20mg tablets manufactured by Allergan, Heritage, Impax, and Mylan from December 2010 to

November 2016:



108.    The table below shows the average monthly price per unit of Propranolol HCL 20mg tablets manufactured by Actavis, Heritage, Impax, and Mylan between December 2014 and November 2015:

**Propranolol HCL 20mg Tablets**

| | Dec. 2014 | Jan. 2015 | Feb. 2015 | March 2015 | April 2015 | May 2015 | June 2015 | July 2015 | Aug. 2015 | Sept. 2015 | Oct. 2015 | Nov. 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ACTAVIS | $0.015 | $0.020 | **$0.055** | **$0.094** | **$0.082** | **$0.134** | **$0.145** | **$0.194** | **$0.233** | **$0.232** | **$0.235** | $0.232 |
| HERITAGE | $0.021 | $0.024 | **$0.046** | **$0.100** | **$0.041** | **$0.124** | **$0.185** | **$0.050** | **$0.028** | **$0.025** | **$0.031** | $0.026 |
| IMPAX | $0.025 | $0.032 | **$0.191** | **$0.198** | **$0.201** | **$0.194** | **$0.203** | **$0.195** | **$0.226** | **$0.259** | **$0.266** | $0.263 |
| MYLAN | $0.038 | $0.038 | **$0.036** | **$0.038** | **$0.037** | **$0.038** | **$0.038** | **$0.062** | **$0.173** | **$0.175** | **$0.186** | $0.239 |

109.   This drastic increase in the price of Propranolol HCL 20mg tablets occurred shortly after and/or in conjunction with the following trade association meetings:

- GPhA 2015 Annual Meeting in February 2015 attended by representatives from Allergan, Heritage, Mylan, and other Co-Conspirators (¶ 89);

- NACDS 2015 Annual Meeting in April 2015 attended by representatives from Allergan (including Boyer and Falkin) and representatives from Mylan, along with representatives from other Co-Conspirators (¶¶ 99-100);

- GPhA 2015 CMC Workshop in June 2015 attended by representatives from Allergan, Heritage, Impax, Mylan, and other Co-Conspirators (¶ 89);

- HDA 2015 BLC in June 2015 attended by representatives from Allergan (including Boyer, Falkin, and Rogerson) and representatives from Mylan and Heritage, along with representatives from other Co-Conspirators (¶ 93); and

- NACDS 2015 Total Store Expo in August 2015 attended by representatives from Allergan (including Boyer, Falkin, and Rogerson) and representatives from Mylan and Heritage, along with representatives from other Co-Conspirators (¶¶ 99-100).

110.   The graph below shows the average monthly price per unit of Propranolol HCL 80mg tablets manufactured by Allergan, Heritage, Impax, and Mylan from December 2010 to November 2016:



111.    The table below shows the average monthly price per unit of Propranolol HCL

80mg tablets manufactured by Actavis, Heritage, Impax, and Mylan between December 2014

and November 2015:

**Propranolol HCL 80mg Tablets**

|          | Dec. 2014 | Jan. 2015 | Feb. 2015 | March 2015 | April 2015 | May 2015 | June 2015 | July 2015 | Aug. 2015 | Sept. 2015 | Oct. 2015 | Nov. 2015 |
|----------|-----------|-----------|-----------|------------|------------|----------|-----------|-----------|-----------|------------|-----------|-----------|
| ACTAVIS  | $0.025    | $0.036    | $0.089    | $0.159     | $0.170     | $0.295   | $0.223    | $0.354    | $0.455    | $0.455     | $0.457    | $0.465    |
| HERITAGE | $0.040    | $0.047    | $0.100    | $0.121     | $0.057     | $0.098   | $0.101    | $0.044    | $0.041    | $0.026     | $0.018    | $0.039    |
| IMPAX    | $0.046    | $0.054    | $0.307    | $0.346     | $0.340     | $0.401   | $0.431    | $0.393    | $0.453    | $0.508     | $0.501    | $0.507    |
| MYLAN    | $0.055    | $0.057    | $0.058    | $0.056     | $0.058     | $0.061   | $0.054    | $0.069    | $0.385    | $0.379     | $0.454    | $0.436    |

42

112.    This drastic increase in the price of Propranolol HCL 80mg tablets occurred shortly after and/or in conjunction with the following trade association meetings:

- GPhA 2015 Annual Meeting in February 2015 attended by representatives from Allergan, Heritage, Mylan, and other Co-Conspirators (¶ 89);

- NACDS 2015 Annual Meeting in April 2015 attended by representatives from Allergan (including Boyer and Falkin) and representatives from Mylan, along with representatives from other Co-Conspirators (¶¶ 99-100);

- GPhA 2015 CMC Workshop in June 2015 attended by representatives from Allergan, Heritage, Impax, Mylan, and other Co-Conspirators (¶ 89);

- HDA 2015 BLC in June 2015 attended by representatives from Allergan, (including Boyer, Falkin, and Rogerson) and representatives from Mylan and Heritage, along with representatives from other Co-Conspirators (¶ 93); and

- NACDS 2015 Total Store Expo in August 2015 attended by representatives from Allergan (including Boyer, Falkin, and Rogerson) and representatives from Mylan and Heritage, along with representatives from other Co-Conspirators (¶¶ 99-100).

### 2.    No Commercial Justification for Price Hikes

113.    There was no reasonable justification for the price hikes discussed above.  While a supply shortage can explain an abrupt rise in prices, here—notwithstanding drug manufacturers' obligation to report shortages to the FDA—no such shortage of Propranolol was reported during the relevant time period.  In addition, there was no significant increase in the demand for Propranolol or in the drug's production costs that would explain the enormous price increase.  Even if there was such a benign market explanation for the price increase, at no point following the initial spike did the price return to the pre-spike equilibrium price point.

114.    In addition, price increases of this magnitude would have been contrary to each of the Co-Conspirators' economic interest absent the price-fixing scheme.  Without the certainty that all of the Co-Conspirators would raise and maintain the prices for generic Propranolol, each Co-Conspirator risked getting undercut by the others, leading to a loss of market share and a loss

of revenue.  This risk was alleviated by the Co-Conspirators' agreement to raise and maintain their prices for generic Propranolol.

>       3.      **The Markets for Generic Propranolol HCL 10mg, 20mg, and 80mg Tablets Were Susceptible to Anti-Competitive Conduct**

>               **(a)      Market Concentration**

115.    In 2014 and 2015, the markets for generic Propranolol HCL 10mg, 20mg, and 80mg tablets were highly concentrated, as demonstrated by the HHI calculations below:

|                                | **2014 HHI** | **2015 HHI** |
|--------------------------------|:------------:|:------------:|
| **Propranolol HCL 10mg tablets** | 2,444 | 2,786 |
| **Propranolol HCL 20mg tablets** | 2,506 | 3,034 |
| **Propranolol HCL 80mg tablets** | 2,514 | 2,684 |

116.    During this period, Allergan and Co-Conspirators Heritage, Impax, and Mylan combined to account for more than 75% of the total markets for generic Propranolol HCL 10mg, 20mg, and 80mg tablets, as shown in the charts below:













**(b)     Barriers to Entry**

117.     As mentioned above, the barriers to entry into the markets for generic Propranolol 10mg, 20mg, and 80mg tablets included high manufacturing costs as well as certain regulatory and intellectual property barriers.  For example, the requirement that generic drug companies file an ANDA and receive FDA approval can delay entry into the market by an average of thirty-six months.

**(c)     Lack of Substitutes**

118.     As discussed above, pharmacists presented with a prescription for a given drug can only substitute another drug if that drug has an "AB" rating.  Only generic Propranolol and brand-name Propranolol for a given dosage are AB-rated to one another.   Therefore, a pharmacist can only fill a prescription for Propranolol with the brand-name version or one of the AB-rated generic versions and cannot substitute another drug.

**(d)     High Degree of Interchangeability**

119.     As mentioned above, all generic versions of any given brand-name drug are necessarily interchangeable.  Generic Propranolol is no exception.  The FDA approved versions of generic Propranolol 10mg, 20mg, and 80mg tablets manufactured by the Co-Conspirators Allergan, Heritage, Impax, and Mylan each has an "AB" rating.   Thus, pharmacists are able to substitute one manufacturer's generic version of Propranolol for another.

**(e)     Absence of Competitive Sellers**

120.     In the case of generic Propranolol HCL 10mg, 20mg, and 80mg tablets, there was no realistic threat that the other market participants, who collectively contributed only 18.2%, 15.7%, and 16.3%, respectively, of the total generic sales for Propranolol HCL 10mg, 20mg, and 80mg tablets in 2014 and 9.3%, 7.5%, and 8.9%, respectively, of the total generic sales for Propranolol HCL 10mg, 20mg, and 80mg tablets in 2015, would take market share from

Allergan and Co-Conspirators Heritage, Impax, and Mylan.  The dominance of Allergan and the Co-Conspirators facilitated their ability to raise prices without losing market share to the non-conspirators.  Moreover, following the dramatic price increases in early to mid-2015, discussed above, neither Allergan nor the Co-Conspirators were willing to meaningfully undercut prices to gain market share, thereby further demonstrating the absence of a competitive market.

      **E.**     **Ursodiol**

     121.    Ursodiol, or ursodeoxycholic acid, is a bile acid used to treat gallbladder stones and is usually prescribed to patients with small gallstones who cannot undergo gallbladder surgery.  The drug decreases the amount of cholesterol produced by the liver and absorbed by the intestines and helps to break down cholesterol that has formed into gallstones.  Generic versions of Ursodiol in capsule form have been on the market since 2000.  Allergan listed Ursodiol as a "key product" in the Company's 2014 Form 10-K.

      **1.**     **The Co-Conspirators' Price Hikes**

     122.    Allergan and the Co-Conspirators engaged in anti-competitive conduct by colluding to improperly raise and maintain the prices of Ursodiol, beginning in mid-2014.  For example, as demonstrated by the graph and table below, Allergan and Co-Conspirators Epic and Lannett raised the prices of Ursodiol 300mg capsules by as much as *2,000%*.

     123.    The graph below shows the average monthly price per unit of Ursodiol 300mg capsules manufactured by Allergan, Epic, and Lannett between December 2010 and October 2016:



124.   The table below shows the average monthly price of Ursodiol 300mg capsules manufactured by Allergan, Epic, and Lannett from January 2014 to January 2015:

**Ursodiol 300mg Capsules**

|  | Jan. 2014 | Feb. 2014 | March 2014 | April 2014 | May 2014 | June 2014 | July 2014 | Aug. 2014 | Sept. 2014 | Oct. 2014 | Nov. 2014 | Dec. 2014 | Jan. 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ACTAVIS | $0.27 | $0.26 | $0.26 | $0.26 | **$0.27** | **$0.51** | **$2.94** | **$2.53** | **$3.57** | **$3.53** | $3.42 | $3.20 | $3.15 |
| EPIC PHARMA | $0.20 | $0.20 | $0.21 | $0.19 | **$0.26** | **$2.63** | **$3.82** | **$3.91** | **$4.03** | **$4.47** | $4.27 | $4.01 | $4.29 |
| LANNETT | $0.29 | $0.30 | $0.30 | $0.32 | **$0.70** | **$1.66** | **$2.56** | **$2.92** | **$3.75** | **$4.34** | $3.60 | $3.46 | $3.78 |

125.   This drastic increase in the price of Ursodiol 300mg capsules occurred shortly after and/or in conjunction with the following trade association meetings:

- GPhA 2014 Annual Meeting in February 2014 attended by representatives from Allergan, Epic, and other Co-Conspirators (¶ 89);

- NACDS 2014 Annual Meeting in April 2014 attended by representatives from Allergan (including Boyer and Falkin) and certain Co-Conspirators (¶¶ 99-100);

- GPhA 2014 CMC Workshop in June 2014 attended by representatives from Allergan, Lannett, and other Co-Conspirators (¶ 89);

- HDA 2014 BLC in June 2014 attended by representatives from Allergan (including Falkin) and certain Co-Conspirators (¶ 93); and

- NACDS 2014 Total Store Expo in August 2014 attended by representatives from Allergan (including Boyer, Falkin, and Rogerson) and certain Co-Conspirators (¶¶ 99-100).

## 2.   No Commercial Justification for Price Hikes

126.   There was no reasonable justification for the price hikes discussed above.  While a supply shortage can explain an abrupt rise in prices, here—notwithstanding drug manufacturers' obligation to report shortages to the FDA—no such shortage of Ursodiol or ursodeoxycholic acid was reported during the relevant time period.  In addition, there was no significant increase in the demand for Ursodiol or in the drug's production costs that would explain the enormous price increase.  Even if there was such a benign market explanation for the price increase, at no point following the initial spike did the price return to the pre-spike equilibrium price point.

127.   In addition, price increases of this magnitude would have been contrary to each of the Co-Conspirators' economic interest absent the price-fixing scheme.  Without the certainty that all of the Co-Conspirators would raise and maintain the prices for generic Ursodiol, each Co-Conspirator risked getting undercut by the others, leading to a loss of market share and a loss of revenue.  This risk was alleviated by the Co-Conspirators' agreement to raise and maintain their prices for generic Ursodiol.

51

### 3.   The Market for Generic Ursodiol 300mg Capsules Was Susceptible to Anti-Competitive Conduct

#### (a)   Market Concentration

128.    In 2014, the market for generic Ursodiol 300mg capsules was highly concentrated, as demonstrated by the HHI calculation below:

|  | **2014 HHI** |
|---|---|
| **Ursodiol 300mg capsules** | 3,726 |

129.    During this period, Allergan and Co-Conspirators Epic and Lannett combined to account for more than 95% of the total market for generic Ursodiol 300mg capsules, as shown in the chart below:



**(b)      Barriers to Entry**

130.    As mentioned above, the barriers to entry into the market for generic Ursodiol

300mg capsules included high manufacturing costs as well as certain regulatory and intellectual

property barriers.  For example, the requirement that generic drug companies file an ANDA and

receive FDA approval can delay entry into the market by an average of thirty-six months.

