# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| IN RE ALLERGAN GENERIC DRUG PRICING SECURITIES LITIGATION | Civil Action No. 2:16-cv-09449 (SDW) (LDW)<br><br>Oral Argument Requested |

---

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

---

Shannon McClure, Esq.
Julia A. Lopez, Esq.
**REED SMITH LLP**
Princeton Forrestal Village
136 Main Street, Suite 250
Princeton, New Jersey 08540
Telephone: (609) 987-0050
Facsimile: (609) 951-0824

Richard Schirtzer, Esq.
(*pro hac vice* application pending)
Molly Stephens, Esq.
(*pro hac vice* application pending)
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Adam Abensohn, Esq.
(*pro hac vice* application pending)
Jesse Bernstein, Esq.
(*pro hac vice* application pending)
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

*Attorneys for Defendants Allergan plc, Brenton L. Saunders, Paul M. Bisaro, Maria Teresa Hilado, R. Todd Joyce, Sigurdur O. Olafsson, David A. Buchen, James H. Bloem, Christopher W. Bodine, Tamar D. Howson, John A. King, Ph.D., Catherine M. Klema, Jiri Michal, Jack Michelson, Patrick J. O'Sullivan, Ronald R. Taylor, Andrew L. Turner, Fred G. Weiss, Nesli Basgoz, M.D., and Christopher J. Coughlin*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................1

FACTUAL BACKGROUND ..........................................................................................5

    A.    Allegations Regarding Price-Fixing ...........................................................5

    B.    Allegations Regarding Defendants' Statements To The Market ..........................9

        1.    Statements Regarding the Generic Drug Market and Allergan's Revenues ...........................................................9

        2.    Statements Regarding Allergan's Reported Revenues ..............................10

        3.    Statements In Allergan's SEC Certifications...............................10

        4.    Statements Regarding Allergan's Code of Conduct ........................10

    C.    Allegations Regarding Scienter ...............................................11

    D.    Allegations Regarding Loss Causation ..........................................11

ARGUMENT .....................................................................................12

I.    PLAINTIFFS' SECTION 10(b) CLAIM SHOULD BE DISMISSED ......................12

    A.    Plaintiffs Fail to Allege a Material Misrepresentation...........................13

        1.    Plaintiffs Fail To Identify An Actionable Omission..........................13

        2.    Plaintiffs Fail to Identify Any False or Misleading Statements.................14

            (a)    Allergan's Revenue Reports Were Accurate ...............................14

            (b)    Allergan's Generalized Statements About Growth and Competition Were True .......................................15

            (c)    The Sarbanes-Oxley Certifications Were Accurate .....................18

            (d)    Allergan's Statements Concerning Its Corporate Code of Conduct Are Not Actionable ...............................19

        3.    Plaintiffs Fail to Adequately Allege a Price-Fixing Conspiracy .............19

            (a)    Plaintiffs' "Motive" and "Opportunity" Allegations Are Deficient...........................................21

            (b)    Plaintiffs' Allegations of Governmental Actions Involving Other Entities Are Deficient ...........................21

            (c)    Plaintiffs' Pricing Allegations Are Deficient...............................22

    B.    The Complaint Fails To Plead A "Strong Inference" Of Scienter........................24

        1.    Plaintiffs' Allegations Of Price-Fixing Do Not Support A Particularized Showing That Any Defendant Intended To Deceive Investors ...........................................26

        2.    The Alleged Stock Sales Do Not Support An Inference Of Scienter ........29

C.      Plaintiffs Have Failed To Adequately Plead Loss Causation ................................30

II.      PLAINTIFFS' SECTION 20(a) CLAIM SHOULD BE DISMISSED .............................32

III.     PLAINTIFFS' SECTION 14(a) CLAIMS SHOULD BE DISMISSED .........................32

A.      Plaintiffs Fail to Allege a Material Misstatement or Omission in the Proxy.........32

B.      Plaintiffs Fail To Satisfy The Remaining Elements Of Section 14(a)..................33

C.      The Section 14(a) Claims Are Also Untimely......................................................34

IV.     PLAINTIFFS' PREFERRED SHARES CLAIMS SHOULD BE DISMISSED .............35

CONCLUSION......................................................................................................................35

# **TABLE OF AUTHORITIES**

**Page**

## **Cases**

*In re Advanta Corp. Sec. Litig.,*
180 F.3d 525 (3d Cir. 1999)....................................................................... 14, 29, 30

*In re Aetna, Inc. Sec. Litig.,*
617 F.3d 272 (3d Cir. 2010)....................................................................... 12, 15, 16

*In re Alpharma Inc. Sec. Litig.,*
372 F.3d 137 (3d Cir. 2004)....................................................................... 24, 27

*In re Ariad Pharm., Inc. Sec. Litig.,*
842 F.3d 744 (1st Cir. 2016)....................................................................... 29

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)....................................................................... 33

*In re Baby Food Antitrust Litig.,*
166 F.3d 112 (3d Cir. 1999)....................................................................... 21, 24

*Bauer v. Eagle Pharm., Inc.,*
No. 16-cv-309, 2017 WL 2213147 (D.N.J. May 19, 2017)....................................................................... 28

*Bd. of Trustees of City of Ft. Lauderdale Gen. Employees' Ret. Sys. v. Mechel OAO,*
811 F. Supp. 2d 853 (S.D.N.Y. 2011)....................................................................... 28

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)....................................................................... 20

*Belmont v. MB Inv. Partners, Inc.,*
708 F.3d 470 (3d Cir. 2013)....................................................................... 25, 32

*Bolger v. First State Fin. Servs.,*
759 F. Supp. 182 (D.N.J. 1991)....................................................................... 33

*In re Burlington Coat Factory Sec. Litig.,*
114 F.3d 1410 (3d Cir. 1997)....................................................................... 17

*Burtch v. Milberg Factors, Inc.,*
662 F.3d 212 (3d Cir. 2011)....................................................................... 20, 21

*California Pub. Employees' Ret. Sys. v. Chubb Corp.,*
394 F.3d 126 (3d Cir. 2004)....................................................................... 12, 34

*In re Cent. European Distribution Corp. Sec. Litig.,*
No. 11-cv-6247, 2012 WL 5465799 (D.N.J. Nov. 8, 2012)....................................................................... 35

*In re Citigroup, Inc. Sec. Litig.,*
330 F. Supp. 2d 367 (S.D.N.Y. 2004)....................................................................... 14

*City of Edinburgh Council v. Pfizer, Inc.,*
754 F.3d 159 (3d Cir. 2014)....................................................................... 13, 32

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG,*
   752 F.3d 173 (2d Cir. 2014)............................................................................ 13

*City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.,* ("*Horizon III*")
   442 F. App'x 672 (3d Cir. 2011) .................................................................. 27

*City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.,* ("*Horizon I*")
   686 F. Supp. 2d 404 (D. Del. 2009)............................................................. 19

*City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.,* ("*Horizon II*")
   713 F. Supp. 2d 378 (D. Del. 2010)..................................... 25, 27, 29, 30

*Data Probe Acquisition Corp. v. Datatab, Inc.,*
   722 F.2d 1 (2d Cir. 1983)............................................................................. 33

*Dura Pharm., Inc. v. Broudo,*
   544 U.S. 336 (2005)..................................................................................... 30

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,*
   553 F.3d 187 (2d Cir. 2009)......................................................................... 17

*In re Exxon Mobil Corp. Sec. Litig.,*
   500 F.3d 189 (3d Cir. 2007)......................................................................... 34

*Frederick v. Mechel OAO,*
   475 F. App'x 353 (2d Cir. 2012) .................................................................. 28

*Galati v. Commerce Bancorp, Inc.,*
   220 F. App'x 97 (3d Cir. 2007) ....................................................... 14, 15, 16

*Grace v. Rosenstock,*
   228 F.3d 40 (2d Cir. 2000)........................................................................... 34

*In re Hertz Glob. Holdings, Inc. Sec. Litig.,*
   No. 13-cv-7050, 2017 WL 1536223 (D.N.J. Apr. 27, 2017)................... 18, 30

*Ieradi v. Mylan Labs., Inc.,*
   230 F.3d 594 (3d Cir. 2000)......................................................................... 17

*In re Immucor, Inc. Sec. Litig.,*
   No. 09-cv-2351, 2011 WL 3844221 (N.D. Ga. Aug. 29, 2011) .................. 31

*Institutional Inv'rs Grp. v. Avaya, Inc.,*
   564 F.3d 242 (3d Cir. 2009)......................................................................... 29

*InterVest, Inc. v. Bloomberg, L.P.,*
   340 F.3d 144 (3d Cir. 2003)................................................................... 20, 22

*Just New Homes, Inc. v. Beazer Homes,*
   293 F. App'x 931 (3d Cir. 2008) .................................................................. 21

*Lipow v. Net1 UEPS Techs., Inc.,*
   131 F. Supp. 3d 144 (S.D.N.Y. 2015).......................................................... 28

*Loos v. Immersion Corp.,*
   762 F.3d 880 (9th Cir. 2014), *as amended* (Sept. 11, 2014)...................... 31

*Lopez v. Ctpartners Exec. Search Inc.*,
   173 F. Supp. 3d 12 (S.D.N.Y. 2016)...................................................................... 19

*In re Micron Techs., Inc. Sec. Litig.*,
   No. 06-cv-085, 2007 WL 576468 (D. Idaho Feb. 21, 2007) ................................ 20

*In re Mirant Corp. Sec. Litig.*,
   No. 02-cv-1467R, 2009 WL 48188 (N.D. Ga. Jan. 7, 2009)................................ 20

*In re NAHC, Inc. Sec. Litig.*,
   306 F.3d 1314 (3d Cir. 2002)....................................................................... 12, 33

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*,
   720 F. Supp. 2d 517 (D.N.J. 2010) ...................................................................... 27

*Oran v. Stafford*,
   226 F.3d 275 (3d Cir. 2000)................................................................................. 14

*In re Party City Sec. Litig.*,
   147 F. Supp. 2d 282 (D.N.J. 2001) ...................................................................... 30

