James E. Cecchi
Donald A. Ecklund
**CARELLA, BYRNE, CECCHI, OLSTEIN,
BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744

John C. Browne
Lauren A. Ormsbee
Abe Alexander
Michael Mathai (pro hac vice to be filed)
**BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1448

*Liaison Counsel for Lead Plaintiffs and
the Class*

*Co-Lead Counsel for Lead Plaintiffs and
the Class*

Matthew L. Mustokoff
Kimberly A. Justice
Margaret E. Onasch
Jonathan F. Neumann
**KESSLER TOPAZ
MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Co-Lead Counsel for Lead Plaintiffs and
the Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE ALLERGAN GENERIC DRUG PRICING SECURITIES LITIGATION | Case No. 2:16-cv-09449 (SDW) (LDW) <br><br> **LEAD PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................................................. i

INTRODUCTION ....................................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 5

    **I.**    Allergan's Generic Drug Business ............................................................. 5

    **II.**    Allergan and Other Drug Makers Engage in a Price-Fixing Conspiracy ............... 6

    **III.**    Defendants Made Numerous False and Misleading Statements and Omissions ............... 7

    **IV.**    Defendants Reap Millions in Insider Sales ................................................. 9

    **V.**    The Fraud Is Revealed ............................................................................ 9

    **VI.**    Post-Class Period Events Confirm Defendants' Fraud ................................. 10

        **A.**    Ongoing Investigations Into the Price-Fixing Conspiracy ................. 10

        **B.**    Identical Allegations of Price-Fixing Involving Allergan Are Sustained ............... 11

ARGUMENT ............................................................................................................ 12

    **I.**    The Heightened Pleading Standard Is Relaxed Under These Circumstances ........ 12

    **II.**    The Complaint Adequately Alleges False and Misleading Statements and Omissions ............... 13

        **A.**    Statements that the Market Was "Highly Competitive" Were Misleading ............... 14

        **B.**    Allergan Issued Misleading Financial Results Inflated by Price-Fixing ............... 15

        **C.**    Defendants' Statements Attributing Allergan's Financial Results to Wholly Legitimate Factors Were Materially Misleading ............... 16

        **D.**    Defendants' Assurances That Allergan Employees Did Not Engage in Price-Fixing Were False and Misleading ............... 19

        **E.**    The Individual Defendants' Certifications Were False and Misleading ............... 20

i

**III.**    The Complaint Adequately Pleads a Price-Fixing Conspiracy .............................. 21

**IV.**    The Complaint Alleges That Defendants Acted with Scienter ............................ 24

        **A.**    There Is a Strong Inference That Defendants Made False Statements Concerning Allergan's Core Business Operations with Scienter ............................................................................................ 24

        **B.**    The Motive Allegations Strengthen the Inference of Scienter ................. 30

**V.**    The Complaint Adequately Alleges Loss Causation ............................................. 31

**VI.**    Defendants' Remaining Arguments Fail ............................................................... 34

**VII.**    In the Event of Partial or Full Dismissal, Leave to Amend Should Be Granted .................................................................................................................. 35

CONCLUSION .................................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
    692 F.3d 34 (2d Cir. 2012)..................................................................................33

*In re Advanta Corp. Sec. Litig.*,
    180 F.3d 525 (3d Cir. 1999)................................................................................31

*In re Aetna, Inc. Sec. Litig.*,
    617 F.3d 272 (3d Cir. 2010)................................................................................18

*In re Alpharma Inc. Sec. Litig.*,
    372 F.3d 137 (3d Cir. 2004)................................................................................27

*In re Amgen Inc. Sec. Litig.*,
    544 F. Supp. 2d 1009 (C.D. Cal. 2008) ..............................................................16

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012)................................................................................23

*In re ATI Techs., Inc. Sec. Litig.*,
    216 F. Supp. 2d 418 (E.D. Pa. 2002) ..................................................................16

*Aviva Partners LLC v. Exide Techs.*, No. 05-3098,
    2007 WL 789083 (D.N.J. Mar. 13, 2007)...........................................................25

*In re Baby Food Antitrust Litig.*,
    166 F.3d 112 (3d Cir. 1999)..........................................................................22, 28

*Basic, Inc. v. Levinson*,
    485 U.S. 224 (1988)............................................................................................13

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)............................................................................................21

*In re Bradley Pharms., Inc. Sec. Litig.*,
    421 F. Supp. 2d 822 (D.N.J. 2006) .....................................................................32

*In re Braskem S.A. Sec. Litig.*, No. 15 Civ. 5132,
    2017 WL 1216592 (S.D.N.Y. Mar. 30, 2017) ....................................................18

*In re Bristol-Myers Squibb Sec. Litig.*, No. Civ.A. 00-1990,
    2005 WL 2007004 (D.N.J. Aug. 17, 2005) ...................................................15, 16

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1996)........................................................................13, 19

*Cal. Pub. Emps' Ret. Sys. v. Chubb Corp.*,
   394 F.3d 126 (3d Cir. 2004)...................................................................13, 34

*Cal. Pub. Emps' Ret. Sys. v. Chubb Corp.*, No. Civ. No. 00–4285,
   2002 WL 33934282 (D.N.J. June 26, 2002) ............................................34

*In re Campbell Soup Sec. Litig.*,
   145 F. Supp. 2d 574 (D.N.J. 2001) ....................................................16, 25

*In re Cell Pathways, Inc., Sec. Litig.*, No. 99-725,
   2000 WL 805221 (E.D. Pa. June 20, 2000) ............................................25

*In re Cent. European Distrib. Corp. Sec. Litig.*, No. 11-6247,
   2012 WL 5465799 (D.N.J. Nov. 8, 2012) ...............................................35

*Chamberlain v. Reddy Ice Holdings, Inc.*,
   757 F. Supp. 2d 683 (E.D. Mich. 2010).............................14, 15, 18, 33

*Chao Sun v. Daqing Han*, No. 15-703,
   2015 WL 9304542 (D.N.J. Dec. 21, 2015) .............................................30

*City of Roseville Employees' Retirement System v. Horizon Lines, Inc.*,
   713 F. Supp. 2d 378 (D. Del. 2010).................................................27, 31

*City of Roseville Emps. Ret. Sys. v. Horizon Lines, Inc.*,
   686 F. Supp. 3d 404 (D. Del. 2009)............................................15, 17, 20

*In re Convergent Tech. Sec. Litig.*,
   948 F.2d 507 (9th Cir. 1991) ...................................................................16

*In re DVI, Inc. Sec. Litig.*, No. 2:03-cv-05336,
   2010 WL 3522090 (E.D. Pa. Sept. 3, 2010) ..........................................32

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase*,
   553 F.3d 187 (2d Cir. 2009)...................................................................19

*In re Electrobras Sec. Litig.*, No. 15-cv-5754,
   2017 WL 1157138 (S.D.N.Y. Mar. 25, 2017) ...................................19, 20

*Friedman v. Rayovac Corp.*,
   295 F. Supp. 2d 957 (W.D. Wis. 2003) .............................................16, 18

*Foman v. Davis*, 371 U.S. 178 (1962) .........................................................35

*Galati v. Commerce Bancorp, Inc.*,
   220 Fed. App'x 97 (3d Cir. 2007).............................................................18

*In re Generic Pharm. Pricing Antitrust Litig.*,
   No. 16 MD 2724 (CMR) (E.D.Pa. Aug. 5, 2016)....................................2

*In re Gentiva Sec. Litig.*,
　932 F. Supp. 2d 352 (E.D.N.Y. 2013) ...............................................................28, 33

*Gray v. BMW of N. Am., LLC*, No. 13-cv-3417,
　2014 WL 4723161 (D.N.J. Sept. 23, 2014) ..............................................................13

*In re Hertz Global Holdings Inc. Sec. Litig.*, No. 13-7050,
　2017 WL 1536223 (D.N.J. April 27, 2017) ..............................................................31

*Ieradi v. Mylan Labs., Inc.*,
　230 F.3d 594 (3d Cir. 2000) ........................................................................................19

*In re Indep. Energy Holdings, PLC Sec. Litig.*,
　154 F. Supp. 2d 741 (S.D.N.Y. 2001) ........................................................................20

*In re Infineon Techs. AG*, No. C 04-04156,
　2006 WL 1329887 (N.D. Cal. May 16, 2006) .......................................14, 15, 16, 18

*In re Infineon Techs. AG Sec. Litig.*, No. C 04-04156,
　2008 WL 11333700 (N.D. Cal. Jan. 25, 2008) ..........................................................27

*Institutional Investors Group v. Avaya, Inc.*,
　564 F.3d 242 (3d Cir. 2009) ..............................................24, 25, 26, 28, 30, 31

*In re Intelligroup SEC Litig.*,
　527 F. Supp. 2d 262 (D.N.J. 2007) .............................................................................32

*In re LaBranche Sec. Litig.*,
　405 F. Supp. 2d 333 (S.D.N.Y. 2005) ........................................................................16

*Lipow v. Net 1 UEPS Techs., Inc.*,
　131 F. Supp. 3d 144 (S.D.N.Y. 2015) ........................................................................29

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
　797 F.3d 160 (2d Cir. 2015) ........................................................................................35

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
　513 F.3d 702 (7th Cir. 2008) .................................................................................25, 27

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
　927 F. Supp. 1297 (C.D. Cal. 1996) ...........................................................................31

*McCabe v. Ernst & Young LLP*,
　494 F.3d 418 (3d Cir. 2007) ........................................................................................32

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
　164 F. Supp. 3d 568 (S.D.N.Y. 2016) ........................................................................21

*Menkes v. Stolt-Nielsen S.A.*, No. 3:03 CV 409,
 2005 WL 3050970 (D. Conn. Nov. 10, 2005) .......................................................14

*In re Merck & Co., Inc., Deriv., & ERISA Litig.*, No. 05-1151,
 2011 WL 3444199 (D.N.J. Aug 8, 2011) .............................................................32

*In re MicroStrategy, Inc. Sec. Litig.*,
 115 F. Supp. 2d 620 (E.D. Va. 2000) ...................................................................31

*In re Moody's Corp. Sec. Litig.*,
 599 F. Supp. 2d 493 (S.D.N.Y. 2009)...................................................................20

*Nat'l Junior Baseball League v. Pharmanet Dev. Group Inc.*,
 720 F. Supp. 2d 517 (D.N.J. 2010) .......................................................................27

*Novak v. Kasaks*,
 216 F.3d 300 (2d Cir. 2000)..................................................................................28

