# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

IN RE ALLERGAN GENERIC DRUG
PRICING SECURITIES LITIGATION

Civil Action No. 2:16-cv-09449 (KSH) (CLW)

Oral Argument Requested

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

---

Shannon McClure, Esq.
Julia A. Lopez, Esq.
**REED SMITH LLP**
Princeton Forrestal Village
136 Main Street, Suite 250
Princeton, New Jersey 08540
Telephone: (609) 987-0050
Facsimile: (609) 951-0824

Richard Schirtzer, Esq.
(admitted *pro hac vice*)
Molly Stephens, Esq.
(admitted *pro hac vice*)
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Adam Abensohn, Esq.
(admitted *pro hac vice*)
Jesse Bernstein, Esq.
(admitted *pro hac vice*)
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

*Attorneys for Defendants Allergan plc, Brenton L. Saunders, Paul M. Bisaro, Maria Teresa Hilado, R. Todd Joyce, Sigurdur O. Olafsson, David A. Buchen, James H. Bloem, Christopher W. Bodine, Tamar D. Howson, John A. King, Ph.D., Catherine M. Klema, Jiri Michal, Jack Michelson, Patrick J. O'Sullivan, Ronald R. Taylor, Andrew L. Turner, Fred G. Weiss, Nesli Basgoz, M.D., and Christopher J. Coughlin*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ......................................................................................1

FACTUAL BACKGROUND .......................................................................................4

    A.    Allegations Regarding Price-Fixing .........................................................5

    B.    Allegations Regarding Defendants' Statements To The Market ...........9

        1.    Statements Regarding Allergan's Reported Revenues ..............10

        2.    Statements Regarding the Generic Drug Market .....................10

    3.    Statements Regarding DOJ Subpoena .......................................11

        4.    Statements In Allergan's SEC Certifications...........................11

        5.    Statements Regarding Allergan's Code of Conduct ................12

    C.    Allegations Regarding Scienter .............................................................12

    D.    Allegations Regarding Loss Causation ..................................................12

ARGUMENT ...........................................................................................................13

I.    PLAINTIFFS' SECTION 10(B) CLAIM SHOULD BE DISMISSED ...........................13

    A.    Plaintiffs Fail to Allege a Material Misrepresentation...........................14

        1.    Plaintiffs Fail To Identify An Actionable Omission..................14

        2.    Plaintiffs Fail to Identify Any False or Misleading Statements.................15

            (a)    Allergan's Revenue Reports Were Accurate ................16

            (b)    Allergan's Generalized Statements About Growth and Competition Were Accurate ........................16

            (c)    Saunders' Statements Regarding the DOJ Subpoena Were Accurate ......................20

            (d)    The Sarbanes-Oxley Certifications Were Accurate ......21

            (e)    Allergan's Statements Concerning Its Corporate Code of Conduct Were Accurate ......................22

        3.    Plaintiffs Fail to Adequately Allege a Price-Fixing Conspiracy .............22

            (a)    Plaintiffs Fail to Allege Direct Evidence of Price-Fixing for Verapamil and Glyburide-Metformin ...............23

            (b)    Plaintiffs Fail to Allege Circumstantial Evidence of Price-Fixing for the Remaining Four Drugs..............24

    B.    The Complaint Fails To Plead A "Strong Inference" Of Scienter.........28

        1.    Plaintiffs' Allegations Of Price-Fixing Do Not Support A Particularized Showing That Any Defendant Intended To Deceive Investors.................29

i

2.      The Alleged Stock Sales Do Not Support An Inference Of Scienter ........33

C.      Plaintiffs Have Failed To Adequately Plead Loss Causation ...............................35

II.      PLAINTIFFS' SECTION 20(A) CLAIM SHOULD BE DISMISSED ..........................36

III.      PLAINTIFFS' SECTION 14(A) CLAIMS SHOULD BE DISMISSED ........................37

A.      Plaintiffs Fail to Allege a Material Misstatement or Omission in the Proxy Statements ........................................................................................................................37

B.      Plaintiffs Fail To Satisfy The Remaining Elements Of Section 14(a)..................38

C.      The Section 14(a) Claims Are Also Untimely ......................................................39

IV.      PLAINTIFFS' PREFERRED SHARES CLAIMS SHOULD BE DISMISSED .............39

CONCLUSION....................................................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

<u>**Page**</u>

### <u>Cases</u>

*In re Advanta Corp. Sec. Litig.*,
   180 F.3d 525 (3d Cir. 1999) ................................................................. 16, 33, 35

*In re Aetna, Inc. Sec. Litig.*,
   617 F.3d 272 (3d Cir. 2010) ................................................................. 13, 16, 17

*In re Alpharma Inc. Sec. Litig.*,
   372 F.3d 137 (3d Cir. 2004) ................................................................. 28, 31

*In re Ariad Pharm., Inc. Sec. Litig.*,
   842 F.3d 744 (1st Cir. 2016) ................................................................. 33

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................. 37

*In re Axis Capital Holdings Ltd. Sec. Litig.*,
   456 F. Supp. 2d 576 (S.D.N.Y. 2006) ................................................................. 17

*In re Baby Food Antitrust Litig.*,
   166 F.3d 112 (3d Cir. 1999) ................................................................. 25, 28

*Backman v. Polaroid Corp.*,
   910 F.2d 10 (1st Cir. 1990) (en banc) ................................................................. 15

*Bd. of Trustees of City of Ft. Lauderdale Gen. Employees' Ret. Sys. v. Mechel OAO*,
   811 F. Supp. 2d 853 (S.D.N.Y. 2011) ................................................................. 33

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................. 22

*Belmont v. MB Inv. Partners*,
   708 F.3d 470 (3d Cir. 2013) ................................................................. 36

*Bolger v. First State Fin. Servs.*,
   759 F. Supp. 182 (D.N.J. 1991) ................................................................. 38

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997) ................................................................. 19

*Burtch v. Milberg Factors, Inc.*,
   662 F.3d 212 (3d Cir. 2011) ................................................................. 22, 25

*California Pub. Employees' Ret. Sys. v. Chubb Corp.*,
   394 F.3d 126 (3d Cir. 2004) ................................................................. 13, 38

*Carmack v. Amaya Inc.*,
   258 F. Supp.3d 454 (D.N.J. 2017) ................................................................. 22

*In re Cent. European Distrib. Corp. Sec. Litig.*,
   No. 11-cv-6247, 2012 WL 5465799 (D.N.J. Nov. 8, 2012) ................................................................. 39

*Chamberlain v. Reddy Ice Holdings, Inc.*,
   757 F. Supp. 2d 683 (E.D. Mich. 2010)................................................................ 24

*In re Citigroup, Inc. Sec. Litig.*,
   330 F. Supp. 2d 367 (S.D.N.Y. 2004) .................................................................. 15

*City of Edinburgh Council v. Pfizer, Inc.*,
   754 F.3d 159 (3d Cir. 2014) ............................................................................ 14, 36

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014) ................................................................................ 15

*City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, ("*Horizon III*")
   442 F. App'x 672 (3d Cir. 2011) .......................................................................... 29

*City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, ("*Horizon I*")
   686 F. Supp. 2d 404 (D. Del. 2009)...................................................................... 22

*City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, ("*Horizon II*")
   713 F. Supp. 2d 378 (D. Del. 2010)...................................... 29, 31, 32, 33, 34, 35

*Data Probe Acquisition Corp. v. Datatab, Inc.*,
   722 F.2d 1 (2d Cir. 1983) .................................................................................... 38

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005)............................................................................................. 35

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009) ................................................................................ 19

*In re Exxon Mobil Corp. Sec. Litig.*,
   500 F.3d 189, 199 (3d Cir. 2007) ........................................................................ 39

*In re FBR Inc. Sec. Litig.*,
   544 F. Supp. 2d 346 (S.D.N.Y. 2008) .................................................................. 18

*Frederick v. Mechel OAO*,
   475 F. App'x 353 (2d Cir. 2012) ......................................................................... 33

*Fries v. Northern Oil and Gas, Inc.*,
   No. 16-cv-6543, 2018 WL 388915 (S.D.N.Y. Jan. 11, 2018) .............................. 18

*Galati v. Commerce Bancorp, Inc.*,
   220 F. App'x 97 (3d Cir. 2007) .............................................. 15, 16, 17, 18, 19

*Grace v. Rosenstock*,
   228 F.3d 40 (2d Cir. 2000) .................................................................................. 38

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
   No. 13-cv-7050, 2017 WL 1536223 (D.N.J. Apr. 27, 2017)........................... 21, 34

*Ieradi v. Mylan Labs., Inc.*,
   230 F.3d 594 (3d Cir. 2000) ................................................................................ 19

*In re Immucor, Inc. Sec. Litig.*,
   No. 09-cv-2351, 2011 WL 3844221 (N.D. Ga. Aug. 29, 2011)........................... 36

*In re Infineon Technologies AG*,
   No. 04-cv-4156, 2006 WL 1329887 (N.D. Cal. 2006) ................................... 17, 24

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009) ...................................................................... 33

*InterVest, Inc. v. Bloomberg, L.P.*,
   340 F.3d 144 (3d Cir. 2003) ............................................................... 24, 26

*Just New Homes, Inc. v. Beazer Homes*,
   293 F. App'x 931 (3d Cir. 2008) ................................................................ 25

*Loos v. Immersion Corp.*,
   762 F.3d 880 (9th Cir. 2014) ...................................................................... 35

*Malin v. XL Cap. Ltd.*,
   499 F. Supp. 2d 117 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009) .................... 34

*Martin v. GNC Holdings, Inc.*,
   No. 2:15-cv-01522, 2017 WL 3974002 (W.D. Pa. Sept. 8, 2017) .......................... 36

*In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation*,
   218 F.R.D. 76 (S.D.N.Y. 2003) .................................................................. 23

*In re Mirant Corp. Sec. Litig.*,
   No. 02-cv-1467, 2009 WL 48188 (N.D. Ga. Jan. 7, 2009) .................................... 22

*In re NAHC, Inc. Sec. Litig.*,
   306 F.3d 1314 (3d Cir. 2002) ......................................................... 13, 37, 38

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*,
   720 F. Supp. 2d 517 (D.N.J. 2010) ............................................................. 31

*Natsource LLC v. GFI Group, Inc.*,
   332 F.Supp 2d 626 (S.D.N.Y. 2004) ........................................................... 23

*Oran v. Stafford*,
   226 F.3d 275 (3d Cir. 2000) ................................................................ 15, 34

*In re Party City Sec. Litig.*,
   147 F. Supp. 2d 282 (D.N.J. 2001) ............................................................. 35

*In re PetroChina Co. Ltd. Sec. Litig.*,
   120 F. Supp. 3d 340 (S.D.N.Y. 2015), *aff'd* (2d. Cir. Mar. 21, 2016) ................... 21

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co. Inc.*,
   998 F.2d 1224 (3d Cir. 1993) .................................................................... 25

*In re Propranolol Antitrust Litig.*,
   No. 16-cv-09901, 2017 WL 1287515 (Apr. 6, 2017) .................................... 28, 29

*Rahman v. Kid Brands, Inc.*,
   736 F.3d 237 (3d Cir. 2016) ......................................................... 30, 32, 33

*Resco Prods. Inc. v. Bosai Minerals Grp. Co.*,
   158 F. Supp. 3d 406 (W.D. Pa. 2016) .......................................................... 27