131.    Further discouraging new entrants into the market for generic Ursodiol 300mg

capsules is the relatively small size of the worldwide market for the drug.

**(c)      Lack of Substitutes**

132.    As discussed above, pharmacists presented with a prescription for a given drug

can only substitute another drug if that drug has an "AB" rating.  Only generic Ursodiol and

brand-name Ursodiol for a given dosage are AB-rated to one another.  Therefore, a pharmacist

can only fill a prescription for Ursodiol with the brand-name version or one of the AB-rated

generic versions and cannot substitute another drug.

**(d)      High Degree of Interchangeability**

133.    As mentioned above, all generic versions of any given brand-name drug are

necessarily interchangeable.  Generic Ursodiol is no exception.  The FDA approved versions of

generic Ursodiol 300mg capsules manufactured by the Co-Conspirators Allergan, Epic, and

Lannett each has an "AB" rating.  Thus, pharmacists are able to substitute one manufacturer's

generic version of Ursodiol for another.

**(e)      Absence of Competitive Sellers**

134.    In the case of generic Ursodiol 300mg capsules, there was no realistic threat that

the other market participants, who collectively contributed only 4.3% of the total generic

Ursodiol 300mg capsule sales, would take market share from Allergan and Co-Conspirators Epic

and Lannett.  The dominance of Allergan and the co-conspirators facilitated their ability to raise

prices without losing market share to the non-conspirators.  Moreover, following the dramatic price increases in the second half of 2014, discussed above, neither Allergan nor the Co-Conspirators were willing to meaningfully undercut prices to gain market share, thereby further demonstrating the absence of a competitive market.

F.    **Doxycycline**

135.    Patented in 1957 and put into commercial use in 1967, Doxycycline is a broad-spectrum antibiotic in the tetracycline class.  Doxycycline is commonly produced in two salt forms: hyclate and monohydrate.  Doxycycline is used to treat a variety of bacterial infections, including pneumonia, acne, chlamydia, Lyme disease, cholera, and syphilis.  Doxycycline, in combination with quinine, is also used to treat malaria.  Doxycycline is included on the Core List within the WHO's Model List of Essential Medicines.  Allergan listed Doxycycline hyclate as a "key product" in the Company's 2013 and 2014 Forms 10-K.

1.    **The Co-Conspirators' Price Hikes**

136.    Allergan and the Co-Conspirators engaged in anti-competitive conduct by colluding to improperly raise and maintain the prices of Doxycycline hyclate, beginning in early 2013.  For example, as demonstrated by the graphs and tables below, Allergan, Mutual, and West-Ward raised the prices of Doxycycline hyclate 50mg and 100mg capsules and 100mg tablets by as much as *7,000%*.

137.    The graph below shows the average monthly price per unit of Doxycycline hyclate 50mg capsules manufactured by Allergan, Mutual, and West-Ward from May 2010 to May 2016:



138.  The table below shows Allergan's and the Co-Conspirators' average monthly prices for Doxycycline 50mg capsules from September 2012 to September 2013:

**Doxycycline 50mg Capsules**

|  | Sept. 2012 | Oct. 2012 | Nov. 2012 | Dec. 2012 | Jan. 2013 | Feb. 2013 | March 2013 | April 2013 | May 2013 | June 2013 | July 2013 | Aug. 2013 | Sept. 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ACTAVIS | $0.061 | $0.075 | $0.084 | $0.087 | **$0.086** | **$0.180** | **$0.795** | **$1.698** | **$1.695** | **$1.674** | $1.709 | $1.759 | $1.543 |
| MUTUAL PHARM | $0.063 | $0.061 | $0.067 | $0.084 | **$0.094** | **$0.960** | **$0.975** | **$1.104** | **$1.304** | **$1.296** | $1.404 | $1.422 | $1.410 |
| WEST-WARD | $0.062 | $0.063 | $0.059 | $0.059 | **$0.051** | **$1.143** | **$1.286** | **$1.199** | **$1.202** | **$1.258** | $1.277 | $1.302 | $1.271 |

139.    This drastic increase in the price of Doxycycline 50mg capsules occurred in conjunction with the GPhA 2013 Annual Meeting in February 2013 attended by representatives from Allergan (including Olafsson), URL (the parent company of Mutual), and other Co-Conspirators (¶ 89).

140.    The graph below shows the average monthly price per unit of Doxycycline hyclate 100mg capsules manufactured by Allergan, Mutual, and West-Ward from May 2010 to May 2016:



141.    The table below shows Allergan's and the Co-Conspirators' average monthly prices for Doxycycline 100mg capsules from September 2012 to September 2013:

**Doxycycline 100mg Capsules**

| | Sept. 2012 | Oct. 2012 | Nov. 2012 | Dec. 2012 | Jan. 2013 | Feb. 2013 | March 2013 | April 2013 | May 2013 | June 2013 | July 2013 | Aug. 2013 | Sept. 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ACTAVIS | $0.071 | $0.073 | $0.090 | **$0.115** | **$0.092** | **$2.216** | **$2.525** | **$2.575** | **$2.592** | **$2.663** | $2.660 | $2.649 | $2.814 |
| MUTUAL PHARM | $0.050 | $0.042 | $0.106 | **$0.076** | **$0.072** | **$0.436** | **$0.529** | **$1.098** | **$2.864** | **$2.770** | $3.066 | $3.080 | $3.327 |
| WEST-WARD | $0.045 | $0.051 | $0.055 | **$0.181** | **$1.004** | **$2.810** | **$3.190** | **$3.285** | **$2.785** | **$2.918** | $3.052 | $3.150 | $3.229 |

142.   This drastic increase in the price of Doxycycline 100mg capsules occurred in conjunction with the GPhA 2013 Annual Meeting in February 2013 attended by representatives from Allergan (including Olafsson), URL (the parent company of Mutual), and other Co-Conspirators (¶ 89) and the NACDS 2013 Annual Meeting in April 2013 attended by representatives from Allergan (including Bisaro and Boyer) and certain Co-Conspirators (¶¶ 99-100).

143.   The graph below shows the average monthly price per unit of Doxycycline hyclate 100mg tablets manufactured by Allergan, Mutual, and West-Ward from May 2010 to May 2016:



144. The table below shows Allergan's and the Co-Conspirators' average monthly prices for Doxycycline 100mg tablets from September 2012 to September 2013:

**Doxycycline 100mg Tablets**

|  | Sept. 2012 | Oct. 2012 | Nov. 2012 | Dec. 2012 | Jan. 2013 | Feb. 2013 | March 2013 | April 2013 | May 2013 | June 2013 | July 2013 | Aug. 2013 | Sept. 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ACTAVIS | $0.080 | $0.075 | **$0.083** | **$0.127** | **$0.115** | **$1.080** | **$2.391** | **$2.605** | **$2.732** | $2.618 | $2.629 | $2.639 | $2.646 |
| MUTUAL PHARM | $0.045 | $0.048 | **$0.063** | **$0.135** | **$0.121** | **$2.230** | **$2.600** | **$2.591** | **$3.066** | $2.992 | $3.240 | $3.477 | $3.623 |
| WEST-WARD | $0.045 | $0.044 | **$0.054** | **$0.105** | **$1.634** | **$1.541** | **$2.405** | **$2.930** | **$2.877** | $2.731 | $2.550 | $2.466 | $2.550 |

145. This drastic increase in the price of Doxycycline 100mg tablets occurred in conjunction with the GPhA 2013 Annual Meeting in February 2013 attended by representatives

58

from Allergan (including Olafsson), URL (the parent company of Mutual), and other Co-Conspirators (¶ 89) and the NACDS 2013 Annual Meeting in April 2013 attended by representatives from Allergan (including Bisaro and Boyer) and certain Co-Conspirators (¶¶ 99-100).

### 2.    No Commercial Justification for Price Hikes

146.    There were no reported shortages of Doxycycline that justified the drastic price increases discussed above.  While the FDA did report a shortage of Doxycycline in January 2013, this shortage cannot explain the significant price increases set forth in ¶¶ 137, 140, and 143, because among other reasons, the Doxycycline prices did not return to the pre-shortage levels following the resolution of the shortage in October 2013.    Indeed, Allergan's prices immediately before the shortage were $0.087, $0.115, and $0.127, respectively, for the 50mg capsule, 100mg capsule, and 100mg tablet formulations and never returned to these levels after October 2013, as shown in the above graphs.  There were also no significant increases in the demand for these three formulations that would explain the enormous price increases.

147.    In addition, price increases of this magnitude would have been contrary to each of the Co-Conspirators' economic interest absent the price-fixing scheme.  Without the certainty that all of the Co-Conspirators would raise and maintain the prices for generic Doxycycline, each Co-Conspirator risked getting undercut by the others, leading to a loss of market share and a loss of revenue.  This risk was alleviated by the Co-Conspirators' agreement to raise and maintain their prices for generic Doxycycline.

3. **The Markets for Generic Doxycycline 50mg and 100mg Capsules and 100mg Tablets Were Susceptible to Anti-Competitive Conduct**

(a) **Market Concentration**

148.    In 2013, the markets for generic Doxycycline 50mg and 100mg capsules and 100mg tablets were highly concentrated, as demonstrated by the HHI calculations below:

|  | **2013 HHI** |
|---|---|
| **Doxycycline 50mg capsules** | 3,665 |
| **Doxycycline 100mg capsules** | 3,540 |
| **Doxycycline 100mg tablets** | 3,279 |

149.    During this period, Allergan and Co-Conspirators Mutual and West-Ward combined to account for more than 95% of the total markets for generic Doxycycline 50mg and 100mg capsules and 100mg tablets, as shown in the charts below:







(b)     **Barriers to Entry**

150.    As mentioned above, the barriers to entry into the markets for generic Doxycycline 50mg and 100mg capsules and 100mg tablets included high manufacturing costs as well as certain regulatory and intellectual property barriers.  For example, the requirement that generic drug companies file an ANDA and receive FDA approval can delay entry into the markets for generic Doxycycline by an average of thirty-six months.

(c)     **Lack of Substitutes**

151.    As discussed above, pharmacists presented with a prescription for a given drug can only substitute another drug if that drug has an "AB" rating.  Only generic Doxycycline and brand-name Doxycycline for a given dosage are AB-rated to one another.  Therefore, a pharmacist can only fill a prescription for Doxycycline with the brand-name version or one of the AB-rated generic versions and cannot substitute another drug.

62

### (d)  High Degree of Interchangeability

152.    As mentioned above, all generic versions of any given brand-name drug are necessarily interchangeable.  Generic Doxycycline hyclate is no exception.  The FDA approved versions of generic Doxycycline hyclate in 50mg and 100mg capsules and 100mg tablets manufactured by the Co-Conspirators Allergan, Mutual, and West-Ward each has an "AB" rating.    Thus, pharmacists are able to substitute one manufacturer's generic version of Doxycycline hyclate for another.

### (e)  Absence of Competitive Sellers

153.    In the case of generic Doxycycline hyclate 50mg and 100mg capsules and 100mg tablets, there was no realistic threat that the other market participants, who collectively contributed only 0%, 1.2%, and 4.1%, respectively of the total generic sales for Doxycycline hyclate 50mg and 100mg capsules and 100mg tablets, would take market share from Allergan and Co-Conspirators Mutual and West-Ward.   The dominance of Allergan and the Co-Conspirators facilitated their ability to raise prices without losing market share to the non-conspirators.  Moreover, following the dramatic price increases in early 2013, discussed above, neither Allergan nor the Co-Conspirators were willing to meaningfully undercut prices to gain market share, thereby further demonstrating the absence of a competitive market.

### G.  Desonide

154.    Desonide is a mild topical corticosteroid produced in cream, gel, and ointment form.  Desonide is used to treat a variety of skin conditions, including eczema, seborrheic and contact dermatitis, allergies, and psoriasis, and works by reducing the swelling, itching, and redness that accompanies these conditions.  Allergan listed Desonide cream as a "key product" in the Company's 2013 and 2014 Forms 10-K.

### 1. The Co-Conspirators' Price Hikes

155.     Allergan and the Co-Conspirators engaged in anti-competitive conduct by colluding to improperly raise and/or maintain the prices of Desonide, beginning in mid-2013. For example, as demonstrated by the chart and graph below, Taro and Perrigo raised the price of a 15gm tube of Desonide 0.05% cream by as much as ***470%*** between March and September of 2013.   When Allergan entered the market for this drug in September 2013, it joined the conspiracy and offered its version of the drug at the inflated price established by Co-Conspirators Taro and Perrigo.

156.     The graph below shows the average monthly price per 15gm tube of Desonide 0.05% cream manufactured by Taro, Perrigo, and Allergan between December 2010 and December 2016:



157.    The table below shows the average monthly price of a 15gm tube of Desonide

0.05% cream manufactured by Taro, Perrigo, and Allergan from March 2013 to January 2014:

**Desonide 0.05% Cream 15gm**

|  | March 2013 | April 2013 | May 2013 | June 2013 | July 2013 | Aug. 2013 | Sept. 2013 | Oct. 2013 | Nov. 2013 | Dec. 2013 | Jan. 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ACTAVIS |  |  |  |  |  |  | 3.723 | 3.683 | 3.543 | 3.532 | 3.513 |
| PERRIGO | $0.591 | $0.581 | $0.869 | $1.428 | $2.830 | $3.225 | $2.733 | $2.585 | $2.640 | $2.551 | $2.440 |
| TARO PHARM | $0.693 | $0.708 | $2.790 | $3.304 | $3.648 | $3.765 | $3.968 | $3.947 | $3.809 | $3.763 | $3.766 |

158.    This drastic increase in the price of 15gm tubes of generic Desonide 0.05% cream

and Allergan's entrance into the market at an inflated price occurred shortly after the GPhA 2013

Annual Meeting in February 2013 attended by representatives from Allergan (including Olafsson), Perrigo, Taro, and other Co-Conspirators (¶ 89), the NACDS 2013 Annual Meeting in April 2013 attended by representatives from Allergan (including Bisaro and Boyer), and certain Co-Conspirators (¶¶ 99-100), and the GPhA 2013 CMC Workshop in June 2013, attended by representatives from Allergan, Perrigo, Taro, and other Co-Conspirators (¶ 89).