*In re PetroChina Co. Ltd. Sec. Litig.*,
   120 F. Supp. 3d 340 (S.D.N.Y. 2015).................................................................. 18

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co. Inc.*,
   998 F.2d 1224 (3d Cir. 1993)............................................................................... 21

*In re Propranolol Antitrust Litig.*,
   No. 16-cv-9901, 2017 WL 1287515 (Apr. 6, 2017) ............................................ 24

*Rahman v. Kid Brands, Inc.*,
   736 F.3d 237 (3d Cir. 2016)................................................................................. 28

*Resco Prods. Inc. v. Bosai Minerals Grp. Co.*,
   158 F. Supp. 3d 406 (W.D. Pa. 2016).................................................................. 23

*Sapssov v. Health Mgmt. Assoc., Inc.*,
   608 F. App'x 855 (11th Cir. 2015) ...................................................................... 31

*In re Scottish Re Grp. Sec. Litig.*,
   524 F. Supp. 2d 370 (S.D.N.Y. 2007).................................................................. 18

*Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, 12-cv-00993,
   2016 WL 7117455 (M.D. Pa. Dec. 7, 2016)........................................................ 31

*In re Sotheby's Holdings, Inc.*,
   No. 00-cv-1041, 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000)........................... 20

*Superior Offshore Int'l Inc. v. Bristow Group, Inc.*,
   738 F. Supp. 2d 505 (D. Del. 2000)..................................................................... 22

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
   531 F.3d 190 (2d Cir. 2008)........................................................................... 25, 28

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)............................................................................... 13, 25, 26

*Tracinda Corp. v. DaimlerChrysler AG,*
    502 F.3d 212 (3d Cir. 2007)....................................................................... 33

*Winer Family Trust v. Queen,*
    503 F.3d 319 (3d Cir. 2007)................................................................... 5, 26

*Wisniewski v. Fisher,*
    857 F.3d 152 (3d Cir. 2017)....................................................................... 35

*In re Yukos Oil Co. Sec. Litig.,*
    No. 04-cv-5243, 2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006)................. 20

## <u>Statutory Authorities</u>

15 U.S.C. § 78u-4(b)(1) ........................................................................... 12, 33

15 U.S.C. § 78u-4(b)(2) .............................................................. 12, 24, 26, 33

## <u>Rules and Regulations</u>

17 C.F.R. § 240.14a-9 ............................................................................. 32, 34

64 Fed. Reg. 45, 150 (1999) .......................................................................... 18

Fed. R. Civ. P. 9(b) .................................................................................. 12, 33

Defendant Allergan plc ("Allergan"), the Individual Defendants, and the Director Defendants[1] respectfully submit this memorandum of law in support of their motion, pursuant to Federal Rules of Civil Procedure 12(b)(6), to dismiss the claims asserted against them under Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 and SEC Rules 10b-5 and 14a-9 in Plaintiffs' Consolidated Amended Class Action Complaint (the "Complaint" or "AC") (Dkt. # 36).

## PRELIMINARY STATEMENT

Plaintiffs attempt to manufacture a securities fraud claim where none exists. Their theory is that Allergan's public representations concerning its overall business were rendered false, and somehow caused harm to investors, on account of supposed price-fixing by its former generics drug business, known as Actavis[2], involving only 4 out of approximately 250 generic drugs sold

---

[1]  Defendants are Allergan plc, an Irish pharmaceuticals company, the Individual Defendants; (i) Paul M. Bisaro, Actavis's CEO and President between October 2013 and July 2014; (ii) Brenton L. Saunders, Allergan's CEO and President since July 2014; (iiii) R. Todd Joyce, Actavis's CFO from October 2009 to December 2014; (iv); Maria T. Hilado, Allergan's CFO since December 2014; (v) Sigurdur O. Olafsson, president of Actavis Pharma, the predecessor entity to Allergan's generic business, between April 2012 and June 2014; and (vi) David A. Buchen, Actavis's Chief Legal Officer from April 2012 to July 2014, and Executive Vice President of its Generics business from July 2014 to May 1, 2015; (vii), and the Director Defendants: (i) James H. Bloem; (ii) Christopher W. Bodine; (iii) Tamar D. Howson; (iv) John A. King, Ph.D; (v) Catherine M. Klema; (vi) Jiri Michael; (vii) Jack Michelson; (viii) Patrick J. O'Sullivan; (ix) Ronald R. Taylor; (x) Andrew L. Turner; and (xi) Fred G. Weiss; (xii).  (AC ¶¶ 37, 41-61.)

[2]  Plaintiffs confusingly refer to both Actavis and Allergan as "Allergan" in their AC.  Prior to March 2015, Actavis sold the four generic drugs discussed in the complaint, along with nearly 250 other generic drugs, and approximately 80 different branded drugs.  Prior to March 2015, Allergan, Inc. was a company that manufactured and sold only branded drugs, not generics.  None of those drugs are at issue in this case.  In March 2015, Actavis acquired Allergan, and the resulting company was renamed Allergan plc.  Thereafter, Allergan, through its Actavis business, continued to sell generic drugs, including the four at issue, but only for a short time.  In July 2015, Allergan announced that it had sold its Actavis generics business to Teva Pharmaceuticals.  The sale closed in August 2016.  Allergan has not sold any generic drugs since August 2016.

at different times during the relevant period.  Plaintiffs' theory depends on multiple layers of assumption and speculation, each of which courts have seen and rejected before.

Plaintiffs start from the improper ***assumption*** that there was price-fixing based on reports of investigations, none of which have led to any charges or court findings against Allergan. Plaintiffs then attempt to transform that assumed antitrust violation into a securities fraud, notwithstanding that Allergan's purported misrepresentations had nothing to do with any of the four drugs underlying their claim.  And Plaintiffs conclude with the assumption that investors were harmed, even though the Complaint acknowledges both that the supposed price-fixing involved a tiny fraction of Allergan's overall business and that Allergan sold its Actavis generics business ***for over $40 billion*** after the "corrective" disclosures that had supposedly devalued that business.

Plaintiffs' pleading formula, at bottom, is to assume wrongdoing and label it securities fraud, without regard to whether investors were actually misled, while ignoring undisputed facts rendering the claim implausible.  That approach defies the Supreme Court's repeated directives that claims under Section 10(b) must be pled with particularity, and that corporations are under no generalized duty to accuse themselves of wrongdoing.  This action should be dismissed.

### *Plaintiffs Fail to State a Claim Under Section 10(b):*

Plaintiffs treat Section 10(b) as a catch-all provision where any form of purported wrongdoing can be classified as securities fraud.  That is not the law.  To state a viable claim, Plaintiffs must set forth particularized facts showing specific misrepresentations or omissions made with scienter and resulting in losses to investors.  In their attempt to convert a purported antitrust violation into a Section 10(b) claim, Plaintiffs have failed to satisfy these basic elements.

*First*, the Complaint fails to plead any material misrepresentations or omissions.  Allergan was under no generalized duty to disclose un-adjudicated allegations of price-fixing, and its "failure" to do so is not an actionable omission under Section 10(b).  Although the Complaint

2

spends ten pages cycling through excerpts from Allergan's SEC filings, it is devoid of any allegations indicating those excerpted statements were materially false or misleading. Significantly, there is no allegation explaining how Allergan's revenue reports, or its public statements concerning its overall growth and business prospects, were somehow rendered inaccurate as a result of supposed price-fixing involving a small fraction of its generic drugs.

The Complaint also fails to allege adequately that price-fixing even took place. The Complaint does not describe any purported meetings between co-conspirators; it does not describe the terms of any improper agreements; and it lists pricing activity demonstrating that different competitors charged substantially different amounts for the same products. Unable to advance allegations indicating a true price-fixing conspiracy, Plaintiffs simply assume Allergan is guilty based on reports of grand jury subpoenas and investigations *of other companies* in the relevant market. Numerous courts have rejected similar assumptions.

*Second*, Plaintiffs' allegations fail to raise a "strong inference of scienter," as required by the Private Securities Litigation Reform Act ("PSLRA"). Many of Plaintiffs' allegations are misdirected – they purport to show an intent to engage in price-fixing, as opposed to an intent to mislead investors, which is what a claim for securities fraud requires. And all of the allegations, in any event, rest on assumption and speculation. Plaintiffs claim, for instance, it can be presumed Actavis intended to engage in price-fixing because company officials had a "motive" or "incentive" to maximize profits. But all corporations have that incentive, which is why the Third Circuit finds such allegations deficient. Plaintiffs' theory that Actavis's attendance at industry conferences created the "opportunity" to conspire to fix prices is a similarly misguided effort to convert innocuous facts, common to virtually all companies in all industries, into indicia of bad intent. And Plaintiffs point to price movements that, if anything, ***show a lack of coordination***

3

between the purported co-conspirators, thus defeating the suggestion that Allergan intended to engage in price-fixing, much less mislead investors.

*Third*, there is no loss causation.  Plaintiffs point to public reports that supposedly disclosed the "truth" of Actavis's involvement in price-fixing.  Those reports did no such thing.  They merely described Actavis's receipt of a subpoena requesting information about some of its generic drugs, which has never led to charges against Actavis or Allergan.  As multiple courts have recognized, these public reports are not the sort of corrective disclosures that can be deemed to harm investors.  And they certainly could not have affected Allergan's stock price here, when Allergan sold its generics business for over $40 billion, with no price reduction resulting from the supposed revelations of price-fixing.

### Plaintiffs' Remaining Claims Are Deficient:

Plaintiffs' remaining claims also fail.  Plaintiffs' Section 20(a) claim, for instance, requires a viable underlying Section 10(b) claim, which is absent here.  It also requires allegations of culpable participation by the Individual Defendants.  For the same reasons Plaintiffs have failed to plead scienter, they have failed to plead culpable participation.

Plaintiffs' Section 14(a) claims fail the most basic pleading requirement, which is to identify specific misstatements and describe how they were false.  Rather than include such allegations, the Complaint makes the generalized assertion that Allergan's proxy statements were misleading, *without ever identifying the representations that were supposedly false*.  Further, if the Court were to credit Plaintiffs' theory that the "truth" emerged with news reports in August 2015 that Allergan received a subpoena in an antitrust investigation, this claim would be time-barred because it was filed more than one year after the disclosure.