*In re Party City Sec. Litig.*,
 147 F. Supp. 2d 282 (D.N.J. 2001) .......................................................................31

*In re Petrobras Sec. Litig.*,
 116 F. Supp. 3d 368 (S.D.N.Y. 2015)...................................................................20

*In re Platinum & Palladium Antitrust Litig.*, No. 1:14-CV-9391,
 2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) ......................................................22

*Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*,
 645 F. Supp. 2d 210 (S.D.N.Y. 2009)...................................................................33

*In re Propranolol Antitrust Litig*, No. 16-CV-09901,
 2017 WL 1287515 (S.D.N.Y. Apr. 6, 2017)............................................... *passim*

*In re Propranolol Cases*,
 16-PP-27240 (CMR) (E.D.Pa. Aug. 5, 2016) .........................................................2

*In re Providian Fin. Corp. Sec. Litig.*,
 152 F. Supp. 2d 814 (E.D. Pa. 2001) ................................................16, 17, 18, 25

*Public Empls' Ret. Sys. of Mississippi v. Amedisys, Inc.*,
 769 F.3d 313 (5th Cir. 2014) ................................................................................33

*In re RAIT Fin. Trust Sec. Litig.*, No. 2:07-cv-03148,
 2008 WL 5378164 (E.D. Pa. Dec. 22, 2008)........................................................25

*In re Ramp Cos. Sec. Litig.*, No. 05 Civ. 6521,
 2006 WL 2037913 (S.D.N.Y. Jul., 12, 2006) .......................................................20

*In re Schering-Plough Corp./Enhance Sec. Litig.*, No. 08-CV-397,
    2009 WL 2855457 (D.N.J. Sept. 2, 2009) ....................................................................13, 21

*In re Schering-Plough Corp./Enhance Sec. Litig.*, No. 8-397,
    2012 WL 4482032 (D.N.J. Sept. 25, 2012) .............................................................35

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
    266 F. Supp. 2d 1150 (C.D. Cal. 2003) ..................................................................31

*Shaev v. Saper*,
    320 F.3d 373 (3d Cir. 2003)..................................................................................34

*Shapiro v. UJB Fin. Corp.*,
    964 F.2d 272 (3d Cir. 1992)..................................................................................19

*In re Sipex Corp. Sec. Litig.*, No. C 05-00392,
    2005 WL 3096178 (N.D. Cal. Nov. 17, 2005) .......................................................19

*In re SmarTalk Teleservices, Inc. Sec. Litig.*,
    124 F. Supp. 2d 527 (S.D. Ohio 2000) ..................................................................31

*In re Sotheby's Holdings, Inc. Sec. Litig.*, No. 00 Civ. 1041,
    2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000) ...............................................14, 17

*Steiner v. MedQuist Inc.*, No. 04-5487,
    2006 WL 2827740 (D.N.J. Sept. 29, 2006) ...........................................................17

*In re Suprema Specialties, Inc. Securities Litigation*,
    438 F.3d 256 (3d Cir. 2006)......................................................................29, 31, 34

*In re Syncor Int'l Corp. Sec. Litig.*,
    239 F. App'x 318 (9th Cir. 2007) ..........................................................................17

*In re Syncor Int'l Corp. Sec. Litig.*,
    327 F. Supp. 2d 1149 (C.D. Cal. 2004) ..................................................................29

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)...................................................................33

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008)..................................................................................30

*Tellabs. Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..............................................................................................24

*United States v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015)..................................................................................21

*United States v. Socony–Vacuum Oil Co.*,
    310 U.S. 150 (1940)........................................................................................23

*In re Van der Moolen, Holding N.V. Sec. Litig.*,
    405 F. Supp. 2d 388 (S.D.N.Y. 2005)..........................................................16, 17

*In re Xcel Energy, Inc.*,
    364 F. Supp. 2d 980 (D. Minn. 2005)...........................................................29

**STATUTES**

15 U.S.C. §78u-4(b)(2) .....................................................................................24

Fed. R. Civ. P. §9(b) .........................................................................................13

Fed. R. Civ. P. §10b .....................................................................................34, 35

Fed. R. Civ. P. §12(b)(6) ..................................................................................22

Fed. R. Civ. P. §14(a) ...................................................................................34, 35

Fed. R. Civ. P. 15(a)(2) ....................................................................................35

Fed. R. Civ. P. §20(a) .......................................................................................34

**OTHER AUTHORITIES**

SEC Staff Accounting

## INTRODUCTION

This securities litigation arises from Allergan's participation in a generic drug price-fixing conspiracy that caused the prices of generic drugs sold by Allergan and its co-conspirators to skyrocket up to 7,000% during the Class Period.[1]  This conspiracy is the focus of an ongoing criminal investigation by the U.S. Department of Justice Antitrust Division ("DOJ") that has already resulted in felony guilty pleas of two pharmaceutical company executives, an ongoing civil litigation brought by 47 state Attorneys General (the "State AGs"), Congressional investigations, and over 100 civil antitrust class action lawsuits, now consolidated into eighteen multidistrict lawsuits alleging antitrust claims (the "Generic Drugs MDL").  Seven of those Generic Drugs MDL actions target Allergan, and four focus on the specific drugs identified by Lead Plaintiffs in the Complaint.[2]  Allegations supporting Allergan's role in this price-fixing conspiracy have already been sustained in one of the Generic Drugs MDL actions in which Judge Rakoff of the Southern District of New York held that allegations substantially identical to those in the Complaint sufficiently alleged that Allergan and other drug companies engaged in a conspiracy to

---

[1] On May 1, 2017, Lead Plaintiffs Sjunde AP-Fonden and Union Asset Management Holding AG ("Plaintiffs") filed a Consolidated Amended Class Action Complaint (the "Complaint") against Allergan plc (doing business as Actavis plc at all relevant times until approximately June 15, 2015) ("Allergan" or the "Company"), Paul Bisaro ("Bisaro"), Brenton L. Saunders ("Saunders"), R. Todd Joyce ("Joyce"), Maria Teresa Hilado ("Hilado"), Sigurdur O. Olafsson ("Olafsson"), and David A. Buchen ("Buchen") (collectively, the "Individual Defendants"), and certain members of Allergan's Board of Directors (the "Director Defendants").  On July 17, 2017, Defendants moved to dismiss the Complaint (the "Motion" or the "Mot.").  Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Complaint.  Citations to ¶_ refer to the Complaint. Emphasis is added and citations or quotations are omitted unless otherwise noted.

[2] The Complaint provides detailed allegations concerning Allergan's price-fixing of propranolol, ursodiol, doxycycline, and desonide (the "Price-Fixed Drugs").  This action may grow to include additional generic drugs whose prices were fixed through similar conspiratorial conduct by Allergan, as noted in the Complaint.  *See* ¶7 ("Allergan's anti-competitive conduct impacted ***at least*** four generic drugs.").  Allergan is a defendant in three other consolidated actions in the Generic Drugs MDL that target other drugs: fluocinonide, lidocaine/prilocaine, and pravastatin.

fix the price of propranolol. *See In re Propranolol Antitrust Litig*, 2017 WL 1287515 (S.D.N.Y. Apr. 6, 2017) (now consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation– In re Propranolol Cases*, 16-MD-2724 (CMR); 16-PP-27240 (CMR) (E.D. Pa.)).

The Complaint spells out a clear case of securities fraud. During the Class Period (October 29, 2013 to November 2, 2016), Allergan and its senior executives intentionally misled investors into believing that the Company's generic drugs were competitively priced in compliance with the antitrust laws. Defendants also misled investors regarding the most fundamental aspects of the Company's business, including the legality and sustainability of its pricing practices and the underlying reasons for its reported earnings and growth. Reassured by Defendants' statements and Allergan's reported revenue (which was tainted by this fraud), investors believed that Allergan's generic drug business was able to generate increasing revenues through legitimate business practices.

Investors began to learn the truth on August 6, 2015, when Allergan revealed that the DOJ had served it with a grand jury subpoena seeking information on its generic drug pricing, "thus becoming the biggest company yet to draw scrutiny in the government's widening antitrust probe of the [generic drug] industry." On this news, Allergan's common stock dropped $17.17 per share in a single day. Defendants remained silent about the investigation over the following year, but on November 3, 2016, investors learned that the DOJ's probe had intensified and that charges might be filed against Allergan and other potential co-conspirators. On this news, Allergan's stock price fell again, with its common stock dropping $9.07 per share.

Scrutiny of the price-fixing conspiracy and Allergan's role in it has only intensified. The DOJ's grand jury investigation of Allergan and its industry rivals is active, ongoing, and, according to recent statements made by the DOJ since the filing of the Complaint, likely to result in additional

criminal charges brought against participants in the price-fixing conspiracy. According to sources cited by Bloomberg, the investigation already "spans more than a dozen companies and about two dozen drugs," a fact confirmed by the DOJ on May 1, 2017 when it sought to intervene in the Generic Drugs MDL and stated: "Evidence uncovered during the criminal investigation implicates other companies and individuals (*including a significant number of the Defendants [in the Generic Drug MDL]*) in collusion with respect to doxycycline hyclate, glyburide, and other drugs (*including a significant number of the drugs at issue [in the MDL]*)." In fact, the DOJ and the State AGs' investigations have resulted, to date, in two felony guilty pleas by the CEO and another executive of a drug company (Heritage) that is alleged in the Complaint to have conspired with Allergan to fix the price of propranolol.

Plaintiffs expect discovery will reveal significant additional evidence of Allergan's participation in the antitrust conspiracy and Defendants' culpability here. Defendants move to dismiss this case at the pleading stage—before any discovery has taken place, and while discovery in the criminal and civil antitrust actions is still under seal. In doing so, they downplay the seriousness and active status of the DOJ's investigation, ignoring almost completely the *Propranolol* opinion sustaining identical allegations in the antitrust complaint, and otherwise raise a series of boilerplate arguments contending that the Complaint does not satisfy the requirements of the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

First, Defendants argue that the Complaint "fails to plead any material misrepresentation or omission" because even if Allergan participated in the criminal conspiracy to artificially inflate the price of generic drugs as alleged, the Court should still conclude, as a matter of law, that Defendants did not make a single misleading statement about Allergan's business. Mot. 2, 12-19. Defendants are wrong: the Complaint particularizes numerous false statements relating to, among

other things, (a) Allergan's pricing and competition; (b) Allergan's financial results that were inflated by Defendants' anticompetitive pricing; and (c) the sources of Allergan's supposedly legitimate revenues.  For example, while Allergan was engaging in anticompetitive conduct, Defendants stated: "***We actively compete in the generic pharmaceutical industry***."  ¶¶183, 193, 202.  Defendants also repeatedly attributed the Company's revenue growth to legitimate factors, such as "the continued strength, "growth," and "strong performance" of its generics business, without informing investors that that business profited from anticompetitive pricing.  *See* ¶¶184, 187, 190, 191, 194.  Once the DOJ subpoena was disclosed to investors, Defendants downplayed the scope of the criminal investigation, affirmatively and falsely stating that "[w]e have never been aggressive price takers," and have "never [taken price increases] in a significant way."  ¶200. These statements and numerous others (*see* ¶¶178-216) were false and misleading: Allergan's price increases and revenue stability were not the result of legitimate business activities, but rather a widespread price-fixing conspiracy.  Because Defendants gave specific (and false) explanations for how Allergan's results were achieved, the law is clear that they made actionable misrepresentations.