*RSM Production Corp. v. Fridman*,
   643 F. Supp. 2d 382 (S.D.N.Y. 2009) ................................................................. 23

*Sapssov v. Health Mgmt. Assocs., Inc.*,
   608 F. App'x 855 (11th Cir. 2015) ..................................................................... 35

*In re Scottish Re Grp. Sec. Litig.*,
   524 F. Supp. 2d 370 (S.D.N.Y. 2007) ................................................................. 21

*Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*,
   No. 1:12-cv-0093, 2016 WL 7117455 (M.D. Pa. Dec. 7, 2016) ........................... 36

*In re Sotheby's Holdings, Inc.*,
   No. 00-cv-1041, 2000 WL 1234601, (S.D.N.Y. August 31, 2000)................... 17, 30

*Superior Offshore Intern., Inc. v. Bristow Group Inc.*,
   738 F. Supp. 2d 505 (D. Del. 2010), *aff'd* 490 F. App'x 492 (3d Cir. 2012) ......... 26

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
   531 F.3d 190 (2d Cir. 2008) .......................................................................... 28, 32

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)............................................................................ 14, 16, 28

*Tracinda Corp. v. DaimlerChrysler AG*,
   502 F.3d 212 (3d Cir. 2007) ............................................................................. 37

*Tunis Bros. Co., Inc. v. Ford Motor Co.*,
   952 F.2d 715 (3d Cir. 1991) ............................................................................. 23

*In re VEON Ltd. Sec. Litig.*,
   15-cv-08672, 2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017) ................................ 16

*Winer Family Tr. v. Queen*,
   503 F.3d 319 (3d Cir. 2007) ..................................................................... 5, 15, 19, 30

*Wisniewski v. Fisher*,
   857 F.3d 152 (3d Cir. 2017) ............................................................................. 39

*In re Yukos Oil Co. Sec. Litig.*,
   No. 04-cv-5243, 2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006)............................ 22

## <u>Statutory Authorities</u>

15 U.S.C. § 78u-4(b)..................................................................................... 14, 28, 30

## <u>Rules and Regulations</u>

64 Fed. Reg. 45, 150 (1999) ............................................................................. 20

Fed. R. Civ. P. 9(b) ................................................................................... 13, 38

Defendant Allergan plc ("Allergan"), the Individual Defendants, and the Director Defendants[1] respectfully submit this memorandum of law in support of their motion, pursuant to Federal Rules of Civil Procedure 12(b)(6), to dismiss the claims asserted against them under Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 and SEC Rules 10b-5 and 14a-9 in Plaintiffs' Consolidated Second Amended Class Action Complaint (the "Complaint" or "SAC") (Dkt. # 82).

## PRELIMINARY STATEMENT

Plaintiffs attempt to manufacture a securities fraud claim where none exists.

They begin with the ***assumption*** that personnel from Allergan's former generics business, known as Actavis, engaged in price-fixing on six out of approximately 550 generic drugs—an assumption based on unadjudicated claims in other litigation. Plaintiffs then point to public statements by Allergan having nothing to do with those six drugs, but relating instead to the company's overall revenues and the generics market generally, and claim that the purported price-fixing—involving a tiny portion of Allergan's overall business—somehow rendered those statements false. Plaintiffs next claim that Allergan's management, the individual defendants in this case, intended to mislead investors, even though the Complaint provides no indication management was aware of the supposed improper pricing. And, lastly, Plaintiffs claim investors

---

[1]   Defendants are Allergan plc, an Irish pharmaceuticals company, the Individual Defendants: (i) Paul M. Bisaro, Actavis's CEO and President between October 2013 and July 2014; (ii) Brenton L. Saunders, Allergan's CEO and President since July 2014; (iiii) R. Todd Joyce, Actavis's CFO from October 2009 to December 2014; (iv); Maria T. Hilado, Allergan's CFO since December 2014; (v) Sigurdur O. Olafsson, president of Actavis Pharma, the predecessor entity to Allergan's generic business, between April 2012 and June 2014; and (vi) David A. Buchen, Actavis's Chief Legal Officer from April 2012 to July 2014, and Executive Vice President of its Generics business from July 2014 to May 1, 2015, and the Director Defendants: (i) James H. Bloem; (ii) Christopher W. Bodine; (iii) Tamar D. Howson; (iv) John A. King, Ph.D; (v) Catherine M. Klema; (vi) Jiri Michal; (vii) Jack Michelson; (viii) Patrick J. O'Sullivan; (ix) Ronald R. Taylor; (x) Andrew L. Turner; and (xi) Fred G. Weiss; (xii).  (SAC ¶¶ 40, 44-64.)

were harmed when the purported price-fixing was "revealed" through public reports that Allergan had been subpoenaed, notwithstanding the undisputed fact that the company had already announced the sale of Actavis at a price, $ 40.5 billion, that remained unchanged following that disclosure.

Plaintiffs' pleading formula, at bottom, is to assume wrongdoing and label it securities fraud, without regard to whether investors were actually misled, while ignoring undisputed facts rendering any claim for damages implausible. It is a formula multiple courts have rejected and an approach that defies the Supreme Court's repeated directives that claims under Section 10(b) must be pled with particularity. This action should be dismissed.

### *Plaintiffs Fail to State a Claim Under Section 10(b):*

Plaintiffs treat Section 10(b) as a catch-all provision where any form of purported wrongdoing can be classified as securities fraud. That is not the law. To state a viable claim, Plaintiffs must set forth particularized facts showing specific misrepresentations or omissions made with scienter and resulting in losses to investors. In their attempt to convert a purported antitrust violation into a Section 10(b) claim, Plaintiffs have failed to satisfy these basic elements.

*First*, the Complaint fails to plead any material misrepresentations or omissions. Allergan was under no generalized duty to disclose unadjudicated allegations of price-fixing, and its "failure" to do so is not an actionable omission under Section 10(b). Although the Complaint spends ten pages cycling through excerpts from Allergan's SEC filings, it is devoid of any allegations indicating those excerpted statements were materially false or misleading. Significantly, there is no allegation explaining how Allergan's revenue reports, or its public statements concerning its overall growth and business prospects, were somehow rendered inaccurate by supposed price-fixing involving a small portion of its generic drug business.

The Complaint also fails to allege adequately that price-fixing even took place.  Although forbidden by precedent, Plaintiffs simply assume Allergan is guilty based on reports of grand jury subpoenas, investigations, and unadjudicated claims in other litigation.  Plaintiffs also rely on purported opportunities to collude, through mere attendance at trade association events, but the Third Circuit regularly rejects such allegations.  Lastly, Plaintiffs point to supposed "parallel" pricing movements between competitors, but the pricing data Plaintiffs include in their Complaint shows just the opposite—different competitors charged substantially ***different*** amounts for the same products.

*Second*, Plaintiffs' allegations fail to raise a "strong inference of scienter," as required by the Private Securities Litigation Reform Act ("PSLRA").  Plaintiffs assume Defendants knew about the unproven scheme and intended to mislead investors regarding its existence but fail to identify ***a single piece of information*** available to Defendants that was not available to investors generally.  In the absence of such information, Plaintiffs claim it can be presumed Actavis not only intended to engage in price-fixing, but also intended to mislead investors about it, because company officials had a "motive" or "incentive" to maximize profits.  But all corporations have that incentive, which is why the Third Circuit finds such allegations deficient.

*Third*, there is no loss causation.  Plaintiffs point to public reports that supposedly disclosed the "truth" of Actavis's involvement in price-fixing.  Those reports did no such thing.  They merely described Actavis's receipt of a subpoena requesting information about some of its generic drugs, which has never led to criminal charges against Actavis or Allergan.  As multiple courts have recognized, these public reports are not the sort of corrective disclosures that can be deemed to harm investors.  And they certainly could not have affected Allergan's stock price here, when

Allergan sold its generics business for over $40 billion, which is a price that was announced prior to, and did not change as a result of, the supposed revelations of price-fixing.

### *Plaintiffs' Remaining Claims Are Deficient:*

Plaintiffs' remaining claims also fail. Plaintiffs' Section 20(a) claim, for instance, requires a viable underlying Section 10(b) claim, and there is none.

Plaintiffs' Section 14(a) claims fail the most basic pleading requirement, which is to identify specific misstatements and describe how they were false. Rather than include such allegations, the Complaint makes the generalized assertion that Allergan's proxy statements were misleading, *without ever identifying the representations that were supposedly false*. Further, Plaintiffs' own theory that the "truth" emerged in August 2015, with news reports stating Allergan received a subpoena in an antitrust investigation, means that this claim is time-barred because it was filed more than one year after that disclosure.

*        *        *

In sum, Plaintiffs have failed in their effort to transform purported price-fixing on six generic drugs in Allergan's former generics division—a claim that has never been substantiated—into a viable claim of securities fraud. The Complaint does not set forth the key elements for such a claim. It fails to describe any misrepresentations to investors; it includes no allegations indicating an intention to mislead investors; and it identifies no harm to investors. Plaintiffs thus fail to satisfy the heightened pleading requirements that exist specifically to prevent strike suits like this one, and the Complaint should be dismissed in its entirety.

## FACTUAL BACKGROUND

The putative lead plaintiffs purport to assert claims on behalf all "persons and entities who purchased or otherwise acquired the common and preferred stock in Allergan between October 29,

4

2013 and November 2, 2016."[2]  (SAC at 1.)  Plaintiffs allege Allergan violated the securities laws by failing to disclose a purported conspiracy to fix the prices for six generic drugs, (SAC ¶ 26), out of nearly 550 drugs sold by its former generics business.  *See* Ex. 1 to the Certification of Shannon McClure ("McClure Cert.") (Actavis Plc 2013 10-K)[3] at 4; Ex. 2 to McClure Cert. (Actavis Plc 2014 10-K) at 2, 12.  The generics business alone generated approximately $6.35 billion, $6.75 billion, and $6.38 billion in revenue in 2013, 2014, and 2015, respectively.  (*See* SAC ¶ 221.)  Plaintiffs fail to allege the percentage of revenues attributable to any of the drugs at issue in the Complaint.  (*Id.*)

A.    Allegations Regarding Price-Fixing

The allegations of price-fixing concern only six of the many generic drugs sold by Actavis (or, later, Allergan): Propranolol, Ursodiol, Doxycycline Hyclate, Desonide, Verapamil, and Glyburide-Metformin.  (*Id.* ¶¶ 76-179.)

- Propranolol, used to treat high blood pressure and certain types of irregular heart rates, had been on the market since the 1960s, and Allergan allegedly participated in a

---

[2]  Plaintiffs confusingly refer to both Actavis and Allergan as "Allergan" in their SAC.  Prior to March 2015, Actavis sold the 6 generic drugs discussed in the Complaint, along with nearly 550 other generic drugs and approximately 80 branded drugs.  Ex. 2 to McClure Cert. at 2, 12.  Prior to March 2015, Allergan, Inc. was a separate company that manufactured and sold only branded drugs, not generics.  None of those drugs are at issue in this case.  In March 2015, Actavis acquired Allergan, and the resulting company was renamed Allergan plc.  Thereafter, Allergan, through its Actavis business, continued to sell generic drugs, including the drugs at issue here, but only for a short time.  In July 2015, Allergan announced that it had sold its Actavis generics business to Teva Pharmaceuticals.  The sale closed in August 2016.  Allergan has not sold any generic drugs since August 2016.