## 2.   No Commercial Justification for Price Hikes

159.   There was no reasonable justification for the price hikes discussed above.  While a supply shortage can explain an abrupt rise in prices, here—notwithstanding drug manufacturers' obligation to report shortages to the FDA—no such shortage of Desonide was reported during the relevant time period.  In addition, there was no significant increase in the demand for Desonide or in the drug's production costs that would explain the enormous price increase.  Even if there was such a benign market explanation for the price increase, at no point following the initial spike did the price return to the pre-spike equilibrium price point.

160.   In addition, price increases of this magnitude would have been contrary to each of the Co-Conspirators' economic interest absent the price-fixing scheme.  Without the certainty that all of the Co-Conspirators would raise and maintain the prices for generic Desonide, each Co-Conspirator risked getting undercut by the others, leading to a loss of market share and a loss of revenue.  This risk was alleviated by the Co-Conspirators' agreement to raise and maintain their prices for generic Desonide.

## 3.   The Market for 15gm Tubes of Generic Desonide 0.05% Cream Was Susceptible to Anti-Competitive Conduct

### (a)   Market Concentration

161.   In 2013 and 2014, the market for 15gm tubes of generic Desonide 0.05% cream was highly concentrated, as demonstrated by the HHI calculation below:

|  | **2013 HHI** | **2014 HHI** |
|---|---|---|
| **Desonide 0.05% 15gm tube** | 5,317 | 4,731 |

162.    During this period, Allergan and Co-Conspirators Taro and Perrigo combined to account for 100% of the total market for 15gm tubes of generic Desonide 0.05% cream, as shown in the charts below:





**(b)    Barriers to Entry**

163.    As mentioned above, the barriers to entry into the market for 15gm tubes of generic Desonide 0.05% cream included high manufacturing costs as well as certain regulatory and intellectual property barriers.  For example, the requirement that generic drug companies file an ANDA and receive FDA approval can delay entry into the market by an average of thirty-six months.

**(c)    Lack of Substitutes**

164.    As discussed above, pharmacists presented with a prescription for a given drug can only substitute another drug if that drug has an "AB" rating.  Only generic Desonide and brand-name Desonide for a given dosage are AB-rated to one another.  Therefore, a pharmacist can only fill a prescription for Desonide with the brand-name version or one of the AB-rated generic versions and cannot substitute another drug.

### (d)    High Degree of Interchangeability

165.    As mentioned above, all generic versions of any given brand-name drug are necessarily interchangeable.  Generic Desonide is no exception.  The FDA approved versions of generic Desonide 0.05% in 15gm tubes manufactured by the Co-Conspirators Allergan, Perrigo, and Taro each has an "AB" rating.   Thus, pharmacists are able to substitute one manufacturer's generic version of Desonide for another.

### (e)    Absence of Competitive Sellers

166.    In the case of 15gm tubes of generic Desonide 0.05% cream, there were no other market participants who could take market share from Allergan and Co-Conspirators Taro and Perrigo.  The complete dominance of Allergan and the co-conspirators facilitated their ability to raise prices without losing market share to the non-conspirators.   Moreover, following the dramatic price increases in mid-2013, discussed above, neither Allergan nor the Co-Conspirators were willing to meaningfully undercut prices to gain market share, thereby further demonstrating the absence of a competitive market.

### H.    Government Investigations into Allergan's Anti-Competitive Conduct

167.    As discussed above, on October 2, 2014, U.S. Senator Bernie Sanders and U.S. Representative Elijah Cummings launched an investigation into "soaring generic drug prices," according to a press release.  Sen. Sanders and Rep. Cummings sent out letters to various generic pharmaceutical manufacturers, including Allergan (then Actavis).

168.    As part of the letter to Allergan, Sen. Sanders and Rep. Cummings asked Defendant Saunders to provide the following information:

> In order to evaluate the underlying causes of recent increases in the price of your company's drug, we request that you provide the following documents and information for the time period covering January 1, 2012, to the present:
>
> 1. total gross revenues from the company's sales of this drug;

69

2. the dates, quantities, purchasers, and prices paid for all sales of this drug;

3. total expenses relating to the sales of this drug, as well as the specific amounts for manufacturing, marketing and advertising, and purchases of active pharmaceutical ingredients, if applicable;

4. sales contracts or purchase agreements for active pharmaceutical ingredients for this drug, including any agreements relating to exclusivity, if applicable;

5. a description and valuation of the specific financial and non-financial factors that contributed to your company's decisions to increase the price of this drug;

6. any cost estimates, profit projections, or other analyses relating to the company's current and future sales of this drug;

7. price of this drug in all foreign countries or markets, including price information for the countries paying the highest and lowest price; and

8. the identity of company official(s) responsible for setting the price of the drug over the above time period.

169. One month later, the DOJ convened a grand jury in the United States District Court for the Eastern District of Pennsylvania. One of Allergan's Co-Conspirators, Lannett, reported on November 3, 2014 that its Senior Vice President of Sales and Marketing had received a subpoena from the DOJ in connection with the federal investigation of the generic pharmaceutical industry and requesting information on Lannett's generic drug pricing and communications with competitors. On December 5, Lannett itself received a subpoena requesting similar information. Lannett was the first of at least ten other generic drug manufacturers to receive DOJ subpoenas in connection with the investigation, including Allergan and Co-Conspirators Heritage, Impax, and Mylan—companies which, as shown above (¶¶ 104, 107, 110), also raised the prices of some of their generics at or close to the same time as Allergan's price increases. On August 6, 2015, Allergan disclosed for the first time that its

Actavis generic drug unit had received a DOJ subpoena in June 2015.  In response to the news, *Bloomberg* noted that Allergan was "the biggest company yet to draw scrutiny in the government's widening antitrust probe of the [generic pharmaceutical] industry."

170.    The fact that the DOJ sent a subpoena to Allergan *after* sending subpoenas to its competitors strongly suggests that evidence learned through those prior subpoenas led the DOJ to believe that Allergan was also engaged in improper pricing.  Moreover, the DOJ has filed motions to intervene in at least six civil antitrust actions alleging price-fixing in violation of the Sherman Act against Allergan and/or the Actavis generic drug unit sold to Teva in August 2016, including one case in which the district court has already denied the defendants' motion to dismiss (*FWK Holdings, LLC v. Actavis Elizabeth, LLC, et al.*, 1:16-cv-09901-JSR (S.D.N.Y.), ECF No. 134).  In these cases, the plaintiffs have requested that the various generic drug company-defendants produce all documents produced to the DOJ in the criminal investigation. In the DOJ's motion to intervene in the *FWK Holdings* action alleging price-fixing of Propranolol (ECF No. 72), the DOJ explained that the "action presents a risk to the United States' interest in ensuring the integrity of its ongoing criminal investigation" because, among other reasons, "its ongoing criminal antitrust investigation shares common questions of law and fact with the civil claims" and because the plaintiffs have sought the same documents produced to the federal prosecutors.  The DOJ's intervention in these civil actions implicating Allergan's price-fixing activities is a powerful indication that the allegations of price-fixing are supported (at least in part) by documents and other information provided to the DOJ in its investigation.

171.    The DOJ filed the first criminal charges in connection with its investigation on December 12 and 13, 2016 against Jason T. Malek and Jeffrey A. Glazer of Heritage in the United States District Court for the Eastern District of Pennsylvania.  Malek was Heritage's

President and Glazer was Heritage's CEO and Chairman during the period covered by the DOJ's investigation.  On December 14, 2016 the DOJ released an information charging Malek and Glazer with criminal violations of Section 1 of the Sherman Act (15 U.S.C. § 1) for price-fixing and other anti-competitive conduct in connection with generic Doxycycline, one of the drugs sold by Allergan at historically high prices during the Class Period, and a second drug, Glyburide.  The DOJ alleged that Malek and Glazer conspired to:

> a.  Participate, direct, authorize, or consent to subordinate employs to discuss the sale of doxycycline hyclate and glyburide and created "rig bids" for those drugs in meetings, conversations, and *communications with co-conspirators*;
>
> b.  Agreed during those meetings to "allocate customers" and not compete against one another for doxycycline and glyburide customers in the United States;
>
> c.  Actually submitted or withheld the discussed bids and issued price proposals in accordance with agreements reached; and
>
> d.  Sold and profited from selling doxycycline and glyburide in the United States at "collusive and noncompetitive prices."

The DOJ described how Malek and Glazer did not act alone and that "various corporations and individuals, *not made defendants in this Count*, participated as co-conspirators in the offenses charged herein and performed acts and made statements in furtherance of."

172.   Malek and Glazer pled guilty to the DOJ charges on January 9, 2017.

173.   On December 14, 2016, in an article by *Forbes* entitled, "The Man the Feds are Using to First Crack Open Their Big Antitrust Case Against Generic Drug Makers," Robert Connolly, former chief of the DOJ's Antitrust Division, stated the following:

> [a] criminal information against an individual for antitrust charges prior to any other government action in an antitrust case suggests the individual is cooperating with the government investigation. ***"It sounds like it can be just the first case and others will follow,***

*it would be unusual for the federal government to charge just one individual so I would assume there is more to come."*

174.     On the same day that the DOJ announced the charges against Malek and Glazer, twenty state Attorneys General revealed that they had sued six generic drug companies for their roles in the conspiracy to artificially inflate prices of Doxycycline and Glyburide, including Heritage, Mayne, Mylan, and Teva USA.  Teva's Actavis unit (part of Allergan prior to July 26, 2015) received a subpoena from the Connecticut Attorney General in connection with its price-fixing investigation which began in June 2014.

175.     The AG Complaint states that the Attorneys General "have uncovered a wide-ranging series of conspiracies implicating numerous different drugs and competitors, which will be acted upon at the appropriate time."  The Attorneys General describe these conspiracies as "schemes to fix and maintain prices, allocate markets and otherwise thwart competition" and explain that they are carried out by generic drug companies through their senior executives who "exploit their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements."

176.     According to the AG Complaint, the drug manufacturers attempted to explain the suspicious price hikes through "a myriad of benign factors," however, the plaintiff States "found through their investigation . . . that the reason underlying many of these price increases is much more straightforward and sinister—collusion among generic drug competitors."  Among others things, the company executives met at "regular 'industry dinners'" and "exchanged numerous and frequent telephone calls, emails and text messages."

177.     The Connecticut Attorney General noted in his December 15, 2016 press release that the price collusion was not the isolated misconduct of a few rogue employees, explaining that "the misconduct was conceived and carried out by senior drug company executives and their

subordinate marketing and sales executives."  The Connecticut Attorney General further noted that the States' investigation is still ongoing and claims to have "uncovered evidence of a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States."  As the Connecticut Attorney General explained, "[w]hile the principal architect of the conspiracies addressed in this lawsuit was Heritage Pharmaceuticals, *we have evidence of widespread participation in illegal conspiracies across the generic drug industry* . . . . We intend to pursue this and other enforcement actions aggressively, and look forward to working with our colleagues across the country to restore competition and integrity to this important market."

## V.   DEFENDANTS' MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS

178.   During the Class Period, Defendants made a series of materially false or misleading statements and omissions of material fact regarding:  (i) the competitive nature of the generic drug market and the source of Allergan's revenues; (ii) the Company's reported revenues; (iii) the accuracy of the Company's SEC filings; and (iv) compliance with the Company's Code of Conduct.

### A.   Statements Regarding Competitive Nature of the Generic Drug Market and Source of Revenues

179.   The Class Period begins on October 29, 2013, when Allergan filed a Form 8-K, signed by Joyce, with the SEC (the "3Q 2013 Form 8-K").  In the press release attached to the 3Q 2013 Form 8-K, which announced certain of the Company's financial and operating results for the quarter ended September 30, 2013, Bisaro stated, in part:

> *Strong global growth in our Actavis Pharma segment was driven by our ability to capitalize on product opportunities from our industry leading R&D pipeline*.  In the U.S., we launched generic versions of Lidoderm® and Opana® ER and received  FDA  approval  of  a  generic  version  of  Lamictal®  ODT.    We  also

confirmed that we have initiated U.S. patent challenges on such important products as generic versions of Nucynta ER® and Suboxone® Sublingual Film.

180.    On October 29, 2013, Allergan hosted a conference call to discuss the Company's

3Q 2013 financial results.  During this call, Olafsson stated, in part:

> With regard to the generic pricing outlook at a high level, what has happened probably over the last two years is it has been more common that obviously there is a price erosion in the market due to the consolidation.  ***But there is opportunities [sic] to take pricing increases; and that is what has changed since maybe five years ago when there wasn't an opportunity.   These pricing increases have been in products where there has been manufacturing problems or stock-out situation.***
>
> ***So I think that has been a fact in the US generic market, that there is an opportunity to take price increases***.   But also at the same time with the environment on the consolidation of the customers, clearly there is a pricing pressure overall in the market.

181.    On October 31, 2013, Allergan filed a quarterly report on Form 10-Q with the

SEC, reporting certain of the Company's financial and operating results for the quarter ended

September 30, 2013 (the "3Q 2013 Form 10-Q").  In the 3Q 2013 Form 10-Q, Allergan stated, in

part:

> The pharmaceutical industry is highly competitive . . .  ***We face strong competition in our all of our businesses***.

182.    On February 20, 2014, Allergan filed a Form 8-K, signed by Joyce, with the SEC

(the "4Q 2013 Form 8-K").   In the press release attached to the 4Q 2013 Form 8-K, which

announced certain of the Company's financial and operating results for the year and quarter

ended December 31, 2013, Bisaro stated, in part:

> Growth in our U.S. generic business was driven by strong product launches of generic versions of Suboxone® Sublingual tablets, Lidoderm® and Cymbalta®.