\*       \*       \*

4

In sum, Plaintiffs have failed in their effort to transform purported price-fixing on four generic drugs – a claim that has never been substantiated – into a viable claim of securities fraud. The Complaint does not set forth the key elements for such a claim.  It fails to describe any misrepresentations to investors; it includes no allegations indicating an intention to mislead investors; and it identifies no harm to investors.  Plaintiffs thus fail to satisfy the heightened pleading requirements that exist specifically to prevent strike suits like this one, and the Complaint should be dismissed in its entirety.

## FACTUAL BACKGROUND

The putative lead plaintiffs purport to assert claims on behalf all "persons and entities who purchased or otherwise acquired the common and preferred stock in Allergan between October 29, 2013 and November 2, 2016."  (AC at 1.)  Plaintiffs allege Allergan violated the securities laws by failing to disclose a purported conspiracy to fix the prices for 4 generic drugs, (AC ¶ 23), out of nearly 250 drugs sold by its former generics business.  *See* Ex. A to the Certification of Shannon McClure ("McClure Cert.") (Actavis Plc 2013 10-K) at 4; Ex. B to McClure Cert. (Actavis Plc 2014 10-K) at 2.[3]  That business generated approximately $6.35 billion, $6.75 billion, and $6.38 billion in revenue in 2013, 2014, and 2015, respectively.  (*See* AC ¶ 204.)  Plaintiffs fail to allege the percentage of revenues attributable to any of the four drugs at issue in the complaint.  (*Id.*)

A.    Allegations Regarding Price-Fixing

The allegations of price-fixing concern only four of the many drugs sold by Actavis (or, later, Allergan): Propranolol, Ursodiol, Doxycycline Hyclate, and Desonide.  (*Id.* ¶¶ 73-166.)

- Propranolol, used to treat high blood pressure and certain types of irregular heart rates, had been on the market since the 1960s, and Allergan allegedly participated in a

---

[3]  The Court may take judicial notice of these financial filings since they "were explicitly relied upon in the Complaint."  *Winer Family Trust v. Queen*, 503 F.3d 319, 328 (3d Cir. 2007).

conspiracy to fix prices for this drug starting in approximately March 2015 until approximately December 2015.  (*Id.* ¶¶ 102, 104-05.)

- Ursodiol, used to treat gallbladder stones, had been on the market since 2000, and Allergan (when it was Actavis) allegedly participated in a conspiracy to fix prices for this drug starting in approximately May 2014 until approximately November 2014.  (*Id.* ¶¶ 121, 123-24.) Plaintiffs admit the market for Ursodiol was "relatively small."  (*Id.* ¶ 131.)

- Doxycycline, used to treat a variety of infections, including pneumonia, had been on the market since at least 1967, and Allergan (when it was Actavis) allegedly participated in a conspiracy to fix prices for this drug starting in approximately January 2013 (the month of a reported FDA shortage) until approximately October 2013 (when the FDA reported shortage ceased).  (*Id.* ¶¶ 135-38, 146, 149.)

- Desonide, which is used to treat a variety of skin conditions, had been on the market since the 1970s, and Actavis was not yet selling the drug as of May 2013, when, according to the Complaint, two other companies began conspiring to fix its price.  (*Id.* ¶ 154-55; Desonide NDA 21-844 at 10 available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2006/021844s000_ChemR.pdf.)  Plaintiffs allege Allergan (when it was Actavis) "joined the conspiracy" when it entered the market six months later, in September 2013.  (AC ¶ 155.)  The maximum price for the drug was approximately $4.00 per tube when Actavis entered the market, and Actavis undercut that price, leading to price drops.  (*Id.* ¶ 157.)

Plaintiffs allege no direct evidence of price-fixing.  Instead, they allege the markets for the four generic drugs were "highly susceptible" to price-fixing and circumstantial evidence of trade

meetings, pricing trends, and governmental investigations suggests price-fixing took place.  (*See, e.g.*, *id.* ¶¶ 73, 80-101, 104-12, 123-25, 137-45, 156-58, 167-77.)

*Trade Meetings:*  Plaintiffs assert Allergan had "opportunities" to conspire based on the attendance of certain of its personnel at industry conferences.  (*Id.* ¶¶ 80, 81, 92, 99.)  But Plaintiffs do not identify any conspiratorial conduct during these conferences, such as specific meetings or discussions; they allege only that these industry conferences took place.

*Pricing Trends:*  Plaintiffs include charts and tables tracking the prices of Propranolol, Ursodiol, Doxycycline and Desonide over a period of months.  (*Id.* ¶¶ 104-05, 107-08, 110-11, 123-24, 137-38, 140-41, 143-44, 156-57.)   The price increases, however, show a lack of coordination between competitors.  Plaintiffs' charts demonstrate the alleged co-conspirators charged substantially different prices for the identical drugs during the period of each alleged conspiracy.  (*See, e.g.*, *id* ¶ 124) (Epic and Lannett prices for Ursodiol 300mg Capsules in June 2014 exceeded Actavis's price by 416% and 225% respectively).

Plaintiffs' charts also show that price movements often did not correlate to the timing of the trade shows at which conspirators supposedly agreed to fix prices; in some instances, price increases occurred prior to those meetings, and, in others, price drops occurred after.  (*See, e.g.*, *id.* ¶¶ 104; (price increase for Propranolol begins prior to first alleged meeting between co-conspirators); 110 (GPhA 2015 workshop occurred when prices dropped or moved in opposite directions)).  Further, Plaintiffs allege, and the charts show, that prices have not returned to "pre-spike" levels, even though the supposed price-fixing has been fully revealed to investors through public disclosures concerning governmental investigations.[4]  (*See, e.g.*, *id.* ¶¶ 104, 113, 123, 126.)

---

[4]  Plaintiffs' allegations also indicate that, (i) certain alleged "conspiracies" began over two years apart from each other; (ii) the alleged Propranolol conspiracy began ***after*** information regarding

*Governmental Investigations:*   Plaintiffs allege two members of Congress launched an investigation into increases in generic drug prices in October 2014, and as part of this investigation they sent a letter to Allergan (when it was Actavis) requesting information about its generic drugs sold in the US.  (*Id.* ¶¶ 167-68.)  Plaintiffs also allege that, one month later, a "Co-Conspirator" (for Ursodiol) received a subpoena relating to its generic drug pricing.  (*Id.* ¶ 169.)  Plaintiffs allege the Department of Justice ("DOJ") subsequently sent subpoenas to at least ten other drug companies, including Allergan and three alleged "Co-Conspirators," in connection with generics pricing.  (*Id.*)

Plaintiffs also allege the DOJ has intervened in six civil antitrust price-fixing cases against Allergan.  (*Id.* ¶ 170.)  Plaintiffs speculate the DOJ's intervention is "powerful indication" that it concluded Allergan had engaged in price-fixing, though Plaintiffs provide no support for their speculation.  (*See id.*)

Plaintiffs' remaining allegations regarding antitrust investigations and lawsuits relate to individuals and entities other than Allergan.   Plaintiffs allege two employees of Heritage Pharmaceuticals Inc. ("Heritage") pled guilty to antitrust violations relating to price-fixing of generic Doxycycline, (*id.* ¶¶ 171-72), but Plaintiffs *do not allege* Heritage conspired with Allergan to fix Doxycycline prices (*id.* ¶ 136).  Plaintiffs also allege that state Attorneys General sued six generic drug companies for allegedly conspiring to fix the price of Doxycycline.  (*Id.* ¶ 174.)  However, Plaintiffs do not allege that Actavis or Allergan were among the companies sued.  (*Id.*)

---

the DOJ and Congressional investigations became public (*id.* ¶¶ 167, 169); and (iii) two of the alleged conspiracies (Doxycycline and Desonide) began subsiding ***before*** the investigations became public (*id.*).

B.      Allegations Regarding Defendants' Statements To The Market

Plaintiffs allege Defendants made four categories of false or misleading statements, relating to: "(i) the competitive nature of the generic drug market and the source of Allergan's revenues; (ii) the Company's reported revenues; (iii) the Company's SEC certifications; and (iv) the Company's Code of Conduct."  (*Id.* ¶ 178.)  These allegations are summarized below.

1.      Statements Regarding the Generic Drug Market and Allergan's Revenues

Plaintiffs present over 20 paragraphs of quotations from Defendants' public filings that touch on the "growth" of the generics business and the general competiveness of the generics industry as a whole.  (*Id.* ¶¶ 179-202.)  According to Plaintiffs, these statements "had the effect of concealing, and/or failed to disclose, that: (i) Allergan's generics unit [Actavis] and several of its pharmaceutical industry peers colluded to fix generic drug prices; (ii) the foregoing conduct constituted anti-competitive conduct; and (iii) consequently, Allergan's revenues during the Class Period were in part the result of anti-competitive conduct."  (*Id.* ¶ 203.)  Plaintiffs' theory is that, "[b]y electing to speak publicly about Allergan's generic drug business . . . and thereby putting these subjects into play … Defendants had a duty to . . . disclose all material facts regarding generic drug pricing, competition, and revenues so as to not mislead investors."  (*Id.*)

Typical of the statements Plaintiffs rely on is a press release attached to the 3Q 2013 Form 8-K, in which Mr. Bisaro attributed "[s]trong global growth in our Actavis Pharma segment," to "our ability to capitalize on product opportunities from our industry leading R&D pipeline…."  (*Id.* ¶ 179.)  In the press release attached to the 2Q 2014 Form 8-K, Mr. Bisaro stated that "[w]e also saw strong growth within our generics business, powered by our strong base business along with continued strong sales of the generic versions of Lidoderm® and Cymbalta®."  (*Id.* ¶ 187.)