Second, Defendants argue that Plaintiffs fail to plead a price-fixing conspiracy.  Mot. 19-24.  To the contrary, the Complaint contains detailed allegations of parallel price movements in the Price-Fixed Drugs, and contains similarly detailed allegations supporting the "plus factors" that allow a fact-finder to infer a conspiracy.  ¶¶73-166.  These are the same allegations that have already been deemed sufficient to plead an antitrust conspiracy against Allergan in *Propranolol*.

Third, Defendants argue that the Complaint fails to plead scienter.  Mot. 3-4, 24-30.  This is wrong for myriad reasons.  Foremost, the Complaint alleges particularized facts giving rise to a strong inference that the Individual Defendants (each of whom made false statements) either knew

about Allergan's participation in the vast price-fixing conspiracy, or were reckless in not knowing. The "most plausible inference" from the Complaint's allegations, when viewed in their totality, is that these executives, who were extensively involved in the Company's day-to-day operations and repeatedly made statements about the Company's core business operations—including its pricing practices, competitive environment and revenues—acted with scienter.

Fourth, Defendants' attacks on the two clear corrective disclosure dates alleged in the Complaint (Mot. 30-32) are unavailing, especially in light of the Third Circuit's practical approach to loss causation at the pleading stage.

## STATEMENT OF FACTS

### I.  Allergan's Generic Drug Business

Generic drugs save consumers and the U.S. healthcare system billions of dollars each year because they are typically less expensive than their branded counterparts.  ¶68.  While the first generic drug to enter a market is generally priced 20% to 30% lower than the brand name drug, the price of a generic drug reaches an equilibrium price point, at or close to the manufacturers' marginal production costs, as more generic competitors emerge.  ¶¶64-69.  Allergan's production of generic drugs was vital to the Company's success during the Class Period, growing from 32% of the Company's total revenues to 42% of total revenues from 2014 to 2015.  ¶¶25, 204, 233. Allergan marketed and sold approximately 250 generic drugs throughout the Class Period, but listed only approximately 25 of them in its Forms 10-K as "key products" that "comprised a *majority* of product sales for North American Generics" for each year.  ¶¶121, 135, 154; Cecchi Decl., Ex. 1.  While Allergan does not disclose revenues per generic drug, three of the Price-Fixed Drugs were included in those core "key products" reported in Allergan's Forms 10-K during the Class Period (¶¶121, 135, 154), indicating that these drugs were significant contributors to Allergan's revenue.

5

## II.   Allergan and Other Drug Makers Engage in a Price-Fixing Conspiracy

Beginning in 2013, the prices for several commonly prescribed generic drugs skyrocketed. During the Class Period, Allergan and its co-conspirators increased each drug's price between *470% and 7,000%*, following years of stable pricing.  ¶¶103, 122, 136, 155.  There was no commercial justification for these price increases.  ¶¶113, 126, 146, 159.  Indeed, absent collusion, price increases of these magnitudes would have been contrary to Allergan's and each of its co-conspirators' economic interests because on an open market, each seller risked getting its raised price undercut by the others, leading to a collapse of market share (and therefore revenue).  ¶¶114, 127, 147, 160.  As set forth below, these astonishing price increases were due to an illicit price-fixing conspiracy.

This price-fixing conspiracy was possible because the markets for each of Allergan's Price-Fixed Drugs were highly susceptible to collusion.  As set forth in the Complaint, the market for each Price-Fixed Drug was highly concentrated; there were considerable barriers to entry, a lack of possible substitutes, and a high degree of interchangeability (meaning that each of Allergan's Price-Fixed Drugs could be substituted for another manufacturer's version of the same drug) in the Price-Fixed Drug Markets; and the markets for the Price-Fixed Drugs were dominated by Allergan and its co-conspirators such that the conspiracy could not be threatened by so-called fringe sellers.  ¶¶73-79, 115-20, 128-34, 148-53, 161-66.  In addition, senior executives from Allergan and its co-conspirators had regular opportunities to discuss these price hikes in person. Representatives from Allergan—including Bisaro and Olafsson, as well as senior members of Allergan's generics business during the Class Period—routinely attended conferences, meetings, and trade shows sponsored by various pharmaceutical trade associations, as well as informal face-to-face meetings during "industry dinners" and other events, all of which provided them with numerous opportunities to meet and devise the price-fixing scheme.  ¶¶80-101, 137, 139, 140, 142,

143, 145, 156, 158, 238, 246.[3]   Witnesses, including Allergan's former Associate Director of Finance, confirmed that the Allergan executives who attended the industry events preceding these unprecedented price hikes were responsible for the generic drug pricing at the Company.   ¶¶82-83.   Parallel price increases of the Price-Fixed Drugs occurred shortly after and/or in conjunction with these trade meetings.   ¶¶104-12, 123-25, 137-45, 156-58.

## III.   Defendants Made Numerous False and Misleading Statements and Omissions

*Pricing and Revenues*: Defendants issued multiple statements throughout the Class Period designed to mislead Allergan's investors into believing that Allergan's profits in the generic drug markets were legitimately (and legally) increasing.   *E.g.*, ¶¶179-80; *see also* ¶204 (reported revenues).   Notably, Defendants provided legitimate business reasons for Allergan's reported revenues and earnings, but never disclosed that the Company's revenues and the sustainability of those revenues were accomplished in part through an illegal price-fixing conspiracy.

Defendants repeatedly described Allergan's steadily rising revenues throughout the Class Period.   ¶204.   However, Defendants did not merely announce these increases, they provided specific explanations for Allergan's revenue growth.   ¶¶179-80, 182, 184-91, 194-200.   For example, Allergan repeatedly ascribed its growth in generics business revenue to its "strong base business" and sales of certain generic products.   ¶¶179, 182, 184, 185, 187, 190-91, 194.   In a 3Q 2013 earnings call with investors, Olafsson falsely attributed the Company's generic pricing

---

[3] A large number of generic drug manufacturers are headquartered in close proximity to one another in New Jersey, including Allergan, which is based in Parsippany.   This close proximity affords easier and frequent opportunities to meet and collude.   For example, the State AG action revealed that at least thirteen high-ranking male executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey in January 2014, at a time when the prices of a number of generic drugs were soaring.   Cecchi Decl., Ex. 2, ¶¶53-59.   According to the State AGs, at these industry events, executives of the top generic drug manufacturers discussed how to allocate market share to avoid competing with each other for business.   *Id*.

increases to "the opportunity to take pricing increases" in "products where there has been manufacturing problems or stock-out situation[s]." ¶180. Similarly, during a May 29, 2014 industry conference, Bisaro credited Allergan's price increases to legitimate factors, such as the "ability to take price increases on older products where the price had gone to a point where companies had to make the decision about whether to continue manufacturing or raise price." ¶186. On May 11, 2015, Bisaro again commented on Allergan's generic drug pricing during a conference call to discuss the Company's 1Q 2015 results, during which he acknowledged that "the model for generics is price decreases as more competitors come into the market," but differentiated Allergan by stating that its "pipeline and product line gives us a bit of an advantage." ¶195. After Allergan announced that the Company had been served with a federal grand jury subpoena, Defendants continued to mislead investors about the cause of the Company's revenues and price hikes. For example, on February 22, 2016, Allergan reported that "[t]he Global Generics business delivered solid performance during the fourth quarter." ¶199. The next day, on February 23, 2016, Saunders stated at a conference that "[w]e have never been aggressive price takers," and that Allergan's "business model and [] philosophy doesn't lend itself to [price increases]." ¶200.

**Competition:** Defendants also misled investors regarding Allergan's competition within the generic drugs market, actively concealing that, in fact, Allergan was colluding with its purported competitors in order to artificially inflate the prices of certain generic products, to the direct detriment of purchasers of generic prescription drugs. On October 31, 2013, Allergan stated that "[t]he pharmaceutical industry is highly competitive . . . ***We face strong competition in all of our businesses***." ¶181. In its annual Forms 10-K, Allergan repeatedly stated that "***We actively compete in the generic pharmaceutical industry***," and noted that the Company "face[d] competition from brand name companies in the generic market," including from its co-conspirators

8

Mylan and Teva.   ¶¶183, 193, 202.   While the Company stated that it faced competition, Defendants assured investors that market share and pricing were secure because of Allergan's "ability to capitalize on product opportunities," "operational excellence," its "broad portfolio," and for other purported legitimate reasons.   ¶¶179, 189, 197-98.

*Compliance with Antitrust Laws*: Allergan's publicly available Code of Conduct, which was reproduced in the Company's Annual Reports and which clearly applies to the Individual Defendants' conduct, states that: "No employee may discuss with, or provide information to, any competitor about pricing or related matters, whether the information concerns the Company or Actavis' suppliers, distributors, wholesalers or customers."   ¶215.   There can be no question that the conspiratorial conduct at the heart of this fraud was prohibited: the Code of Conduct provides specific examples of anticompetitive conduct, including "[a]greements or understandings with competitors on price," that "need not be in writing . . . to be unlawful," and "can be oral or inferred from the conduct of the parties."   *Id.*

## IV.   Defendants Reap Millions in Insider Sales

Once the price-fixing scheme was underway, in November and December 2013, Defendants Bisaro, Joyce, Olafsson and Buchen collectively sold over 118,000 shares of Allergan common stock during the Class Period, totaling $20.1 million in proceeds.   ¶¶239, 243, 247, 249. These sales comprised a significant portion—up to 37%—of these Defendants' total holdings.   *Id.*

## V.   The Fraud Is Revealed

Allergan revealed to investors that the DOJ had roped the Company into its price-fixing probe on August 6, 2015, when Allergan disclosed that the DOJ had served Allergan with a grand jury subpoena.   ¶¶217, 219.   *Bloomberg* noted that Allergan was "the biggest company yet to draw scrutiny in the government's widening antitrust probe of the [generic drug] industry."   ¶218.   This revelation, which was widely covered by the press, disclosed that the "DOJ is looking into whether

drugmakers colluded to raise generic prices." ¶221.   On this news, Allergan's common stock dropped $17.17 per share in one day—5% from its previous closing price—and Allergan's preferred share price dropped 3.5%, or $39.24 per share.  ¶220.