[3]  The Court may take judicial notice of these financial filings since they "were explicitly relied upon in the Complaint."  *Winer Family Trust v. Queen*, 503 F.3d 319, 328 (3d Cir. 2007).  As set forth in its 2013 10-K, Actavis Plc had, in its U.S. portfolio, "approximately 250 generic pharmaceutical product families and approximately 45 brand pharmaceutical product families."  Ex. 1 at 4.  The 2014 10-K elaborated that, in addition to "250 generic pharmaceutical product families and approximately 80 brand pharmaceutical families," Ex. 2 at 2, Actavis had "launch[ed] approximately 550 generic products globally."  *Id.* at 12.

conspiracy to fix prices for this drug starting in approximately March 2015 and lasting until approximately December 2015.  (*Id.* ¶¶ 106-16.)

- Ursodiol, used to treat gallbladder stones, had been on the market since 2000, and Allergan (when it was Actavis) allegedly participated in a conspiracy to fix prices for this drug starting in approximately May 2014 and lasting until approximately November 2014.  (*Id.* ¶¶ 125-29.)  Plaintiffs admit the market for Ursodiol was "relatively small."  (*Id.* ¶ 135.)

- Doxycycline, used to treat a variety of infections, including pneumonia, had been on the market since at least 1967, and Allergan (when it was Actavis) allegedly participated in a conspiracy to fix prices for this drug starting in approximately January 2013 (the month of a reported FDA shortage) and lasting until approximately October 2013 (when the FDA reported shortage ceased).  (*Id.* ¶¶ 139-48, 150, 153.)

- Desonide, used to treat a variety of skin conditions, had been on the market since the 1970s, and Actavis was not yet selling the drug as of May 2013, when, according to the Complaint, two other companies began conspiring to fix its price.  (*Id.* ¶ 158-59; Desonide NDA 21-844 at 10 available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2006/021844s000_ChemR.pdf.)  Plaintiffs allege Allergan (when it was Actavis) "joined the conspiracy" when it entered the market six months later, in September 2013.  (SAC ¶ 159.)  The maximum price for the drug was approximately $4.00 per tube when Actavis entered the market, and Actavis undercut that price, leading to price drops.  (*Id.* ¶ 161.)

- Verapamil, used to treat high blood pressure and chest pain, had been on the market since the 1980s, and the Complaint alleges that Allergan conspired to fix the price of Verapamil beginning in April 2014.  (*Id*. ¶¶ 172, 174-176; FDA, Approved Drug Products (supp.

12 Dec. 2017) at 1-163, *available at*

*https://www.fda.gov/downloads/drugs/informationondrugs/ucm086233.pdf*.)

- Glyburide-Metformin, a medication used to control high blood sugar, had been on the market for nearly two decades, and the Complaint alleges that Allergan engaged in a conspiracy to fix the price beginning in April 2014. (*Id.* ¶¶ 173-177; Glyburide Metformin NDA 21-178 at 2, *available at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/2000/21-178_Glucovance_Approv.pdf.)

As to two of these drugs—Verapamil and Glyburide-Metformin—Plaintiffs copy allegations of "phone calls and text messages between executives and sales people from Allergan and its co-conspirators," (*id.* ¶¶ 25, 171, 174-179), set forth in redacted form in a Proposed Consolidated Amended Complaint brought by several State Attorneys General in the Eastern District of Pennsylvania (the "AG Action").[4]  While the Complaint adopts allegations from the AG Action that Actavis personnel communicated with competitors about "want[ing] to raise prices," (*id.* ¶174), for these two drugs, there is no allegation Actavis actually did raise prices for those drugs.[5]  *See* AG ¶¶ 377, 451.

As for the remaining four drugs—Propranolol, Doxycycline, Ursodiol, and Desonide—Plaintiffs rely on allegations that they were "highly susceptible" to price-fixing and that circumstantial evidence of trade meetings, pricing trends, and governmental investigations

---

[4]  Citations to "AG ¶ __" refer to the AG Action, *Connecticut v. Aurobindo Pharma USA, Inc.*, 17-cv-3768 (E.D.Pa.), Dkt. 3-1.

[5]  This is unsurprising given that the complaint in the AG Action, the source of all of Plaintiffs' allegations regarding Verapamil and Glyburide-Metformin, concedes that Heritage Pharmaceuticals ("Heritage")—the supposed ringleader of the alleged price-fixing conspiracy—did not increase prices at all for Glyburide-Metformin and did not increase prices market wide for Verapamil. (AG ¶¶ 377, 451.)  Further, though the AG Action alleges that both Heritage and Teva raised their wholesale average cost ("WAC") on Glyburide-Metformin, it makes no such allegation against Actavis or Allergan. (*Id.* ¶ 377.)

suggests price-fixing took place.  (*See, e.g.*, *id.* ¶¶ 76, 83-105, 108-16, 127-29, 141-49, 160-62, 180-93.)

*Trade Meetings:*  Plaintiffs assert Allergan had "opportunities" to fix prices because certain of its personnel attended industry conferences.  (*Id.* ¶¶ 83, 84, 95, 102.)  But Plaintiffs do not identify any conspiratorial conduct during these conferences, such as specific meetings or discussions; they allege only that these industry conferences took place.  Plaintiffs repeatedly emphasize one dinner in January 2014 but fail to specify who attended and admit it occurred when prices were already at their peak, after any collusion would have occurred.  (*Id*. ¶¶ 25, 105.)

*Pricing Trends:*  Plaintiffs include charts and tables tracking the prices of four of the six at-issue drugs—Propranolol, Ursodiol, Doxycycline and Desonide—over a period of months.  (*Id.* ¶¶ 108-09, 111-12, 114-15, 127-28, 141-42, 144-45, 147-48, 160-61.)  The price increases show a lack of coordination between competitors.  Plaintiffs' charts demonstrate the alleged co-conspirators charged substantially different prices for the identical drugs during the period of each alleged conspiracy.  (*See, e.g.*, *id* ¶ 128) (Epic and Lannett prices for Ursodiol 300mg Capsules in June 2014 exceeded Actavis's price by 416% and 225% respectively).

Plaintiffs' charts also show that price movements often did not correlate to the timing of the trade shows at which conspirators supposedly agreed to fix prices; in some instances, price increases occurred prior to those meetings, and, in others, price drops occurred after.  (*See, e.g.*, *id.* ¶¶ 108 (price increase for Propranolol begins prior to first alleged meeting between co-conspirators); 110 (GPhA 2015 workshop occurred when prices dropped or moved in opposite directions)).  Further, Plaintiffs allege, and the charts show, that prices have not returned to "pre-

spike" levels, even though the supposed price-fixing has been fully revealed to investors through public disclosures concerning governmental investigations.[6]  (*See, e.g.*, *id.* ¶¶ 108, 117, 127, 130.)

*Governmental Investigations:*  Plaintiffs allege two members of Congress launched an investigation into increases in generic drug prices in October 2014 and as part of this investigation sent a letter to Allergan (when it was Actavis) requesting information about its generic drugs sold in the United States.  (SAC ¶¶ 180-81.)  Plaintiffs also allege that, one month later, a "Co-Conspirator" (for Ursodiol) received a subpoena relating to its generic drug pricing.  (*Id.* ¶ 182.) Plaintiffs allege the Department of Justice ("DOJ") subsequently sent subpoenas to at least ten other drug companies, including Allergan and three alleged "Co-Conspirators," in connection with generics pricing.  (*Id.*)

Plaintiffs' remaining allegations largely concern companies other than Allergan.  For instance, Plaintiffs allege two employees of Heritage pled guilty to antitrust violations relating to price-fixing of generic Doxycycline, (*id.* ¶¶ 184-85), but Plaintiffs *do not allege* Heritage conspired with Allergan to fix Doxycycline prices (*id.* ¶ 140-42).  Plaintiffs also allege that the AG Action is pursuing claims related to Doxcycline prices but neglect to mention that the AG Action does not allege that Actavis or Allergan participated in any price-fixing with respect to Doxcycycline.  (*Id.* ¶ 187; AG ¶¶ 241-42)

B.      Allegations Regarding Defendants' Statements To The Market

Plaintiffs allege Defendants made five categories of false or misleading statements, relating to: (i) the Company's reported revenues; (ii) the competitive nature of the generic drug market and

---

[6]  Plaintiffs' allegations also indicate that: (i) certain alleged "conspiracies" began over two years apart from each other; (ii) the alleged Propranolol conspiracy began *after* information regarding the DOJ and Congressional investigations became public (*id.* ¶¶ 180, 182); and (iii) two of the alleged conspiracies (Doxycycline and Desonide) began subsiding *before* the investigations became public, (*id.*).

the source of Allergan's revenues; (iii) the significance and circumstances of the DOJ subpoena; (iv) the Company's SEC certifications; and (v) the Company's Code of Conduct. (SAC ¶¶ 194, 214.) These allegations are summarized below.

### 1. Statements Regarding Allergan's Reported Revenues

Plaintiffs present a table listing Allergan's net revenues from the sale of generic drugs during the putative Class Period. (*Id.* ¶ 221.) Plaintiffs do not allege that Defendants did not actually generate the reported revenue. Plaintiffs also do not allege how, if at all, alleged price-fixing for the 6 at-issue generic drugs materially inflated the overall revenues of Allergan which sold approximately 600 drugs. *See* Ex. 2 to McClure Cert. at 2, 12.

### 2. Statements Regarding the Generic Drug Market

Plaintiffs present over 20 paragraphs of quotations from Defendants' public filings that touch on the "growth" of the generics business and the competiveness of the pharmaceutical industry as a whole. (*Id.* ¶¶ 195-219.) None of these statements mention the six drugs at issue here. Typical of the statements Plaintiffs rely on is a press release in which Mr. Bisaro attributed "[s]trong global growth in our Actavis Pharma segment" to "our ability to capitalize on product opportunities from our industry leading R&D pipeline." (*Id.* ¶ 195.) In another press release Mr. Bisaro stated that "[w]e also saw strong growth within our generics business, powered by our strong base business along with continued strong sales of the generic versions of Lidoderm® and Cymbalta®." (*Id.* ¶ 203.) There is no explanation regarding how the supposed price-fixing of 6 out of 550 generic drugs in the Actavis product portfolio, which include neither the generic versions of Lidoderm nor Cymbalta, rendered these statements false.

The Complaint also cites a number of generalized statements discussing the "competitive" nature of the pharmaceutical industry. (*Id.* ¶ 199.) None of these statements mention the six drugs at issue here. For example, Plaintiffs point to Allergan's statement that "[t]he pharmaceutical

10

industry is highly competitive," (*id.*), and that "[t]he level of market share, revenues and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market, pricing and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches[.]" (*Id.*)  Plaintiffs do not explain how alleged price-fixing on 6 out of 550 generic drugs renders statements about competition in the pharmaceutical industry as a whole misleading.

### 3.   Statements Regarding DOJ Subpoena

Plaintiffs point to a statement by Mr. Saunders that the DOJ subpoena regarding three drugs, which are not alleged to be the same drugs as are at-issue here, was "not that significant." (SAC ¶¶ 15, 214.)  Plaintiffs make no attempt to show that the three drugs were in fact "significant" in the context of Allergan's larger portfolio of over 600 generic and brand drugs.  Nor do Plaintiffs allege that Allergan actually engaged in price-fixing as to these three drugs.  Further, Plaintiffs omit a key portion of Mr. Saunders' explanation for why the subpoena was not significant.  Namely, Allergan had ***already sold*** the Actavis unit to Teva, and the subpoena had been disclosed to Teva.  Plaintiffs do not—and cannot—explain how Mr. Saunders' statement concerning three drugs as to which there are no allegations of price-fixing, and which were already sold by the time of those statements, could have been materially misleading.