183.    On February 25, 2014, Allergan filed a Form 10-K reporting the Company's

financial results for 2013 (the "2013 Form 10-K").  In the 2013 Form 10-K, Allergan stated:

### Competition

***The pharmaceutical industry is highly competitive.***  In our Actavis Pharma and Actavis Specialty Brands businesses, we compete with different companies depending upon product categories, and within each product category, upon dosage strengths and drug delivery systems.  Such competitors include the major brand name and generic manufacturers of pharmaceutical products.  In addition to product development, other competitive factors in the pharmaceutical industry include product quality and price, reputation and service and access to proprietary and technical information.

\* \* \*

***We actively compete in the generic pharmaceutical industry***.

\* \* \*

***[T]he level of market share, revenues and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market, pricing*** and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches.

\* \* \*

In addition to competition from other generic drug manufacturers, ***we face competition from brand name companies in the generic market***.  Many of these companies seek to participate in sales of generic products by, among other things, collaborating with other generic pharmaceutical companies or by marketing their own generic equivalent to their brand products as Authorized Generics.  Our major competitors include Teva Pharmaceutical Industries, Ltd., Mylan Inc. and Sandoz, Inc. (a division of Novartis AG).

184.    On April 30, 2014, Allergan filed a Form 8-K, signed by Joyce, with the SEC (the "1Q 2014 Form 8-K").  In the press release attached to the 1Q 2014 Form 8-K, which announced certain of the Company's financial and operating results for the quarter ended March 31, 2014, Bisaro stated, in part:

> Overall revenue growth of 36 percent in our commercial pharmaceutical business benefitted from the continued strength of our generics business, resulting from the launch of our generic Micardis® in the U.S. and continued strong sales of the generic versions of Lidoderm® and Cymbalta®.

185.    In the 1Q 2014 Form 8-K, Allergan stated:

North American Generics revenue increased 7 percent to $1.02 billion for the first quarter 2014, driven by product launches including generic versions of Cymbalta® and Lidoderm® partially offset by generic competition of extended release products including our authorized generic version of Concerta®.

186.    On May 29, 2014, Allergan participated in the Sanford C. Bernstein Strategic

Decisions Conference ("Bernstein Conference").  During this conference, Bisaro stated, in part:

And I guess where that leads to is I think sustainable and longer-term higher pricing in the generic industry than people are generally used to.  *We have also seen in the short term the ability to take price increases on older products where the price had gone to a point where companies had to make the decision about whether to continue manufacturing or raise price.  And now we are taking those price increases and those price increases are sticking.*

So instead of discontinuing a product we are looking to raise the price.  And while it may seem like a lot of money, or it is not an insignificant number in a very high percentage, but we are talking about going from $10 a thousand to $20 a thousand.  So not enormous numbers when it comes to the patient but important and relevant to us.

187.    On August 5, 2014, Allergan filed a Form 8-K, signed by Joyce, with the SEC

(the "2Q 2014 Form 8-K").  In the press release attached to the 2Q 2014 Form 8-K, which

announced the highlights from the Company's 2Q 2014 financial and operating results, Bisaro

stated, in part:

Our exceptional performance during the second quarter resulted from double digit revenue growth in both our North American brand and generics businesses and Anda Distribution[.]

* * *

We also saw strong growth within our generics business, powered by our strong base business along with continued strong sales of the generic versions of Lidoderm® and Cymbalta®.

188.    On August 5, 2014, Allergan hosted a conference call to discuss the Company's

2Q 2014 financial results.  During this call, an analyst from Leerink Partners inquired about the

"US generic pricing outlook for 2014 and 2015" and also asked whether Allergan had "factored

any aggressive pricing increases" into the Company's guidance numbers, specifically noting that

"smaller generic players seem to be taking very aggressive pricing increases."  In responding to

these questions, Saunders stated, in part:

> Clearly we think there are more opportunities to take price [increases], particularly as we leverage our strong supply chain and the reliability of high-quality supply that we can offer customers that perhaps you are seeing with some of our competitors not to be as true.  And so that always creates opportunity.

189.    Buchen then added:

> We have a very broad portfolio and we take pricing opportunities where we can. . . . That is one of the advantages of having a very diverse portfolio is we can – with our supply chain the way it is, we can react very quickly when there are pricing opportunities and the ability to take more share.

190.    On November 5, 2014, Allergan filed a Form 8-K, signed by Joyce, with the SEC

(the "3Q 2014 Form 8-K").  In the press release attached to the 3Q 2014 Form 8-K, which

announced certain of the Company's financial and operating results for the quarter ended

September 30, 2014, Saunders stated, in part:

> ***Our 53 percent year-over-year growth in non-GAAP EPS reflects*** the strong contributions of our new brand pharmaceutical portfolios, resulting from the acquisitions of Warner Chilcott and Forest, as well as ***the continued strong performance of our U.S. Generics*** and International businesses and the Anda Distribution business[.]
>
> * * *
>
> Within our North American Generics business, we capitalized on continued strength across the business.

191.    On February 18, 2015, Allergan filed a Form 8-K, signed by Hilado, with the SEC

(the "4Q 2014 Form 8-K").  In the press release attached to the 4Q 2014 Form 8-K, which

announced certain of the Company's financial and operating results for the year and quarter

ended December 31, 2014, Saunders stated, in part:

In our North American Generics business, strong results were driven by continued performance of our generic versions of Lidoderm® and Concerta®, and fourth quarter launches of generic versions of Intuniv™ and Celebrex®.

192.    On February 18, 2015, Allergan also filed an Annual Report on Form 10-K with the SEC, reiterating the financial and operating results previously announced in the 4Q 2014 Form 8-K and reporting in full the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "2014 Form 10-K").

193.    In the 2014 10-K, Allergan stated, in part:

### Competition

The pharmaceutical industry is highly competitive. ***In our North American Brands and North American Generics and International businesses, we compete with different companies*** depending upon product categories, and within each product category, upon dosage strengths and drug delivery systems. Such competitors include the major brand name and generic manufacturers of pharmaceutical products. In addition to product development, other competitive factors in the pharmaceutical industry include product quality, price, reputation, service and access to proprietary and technical information.

* * *

***We actively compete in the generic pharmaceutical industry***.

* * *

***[T]he level of market share, revenues and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market, pricing*** and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches.

* * *

In addition to competition from other generic drug manufacturers, ***we face competition from brand name companies in the generic market***. Many of these companies seek to participate in sales of generic products by, among other things, collaborating with other generic pharmaceutical companies or by marketing their own generic equivalent to their brand products as "Authorized Generics." Our major competitors include Teva Pharmaceutical Industries, Ltd., Mylan Inc. and Sandoz, Inc. (a division of Novartis AG).

194.   On May 11, 2015, Allergan filed a Form 8-K, signed by Hilado, with the SEC (the "1Q 2015 Form 8-K").   In the press release attached to the 1Q 2015 Form 8-K, which announced certain of the Company's financial and operating results for the quarter ended March 31, 2015, Saunders stated, in part:

> ***Our first quarter performance was highlighted by strong revenue growth*** from Namenda XR®, Linzess®, Bystolic®, Viibryd®/ Fetzima®, LoLoestrin® Fe, Saphris®, Estrace® Cream ***as well as continued growth within our generics business***, powered by strong sales of the generic versions of Concerta®, Intuniv® and the recent launch of our generic version of OxyContin®.

195.   On May 11, 2015, Allergan hosted a conference call to discuss the Company's 1Q 2015 financial results.   During this call, an analyst from Guggenheim Securities LLC asked for Allergan's thoughts on "***generic drug pricing*** given that there have been concerns that it may not be as favorable going forward."   Responding to this question, Saunders stated, in part:

> We haven't seen much of a change despite all the fanfare and publicity around drug pricing and generics.   ***There are obviously a few products that go up but the model for generics is price decreases as more competitors come into the market***.   That is just the way the business works and overall we still model a mid single-digit price decrease in our business.   That being said, the environment has remained pretty stable and favorable.   We don't expect that to change short-term either.

196.   Bisaro added:

> [O]ur pipeline and product line gives us a bit of an advantage because of the uniqueness of it and allows us to be somewhat insulated from the general reduction of prices.   As you know we have worked very hard to create that product line and we are obviously taking advantage of the situation as the situations present themselves.

197.   On August 6, 2015, Allergan filed a Form 8-K, signed by Hilado, with the SEC (the "2Q 2015 Form 8-K").   In the press release attached to the 2Q 2015 Form 8-K, which announced certain of the Company's financial and operating results for the quarter ended June 30, 2015, Saunders stated, in part:

In our first full quarter as a combined Company, Allergan delivered exceptional results. ***Our performance was powered by operational excellence and double-digit growth across our Brands and Global Generics businesses***, while continuing outstanding momentum on the integration of Actavis and Allergan. We also achieved important R&D milestones that will help fuel both our branded and generics businesses in the future[.]

198.    On November 4, 2015, Allergan filed a Form 8-K, signed by Hilado, with the

SEC (the "3Q 2015 Form 8-K").  In the press release attached to the 3Q 2015 Form 8-K, which

announced certain of the Company's financial and operating results for the quarter ended

September 30, 2015, Saunders stated, in part:

Allergan delivered exceptional performance across the board in the third quarter that exceeded expectations.  These strong results were driven by our continued focus on customers, fueling volume-driven year-over-year growth in our U.S. Brands, Medical Aesthetics, International Brands and Anda Distribution segments, while also executing pre-integration activities ahead of the divestiture of the Generics business to Teva, which remains on track to be completed in the first quarter of 2016[.]

199.    On February 22, 2016, Allergan filed a Form 8-K, signed by Hilado, with the SEC

(the "4Q 2015 Form 8-K").  In the press release attached to the 4Q 2015 Form 8-K, which

announced certain of the Company's financial and operating results for the quarter and year

ended December 31, 2015, Allergan stated, in part:

The Global Generics business delivered solid performance during the fourth quarter.

200.    On February 23, 2016, certain of the Individual Defendants participated in the

RBC Capital Markets Healthcare Conference.  During this conference, Saunders stated:

***We have never been aggressive price takers***.  We, in fact, have been criticized or I have been criticized and I think Bill Meury, who's here, has been criticized in forums like this in the past for not taking more price.  And we have always explained that this is a customer long-term relationship and to the extent you poke them in the eye over and over again, they are going to poke back.

You wouldn't do that with any customer regardless of whether it's a PBM or a hospital or a physician buying group or an individual physician.  ***You just don't***

*treat customers that way.  There has to be mutual respect and planning, and so we price our drugs appropriately.*

*We look to take price increases as we believe we can, but we have never done it in a significant way because our products don't lend themselves to that in large part.  But also our business model and our philosophy doesn't lend itself to that.*

\*\*\*

*And this idea that you can just take price increases as you see fit is really not true*. There are anomalies and there are companies that have figured out how to exploit that system, but the reality is every price increase comes with a reaction. They are highly negotiated and the system does, for the most part, work.  There are, again, anomalies to it, but it does work.

201.    On February 26, 2016, Allergan filed an Annual Report on Form 10-K with the

SEC, reiterating the financial and operating results previously announced in the 4Q 2015 Form

8-K and reporting in full the Company's financial and operating results for the quarter and year

ended December 31, 2015 (the "2015 Form 10-K").

202.    In the 2015 Form 10-K, Allergan stated, in part:

**Competition**

The pharmaceutical industry is highly competitive.

\*\*\*

As a result of the Teva Transaction, the Company's global generics business is classified as discontinued operations.  *Our discontinued operations actively competes in the generic pharmaceutical industry*.

\*\*\*

Accordingly, *the level of market share, revenues and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market, pricing* and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches.  *We face competition from other generic drug manufacturers and from brand name companies in the generic market*.  Many of these companies seek to participate in sales of generic products by, among other things, collaborating with other generic pharmaceutical companies or by marketing their own generic equivalent to their brand products as "Authorized Generics."

203.    The statements set forth in ¶¶ 179-202 above were materially false and misleading or omitted material facts about the Company's business, operations, compliance with policies, and financial results.   Specifically, Defendants made materially false and/or misleading statements which had the effect of concealing, and/or failed to disclose, that: (i) Allergan's generics unit and several of its pharmaceutical industry peers colluded to fix generic drug prices; (ii) the foregoing conduct constituted anti-competitive conduct; and (iii) consequently, Allergan's revenues during the Class Period were in part the result of anti-competitive conduct. By electing to speak publicly about Allergan's generic drug business—specifically, pricing and competition for generic drugs and revenues from those drugs—and thereby putting these subjects into play during earnings calls with shareholders and in SEC filings, Defendants had a duty to fully, completely, and truthfully disclose all material facts regarding generic drug pricing, competition, and revenues so as to not mislead investors.   As a result of the foregoing, Defendants' public statements were materially false and misleading at all relevant times.