Plaintiffs also allege a number of generalized statements discussing the "competitive" nature of the pharmaceutical industry.  (*Id.* ¶ 183).  For example, Plaintiffs point to Allergan's

2013 Form 10-K, which states that "[t]he pharmaceutical industry is highly competitive," (*id.*), and that "[t]he level of market share, revenues and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market, pricing and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches[.]" (*Id.*) Plaintiffs do not allege any of these general statements were inaccurate.

### 2.   Statements Regarding Allergan's Reported Revenues

Plaintiffs present a table listing Allergan's net revenues from the sale of generic drugs during the putative Class Period. (*Id.* ¶ 204.) Plaintiffs do not allege that Defendants did not actually generate the reported revenue. Plaintiffs also do not allege how, if at all, price-fixing for the 4 at-issue generic drugs materially inflated the overall revenues of the generics business, which sold nearly 250 drugs. Rather, Plaintiffs repeat their allegations that Allergan created a duty to disclose the alleged price-fixing "[b]y electing to speak publicly about Allergan's financial results." (*Id.* ¶ 205.)

### 3.   Statements In Allergan's SEC Certifications

Plaintiffs allege the Individual Defendants signed Sarbanes-Oxley ("SOX") certifications attesting that, "to such officer's knowledge," Allergan's filings complied with "the requirements of Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934, as amended; and (ii) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Compan[y]." (*Id.* ¶¶ 206-13.) Once again, Plaintiffs do not explain how these representations were false. (*Id.* ¶ 214.)

### 4.   Statements Regarding Allergan's Code of Conduct

Plaintiffs allege Allergan's Form 10-Ks "represented that the Company has 'adopted a Code of Conduct,'" and provided "[e]xamples of conduct that violates Actavis policy," including "[a]greements or understandings with competitors on price[.]" (*Id.* ¶ 215.) Plaintiffs do not allege

the statements about the Code of Conduct or its provisions were false.  Rather, Plaintiffs again resort to their theory that Allergan assumed a duty to disclose the alleged price-fixing by "[h]aving elected to speak publicly about the Company's adoption of the Code of Conduct."  (*Id.* ¶ 216.)

C.    Allegations Regarding Scienter

The Complaint does not allege how each Defendant knew or must have known that each statement attributable to that Defendant was materially false or misleading.  (*See id.* ¶¶ 226-249.) Instead, Plaintiffs make general allegations falling into three categories.  First, Plaintiffs repeat their allegations of price-fixing, including pricing trends, the general motive to fix prices in the generic drug market, and the opportunity to fix prices at trade meetings.  (*Id.* ¶¶ 227-31, 234.) Second, Plaintiffs allege facts regarding Defendants' access to information, including the public reports about the government's price-fixing investigation, Defendants' alleged duty to monitor prices, and general access to pricing information at Actavis.  (*Id.* ¶¶ 232-33, 236-38, 240, 242, 244-46, 248.)  Third, Plaintiffs allege stock sales by certain Defendants.  (*Id.* ¶¶ 239, 243, 247, 249.)

D.    Allegations Regarding Loss Causation

Plaintiffs claim investors sustained losses when "the truth emerge[d]" concerning the purported price-fixing.  (*Id.* at 89)  *First,* Plaintiffs allege Allergan's common share price fell approximately 5%, and its preferred share price fell approximately 3.5%, on August 6, 2015, the day Allergan publicly disclosed that Actavis had received a subpoena from the DOJ.  (*Id.* ¶¶ 217-20.)  *Second,* Plaintiffs allege Allergan's common share price fell approximately 4.6%, and its preferred share price fell approximately 4.1%, on November 3, 2016, when it was reported that the U.S. might file criminal charges against unidentified parties for price-fixing by year end.  (*Id.* ¶¶ 222-23.)  Allergan's share price fully recovered within a few days, rallying to close at $212.90 by

November 9, 2016, and no charges have been filed.  *See* Ex. C to McClure Cert. (Allergan Historical Stock Price Table) at 17.[5]

The value of the Actavis unit was unchanged before and after the August 2015 disclosure: Allergan announced on July 27, 2015, that Teva had agreed to purchase the unit for $40.5 billion, (AC ¶ 40), and, on August 2, 2016, Teva announced it had completed the acquisition at that price. (*Id.*)

## ARGUMENT

### I.     PLAINTIFFS' SECTION 10(b) CLAIM SHOULD BE DISMISSED

Plaintiffs' first claim for relief (*Id.* ¶¶ 256-262) is brought under Section 10(b) of the Exchange Act, and SEC Rule 10b-5.  To sustain such a claim, a plaintiff must plead each of the following elements:  (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 277 (3d Cir. 2010).

Such claims are subject to the heightened pleading standard under Federal Rule of Civil Procedure 9(b).  "As such, plaintiffs asserting securities fraud claims must specify the who, what, when, where, and how: the first paragraph of any newspaper story."  *California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144 (3d Cir. 2004) (internal quotation marks omitted). Securities fraud claims under Section 10(b) are also subject to the heighted pleading standards of the PSLRA, which requires that a plaintiff "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)-(2).

---

[5] The Court may take judicial notice of historical stock prices.  *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002).

Moreover, "the complaint shall, with respect to each act or omission alleged to violate this Act, state with particularity facts giving rise to a ***strong inference*** that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). These are "[e]xacting pleading requirements," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007), which Plaintiffs fail to meet.

A.  <u>Plaintiffs Fail to Allege a Material Misrepresentation</u>

The Complaint fails to allege a misrepresentation or omission. First, Allergan was under no generalized duty to disclose uncharged and un-adjudicated wrongdoing. Second, Plaintiffs fail to identify any statements by Allergan rendered false or misleading on account of the purported price-fixing. Third, even if it were theoretically possible that a failure to disclose a price-fixing conspiracy could be transformed into securities fraud, Plaintiffs do not adequately allege that price-fixing actually took place.

1.  <u>Plaintiffs Fail To Identify An Actionable Omission</u>

It is axiomatic that silence does not constitute an actionable "omission" absent a duty to disclose. *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 174 (3d Cir. 2014). It is equally well-settled that there is no generalized duty to disclose uncharged and un-adjudicated wrongdoing. *See, e.g.*, *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) ("[D]isclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing.") (internal quotation marks omitted).

Here, there has been no adjudication of the alleged price-fixing. No governmental agency has brought claims against Actavis or Allergan related to the alleged price-fixing conspiracy. In fact, in the sole action referenced by Plaintiffs where governmental agencies pursued claims related to alleged price-fixing for generic drugs, neither Actavis nor Allergan were named as defendants. (AC ¶ 174.) Accordingly, Allergan was "not require[d] [] to accuse itself of

13

wrongdoing," *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004), and had no duty to disclose the alleged conspiracy.

Plaintiffs contend Allergan nevertheless assumed a duty to disclose the alleged price-fixing by "electing to speak publically about [its] generic drug business," but that is simply not the law. (*See* AC ¶ 203.)  A defendant's statements give rise to a duty to disclose only where the omitted facts would render its specific representations misleading.  *See Oran v. Stafford*, 226 F.3d 275, 285-86 (3d Cir. 2000).  The Complaint does not describe any representation meeting that standard.

2.   Plaintiffs Fail to Identify Any False or Misleading Statements

Plaintiffs identify four categories of statements by Defendants allegedly rendered false or misleading by the failure to disclose the alleged price-fixing conspiracy: (i) Allergan's disclosures of the historical revenues for the generics business; (ii) its generalized comments regarding "growth" and "competition"; (iii) the SOX certifications signed by some Individual Defendants; and (iv) the Company's description of its "Code of Conduct."   (AC ¶ 178.)   None of these statements were false or misleading.

(a)   Allergan's Revenue Reports Were Accurate

Plaintiffs recite Allergan's reported revenues throughout the proposed Class Period, while making no attempt to explain how the omission of the alleged price-fixing rendered the reported figures false or misleading.  (*Id.* ¶ 204.)  There is no dispute that Allergan accurately reported its revenues.  That is dispositive; as long as historical financial data is accurately disclosed, it is neither false nor misleading and cannot give rise to Section 10(b) liability.  *Galati v. Commerce Bancorp, Inc.*, 220 F. App'x 97, 102 (3d Cir. 2007) ("Factual recitations of past earnings, so long as they are accurate, do not create liability under Section 10(b).") (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999), *abrogated on other grounds by Tellabs*, 551 U.S. 308).

14

(b)      Allergan's Generalized Statements About Growth and Competition
          Were True

The Complaint recites pages of Allergan's general comments about its growth and future

prospects, and claims those statements – ***not a single one of which mentioned any of the four***

***drugs at issue in this case*** – were materially misleading in light of the alleged price-fixing

conspiracy.  (AC ¶¶ 179-202.)  They were not.  General and vague statements of optimism, known

as "puffery," cannot create Section 10(b) liability.  *Aetna*, 617 F.3d at 284 ("general statements of

optimism . . . constitute no more than 'puffery'") (internal quotation marks omitted); *Galati*, 220

F. App'x at 102.

The Third Circuit in *Galati* rejected a theory analogous to Plaintiffs' theory here.  There,

the plaintiffs alleged the defendants, financial institutions and their executives, violated Section

10(b) by failing to disclose that they participated in a bid-rigging conspiracy that increased

deposits.  220 F. App'x at 99.[6]  The Third Circuit affirmed dismissal, holding defendants'

"statements concerning the Company's 'dramatic deposit growth,' 'strong performance,' and

'unique business model,' constitute nothing more than mere 'puffery,'" insufficient to sustain a

10(b) claim.  *Id.* at 102.