On November 3, 2016, investors learned that the DOJ's probe had intensified and that criminal charges could soon be filed against Allergan and other co-conspirators.   ¶222. Specifically, *Bloomberg* reported that "U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion," and noted that "the first charges" in this broad investigation "could emerge by the end of the year." *Id.*  Allergan's stock fell price fell again, with its common stock dropping $9.07 per share (roughly 4.6%) and its preferred shares dropping $30.03 per share (roughly 4.1%).  ¶223.

## VI.   Post-Class Period Events Confirm Defendants' Fraud

### A.   Ongoing Investigations Into the Price-Fixing Conspiracy

On December 12 and 13, 2016, the DOJ filed criminal charges against Jason T. Malek and Jeffrey A. Glazer, President and CEO, respectively, of Allergan competitor Heritage, for price-fixing in connection with two drugs, one of which—doxycycline delayed release—is also sold by Allergan in a similar regular release format.  ¶171.   Heritage is an alleged co-conspirator with respect to the price fixing of propranolol.  ¶104.  Malek and Glazer entered guilty pleas on January 9, 2017.  ¶172.  That same day, twelve State AGs announced their own charges against Heritage and five other entities for conspiring to fix the prices of the same two drugs.  ¶174.   The Connecticut AG made clear that this conspiracy was directed from the very top: "the misconduct was conceived and carried out by ***senior drug company executives and their subordinate marketing and sales executives***."  ¶177.  The Connecticut AG noted that the DOJ and State AG charges were just the tip of the iceberg (¶¶173, 177), stating: "we have evidence of widespread participation in illegal conspiracies across the generic drug industry."   ¶177.

Both the DOJ and the State AGs (which now number 47) have confirmed, as recently as September 12, 2017, that the investigation into a price-fixing conspiracy among the top pharmaceutical companies is ongoing, active, and likely to result in additional charges in the near term.  The DOJ has successfully sought to stay further discovery in the Generic Drugs MDL in order to preserve its developing investigation.  In support of this stay, the DOJ explained on May 1, 2017 that "[e]vidence uncovered during the criminal investigation implicates other companies and individuals (***including a significant number of the Defendants [in the Generic Drug MDL]***) in collusion with respect to doxycycline hyclate, glyburide, and other drugs (***including a significant number of the drugs at issue [in the Generic Drug MDL]***)."  Cecchi Decl., Ex. 3, at 1.  The State AGs similarly noted on May 24, 2017 that their investigation "is ongoing with regard to to a number of ***additional*** generic drugs, generic drug companies and key executives," and informed the MDL Court on September 12, 2017 that the State AGs would file an amended complaint in late October that will "expand the scope of our case" to include "a significant number" of additional generic drugs and reflect that "there is really widespread misconduct and anti-competitive conduct" in the generic drug market.  *Id.*, Ex. 4, Ex. 5, at 27-30.

**B.**     **Identical Allegations of Price-Fixing Involving Allergan Are Sustained**

In addition to its involvement in the ongoing federal and state investigations, Allergan has been named as a defendant in seven of the eighteen Generic Drugs MDL actions based on the Company's generic drug price-fixing, four of which involve the Price-Fixed Drugs and seven of which involve Allergan.  Cecchi Decl., Ex. 6, App. B.  Claims against Allergan involving a conspiracy to fix the price of one of the Price-Fixed Drugs were sustained by Judge Jed Rakoff, who concluded that the existence of a price-fixing conspiracy was reasonably alleged.  *See Propranolol*, 2017 WL 1287515, at *4-8.

First, Judge Rakoff found that defendants "had a motive to increase prices because they operate in an oligopolistic market characterized by falling prices." *Propranolol*, 2017 WL 1287515, at *4-5. Here, as in *Propranolol*, the Complaint alleges market-specific factors leading to these falling prices, including that the markets for the Price-Fixed Drugs were highly concentrated (*i.e.*, "oligopolistic") (¶¶74-75, 115-16, 128-29, 148-49, 161-62), that generic versions of the Price-Fixed Drugs offered by different drug companies are "interchangeable," such that pricing remained stable and at "an equilibrium price point, at or close to the manufacturers' marginal production costs" for years (¶¶67, 78, 104-05, 107-08, 110-11, 119, 123-24, 133, 137-38, 140-41, 143-44, 152, 156-57, 165), and that "drug cost reimbursements from insurance companies are capped at a certain price" called the Maximum Allowable Cost pricing. ¶¶8, 69. Second, Judge Rakoff found that, absent collusion, "the price increases were against defendants' self-interest because in a competitive market, defendants should have tried to undercut each other's prices to increase their market share." *Id*. at *4-7. The Complaint alleges the same. ¶¶113-14, 126-27, 146-47, 159-60. Third, Judge Rakoff found that "defendants frequently communicated at trade association meetings," *id*., and the Complaint likewise contains detailed allegations regarding regular communications between the co-conspirators. ¶¶80-101, 106, 109, 112, 125, 139, 142, 145, 158. Fourth, as Judge Rakoff and the Complaint have both noted, there are ongoing state and federal investigations for price manipulation of generic drugs that are active and likely to lead to additional evidence of price-fixing. *Id*.

## ARGUMENT

### I.     The Heightened Pleading Standard Is Relaxed Under These Circumstances

While the Complaint's allegations satisfy the Third Circuit's heightened pleading standards typically applied in securities fraud cases, this Circuit recognizes that, even in cases brought under the PSLRA, the "[heightened pleading] standard is 'relaxed somewhat where the factual

information is peculiarly within the defendant's knowledge or control.'" *In re Schering-Plough Corp./Enhance Sec. Litig.*, 2009 WL 2855457, at *2 (D.N.J. Sept. 2, 2009) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1996)); *see also Gray v. BMW of N. Am., LLC*, 2014 WL 4723161, at *2 (D.N.J. Sept. 23, 2014) (where fraud "is the fraudulent omission of information within the exclusive control of the Defendant, the standard is relaxed.").

These considerations are particularly relevant here.  As detailed in the Complaint, the criminal investigation is still active, additional charges by both the DOJ and State AGs are likely, and, as a result, discovery in the numerous pending civil actions is stayed.  Moreover, because strict protective orders govern the disclosure of information in the Generic Drugs MDL, *see* Cecchi Decl., Ex. 7 at ¶¶9.2, 9.3, the antitrust plaintiffs filed their August 15, 2017 consolidated class action complaints under seal, further limiting Plaintiff's access to facts regarding the price-fixing cartel.  Accordingly, while Plaintiffs have met their burden under the PSLRA and Rule 9(b), it would be entirely appropriate to relax that standard in these circumstances.

## II.    The Complaint Adequately Alleges False and Misleading Statements and Omissions

Under the PSLRA, a complaint need only allege facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission."  *Cal. Pub. Emps' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004).  A misstatement or omission of fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).

Here, Defendants repeatedly misled investors during the Class Period by describing the competitive landscape Allergan faced—specifically, the "highly competitive" market for generic drugs—and represented that none of its employees engaged in anticompetitive conduct, yet omitted the crucial facts that Allergan "competed" through anticompetitive agreements to fix the

prices of certain drugs. Defendants also misled investors by presenting income figures without disclosing that some of the income derived from Allergan's illicit anticompetitive activity.

### A.    <u>Statements that the Market Was "Highly Competitive" Were Misleading</u>

Defendants' statements asserting that the market for Allergan's generic drugs was "highly competitive," including with respect to "price," were false and misleading because Allergan was engaged in a scheme to fix the prices of its generic drugs. Courts have repeatedly held that a company makes a false statement where, as here, it asserts that it operates in a competitive industry while it is engaged in anti-competitive behavior. *See, e.g.*, *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 711-12 (E.D. Mich. 2010) (statements characterizing industry in which issuer operated as "highly competitive" were misleading); *In re Infineon Techs. AG*, 2006 WL 1329887, at \*3, \*6 (N.D. Cal. May 16, 2006) ("*Infineon I*") (sustaining "statements describing Infineon's business, its competition, market growth, product demand, profit forecasts, and other similar subjects," including that the environment included "intense" and "significant" competition); *Menkes v. Stolt-Nielsen S.A.*, 2005 WL 3050970, at \*3, \*10 (D. Conn. Nov. 10, 2005) (statements about competition in defendant's market were false because defendant "had a duty to disclose its alleged anti-competitive conduct arising from these statements"); *In re Sotheby's Holdings, Inc. Sec. Litig.*, 2000 WL 1234601, at \*4 n.2 (S.D.N.Y. Aug. 31, 2000) (statements that "Competition in the international art market is intense" were misleading when company engaged in collusive behavior).

Defendants argue erroneously that the Complaint fails to allege these statements are misleading because it does "not explain how alleged price-fixing on 4 out of 250 generic drugs (without any allegation of price-fixing as to an additional 80 brand drugs) makes the pharmaceutical industry, as a whole, not competitive." Mot. 16. <u>First</u>, as the Company's own disclosures make clear, three of the four Price-Fixed Drugs were ***"key products"*** that, together

with several other generic drugs, "comprised a **_majority_** of product sales for North American Generics" for each year. *See* ¶¶121, 135, 154; Cecchi Decl., Ex. 1. <u>Second</u>, Defendants' statements do not broadly concern the "pharmaceutical industry, as a whole," but rather the generic market, specifically. Defendants stated, "**_we actively compete in the generic pharmaceutical industry_**," a market that was "**_highly competitive_**." ¶¶24, 181, 183, 193, 202. These statements were not academic observations about the state of the pharmaceutical industry; they were false representations that Allergan's products possessed competitive strengths, were positioned to thrive in a crowded marketplace, and, critically, that Allergan's "financial success was due to lawful competition." *See Chamberlain*, 757 F. Supp. 2d at 693. <u>Third</u>, courts routinely find similar statements concerning competition to be actionable where the issuer was engaged in anti-competitive conduct, even absent allegations that all or most of the issuer's products were affected by that conduct. *See, e.g.*, *Infineon I*, 2006 WL 1329887, at \*3, \*6. After all, even if Allergan faced competition with respect to some aspects of its generics business, its statements would, at best, constitute misleading "half-truths" given the criminal anticompetitive behavior impacting some of its "key products." *In re Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004, at \*22-23 (D.N.J. Aug. 17, 2005) ("'The disclosure required by the securities laws is measured not by literal truth but by the ability of the material to accurately inform rather than mislead prospective buyers.' . . . [A] defendant may choose silence or speech based on the then-known factual basis, but cannot choose half-truths.").