### 4.   Statements In Allergan's SEC Certifications

Plaintiffs allege the Individual Defendants signed Sarbanes-Oxley ("SOX") certifications attesting that, "to such officer's knowledge," Allergan's filings complied with "the requirements of Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934, as amended; and (ii) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Compan[y]." (*Id.* ¶¶ 223-20.)  Once again, Plaintiffs do not explain how these representations were false.  (*Id.* ¶ 231.)

5.      Statements Regarding Allergan's Code of Conduct

Plaintiffs allege Allergan's Form 10-Ks "represented that the Company has 'adopted a Code of Conduct,'" and provided "[e]xamples of conduct that violates Actavis policy," including "[a]greements or understandings with competitors on price." (*Id.* ¶ 232.) Plaintiffs do not explain how isolated incidents of supposed wrongdoing could render statements reporting the existence of a Code of Conduct false or misleading.

C.      Allegations Regarding Scienter

The Complaint does not allege how each Defendant knew or must have known that each statement attributable to that Defendant was materially false or misleading. (*See id.* ¶¶ 243-267.) Instead, Plaintiffs make general allegations falling into three categories. First, Plaintiffs repeat their allegations of price-fixing, including pricing trends, the general motive to fix prices in the generic drug market, the opportunity to fix prices, and communications they do not allege involved any of the Defendants. (*Id.* ¶¶ 244-49, 252.) Second, Plaintiffs allege facts regarding Defendants' access to information, including public reports about the government's price-fixing investigation, and Defendants' alleged duty to monitor prices. (*Id.* ¶¶ 249-51, 254-56, 258, 260, 262-64, 266.) Third, Plaintiffs allege stock sales by certain Defendants. (*Id.* ¶¶ 257, 261, 265, 267.)

D.      Allegations Regarding Loss Causation

Plaintiffs claim investors sustained losses when "the truth emerge[d]" concerning the purported price-fixing. (*Id.* ¶ 234.) *First*, Plaintiffs allege Allergan's common share price fell approximately 5%, and its preferred share price fell approximately 3.5%, on August 6, 2015, the day Allergan publicly disclosed Actavis had received a subpoena from the DOJ. (*Id.* ¶¶ 234-37.) *Second*, Plaintiffs allege Allergan's common share price fell approximately 4.6%, and its preferred share price fell approximately 4.1%, on November 3, 2016, when Bloomberg reported that the U.S. might file criminal charges against unidentified parties for price-fixing by year end. (*Id.*

12

¶¶ 239-40.)  The first of these "revelations" occurred after Allergan had already announced the sale of its Actavis unit to Teva for $40.5 billion, and the second "revelation" occurred after Allergan had finalized the sale of its Acatvis unit to Teva for the same $40.5 billion.  In other words, the value of the Actavis unit was unchanged before and after the August 2015 disclosure.  Further, Allergan's share price fully recovered within a few days of the November 3, 2016 Bloomberg article, rallying to close at $212.90 by November 9, 2016.  *See* Ex. 3 to McClure Cert. (Allergan Historical Stock Price Table) at 17.[7]  In addition, to the extent the Bloomberg article had predicted that criminal charges would be filed during 2016 against unnamed parties, no such charges were filed against Allergan (and none have been filed to the present day).

## ARGUMENT

## I.    PLAINTIFFS' SECTION 10(b) CLAIM SHOULD BE DISMISSED

Plaintiffs' first claim for relief (*Id.* ¶¶ 274-280) is brought under Section 10(b) of the Exchange Act, and SEC Rule 10b-5.  To sustain such a claim, a plaintiff must plead each of the following elements:  (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 277 (3d Cir. 2010).

Such claims are subject to the heightened pleading standard under Federal Rule of Civil Procedure 9(b).  "As such, plaintiffs asserting securities fraud claims must specify the who, what, when, where, and how: the first paragraph of any newspaper story."  *California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144 (3d Cir. 2004) (internal quotation marks omitted).

---

[7]  The Court may take judicial notice of historical stock prices.  *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002).

Securities fraud claims under Section 10(b) are also subject to the heightened pleading standards of the PSLRA, which requires that a plaintiff "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Moreover, "the complaint shall, with respect to each act or omission alleged to violate this Act, state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). These are "[e]xacting pleading requirements," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007), which Plaintiffs fail to meet.

A.    Plaintiffs Fail to Allege a Material Misrepresentation

The Complaint fails to allege an actionable misrepresentation or omission. *First*, Allergan was under no generalized duty to disclose uncharged and unadjudicated wrongdoing. *Second*, absent a generalized duty to disclose, Plaintiffs must identify an affirmative statement rendered false and misleading by the alleged price-fixing. However, Plaintiffs fail to point to a single statement by Defendants referencing *any* of the six drugs for which prices were supposedly fixed. Thus, Plaintiffs are left in the untenable position of arguing that statements about drugs *other than* the drugs at issue here, and the pharmaceutical industry *as a whole*, were somehow rendered materially false and misleading in light of alleged price-fixing on six drugs constituting a small fraction of Allergan's overall business. *Third*, even if it were theoretically possible that a failure to disclose a price-fixing conspiracy could be transformed into securities fraud, Plaintiffs do not adequately allege that price-fixing actually took place.

1.    Plaintiffs Fail To Identify An Actionable Omission

It is axiomatic that silence does not constitute an actionable "omission" absent a duty to disclose. *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 174 (3d Cir. 2014). It is equally well-settled that there is no generalized duty to disclose uncharged and unadjudicated wrongdoing.

14

*See, e.g.*, *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) ("[D]isclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing.") (internal quotation marks omitted).  Here, there has been no adjudication of the alleged price-fixing.  Thus, Allergan was "not require[d] [] to accuse itself of wrongdoing," *In re Citigroup, Inc. Sec. Litig.,* 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004), and had no duty to disclose the alleged conspiracy.

2.    Plaintiffs Fail to Identify Any False or Misleading Statements

Plaintiffs attempt to get around the well-settled rule that an omission is only actionable where there is a duty to disclose by arguing that Allergan assumed such a duty by "electing to speak publically about [its] generic drug business," but that is simply not the law.  (*See* SAC ¶ 220.) A defendant's statements give rise to a duty to disclose only where the omitted facts would render its specific representations misleading.  *See Oran v. Stafford*, 226 F.3d 275, 285-86 (3d Cir. 2000). This rule "does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise, but means only such others, if any, that are needed so that what was revealed would not be so incomplete as to mislead."  *Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir. 1990) (en banc); *accord Winer Family Tr. v. Queen*, 503 F.3d 319, 330 (3d Cir. 2007); *see also Galati v. Commerce Bancorp, Inc.*, 220 F. App'x 97, 102 (3d Cir. 2007) (general statements regarding business unit did not "put into play," and thus require disclosure of, kickback scheme by management).

Plaintiffs identify five categories of statements by Defendants allegedly rendered false or misleading by the failure to disclose the alleged price-fixing conspiracy: (i) Allergan's disclosures of the historical revenues for the generics business; (ii) its generalized comments regarding "growth" and "competition"; (iii) Mr. Saunders' statement regarding the DOJ subpoena; (iv) the

SOX certifications signed by some Individual Defendants; and (v) the Company's description of its "Code of Conduct."  (SAC ¶ 194; 214.)  None of these statements were false or misleading.

(a) <u>Allergan's Revenue Reports Were Accurate</u>

Plaintiffs recite Allergan's reported revenues throughout the proposed Class Period, while making no attempt to explain how the omission of the alleged price-fixing rendered the reported figures false or misleading.  (*Id.* ¶ 221.)  There is no dispute that Allergan accurately reported its revenues.  That is dispositive; as long as historical financial data is accurately disclosed, it is neither false nor misleading and cannot give rise to Section 10(b) liability even if some of the revenue is allegedly derived from illegal sources.  *See Galati*, 220 F. App'x at 102 ("Factual recitations of past earnings, so long as they are accurate, do not create liability under Section 10(b).") (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999), *abrogated on other grounds by Tellabs*, 551 U.S. 308 (2007)); *In re VEON Ltd. Sec. Litig.*, 15-cv-08672, 2017 WL 4162342, at *6 (S.D.N.Y. Sept. 19, 2017) ("[A]ccurately reported income derived from illegal sources is non-actionable despite a failure to disclose the illegality.").

(b) <u>Allergan's Generalized Statements About Growth and Competition<br>Were Accurate</u>

The Complaint recites pages of Allergan's general comments about its growth and future prospects, and claims those statements—***not a single one of which mentioned any of the drugs at issue in this case***—were materially misleading in light of the alleged price-fixing conspiracy.  (SAC ¶¶ 195-219.)  They were not.  General and vague statements of optimism, known as "puffery," cannot create Section 10(b) liability.  *Aetna*, 617 F.3d at 283 ("general statements of optimism . . . constitute no more than 'puffery'") (internal quotation marks omitted).

The Third Circuit in *Galati* rejected a theory analogous to Plaintiffs' theory here.  There, the defendant financial institutions and their executives allegedly violated Section 10(b) by failing

16

to disclose their participation in a bid-rigging conspiracy that increased deposits. 220 F. App'x at 99.[8]  The Third Circuit affirmed dismissal, holding defendants' "statements concerning the Company's 'dramatic deposit growth,' 'strong performance,' and 'unique business model,' constitute nothing more than mere 'puffery,'" insufficient to sustain a 10(b) claim. *Id.* at 102. Allergan's statements regarding its "[s]trong global growth" (SAC ¶ 195), "continued strong performance" (*id.* ¶ 206), "strong results" (*id.* ¶¶ 207, 215), "continued growth" (*id.* ¶ 210), and "operational excellence and double-digit growth" (*id.* ¶ 213), are no different and, as in *Galati*, constitute "routine recitations of past financial performance, and general optimistic statements about the Company's future growth" too vague to be materially false. *Galati*, 220 F. App'x at 102; *see also Aetna*, 617 F.3d 272 at 281-83 (statements regarding "disciplined pricing" were puffery).

Plaintiffs invoke similarly general statements by Allergan that the pharmaceutical industry as a whole "is highly competitive." (SAC ¶ 199.) Plaintiffs do not explain how alleged price-fixing on 6 out of 550 generic drugs makes the pharmaceutical industry, as a whole, not competitive.[9]  *See* Ex. 2 to McClure Cert. at 2, 12. Not "[e]very antitrust violation will render misleading generalized statements regarding a company's increased earnings or the competitive state of the marketplace." *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 590

---

[8]   Unlike the present case, some of the defendants in *Galati* were actually indicted for the underlying wrongdoing. *See* 220 F. App'x at 99.