**B.    Financial Statements**

204.    During the Class Period, Allergan reported the financial results set forth in the table below:

| SEC Filing | Net Revenues (Generics Segment) for Period | Net Generics Revenues for Period | Net Revenues for Period | Period |
|---|---|---|---|---|
| 3Q 2013 Form 8-K | $ 1.55 billion | | $2.01 billion | 3Q 2013 |
| 4Q 2013 Form 8-K | $1.70 billion | | $2.78 billion | 4Q 2013 |
| 2013 Form 10-K | $6.35 billion | | $8.68 billion | FY 2013 |
| 1Q 2014 Form 8-K | $2.26 billion | $1.02 billion | $2.66 billion | 1Q 2014 |
| May 5, 2014 Form 10-Q ("1Q 2014 Form 10-Q") | $2.64 billion | $1.02 billion | $2.66 billion | 1Q 2014 |

| SEC Filing | Net Revenues (Generics Segment) for Period | Net Generics Revenues for Period | Net Revenues for Period | Period |
|---|---|---|---|---|
| 2Q 2014 Form 8-K | $2.24 billion | $1.03 billion | $2.67 billion | 2Q 2014 |
| May 6, 2014 Proxy[13] | | | $8.68 billion | FY 2013 |
| August 5, 2014 Form 10-Q ("2Q 2014 Form 10-Q") | $2.24 billion | $1.03 billion | $2.67 billion | 2Q 2014 |
| 3Q 2014 Form 8-K | $1.64 billion | $1.64 billion | $3.68 billion | 3Q 2014 |
| November 5, 2014 Form 10-Q ("3Q 2014 Form 10-Q") | $1.64 billion | $1.64 billion | $3.68 billion | 3Q 2014 |
| January 27, 2015 Proxy[14] | | | $8.68 billion | FY 2013 |
| 4Q 2014 Form 8-K | $1.78 billion | $1.78 billion | $4.06 billion | 4Q 2014 |
| 2014 Form 10-K | $6.75 billion | $4.18 billion[15] | $13.06 billion | FY 2014 |
| 1Q 2015 Form 8-K | $1.78 billion | $1.78 billion | $4.23 billion | 1Q 2014 |
| May 11, 2015 Form 10-Q ("1Q 2015 Form 10-Q") | $1.78 billion | $1.78 billion | $4.23 billion | 1Q 2015 |
| 2Q 2015 Form 8-K | | $1.58 billion[16] | $5.76 billion | 2Q 2015 |
| August 6, 2015 Form 10-Q ("2Q 2015 Form 10-Q") | $1.63 billion | $1.63 billion | $5.76 billion | 2Q 2015 |
| 3Q 2015 Form 8-K | | | $4.09 billion | 3Q 2015 |

---

[13]    The May 6, 2014 Proxy incorporated by reference the 2013 Form 10-K.

[14]    The January 27, 2015 Proxy incorporated by reference the 2013 Form 10-K and the 1Q, 2Q, and 3Q 2014 Forms 10-Q.

[15]    The Company noted in its 2014 Form 10-K that approximately 61.9% of the $6.75 billion in revenues for the North American Generics and International segment "came from our North American generics."

[16]    Reported as "Total Generic Products Revenues."

| SEC Filing | Net Revenues (Generics Segment) for Period | Net Generics Revenues for Period | Net Revenues for Period | Period |
|---|---|---|---|---|
| November 6, 2015 Form 10-Q ("3Q 2015 Form 10-Q") | $1.43 billion[17] | $1.43 billion | $4.09 billion | 3Q 2015 |
| 4Q 2015 Form 8-K | | | $4.20 billion | 4Q 2015 |
| 2015 Form 10-K | $6.38 billion | $6.38 billion | $15.06 billion | FY 2015 |
| May 10, 2016 Form 10-Q ("1Q 2016 Form 10-Q") | $1.3 billion | $1.3 billion | $3.8 billion | 1Q 2016 |

205.    The financial results set forth in ¶ 204 above were materially false and misleading because: (i) Allergan's generics unit and several of its pharmaceutical industry peers colluded to fix generic drug prices; (ii) the foregoing conduct constituted anti-competitive conduct; and (iii) consequently, Allergan's revenues during the Class Period were in part the result of anti-competitive conduct.   None of these facts were disclosed in connection with Defendants' issuance of Allergan's financial results and, consequently, Defendants concealed the true source of Allergan's revenues.   By electing to speak publicly about Allergan's financial results, including revenues from its generic drug business, and thereby putting these financial results into play in SEC filings, Defendants had a duty to fully, completely, and truthfully disclose all material facts regarding such financial results so as to not mislead investors.   As a result of the foregoing, Defendants' public statements regarding Allergan's financial results were materially false and misleading at all relevant times.

---

[17]    As a result of Allergan's July 27, 2015 announcement that the Company had agreed to sell its global generics business to Teva, Allergan reported net revenues from its global generics business in the "Income from discontinued operations" portion of the Company's February 26, 2016 Form 10-K for this filing and all future filings.

C.    **False Certifications**

206.    Each of Allergan's Forms 10-Q filed with the SEC during the Class Period contained the following SOX certification:

> The undersigned officer of [Allergan] (the "Compan[y]"), hereby certifies, to such officer's knowledge, that:
>
>> (i) the Quarterly Report on Form 10-Q of the Compan[y] for the quarter ended [DATE OF QUARTER END] (the "Report") fully complies with the requirements of Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934, as amended; and
>>
>> (ii) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Compan[y].

207.    This certification was signed by: Bisaro for the Company's 3Q 2013 and 1Q 2014 Forms 10-Q; Saunders for the Company's 2Q 2014, 3Q 2014, 1Q 2015, 2Q 2015, 3Q 2015, and 1Q 2016 Forms 10-Q as well as the Company's August 8, 2016 Form 10-Q ("2Q 2016 Form 10-Q") and its November 4, 2016 Form 10-Q ("3Q 2016 Form 10-Q"); Joyce for the Company's 3Q 2013, 1Q 2014, 2Q 2014, and 3Q 2014 Forms 10-Q; and Hilado for the Company's 1Q 2015, 2Q 2015, 3Q 2015, 1Q 2016, 2Q 2016, and 3Q 2016 Forms 10-Q.

208.    Each of Allergan's Forms 10-K filed with the SEC during the Class Period contained the following SOX certification:

> The undersigned officer of [Allergan] . . . (the "Compan[y]"), hereby certifies, to such officer's knowledge, that:
>
>> (i) the Annual Report on Form 10-K of the Compan[y] for the year ended December 31, [year] (the "Report") fully complies with the requirements of Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934, as amended; and
>>
>> (ii) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Compan[y].

209.    This certification was signed by: Bisaro for the Company's 2013 Form 10-K; Saunders for the Company's 2014 and 2015 Forms 10-K; Joyce for the Company's 2013 Form 10-K; and Hilado for the Company's 2014 and 2015 Forms 10-K.

210.    Each of Allergan's Forms 10-Q filed with the SEC during the Class Period also contained the following certification pursuant to Rule 13a-14(a) of the Exchange Act:

I, [EXECUTIVE NAME AND TITLE], certify that:

1. I have reviewed this quarterly report on Form 10-Q of [Allergan];

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report

\*\*\*

211.    This certification was signed by: Bisaro for the Company's 3Q 2013 and 1Q 2014 Forms 10-Q; Saunders for the Company's 2Q 2014, 3Q 2014, 1Q 2015, 2Q 2015, 3Q 2015, 1Q 2016, 2Q 2016 and 3Q 2016 Forms 10-Q; Joyce for the Company's 3Q 2013, 1Q 2014, 2Q 2014 and 3Q 2014 Forms 10-Q; and Hilado for the Company's 1Q 2015, 2Q 2015, 3Q 2015, 1Q 2016, 2Q 2016 and 3Q 2016 Forms 10-Q.

212.    Each of Allergan's Forms 10-K filed with the SEC during the Class Period also contained the following certification pursuant to Rule 13a-14(a) of the Exchange Act:

I, [EXECUTIVE NAME AND TITLE], certify that:

1. I have reviewed this annual report on Form 10-K of [Allergan];

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements

made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report

\*\*\*

213.    This certification was signed by: Bisaro for the Company's 2013 Form 10-K; Saunders for the Company's 2014 and 2015 Forms 10-K; Joyce for the Company's 2013 Form 10-K; and Hilado for the Company's 2014 and 2015 Forms 10-K.

214.    The certifications referenced in ¶¶ 206-13 above were materially false and misleading because Defendants' Class Period SEC filings contained materially false and/or misleading statements and/or failed to disclose material facts about the Company's business, operations, compliance with policies, and financial results.  Specifically, these filings contained materially false and/or misleading statements which had the effect of concealing, and/or failed to disclose, that: (i) Allergan's generics unit and several of its pharmaceutical industry peers colluded to fix generic drug prices; (ii) the foregoing conduct constituted anti-competitive conduct; and (iii) consequently, Allergan's revenues during the Class Period were in part the result of anti-competitive conduct.  As a result of the foregoing, Defendants' public statements were materially false and misleading at all relevant times.

### D.    Code of Conduct

215.    Throughout the Class Period, Allergan's Forms 10-K represented that the Company had "adopted a Code of Conduct that applies to our employees, including our principal executive officer, principal financial officer and principal accounting officer."  The version of the referenced Code of Conduct, effective as of August 2014, stated: "No employee may discuss with, or provide information to, any competitor about pricing or related matters, whether the

information concerns the Company or Actavis' suppliers, distributors, wholesalers or customers." The Company's Code of Conduct also provided "[e]xamples of conduct that violates Actavis policy," including "[a]greements or understandings with competitors on price." This policy further explained: "An 'agreement' or 'understanding' need not be in writing for it to be unlawful. It can be oral or inferred from the conduct of the parties."

216.    The statements referenced in ¶ 215 above were materially false and misleading and/or omitted material facts because Allergan and its representatives did not comply with the Company's stated Code of Conduct given the anti-competitive and collusive conduct alleged herein and failed to disclose that: (i) Allergan's generics unit and several of its pharmaceutical industry peers colluded to fix generic drug prices; (ii) the foregoing conduct constituted anti-competitive conduct; and (iii) consequently, Allergan's revenues during the Class Period were in part the result of anti-competitive conduct. Having elected to speak publicly about the Company's adoption of the Code of Conduct which expressly prohibits price collusion, Defendants had a duty to fully, completely, and truthfully disclose all material facts regarding violations of that Code of Conduct, including the anti-competitive conduct alleged herein. As a result of the foregoing, Defendants' public statements were materially false and misleading at all relevant times.

## VI.    THE TRUTH EMERGES:  ALLEGATIONS OF LOSS CAUSATION

217.    On August 6, 2015, Allergan revealed to shareholders in its Q2 2015 Form 10-Q that it had "received a subpoena from the DOJ seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."

218.    On the same day, in an article entitled "Allergan Brought into Widening U.S. Probe of Generic Drug Prices," *Bloomberg* reported that Allergan had received a subpoena from

the DOJ "seeking information on the marketing and prices of its generic drugs," thus "becoming the biggest company yet to draw scrutiny in the government's widening antitrust probe of the industry."  The article further revealed that the Company first received the subpoena on June 25, 2015, and that the subpoena "sought information about communications with competitors regarding the products."  Furthermore, the article named Impax, Lannett, Endo International Plc, and Par as having made "similar disclosures" in the past several months.

219.    Other media outlets reported the DOJ investigation into Allergan as well.  In an August 6, 2015 article, the *Wall Street Journal*, reported:  "Allergan noted that its Actavis business had received a subpoena in June from the Justice Department seeking information relating to the marketing and pricing of certain generic products and the company's communications with competitors about such products."  An *MTNewswires* article published the same day noted Allergan's acknowledgement of the June 25 subpoena in the Company's SEC filing and also referenced Lannett and Impax as among Allergan's competitors who had made similar disclosures regarding the receipt of subpoenas.

220.    In response to this news, Allergan's common share price fell $17.17 per share, or approximately 5%, from its previous closing price to close at $319.47 per share on August 6, 2015, and its preferred share price fell $39.24 per share, or approximately 3.5%, from its previous closing price to close at $1,084.00 per share on August 6, 2015.

221.    Several articles published on August 7, 2015, including articles from *TheStreet.com*, *Herald Democrat,* and *The Buffalo News* also discussed Allergan's receipt of the DOJ subpoena.  In addition, an August 10, 2015 article from *Washington Business Information* further discussed the DOJ subpoena, noting, "the request for information about competitors suggests DOJ is looking into whether drugmakers colluded to raise generic prices."

222.    On November 3, 2016, media outlets reported that U.S. prosecutors might file criminal charges against Allergan and several other pharmaceutical companies for unlawfully colluding to fix generic drug prices.  In an article titled "U.S. Charges in Generic-Drug Probe to Be Filed by Year-End," *Bloomberg* reported, in relevant part:

> U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion, a fresh challenge for an industry that's already reeling from public outrage over the spiraling costs of some medicines.

> The antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs, according to people familiar with the matter.  The grand jury probe is examining whether some executives agreed with one another to raise prices, and the first charges could emerge by the end of the year, they said.

> Though individual companies have made various disclosures about the inquiry, they have identified only a handful of drugs under scrutiny, including a heart treatment and an antibiotic.  Among the drugmakers to have received subpoenas are industry giants Mylan NV and Teva Pharmaceutical Industries Ltd.  ***Other companies include Actavis, which Teva bought from Allergan plc in August***, Lannett Co., Impax Laboratories Inc., Covis Pharma Holdings Sarl, Sun Pharmaceutical Industries Ltd., Mayne Pharma Group Ltd., Endo International Plc's subsidiary Par Pharmaceutical Holdings and Taro Pharmaceutical Industries Ltd.

> All of the companies have said they are cooperating except Covis, which said last year it was unable to assess the outcome of the investigation.

223.    On this news, Allergan's common share price fell $9.07, or approximately 4.6%, to close at $188.82 on November 3, 2016, and its preferred share price fell $30.03, or approximately 4.1%, to close at $708.45 on November 3, 2016.

224.    Defendants' conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiffs and the Class.  The disclosures of previously misrepresented and concealed material facts about Allergan's involvement in anti-competitive price collusion caused

the price of Allergan's securities to decline markedly, wiping out billions of dollars in shareholder wealth.

225.   It was entirely foreseeable that concealing from the public the Company's involvement in an illegal anti-competitive price-fixing scheme that, among other things, vastly inflated the revenues from its generics business, would artificially inflate the price of Allergan's securities.  It was also foreseeable that the disclosure of this information, and the materialization of concealed risks associated with Allergan's misconduct, would cause the price of Allergan securities to decline as the inflation caused by Allergan's earlier misrepresentations and omissions was removed from the price of Allergan's securities.  Accordingly, the conduct of Defendants, as alleged herein, proximately caused foreseeable losses for Plaintiffs and the Class, who purchased Allergan securities during the Class Period.