The situation here is similar to *Galati*.  Allergan's statements regarding its "[s]trong global

growth" (AC ¶ 179), "continued strong performance" (*id.* ¶ 190), "strong results" (*id.* ¶ 191),

"continued growth" (*id.* ¶ 194), and "operational excellence and double-digit growth" (*id.* ¶ 197),

were "routine recitations of past financial performance, and general optimistic statements about

---

[6]      Unlike the present case, some of the defendants in *Galati* were actually indicted for the
underlying wrongdoing.  *See* 220 F. App'x at 99.

the Company's future growth" too vague to be materially false.  *Galati*, 220 F. App'x at 102; *see also Aetna*, 617 F.3d 272 at 283 (statements regarding "disciplined pricing" were puffery).[7]

Plaintiffs invoke similarly general statements concerning competition and pricing, including Allergan's statement that the pharmaceutical industry as a whole, encompassing countless generic drugs and brand name drugs, "is highly competitive."  (AC ¶ 183.)  Plaintiffs do not explain how alleged price-fixing on 4 out of 250 generic drugs (without any allegation of price-fixing as to an additional 80 brand drugs) makes the pharmaceutical industry, as a whole, not competitive.  *See* Ex. B to McClure Cert. at 2.  The Complaint also describes a statement by Mr. Olafsson in October 2013 that there were "opportunities [sic] to take pricing increases . . . where there has been manufacturing problems or stock-out situation(s)."  (AC ¶ 180.)  That observation was consistent with Plaintiffs' own allegations that Doxycycline, the only drug Plaintiffs alleged was price-fixed during that period, had an FDA reported shortage in January 2013 that did not end until *after* September 30, 2013.  (*Id.* ¶ 146.)  Plaintiffs also invoke a statement by Mr. Bisaro that "in the short term" Actavis had "the ability to take price increases on older products where the price had gone to a point where companies had to make the decision about whether to continue manufacturing or raise price."  (*Id.* ¶ 186.)  This too was consistent with the fact that each of the four drugs alleged to have been "price-fixed" were older drugs (some as old as *forty* years old) whose prices had all fallen to a point where revenue was minimal.  (*See, e.g.*, *id.* ¶¶ 102, 104, 107, 110.)

---

[7]  Many of the alleged "misstatements," in addition to being standard puffery, are demonstrably true, even based on Plaintiffs' own allegations.  For instance, Plaintiffs point to statements by Defendants that the profitability of generic drugs normally correlates to the number of competitors in the product (*see* AC ¶¶ 193, 195, 202).  This is borne out by the fact that, with respect to the one drug Plaintiffs reference in the Complaint where a competitor was added (Desonide), the price of the drug *did* decrease.  (*See id.* ¶ 157.)

Plaintiffs' kitchen sink approach is perhaps best exemplified by their reliance on representations that, to the extent they reference any specific drugs, had nothing to do with the four drugs that were the subject of the supposed price-fixing.  For instance, the Complaint excerpts statements regarding product launches of generic versions of Cymbalta, Lidoderm, and Concerta (*id.* ¶¶ 184, 185, 187, 191), none of which were among the four drugs for which prices were supposedly manipulated.  The Complaint points to several other statements by Allergan concerning growth and competition from brand name drugs, as opposed to the generic drugs at issue in this case.  (*See, e.g.*, *id.* ¶ 193) ("we face competition from brand name companies in the generic market").

Finally, even if a defendant's reporting of its "strong" financial results and growth could theoretically be rendered misleading by a failure to disclose purported price-fixing, the Complaint includes no particularized allegations indicating the purported price-fixing of 4 out of 250 generic drugs would have had a sufficient impact on Allergan's financial results to render its reports of "strong" earnings materially false or misleading.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426-27 (3d Cir. 1997); *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 203 (2d Cir. 2009) (holding that accounting for transactions as 'trading activities' rather than loans was immaterial as a matter of law, because affected item (though totaling more than $2 billion) was less than one percent of defendant's total assets); *see also Ieradi v. Mylan Labs., Inc.*, 230 F.3d 594, 599 (3d Cir. 2000) (ruling that failure to disclose anti-competitive contracts was immaterial).  The Complaint makes no allegation as to the revenue generated by Ursodiol; it attributes just over $50 million in total revenue to Propranolol and Desonide (AC ¶¶ 104, 107, 110, 156); and it attributes approximately 2.8% of Allergan's total revenue during the relevant period to the sale of Doxycycline (*compare id.* ¶¶ 137, 140, and 143

with 204).[8]  These figures are well short of the SEC's quantitative 5% standard for materiality, and not nearly substantial enough to render as somehow false Allergan's representations about its overall earnings and growth.  *See* SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45, 150 (1999) ("The use of a percentage as a numerical threshold, such as 5%, may provide the basis for a preliminary assumption that … a deviation of less than the specified percentage with respect to a particular item on the registrant's financial statements is unlikely to be material.").

In sum, the statements Plaintiffs point to were not directed to ***any*** of the four at-issue drugs, and are no different from the kind of puffery and immaterial statements the Third Circuit has rejected as a basis for a Section 10(b) claim.

(c)   The Sarbanes-Oxley Certifications Were Accurate

A SOX certification requires the principal executive and financial officers of publicly-traded companies to certify to the "general truthfulness of the company's quarterly and annual reports and to the establishment and adequacy of the company's internal controls."  *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, No. 13-cv-7050, 2017 WL 1536223, at *19 (D.N.J. Apr. 27, 2017). SOX certifications are typically not false or misleading unless the executive has knowledge that the company's financial reports are false or its internal controls are defective.  *See, e.g.*, *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 359 (S.D.N.Y. 2015), *aff'd*  (2d. Cir. Mar. 21, 2016).

Applying these standards, Plaintiffs' reliance on the SOX certifications fails for three reasons.  First, as discussed above (*see* Section I.A.2(a), *supra*), any omission of alleged price-

---

[8] The Complaint makes no allegations regarding the revenue attributable to any of the drugs during the alleged price-fixing period, instead alleging the total revenue for far longer periods: Propranolol (December 2010 - September 2016); Desonide (December 2010 - December 2016); Doxycycline (May 2010 - February 2016).  Thus, the revenue figures described in the Complaint, which are immaterial in any event, are higher than the revenue figures that, under Plaintiffs' theory, would be attributable to supposed price-fixing.

fixing for the four generic drugs did not render Allergan's historical financial reports false or misleading.  Second, there are no allegations the company's internal controls were inadequate.  Third, even if Plaintiffs had adequately pled Allergan's financial statements were false or misleading, which they have not, they still have not alleged that the executives who signed those certifications had ***knowledge*** their certifications were false.  *See In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 391 (S.D.N.Y. 2007) ("Thus, for these certifications to be materially false, it is insufficient for the financial statements themselves to have been false—defendants must also have had knowledge of that falsity.").

(d)      Allergan's Statements Concerning Its Corporate Code of Conduct<br>Are Not Actionable

Plaintiffs claim Allergan's statements that it had adopted a "Code of Conduct," and its description of certain of its provisions, were rendered false and misleading by the "failure" to disclose the purported price-fixing.  (AC ¶¶ 215-16.)  But there is no allegation Allergan did not in fact adopt a Code of Conduct, just as it reported.  Courts have held repeatedly that a company's accurate statements describing its code of conduct are not somehow rendered misleading, or otherwise actionable, where the company was allegedly aware of violations.  *See, e.g.*, *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 415 (D. Del. 2009) ("*Horizon I*") (plaintiff's position that a company must disclose all violations of its code of conduct is "untenable"); *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 28 (S.D.N.Y. 2016) (statements regarding code of ethics are "immaterial puffery").

3.      Plaintiffs Fail to Adequately Allege a Price-Fixing Conspiracy

Even if Plaintiffs had identified statements that would have been rendered false or misleading by the failure to disclose a price-fixing conspiracy, their claim still fails because they have not adequately alleged such a conspiracy existed.  "In cases alleging securities fraud based

19

on the failure to disclose the existence of an underlying illegal scheme," like here, the failure to allege such illegality "with particularity" is fatal. *In re Mirant Corp. Sec. Litig.*, No. 02-cv-1467, 2009 WL 48188, at *17 (N.D. Ga. Jan. 7, 2009); *In re Yukos Oil Co. Sec. Litig.*, No. 04-cv-5243, 2006 WL 3026024, at *14 (S.D.N.Y. Oct. 25, 2006).

For a price-fixing scheme, a complaint must allege "enough factual matter (taken as true) to suggest that an agreement was made." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "To adequately plead an agreement, a plaintiff must plead either direct evidence of an agreement or circumstantial evidence." *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011). Here, Plaintiffs do not allege direct evidence of a conspiracy. They do not identify any meetings, phone calls, emails, or other communications in which any Actavis or Allergan employees conspired with other companies' employees to set drug prices, which are the types of direct evidence recognized by courts. *See InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 162-63 (3d Cir. 2003) (providing examples of direct evidence of price-fixing, such as "a memorandum produced by a defendant conspirator detailing the discussions from a meeting of a group of alleged conspirators").

Instead, Plaintiffs fall back on alleged circumstantial evidence:  market "susceptibility," trade meetings, governmental investigations, and price movements.  These allegations fall far short of showing a price-fixing conspiracy, where actionable Section 10(b) claims routinely rest on a public admission of guilt.  *E.g., In re Sotheby's Holdings, Inc.*, No. 00-cv-1041, 2000 WL 1234601, at *2 (S.D.N.Y. Aug. 31, 2000) (upholding 10(b) claims premised on failure to disclose price-fixing where defendant entered into DOJ's Leniency Program); *In re Micron Techs., Inc. Sec. Litig.*, No. 06-cv-085, 2007 WL 576468, at *3 (D. Idaho Feb. 21, 2007) (upholding 10(b) claims premised on failure to disclose price-fixing where defendant pled guilty).

(a)   Plaintiffs' "Motive" and "Opportunity" Allegations Are Deficient

Plaintiffs devote nearly thirty allegations to the proposition that the generic drug market was "susceptible to anti-competitive conduct." (*See, e.g.,* AC ¶¶ 73-101.)  But even if that premise was right, it would be irrelevant.  It is settled in the Third Circuit that mere susceptibility cannot constitute circumstantial evidence that price-fixing occurred.  *Milberg Factors*, 662 F.3d at 229 ("motivation[s] of market behavior are precisely the legally insufficient facts we have cautioned against using as circumstantial evidence of an agreement" to conspire).