### B.    <u>Allergan Issued Misleading Financial Results Inflated by Price-Fixing</u>

Allergan's statements reporting revenues, including revenues from its generics business, were false and misleading throughout the Class Period because these statements failed to disclose that the reported results were inflated by Allergan's illicit price-fixing scheme. *See City of Roseville Emps. Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 415-16 (D. Del. 2009)

15

("*Horizon I*") ("'Accurately depicting successful financial performance, but attributing the performance to the wrong source, is misleading under the securities laws.'") (quoting *In re ATI Techs., Inc. Sec. Litig.*, 216 F. Supp. 2d 418, 436 (E.D. Pa. 2002)); *In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 824-25 (E.D. Pa. 2001) ("[B]ecause of the illegal or fraudulent sales practices, the statements misstated or inflated Providian's financial results."); *In re Campbell Soup Sec. Litig.*, 145 F. Supp. 2d 574, 588-89 (D.N.J. 2001) (financial results misleading when inflated by illegal conduct).[4]  Defendants' attempt to argue that these statements are not misleading because "Allergan accurately reported its revenues" (Mot. 14) is contrary to this prevailing law:  Allergan's "historical financial information was false and misleading because it omitted information concerning the price-fixing conspiracy."  *Infineon I*, 2006 WL 1329887, at *6; *see also Bristol-Myers Squibb*, 2005 WL 2007004, at *23 ("[E]ven objectively true statements can be actionable if . . . Defendants omitted material information that rendered a facially true statement false or misleading . . .").

C.    **Defendants' Statements Attributing Allergan's Financial Results to Wholly Legitimate Factors Were Materially Misleading**

Throughout the Class Period, Defendants repeatedly made statements attributing Allergan's revenue, growth, market share, and pricing strategy in its generics business to legitimate business factors and conditions.  ¶¶179-80, 182, 184-91, 194-200, 204-05.  These statements were false and misleading when made because, unknown to investors, senior management's price-fixing scheme was a factor driving the revenue and market share of Allergan's generics business and the price increases for its generic drugs.  It is black letter law that, when a company puts at issue the

---

[4] *See also In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1034 (C.D. Cal. 2008) (same); (same); *In re Van der Moolen, Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 414-26 (S.D.N.Y. 2005) (same); *Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 991 (W.D. Wis. 2003) (same); *In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991).

cause of its financial results, it cannot fail to disclose that improper business practices contributed to those results.  *See, e.g.*, *Providian*, 152 F. Supp. 2d at 824-25; *Horizon I*, 686 F. Supp. 2d at 416 ("attributing [financial] performance to only lawful conduct falls below the level of honesty required by the securities laws").[5]

In *Providian*, the court held that an issuer's statements crediting the company's success to factors such as a "customer-focused approach" were misleading where the complaint alleged that "illegal or fraudulent, profit inflating practices" were an undisclosed cause of that success.  152 F. Supp. 2d at 824-25.  As the court explained, having put "the topic of the cause of Providian's success in play," the company was "obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information."  *Id*.  The court had little trouble concluding that "[w]ere Providian engaged in a series of illegal or fraudulent business practices and were those practices responsible for inflating revenue, profit, and the customer base, such information would clearly alter the mix of information available to the public as to the source of Providian's success."  *Id*. at 825.

Defendants argue that these are inactionable puffery and "[g]eneral and vague statements of optimism."  Mot. 15.  In making this argument, Defendants fail to confront the reality of what

---

[5] *See also Steiner v. MedQuist Inc.*, 2006 WL 2827740, at *16 (D.N.J. Sept. 29, 2006) (statements "attributing its revenues to legitimate business factors such as 'increased sales to existing customers, sales to new customers and additional revenue from acquisitions'" were misleading where they failed to disclosed issuer's illicit "billing scheme"); *In re Syncor Int'l Corp. Sec. Litig.*, 239 F. App'x 318, 320 (9th Cir. 2007) ("By attributing Syncor's success solely to legitimate practices, defendants implicitly (and falsely) warranted that there were no illegal practices contributing to that success."); *Van der Moolen*, 405 F. Supp. 2d at 400-01 (statements "concerning the sources and significance of revenue" were misleading because they failed to disclose that revenue had been generated in part by subsidiary's trading activities that violated NYSE rules); *Sotheby's*, 2000 WL 1234601, at *4 (sustaining claims based on statements "publicly tout[ing] the positive impact of [legitimate activities] as the sources of improved revenues, when the real cause of the increased profits was the illegal collusion").

17

they told investors by mischaracterizing the statements as "routine recitations of past financial performance" that tout the Company's "strong global growth" and "strong results." *Id.* However, these statements are materially false not because they characterize Defendants' results as "strong," but because they attribute those results to legitimate business factors. Defendants ignore the long line of cases, cited above, holding such statements actionable.[6]

Defendants also argue that the Complaint fails to allege these statements are misleading because Plaintiffs do not quantify the impact of the Price-Fixed Drugs on Allergan's financial results. Mot. 17-18. First, the Complaint clearly alleges that the Price-Fixed Drugs were material to Allergan's revenues as a select few "key products." ¶¶121, 135, 154. Second, and in any event, Plaintiffs are not required to allege the precise amounts by which Allergan's financial results were artificially inflated, and courts regularly sustain securities claims that do not contain such quantification. *See Friedman*, 295 F. Supp. 2d at 991; *Providian*, 152 F. Supp. 2d at 824-25; *Infineon I*, 2006 WL 1329887, at *6; *In re Braskem S.A. Sec. Litig.,* 2017 WL 1216592, at *17-18 (S.D.N.Y. Mar. 30, 2017); *Chamberlain,* 757 F. Supp. 2d at 693-94, 708.

Defendants similarly ask the Court to find, at the pleading stage, that Allergan's price-fixing of (at least) four generic drugs is immaterial as a matter of law because the Company manufactures many generic drug products, not all of which have been impacted by price fixing. Mot. 17-18. This argument holds no weight. Defendants ignore that "[m]ateriality is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder

---

[6] Defendants rely on *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272 (3d Cir. 2010) and *Galati v. Commerce Bancorp, Inc.*, 220 Fed. App'x 97 (3d Cir. 2007) to support their argument that statements attributing Allergan's financial success to legitimate causes are immaterial. Mot. 15. Unlike this case, the statements at issue in *Aetna* and *Galati* did not discuss the causes of the issuers' financial results. *Aetna*, 617 F.3d at 275-76 (issuer merely described pricing policy as "disciplined," and did not discuss causes of reported financial results); *Galati*, 220 Fed. App'x at 102 (describing deposit growth as "strong" without describing causes of growth).

would draw from a given set of facts are peculiarly for the trier of fact." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 280 n.11 (3d Cir. 1992). Thus, "[o]nly if the alleged misrepresentations or omissions are so ***obviously unimportant*** to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." *Id.* (emphasis in original).

Moreover, courts have held that the fact that an issuer is engaged in illegal conduct is, ***by itself***, material, regardless of the impact of such conduct on the Company's financial performance. *See In re Electrobras Sec. Litig.*, 2017 WL 1157138, at *8 (S.D.N.Y. Mar. 25, 2017) (failure to disclose bribery scheme held material without allegations concerning the "quantitative material[ity]" of scheme); *In re Sipex Corp. Sec. Litig.*, 2005 WL 3096178, at *2 (N.D. Cal. Nov. 17, 2005) ($350,000 sham transaction was material because it indicated that "top management" were "potentially corrupt," regardless of size of transaction compared to size of company). Indeed, Defendants wholly ignore explicit guidance that a quantitatively small misstatement of a financial item may nevertheless be material if it involves concealment of an unlawful transaction. *See* SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45, 150 (1999).[7]

## D.   Defendants' Assurances That Allergan Employees Did Not Engage in Price-Fixing Were False and Misleading

During the Class Period, Defendants put Allergan's compliance with antitrust and price-fixing laws squarely at issue by assuring investors through its Code of Conduct that Allergan

---

[7] Defendants' reliance on *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426-27 (3d Cir. 1997) and *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase*, 553 F.3d 187, 203 (2d Cir. 2009) is misplaced, as neither of these cases involved a failure to disclose illegal conduct. Defendants' reliance on *Ieradi v. Mylan Labs., Inc.*, 230 F.3d 594, 599 (3d Cir. 2000) is also unavailing: that case held that a failure to disclose anti-competitive contracts was immaterial because the company's previous disclosure of an FTC investigation already alerted investors that it was engaging in anti-competitive conduct.

employees did not enter into "[a]greements or understandings with competitors on price" and did not "discuss with, or provide information to, any competitor about pricing or related matters." ¶215.  These statements were false and misleading because they communicated to investors that Allergan was complying with antitrust laws at the same time the Company was engaged in a price-fixing scheme.  *See Electrobras*, 2017 WL 1157138, at *2-3 (statements in code of ethics that company would "refuse and denounce any form or attempt of corruption, bribery, kickback and 'backscratching'" were actionable where company was engaged in bribery scheme); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 375-77, 380-81 (S.D.N.Y. 2015) (issuer's statements "tout[ing] its Code of Ethics and corruption prevention program" were misleading where company was engaged in bribery scheme).[8]

### E.  The Individual Defendants' Certifications Were False and Misleading

Defendants Bisaro, Saunders, Hilado, and Joyce certified that Allergan's SEC filings "fairly present[ed] in all material respects the financial condition" of Allergan and did not contain any material misstatements or omissions.  ¶¶206-13.  These certifications were false because Allergan's periodic reports presented misleadingly inflated financial results and contained false and misleading statements.  *See Horizon I*, 686 F. Supp. 3d at 419 ("Typically, plaintiffs alleging fraud on the basis of Sarbanes–Oxley certifications do so by setting forth the inaccuracy of the financial numbers themselves . . . ."); *see also In re Ramp Cos. Sec. Litig.*, 2006 WL 2037913, at

---

[8] *See also In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 508-09 (S.D.N.Y. 2009) (sustaining claim based on alleged violation of its code of conduct); *In re Indep. Energy Holdings, PLC Sec. Litig.*, 154 F. Supp. 2d 741, 759 (S.D.N.Y. 2001) (same).  Defendants' argument that assurances in the Code of Conduct are not actionable (Mot. 19) is incorrect, especially where, as here, compliance with the Code's standards are "objectively verifiable"; are sufficiently specific rather than overly vague; and are not "couched in the language of optimism or hope," but rather purport to reflect the current state of affairs of the company.  *See, e.g.*, *Electrobras*, 2017 WL 1157138, at *2-3; *Petrobras*, 116 F. Supp. 3d at 375-77, 380-81.