[9]   In contrast to Plaintiffs' allegations here, Section 10(b) claims involving statements regarding the competitiveness of the entire marketplace have been sustained where there were allegations of pervasive price-fixing throughout the entire market. *See, e.g.*, *Infineon*, No. 04-cv-4156, 2006 WL 1329887, at *3, *6 (N.D. Cal. May 16, 2006) (entire market for product, constituting 70% of company's earnings, subject to price-fixing scheme); *In re Sotheby's Holdings, Inc.*, No. 00-cv-1041, 2000 WL 1234601, at *4 & *4 n.2 (S.D.N.Y. August 31, 2000) (price-fixing impacted 95% of the market in sole line of business).

n.4 (S.D.N.Y. 2006); *Galati*, 220 F. App'x at 102 (general statements regarding business unit did not "put in play," and thus require disclosure of, kickback scheme by management); *see also In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 358 (S.D.N.Y. 2008) ("[P]laintiffs do not point to any specific statement in the press releases that could be interpreted by a reasonable investor as suggesting that the company or its executives had not assisted or participated in a single . . . violation."); *Fries v. Northern Oil and Gas, Inc.*, No. 16-cv-6543, 2018 WL 388915, at *8 (S.D.N.Y. Jan. 11, 2018) (statements regarding company's reliance on CEO's relationships in the industry were not rendered misleading by failure to disclose CEO's misconduct because there was no allegation that the company did not in fact rely on CEO's relationships in the industry, "[n]or do any of the highlighted statements suggest that [the CEO] was not engaged in the undisclosed improper activities").

The Complaint also describes a statement by Mr. Olafsson in October 2013 that there were "opportunities [sic] to take pricing increases . . . where there has been manufacturing problems or stock-out situation[s]." (SAC ¶ 196.)  That observation was consistent with Plaintiffs' own allegations that Doxycycline, the only drug Plaintiffs alleged was price-fixed during that period, had an FDA reported shortage in January 2013 that did not end until *after* September 30, 2013. (*Id.* ¶ 150.)  Plaintiffs also invoke a statement by Mr. Bisaro that "in the short term" Actavis had "the ability to take price increases on older products where the price had gone to a point where companies had to make the decision about whether to continue manufacturing or raise price." (*Id.* ¶ 202.)  This too was consistent with the fact that each of the drugs alleged to have been "price-fixed" were older drugs (some as old as forty years old) whose prices had all fallen to a point where revenue was minimal. (*See, e.g., id.* ¶¶ 106, 108, 111, 114; 127, 141, 144, 147, 160.)

Plaintiffs' kitchen sink approach is perhaps best exemplified by their reliance on representations involving drugs not at issue in this case.  For instance, the Complaint excerpts statements regarding product launches of generic versions of Cymbalta, Lidoderm and Concerta (*id.* ¶¶ 200, 201, 203, 207), none of which were among the six drugs for which prices were supposedly manipulated.  Plaintiffs' truthful statements regarding other drugs did not somehow create a duty to disclose unadjudicated alleged wrongdoing with respect to entirely different drugs. *See, e.g.*, *Winer*, 503 F.3d at 329; *Galati*, 220 F. App'x at 102.

Finally, even if a defendant's earning reports could theoretically be rendered misleading by a failure to disclose purported price-fixing, the Complaint includes no particularized allegations indicating the purported price-fixing of 6 out of 550 generic drugs had a sufficient impact on Allergan's financial results to render its reports of "strong" earnings *materially* false or misleading. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426-27 (3d Cir. 1997); *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 203-04 (2d Cir. 2009) (holding that accounting for transactions as 'trading activities' rather than loans was immaterial as a matter of law, because affected item (though totaling more than $2 billion) was less than one percent of defendant's total assets); *see also Ieradi v. Mylan Labs., Inc.*, 230 F.3d 594, 599 (3d Cir. 2000) (ruling that failure to disclose anti-competitive contracts was immaterial). The Complaint makes no allegation as to the revenue generated by Ursodiol, Verapamil, or Glyburide-Metformin; it attributes just over $50 million in total revenue to Propranolol and Desonide (SAC ¶¶ 108, 111, 114, 160); and it attributes approximately 2.8% of Allergan's total revenue during the relevant period to the sale of Doxycycline (*compare id.* ¶¶ 141, 144, and 147 *with* 221).  These figures are well short of the SEC's quantitative 5% standard for materiality and not nearly substantial enough to render as somehow materially false Allergan's representations

about its overall earnings and growth.[10]  *See* SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45, 150 (1999) ("The use of a percentage as a numerical threshold, such as 5%, may provide the basis for a preliminary assumption that … a deviation of less than the specified percentage with respect to a particular item on the registrant's financial statements is unlikely to be material.").

Plaintiffs seek to avoid this conclusion by repeatedly stating that three of the six at-issue drugs were at one point included by Allergan on a list of 25 "key products."  (SAC ¶¶ 7, 125, 139, 158.)  But Plaintiffs put far more weight on that designation than the undisputed facts permit.  In the same disclosure, Allergan identified more than twenty other "key products," and in total, Allergan sold 250 U.S. generic products and approximately 550 global generic products.  McClure Cert. Ex. 2 at 2, 12.  As explained above, revenue from the six drugs was far less than 5% of Allergan's total revenues during the Class Period, even considering Plaintiffs' inflated numbers.

In sum, the statements Plaintiffs point to were not directed to ***any*** of the at-issue drugs, are no different from the kind of puffery the Third Circuit has rejected as a basis for a Section 10(b) claim, and involved an immaterial portion of Allergan's overall revenues.

(c)     Saunders' Statements Regarding the DOJ Subpoena Were Accurate

Plaintiffs rely on Mr. Saunders' statement during an interview on CNBC that the subpoena from the DOJ, which did not involve any of the drugs at issue in the Complaint, was "not that significant."  (*Id.* ¶¶ 15, 214.)  But Plaintiffs do not explain why that subpoena, involving drugs as

---

[10]   The figures set forth in the Complaint, which are immaterial in any event, are also misleading. The colorful charts provided by Plaintiffs, which do not cover Verapamil or Glyburide-Metformin at all, calculate revenues for periods far exceeding the periods of the alleged price-fixing.  For example, Plaintiffs include revenue for Propranolol 20mg from December 2010 through September 2016 but only allege price-fixing beginning in February 2015.  (SAC ¶¶ 111-12.) Plaintiffs also fail to allege how much of the revenue for any of the at-issue drugs was attributable to the alleged price-fixing, thus ignoring that it is obviously not the case that every dollar made would have been attributable to the alleged price manipulations.

to which the Complaint includes no allegation of price-fixing, would have been significant. Plaintiffs also omit the rest of Mr. Saunders' statement where he explained the subpoena was immaterial because Allergan had already announced the sale of the entire generics business to Teva. ("Allergan CEO Brent Saunders: Smoothing A Stock Dip," *Mad Money*, CNBC, August 7, 2015, *available at* https://www.youtube.com/watch?v=IfgiVHyiopA.) At no point in the entire interview cited by Plaintiffs did Mr. Saunders reference any of the drugs at issue in the Complaint.

### (d)  The Sarbanes-Oxley Certifications Were Accurate

A SOX certification requires the principal executive and financial officers of publicly-traded companies to certify to the "general truthfulness of the company's quarterly and annual reports and to the establishment and adequacy of the company's internal controls." *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, No. 13-cv-7050, 2017 WL 1536223, at *19 (D.N.J. Apr. 27, 2017). SOX certifications are typically not false or misleading unless the executive has knowledge that the company's financial reports are false or its internal controls are defective. *See, e.g.*, *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 359 (S.D.N.Y. 2015), *aff'd* (2d. Cir. Mar. 21, 2016).

Applying these standards, Plaintiffs' reliance on the SOX certifications fails for three reasons. First, as discussed above (*see* Section I.A.2(a), *supra*), any omission of alleged price-fixing for six generic drugs did not render Allergan's financial reports false or misleading. Second, there are no allegations Allergan's internal controls were inadequate. Third, even if Plaintiffs had adequately pled Allergan's financial statements were false or misleading—they have not—they have not alleged that the executives who signed the certifications had ***knowledge*** they were false. *See In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 391 (S.D.N.Y. 2007) ("[F]or these certifications to be materially false . . . defendants must also have had knowledge of that falsity.").

(e)     Allergan's Statements Concerning Its Corporate Code of Conduct
        Were Accurate

Plaintiffs claim Allergan's statements that it had adopted a "Code of Conduct," and its

description of certain of its provisions, were rendered false and misleading by the "failure" to

disclose the purported price-fixing.  (SAC ¶¶ 232-33.)  However, Courts have held repeatedly that

a company's accurate statements describing its code of conduct are not rendered misleading, or

otherwise actionable, where the company was allegedly aware of violations.  *See, e.g.*, *City of

Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 415 (D. Del. 2009)

("*Horizon I*") (plaintiff's position that a company must disclose all violations of its code of conduct

is "untenable"); *Carmack v. Amaya Inc.*, 258 F.Supp.3d 454, 467-68 (D.N.J. 2017) (holding Code

of Conduct statements inactionable).

3.     Plaintiffs Fail to Adequately Allege a Price-Fixing Conspiracy

Even if Plaintiffs had identified statements that would have been rendered false or

misleading by the failure to disclose a price-fixing conspiracy, their claim still fails because they

have not adequately alleged such a conspiracy existed.  "In cases alleging securities fraud based

on the failure to disclose the existence of an underlying illegal scheme," like here, the failure to

allege such illegality "with particularity" is fatal.  *In re Mirant Corp. Sec. Litig.*, No. 02-cv-1467,

2009 WL 48188, at *17 (N.D. Ga. Jan. 7, 2009); *In re Yukos Oil Co. Sec. Litig.*, No. 04-cv-5243,

2006 WL 3026024, at *14 (S.D.N.Y. Oct. 25, 2006).

For a price-fixing scheme, a complaint must allege "enough factual matter (taken as true)

to suggest that an agreement was made."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

"To adequately plead an agreement, a plaintiff must plead either direct evidence of an agreement

or circumstantial evidence."  *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011).

As to two drugs—Verapamil and Glyburide-Metformin—Plaintiffs claim to have "direct"

evidence of price-fixing (SAC ¶¶ 171-179), and, as to the remaining four, they attempt to state a claim based on purported "circumstantial" evidence suggesting "opportunities" to conspire and purportedly suspicious price movements.  (*Id*. ¶¶ 83-105, 107-116, 126-29, 140-49, 159-162).  As discussed below, Plaintiffs' allegations as to both sets of drugs fall far short.

(a)    <u>Plaintiffs Fail to Allege Direct Evidence of Price-Fixing for<br>Verapamil and Glyburide-Metformin</u>

Plaintiffs' "direct" evidence of price-fixing for Verapamil and Glyburide-Metformin consists of nothing more than unsubstantiated allegations of emails and other communications between Allergan and purported "co-conspirators" copied by Plaintiff from the complaint in the pending AG Action.  (SAC ¶¶ 171-179.)  That mode of pleading is improper and has been rejected: "[P]aragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of law, immaterial within the meaning of Fed.R.Civ.P. 12(f)."  *RSM Production Corp. v. Fridman*, 643 F.Supp.2d 382, 403 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72 (2d Cir. 2010) (striking paragraphs in a complaint based on "preliminary steps in litigation" that have not resulted in "an adjudication of the merits"); *In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003) (same).  The AG Action has not resulted in a finding of liability against either Actavis or Allergan, and Plaintiffs may not rely on the AG Action to allege a price-fixing scheme here.

Further, neither the Complaint nor the AG Action alleges that Allergan or Actavis ever raised the price of Verapamil or Glyburide-Metformin, a basic requirement for describing an antitrust violation.  *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 728 (3d Cir. 1991) ("An antitrust plaintiff must prove that challenged conduct affected the prices, quantity, or quality of goods and services"); *Natsource LLC v. GFI Group, Inc.*, 332 F.Supp 2d 626, 637 (S.D.N.Y. 2004) (An antitrust complaint must "allege that prices have increased, or that they will increase.").