## VII.   SUMMARY OF SCIENTER ALLEGATIONS

226.   Allergan and the Individual Defendants were active and culpable participants in the fraud, as evidenced by their knowing or reckless issuance and/or control over Allergan's and the Individual Defendants' materially false and misleading statements and omissions.  Allergan and the Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements set forth in Section V above were materially false and misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws.  Allergan's and the Individual Defendants' scienter is evidenced by the following facts, among others:

227.   *First*, there were no material increases in demand or production costs or reported supply shortages for Allergan's generic drugs that would justify or otherwise explain the dramatic and concerted price increases for these drugs and Allergan's competitors' generic drugs during the Class Period.  (¶¶ 113-14, 126-27, 146-47, 159-60).   The more compelling

explanation for these price increases is price collusion between Allergan and its competitors, as evidenced by: (i) the sudden and astronomical nature of the increases; (ii) the fact that the increases occurred in concert with the Company's competitors; and (iii) the fact that the increases typically occurred within weeks of the industry conferences or events attended by Allergan executives, including those directly responsible for setting prices at the Company (¶¶ 89, 93, 99-100, 104, 107, 110, 123, 137, 140, 143, 156).  Moreover, the price increases operated as a "one-way ratchet": as the graphs above depict, the drug prices never decreased following the initial price increases to their pre-increase equilibrium price points as one would expect if the sudden price increases reflected temporary supply shortages, cost increases, or other benign market explanations.  (¶¶ 104, 107, 110, 123, 137, 140, 143, 156).

228.    *Second*, price increases of the magnitude alleged herein would have been contrary to Allergan's economic interest absent an agreement to fix prices.  Without the certainty that all of the Co-Conspirators would raise and maintain the prices for their generic drugs, each Co-Conspirator risked getting undercut by the others, leading to a loss of market share and revenue. This risk was alleviated by the Co-Conspirators' agreement to raise and maintain their prices.

229.    *Third*, Allergan and the Individual Defendants had a palpable motive to fix prices with Allergan's competitors which derives from the nature of the U.S. generic drug market itself. As discussed above (¶¶ 65-67), because federal law requires each generic pharmaceutical to be readily substitutable for another generic of the same brand drug, competition will cause prices to fall until they near generic drugmakers' marginal production costs.  This is confirmed by the graphs of the price movements herein, which show that prior to the alleged price collusion among Allergan and the Co-Conspirators, the prices of Propranolol, Ursodiol, Doxycycline, and Desonide had stabilized.  (¶¶ 104, 107, 110, 123, 137, 140, 143, 156).  This stabilization of

prices in turn caused Allergan's profits to level off, thus giving Allergan and its Co-Conspirators a common motive to conspire to raise prices.

230.    **Fourth**, Allergan and the Individual Defendants had substantial opportunities at industry conferences and events to collude on prices.  As confirmed by CWs 1 and 2, the Allergan representatives who attended the conferences (including Boyer, Falkin, and Rogerson) were in charge of setting prices for the Company's generic drugs.  (¶¶ 82-84)  Moreover, given the frequency and regularity of these conferences—as well as the fact that several of the attendees for Allergan and its competitors were "repeat attendees" at the conferences (¶¶ 89, 93 and 99-100) and in some cases served together on industry boards (¶ 88)—there is a strong inference that the various participants in the alleged price-fixing schemes were well-acquainted with each other, bolstering the likelihood that these participants entrusted each other to engage in, and jointly conceal, the illicit price-fixing.

231.    The level of familiarity between Allergan and the Co-Conspirators is further demonstrated by the flux of executives from one company to another.  For example, in early 2014, G. Frederick Wilkinson, the President of Actavis Global R&D, left the Company to become the CEO of Co-Conspirator Impax.   In commenting on Wilkinson's departure, Defendant Bisaro noted during an April 30, 2014 conference call, "it is always good to have a friend in a competitor."   Shortly thereafter, Defendant Olafsson left Allergan to become the President and CEO of Teva's Global Generic Medicines Group.   In discussing Olafsson's departure for Teva, Defendant Saunders stated on June 11, 2014, "it's nice to have a disciplined competitor at a big company."  In addition, Boothe, CEO of Actavis between August 2008 and December 2012, left the Company in 2013 and became the Executive Vice President and

General Manager of Co-Conspirator Perrigo's Pharmaceutical business.   In July 2016, Co-Conspirator Impax named Boothe as the president of its Generics Division.

232.   **Fifth**, as described above (at Section III.H), the historic rise in generic drug prices immediately before and during the Class Period was well publicized.   These price increases led Congress to commence an industry-wide investigation beginning in 2014.   On October 2, 2014, Defendant Saunders received a letter from U.S. Senator Bernie Sanders and U.S. Representative Elijah Cummings, putting Allergan on notice of an investigation and requesting pricing data and other information regarding the Company's generics business (¶¶ 167-68).   This Congressional investigation, the subsequent DOJ subpoena to the Company, and the widespread publicity surrounding the price hikes that spawned these investigations, gave rise to a duty to investigate the existence of price collusion and a duty to monitor changes in the Company's generic drug pricing.   These duties to investigate and monitor fell upon the Individual Defendants as the Company's senior-most executives who were responsible for signing and attesting to the accuracy of the Company's filings with the SEC and addressing market analysts and the investing public during earnings calls.   Even without the Congressional—and later, DOJ—investigations, the Individual Defendants' duties to investigate and monitor were triggered by the Company's Code of Conduct which expressly prohibited price-fixing and other anti-competitive conduct.   At a minimum, Allergan's and the Individual Defendants' false and misleading statements were recklessly made, in dereliction of their duty to investigate perceived anti-competitive behavior and their duty to monitor changes in the pricing of the Company's core products.

233.   **Sixth**, Allergan's production of generic drugs was the Company's core operation during the Class Period.   As discussed and demonstrated in the charts above (¶¶ 25, 204), generic

drug sales accounted for a substantial portion of Allergan's revenues and operations during the Class Period.  For example, in 2014, Allergan's revenues from generics accounted for 32% of the Company's total revenues.  In 2015, the percentage of the Company's revenues from generics jumped to 42%.  Further, analysts covering Allergan during the Class Period, including JP Morgan and Piper Jaffray, identified "greater-than-expected price erosion/competition for the company's core US generics business" and "pricing pressure for key generics products" as among the risks to achieving the analysts' stated price targets, suggesting that the market considered Allergan's generics business to be a primary determinant of the Company's bottom line.  It is implausible that the Individual Defendants, who were the Company's senior-most executives, were unaware of the historically colossal price increases and the reasons for these increases.  The Individual Defendants had access to information concerning these price increases, including the Company's pricing models described above (¶ 83).  At a minimum, they were reckless in falsely telling investors that the market for Allergan's generic drugs was truly competitive without confirming the absence of price collusion, and reckless in certifying the accuracy of the Company's substantial Class Period revenues without confirming the true reason for these revenues (i.e., price collusion).

234.   ***Seventh***, the fact that the DOJ has intervened in at least six civil antitrust actions against Allergan after subpoenaing and receiving documents from the Company strongly suggests that federal prosecutors have determined that there is evidence of a criminal conspiracy to fix prices in an anti-competitive manner.  At least two former executives of Allergan's Co-Conspirator, Heritage, have pled guilty to price-fixing charges in connection with one of the drugs (Doxycycline) also sold by Allergan during the Class Period.  (¶¶ 171-72).

235.   The Individual Defendants' scienter is further evidenced by the following facts:

96

236.   **Bisaro** served as Allergan's CEO and President from before the start of the Class Period through July 2014 and signed SOX certifications and Rule 13a-14(a) certifications for the Company's 3Q 2013 and 1Q 2014 Forms 10-Q and 2013 Form 10-K.  As a signatory of (i) the SOX certification representing that "the information contained in the [SEC filings] fairly presents, in all material respects, the financial condition and results of operations of [Allergan]," and (ii) the Rule 13a-14(a) certification representing that the Company's SEC filings did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading," Bisaro had a duty to monitor any conduct that threatened to undermine the veracity of these filings, including the anti-competitive conduct alleged herein.  Bisaro, as Allergan's CEO, had access to pricing data for the Company's generic drugs.  Notwithstanding the certifications signed by Bisaro and his access to pricing data, Bisaro knowingly or recklessly failed to disclose the price-fixing scheme.

237.   Bisaro also made a materially false and misleading statement during a Company earnings call on May 11, 2015 in response to a question specifically regarding "generic drug pricing given that there have been concerns that it may not be as favorable going forward," demonstrating that he was in a position to know all material facts regarding the Company's generic drug pricing.  Even in the face of this direct question, Bisaro never disclosed the price-fixing scheme, opting instead to project a false picture of a highly competitive, generic pharmaceutical market.  (¶ 196).

238.   Among other industry events, Bisaro attended the NACDS 2013 Annual Meeting that was also attended by representatives from a number of the Co-Conspirators.  This meeting accompanied the dramatic and historic increase in the price of Doxycycline hyclate 100mg capsules and 100mg tablets manufactured by Allergan and certain of the Co-Conspirators (¶¶

140, 142, 143, 145), as well as Allergan's entrance into the market for 15g tubes of generic Desonide 0.05% at inflated prices (¶ 156).

239.    Bisaro sold 40,921 shares of Allergan stock, amounting to 8% of his holdings, for almost $6.5 million on November 11, 2013.

240.    **Saunders** served as Allergan's CEO from July 2014 through the end of the Class Period and signed SOX certifications and Rule 13a-14(a) certifications for the Company's 2Q 2014, 3Q 2014, 1Q 2015, 2Q 2015, 3Q 2015, 1Q 2016, 2Q 2016, and 3Q 2016 Forms 10-Q and 2014 and 2015 Forms 10-K.  As a signatory of (i) the SOX certification representing that "the information contained in the [SEC filings] fairly presents, in all material respects, the financial condition and results of operations of [Allergan]," and (ii) the Rule 13a-14(a) certification representing that the Company's SEC filings did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading," Saunders had a duty to monitor any conduct that threatened to undermine the veracity of these filings, including the anti-competitive conduct alleged herein.  Saunders, as Allergan's CEO, had access to pricing data for the Company's generic drugs.  Notwithstanding the certifications signed by Saunders and his access to pricing data, Saunders knowingly or recklessly failed to disclose the price-fixing scheme.

241.    Saunders also made false and misleading statements on the Company's earnings calls on August 5, 2014 and May 11, 2015, in response to questions from analysts specifically inquiring about the "US generic pricing outlook for 2014 and 2015" and "aggressive pricing increases," demonstrating that he was in a position to know all material facts regarding the Company's generic drug pricing.  Even in the face of these direct questions, Saunders never

disclosed the price-fixing scheme, opting instead to project a false picture of a highly competitive generic pharmaceutical market.  (¶¶ 188, 195).

242.    **Joyce** served as Allergan's CFO from before the start of the Class Period through December 2014 and signed SOX certifications and Rule 13a-14(a) certifications for the Company's 3Q 2013, 1Q 2014, 2Q 2014, and 3Q 2014 Forms 10-Q and 2013 Form 10-K.  As a signatory of (i) the SOX certification representing that "the information contained in the [SEC filings] fairly presents, in all material respects, the financial condition and results of operations of [Allergan]," and (ii) the Rule 13a-14(a) certification representing that the Company's SEC filings did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading," Joyce had a duty to monitor any conduct that threatened to undermine the veracity of these filings, including the anti-competitive conduct alleged herein.  Joyce, as Allergan's CFO, had access to pricing data for the Company's generic drugs.  Notwithstanding the certifications signed by Joyce and his access to pricing data, Joyce knowingly or recklessly failed to disclose the price-fixing scheme.  Joyce also signed Allergan's 3Q 2013, 4Q 2013, 1Q 2014, 2Q 2014, and 3Q 2014 Forms 8-K, each of which contained material misstatements.

243.    Joyce sold 15,000 shares of Allergan stock on November 5, 2013, 7,500 shares on November 6, 2013, and 7,500 shares on December 6, 2013, amounting to more than 37% of his total holdings, for a sum of almost $4.8 million.

244.    **Hilado** served as Allergan's CFO from December 2014 through the end of the Class Period and signed SOX certifications and Rule 13a-14(a) certifications for the Company's 1Q 2015, 2Q 2015, 3Q 2015, 1Q 2016, 2Q 2016, and 3Q 2016 Forms 10-Q and 2014 and 2015 Forms 10-K.  As a signatory of (i) the SOX certification representing that "the information

contained in the [SEC filings] fairly presents, in all material respects, the financial condition and results of operations of [Allergan]," and (ii) the Rule 13a-14(a) certification representing that the Company's SEC filings did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading," Hilado had a duty to monitor any conduct that threatened to undermine the veracity of these filings, including the anti-competitive conduct alleged herein. Hilado, as Allergan's CFO, had access to pricing data for the Company's generic drugs. Notwithstanding the certifications signed by Hilado and her access to pricing data, Hilado knowingly or recklessly failed to disclose the price-fixing scheme. Hilado also signed Allergan's 4Q 2014, 1Q 2015, 2Q 2015, 3Q 2015, and 4Q 2015 Forms 8-K, each of which contained material misstatements.

245. **Olafsson** served as a director of Allergan and the President of Actavis Pharma, the Allergan segment that included the Company's generics business, from April 2012 to June 2014. As the highest-ranking officer of Actavis Pharma, Olafsson had access to pricing data for the Company's generic drugs. Olafsson knowingly or recklessly made a materially false and misleading statement regarding generic pricing during an October 29, 2013 Company earnings call and also signed the Company's 2013 Form 10-K. He also knowingly or recklessly failed to disclose the price-fixing scheme.