It is also not enough for Plaintiffs to assert, as they do repeatedly, that Actavis or Allergan employees had "opportunities" to conspire at industry conferences.  (AC ¶¶ 80, 92, 99, 230.)  "[P]roof of opportunity to conspire, without more, will not sustain an inference that a conspiracy has taken place."  *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co. Inc.*, 998 F.2d 1224, 1235 (3d Cir. 1993).  It does not follow that, just because Allergan employees ***might have*** interacted with employees of other drug companies – and Plaintiffs do not identify any specific interactions – they were conspiring to raise drug prices.  "Communications between competitors do not permit an inference of an agreement to fix prices unless those communications rise to the level of an agreement, tacit or otherwise."  *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 126 (3d Cir. 1999) (internal quotation marks omitted).  "[M]embership in a trade association, without more, does not violate the antitrust laws."  *Just New Homes, Inc. v. Beazer Homes*, 293 F. App'x 931, 934 (3d Cir. 2008).

(b)   Plaintiffs' Allegations of Governmental Actions Involving Other
        Entities Are Deficient

Plaintiffs again rely on the ***possibility*** of price-fixing, with no indication it actually took place, when they cite a number of governmental inquiries related to drug prices, none of which involved any finding of wrongdoing, or even allegation of wrongdoing, against Actavis or

Allergan.  Courts assign no weight to allegations a defendant is being investigated, because "the mere occurrence of [an] investigation is equally consistent with Defendants' innocence." *Superior Offshore Int'l Inc. v. Bristow Group, Inc.*, 738 F. Supp. 2d 505, 508 (D. Del. 2000), *aff'd* 490 F. App'x 492 (3d Cir. 2012).  Allergan (then Actavis) is only alleged to have received information requests – a letter from Congress and a subpoena (AC ¶¶ 167-69) – which does not constitute circumstantial evidence of price-fixing.  *Superior Offshore*, 738 F. Supp. 2d at 516-17.

The only governmental charges identified in the Complaint have been filed against drug makers other than Allergan.  (*Id.* ¶¶ 171-72, 174 (identifying Heritage, Mayne, Mylan, and Teva USA as defendants in charges or complaints).)  Charges and allegations against *other companies* hardly supports particularized allegations of wrongdoing by Allergan here.

(c)     Plaintiffs' Pricing Allegations Are Deficient

Plaintiffs try to bring their allegations beyond the mere possibility of price-fixing by laying out price movements of the four drugs that were supposedly subject to price-fixing during the class period.  (*Id.* ¶¶ 104-05, 107-08, 110-11, 123-24, 137-38, 140-41, 143-44, 156-57.)  Even accepting those pricing allegations as true solely for purposes of this motion, those allegations actually contradict any inference of a conspiracy.  A conspiracy requires a plaintiff to establish the defendants acted in parallel.  *InterVest*, 340 F.3d at 165.  That is not what Plaintiffs' allegations describe.

Plaintiffs' pricing charts and tables show the alleged co-conspirators' prices varied widely for the same drugs during the alleged conspiracy; and that they moved their prices during that period at different rates and different times.  The following are just a few examples:

- Plaintiffs allege (AC ¶¶ 107-08) Impax Generics raised its Propranolol 20mg prices drastically in February 2015, with Actavis and the two other competitors raising their prices by far less and only months later.  By June 2015, which was the heart of the alleged price-fixing period, the prices charged by one purported co-conspirator (Impax) was fully 434% higher than the price charged by another (Mylan).

- Plaintiffs allege (*id.* ¶¶ 123-24) Lannett raised its Ursodiol 300mg prices in May 2014, with Actavis and Epic Pharma following suit in June.  That month, however, the prices charged by Epic and Lannett exceeded the prices of Actavis by 416% and 225% respectively.

- Plaintiffs allege (*id.* ¶¶ 140-41) three companies – Actavis, Mutual Pharmaceutical and West-Ward – conspired to raise prices on Doxycycline 100mg.  By April 2013, which was the heart of the alleged price-fixing conspiracy, the prices charged by West-Ward exceeded the prices of Mutual and Actavis by 199% and 28% respectively.

- Plaintiffs allege (*id.* ¶¶ 156-57) a price-fixing conspiracy for Desonide .05% Cream starting in March 2013, which was six months before Actavis entered the market.  When Actavis did enter the market, moreover, in September 2013, it charged less than one of its two alleged co-conspirators, and all three proceeded to reduce their prices over the next three months.  Further, the prices charges by Taro exceeded the prices of Perrigo by 45%.

Per Plaintiffs' own allegations, such undercutting is inconsistent with a price-fixing conspiracy.

(*See id.* ¶ 228) (alleging that absent a conspiracy, competitors would "risk getting undercut by the

others.").

     Plaintiffs' theory comes apart even further when the price movements are compared to the

industry meetings at which the alleged co-conspirators supposedly formulated their plans.  Price

increases must be logically related in time to the alleged conspiratorial conversations to adequately

allege a conspiracy to raise prices.  *See, e.g., Resco Prods. Inc. v. Bosai Minerals Grp. Co.*, 158 F.

Supp. 3d 406, 424 (W.D. Pa. 2016).  Here again, that is not what Plaintiffs' allegations show:

- Plaintiffs allege the purported conspiracy to fix prices for Propranolol was conceived at a Generics Pharmaceutical Associate (GPhA) trade meeting in February 2015.  (AC ¶ 104.)  But one of the purported co-conspirators, Impax, was not in attendance.  (*Id.* ¶ 106.)  Further, no one from Allergan or Actavis alleged to have been responsible for pricing is alleged to have attended that meeting and none of the Individual Defendants are alleged to have attended ***any*** of the meetings that supposedly preceded the price increases.  (*Id.*)

- Plaintiffs allege the purported conspiracy to fix prices for Ursodiol was conceived at the GPhA annual meeting in February 2014.  (*Id.* ¶123).  But one of the three purported co-conspirators, Lannett, is not alleged to have been present.  (*Id.* ¶ 125).  Further, no one from Allergan or Actavis alleged to have been responsible for pricing is alleged to have attended that meeting and none of the individual Defendants attended ***any*** of the alleged meetings that supposedly preceded price increases.  (*Id.*)

- Plaintiffs allege the purported conspiracy to fix prices for Doxycycline was conceived at the GPhA annual meeting in February 2013 (*id.* ¶ 140). But one of the alleged co-conspirators, West-Ward, is not alleged to have attended and the only representative from Mutual was from its parent company. (*Id.* ¶ 142.) Further, West's prices increased *before* February 2013. (*Id.* ¶ 141.)

- Plaintiffs allege the purported conspiracy to fix prices for Desonide commenced immediately after a National Association of Chain Drug Stores annual meeting in April 2013 (*id.* ¶156). But there is no allegation that either of Actavis's supposed co-conspirators – Perrigo and Taro Pharmaceutical – were in attendance (*id.* ¶158). Further, in April 2013, Actavis did not even sell Desonide.

In sum, the alleged price-fixing is not demonstrated by the underlying allegations describing drug pricing and purported co-conspirator meetings.[9]

### B.   The Complaint Fails To Plead A "Strong Inference" Of Scienter

Plaintiffs' Section 10(b) claim fails for the added reason that there are no particularized allegations supporting a strong inference Defendants acted with scienter. *See* 15 U.S.C. § 78u-4(b)(2)(A). Plaintiffs must allege facts supporting an inference of an "intent to deceive" or "highly unreasonable (conduct), involving not merely simple, or even excusable negligence, but an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 148 (3d Cir. 2004), *abrogated*

---

[9] A court outside this Circuit recently applied a "plausibility" standard to deny a motion to dismiss in an antitrust case against Actavis and other manufacturers of Propranolol. *See In re Propranolol Antitrust Litig.*, No. 16-cv-9901, 2017 WL 1287515 (Apr. 6, 2017) (Rakoff, J.). Among other things, the court in that action rejected as non-binding (*id.* at *5) the Third Circuit decision in *In re Baby Food Antitrust Litig.*, 166 F.3d at 137, where the Court rejected allegations – like Plaintiffs' allegations here – that defendants' "economic motives to … increase their profit margins" could support an anti-trust claim, since this is an "obvious fact" and "the essence of a capitalistic economy," *id.* at 137. Further, the defendants in the Propranolol case disputed the pricing information alleged by Plaintiffs, which contributed to the court's finding of a factual dispute. *In re Propranolol*, 2017 WL 1287515, at *5. Here, by contrast, Defendants accept Plaintiffs' pricing data *arguendo*, and, as demonstrated in text, that data helps render their price-fixing allegations implausible.

*on other grounds by Tellabs*, 551 U.S. 308).  The inference "must be more than merely 'reasonable' or 'permissible'—it must be . . . cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

Plaintiffs' scienter allegations do not nearly meet this standard.  Plaintiffs do not point to any "reports or statements" available to Defendants that would have made them aware that any representation to investors was false or misleading. *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) ("[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information") (internal quotation marks omitted); *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 400 (D. Del. 2010) ("*Horizon II*"), *aff'd*, 442 F. App'x 672 (3d Cir. 2011) (dismissing complaint where no allegation "[d]efendants had access to information which, had they looked into it, would have confirmed the existence of the [price-fixing] conspiracy").[10]  Indeed, there are no allegations identifying any data or information available to anyone responsible for Allergan's representations that would have indicated Allergan's reported revenues (AC ¶ 204), or descriptions of "strong growth" (*id.* ¶¶ 179-203), or descriptions of the generics market generally (*id.*), were somehow false or misleading.  Rather, Plaintiffs' "scienter" allegations largely rehash their earlier allegations that there was "motive" and "opportunity" for Allergan to engage in **price-fixing** (*id.* ¶¶ 227-34), which ignores Plaintiffs' distinct burden to set forth particularized allegations of an intent by Allergan *to **mislead investors***. *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 493 (3d Cir. 2013) ("Investors must show that

---

[10]   The sole pricing "documents" referenced in the Complaint are the "pricing models" that Confidential Witness No. 2 ("CW2") alleges non-defendants Messrs. Boyer, Falkin, and Rogerson had access to.  (AC ¶¶ 83-84.)  However, CW2 provides no information that would demonstrate that the "pricing models" would have revealed the alleged price-fixing conspiracy.  In fact, it is not even clear that CW2 has ever seen the "pricing models."