*4 (S.D.N.Y. Jul., 12, 2006).[9]

### III.   The Complaint Adequately Pleads a Price-Fixing Conspiracy

To allege a price fixing conspiracy, "a plaintiff must show the existence of additional circumstances, often referred to as 'plus' factors, which, when viewed in conjunction with the parallel acts, [] serve to allow a fact-finder to infer a conspiracy." *United States v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015).  The Complaint contains copious facts demonstrating Allergan's collusive conduct—a conclusion already reached by another court.  *See* discussion *supra* at 11-12.

Defendants' arguments to the contrary are unavailing.  <u>First</u>, the allegations of an underlying conspiracy must be "plausible on [their] face" and not pled "with particularity." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007) (plausibility pleading standard applies to all elements except for scienter and falsity); *see Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 578 (S.D.N.Y. 2016) ("When a securities fraud action rests on the failure to disclose uncharged illegal conduct, the complaint must state a ***plausible*** claim that the underlying conduct occurred.").  This plausibility standard is further bolstered by the Third Circuit's relaxation of any heightened pleading standard when evidence of the fraud is particularly under the control of Defendants, as it is here.  *See Schering-Plough*, 2009 WL 2855457, at *2.[10]

<u>Second</u>, and in any event, the Complaint alleges in detail not only that Defendants had "frequent opportunities" and motive to conspire at industry conferences, but that those

---

[9] Defendants insist that the Complaint fails to independently allege that these certifications are false because it has not "alleged that the executives who signed those certification had knowledge their certifications were false." Mot. 18-19.  This is wrong—Plaintiffs amply allege Defendants' knowledge of the price-fixing conspiracy.  ¶¶226-233, 236-38, 240-242, 244-246, 248.

[10] Both cases cited by Defendants in support of their argument that the existence of a conspiracy must be pleaded with particularity (Mot. 20) are distinguishable because plaintiffs in those two cases failed to allege how the conspiracy actually broke any laws. That is not so where the violated federal laws are clear.

opportunities were taken and acted upon to artificially inflate drug prices by up to 7,000%.  ¶¶80-101, 137, 139-140, 142-143, 145, 156, 158, 238, 246.  The Court should conclude here, as in *Propranolol*, that the Complaint "set[s] forth in detail that defendants' attendees [at trade association meetings] were responsible for setting drug prices and that the stated purposes of the various conferences were to provide 'peer-to-peer connections'" (¶87), "strategic business discussions" (¶92), and "opportunities to meet one-on-one and engage in collusive conduct" (*id.*). 2017 WL 1287515, at *7 ("Plaintiffs accordingly have alleged ***far more than the 'mere opportunity to conspire,'*** and so have shown a high level of interfirm communications.").

Third, Defendants' argument that the price movements of the Price-Fixed Drugs do not exhibit parallel price movements (Mot. 22-24) is squarely contradicted by the clearly parallel price movements as graphed in the Complaint.  ¶¶104, 107, 110, 123, 137, 140, 143, 156.  Also, whether certain price increases constitute parallel movement is a highly factual question that is inappropriate for resolution on a motion to dismiss.  *See In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *32 (S.D.N.Y. Mar. 28, 2017) ("The choice between two plausible inferences that may be drawn from [alleged price movements] is not a choice to be made by the court on a Rule 12(b)(6) motion.").[11]  As Judge Rakoff concluded with respect to Allergan's and its co-conspirators' pricing of propranolol, "Defendants consistently raised prices on a bi-monthly

---

[11] *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 137 (3d Cir. 1999), cited by Defendants (Mot. 21, 24), is inapposite. As noted in *Propranolol*, *Baby Food* is distinguishable because "[t]here, plaintiffs submitted an expert report in support of their motion for summary judgment that 'never made any reference to the evidence in this case,' [] 'never analyzed the pricing conduct[,]' and included nothing more than 'an abstract statement based on 'economic theory' that the interest in enhancing profits motivated the defendants to conspire' to raise the price of baby food in the United States." 2017 WL 1287515, at *5. While the Third Circuit in *Baby Food* concluded that such "bare opinion of an obvious fact" was insufficient to establish motive, *Baby Food*, 166 F.3d at 137-38, here, the Complaint "detail[s] a regulatory regime that has historically pushed the price of Propranolol downwards and gradually reduced defendants' profits, thereby giving them a common motive to conspire." 2017 WL 1287515, at *5; *see* ¶229.

22

and quarterly basis, which is consistent with an illegal agreement." *Propranolol*, 2017 WL 1287515, at *6-7 & n.12 (rejecting defendants' attempts to provide alternative explanations for price increases). *See also United States v. Socony–Vacuum Oil Co*., 310 U.S. 150, 222-23 (1940) (price changes need not be uniform to evidence price fixing). Moreover, there were no supply shortages or increased costs during the Class Period to otherwise explain the historic price increases for all four Price-Fixed Drugs. ¶7.

Fourth, Defendants' attempt to minimize and ignore the ongoing criminal investigation should be rejected. Mot. 21-22. Allergan received a ***criminal*** grand jury subpoena *duces tecum*. ¶169. That fact, alone, supports an inference of a price-fixing conspiracy and Allergan's potential involvement in it.[12] In addition, the DOJ and the State AGs have made clear that evidence developed in their respective investigations implicates "a significant number of the Defendants" and "a significant number of the drugs at issue" in the Generic Drug MDL. *See* discussion *supra* at 10-11. Allergan, and the generic drugs it sold, are named in 7 of the 18 MDL actions. There can be no doubt that Allergan is in the DOJ's crosshairs. And as Judge Rakoff concluded in *Propranolol*, the scope of the DOJ investigation, combined with the Heritage guilty pleas, "raises an inference of conspiracy." 2017 WL 1287515, at *8-9.[13]

---

[12] *See* DOJ, ANTITRUST DIVISION MANUAL (5th ed. 2015) at III-82, §F-1 (when deciding whether to request the initiation of a grand jury investigation, which needs to be approved by a field chief and sent to the Antitrust Criminal Enforcement Division, "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution") (*available at* https://www.justice.gov/atr/file/761141/download).

[13] The argument that the Complaint does not allege "direct evidence" of a conspiracy (Mot. 20) is irrelevant because "conspiracies are rarely evidenced by explicit agreements but nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators." *Anderson News*, *L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012).

## IV.    The Complaint Alleges That Defendants Acted with Scienter

To plead scienter, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2).  A plaintiff has sufficiently pled scienter when "all of the facts, taken collectively, give rise to a strong inference" of either reckless or conscious behavior; (s)he is not required to show that "any individual allegation, scrutinized in isolation, meets that standard." *Tellabs. Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007) (scienter allegations "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre").  Moreover, as the Third Circuit has explained, the scienter analysis under *Tellabs* is "case specific" and *per se* a matter of factual degree:

> [The scienter analysis] will ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, ***it is at least as likely as not that defendants acted with scienter*** . . . . 'In assessing the allegations holistically as required by *Tellabs*, the federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective.'

*Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 269, 274-75 (3d Cir. 2009).  A court must consider the factual allegations of the complaint in their entirety, and take into account only those "plausible opposing inferences"—*i.e.*, plausible nonculpable explanations for the defendant's conduct—that may be "rationally drawn from the facts alleged." *Tellabs*, 551 U.S. at 314.  Thus, it is the defendant's burden to demonstrate that the allegations give rise to an inference of nonculpable conduct that is *stronger* than the inference of scienter. *Id.*

### A.    There Is a Strong Inference That Defendants Made False Statements Concerning Allergan's Core Business Operations with Scienter

Defendants violated antitrust laws by engaging in an antitrust conspiracy to fix the prices of the Price-Fixed Drugs. *See* discussion *supra* at 6-12.  These allegations, standing alone, are sufficient to raise a strong inference of scienter with respect to this concealed anticompetitive

24

activity.  *See Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) ("Intentional misconduct is easily identified since it encompasses deliberate illegal behavior."); *Aviva Partners LLC v. Exide Techs*., 2007 WL 789083, at *12 (D.N.J. Mar. 13, 2007) (scienter satisfied through allegations of "conscious wrongdoing, such as intentional fraud or other deliberate illegal behavior.").

Numerous, additional well-pled facts give rise to the inference that Defendants acted knowingly, or at a minimum recklessly, in making their false statements and omissions.  First, courts have held that the fact that a fraud, like the one alleged here, involves a company's core operations supports a strong inference of scienter.  *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.* ("*Tellabs II*"), 513 F.3d 702, 709, 711 (7th Cir. 2008) (finding a strong inference of CEO's scienter when it was "exceedingly unlikely" that he was completely unaware of the problems with the company's two major products when he was "[a]t the top of the corporate pyramid" and made numerous false statements about the products); *Campbell Soup*, 145 F. Supp. 2d at 599 ("disclosures [that] involve the company's core business" impute knowledge).[14]

The Third Circuit's decision in *Avaya* is especially informative here.  In *Avaya*, the plaintiff's "central allegation" was that Avaya, a company whose core business was selling communications products, had misrepresented the pricing competition facing the company, falsely stating that there were no significant changes to the pricing environment when, in fact, the company was engaged in widespread discounting.  564 F.3d at 268-273.  In holding that allegations regarding pricing pressures gave rise to a strong inference of scienter, the Third Circuit noted that, even absent any evidence of direct knowledge by the CFO, such as a "particular document or

---

[14] *See also In re Cell Pathways, Inc., Sec. Litig.*, 2000 WL 805221, at *7 (E.D. Pa. June 20, 2000) ("[W]here the alleged fraud relates to the core business of the company, knowledge of the fraud may be imputed to the individual defendants"); *In re RAIT Fin. Trust Sec. Litig.*, 2008 WL 5378164, at *12-13 (E.D. Pa. Dec. 22, 2008); *Providian*, 152 F. Supp. 2d at 818.

conversation," several statements made by the CFO about the stable nature of the company's pricing environment were sufficient to give rise to the strong inference that he knew or was reckless in not knowing that the pricing environment was not stable. *Id.* at 270.[15]  The court found that "the possibility that [the CFO] was ignorant is not necessarily exculpatory" because even if he was unaware of "the entirety of the other circumstances alleged by Shareholders, he might be culpable as long as what he knew made obvious the risk that his confident, unhedged denials of unusual discounting would mislead investors." *Id.*

As in *Avaya*, the Individual Defendants made a series of actionable misrepresentations concerning the sources of Allergan's revenue and generic drug price increases without disclosing that these results were achieved only by entering into an illegal price fixing conspiracy.  ¶¶180, 186-91, 194-200.  By repeatedly making statements that referenced the "highly competitive" market, the pricing of generic drugs, and the reasons for increased revenues in Allergan's generic drugs business, Defendants demonstrate that these issues were part of the core operations of Allergan on which the Company's most senior executives focused.  Indeed, Allergan's ability to increase prices for some of its "key product" generic drugs was perhaps the single most important aspect of Allergan's business.  The fact that these Defendants spoke repeatedly about these core operational issues without disclosing the unlawful price fixing scheme underlying them suggest they "were at least reckless, which is enough to survive a motion to dismiss under the PSLRA." *Avaya*, 564 F.3d at 269.