23

(b)    Plaintiffs Fail to Allege Circumstantial Evidence of Price-Fixing
       for the Remaining Four Drugs

Plaintiffs do not purport to identify direct evidence of price-fixing for the remaining 4 drugs —Propranolol, Doxycycline, Ursodiol, and Desonide.  Indeed, there are no allegations identifying any meetings, phone calls, emails, or other communications in which any Actavis or Allergan employees purportedly conspired with other companies' employees to set prices for those drugs, which are the types of direct evidence routinely detailed in viable anti-trust complaints.  *See InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 162-63 (3d Cir. 2003) (providing examples of direct evidence of price-fixing, such as "a memorandum produced by a defendant conspirator detailing the discussions from a meeting of a group of alleged conspirators").  There are also no allegations of any guilty pleas or other admissions of guilt as in other Section 10(b) actions involving the purported failure to disclose underlying anti-trust violations.  *E.g.*, *In re Infineon Technologies AG*, No. 04-cv-4156, 2006 WL 1329887, at *1 (N.D. Cal. 2006) (upholding 10(b) claims where defendant had pled guilty to participating in a price-fixing conspiracy); *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F.Supp.2d 683, 696 (E.D. Mich. 2010) (upholding 10(b) claims where defendant had already announced the suspension of an executive for wrongdoing and his involvement with matters under investigation by the DOJ).

Unable to advance such allegations, Plaintiffs fall back on purported circumstantial evidence of price-fixing:  market "susceptibility," attendance at trade shows, governmental investigations and price movements.  Those allegations are deficient.

(i)    Plaintiffs' "Market Susceptibility" and "Opportunity"
       Allegations Are Deficient

Plaintiffs devote nearly thirty allegations to the proposition that the generic drug market was "susceptible to anti-competitive conduct."  (*See, e.g.*, SAC ¶¶ 76-105.)  But even if that premise was right, it would be irrelevant.  It is settled in the Third Circuit that mere susceptibility

cannot constitute circumstantial evidence of price-fixing.  *Milberg Factors*, 662 F.3d at 229

("motivation[s] of market behavior are precisely the legally insufficient facts we have cautioned

against using as circumstantial evidence of an agreement" to conspire).

It is also not enough for Plaintiffs to assert, as they do repeatedly, that Actavis or Allergan

employees had "opportunities" to conspire at industry conferences.  (SAC ¶¶ 83, 95, 102, 247.)

"[P]roof of opportunity to conspire, without more, will not sustain an inference that a conspiracy

has taken place."  *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co. Inc.*, 998 F.2d 1224,

1235 (3d Cir. 1993).  It does not follow that, just because some Allergan employees interacted

with employees of other drug companies, they were conspiring to raise drug prices.

"Communications between competitors do not permit an inference of an agreement to fix prices

unless those communications rise to the level of an agreement, tacit or otherwise."  *In re Baby*

*Food Antitrust Litig.*, 166 F.3d 112, 126 (3d Cir. 1999) (internal quotation marks omitted).

"Membership in a trade association, without more, does not violate the antitrust laws."  *Just New*

*Homes, Inc. v. Beazer Homes*, 293 F. App'x 931, 934 (3d Cir. 2008).

(ii)    Plaintiffs' Allegations of Governmental Actions Are
Deficient

Plaintiffs invoke the AG Action, but, as discussed *supra*, unadjudicated allegations in

another litigation cannot support an allegation of price-fixing here.  Further, the AG Action

includes no allegations whatsoever that Allergan engaged in price-fixing as to Propranolol,

Doxycycline, Ursodiol, or Desonide, and thus provides no support for Plaintiffs' claims pertaining

to those drugs.  To the contrary, while several other companies are accused in the AG Action of

manipulating prices for one of those drugs, Doxycycline, the AG Action makes no accusations that

Actavis or Allergan played any role in those manipulations.

25

Plaintiffs also emphasize that Allergan (then Actavis) received information requests, a subpoena and a letter from Congress, which also provide no basis for any allegation of price-fixing. *Superior Offshore Intern., Inc. v. Bristow Group Inc.*, 738 F. Supp. 2d. 505, 516-17 (D. Del. 2010), *aff'd* 490 F. App'x 492 (3d Cir. 2012).  Courts assign no weight to allegations a defendant is being investigated, because "the mere occurrence of [an] investigation is equally consistent with Defendants' innocence."  *Id.* at 517 .

(iii)   <u>Plaintiffs' Pricing Allegations Are Deficient</u>

Plaintiffs try to salvage their price-fixing allegations by laying out price movements of four of the six drugs.  (SAC ¶¶ 108-09, 111-12, 114-15, 127-28, 141-42, 144-45, 147-48, 160-61.)  Even accepting those price movements are accurately described, solely for purposes of this motion, those allegations actually contradict any inference of a conspiracy.  A conspiracy requires a plaintiff to establish the defendants acted in parallel.  *InterVest*, 340 F.3d at 165.  That is not what Plaintiffs' allegations describe.

Plaintiffs' pricing charts and tables show the alleged co-conspirators' prices varied widely for the same drugs during the alleged conspiracy; and that they moved their prices during that period at different rates and different times.  The following are just a few examples:

- Plaintiffs allege (SAC ¶¶ 111-12) Impax Generics raised its Propranolol 20mg prices drastically in February 2015, with Actavis and the two other competitors raising their prices by far less and only months later.  By June 2015, which was the heart of the alleged price-fixing period, the prices charged by one purported co-conspirator (Impax) was 434% higher than the price charged by another (Mylan).

- Plaintiffs allege (*id.* ¶¶ 127-28) Lannett raised its Ursodiol 300mg prices in May 2014, with Actavis and Epic Pharma following suit in June.  That month, however, the prices charged by Epic and Lannett exceeded the prices of Actavis by 416% and 225% respectively.

- Plaintiffs allege (*id.* ¶¶ 144-45) three companies – Actavis, Mutual Pharmaceutical and West-Ward – conspired to raise prices on Doxycycline 100mg.  By April 2013, which was the heart of the alleged price-fixing conspiracy, the prices charged by West-Ward exceeded the prices of Mutual and Actavis by 199% and 28% respectively.

26

- Plaintiffs allege (*id.* ¶¶ 160-61) a price-fixing conspiracy for Desonide .05% Cream starting in March 2013, which was six months before Actavis entered the market. When Actavis entered the market, in September 2013, it charged less than one of its two alleged co-conspirators, and all three proceeded to reduce their prices over the next three months.

Plaintiffs recognize that such undercutting is inconsistent with a price-fixing conspiracy. (*See id.* ¶ 245) (alleging that absent a conspiracy, competitors would "risk getting undercut by the others.").

Plaintiffs' theory comes apart even further when the price movements are compared to the industry meetings at which the alleged co-conspirators supposedly formulated their plans. Price increases must be logically related in time to the alleged conspiratorial conversations to adequately allege a conspiracy to raise prices. *See, e.g., Resco Prods. Inc. v. Bosai Minerals Grp. Co.*, 158 F. Supp. 3d 406, 424 (W.D. Pa. 2016). Here again, that is not what Plaintiffs' allegations show:

- Plaintiffs allege the purported conspiracy to fix prices for Propranolol was conceived at a Generics Pharmaceutical Associate (GPhA) trade meeting in February 2015. (SAC ¶ 108.) But one of the purported co-conspirators, Impax, was not in attendance. (*Id.* ¶ 110.) Further, there is no allegation that anyone from Allergan or Actavis responsible for pricing, or any Individual Defendant, attended that meeting. (*Id.*)

- Plaintiffs allege the purported conspiracy to fix prices for Ursodiol was conceived at the GPhA annual meeting in February 2014. (*Id.* ¶ 127). But one of the three purported co-conspirators, Lannett, is not alleged to have been present. (*Id.* ¶ 129). Further, no one from Allergan or Actavis alleged to have been responsible for pricing is alleged to have attended that meeting, and none of the individual Defendants attended ***any*** of the alleged meetings that supposedly preceded price increases. (*Id.*)

- Plaintiffs allege the purported conspiracy to fix prices for Doxycycline was conceived at the GPhA annual meeting in February 2013 (*id.* ¶ 144). But one of the alleged co-conspirators, West-Ward, is not alleged to have attended, and the only representative from Mutual was from its parent company. (*Id.* ¶ 146.) Further, West-Ward's prices increased ***before*** February 2013. (*Id.* ¶ 145.)

- Plaintiffs allege the purported conspiracy to fix prices for Desonide commenced immediately after a National Association of Chain Drug Stores annual meeting in April 2013 (*id.* ¶ 160). But there is no allegation that either of Actavis's supposed co-conspirators—Perrigo and Taro Pharmaceutical—were in attendance (*id.* ¶ 162). Further, in April 2013, Actavis did not even sell Desonide.

In sum, the alleged price-fixing is not supported by the underlying allegations describing drug pricing and purported co-conspirator meetings.[11]

**B.**     The Complaint Fails To Plead A "Strong Inference" Of Scienter

Plaintiffs' Section 10(b) claim fails for the added reason that there are no particularized allegations supporting a strong inference Defendants acted with scienter.  *See* 15 U.S.C. § 78u-4(b)(2)(A).  Plaintiffs must allege facts supporting an inference of an "intent to deceive" or "highly unreasonable (conduct), involving not merely simple, or even excusable negligence, but an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 148 (3d Cir. 2004), *abrogated on other grounds by Tellabs*, 551 U.S. 308 (2007).  The inference "must be more than merely 'reasonable' or 'permissible'—it must be . . . cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.

Plaintiffs' scienter allegations do not nearly meet this standard.  Plaintiffs fail to identify any "reports or statements" available to Defendants that would have made them aware that any representation to investors was false or misleading.  *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) ("[W]here plaintiffs contend

---

[11]   A court outside this Circuit applied a "plausibility" standard to deny a motion to dismiss in an antitrust case against Actavis and other manufacturers of Propranolol.  *See In re Propranolol Antitrust Litig.*, No. 16-cv-09901, 2017 WL 1287515 (Apr. 6, 2017 S.D.N.Y.) (Rakoff, J.).  The court in that action, *inter alia*, rejected as non-binding (*id.* at *5) the Third Circuit decision in *In re Baby Food Antitrust Litig.*, 166 F.3d at 137, where the Court rejected allegations—like Plaintiffs' allegations here—that defendants' "economic motive to … increase their profit margins" could support an anti-trust claim, since this is an "obvious fact" and "the essence of a capitalistic economy," *id.* at 137.  Further, the defendants in the Propranolol case disputed the pricing information alleged by Plaintiffs, which contributed to the court's finding of a factual dispute.  *In re Propranolol*, 2017 WL 1287515, at *5.  Here, by contrast, Defendants accept Plaintiffs' pricing data *arguendo*, and, as demonstrated in text, that data helps render their price-fixing allegations implausible.

defendants had access to contrary facts, they must specifically identify the reports or statements containing this information") (internal quotation marks omitted); *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 400 (D. Del. 2010) ("*Horizon II*"), *aff'd*, 442 F. App'x 672 (3d Cir. 2011) (dismissing complaint where no allegation "[d]efendants had access to information which, had they looked into it, would have confirmed the existence of the [price-fixing] conspiracy").