246. Among other industry events, Olafsson attended the GPhA 2013 Annual Meeting in Orlando, Florida that was also attended by representatives from a number of the Co-Conspirators. This meeting preceded a dramatic and historic increase in the price of Doxycycline hyclate 50mg and 100mg capsules and 100mg tablets manufactured by Allergan and certain of the Co-Conspirators. (¶¶ 137, 139, 140, 142, 143, 145, 158).

247.    Olafsson sold 25,000 shares of Allergan stock on November 11, 2013, amounting to more than 25% of his total holdings, for almost $4 million.

248.    **Buchen** served as the Executive Vice President, Commercial, North American Generics and International from July 2014 to March 21, 2015.  Buchen knowingly or recklessly made a false and misleading statement during the Company's August 5, 2014 earnings call in response to questions from analysts specifically inquiring about the "US generic pricing outlook for 2014 and 2015" and "aggressive pricing increases," demonstrating that he was in a position to know all material facts regarding the Company's generic drug pricing.  Even in the face of these direct questions, Buchen never disclosed the price-fixing scheme, opting instead to project a false picture of a highly competitive, generic pharmaceutical market.  (¶ 189).

249.    Buchen sold 30,000 shares of Allergan stock on November 11, 2013, amounting to more than 33% of his total holdings, for almost $4.8 million.

## VIII.  CLASS ACTION ALLEGATIONS

250.    Plaintiffs bring this action on their own behalf and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities who purchased the common or preferred stock of Allergan from October 29, 2013, through and including November 2, 2016, and were damaged thereby.  Excluded from the Class are:  (i) Defendants; (ii) members of the immediate families of the Individual Defendants; (iii) the Company's subsidiaries and affiliates; (iv) any person who is or was an officer or director of the Company or any of the Company's subsidiaries or affiliates during the Class Period; (v) any entity in which any Defendant has a controlling interest; and (vi) the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

251.    The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, Allergan had more than 170 million shares of common

stock outstanding and actively trading on the NYSE.  From February 24, 2015, through the end

of the Class Period, the Company had more than 5 million shares of preferred stock outstanding

and actively trading on the NYSE.  While the exact number of Class members is unknown to

Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs

believe that the proposed Class numbers in the thousands and is geographically widely dispersed.

Record owners and other members of the Class may be identified from records maintained by the

Company or its transfer agent and may be notified of the pendency of this action by mail, using a

form of notice similar to that customarily used in securities class actions.

252.    Plaintiffs' claims are typical of the claims of the members of the Class.   All

members of the Class were similarly affected by Defendants' alleged conduct in violation of the

Exchange Act as complained of herein.

253.    Plaintiffs will fairly and adequately protect the interests of the members of the

Class.   Plaintiffs have retained counsel competent and experienced in class and securities

litigation.

254.    Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class.  The questions

of law and fact common to the Class include:

- whether Defendants violated the federal securities laws by their acts and
  omissions as alleged herein;

- whether Defendants made statements to the investing public during the Class
  Period that contained material misrepresentations or omitted material facts;

- whether and to what extent the market price of Allergan's common and
  preferred stock was artificially inflated during the Class Period because of the
  material misstatements and omissions alleged herein;

- whether Allergan and the Individual Defendants acted with the requisite level
  of scienter;

- whether the Individual Defendants were controlling persons of the Company;

- whether reliance may be presumed; and

- whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

255.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

## IX.    CAUSES OF ACTION

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Allergan, Bisaro, Saunders, Joyce, Hilado, Olafsson, and Buchen

256.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

257.    This Count is asserted pursuant to Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, against Allergan and the Individual Defendants.

258.    As alleged herein, throughout the Class Period, Allergan and the Individual Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made materially untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme, and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Allergan and the Individual Defendants intended to and did, as alleged

herein, (i) deceive the investing public, including Plaintiffs and members of the Class; (ii) artificially inflate and maintain the prices of Allergan's common and preferred stock; and (iii) cause Plaintiffs and members of the Class to purchase the Company's common and preferred stock at artificially inflated prices.

259.   The Individual Defendants were individually and collectively responsible for making the materially false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Plaintiffs and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

260.   As set forth above, Allergan and the Individual Defendants made the materially false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased the Company's common and preferred stock during the Class Period.

261.   In ignorance of the materially false and misleading nature of Allergan's and the Individual Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Allergan's common and preferred stock, Plaintiffs and other members of the Class purchased the Company's common and preferred stock at artificially inflated prices during the Class Period.  But for the fraud, Plaintiffs and members of the Class would not have purchased the Company's common and preferred stock at such artificially inflated prices.  As set forth herein, when the true facts were subsequently disclosed, the price of Allergan's common and preferred stock declined precipitously, and Plaintiffs and

members of the Class were harmed and damaged as a direct and proximate result of their purchases of the Company's common and preferred stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

262.   By virtue of the foregoing, Allergan and the Individual Defendants are liable to Plaintiffs and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act**
**Against Bisaro, Saunders, Joyce, Hilado, Olafsson, and Buchen**

263.   Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

264.   This Count is asserted pursuant to Section 20(a) of the Exchange Act against each of the Individual Defendants.

265.   As alleged above, the Company violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making materially false and misleading statements and omissions in connection with the purchase or sale of Allergan's common and preferred stock and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period.  This fraudulent conduct was undertaken with scienter, and Allergan is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with deliberate reckless disregard of the falsity of the Company's statements and the fraudulent nature of its scheme during the Class Period.

266.   As set forth above, the Individual Defendants were controlling persons of the Company during the Class Period, due to their senior executive positions with the Company and their direct involvement in the Company's day-to-day operations, including their power to

105

control or influence the policies and practices giving rise to the securities violations alleged herein, and exercised the same.

267.     By virtue of the foregoing, the Individual Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content of its public statements with respect to its operations, corporate governance, and compliance with regulators.

268.     The Individual Defendants were culpable participants in Allergan's fraud alleged herein, by acting acted knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon Plaintiffs and the other members of the Class who purchased the Company's common and preferred stock during the Class Period.

269.     By reason of the foregoing, the Individual Defendants are liable to Plaintiffs and the members of the Class as controlling persons of the Company in violation of Section 20(a) of the Exchange Act.

## COUNT III
### For Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder Against Allergan, Saunders, Bisaro, Olafsson, Bloem, Bodine, Howson, King, Klema, Michal, Michelson, O'Sullivan, Taylor, Turner, and Weiss

270.     This Count is asserted pursuant to Section 14(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder, in connection with the **Forest Merger**.  This claim is asserted against Allergan, Saunders, and the 2014 Board of Directors.

271.     For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on negligence.

272.    The May 6, 2014 Proxy and the documents attached to the May 6, 2014 Proxy or incorporated by reference therein misrepresented material facts or omitted material facts required to be stated to make the statements contained in those documents not misleading.

273.    Defendants named in this count failed to update the May 6, 2014 Proxy when material information arose between the dissemination of these documents or statements and the June 17, 2014 shareholder vote.

274.    Defendants named in this count, jointly and severally, solicited and permitted the use of their names in solicitations contained in the May 6, 2014 Proxy.

275.    Allergan was an issuer of the May 6, 2014 Proxy.  Allergan also permitted the use of its name in the May 6, 2014 Proxy by allowing the document to represent, among other things, its operating results and financial condition.

276.    Defendants Bisaro and Saunders signed the cover letters for the May 6, 2014 Proxy and permitted the use of their names in connection with the May 6, 2014 Proxy.

277.    Defendant Buchen signed the Notice of the Extraordinary General Meeting of Shareholders to be held on June 17, 2014, and permitted the use of his name in connection with the May 6, 2014 Proxy.

278.    Defendants Bloem, Bodine, Howson, King, Klema, Michal, Michelson, O'Sullivan, Taylor, Turner, and Weiss permitted the use of their names in connection with the May 6, 2014 Proxy by, among other things, allowing the May 6, 2014 Proxy to represent that they recommended a vote to approve the Forest Merger.

279.    By means of the May 6, 2014 Proxy and the documents attached to or incorporated by reference therein, Defendants named in this count sought to secure the approval

107

of the Forest Merger from AP7 and other Class members who were Forest shareholders, and solicited proxies from AP7 and other Class members who were Forest shareholders.

280.    Each Defendant named in this count acted negligently in making false or misleading statements of material fact, omitting material facts required to be stated to make the statements contained in the May 6, 2014 Proxy not misleading, and failing to update statements that were rendered misleading by material information that arose after the dissemination of these statements and before the June 17, 2014 shareholder vote.

281.    The May 6, 2014 Proxy described in this Count was an essential link in the accomplishment of the Forest Merger.  As a result of the May 6, 2014 Proxy, Allergan and Forest shareholders approved the Forest Merger.

282.    AP7 and the other Class members who were Forest shareholders and were eligible to vote on the Forest Merger were denied the opportunity to make an informed decision in voting on the Forest Merger as a result, and were damaged as a direct and proximate result of the materially false or misleading statements and omissions as alleged in this Count.

283.    As a result of their acquisition of Allergan stock in the Forest Merger in exchange for their Forest stock at an artificially inflated price, and the corrections removing the artificial inflation in the price of those Allergan shares, AP7 and the Class of Forest shareholders entitled to vote on the Forest Merger suffered economic harm under Section 14(a) of the Exchange Act. Alternatively, AP7 and the Class of Forest shareholders entitled to vote on the Forest Merger who received Allergan shares are entitled to a rescissory measure of damages sufficient to put them back in the economic position they were in before the consummation of the Forest Merger.

284.    By reason of the foregoing, the Defendants named in this count violated Section 14(a) of the Exchange Act and Rule 14a-9.

<u>COUNT IV</u>
**For Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated
Thereunder Against Allergan, Saunders, Bisaro, Bloem, Bodine, Howson, King, Klema,
Michal, O'Sullivan, Taylor, Turner, Weiss, Basgoz, and Coughlin**

285.    This Count is asserted pursuant to Section 14(a) of the Exchange Act, and Rule

14a-9 promulgated thereunder, in connection with the **Actavis Merger**.  This claim is asserted

against Allergan, Saunders, and the 2015 Board of Directors.

286.    For purposes of this Count, Plaintiffs expressly exclude and disclaim any

allegation that could be construed as alleging or sounding in fraud or intentional or reckless

misconduct. This claim is based solely on negligence.

287.    The January 27, 2015 Proxy and the documents attached to the January 27, 2015

Proxy or incorporated by reference therein misrepresented material facts or omitted material

facts required to be stated to make the statements contained in those documents not misleading.

288.    Defendants named in this count failed to update the January 27, 2015 Proxy when

material information arose between the dissemination of these documents or statements and the

March 10, 2015 shareholder vote.

289.    Defendants named in this count, jointly and severally, solicited and permitted the

use of their names in solicitations contained in the January 27, 2015 Proxy.

290.    Allergan was an issuer of the January 27, 2015 Proxy.  Allergan also permitted

the use of its name in the January 27, 2015 Proxy by allowing the document to represent, among

other things, its operating results and financial condition.

291.    Defendants Bisaro and Saunders signed the cover letters for the January 27, 2015

Proxy and permitted the use of their names in connection with the January 27, 2015 Proxy.

292.    Defendants Bloem, Bodine, Howson, King, Klema, Michal, O'Sullivan, Taylor,

Turner, Weiss, Basgoz, and Coughlin permitted the use of their names in connection with the

January 27, 2015 Proxy by, among other things, allowing the January 27, 2015 Proxy to represent that they recommended a vote to approve the Actavis Merger.

293.   By means of the January 27, 2015 Proxy and the documents attached to or incorporated by reference therein, Defendants named in this count sought to secure the approval of the Actavis Merger from AP7 and other Class members who were Allergan, Inc. shareholders and solicited proxies from AP7 and other Class members.

294.   Each Defendant named in this count acted negligently in making false or misleading statements of material fact, omitting material facts required to be stated to make the statements contained in the January 27, 2015 Proxy not misleading, and failing to update statements that were rendered misleading by material information that arose after the dissemination of these statements and before the March 10, 2015 shareholder vote.

295.   The January 27, 2015 Proxy described in this Count was an essential link in the accomplishment of the Actavis Merger.  As a result of the January 27, 2015 Proxy, Allergan and Actavis shareholders approved the Actavis Merger.

296.   Plaintiff and the Class members who were Allergan, Inc. shareholders eligible to vote on the Actavis Merger were denied the opportunity to make an informed decision in voting on the Actavis Merger as a result, and were damaged as a direct and proximate result of the materially false or misleading statements and omissions as alleged in this Count.

297.   As a result of their acquisition of Allergan plc stock in the Actavis Merger in exchange for their Allergan, Inc. stock at an artificially inflated price, and the corrections removing the artificial inflation in the price of those Allergan plc shares, AP7 and the Class of Allergan, Inc. shareholders entitled to vote on the Actavis Merger suffered economic harm under Section 14(a) of the Exchange Act.   Alternatively, AP7 and the Class of Allergan, Inc.

shareholders entitled to vote on the Actavis Merger who received Allergan plc shares are entitled to a rescissory measure of damages sufficient to put them back in the economic position they were in before the consummation of the Actavis Merger.

298.    By reason of the foregoing, the Defendants named in this count violated Section 14(a) of the Exchange Act and Rule 14a-9.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment as follows:

299.    Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiffs as class representatives, and appointing Kessler Topaz Meltzer & Check, LLP and Motley Rice LLC as class counsel pursuant to Rule 23(g);

300.    Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

301.    Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

302.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

303.    Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:  May 1, 2017

Respectfully submitted,

**CARELLA, BYRNE, CECCHI, OLSTEIN,
  BRODY & AGNELLO P.C.**

/s/ *James E. Cecchi*
James E. Cecchi
Donald A. Ecklund
5 Becker Farm Road
Roseland, NJ  07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
decklund@carellabyrne.com

*Liaison Counsel for Lead Plaintiffs
and the Class*


**KESSLER TOPAZ
  MELTZER & CHECK, LLP**

Matthew L. Mustokoff
Kimberly A. Justice
Margaret E. Onasch
Jonathan F. Neumann
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
mmustokoff@ktmc.com
kjustice@ktmc.com
monasch@ktmc.com
jneumann@ktmc.com

*Co-Lead Counsel for Lead Plaintiffs
and the Class*

**MOTLEY RICE LLC**

James M. Hughes
Lance Oliver
28 Brightside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
jhughes@motleyrice.com
loliver@motleyrice.com

-and-

William H. Narwold
One Corporate Center
20 Church St., 17th Floor
Hartford, CT 06103
Telephone: (860) 882-1681
Facsimile: (860) 882-1682
bnarwold@motleyrice.com

*Co-Lead Counsel for Lead Plaintiffs
and the Class*

# EXHIBIT A

## CERTIFICATION

Sjunde AP-Fonden ("AP7" or "Plaintiff"),[1] declares, as to the claims asserted under the federal securities laws that:

1.     Plaintiff did not purchase the securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

2.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

3.     Plaintiff's Class Period purchase and sale transactions in the Allergan plc securities that are the subject of this action are attached in Schedule A.