[defendants], with 'a mental state embracing intent to deceive, manipulate, or defraud' made some material misrepresentation") (quoting *Tellabs*, 551 U.S. at 319).

  1. <u>Plaintiffs' Allegations Of Price-Fixing Do Not Support A Particularized Showing That Any Defendant Intended To Deceive Investors</u>

  In their attempt to establish scienter, Plaintiffs recycle the same allegations that Defendants had the "motive" and "opportunity" to engage in price-fixing, including because of their desire to maximize profits and their attendance at trade shows.  (AC ¶¶ 229-31.)  And Plaintiffs again rely on their mischaracterization of price patterns in the generics market (*id.* ¶¶ 227-28), and their assumption that the Government's issuance of a subpoena confirmed the existence of an improper scheme (*id.* ¶¶ 232, 234).  These allegations, which are deficient even to allege the existence of a price-fixing conspiracy (*see* Section I.A.3, *supra*), are not nearly adequate to show that any Defendant intended for any specific representation to mislead investors.  *Winer*, 503 F.3d at 335 ("Each untrue statement or omission must be set forth with particularity as to 'the defendant' and scienter must be pleaded in regards to 'each act or omission' sufficient to support a strong inference that 'the defendant' acted with the required state of mind.") (quoting 5 U.S.C. § 78u-4(b)(2)).

  *First*, there is no allegation that any Individual Defendant, or the personnel responsible for any of the purportedly misleading representations by Allergan to investors, was aware of the alleged price-fixing.  The Individual Defendants rarely attended any of the conferences at which other personnel, who were working for Actavis, supposedly met with co-conspirators to devise the alleged price-fixing.[11]  Nothing Plaintiffs point to would have alerted Defendants to such activities.

---

[11]   No Individual Defendant is alleged to have attended any conference preceding a price increase for Propranolol or Ursodiol.  (AC ¶¶ 106, 125.)  Further, Mr. Bisaro is only alleged to have attended one conference, which allegedly preceded a price increase for Doxycycline and Desonide.  However, no competitor for Doxycycline or Desonide is alleged to have attended that conference.  Similarly, Mr. Olafsson is alleged to have attended one conference, which allegedly preceded a price increase for Doxycycline and Desonide.  However, that preceded Actavis's entry into the Desonide market by seven months.  (*Id.* ¶¶ 142, 145.)

The Third Circuit has been clear that Plaintiffs cannot simply assume knowledge by the Defendants based on their position within the company, or because certain of their subordinates were supposedly involved in the pricing scheme. *Alpharma*, 372 F.3d at 150 ("allegations that [defendant's] subordinate knew of the irregularities occurring in Brazil provide an insufficient basis upon which to impute knowledge to [defendant]"); *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 442 F. App'x 672, 677 (3d Cir. 2011) ("*Horizon III*") (affirming dismissal for lack of scienter despite fact that non-defendant employees pled guilty to price-fixing that "affected a substantial portion of [defendant's] business"); *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 556 (D.N.J. 2010) ("Plaintiff's attempt to impute knowledge to the Individual Defendants by virtue of their employment has been rejected as a basis for an inference of scienter").

Plaintiffs' suggestion that Defendants had a duty to investigate the alleged price-fixing upon public disclosure of the governmental investigations (AC ¶ 232) is a dead-end. *Horizon II* is instructive. There, one of the defendants' "crucial" subsidiaries pled guilty to price-fixing which had a "significant[]" impact on the defendant's earnings. 713 F. Supp. 2d at 400. Nonetheless, the court rejected the argument the defendants should have been aware of the price-fixing because, given the "covert nature of a price-fixing conspiracy," plaintiffs "pleaded no facts to establish that any of [the] defendants had access to information which, had they looked into it, would have confirmed the existence of the conspiracy." *Id.* Here, plaintiffs similarly fail to point to a single document Defendants had access to which would have confirmed the existence of the alleged conspiracy – a conspiracy that, by its very nature, would have been "covert" and difficult to detect. *Id.*; *see also Teamsters Local 445*, 531 F.3d at 196. Moreover, unlike in *Horizon II*, no one at Allergan has pled guilty, been convicted of, or even been charged with price-fixing.

*Second,* even putting aside that Plaintiffs' allegations are aimed at the supposed motive and opportunity to commit price-fixing (as opposed to committing securities fraud), allegations of motive and opportunity are insufficient to support scienter under Section 10(b). *See Bauer v. Eagle Pharm., Inc.*, No. 16-cv-309, 2017 WL 2213147, at *12 (D.N.J. May 19, 2017). Moreover, "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from [the] fraud." *Rahman v. Kid Brands*, *Inc.*, 736 F.3d 237, 245-46 (3d Cr. 2016). Plaintiffs' allegation that Defendants had "a common motive" to increase profits (AC ¶ 229) is precisely the type of universally held motive that cannot raise an inference of scienter. *Id.* at 246. Likewise, Plaintiffs cannot plead scienter based on allegations of government investigations. *See, e.g.*, *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 167 (S.D.N.Y. 2015) ("[G]overnment investigations cannot bolster allegations of scienter that do not exist, and, as currently pled, the government investigations are just that, investigations.").

*Third,* even if it could be assumed Defendants were aware of the purported price-fixing, there is no explanation as to how such knowledge would have meant Defendants intended to mislead investors in a series of public statements that had nothing to do with the four drugs that were supposedly the subject of that scheme.[12] *See* Section I.A.2(a), *supra*. Contrary to Plaintiffs'

---

[12] Plaintiffs cannot avoid this conclusion with their allegation that the 4 out of 250 drugs constituted "core" products. (AC ¶ 233.) The "core operations" doctrine is not applicable where, as here, the products at issue do not make up a significant portion of the core operations' revenue. *Kid Brands*, 736 F.3d at 246; *Bd. of Trustees of City of Ft. Lauderdale Gen. Employees' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 872 (S.D.N.Y. 2011), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012). The Complaint does not include any allegations indicating that Allergan or its Actavis unit generated a substantial portion of their revenue from the purported price-fixing, and, as discussed in Section I.A.2(a), *supra*, the figures that are included reveal that the total revenue from those products was immaterial as a matter of law. Further, the core operations doctrine does not raise an inference of scienter absent "ample" evidence that defendants

allegations, it is more reasonable to infer Defendants were not aware of the alleged price-fixing and did not act with scienter given the immaterial revenue attributable to the drugs at issue. *In re Ariad Pharm., Inc. Sec. Litig.*, 842 F.3d 744, 750 (1st Cir. 2016) ("the marginal materiality of an omitted fact tends to undercut the argument that defendants acted with the requisite intent ... in not disclosing it") (internal quotation marks omitted).

2.    <u>The Alleged Stock Sales Do Not Support An Inference Of Scienter</u>

The only scienter allegations arguably directed to Defendants' supposed intent to mislead investors are the allegations of insider stock sales.  (AC ¶¶ 239, 243, 247, 249.)  It is settled, however, that Courts "will not infer fraudulent intent from the mere fact that some officers sold stock." *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 279 (3d Cir. 2009).  Rather, the sales must be unusual in scope or timing. *Id.*

Mr. Saunders and Ms. Hilado, who have served as the CEO and CFO of Actavis and then Allergan since July 2014 and December 2014, respectively, are not alleged to have sold a ***single*** share during the class period.  This negates any inference of scienter across all Defendants.  *See Advanta*, 180 F.3d at 540 (fact that certain individual defendants "sold no stock at all during the class period, rais[es] doubt whether the [other defendants'] sales were motivated by an intent to profit from inflated stock prices").

In any event, the timing of the stock sales by the remaining Defendants was not suspicious, as it all occurred between November and December of 2013 (*see* AC ¶¶ 239, 243, 247, 249), years before the alleged price-fixing was revealed and before the majority of the alleged price-fixing is alleged to have occurred.  *See, e.g.*, *Horizon II*, 713 F. Supp. 2d at 396 (stock sales occurring more than a year before price-fixing conspiracy was uncovered were not "unusual in timing" and did

---

knew their statements were false, which, as discussed in text, is absent here.  *Horizon II*, 713 F. Supp. 2d at 400.

not give rise to an inference of scienter).  Moreover, in late 2013, Allergan's stock traded well-below its high of $340.34 in July 2015 (*see* Ex. C to McClure Cert. at 10) which further negates any inference of suspicious timing.  *Hertz*, 2017 WL 1536223, at *22.

The scope of the sales is similarly innocuous.  While the Defendants who sold shares did so for a few million dollars, the allegations show that each retained larger holdings, which would have exposed them to far greater losses had they actually been aware of material information pertaining to a price-fixing conspiracy that could one day lead to a market drop.  (*See, e.g.*, AC ¶¶ 239, 241, 243, 244, 247, 249) (Mr. Bisaro retained 92%; Mr. Saunders retained 100%; Ms. Hilado retained 100%; Mr. Olafsson retained 75%; Mr. Joyce retained 63%; Mr. Buchen retained 66%).  Such sales do not give rise to an inference of scienter.  *Horizon II*, 713 F. Supp. 2d at 396 (sales of a few million dollars not unusual in scope); *Advanta*, 180 F.3d at 541  (inference of scienter not raised where individual defendants "continued to hold a sizable percentage" of stock); *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 313 (D.N.J. 2001) ("Low aggregate sales and large retained aggregate holdings rebut an inference of motive, even where some defendants have sold significant percentages").

C.    Plaintiffs Have Failed To Adequately Plead Loss Causation

Loss causation is the "causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  Plaintiffs attempt to draw that connection with their dramatic declaration that "THE TRUTH EMERGE[D]" (AC at 89) through the disclosure on August 6, 2015 of the SEC subpoena on Actavis, and a November 3, 2016 Bloomberg Article which reported that the DOJ may press charges against ***some*** in the generics industry by the end of the year, both of which allegedly resulted in a drop in value of Allergan's stock.  Neither of these allegations support a showing of loss causation.