---

[15] Here, the Complaint alleges that the Generic Pricing Department, whose head reported to Defendants Olafsson and Buchen at varying times, who in turn reported to Defendants Bisaro and Saunders, created and maintained pricing models and approved all pricing changes.  ¶¶82-85. Given these allegations, and *Avaya*'s acknowledgement that a "particular document or conversation" need not be alleged to find a strong inference of scienter, 564 F.3d at 270, Defendants' focus on the lack of specific "reports or statements" presented to Defendants is without import.  Mot. 25.

The price-fixing scheme here lasted for several years and succeeded in dramatically manipulating the prices of Allergan's "key products" on a nationwide scale. Such an undertaking could not be done without the knowledge and approval of the Company's senior executives, especially when the members of Allergan's generic drug management team who attended the majority of the trade meetings at which price collusion occurred and who were responsible for pricing decisions reported directly to Olaffson and Buchen, who in turn reported directly to Bisaro and Saunders. ¶¶81-85. Such significant corporate actions could not have been accomplished by rogue employees, but rather required the approval and direction of Allergan's most senior officers. *See In re Infineon Techs. AG Sec. Litig.*, 2008 WL 11333700, at *7 (N.D. Cal. Jan. 25, 2008) (the "price-fixing conspiracy could not have been perpetrated over such a long period of time without the knowledge and complicity of persons at the highest levels of management at the company"); *Tellabs II*, 513 F.3d at 711 (***"Is it conceivable that [the CEO] was unaware of the problems of his company's two major products and merely repeating lies fed to him by other executives of the company? It is conceivable, yes, but it is exceedingly unlikely."***).[16]

Second, on several occasions, Defendants attributed the Company's increased revenues in its generic drugs business to legitimate business practices, even after public scrutiny into generic drug pricing intensified following the October 2014 Congressional hearings. *E.g.*, ¶¶190-91, 194-200. These Defendants either possessed the detailed knowledge they claimed to have concerning

---

[16] Plaintiffs do not ask this Court to "simply assume knowledge" based on Defendants' "position within the company." Mot. 27. Defendants' cited cases involved alleged schemes that were smaller in scope or based on technical accounting violations and did not involve obvious phenomena such as inexplicable price hikes of up to 7,000%. *See In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 141 (3d Cir. 2004) (alleged violation of GAAP and revenue recognition policy); *City of Roseville Employees' Retirement System v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 388, 400 (D. Del. 2010) ("*Horizon II*") (revenue up less than 10%, and increase not necessarily suspicious); *Nat'l Junior Baseball League v. Pharmanet Dev. Group Inc.*, 720 F. Supp. 2d 517, 524 (D.N.J. 2010) (allegations concerned backlog and "book-to-bill ratio" figures.)

the factors that drove the strong performance in the Company's generic drugs business, and thus their statements were knowingly false, or they lied about having this information: either way, scienter is pled.  *See Novak*, 216 F.3d at 311 (scienter established where defendants "knew . . . ***or had access to*** information suggesting that their public statements were not accurate").

Third, the astronomical price increases alleged here (and in *Propranolol*) were, absent a price-fixing agreement, clearly against the co-conspirators' self-interest:

> Absent price collusion, if one manufacturer raises the price of a given drug, its competitors will seek to increase their own market share by selling the drug to the first manufacturer's customers at lower prices.  Indeed, under the "maximum allowable cost" ("MAC") pricing regime that governs much of the U.S. generic pharmaceutical market, drug cost reimbursements from insurance companies are capped at a certain price, and if a drug manufacturer raises its prices above this cap while its competitors do not, the reimbursements for the higher-priced drug will cease.  Thus, it would not be in any drugmaker's unilateral self-interest to increase the prices of its generic drugs unless it had an agreement with the other drugmakers that they would do the same.

¶8; *see also* ¶¶69, 114, 127, 147, 160, 228; *cf. Propranolol*, 2017 WL 1287515, at *7 ("plaintiffs have plausibly alleged that the price increases in Propranolol capsules and tablets were against defendants' self-interest").[17]  Both the fact that the price hikes were contrary to Allergan's self-interest and the lack of benign market explanations for the increases (¶¶7, 113, 126, 146, 159) "diminish the plausibility of innocent explanations," and as the Third Circuit noted in *Avaya*, "as the plausibility of [] benign explanations shrinks, the cogency of the culpable explanation"—here, price collusion—correspondingly grows."  564 F.3d at 271-72.

Fourth, the fact that the grand jury issued a subpoena *duces tecum* to Allergan as part of the DOJ's wide-reaching criminal price-fixing investigation strongly supports an inference of

---

[17] Thus, this case is much more akin to the allegations in *Propranolol* than those in *Baby Food* (cited at Mot. 24 n.9) where the Third Circuit found that the plaintiffs offered "meager evidence of defendants' behavior contrary to self interest."  166 F.3d at 135.

scienter.  "Courts have considered a governmental investigation as one piece of the puzzle when taking a 'holistic' view of the purported facts as they relate to scienter."  *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013); *Lipow v. Net 1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 164 (S.D.N.Y. 2015) (cited by Defendants) ("the existence of an investigation . . . may be considered by the Court as part of its analysis"); *In re Xcel Energy, Inc.*, 364 F. Supp. 2d 980, 995 (D. Minn. 2005) (noting that governmental investigations "into the primary allegations of securities fraud" in a private case are included among the "usual indicia of securities fraud"); *In re Syncor Int'l Corp. Sec. Litig.*, 327 F. Supp. 2d 1149, 1162 (C.D. Cal. 2004) (finding it "appropriate to consider the SEC investigation" in evaluating scienter).  Defendants ignore (i) the scope and status of the governmental criminal and civil investigations,[18] (ii) facts about the conspiracy from statements in the criminal cases, and (iii) the fact that the governmental investigations are believed to expand to yet-to-be-named drugs, pharmaceutical companies and executives, all of which are pled in the Complaint.  ¶¶169-77.  In fact, the DOJ and State AGs unequivocally stated in the Generic Drugs MDL that uncharged senior executives of the targeted pharmaceutical companies are implicated in the scheme, specifically noting the significant overlap in defendants and drugs between their investigations and the MDL.  *See* discussion *supra* at 10-11.

The Third Circuit's decision in *In re Suprema Specialties, Inc. Securities Litigation*, 438 F.3d 256, 278 (3d Cir. 2006), is informative here.  In *Suprema*, the court found that similar allegations gave rise to a strong circumstantial inference of scienter.  The plaintiff in *Suprema* alleged that three of the company's "key customers pled guilty to fraud charges in connection with a round-trip sales scheme and admitted in their plea allocutions that they [had engaged in this

---

[18]  *See* Mot. 26 (plaintiffs rely only on "their assumption that the Government's issuance of a subpoena confirmed the existence of an improper scheme").

fraud] 'at the direction and **with the participation of Suprema's management**.'" *Id.* at 278. Here, the Heritage CEO/Chairman and President, both of whom pled guilty to generic drug price-fixing, specifically admitted to conspiring with other competitors who, while not yet named as defendants, "participated as co-conspirators in the offenses charged" by the DOJ. ¶¶171-73. Moreover, both the DOJ and the State AGs have recently affirmed that new charges are likely given the scope of the investigations.[19]  Cecchi Decl., Exs. 3-5.

### B.    The Motive Allegations Strengthen the Inference of Scienter

Motive and opportunity "are to be considered along with all other allegations in the complaint" in assessing whether scienter has been adequately alleged, and, when insider stock sales are "unusual in scope or timing, they may support an inference of scienter." *Avaya*, 564 F.3d at 276-79. In addition to allegations regarding the Individual Defendants' knowledge or reckless disregard of the facts, the Complaint alleges that Defendants were motivated and had the opportunity to mislead the public. ¶¶229-31, 238-39, 243, 246-47, 249.

First, Plaintiffs allege a unique, industry-specific motive, namely, the fact that the prices for generic drugs had stabilized or "bottomed out" as a result of the regulatory pricing regime for generic drugs, prompting Defendants and their industry rivals to collude on prices. *See, e.g.*, ¶229 (Price-Fixed Drug prices had leveled off, creating "a common motive to conspire to raise prices"); *cf. Propranolol* 2017 WL 1287515, at *5 (finding "common motive to conspire").