       1.    <u>Plaintiffs' Allegations Of Price-Fixing Do Not Support A Particularized Showing That Any Defendant Intended To Deceive Investors</u>

In their attempt to establish scienter to commit securities fraud, Plaintiffs rely on allegations directed instead to Allergan's supposed intent to engage in price-fixing. For example, Plaintiffs recycle the same allegations that Defendants had the "motive" and "opportunity" to engage in price-fixing, including because of their desire to maximize profits and their attendance at trade shows. (SAC ¶¶ 246-48.) And Plaintiffs again rely on their mischaracterization of price patterns in the generics market (*id.* ¶¶ 244-45), and their assumption that the Government's issuance of a subpoena and other unadjudicated claims confirmed the existence of an improper price-fixing scheme (*id.* ¶¶ 249, 252). Even if such allegations were sufficient to support a finding that Defendants intended to engage in price-fixing (and they are not, *see* Section I.A.3., *supra*), they would not support a finding of intent to engage in securities fraud, as required here. This is confirmed by several cases where, unlike here, there was confirmed price-fixing, and the courts still rejected securities fraud claims as inadequately pled.[12] *See, e.g.*, *City of Roseville Employees'*

---

[12] This stands as another reason that the *Propranolol* decision is inapposite. *See supra* n.12. Even if the Court in that action were correct that the plaintiffs had described a viable antitrust violation, the question would remain—as in those cases where courts have dismissed securities fraud claims even where antitrust violations had been confirmed—as to whether corporate management made public statements intended to mislead investors. The *Propranolol* Court had no such claim before it, and did not reach that question.

*Ret. Sys. v. Horizon Lines, Inc.*, 442 F. App'x 672, 676 (3d Cir. 2011) ("*Horizon III*") (affirming for lack of scienter despite allegations of pervasive price-fixing across the defendant's key business); *In re Sotheby's Holdings, Inc.*, No. 00-cv-1041, 2000 WL 1234601, at *7.

Plaintiffs' remaining allegations are not nearly adequate to show that each Defendant intended for specific representations to mislead investors. *Winer*, 503 F.3d at 335 ("Each untrue statement or omission must be set forth with particularity as to 'the defendant' and scienter must be pleaded in regards to 'each act or omission' sufficient to support a strong inference that 'the defendant' acted with the required state of mind.") (quoting 15 U.S.C. § 78u-4(b)(2)).

*First*, there is no allegation that any Individual Defendant, or the personnel responsible for any of the purportedly misleading representations by Allergan to investors, was aware of the alleged price-fixing. *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 247 (3d Cir. 2016) (scienter requires "additional allegations of **specific information conveyed to management and related to fraud**.") (emphasis added). Though Plaintiffs invoke alleged communications between Allergan and other companies, (SAC ¶ 249), there is no claim that any Individual Defendant, or any personnel responsible for the allegedly false public disclosures, participated in those communications. To the contrary, the Individual Defendants rarely attended any of the conferences at which other personnel supposedly met with co-conspirators to devise the alleged price-fixing.[13] Similarly, Plaintiffs allege that "Allergan has recently been named as a defendant

---

[13]   No Individual Defendant is alleged to have attended any conference preceding a price increase for Propranolol or Ursodiol. (SAC ¶¶ 110, 129.) Further, Mr. Bisaro is only alleged to have attended one conference, which allegedly preceded a price increase for Doxycycline and Desonide. However, no competitor for Doxycycline or Desonide is alleged to have attended that conference. (*Id.* ¶ 146)  Similarly, Mr. Olafsson is alleged to have attended one conference, which allegedly preceded a price increase for Doxycycline and Desonide. (*Id.* ¶ 146)  However, that preceded Actavis's entry into the Desonide market by seven months. (*Id.* ¶¶ 146, 149.)  Finally, Plaintiffs make no allegations whatsoever regarding the Individual Defendants with respect to price increases for Verapamil, and Glyburide-Metformin.

in the [AG Action]" but Plaintiffs do not allege that the AG Action alleges that the Individual Defendants were involved in any alleged price-fixing—because it does no such thing. (SAC ¶ 252.) Nothing Plaintiffs point to would have alerted Defendants to such alleged activities. The Third Circuit has been clear that Plaintiffs cannot simply assume knowledge by Defendants based on their position within the company, or because certain of their subordinates were supposedly involved in the pricing scheme. *Alpharma*, 372 F.3d at 150 ("allegations that [defendant's] subordinate knew of the irregularities occurring in Brazil provide an insufficient basis upon which to impute knowledge to [defendant]"); *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 556 (D.N.J. 2010) (Imputing knowledge to Defendants "by virtue of their employment has been rejected as a basis for an inference of scienter").

Plaintiffs attempt to get around this problem with their allegation that Defendants had a duty to investigate, and should have confirmed, the alleged price-fixing upon public disclosure of the governmental investigations (SAC ¶ 250.) *Horizon II* confirms the error in that logic. There, one of the defendants' subsidiaries pled guilty to price-fixing one of the "crucial components of [defendants' financial performance]" which had a "significant[]" impact on the defendant's earnings. 713 F. Supp. 2d at 396, 400. Nonetheless, the court rejected the argument the defendants should have been aware of the price-fixing because, given the "covert nature of a price-fixing conspiracy," plaintiffs "pleaded no facts to establish that any of [the] defendants had access to information which, had they looked into it, would have confirmed the existence of the conspiracy." *Id*. at 400. Here, plaintiffs similarly fail to point to a single document Defendants had access to which would have confirmed the existence of the alleged conspiracy—a conspiracy that, by its

very nature, would have been "covert" and difficult to detect.[14]  *Id.*; *see also Teamsters Local 445*, 531 F.3d at 196.  In fact, Plaintiffs' showing here is weaker than in *Horizon II*, given that no one at Allergan has pled guilty or been convicted of price-fixing.

*Second,* even putting aside that Plaintiffs' allegations are aimed at the supposed motive and opportunity to commit price-fixing (as opposed to committing securities fraud), allegations of motive and opportunity are insufficient to support scienter under Section 10(b).  *See Horizon II*, 713 F. Supp 2d at 395 ("motive and opportunity may no longer serve as an independent route to scienter") (internal quotation marks omitted).  Further, to the extent motive and opportunity allegations can supplement other scienter allegations, "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from [the] fraud."  *Rahman v. Kid Brands*, *Inc.*, 736 F.3d 237, 245-46 (3d Cr. 2016).  Plaintiffs' allegation that Defendants had "a common motive" to increase profits, (SAC ¶ 246), is precisely the type of universally held motive that cannot raise an inference of scienter.  *Kid Brands*, 736 F.3d at 245-46.

*Third,* even if it could be assumed Defendants were aware of the purported price-fixing, there is no explanation as to how such knowledge would have meant Defendants intended to mislead investors in public statements having nothing to do with the drugs that were supposedly the subject of that scheme.[15]  *See* Section I.A.2, *supra*.  Contrary to Plaintiffs' allegations, it is

---

[14]    The sole pricing "documents" referenced in the Complaint are the "pricing models" that Confidential Witness No. 2 ("CW2") alleges non-defendants Boyer, Falkin, and Rogerson had access to.  (SAC ¶¶ 86-88.)  But there is no allegation that these "pricing models" would have revealed the alleged price-fixing conspiracy.  In fact, it is not even clear CW2 has ever seen the "pricing models."

[15]    Plaintiffs cannot avoid this conclusion with their allegation that the generics business constituted a core business.  (SAC ¶ 251.)  The "core operations" doctrine does not apply where, as here, the products at issue do not make up a significant portion of the core operations' revenue.

more reasonable to infer Defendants were not aware of the alleged price-fixing and did not act with scienter given the immaterial revenue attributable to the drugs at issue. *In re Ariad Pharm., Inc. Sec. Litig.*, 842 F.3d 744, 750 (1st Cir. 2016) ("[T]he marginal materiality of an omitted fact tends to undercut the argument that defendants acted with the requisite intent ... in not disclosing it.") (internal quotation marks omitted).

### 2.   The Alleged Stock Sales Do Not Support An Inference Of Scienter

The only scienter allegations arguably directed to Defendants' supposed intent to mislead investors, as opposed to a supposed intent to fix prices, are the allegations of insider stock sales. (SAC ¶¶ 257, 261, 265, 267.)  It is settled, however, that Courts "will not infer fraudulent intent from the mere fact that some officers sold stock." *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 279 (3d Cir. 2009).  The sales must be unusual in scope or timing. *Id.*

Mr. Saunders and Ms. Hilado, who have served as the CEO and CFO of Actavis and then Allergan since July 2014 and December 2014, respectively, are not alleged to have sold a ***single*** share during the class period.  This negates any inference of scienter across all Defendants. *See Advanta*, 180 F.3d at 540 (fact that certain defendants "sold no stock at all during the class period, rais[es] doubt whether the [other defendants'] sales were motivated by an intent to profit from inflated stock prices").

---

*Kid Brands*, 736 F.3d at 247; *Bd. of Trustees of City of Ft. Lauderdale Gen. Employees' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 872 (S.D.N.Y. 2011), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012).  The Complaint does not include any allegations indicating that Allergan or its Actavis unit generated a substantial portion of their revenue from the purported price-fixing, and, as discussed in Section I.A.2(b), *supra*, the figures that are included reveal that the total revenue from those products was immaterial as a matter of law.  Further, the core operations doctrine does not raise an inference of scienter absent "ample" evidence that defendants knew their statements were false, which, as discussed in text, is absent here. *Horizon II*, 713 F. Supp. 2d at 400.

In any event, the timing of the stock sales by the remaining Defendants was not suspicious, as it all occurred between November and December of 2013, (*see* SAC ¶¶ 257, 261, 265, 267), years before the alleged price-fixing was revealed and before the majority of the alleged price-fixing is alleged to have occurred. *See, e.g.*, *Horizon II*, 713 F. Supp. 2d at 396 (stock sales occurring more than a year before price-fixing conspiracy was uncovered were not "unusual in . . . timing" and did not give rise to an inference of scienter). Moreover, in late 2013, Allergan's stock traded well-below its high of $340.34 in July 2015 (*see* Ex. 3 to McClure Cert. at 10) which further negates any inference of suspicious timing. *Hertz*, 2017 WL 1536223, at *22.

The scope of the sales is similarly innocuous. Plaintiffs make no attempt to show, as they must, that the sales by the Defendants who did sell were unusual in scope relative to prior sales or their overall holdings. *See, e.g.*, *Oran v. Stafford*, 226 F.3d 275, 290 (3d Cir. 2000) (sales not unusual in scope where they are similar in scope to pre-class period sales). There is no basis for such a showing. For example, Mr. Buchen sold approximately $3.4 million more in the three years prior to the relevant period than he is alleged to have sold during that period, Mr. Bisaro sold at least $200,000 more, and Mr. Joyce sold nearly $1,000,000 more. McClure Cert. Exs. 4 (Buchen Forms 4 dated March 4, 2011 through September 3, 2013); 5 (Bisaro Form 4 dated August 20, 2103); 6 (Joyce Forms 4 dated December 13, 2010 through August 15, 2013); 7 (Olafsson Form 4 dated August 2, 2013).[16] Moreover, while the Defendants who sold shares did so for a few million dollars, the allegations show that each retained larger holdings, which would have exposed them

---

[16]   If the class period from the original complaint is used, there were **zero** shares sold by **any** Defendant. *See* Dkt. # 1 at 2 (class period starting on February 25, 2014). "Lengthening the Class Period permits Plaintiffs to sweep as many stock sales into their totals as possible, thereby making the stock sales appear more suspicious than they would be with a shorter class period." *Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 151 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009) (internal quotation marks omitted).

to far greater losses had they actually been aware of material information pertaining to a price-fixing conspiracy that could one day lead to a market drop.  (*See, e.g.*, SAC ¶¶ 257, 261, 265, 267) (Mr. Bisaro retained 92%; Mr. Saunders retained 100%; Ms. Hilado retained 100%; Mr. Olafsson retained 75%; Mr. Joyce retained 63%; Mr. Buchen retained 66%).  Such sales do not give rise to an inference of scienter.  *Horizon II*, 713 F. Supp. 2d at 396 (sales of a few million dollars not unusual in scope); *Advanta*, 180 F.3d at 540-41 (inference of scienter not raised where individual defendants "continued to hold a sizable percentage" of stock); *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 313 (D.N.J. 2001) ("Low aggregate sales and large retained aggregate holdings rebut an inference of motive, even where some defendants have sold significant percentages").