4.     AP7 has full power and authority to bring suit to recover for its investment losses.

5.     Plaintiff has fully reviewed the Consolidated Amended Class Action Complaint and authorizes its filing.

6.     I, Richard Gröttheim, Chief Executive Officer of AP7, am authorized to make legal decisions on behalf of AP7.

7.     Plaintiff intends to actively monitor and vigorously pursue this action for the benefit of the Class.

8.     Plaintiff will endeavor to provide fair and adequate representation and work directly with the efforts of Class counsel to ensure that the largest recovery for the Class consistent with good faith and meritorious judgment is obtained.

9.     AP7 is currently serving as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this certification in *In re Cobalt International*

---

[1]  AP7 is acting on behalf of the AP7 Equity Fund in this litigation.  All references to "Sjunde AP-Fonden" or "AP7" in this litigation are to AP7 acting on behalf of the AP7 Equity Fund.



*Energy, Inc. Sec. Litig.,* No. 14-3428 (S.D. Tex.), *United Union of Roofers, Waterproofers & Allied Workers Local No. 8 v. Ocwen Financial Corp., et al.*, No. 14-81057 (S.D. Fla.) ("*United Union*"), and the instant action, *In re Allergan Generic Drug Pricing Sec. Litig.*, No. 16-9449 (D.N.J.).

10.     AP7 has sought to serve (and either withdrew its motion or was not appointed as the date of this Certification) as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification in: *Shah v. Qualcomm Incorporated, et al.*, No. 17-121 (S.D. Cal.) (motion pending), *Hefler v. Wells Fargo & Company, et al.*, No. 16-5479 (N.D. Cal.); *In re Cobalt International Energy, Inc. Sec. Litig.*, No. 14-3428 (S.D. Tex.) (withdrew lead plaintiff motion; later named as a proposed class representative), *Ciraulu v. American Realty Capital Properties, Inc., et al.*, No. 14-8659 (S.D.N.Y.), *In re Genworth Financial, Inc. Sec. Litig.*, No. 14-682 (E.D. Va.), and *Elm Tree Investment L.P. v. Ocwen Financial Corp., et al.*, No. 1:14-cv-61 (D.V.I.) (transferred to the U.S. District Court for the Southern District of Florida for consolidated and/or coordinated proceedings with *United Union*).

11.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed this __27__ day of __April__ 2017.

**Sjunde AP-Fonden**

By: _____

Richard Gröttheim
Chief Executive Officer

## SCHEDULE A

| **Security** | **Buy/Sell** | **Date** | **Quantity** | **Price** |
|---|---|---|---|---|
| Ordinary Shares | Buy | 11/5/2013 | 4,090 | $156.53 |
| Ordinary Shares | Buy | 11/5/2013 | 10 | $156.53 |
| Ordinary Shares | Buy | 12/9/2013 | 10,441 | $166.16 |
| Ordinary Shares | Buy | 3/25/2014 | 14,000 | $207.67 |
| Ordinary Shares | Buy | 6/25/2014 | 2,008 | $222.83 |
| Ordinary Shares | Buy | 6/25/2014 | 1,392 | $222.83 |
| Ordinary Shares | Merger Shares Received | 7/1/2014 | 61,902 | $224.00 |
| Ordinary Shares | Buy | 7/31/2014 | 5,917 | $214.25 |
| Ordinary Shares | Buy | 8/29/2014 | 5,100 | $226.91 |
| Ordinary Shares | Buy | 10/28/2014 | 12,600 | $238.05 |
| Ordinary Shares | Buy | 11/26/2014 | 3,100 | $270.47 |
| Ordinary Shares | Buy | 12/15/2014 | 8,447 | $263.00 |
| Ordinary Shares | Buy | 12/29/2014 | 1,600 | $256.77 |
| Ordinary Shares | Buy | 1/26/2015 | 3,600 | $279.65 |
| Ordinary Shares | Buy | 2/13/2015 | 2,900 | $282.11 |
| Ordinary Shares | Buy | 2/20/2015 | 2,000 | $295.77 |
| Ordinary Shares | Buy | 2/27/2015 | 2,600 | $291.30 |
| Ordinary Shares | Merger Shares Received | 3/17/2015 | 90,164 | $307.51 |
| Ordinary Shares | Buy | 4/14/2015 | 794 | $295.00 |
| Ordinary Shares | Buy | 4/23/2015 | 2,364 | $298.36 |
| Ordinary Shares | Buy | 4/29/2015 | 1,663 | $288.23 |
| Ordinary Shares | Buy | 5/12/2015 | 985 | $296.79 |
| Ordinary Shares | Buy | 5/21/2015 | 799 | $298.33 |
| Ordinary Shares | Buy | 5/21/2015 | 3,000 | $301.22 |
| Ordinary Shares | Buy | 8/31/2015 | 4,900 | $303.73 |
| Ordinary Shares | Buy | 9/10/2015 | 1,673 | $299.06 |
| Ordinary Shares | Buy | 10/21/2015 | 3,000 | $259.00 |
| Ordinary Shares | Buy | 11/2/2015 | 6,500 | $311.97 |
| Ordinary Shares | Buy | 11/25/2015 | 7,000 | $311.97 |
| Ordinary Shares | Buy | 11/30/2015 | 2,100 | $313.86 |
| Ordinary Shares | Buy | 12/14/2015 | 11,212 | $303.02 |
| Ordinary Shares | Buy | 3/31/2016 | 489 | $268.03 |
| Ordinary Shares | Buy | 3/31/2016 | 1,279 | $268.03 |
| Ordinary Shares | Buy | 3/31/2016 | 3,632 | $268.03 |
| Ordinary Shares | Buy | 4/20/2016 | 11,800 | $228.33 |
| Ordinary Shares | Buy | 8/10/2016 | 4,000 | $252.18 |
| Ordinary Shares | Buy | 8/23/2016 | 4,700 | $253.21 |
| Ordinary Shares | Buy | 8/31/2016 | 1,596 | $234.53 |
| Ordinary Shares | Sell | 7/29/2014 | 14,000 | $214.73 |



| Ordinary Shares | Sell | 8/26/2014 | 13,500 | $227.73 |
| Ordinary Shares | Sell | 10/14/2014 | 3,500 | $222.07 |
| Ordinary Shares | Sell | 10/16/2014 | 2,700 | $222.07 |
| Ordinary Shares | Sell | 10/16/2014 | 700 | $222.07 |
| Ordinary Shares | Sell | 5/26/2015 | 900 | $300.49 |
| Ordinary Shares | Sell | 7/8/2015 | 2,025 | $299.67 |
| Ordinary Shares | Sell | 8/25/2015 | 4,476 | $290.63 |
| Ordinary Shares | Sell | 8/25/2015 | 224 | $290.63 |
| Ordinary Shares | Sell | 1/27/2016 | 3,946 | $290.02 |
| Ordinary Shares | Sell | 3/15/2016 | 12,600 | $285.80 |
| Ordinary Shares | Sell | 5/6/2016 | 6,500 | $203.13 |
| Ordinary Shares | Sell | 6/24/2016 | 11,800 | $227.63 |



# EXHIBIT B

**PLAINTIFF'S CERTIFICATION**
**PURSUANT TO FEDERAL SECURITIES LAWS**

The undersigned, Mr. Marcus Hermanns and Mr. Jochen Riechwald, on behalf of Union Asset Management Holding AG ("Union"), on account of its funds listed in Schedule A (the "Funds"), declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1. We have reviewed an amended complaint against Allergan PLC ("Allergan") and designate Motley Rice LLC as proposed lead counsel for Union in this action for all purposes.

2. We are duly authorized to institute legal action on behalf of Union and the Funds, including litigation against Allergan and any other defendants.

3. The Funds did not purchase or sell the security that is the subject of this litigation at the direction of plaintiff's counsel or in order to participate in any private action under the federal securities laws.

4. Union is willing to serve as a lead plaintiff and understands that a lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial. Union also understands that, if appointed Lead Plaintiff in this action, it will be subject to the jurisdiction of the Court and will be bound by all rulings by the Court, including rulings regarding any judgments.

5. Union will not accept any payment for serving as a representative party beyond the Funds' *pro rata* share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court.

6. Union has not sought to serve as a lead plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification, except as detailed below:

> *Ciraulu v. American Realty Capital Properties, Inc.*, No. 1:14-cv-08659 (S.D.N.Y. Dec. 29, 2014);

> *Kaltman v. Petróleo Brasileiro S.A. – Petrobras*, No. 1:14-cv-09662 (S.D.N.Y. Feb. 6, 2015);

> *Glore v. SanDisk Corp.*, No. 3:15-cv-01455 (N.D. Cal. May 29, 2015);

> *Hefler v. Wells Fargo & Company*, No. 3:16-cv-05479 (N.D. Cal. Nov. 25, 2016);

> *Park v. Cognizant Technology Solutions Corp.*, No. 2:16-cv-06509 (D.N.J. Dec. 5, 2016); and

> *Arslanian v. Allergan PLC*, No. 2:17-cv-00002 (D.N.J. Jan. 3, 2017).

7.      Union understands that this is not a claim form, and that its ability to share in any recovery as a member of the class is unaffected by its decision to serve as a representative party.

8.      Attached hereto as Schedule A is a complete listing of all transactions the Funds made during the Class Period in the securities that are the subject of this litigation.  Union will provide records of those transactions upon request.

9.      Union is also represented and counseled in this matter by its attorney, Deborah M. Sturman of Sturman LLC.

**We declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct to the best of our knowledge, information and belief.**

Executed this 25ᵗʰ day of _____April_____, 2017.

For Union Asset Management Holding AG:

_____          _____
Marcus Hermanns                                         Jochen Riechwald
General Counsel                                            Legal Counsel

## Schedule A

## Allergan, PLC (NYSE: AGN)

Class Period: 10/29/13 - 11/02/16

| Union Asset Management Holding AG | | DATE | SHARES | PRICE |
|---|---|---|---|---|
| **UniGlobal** | | | | |
| | Purchases: | 03/17/15 | 93,745 | $305.71 |
| | | 06/23/15 | 14,113 | $311.15 |
| | | 06/23/15 | 28,228 | $311.59 |
| | | 06/23/15 | 13,659 | $310.46 |
| | | 06/24/15 | 45,000 | $312.46 |
| | | 07/13/15 | 1,353 | $316.15 |
| | | 07/13/15 | 66,647 | $316.99 |
| | | 12/09/15 | 12,853 | $306.41 |
| | | 07/26/16 | 14,906 | $248.95 |
| | Sales: | 07/31/15 | 167,162 | $331.15 |
| | | 09/08/15 | 5,048 | $298.06 |
| | | 09/17/15 | 7,854 | $301.05 |
| | | 01/11/16 | 13,536 | $299.37 |
| **UniGlobal II** | | | | |
| | Purchases: | 03/17/15 | 1,903 | $305.71 |
| | | 05/22/15 | 190 | $300.65 |
| | | 06/05/15 | 530 | $305.26 |
| | | 06/08/15 | 167 | $298.66 |
| | | 06/23/15 | 403 | $311.59 |
| | | 06/23/15 | 195 | $310.46 |
| | | 06/23/15 | 202 | $311.15 |
| | | 06/24/15 | 1,080 | $312.46 |
| | | 07/13/15 | 1,372 | $316.99 |
| | | 07/13/15 | 28 | $316.15 |
| | | 11/09/15 | 730 | $296.82 |
| | | 11/16/15 | 500 | $298.99 |
| | Sales: | 08/24/15 | 820 | $291.82 |
| | | 01/08/16 | 947 | $299.46 |

|  |  |  |  |  |
|---|---|---|---|---|
|  |  | 01/29/16 | 869 | $284.43 |
|  |  | 02/12/16 | 745 | $280.48 |
| **UniGlobal Vorsorge** |  |  |  |  |
|  | Purchase: | 07/31/15 | 167,162 | $331.15 |
| **UniGlobal-net-** |  |  |  |  |
|  | Purchases: | 03/17/15 | 7,583 | $305.71 |
|  |  | 06/23/15 | 1,059 | $311.15 |
|  |  | 06/23/15 | 1,024 | $310.46 |
|  |  | 06/23/15 | 2,117 | $311.59 |
|  |  | 06/24/15 | 3,550 | $312.46 |
|  |  | 07/13/15 | 5,293 | $316.99 |
|  |  | 07/13/15 | 107 | $316.15 |
|  |  | 12/09/15 | 2,839 | $306.41 |
|  |  | 07/26/16 | 3,294 | $248.95 |
|  | Sales: | 09/08/15 | 1,204 | $298.06 |
|  |  | 09/17/15 | 1,732 | $301.05 |
|  |  | 01/12/16 | 2,680 | $296.03 |
| **UniSector: BioPharma** |  |  |  |  |
|  | Purchases: | 06/25/15 | 5,316 | $309.93 |
|  |  | 06/26/15 | 10,000 | $306.66 |
|  |  | 04/08/16 | 2,826 | $241.94 |