*First*, the announcement of a subpoena or possible charges does not permit the conclusion wrongdoing actually occurred, which means any resultant stock drop was caused by speculation, not misrepresentation.  *See, e.g.*, *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014), *as amended* (Sept. 11, 2014) ("Consequently, any decline in a corporation's share price following the announcement of an investigation can only be attributed to market speculation about whether fraud has occurred.  This type of speculation cannot form the basis of a viable loss causation theory."); *Sapssov v. Health Mgmt. Assoc., Inc.*, 608 F. App'x 855, 863 (11th Cir. 2015) ("Revelation of the . . . investigation, including issuance of subpoenas, does not show any actual wrongdoing and cannot qualify as a corrective disclosure."); *see also  Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, No. 12-cv-00993, 2016 WL 7117455, at *11 (M.D. Pa. Dec. 7, 2016) ("An SEC investigation does not reveal to the market that a company's previous statements were false or fraudulent.").

*Second*, Plaintiffs' theory that a disclosure purportedly revealing problems at Actavis was the cause of a drop in the value of Allergan's share price makes no logical sense.  As Plaintiffs acknowledge, the sale of the Actavis generics business had already been announced by the time of those disclosures.  (AC ¶¶ 40, 169.)  Thus, Allergan's future prospects and revenues – *i.e.*, those matters that would have been of concern to investors – had nothing to do with the ongoing performance of the Actavis generics business.  It is also telling that Teva, which purchased the generics business, closed that transaction in August 2016 at the same price that was disclosed in July 2015, which was before the public announcement that Actavis had received a subpoena.  (*Id.* ¶¶ 40, 169.)  These reports thus had no effect on the $40.5 billion in cash and securities that Allergan and its shareholders received for selling Allergan's generics business.

*Third*, when a stock rebounds shortly after a corrective disclosure it negates loss causation. *See, e.g.*, *In re Immucor, Inc. Sec. Litig.*, No. 09-cv-2351, 2011 WL 3844221, at *2 (N.D. Ga. Aug.

29, 2011) (dismissing securities case where stock rebounded to pre-disclosure price shortly after the class period).  Here, it took only *two trading days* for Allergan's stock to fully recover from the price it was trading at prior to the November 3, 2016 disclosure cited by Plaintiffs.  *See* Ex. C to McClure Cert. at 17.

## II.       PLAINTIFFS' SECTION 20(a) CLAIM SHOULD BE DISMISSED

Because Plaintiffs have failed to properly allege a 10(b) violation their Section 20(a) violations also fail.  *City of Edinburgh*, 754 F.3d at 177.  In addition, a Section 20(a) claim requires allegations of culpable participation, *MB Inv. Partners*, 708 F.3d at 484, and for the same reasons Plaintiffs cannot plead scienter, they cannot plead culpable participation.  *See supra* Section I.B.

## III.      PLAINTIFFS' SECTION 14(a) CLAIMS SHOULD BE DISMISSED

In Counts III and IV, Plaintiffs invoke Section 14 of the Exchange Act, claiming Defendants made material misstatements or omissions in the proxy solicitations for the Forest Merger and Allergan Merger, respectively.  But Plaintiffs never describe any statements in those solicitations, much less provide an explanation as to how they were false.

### A.       Plaintiffs Fail to Allege a Material Misstatement or Omission in the Proxy

Section 14(a) prohibits "solicitation . . . made by means of any proxy statement . . . containing any statement which . . . is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.  At a minimum, then, Plaintiffs must allege that "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." (internal quotation marks omitted).  *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 228 (3d Cir. 2007). Moreover, Plaintiffs must meet the heightened pleading standard of the PSLRA by "specify[ing]

each statement alleged to have been misleading, [as well as] the reason or reasons why the statement is misleading[.]"  *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1329 (3d Cir. 2002).

Plaintiffs do not come close.  They base their claim on two proxy statements, dated May 6, 2014 and January 27, 2015, but they provide no description of what representations those statements purportedly made, much less "specify each statement" and "the reasons" they were misleading.  Plaintiffs' Section 14(a) allegations amount to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," which would not "suffice[ ]" even if the PSLRA did not apply (*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  (*See* AC¶¶ 270-84, 285-98 (reciting elements of cause of action, and asserting Defendants are liable, but providing no specifics)).  Plaintiffs' failure to identify any purportedly false or misleading statements in the proxy materials warrants dismissal of the Section 14 claims.  *NAHC*, 306 F.3d at 1329.

Even if Plaintiffs had met their basic obligation to allege the purported misrepresentations in the proxy statements, their Section 14(a) claim would still fail for many of the same reasons that their Section 10(b) claim is deficient.  For instance, as set forth above (Section I.A., *supra*), the conspiracy itself has not been adequately alleged and therefore cannot form the basis of a Section 14 claim.  Moreover, even if there were adequate allegations of a price-fixing conspiracy, a proxy statement "is not a rite of confession," *Data Probe Acquisition Corp. v. Datatab, Inc.*, 722 F.2d 1, 5 (2d Cir. 1983), and "the securities laws simply do not require management to accuse itself of antisocial or illegal policies[.]"  *Bolger v. First State Fin. Servs.*, 759 F. Supp. 182, 194 (D.N.J. 1991) (internal quotation marks omitted).

B.   Plaintiffs Fail To Satisfy The Remaining Elements Of Section 14(a)

While "scienter is not [typically] a necessary element in alleging a section 14(a) claim," *Chubb*, 394 F.3d at 143-44, the Third Circuit has held that complaints alleging Section 14(a) violations that "sound in fraud[ ]" are evaluated under the heightened pleading standards of Fed.

R. Civ. P. 9(b) and the PSLRA.  *Chubb*, 394 F.3d at 142.  If the PSLRA requirements are not met, dismissal is mandatory.  *Id*.  Here, the only possible basis for the Section 14(a) claims in the Amended Complaint is the supposed price-fixing scheme alleged in support of the remaining claims.  The Section 14(a) claims are therefore "inextricably intertwined" with the fraud claims, and thus subject to the Rule 9(b) and PSLRA heightened pleading standards.  *Chubb*, 394 F.3d at 142.[13]  For the reasons set forth in Section I.B., *supra*, Plaintiffs cannot meet their burden.

Under Section 14(a), a Plaintiff also must adequately allege that the alleged misrepresentation or omission in the proxy statement actually caused economic harm to the Plaintiff (*i.e.*, loss causation).  *See Grace v. Rosenstock*, 228 F.3d 40, 47 (2d Cir. 2000) ("[L]oss causation and transaction causation must be proven in the context of a private action under § 14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.").  For the reasons explained above in Section I.C., Plaintiffs have failed to adequately allege loss causation.

C.      The Section 14(a) Claims Are Also Untimely

Lastly, the Section 14(a) claims should be dismissed because even if Plaintiffs had alleged a valid claim (and they have not), it would be untimely.  The statute of limitations for a Section 14(a) claim is one year from when the plaintiff discovered, or a plaintiff in the exercise of reasonable diligence would have discovered, the facts essential to the violation.  *In re Exxon Mobil Corp. Sec. Litig.*, 500 F.3d 189, 194, 197 (3d Cir. 2007), *as amended* (Nov. 20, 2007).  Thus, because the initial Complaint was filed on November 11, 2016, the Section 14(a) claims are untimely if they were discovered, or reasonably should have been discovered, on or before November 10, 2015.

---

[13]     Plaintiffs cannot avoid the heightened pleading standard by merely "adding a boilerplate assertion . . . disclaim[ing] any allegations of fraud."  *Chubb*, 394 F.3d at 164.

Plaintiffs' theory is that Allergan's public disclosure, in an August 6, 2015 SEC filing, that Actavis had received a subpoena revealed "the truth" that Actavis had engaged in price-fixing. (AC ¶ 217.)  According to Plaintiffs, Actavis's receipt of that subpoena "strongly" indicated the DOJ had concluded Actavis was [] engaged in improper pricing." (*Id.* ¶ 170.)  If that theory were correct, Plaintiffs' Section 14 claim would be time barred.  This action was filed in November 2016, which was well after the August 2015 disclosure that Plaintiffs claim had the effect of revealing the alleged price-fixing, and is therefore untimely.  *Wisniewski v. Fisher*, 857 F.3d 152, 158 (3d Cir. 2017).

## IV.   PLAINTIFFS' PREFERRED SHARES CLAIMS SHOULD BE DISMISSED

Neither Plaintiff is alleged to have purchased preferred shares.  *See* AC, Ex. A (Stock Certifications).  Therefore, Plaintiffs do not have standing to assert claims on behalf of preferred shareholders and those claims must be dismissed.  *See In re Cent. European Distribution Corp. Sec. Litig.*, No. 11-cv-6247, 2012 WL 5465799, at *10 (D.N.J. Nov. 8, 2012) (noting that in order to have standing either the lead plaintiff or a named plaintiff must have standing as to every claim).

## CONCLUSION

For the foregoing reasons, Plaintiffs' Amended Complaint is insufficient and should be dismissed in its entirety.

Respectfully submitted,

**REED SMITH LLP**

Dated:  July 17, 2017

*s/ Shannon McClure*
Shannon McClure, Esq.
Julia A. Lopez, Esq.
Princeton Forrestal Village
136 Main Street, Suite 250
Princeton, New Jersey 08540
Telephone: (609) 987-0050
Facsimile: (609) 951-0824
smcclure@reedsmith.com

jalopez@reedsmith.com

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
Richard Schirtzer, Esq.
(*pro hac vice* application pending)
Molly Stephens, Esq.
(*pro hac vice* application pending)
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Adam Abensohn, Esq.
(*pro hac vice* application pending)
Jesse Bernstein, Esq.
(*pro hac vice* application pending)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

*Attorneys for Defendants Allergan plc, Brenton
L. Saunders, Paul M. Bisaro, Maria Teresa
Hilado, R. Todd Joyce, Sigurdur O. Olafsson,
David A. Buchen, James H. Bloem, Christopher
W. Bodine, Tamar D. Howson, John A. King,
Ph.D., Catherine M. Klema, Jiri Michal, Jack
Michelson, Patrick J. O'Sullivan, Ronald R.
Taylor, Andrew L. Turner, Fred G. Weiss, Nesli
Basgoz, M.D., and Christopher J. Coughlin*