Second, collectively, Bisaro, Joyce, Olafsson, and Buchen sold over 118,000 shares of

---

[19] Even assuming the Court determines that Plaintiffs' scienter allegations as to the Individual Defendants are insufficient, courts in this Circuit have found that scienter against the Company is established where, as here, "'the pleaded facts create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter.'" *Chao Sun v. Daqing Han*, 2015 WL 9304542, at *12 (D.N.J. Dec. 21, 2015) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)).

stock for $20.1 million during the Class Period.   ¶¶239, 243, 247, 249.   Under the totality of the

circumstances alleged here, these sales are probative of scienter.   *See Suprema*, 438 F.3d at 277-

78.   Defendants argue that the lack of sales by Saunders and Hilado somehow negate entirely the

inference to be drawn from the sales of the other four Defendants.   Mot. 29.   However, Saunders

and Hilado did not assume leadership positions at Allergan until July and December 2014,

respectively.   *Id.*   It is reasonable to assume that the commencement of the Congressional

investigation into price-fixing preempted any stock sales after October 2, 2014, and so it makes no

sense to interpret these Defendants' lack of trading as exculpatory.   Defendants' argument that the

lack of any insider sales in and after 2014 negates scienter (*id.* at 29-30) should be rejected for the

same reason—heightened scrutiny likely prevented any unusual stock sales.   Finally, Defendants'

attacks on "[t]he scope of the sales" are meritless.   *Id.* at 30.   Sales of $20.1 million of stock,

comprising 8%, 37%, 25% and 33% of the four Individual Defendants' holdings respectively, are

suspicious.   Indeed, courts regularly find that insider sales of a magnitude significantly less than

those at issue in this action provide a strong inference of scienter.[20]

## V.       The Complaint Adequately Alleges Loss Causation

The Complaint adequately alleges two loss causation events: the August 6, 2015 disclosure

that Allergan had "received a subpoena from the DOJ" and the November 3, 2016 disclosure that

---

[20] *See, e.g.*, *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1168-69 (C.D. Cal. 2003) (sale of 7.6%); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 647 (E.D. Va. 2000) (sales of as little as 2.2% indicative of scienter); *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 542 (S.D. Ohio 2000) (sales of 40%, 37%, 27%, and 11%); *Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1313 (C.D. Cal. 1996) (selling 20% of stock holdings for $6.3 million is suspicious). Each of Defendants' cases is easily distinguished from the present case, and involved sales pursuant to Rule 10b5-1 plans or sales of far less than 10% of holdings. *See Avaya*, 564 F.3d at 279; *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 540-41 (3d Cir. 1999); *In re Hertz Global Holdings Inc. Sec. Litig.*, 2017 WL 1536223, at *22 (D.N.J. April 27, 2017); *Horizon II*, 713 F. Supp. 2d at 396; *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 313 (D.N.J. 2001).

the DOJ may press charges against generic drug manufacturers, both of which were followed by significant declines in the price of Allergan securities.  ¶¶217-25.

The Third Circuit does not impose an overly rigorous requirement on the pleading of loss cassation.  To the contrary, this Circuit has adopted a "practical approach [to loss causation], in effect applying general causation principles."  *McCabe v. Ernst & Young LLP,* 494 F.3d 418, 426 (3d Cir. 2007).  Under this standard, a plaintiff need only show that "the misrepresentation ***touches upon*** the reasons for the investments decline in value."  *Id.* at 428.  Further, it is well-established that "loss causation can be predicated on a series of partial disclosures," *In re Merck & Co., Inc., Deriv., & ERISA Litig.,* 2011 WL 3444199, at *31 (D.N.J. Aug 8, 2011), and "the market does not have to learn of possible fraud from the company itself."  *In re DVI, Inc. Sec. Litig.,* 2010 WL 3522090, at *6-7 (E.D. Pa. Sept. 3, 2010).  Indeed, courts in this Circuit have upheld corrective disclosures premised upon announcements of regulatory investigations, *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828-29 (D.N.J. 2006), or through "whistleblowers, analysts questioning financial results, resignation of CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspapers and journals, etc.'" *In re Intelligroup SEC Litig.,* 527 F. Supp. 2d 262, 297 n.18 (D.N.J. 2007).  *See also Merck*, 2011 WL 3444199, at *31 (third party scientists and analysts unaffiliated with Defendant partially corrected the fraud).

In the face of these well-settled principles, Defendants argue that the announcement of a subpoena is mere "speculation" that as a matter of law cannot support an allegation of loss causation.  Mot. 31.  Defendants, however, conspicuously fail to cite any Third Circuit precedent for this proposition.  In fact, Judge Hochberg reached the opposite conclusion in *Bradley*, rejecting this argument and holding that the disclosure of an informal SEC inquiry accompanied by a significant stock decline constituted a disclosure event.  421 F. Supp. 2d at 828-29.

Numerous courts have similarly held that an announcement of a regulatory investigation in such circumstances can be a corrective disclosure.[21] As the court in *Gentiva*, 932 F. Supp. 2d at 388, stated:

> The Court rejects the idea that the disclosure of an investigation, absent an actual revelation of fraud, is not a corrective disclosure. To embrace this notion would be to preclude any type of action such as this, where there has been no conclusive finding of fraud by a government agency, or a criminal charge initiated, or a formal corrective disclosure the defendant[.]

Defendants' argument that the November 3, 2016 disclosure does not establish loss causation because Allergan's stock price increased on the following day is unavailing at the pleading stage. As the Second Circuit held in *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 39 (2d Cir. 2012), "the fact that the price rebounded does not, at the pleading stage, negate the plaintiff's showing of loss causation" because "determining *why* a stock's price rebounded after an initial drop requires the court to consider 'a competing theory of causation and raises factual questions not suitable for resolution on a motion to dismiss.'" The *Acticon* Court explained that at the pleading stage, courts "do not resolve why the [] share price rose after its initial fall and instead, drawing all reasonable inferences in favor of [plaintiff], assume that the price rose for reasons unrelated to its initial drop." *Id.* at 40; *see also id.* at 41 ("[T]he recovery does not negate the inference that Acticon has suffered an economic loss.").[22]

---

[21] *See Public Empls' Ret. Sys. of Mississippi v. Amedisys, Inc.*, 769 F.3d 313, 344 (5th Cir. 2014) (reversing dismissal, holding in error the imposition of "an overly rigid rule that government investigations can never constitute a corrective disclosure in the absence of a discovery of actual fraud"); *Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 230-31 (S.D.N.Y. 2009) (news that the "SDNY [US Attorney] and the SEC were investigating" "alone suffices to show" loss causation); *Chamberlain*, 757 F. Supp. 2d at 717 (DOJ investigation announcement was corrective disclosure); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 288 (S.D.N.Y. 2008) ("The Court has found little support for a per se rule holding that the announcement of an SEC investigation cannot form the basis for loss causation allegations.").

[22] Defendants' argument that loss causation is negated because Allergan had already sold Actavis

## VI.   **Defendants' Remaining Arguments Fail**

*The Complaint States Claims Under Section 14(a)*: A claim under Section 14(a) requires that "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Shaev v. Saper*, 320 F.3d 373, 379 (3d Cir. 2003).  Scienter is not required.  *Id.*  These claims do not "sound in fraud" and are subject to no heightened pleading standard (Mot. 33-34) because all allegations of fraud are disavowed, the claims are segregated and "are expressly pled in negligence." *Suprema*, 438 F.2d at 272-74 (distinguishing *Chubb*, 394 F.3d at 161 (cited by Defendants)). Defendants contend that the Complaint does not allege which statements were false in the May 6, 2014 and January 27, 2015 Proxies.  Mot. 33.  However, the Complaint clearly identifies false financial statements in the Proxies, ¶204, and otherwise alleges that the Proxies incorporated by reference the 2013 Form 10-K, and the 1Q, 2Q, and 3Q 2014 Forms 10Q, *id*., n.13-14.[23]

*The Complaint States Claims Under Section 20(a)*: A Section 20(a) claim requires (i) a primary securities law violation by the controlled entity, (ii) defendant's control of the primary violator, and (iii) culpable participation by the defendant.  *Suprema*, 438 F.3d at 284 n.16.

---

to Teva by November 3, 2016 is highly factual and inappropriate at this stage.  In any event, it is more plausible that the market was reacting to management's concealment of and engagement in wrongdoing, negative information which would have impacted Allergan's stock, not Teva's.

[23] Defendants do not otherwise challenge the Proxies aside from their arguments on the Section 10(b) claims. Mot. 32-34. Defendants' argument that the Section 14(a) claims are untimely because Plaintiffs were on inquiry notice of the alleged price fixing as of the filing of Allergan's Form 10-Q on August 6, 2015—which disclosed that Actavis had received a subpoena from the DOJ Antitrust Division—is inappropriate at this stage of the litigation, particularly when Plaintiffs have pleaded subsequent disclosures of alleged wrongdoing.  *See Cal. Pub. Emps' Ret. Sys. v. Chubb Corp.*, 2002 WL 33934282, at *25-26 (D.N.J. June 26, 2002) ("[T]he question of when the plaintiffs should have known of the alleged violation often requires a fact sensitive inquiry that is not appropriate at this early stage of the proceedings.").

Defendants do not dispute that the Individual Defendants controlled Allergan, and the Complaint pleads their culpable participation in Allergan's violations of Sections 10(b) and 14(a).

***Plaintiffs Have Standing To Bring Preferred Share Claims***: Courts in the District of New Jersey have clearly found that Plaintiffs have standing to bring claims on behalf of common and preferred shareholders, even if they purchased only one class of stock. *See In re Schering-Plough Corp./Enhance Sec. Litig.*, 2012 WL 4482032, at *9-10 (D.N.J. Sept. 25, 2012). Defendants' authority for excluding preferred shares claims is entirely inapposite, involving an aspiring lead plaintiff who purchased no shares during the class period and admitted that it was unqualified to serve as lead plaintiff. Mot. 35 (citing *In re Cent. European Distrib. Corp. Sec. Litig.*, 2012 WL 5465799 (D.N.J. Nov. 8, 2012)).

## VII.   In the Event of Partial or Full Dismissal, Leave to Amend Should Be Granted

In the event that the Court grants Defendants' Motion in full or part, Plaintiffs respectfully request the Court grant leave to amend the Complaint. See Fed. R. Civ. P. 15(a)(2) ("[t]he court should freely give leave when justice so requires"); *Foman v. Davis*, 371 U.S. 178, 182 (1962) ("[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits"). Not only will developments in the ongoing investigations likely lead to the release of additional relevant information, but equities favor granting leave to amend. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (leave to amend should be freely granted post-dismissal).

## CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied in its entirety.

Dated: September 15, 2017                    Respectfully submitted,

                                      /s/ James E. Cecchi
                             James E. Cecchi
Donald A. Ecklund
**CARELLA, BYRNE, CECCHI, OLSTEIN,**
**BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
decklund@carellabyrne.com

*Liaison Counsel for Lead Plaintiffs and the Class*

Matthew L. Mustokoff
Kimberly A. Justice
Margaret E. Onasch
Jonathan F. Neumann
**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
mmustokoff@ktmc.com
kjustice@ktmc.com
monasch@ktmc.com
jnewmann@ktmc.com

*Co-Lead Counsel for Lead Plaintiffs and*
*the Class*

John C. Browne
Lauren A. Ormsbee
Abe Alexander
Michael Mathai (pro hac vice to be filed)
**BERNSTEIN LITOWITZ BERGER &**
**GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1448
johnb@blbglaw.com
lauren@blbglaw.com

abe.alexander@blbglaw.com
michael.mathai@blbglaw.com

*Co-Lead Counsel for Lead Plaintiffs and
the Class*