### C.    Plaintiffs Have Failed To Adequately Plead Loss Causation

Loss causation is the "causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  Plaintiffs attempt to draw that connection with their dramatic declaration that "THE TRUTH EMERGE[D]," (SAC ¶ 234), through the disclosure on August 6, 2015 of the DOJ subpoena on Actavis, and a November 3, 2016 Bloomberg Article reporting that the DOJ may press charges against ***some*** in the generics industry by the end of the year, both of which allegedly resulted in a drop in value of Allergan's stock.  Neither of these allegations support a showing of loss causation.

*First*, the announcement of a subpoena or possible charges does not permit the conclusion wrongdoing actually occurred, which means any resultant stock drop was caused by speculation, not misrepresentation.  *See, e.g.*, *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014), *as amended* (Sept. 11, 2014) ("[A]ny decline in a corporation's share price following the announcement of an investigation can only be attributed to market speculation about whether fraud has occurred.  This type of speculation cannot form the basis of a viable loss causation theory."); *Sapssov v. Health Mgmt. Assocs., Inc.*, 608 F. App'x 855, 863 (11th Cir. 2015) ("Revelation of the

. . . investigation, including issuance of subpoenas, does not show any actual wrongdoing and cannot qualify as a corrective disclosure."); *Martin v. GNC Holdings*, Inc., No. 2:15-cv-01522, 2017 WL 3974002, at *18 (W.D. Pa. Sept. 8, 2017) ("The Oregon AG Complaint contains allegations of unproven misconduct, thus it is not a corrective disclosure which revealed GNC's alleged fraudulent conduct to the market."); *see also Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, No. 1:12-cv-0093, 2016 WL 7117455, at *11 (M.D. Pa. Dec. 7, 2016) (similar).

*Second*, Plaintiffs' theory that a disclosure purportedly revealing problems at Actavis was the cause of a drop in the value of Allergan's share price makes no logical sense. As Plaintiffs acknowledge, the sale of the Actavis generics business had already been announced by the time of those disclosures. (SAC ¶¶ 43, 183.) Thus, Allergan's future prospects and revenues—those matters that would have been of concern to investors—had nothing to do with the ongoing performance of the Actavis generics business. It is also significant that Teva, which purchased the generics business, closed that transaction in August 2016 at the same price that was disclosed in July 2015, which was before the public announcement that Actavis had received a subpoena. (*Id.* ¶¶ 43, 183.) These reports thus had no effect on the $40.5 billion in cash and securities that Allergan and its shareholders received for selling Allergan's generics business.[17]

## II.    PLAINTIFFS' SECTION 20(a) CLAIM SHOULD BE DISMISSED

Because Plaintiffs have failed to properly allege a 10(b) violation their Section 20(a) violations also fail. *City of Edinburgh*, 754 F.3d at 177. In addition, a Section 20(a) claim requires allegations of culpable participation, *Belmont v. MB Inv. Partners*, 708 F.3d 470, 484 (3d Cir.

---

[17]    Moreover, it took *two trading days* for Allergan's stock to recover from its pre-November 3, 2016 price, *see* Ex. 3 to McClure Cert. at 17, which negates loss causation. *See, e.g.*, *In re Immucor, Inc. Sec. Litig.*, No. 09-cv-2351, 2011 WL 3844221, at *2 (N.D. Ga. Aug. 29, 2011) (dismissing case where stock rebounded to pre-disclosure price shortly after class period).

2013), and for the same reasons Plaintiffs cannot plead scienter, they cannot plead culpable participation.  *See supra* Section I.B.

## III.   PLAINTIFFS' SECTION 14(a) CLAIMS SHOULD BE DISMISSED

In Counts III and IV, Plaintiffs invoke Section 14 of the Exchange Act, claiming Defendants made material misstatements or omissions in certain proxy solicitations.  (SAC ¶¶ 290, 305.)  But Plaintiffs never describe any statements in those solicitations, much less provide an explanation as to how they were false.

### A.   Plaintiffs Fail to Allege a Material Misstatement or Omission in the Proxy Statements

To state a claim under Section 14(a), Plaintiffs must allege that "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction."  *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 228 (3d Cir. 2007).  Moreover, Plaintiffs must meet the heightened pleading standard of the PSLRA by "specify[ing] each statement alleged to have been misleading, [as well as] the reason or reasons why the statement is misleading[.]"  *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1328 (3d Cir. 2002).

Plaintiffs do not come close.  They base their claim on two proxy statements, dated May 6, 2014 and January 27, 2015, but provide no description of what representations those statements purportedly made, much less "specify each statement" and "the reasons" they were misleading. Plaintiffs' Section 14(a) allegations amount to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," which would not "suffice" even if the PSLRA did not apply.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  (*See* SAC ¶¶ 288-302, 303-16 (reciting elements of cause of action, and asserting Defendants are liable, but providing no specifics)).

Plaintiffs' failure to identify any purportedly false or misleading statements in the proxy statements warrants dismissal of the Section 14 claims.  *NAHC*, 306 F.3d at 1328.

Even if Plaintiffs had met their basic obligation to identify purported misrepresentations in the proxy statements, their Section 14(a) claim would still fail for many of the same reasons that their Section 10(b) claim fails.  For instance, as set forth above (Section I.A., *supra*), the conspiracy has not been adequately alleged and therefore cannot form the basis of a Section 14 claim.  Moreover, even if there were adequate allegations of a price-fixing conspiracy, a proxy statement "is not a rite of confession," *Data Probe Acquisition Corp. v. Datatab, Inc.*, 722 F.2d 1, 5 (2d Cir. 1983), and "the securities laws simply do not require management to accuse itself of antisocial or illegal policies[.]" *Bolger v. First State Fin. Servs.*, 759 F. Supp. 182, 194 (D.N.J. 1991) (internal quotation marks omitted).

B.     Plaintiffs Fail To Satisfy The Remaining Elements Of Section 14(a)

The Third Circuit has held that complaints alleging Section 14(a) violations that "sound in fraud" are evaluated under the heightened pleading standards of Fed. R. Civ. P. 9(b) and the PSLRA.  *Chubb*, 394 F.3d at 142.  Here, the only possible basis for the Section 14(a) claims in the Amended Complaint is the supposed price-fixing scheme alleged in support of the remaining claims.  The Section 14(a) claims are therefore "inextricably intertwined" with the fraud claims and subject to the Rule 9(b) and PSLRA heightened pleading standards.  *Chubb*, 394 F.3d at 142.[18] For the reasons set forth in Section I.B., *supra*, Plaintiffs cannot meet their burden.

Under Section 14(a), a Plaintiff also must adequately allege that misrepresentations or omissions in the proxy statement caused economic harm to the Plaintiff (*i.e.*, loss causation).  *See Grace v. Rosenstock*, 228 F.3d 40, 47 (2d Cir. 2000) ("[L]oss causation and transaction causation

---

[18]    Plaintiffs cannot avoid the heightened pleading standard by merely "adding a boilerplate assertion . . . disclaim[ing] any allegations of fraud."  *Chubb*, 394 F.3d at 164.

must be proven in the context of a private action under § 14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.").  For the reasons explained above in Section I.C., Plaintiffs have failed to adequately allege loss causation.

       C.     The Section 14(a) Claims Are Also Untimely

The Section 14(a) claims should be dismissed because even if Plaintiffs had alleged a valid claim (and they have not), it would be untimely.  The statute of limitations for a Section 14(a) claim is one year from when the plaintiff discovered, or a plaintiff in the exercise of reasonable diligence would have discovered, the facts essential to the violation.  *In re Exxon Mobil Corp. Sec. Litig.*, 500 F.3d 189, 194, 199 (3d Cir. 2007), *as amended* (Nov. 20, 2007).  Thus, because the initial Complaint was filed on November 11, 2016, the Section 14(a) claims are untimely if they were discovered, or reasonably should have been discovered, on or before November 10, 2015.

Plaintiffs' theory is that Allergan's public disclosure, in an August 6, 2015 SEC filing, that Actavis had received a subpoena revealed "THE TRUTH" that Actavis had engaged in price-fixing.  (SAC ¶ 234.)  According to Plaintiffs, Actavis's receipt of that subpoena "strongly" indicated the DOJ had concluded Actavis was "engaged in improper pricing." (*Id.* ¶ 183.)  Under Plaintiffs' own theory, then, their Section 14 claims comes too late.  This action was filed in November 2016, more than one year after the August 2015 disclosure that Plaintiffs claim had the effect of revealing the alleged price-fixing, and is therefore untimely.  *Wisniewski v. Fisher*, 857 F.3d 152, 158 (3d Cir. 2017).

## IV.    **PLAINTIFFS' PREFERRED SHARES CLAIMS SHOULD BE DISMISSED**

Neither Plaintiff is alleged to have purchased preferred shares.  *See* Dkt. # 36, Ex. A (Stock Certifications).  Therefore, Plaintiffs do not have standing to assert claims on behalf of preferred shareholders, and those claims must be dismissed.  *See In re Cent. European Distrib. Corp. Sec.*

*Litig.*, No. 11-cv-6247, 2012 WL 5465799, at *10 (D.N.J. Nov. 8, 2012) (noting that in order to

have standing either the lead plaintiff or a named plaintiff must have standing as to every claim).

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' Consolidated Second Amended Class Action

Complaint is insufficient and should be dismissed in its entirety.

Respectfully submitted,

**REED SMITH LLP**

Dated:  January 22, 2018

*s/ Shannon McClure*
Shannon McClure, Esq.
Julia A. Lopez, Esq.
Princeton Forrestal Village
136 Main Street, Suite 250
Princeton, New Jersey 08540
Telephone: (609) 987-0050
Facsimile: (609) 951-0824
smcclure@reedsmith.com
jalopez@reedsmith.com

**QUINN EMANUEL URQUHART &**
**SULLIVAN, LLP**
Richard Schirtzer, Esq.
(admitted *pro hac vice*)
Molly Stephens, Esq.
(admitted *pro hac vice*)
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Adam Abensohn, Esq.
(admitted *pro hac vice*)
Jesse Bernstein, Esq.
(admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

*Attorneys for Defendants Allergan plc, Brenton L. Saunders, Paul M. Bisaro, Maria Teresa Hilado, R. Todd Joyce, Sigurdur O. Olafsson, David A. Buchen, James H. Bloem, Christopher W. Bodine, Tamar D. Howson, John A. King, Ph.D., Catherine M. Klema, Jiri Michal, Jack Michelson, Patrick J. O'Sullivan, Ronald R. Taylor, Andrew L. Turner, Fred G. Weiss, Nesli Basgoz, M.D., and Christopher J. Coughlin*