James E. Cecchi
Donald A. Ecklund
**CARELLA, BYRNE, CECCHI, OLSTEIN,
BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744

John C. Browne
Lauren A. Ormsbee
Abe Alexander
Michael Mathai
**BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1448

*Liaison Counsel for Lead Plaintiffs and
the Class*

*Co-Lead Counsel for Lead Plaintiffs and
the Class*

Matthew L. Mustokoff
Kimberly A. Justice
Margaret E. Onasch
Jonathan F. Neumann
**KESSLER TOPAZ
MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Co-Lead Counsel for Lead Plaintiffs and
the Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE ALLERGAN GENERIC DRUG PRICING SECURITIES LITIGATION | Case No. 2:16-cv-09449 (SDW) (LDW)<br><br>**LEAD PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS...................................................................................................... i

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 5

    **I.**    Allergan's Generic Drug Business...........................................................5

    **II.**    Allergan and Other Drug Makers Engage in a Price-Fixing Conspiracy ...............6

    **III.**    Defendants Made Numerous False and Misleading Statements and Omissions...................................................................................................7

    **IV.**    Defendants Reap Millions in Insider Sales .............................................9

    **V.**    The Fraud Is Revealed ...........................................................................10

    **VI.**    Post-Class Period Events Confirm Defendants' Fraud .........................10

        **A.**    Ongoing Investigations Into the Price-Fixing Conspiracy...................... 10

        **B.**    Identical Allegations of Price-Fixing Involving Allergan Are Sustained .................................................................................. 12

ARGUMENT ................................................................................................................... 14

    **I.**    The Heightened Pleading Standard Is Relaxed Under These Circumstances........14

    **II.**    The Complaint Adequately Alleges False and Misleading Statements and Omissions...................................................................................................14

        **A.**    Statements That the Market Was "Highly Competitive"......................... 15

        **B.**    Saunders' Statements Downplaying the DOJ Subpoena and Attributing Price Increases to "Supply And Demand" ............................ 17

        **C.**    Statements Attributing Allergan's Financial Results to Legitimate Factors.......................................................................................... 19

        **D.**    Misleading Financial Results Inflated by Price-Fixing ........................... 22

        **E.**    False Assurances That Allergan Employees Did Not Engage in Price-Fixing.......................................................................................... 23

        **F.**    The Individual Defendants' False and Misleading Certifications ........... 24

**III.**     The Complaint Adequately Pleads a Price-Fixing Conspiracy.............................24

**IV.**     The Complaint Adequately Alleges That Defendants Acted with Scienter ..........28

        **A.**     There Is a Strong Inference That Defendants Made False Statements Concerning Allergan's Core Business Operations with Scienter ..................................................................................................... 29

        **B.**     The Motive Allegations Strengthen the Inference of Scienter.................. 34

**V.**     The Complaint Adequately Alleges Loss Causation ..............................................36

**VI.**     Defendants' Remaining Arguments Fail ..............................................................39

**VII.**     In the Event of Partial or Full Dismissal, Leave to Amend Should Be Granted..................................................................................................................40

CONCLUSION.................................................................................................................... 40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
    692 F.3d 34 (2d Cir. 2012)........................................................................39

*In re Aetna, Inc. Sec. Litig.*,
    617 F.3d 272 (3d Cir. 2010)......................................................................20

*In re Alpharma Inc. Sec. Litig.*,
    372 F.3d 137 (3d Cir. 2004)......................................................................31

*In re Amgen Inc. Sec. Litig.*,
    544 F. Supp. 2d 1009 (C.D. Cal. 2008) ...................................................22

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012)......................................................................26

*In re ATI Techs., Inc. Sec. Litig.*,
    216 F. Supp. 2d 418 (E.D. Pa. 2002) .......................................................22

*Aviva Partners LLC v. Exide Techs.*, No. 05-3098,
    2007 WL 789083 (D.N.J. Mar. 13, 2007).................................................29

*In re Baby Food Antitrust Litig.*,
    166 F.3d 112 (3d Cir. 1999)......................................................................27

*Basic, Inc. v. Levinson*,
    485 U.S. 224 (1988)..................................................................................14

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..................................................................................25

*In re Bradley Pharms., Inc. Sec. Litig.*,
    421 F. Supp. 2d 822 (D.N.J. 2006) .....................................................36, 37

*In re Braskem S.A. Sec. Litig.*,
    246 F. Supp. 3d 731 (S.D.N.Y. 2017).......................................................21

*In re Bristol Myers Squibb Co. Sec. Litig.*,
    586 F. Supp. 2d 148 (S.D.N.Y. 2008).......................................................38

*In re Bristol-Myers Squibb Sec. Litig.*, No. Civ. A. 00-1990,
    2005 WL 2007004 (D.N.J. Aug. 17, 2005) .........................................17, 23

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997)........................................................................14, 21

*Cal. Pub. Emps' Ret. Sys. v. Chubb Corp.*, No. 00-4285,
    2002 WL 33934282 (D.N.J. June 26, 2002) ...........................................................40

*Cal. Pub. Emps' Ret. Sys. v. Chubb Corp.*,
    394 F.3d 126 (3d Cir. 2004)........................................................................14, 39

*In re Campbell Soup Sec. Litig.*,
    145 F. Supp. 2d 574 (D.N.J. 2001) ...........................................................22, 29

*In re Cell Pathways, Inc., Sec. Litig.*, No. 99-725,
    2000 WL 805221 (E.D. Pa. June 20, 2000) ...........................................................29

*In re Cent. European Distrib. Corp. Sec. Litig.*, No. 11-6247,
    2012 WL 5465799 (D.N.J. Nov. 8, 2012) ...........................................................40

*Chamberlain v. Reddy Ice Holdings, Inc.*,
    757 F. Supp. 2d 683 (E.D. Mich. 2010)........................................................15, 16, 21, 38

*In re Chocolate Confectionary Antitrust Litig.*,
    801 F.3d 383 (3d Cir. 2015)........................................................................32

*Church & Dwight Co. Inc. v. SPD Swiss Precision Diagnostics, GmBH*,
    No. 10-453, 2010 WL 5239238 (D.N.J. Dec. 16, 2010)........................................25

*City of Roseville Emps. Ret. Sys. v. Horizon Lines, Inc.*,
    713 F. Supp. 2d 378 (D. Del. 2010)........................................................32

*City of Roseville Emps. Ret. Sys. v. Horizon Lines, Inc.*,
    686 F. Supp. 2d 404 (D. Del. 2009)........................................................19, 22, 24

*In re Convergent Tech. Sec. Litig.*,
    948 F.2d 507 (9th Cir. 1991) ........................................................................22

*In re DVI, Inc. Sec. Litig.*, No. 03-cv-05336,
    2010 WL 3522090 (E.D. Pa. Sept. 3, 2010) ...........................................................36

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase*,
    553 F.3d 187 (2d Cir. 2009)........................................................................21

*In re Electrobras Sec. Litig.*,
    245 F. Supp. 3d 450 (S.D.N.Y. 2017)........................................................21, 23

*EP Medsystems, Inc. v. EchoCath, Inc.*,
    235 F.3d 865 (3d Cir. 2000)........................................................................38

*Friedman v. Rayovac Corp.*,
   295 F. Supp. 2d 957 (W.D. Wis. 2003) ...............................................................21, 22

*Galati v. Commerce Bancorp, Inc.*,
   220 Fed. App'x 97 (3d Cir. 2007) ........................................................................17, 20

*In re Gentiva Sec. Litig.*,
   932 F. Supp. 2d 352 (E.D.N.Y. 2013) ..................................................................33, 37

*Gray v. Bayer Corp.*, No. 08-4716,
   2010 WL 1375329 (D.N.J. Mar. 31, 2010).................................................................25

*Gray v. BMW of N. Am., LLC*, No. 13-3417,
   2014 WL 4723161 (D.N.J. Sept. 23, 2014) ...............................................................14

*Greater Pa. Carpenters Pension Fund v. Whitehall Jewelers, Inc.*, No. 04 C 1107,
   2005 WL 61480 (N.D. Ill. Jan. 10, 2005) .................................................................38

*Hull v. Global Digital Solutions, Inc.*, No. 16-5153,
   2017 WL 6493148 (D.N.J. Dec. 19, 2017).................................................................36

*Ieradi v. Mylan Labs., Inc.*,
   230 F.3d 594 (3d Cir. 2000).......................................................................................21

*Ind. Public Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016).........................................................................................21

*In re Indep. Energy Holdings, PLC Sec. Litig.*,
   154 F. Supp. 2d 741 (S.D.N.Y. 2001)........................................................................23

*In re Infineon Techs. AG*, No. No. 04-04156,
   2006 WL 1329887 (N.D. Cal. May 16, 2006)......................................15, 17, 21, 23

*In re Infineon Techs. AG Sec. Litig.*, No. 04-04156,
   2008 WL 11333700 (N.D. Cal. Jan. 25, 2008) .........................................................31

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010).................................................................................24, 25

*Institutional Investors Group v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009).............................................................................. *passim*

*In re Intelligroup SEC Litig.*,
   527 F. Supp. 2d 262 (D.N.J. 2007) ...........................................................................36

*Lipow v. Net 1 UEPS Techs., Inc.*,
   131 F. Supp. 3d 144 (S.D.N.Y. 2015)........................................................................33

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015)............................................................................40

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
    513 F.3d 702 (7th Cir. 2008) ...............................................................29, 31

*Martin v. GNC Holdings, Inc.*, No. 2:15-CV-01522,
    2017 WL 3974002 (W.D. Pa. Sept. 8, 2017)......................................37, 38

*McCabe v. Ernst & Young LLP*,
    494 F.3d 418 (3d Cir. 2007).....................................................................36

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
    164 F. Supp. 3d 568 (S.D.N.Y. 2016).....................................................25

*Menkes v. Stolt-Nielsen S.A.*, No. 3:03CV409,
    2005 WL 3050970 (D. Conn. Nov. 10, 2005) .........................................15

*In re Merck & Co., Inc., Deriv., & ERISA Litig.*, MDL No. 1658,
    2011 WL 3444199 (D.N.J. Aug 8, 2011) ................................................36

*In re Micron Techs., Inc. Sec. Litig.*, No. CV-06-085,
    2007 WL 576468 (D. Idaho Feb. 21, 2007)............................................16

*In re MicroStrategy, Inc. Sec. Litig.*,
    115 F. Supp. 2d 620 (E.D. Va. 2000) ......................................................35

*Mineworkers' Pension Scheme v. First Solar Incorporated*,
    881 F.3d 750 (9th Cir. 2018) .......................................................... *passim*

*In re Moody's Corp. Sec. Litig.*,
    599 F. Supp. 2d 493 (S.D.N.Y. 2009).....................................................23

*Nat'l Junior Baseball League v. Pharmanet Dev. Group Inc.*,
    720 F. Supp. 2d 517 (D.N.J. 2010) ..........................................................32

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)................................................................29, 33

*In re OSG Sec. Litig.*,
    12 F. Supp. 3d 619 (S.D.N.Y. 2014)........................................................25

*In re Petrobras Sec. Litig.*,
    116 F. Supp. 3d 368 (S.D.N.Y. 2015)................................................21, 23

*In re Platinum & Palladium Antitrust Litig.*, No. 14-CV-9391,
    2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) ........................................27

*Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*,
    645 F. Supp. 2d 210 (S.D.N.Y. 2009)...................................................38

*In re Propranolol Antitrust Litig*,
    249 F. Supp. 3d 712 (S.D.N.Y. 2017)........................................... *passim*

*In re Providian Fin. Corp. Sec. Litig.*,
    152 F. Supp. 2d 814 (E.D. Pa. 2001) ........................................... *passim*

*Public Empls' Ret. Sys. of Mississippi v. Amedisys, Inc.*,
    769 F.3d 313 (5th Cir. 2014) ..........................................................37

*In re RAIT Fin. Trust Sec. Litig.*, No. 07-3148,
    2008 WL 5378164 (E.D. Pa. Dec. 22, 2008)..................................30

*In re Ramp Cos. Sec. Litig.*, No. 05-6521,
    2006 WL 2037913 (S.D.N.Y. Jul., 12, 2006)................................24

*Richman v. Goldman Sachs Grp., Inc.*, No. 05 Civ. 6521,
    868 F. Supp. 2d 261 (S.D.N.Y. 2012)...........................................38

*In re Schering-Plough Corp./Enhance Sec. Litig.*, No. 08-397,
    2009 WL 2855457 (D.N.J. Sept. 2, 2009) ....................................14

*In re Schering-Plough Corp./Enhance Sec. Litig.*, No. 08-397,
    2012 WL 4482032 (D.N.J. Sept. 25, 2012) ..................................40

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
    266 F. Supp. 2d 1150 (C.D. Cal. 2003) ........................................35

*Shaev v. Saper*,
    320 F.3d 373 (3d Cir. 2003)..........................................................39

*Shapiro v. UJB Fin. Corp.*,
    964 F.2d 272 (3d Cir. 1992).....................................................18, 20

*In re Sipex Corp. Sec. Litig.*, No. C 05-00392,
    2005 WL 3096178 (N.D. Cal. Nov. 17, 2005) .............................21

*In re Sotheby's Holdings, Inc. Sec. Litig.*, No. 00 CIV 1041,
    2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000)........................15, 19

*Steiner v. MedQuist Inc.*, No. 04-5487,
    2006 WL 2827740 (D.N.J. Sept. 29, 2006) ..................................19

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006)...................................34, 35, 39, 40

*In re Syncor Int'l Corp. Sec. Litig.*,
  239 F. App'x 318 (9th Cir. 2007) ........................................................19

*In re Syncor Int'l Corp. Sec. Litig.*,
  327 F. Supp. 2d 1149 (C.D. Cal. 2004) ...............................................33

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008)..................................................37

*Tellabs. Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)........................................................................28, 29

*In re Tellium, Inc. Sec. Litig.*, No. 02-5878,
  2005 WL 2090254 (D.N.J. Aug. 26, 2005) .........................................38

*United States v. Apple, Inc.*,
  791 F.3d 290 (2d Cir. 2015)...........................................................24, 25

*United States v. Socony–Vacuum Oil Co.*,
  310 U.S. 150 (1940)..............................................................................27

*In re Urban Outfitters, Inc. Sec. Litig.*,
  103 F. Supp. 3d 635 (E.D. Pa. 2015) ..................................................38

*In re Van der Moolen, Holding N.V. Sec. Litig.*,
  405 F. Supp. 2d 388 (S.D.N.Y. 2005)............................................19, 22

*In re Vivendi Universal, S.A. Sec. Litig.*,
  634 F. Supp. 2d 352 (S.D.N.Y. 2009)..................................................38

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016).................................................................38

*In re Worldcom, Inc. Sec. Litig.*, No. 02-3288,
  2003 WL 22533398 (S.D.N.Y. Nov. 7, 2003) .....................................18

*In re Xcel Energy, Inc.*,
  364 F. Supp. 2d 980 (D. Minn. 2005)..................................................33

**Statutes**

15 U.S.C. §78u-4(b)(2) .............................................................................28

**INTRODUCTION**

This securities litigation arises from Allergan's participation in a generic drug price-fixing conspiracy that caused the prices of generic drugs sold by Allergan and its co-conspirators to skyrocket up to 7,000% during the Class Period.[1]  This conspiracy is the focus of an ongoing criminal investigation by the U.S. Department of Justice Antitrust Division ("DOJ") that has already resulted in felony guilty pleas of two pharmaceutical company executives, an ongoing civil litigation brought against Allergan and its alleged co-conspirators by 46 state Attorneys General (the "State AGs Action"), Congressional investigations, and over 100 civil antitrust class action lawsuits, now consolidated into eighteen multidistrict lawsuits alleging antitrust claims (the "Generic Drugs MDL").  Allergan is a defendant in not only the State AGs Action, but in seven of the Generic Drugs MDL actions, four of which focus on the specific drugs identified by Lead Plaintiffs in the Complaint.[2]  Allegations supporting Allergan's role in this price-fixing conspiracy have already been sustained in one of the Generic Drugs MDL actions in which Judge Rakoff of the Southern District of New York held that allegations substantially identical to those in the

---

[1] On November 28, 2017, Lead Plaintiffs Sjunde AP-Fonden and Union Asset Management Holding AG ("Plaintiffs") filed a Consolidated Second Amended Class Action Complaint (the "Complaint") against Allergan plc (doing business as Actavis plc at all relevant times until approximately June 15, 2015) ("Allergan" or the "Company"), Paul Bisaro ("Bisaro"), Brenton L. Saunders ("Saunders"), R. Todd Joyce ("Joyce"), Maria Teresa Hilado ("Hilado"), Sigurdur O. Olafsson ("Olafsson"), and David A. Buchen ("Buchen") (collectively, the "Individual Defendants"), and certain members of Allergan's Board of Directors (the "Director Defendants"). On January 22, 2018, Defendants moved to dismiss the Complaint (the "Motion" or the "Mot."). Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Complaint.  Citations to ¶_ refer to the Complaint.  Emphasis is added and citations or quotations are omitted unless otherwise noted.

[2] The Complaint provides detailed allegations concerning Allergan's price-fixing of propranolol, ursodiol, doxycycline, desonide and scheme to engage in price-fixing of verapamil, and glyburide-metformin (the "Price-Fixed Drugs").  This action may grow to include additional generic drugs whose prices were fixed through similar conspiratorial conduct by Allergan.  Allergan is also a defendant in three other actions in the Generic Drugs MDL that target additional drugs.

Complaint sufficiently alleged that Allergan and other drug companies engaged in a conspiracy to fix the price of propranolol. *See In re Propranolol Antitrust Litig*, 249 F. Supp. 3d 712 (S.D.N.Y. 2017) (now consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation–In re Propranolol Cases*, 16-MD-2724 (CMR); 16-PP-27240 (CMR) (E.D. Pa.)).

The Complaint spells out a clear case of securities fraud.  During the Class Period (October 29, 2013 to November 2, 2016), Allergan and its senior executives intentionally misled investors into believing that Allergan's generic drugs were competitively priced in compliance with the antitrust laws.  Defendants also misled investors regarding the most fundamental aspects of the Company's business, including the legality and sustainability of its pricing practices and the underlying reasons for its reported earnings and growth.  Reassured by these statements and Allergan's reported revenue (which was tainted by this fraud), investors believed that Allergan's generic drug business could generate increasing revenues through legitimate business practices.

Investors began to learn the truth on August 6, 2015, when Allergan revealed that the DOJ had served it with a grand jury subpoena seeking information on its generic drug pricing, "thus becoming the biggest company yet to draw scrutiny in the government's widening antitrust probe of the [generic drug] industry."  On this news, Allergan's common stock dropped $17.17 per share in a single day.  Defendant Saunders immediately went on CNBC's *Mad Money* to address the downward price movement.  Saunders attributed Allergan's generic price increases to "supply and demand" and not price fixing, and characterized the DOJ investigation as a "red herring" that was "not that significant."  Yet, on November 3, 2016, investors learned that the DOJ's probe had intensified and that charges might be filed against Allergan and other potential co-conspirators. On this news, Allergan's stock price fell again, with its common stock dropping $9.07 per share.

2

Scrutiny of the price-fixing conspiracy and Allergan's role in it has only intensified since November 2016.  The State AGs recently filed an amended pleading in the Generic Drugs MDL that includes claims against Allergan, and details emails, phone calls, texts and in-person meetings between Allergan executives and their counterparts at co-conspirator drug companies (the "Amended AG Complaint").  The Connecticut Attorney General stated that the State AGs "allege in this complaint that the defendant companies' collusion was so pervasive that it essentially eliminated competition from the market for these 15 drugs in its entirety. Our ongoing investigation continues to uncover additional evidence, and *we anticipate bringing more claims involving additional companies and drugs at the appropriate time*."  In addition, the DOJ's grand jury investigation of Allergan and its industry rivals is active, ongoing, and, according to statements made by the DOJ, likely to result in additional criminal charges.  According to sources cited by Bloomberg, the investigation already "spans more than a dozen companies and about two dozen drugs," a fact confirmed by the DOJ when it sought to intervene in the Generic Drugs MDL and stated: "Evidence uncovered during the criminal investigation implicates other companies and individuals (*including a significant number of the Defendants [in the Generic Drug MDL]*) in collusion with respect to doxycycline hyclate, glyburide, and other drugs (*including a significant number of the drugs at issue [in the MDL]*)."  The DOJ investigation has already resulted in two felony guilty pleas by the CEO and another executive of a drug company (Heritage) that is alleged to have conspired with Allergan to fix the price of propranolol and verapamil.

Plaintiffs expect discovery will reveal significant additional evidence of Allergan's participation in the antitrust conspiracy and Defendants' culpability here.  Defendants move to dismiss this case at the pleading stage—before any discovery has taken place, and while discovery in the criminal and civil antitrust actions, which is ongoing, is still under seal.  In doing so, they

fail to address the allegations of hundreds of text messages, emails, phone calls and meetings between Allergan and its co-conspirators that were detailed in the Amended AG Complaint, downplay the seriousness and active status of the DOJ's investigation, ignore almost completely the *Propranolol* opinion sustaining identical allegations of price collusion, and otherwise raise a series of boilerplate arguments contending that the Complaint does not state a securities fraud claim. Each of Defendants' challenges is meritless.

<u>First</u>, Defendants argue that the Complaint "fails to plead any material misrepresentation or omission." Mot. 2-3, 14-28. Defendants are wrong: the Complaint particularizes numerous false statements relating to, among other things, (a) Allergan's pricing and competition; (b) Allergan's financial results that were inflated by Defendants' anticompetitive pricing; and (c) the sources of Allergan's supposedly legitimate revenues. For example, while Allergan was engaging in and profiting from anticompetitive conduct, Defendants stated: "***We actively compete in the generic pharmaceutical industry***." ¶¶189, 209, 219. Defendants also repeatedly attributed the Company's revenue growth to legitimate factors, such as "the continued strength," "growth," and "strong performance" of its generics business. *See* ¶¶200, 203, 206, 207, 210. Once the DOJ subpoena was disclosed to investors, Defendants affirmatively misrepresented the DOJ investigation as "not that significant" and a "red herring," and falsely stated that irregular generic drug pricing was due solely to "supply and demand." ¶214. Defendants also falsely stated that "[w]e have never been aggressive price takers," and have "never [taken price increases] in a significant way." ¶217. These statements and numerous others (*see* ¶¶194-233) were false and misleading: Allergan's price increases and revenue stability were not the result of legitimate business activities, but rather a widespread price-fixing conspiracy. Because Defendants gave

4

specific (and false) explanations for how Allergan's results were achieved, the law is clear that they made actionable misrepresentations.

Second, Defendants argue that Plaintiffs fail to plead a price-fixing conspiracy. Mot. 28-33. To the contrary, the Complaint contains detailed allegations of (i) direct evidence of collusion, including meetings, phone calls, emails and text messages; (ii) parallel price movements in the Price-Fixed Drugs; and (iii) "plus factors" that allow a fact-finder to infer a conspiracy. ¶¶76-170. These allegations are far greater than the allegations already deemed sufficient to plead an antitrust conspiracy against Allergan in *Propranolol*.

Third, Defendants argue that the Complaint fails to plead scienter. Mot. 3, 33-35. This is wrong for myriad reasons. Foremost, the Complaint alleges particularized facts giving rise to a strong inference that the Individual Defendants (each of whom made false statements) either knew about Allergan's participation in the vast price-fixing conspiracy, or were reckless in not knowing. The "most plausible inference" from the Complaint's allegations, when viewed in their totality, is that these executives, who were extensively involved in the Company's day-to-day operations and repeatedly made statements about the Company's core business operations—including its pricing practices, competitive environment and revenues—acted with scienter.

Fourth, Defendants' attacks on the two clear corrective disclosure dates alleged in the Complaint (Mot. 35-36) are unavailing, especially in light of the Third Circuit's practical approach to loss causation at the pleading stage.

## STATEMENT OF FACTS

### I.   Allergan's Generic Drug Business

Generic drugs save consumers and the U.S. healthcare system billions of dollars each year. ¶71. While the first generic drug to enter a market is generally priced 15% to 20% lower than the brand name drug, under competitive conditions the price of a generic drug reaches an equilibrium

price point, at or close to the manufacturers' marginal production costs, as more generic competitors emerge. ¶¶67-72. Allergan's production of generic drugs was vital to the Company's success during the Class Period, growing from 32% of the Company's total revenues to 42% of total revenues from 2014 to 2015. ¶¶28, 221, 251. Allergan marketed and sold approximately 250 generic drugs throughout North America during the Class Period, but listed only approximately 25 of them in its Forms 10-K as "key products" that "comprised a *majority* of product sales for North American Generics" for each year. ¶¶125, 139, 158. Three of the Price-Fixed Drugs were included among the "key products" reported in Allergan's Forms 10-K during the Class Period (*id.*), indicating that these drugs were significant contributors to Allergan's revenue.

## II.    Allergan and Other Drug Makers Engage in a Price-Fixing Conspiracy

Beginning in 2013, the prices for several commonly prescribed generic drugs skyrocketed. During the Class Period, Allergan and its co-conspirators increased the prices of propranolol, ursodiol, doxycycline, and desonide between *470% and 7,000%*, following years of stable pricing. ¶¶107, 126, 140, 159. There was no commercial justification for these price increases. ¶¶117, 130, 150, 163. Indeed, absent collusion, price increases of these magnitudes would have been contrary to Allergan's and each of its co-conspirators' economic interests because on an open market, each seller risked being undercut by the others, leading to a collapse of market share (and therefore revenue). ¶¶118, 131, 151, 164. As set forth below, these astonishing price increases were due to an illicit price-fixing conspiracy.

Indeed, the Amended AG Complaint details specific communications between executives from Allergan and other drug companies—including Heritage Pharmaceuticals Inc. ("Heritage"), whose former President and Chief Executive Officer both pled guilty to charges of antitrust violations—concerning their agreement to fix the prices of two additional generic drugs, as well as text messages and emails confirming these agreements. ¶¶171-79.

In addition to this direct evidence of collusion, the Complaint includes extensive allegations of circumstantial evidence of collusion.  The price-fixing conspiracy was possible because the markets for each of Allergan's Price-Fixed Drugs were highly susceptible to collusion: the market for each Price-Fixed Drug was highly concentrated; there were considerable barriers to entry, a lack of possible substitutes, and a high degree of interchangeability (meaning that each of Allergan's Price-Fixed Drugs could be substituted for another manufacturer's version of the same drug); and the markets for the Price-Fixed Drugs were dominated by Allergan and its co-conspirators such that the conspiracy could not be threatened by so-called fringe sellers.  ¶¶76-82, 119-24, 132-38, 152-57, 165-70.

Moreover, senior executives from Allergan and its co-conspirators had regular opportunities to discuss these price hikes in person.  Representatives from Allergan—including Bisaro and Olafsson, as well as senior members of Allergan's generics business during the Class Period—routinely attended conferences, meetings, and pharmaceutical trade shows, as well as informal face-to-face meetings during "industry dinners" and other events, all of which provided numerous opportunities to meet and devise the price-fixing scheme.  ¶¶83-104, 141, 143-44, 146-47, 149, 160, 162, 256, 264.  And witnesses, including Allergan's former Associate Director of Finance, confirmed that the Allergan executives who attended the industry events—many of which preceded these unprecedented price hikes—were responsible for the generic drug pricing at the Company.  ¶¶85-86.  As depicted in the graphs in the Complaint, parallel price increases of the Price-Fixed Drugs occurred shortly after and/or in conjunction with these trade meetings.  ¶¶108-16, 127-29, 141-49, 160-61.

## III.   Defendants Made Numerous False and Misleading Statements and Omissions

***Pricing and Revenues***:  Defendants issued multiple statements throughout the Class Period designed to mislead Allergan's investors into believing that Allergan's profits in the generic drug

7

markets were legitimately (and legally) increasing. *E.g.*, ¶¶195-96; *see also* ¶221 (reported revenues). Notably, Defendants provided legitimate business reasons for Allergan's reported revenues and earnings, ¶¶195-96, 198, 200-01, 210-17, but never disclosed that the Company's rising revenues and the sustainability of those revenues were accomplished in part through an illegal price-fixing conspiracy. For example, Allergan repeatedly ascribed its growth in generics business revenue to its "strong base business" and sales of certain generic products. ¶¶195, 198, 200-03, 206-07, 210. In a 3Q 2013 earnings call with investors, Olafsson falsely attributed the Company's generic pricing increases to "the opportunit[y] to take pricing increases" in "products where there has been manufacturing problems or stock-out situation[s]." ¶196. Similarly, during a May 29, 2014 industry conference, Bisaro credited Allergan's price increases to the "ability to take price increases on older products where the price had gone to a point where companies had to make the decision about whether to continue manufacturing or raise price." ¶202. On May 11, 2015, in a 1Q 2015 conference call, Bisaro acknowledged that "the model for generics is price decreases as more competitors come into the market," but differentiated Allergan by stating that its "pipeline and product line gives us a bit of an advantage." ¶212.

After Allergan announced that the Company had been served with a federal grand jury subpoena, Defendants continued to mislead investors about the cause of the Company's revenues and price hikes. Indeed, on August 6, 2015, the day that the Company announced the subpoena, in an on-camera interview on *CNBC*'s Mad Money, Saunders characterized the subpoena as "a red herring" and "not that significant," and stated that any price increases in Allergan's generic drug business were due to "supply and demand," not price fixing. ¶214. Once again, on February 23, 2016, Saunders stated at a conference that "[w]e have never been aggressive price takers," and that Allergan's "business model and [] philosophy doesn't lend itself to [price increases]." ¶217.

8

*Competition*:  Defendants also misled investors regarding Allergan's competition within the generic drugs market, while actively concealing that, in fact, Allergan was colluding with its purported competitors to artificially inflate the prices of certain generic products, to the direct detriment of consumers.  On October 31, 2013, Allergan stated that "[t]he pharmaceutical industry is highly competitive . . . *We face strong competition in all of our businesses*."  ¶197.  In its annual Forms 10-K, Allergan repeatedly stated that "*We actively compete in the generic pharmaceutical industry*," and noted that the Company "face[d] competition from brand name companies in the generic market," including from its co-conspirators Mylan and Teva.  ¶¶199, 209, 219.  Defendants also assured investors that the Company's market share was secure because of Allergan's "ability to capitalize on product opportunities," "operational excellence," its "broad portfolio," and for other legitimate reasons.  ¶¶195, 205, 213, 215.

*Compliance with Antitrust Laws*:  Throughout the Class Period, Allergan's Forms 10-K represented that the Company had adopted a Code of Conduct, which was reproduced in the Company's Annual Reports, and stated that: "No employee may discuss with, or provide information to, any competitor about pricing or related matters, whether the information concerns the Company or Actavis' suppliers, distributors, wholesalers or customers."  ¶232.  The Code of Conduct provides specific examples of anticompetitive conduct, including "[a]greements or understandings with competitors on price," that "need not be in writing . . . to be unlawful," and "can be oral or inferred from the conduct of the parties."  *Id.*  Despite their disclosure of Allergan's policies against anticompetitive conduct, Defendants failed to disclose the price-fixing conspiracy.

## IV.    Defendants Reap Millions in Insider Sales

Once the price-fixing scheme was underway, in November and December 2013, Defendants Bisaro, Joyce, Olafsson and Buchen collectively sold over 118,000 shares of Allergan

common stock during the Class Period, totaling $20.1 million in proceeds.  ¶¶257, 261, 265, 267. These sales comprised a significant portion—up to 37%—of these Defendants' total holdings. *Id.*

## V.      The Fraud Is Revealed

On August 6, 2015, Allergan disclosed that the DOJ had served the Company with a grand jury subpoena.  ¶¶234, 236.  This was the first indication that Allergan was implicated in the DOJ investigation into illegal collusion in the generic drugs market.  *Bloomberg* noted that Allergan was "the biggest company yet to draw scrutiny in the government's widening antitrust probe of the [generic drug] industry."  ¶235.  This revelation, widely covered by the press, disclosed that the "DOJ is looking into whether drugmakers colluded to raise generic prices."  ¶238.  On this news, Allergan's common stock dropped $17.17 per share in one day—5% from its previous closing price—and Allergan's preferred share price dropped 3.5%, or $39.24 per share.  ¶237.

On November 3, 2016, investors learned that the DOJ's probe had intensified and had gathered sufficient evidence of criminality such that charges could soon be filed against Allergan and other co-conspirators.  ¶239.  It was reported that "U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion."  *Id.*  In response to this news, Allergan's common stock price fell $9.07 per share (roughly 4.6%), and its preferred shares dropped $30.03 per share (roughly 4.1%).  ¶240.

## VI.     Post-Class Period Events Confirm Defendants' Fraud

### A.      Ongoing Investigations Into the Price-Fixing Conspiracy

On December 12 and 13, 2016, the DOJ filed criminal charges against Jason T. Malek and Jeffrey A. Glazer, President and CEO, respectively, of Allergan competitor Heritage, for price-fixing in connection with two drugs, one of which—doxycycline delayed release—is also sold by Allergan in a regular release format.  ¶184.  Heritage is an alleged co-conspirator with respect to the price fixing of propranolol.  ¶108.  Malek and Glazer entered guilty pleas on January 9, 2017.

10

¶185.  That same day, twelve State AGs announced their own charges against Heritage and five other entities for conspiring to fix the prices of the same two drugs.  ¶187.  The Connecticut AG made clear that this conspiracy was directed from the very top: "the misconduct was conceived and carried out by *senior drug company executives and their subordinate marketing and sales executives*."  ¶190.  The Connecticut AG noted that the DOJ and State AG charges were just the tip of the iceberg (¶¶186, 190), stating: "we have evidence of widespread participation in illegal conspiracies across the generic drug industry."   ¶190.

On October 31, 2017, the State AGs, whose action was consolidated into the Generic Drugs MDL, released a redacted copy of their proposed amended complaint, which broadly expanded the scope of their action.  ¶24.  The Amended AG Complaint names Allergan, along with seventeen other generic drug manufacturers, as defendants, and adds allegations related to thirteen additional generic drugs, bringing the total number of drugs at issue up to fifteen.  The Amended AG Complaint provides detailed, corroborative evidence of Allergan's role in the broad price-fixing conspiracy generated from their investigation to date.   ¶25.  For example, the Amended AG Complaint describes how collusive agreements, often reached at trade meetings and industry dinners, were later reinforced through phone calls and text messages between executives and sales people from Allergan and its co-conspirators, and documents at least 334 separate communications between Allergan and one co-conspirator between July 2013 and July 2014 alone. *Id.*  In addition, the Amended AG Complaint details specific illegal agreements between manufacturers to fix the prices for several generic drugs.  For example, the Amended AG Complaint provides (in redacted form) specific communications between executives at Allergan and co-conspirators Heritage, Teva USA and Aurobindo Pharma USA, Inc. ("Aurobindo"),

through which the companies planned and confirmed collusive price activity in connection with the sale of generic drugs glyburide-metformin and verapamil. *Id.*

The State AGs clearly signaled that further charges, ***involving additional generic drugs***, are ***<u>likely</u>***, stating that "the defendant companies' collusion was so pervasive that it essentially eliminated competition from the market for these 15 drugs in its entirety. Our ongoing investigation continues to uncover additional evidence, and we anticipate bringing more claims involving additional companies and drugs at the appropriate time." ¶193. The State AGs reiterated this position on February 21, 2018, stating that the Amended AG Complaint revolves around the conduct of co-conspirator Heritage, and that additional complaints will be filed revolving around other co-conspirators. Declaration of James E. Cecchi ("Cecchi Decl.", Ex. 1.)

The DOJ investigation is also ongoing, active, and likely to result in additional charges in the near term, as evidenced by the DOJ's motion to stay discovery in the Generic Drugs MDL to preserve its developing investigation. In support of this stay, the DOJ explained on May 1, 2017 (and reiterated on October 27, 2017, in a renewed motion to stay discovery) that "[e]vidence uncovered during the criminal investigation implicates other companies and individuals (***including a significant number of the Defendants [in the Generic Drugs MDL]***) in collusion with respect to doxycycline hyclate, glyburide, and other drugs (***including a significant number of the drugs at issue [in the Generic Drugs MDL]***)." ¶16; Cecchi Decl., Ex. 2, at 2.[3]

## B.   Identical Allegations of Price-Fixing Involving Allergan Are Sustained

In addition to being implicated in the ongoing federal and state investigations, Allergan has been named as a defendant in seven of the eighteen Generic Drugs MDL actions, four of which

---

[3] On February 9, 2018, the Generic Drugs MDL court denied in large part the latest motions to stay discovery (filed by the DOJ and the Generic Drugs MDL Defendants), and targeted discovery of parties and non-parties has commenced in those actions. Cecchi Decl., Ex. 3.

involve the Price-Fixed Drugs.  ¶16.  Claims against Allergan involving a conspiracy to fix the price of one of the Price-Fixed Drugs—propranolol—were sustained by Judge Jed Rakoff, who concluded that the existence of a price-fixing conspiracy was sufficiently alleged.  *See Propranolol*, 249 F. Supp. 3d at 718-23.  Notably, Judge Rakoff sustained claims against Allergan based on allegations of indirect evidence of collusion identical to those alleged in the Complaint.

First, Judge Rakoff found that defendants "had a motive to increase prices because they operate in an oligopolistic market characterized by falling prices."  *Propranolol*, 249 F. Supp. 3d at 718-20; *compare with* ¶¶67-81 (alleging the same market conditions, including that the markets for the Price-Fixed Drugs were highly concentrated (*i.e.*, "oligopolistic"), that generic versions of the Price-Fixed Drugs are "interchangeable," and the U.S. generic drug market is designed for drugs to reach equilibrium price).  Second, Judge Rakoff found that, absent collusion, "the price increases were against defendants' self-interest because in a competitive market, defendants should have tried to undercut each other's prices to increase their market share."  *Propranolol*, 249 F. Supp. 3d at 718-22.  The Complaint alleges the same.  ¶¶117-18, 130-31, 150-51, 163-64.  Third, Judge Rakoff found that "defendants frequently communicated at trade association meetings," *Propranolol*, 249 F. Supp. 3d at 718-22.  The Complaint likewise contains detailed allegations regarding regular communications between the co-conspirators.  ¶¶83-105, 110, 113, 116, 129, 143, 146, 149, 162.  Fourth, as Judge Rakoff and the Complaint have both noted, there are ongoing state and federal investigations for price manipulation of generic drugs that are likely to lead to additional evidence of price-fixing.  *Propranolol*, 249 F. Supp. 3d at 718-22.

Notably, in sustaining the *Propranolol* complaint, Judge Rakoff did not have the benefit of the detailed allegations of direct evidence of price collusion set forth in the Amended AG Complaint.  ¶¶171-79.

**ARGUMENT**

**I.     The Heightened Pleading Standard Is Relaxed Under These Circumstances**

While the Complaint's allegations satisfy the Third Circuit's heightened pleading standards typically applied in securities fraud cases, this Circuit recognizes that, even in cases brought under the Private Securities Litigation Reform Act ("PSLRA"), the "[heightened pleading] standard is 'relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control.'"  *In re Schering-Plough Corp./Enhance Sec. Litig.*, 2009 WL 2855457, at *2 (D.N.J. Sept. 2, 2009) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997)); *see also Gray v. BMW of N. Am., LLC*, 2014 WL 4723161, at *2 (D.N.J. Sept. 23, 2014) (where fraud "is the fraudulent omission of information within the exclusive control of the Defendant, the standard is relaxed.").

These considerations are particularly relevant here.  As detailed in the Complaint, the criminal investigation is still active, additional charges by both the DOJ and State AGs are likely, and, as a result, discovery in the numerous pending civil actions is stayed.  Moreover, because strict protective orders govern the disclosure of information in the Generic Drugs MDL, *see* Cecchi Decl., Ex. 4 at ¶¶9.2, 9.3, the antitrust plaintiffs filed their August 15, 2017 consolidated class action complaints under seal and the Amended AG Complaint was filed with heavy redactions (¶192), further limiting Plaintiffs' access to facts regarding the price-fixing cartel.  Accordingly, while Plaintiffs have met their burden under the PSLRA and Rule 9(b), it would be entirely appropriate to relax that standard in these circumstances.

**II.    The Complaint Adequately Alleges False and Misleading Statements and Omissions**

Under the PSLRA, a complaint need only allege facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission."  *Cal. Pub. Emps' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004).  A misstatement or omission of fact is material if

14

there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).

Here, Defendants repeatedly misled investors during the Class Period by issuing five categories of misstatements about Allergan's business, including statements (i) describing the competitive landscape Allergan faced—specifically, the "highly competitive" market for generic drugs, (ii) mischaracterizing Allergan's profits in the generic drug markets as legitimately (and legally) increasing; (iii) reporting financial results, without disclosing that a portion of the income was derived from Allergan's illicit anticompetitive activity; (iv) misrepresenting that none of Allergan's employees engaged in anticompetitive conduct, and (v) falsely certifying that Allergan's quarterly and annual reports to the SEC "fairly present[ed] in all material respects the financial condition" of Allergan and did not contain any material misstatements or omissions. Each of these categories of misstatements readily satisfy the pleading standards under the PSLRA.

## A.     Statements That the Market Was "Highly Competitive"

Defendants' statements asserting that the market for Allergan's generic drugs was "highly competitive," including with respect to "price," were false and misleading because Allergan was engaged in a scheme to fix the prices of its generic drugs.  Courts have repeatedly held that a company makes a false statement where, as here, it asserts that it operates in a competitive industry while it is engaged in anti-competitive behavior. *See, e.g.*, *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 711-12 (E.D. Mich. 2010) (statements characterizing industry in which issuer operated as "highly competitive" were misleading); *In re Infineon Techs. AG*, 2006 WL 1329887, at *3, *6 (N.D. Cal. May 16, 2006) ("*Infineon I*") (sustaining "statements describing Infineon's business, its competition, market growth, product demand, profit forecasts, and other similar subjects," including that the environment included "intense" and "significant"

15

competition); *Menkes v. Stolt-Nielsen S.A.*, 2005 WL 3050970, at *3, *10 (D. Conn. Nov. 10, 2005) (statements about competition in defendant's market were false because defendant "had a duty to disclose its alleged anti-competitive conduct arising from these statements"); *In re Sotheby's Holdings, Inc. Sec. Litig.*, 2000 WL 1234601, at *4 n.2 (S.D.N.Y. Aug. 31, 2000) (statements that "Competition in the international art market is intense" were misleading when company engaged in collusive behavior); *see also In re Micron Techs., Inc. Sec. Litig.*, 2007 WL 576468, at *7 (D. Idaho Feb. 21, 2007) (plaintiffs "sufficiently plead falsity because . . . officials explained [] pricing as a product of market factors rather than price-fixing" while "deliberately and knowingly engaged in a scheme to manipulate [] prices").

Defendants argue erroneously that the Complaint fails to allege how "price-fixing of 6 out of 550 generic drugs makes the pharmaceutical industry, as a whole, not competitive."  Mot. 17. First, as the Company's own disclosures make clear, three of the six drugs named in the Complaint were **"*key products*"** that, together with several other generic drugs, "comprised a ***majority*** of product sales for North American Generics" for each year.  *See* ¶¶125, 139, 158.  The fact that Allergan marketed 250 generic drugs in the United States (and others not at issue outside the country) is not significant when the conspiracy affected drugs that contributed meaningfully to the majority of the Company's product sales. Second, Defendants' statements do not broadly concern the "pharmaceutical industry, as a whole," but rather the generic market, specifically.  Defendants stated, "***we actively compete in the generic pharmaceutical industry***," a market that was "***highly competitive***." ¶¶24, 197, 199, 209, 219.[4]  These statements were not academic observations about

---

[4] To the extent allegations of pervasive price-fixing are necessary (Mot. at n.9), the Complaint readily satisfies this requirement, as it details a widespread price-fixing conspiracy throughout the generic drug market.  ¶190 ("we have evidence of widespread participation in illegal conspiracies across the generic drug industry"); ¶193 ("the defendant companies' collusion was so pervasive that it essentially eliminated competition from the market").

the state of the pharmaceutical industry; they were false representations that Allergan's products possessed competitive strengths, were positioned to thrive in a crowded marketplace, and, critically, that Allergan's "financial success was due to lawful competition." *See Chamberlain*, 757 F. Supp. 2d at 693.  Third, courts routinely find similar statements concerning competition to be actionable where the issuer was engaged in anticompetitive conduct, even absent allegations that all or most of the issuer's products were affected by that conduct. *See, e.g.*, *Infineon I*, 2006 WL 1329887, at *3, *6.[5]  Even if Allergan faced competition with respect to some of its generics business, its statements would, at best, constitute misleading "half-truths" given the criminal anticompetitive behavior impacting some of its "key products." *In re Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004, at *22-23 (D.N.J. Aug. 17, 2005) ("'The disclosure required by the securities laws is measured not by literal truth but by the ability of the material to accurately inform rather than mislead prospective buyers.' . . . [A] defendant may choose silence or speech based on the then-known factual basis, but cannot choose half-truths.").

### B.   Saunders' Statements Downplaying the DOJ Subpoena and Attributing Price Increases to "Supply And Demand"

In the wake of Allergan's August 5, 2015 announcement of the DOJ grand jury subpoena, Defendant Saunders appeared on national television and argued that the unreleased DOJ subpoena was "not that significant" and was a "red herring," despite the intense market reaction to its disclosure. ¶214.  Saunders made the blanket assertion that any irregular pricing patterns identified by the DOJ were solely attributable to legitimate "supply and demand" circumstances. *Id.*  These

---

[5] In contrast to Defendants' cited cases (Mot. 18), Defendants' statements were sufficiently specific to "put in play" their illegal price-fixing conspiracy, thereby requiring disclosure. *See Galati v. Commerce Bancorp, Inc.*, 220 Fed. App'x 97, 102 (3d Cir. 2007) (contrasting general statements touting company's "strong performance" with actionable statements "affirmatively characteriz[ing] management practices as 'adequate,' 'conservative,' 'cautious,' and the like").

statements were false and misleading because Allergan was engaged in a scheme to fix the prices of its generic drugs, which had hiked the costs of generic drugs by up to 7,000%. This scheme was the result of a price-fixing conspiracy and not the result of normal "supply and demand." Moreover, Saunders' minimization of the DOJ criminal investigation as "not that significant" and a "red herring" was false and misleading because Saunders knew that the DOJ subpoena was only the tip of the iceberg, and that additional investigation would bring to light the full scope of Defendants' scheme—precisely what has occurred. Indeed, not only is the DOJ investigation ongoing and active, but Allergan has since been named as a defendant and co-conspirator in the Amended AG Complaint.

Defendants' challenge to Saunders' August 5, 2015 statements fails. As an initial matter, Defendants ignore entirely his "red herring" and "supply and demand" statements, effectively conceding those statements' material falsity. *In re Worldcom, Inc. Sec. Litig*., 2003 WL 22533398, at *10 (S.D.N.Y. Nov. 7, 2003) (allegations not challenged in motion to dismiss should be sustained). Defendants' attempt to validate Saunders' remaining statements is without merit. Defendants contend that Plaintiffs inadequately allege the significance of the subpoena. Mot. 20-21. This ignores the numerous allegations detailing both the severe market reaction to the subpoena, and the resulting wave of DOJ and State AG investigations. Equally unavailing is Defendants' fact-intensive argument that Saunders' comments were intended to convey that "the subpoena was immaterial because Allergan had already announced the sale of the entire generics business to Teva." Mot. 21. The fact that an alleged co-conspirator agreed to acquire Allergan's share of a collusive market in no way affects the materiality or falsity of Saunders' statements downplaying the government's investigation of illegal price-fixing. In any event, questions of materiality are rarely appropriate for resolution on a motion to dismiss. *Shapiro v. UJB Fin. Corp.*,

964 F.2d 272, 280 n.11 (3d Cir. 1992) ("Only if the alleged misrepresentations or omissions are so ***obviously unimportant*** to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law.") . Defendants have made no such showing here.

### C.   Statements Attributing Allergan's Financial Results to Legitimate Factors

Throughout the Class Period, Defendants repeatedly made statements attributing Allergan's revenue, growth, market share, and pricing strategy in its generics business to legitimate business factors and conditions.  *See, e.g.*, ¶203 (attributing generics sales growth to "strong base business"); ¶196 (attributing generic price increases to "the opportunit[y] to take pricing increases" in "products where there has been manufacturing problems or stock-out situation[s]"); ¶212 (stating Allergan's "pipeline and product line" enabled it to increase prices).  These statements were false and misleading when made because, unknown to investors, Defendants' price-fixing scheme was a factor driving the revenue and market share of Allergan's generics business and the price increases for its generic drugs.

It is black letter law that, when a company puts at issue the cause of its financial results, it cannot fail to disclose that improper business practices contributed to those results.  *See, e.g.*, *In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 824-25 (E.D. Pa. 2001); *City of Roseville Emps. Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 416 (D. Del. 2009) ("*Horizon I*") (falsely "attributing [financial] performance to only lawful conduct falls below the level of honesty required by the securities laws"); *Steiner v. MedQuist Inc.*, 2006 WL 2827740, at *16 (D.N.J. Sept. 29, 2006) (statements attributing revenues to legitimate business factors such as increased sales and acquisitions were misleading where they failed to disclosed issuer's illicit billing scheme).[6]

---

[6] *See also In re Syncor Int'l Corp. Sec. Litig.*, 239 F. App'x 318, 320 (9th Cir. 2007) ("By attributing Syncor's success solely to legitimate practices, defendants implicitly (and falsely)

As the court explained in *Providian*, where a company puts "the topic of the cause of [its] success in play," the company is "obligated to disclose information concerning the source of its success, since reasonable investors would find that such information [is material]." 152 F. Supp. 2d at 824-25. The court had little trouble concluding that "[w]ere Providian engaged in a series of illegal or fraudulent business practices and were those practices responsible for inflating revenue, profit, and the customer base, such information would clearly alter the mix of information available to the public as to the source of Providian's success." *Id.* at 825.

Defendants argue that these alleged false statements are inactionable puffery. Mot. 16-17. Yet Defendants' argument rests on mischaracterizing the statements as "routine recitations of past financial performance." *Id.* at 17. However, these statements are false not because they characterize Defendants' results as "strong," but because they attribute those results to legitimate business factors. Defendants ignore the long line of cases, cited above, holding such statements actionable. Indeed, the cases cited by Defendants draw this very distinction. *See Galati*, 220 Fed. App'x at 102 (contrasting inactionable statements about company's "strong performance" with those that "'put into play' the integrity of [the company's business] practices" (quoting *Shapiro*, 964 F.2d at 282)); *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 275-76 (3d Cir. 2010) (statements described pricing policy as "disciplined," but did not discuss causes of financial results).

Defendants also challenge these statements because Plaintiffs purportedly do not quantify the impact of the Price-Fixed Drugs on Allergan's financial results. Mot. 19-20. First, the

---

warranted that there were no illegal practices contributing to that success."); *In re Van der Moolen, Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400-01 (S.D.N.Y. 2005) (statements "concerning the sources and significance of the revenue" were misleading because they failed to disclose that revenue had been generated in part by trading activities that violated NYSE rules); *Sotheby's*, 2000 WL 1234601, at *3 (sustaining claims based on statements "publicly tout[ing] the positive impact of [legitimate activities] as the sources of improved revenues, when the real cause of the increased profits was the illegal collusion").

Complaint clearly alleges that the Price-Fixed Drugs were material to Allergan's revenues as a select few "key products."  ¶¶125, 139, 158.  Second, Plaintiffs are not required to allege the precise amounts by which Allergan's financial results were artificially inflated, and courts regularly sustain securities claims that do not contain such quantification.  *See Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 991 (W.D. Wis. 2003); *Providian*, 152 F. Supp. 2d at 824-25; *Infineon I*, 2006 WL 1329887, at *6; *In re Braskem S.A. Sec. Litig.,* 246 F. Supp. 3d 731, 759-61 (S.D.N.Y. 2017); *Chamberlain,* 757 F. Supp. 2d at 693-94, 708.

Indeed, numerous courts have held that the fact that an issuer is engaged in illegal conduct is, ***by itself***, material, regardless of the impact of such conduct on the Company's financial performance.  *See Ind. Public Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016) (finding undisclosed kickback scheme involving "a single contract out of SAIC's more than 10,000 ongoing contracts and . . . worth a fraction of SAIC's yearly revenues" material where the scheme exposed the company to possible "significant civil and even criminal liability" and risks to future revenues); *In re Electrobras Sec. Litig.*, 245 F. Supp. 3d 450, 464 (S.D.N.Y. 2017) (failure to disclose bribery scheme held material without allegations concerning the "quantitative materiality" of scheme); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 380 (S.D.N.Y. 2015) ("the quantitative analysis is not dispositive of materiality"; finding misstatements qualitatively material where "directly related to [company's] concealment of the unlawful bribery scheme, revelation of which would call into question the integrity of the company as a whole"); *In re Sipex Corp. Sec. Litig.*, 2005 WL 3096178, at *2 (N.D. Cal. Nov. 17, 2005) ($350,000 sham transaction was material because it indicated that "top management" were "potentially corrupt," regardless of size of transaction compared to size of company).[7]

---

[7] Defendants' reliance on *Burlington*, 114 F.3d at 1426-27 and *ECA, Local 134 IBEW Joint*

In addition to disregarding this case law, Defendants ignore explicit SEC guidance that a quantitatively small misstatement of a financial item may nevertheless be material if it involves concealment of an unlawful transaction. *See* SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45, 150 (1999) ("[T]he staff believes that there are numerous circumstances in which misstatements below 5% could well be material," including "whether the misstatement involves concealment of an unlawful transaction."). Given this guidance and the fact-intensive nature of the materiality inquiry, Defendants' argument that Allergan's scheme to fix the prices of (at least) six generic drugs—three of which were included among the "key products" reported in Allergan's Forms 10-K, ¶¶125, 139, 158—is immaterial as a matter of law should be rejected.

### D.   Misleading Financial Results Inflated by Price-Fixing

Allergan's statements reporting revenues, including revenues from its generics business, were false and misleading throughout the Class Period because these statements failed to disclose that the reported results were inflated by Allergan's illicit price-fixing scheme. *See Horizon I,* 686 F. Supp. 2d at 415-16 ("'Accurately depicting successful financial performance, but attributing the performance to the wrong source, is misleading under the securities laws.'") (quoting *In re ATI Techs., Inc. Sec. Litig.*, 216 F. Supp. 2d 418, 436 (E.D. Pa. 2002)); *Providian*, 152 F. Supp. 2d at 823 ("[B]ecause of the illegal or fraudulent sales practices, the statements misstated or inflated Providian's financial results."); *In re Campbell Soup Sec. Litig.*, 145 F. Supp. 2d 574, 588-89 (D.N.J. 2001) (financial results misleading when inflated by illegal conduct).[8]   Defendants'

---

*Pension Trust of Chicago v. JP Morgan Chase*, 553 F.3d 187, 203 (2d Cir. 2009) is misplaced, as neither of these cases involved a failure to disclose illegal conduct. Defendants' reliance on *Ieradi v. Mylan Labs., Inc.*, 230 F.3d 594, 599 (3d Cir. 2000) is also unavailing: that case held that a failure to disclose anti-competitive contracts was immaterial because the company's previous disclosure of an FTC investigation already alerted investors that it was engaging in anti-competitive conduct.

[8] *See also In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1034 (C.D. Cal. 2008) (same);

attempt to immunize these statement because "Allergan accurately reported its revenues" (Mot. 16) is contrary to this prevailing law: Allergan's "historical financial information was false and misleading because it omitted information concerning the price-fixing conspiracy." *Infineon I*, 2006 WL 1329887, at *6; *see also Bristol-Myers Squibb*, 2005 WL 2007004, at *23 ("[E]ven objectively true statements can be actionable if . . . Defendants omitted material information that rendered a facially true statement false or misleading . . .").

### E.     False Assurances That Allergan Employees Did Not Engage in Price-Fixing

During the Class Period, Defendants put Allergan's compliance with antitrust and price-fixing laws squarely at issue by assuring investors through its Code of Conduct that Allergan employees did not enter into "[a]greements or understandings with competitors on price" and did not "discuss with, or provide information to, any competitor about pricing or related matters." ¶232. These statements were false and misleading because they communicated to investors that Allergan was complying with antitrust laws at the same time the Company was engaged in a price-fixing scheme. *See Electrobras*, 245 F. Supp. 3d at 458 (statements in code of ethics that company would "refuse and denounce any form or attempt of corruption, bribery, kickback and 'backscratching'" were actionable where company was engaged in bribery scheme); *Petrobras*, 116 F. Supp. 3d at 375-77, 380 (statements touting Code of Ethics and corruption prevention program were misleading where company was engaged in bribery scheme).[9]

---

(same); *Van der Moolen*, 405 F. Supp. 2d at 414-26 (same); *Friedman*, 295 F. Supp. 2d at 991 (same); *In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991).

[9] Defendants' argument that statements in the Code of Conduct are not actionable (Mot. 22) is incorrect, especially where, as here, compliance with the Code's standards are specific, objectively verifiable, and not "couch[ed]  . . . in the language of optimism or hope," but rather purport to reflect the current state of affairs of the company. *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 508-09 (S.D.N.Y. 2009) (sustaining claim based on violation of code of conduct); *In re Indep. Energy Holdings, PLC Sec. Litig.*, 154 F. Supp. 2d 741, 759 (S.D.N.Y. 2001) (same).

F.     **The Individual Defendants' False and Misleading Certifications**

Defendants Bisaro, Saunders, Hilado, and Joyce certified that Allergan's SEC filings "fairly present[ed] in all material respects the financial condition" of Allergan and did not contain any material misstatements or omissions.  ¶¶223-30.   These certifications were false because Allergan's periodic reports presented misleadingly inflated financial results and contained false and misleading statements.  *See, e.g.*, *Horizon I*, 686 F. Supp. 2d at 418-20 (SOX certifications false where company "failed to disclose that the reported revenue was obtained, in part, through unlawful conduct" and therefore financial statements did not "fairly present" financial condition of company); *In re Ramp Cos. Sec. Litig.*, 2006 WL 2037913, at *4 (S.D.N.Y. Jul., 12, 2006) (SOX certification rendered false based on of violation of code of ethics attached as exhibit to 10-K).

III.    **The Complaint Adequately Pleads a Price-Fixing Conspiracy**

"Allegations of direct evidence of an agreement, if sufficiently detailed, are independently adequate" to allege a price-fixing conspiracy.   *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323–24 (3d Cir. 2010); *see also United States v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015) (conspiratorial evidence may take the form of "direct evidence that the defendants entered into an agreement" like "a recorded phone call in which two competitors agreed to fix prices").   As Defendants concede, the Complaint contains extensive ***direct evidence***, including specific communications between executives at Allergan and co-conspirators Heritage, Teva USA and Aurobindo through which the companies planned and confirmed collusive price activity in connection with the sale of verapamil and glyburide-metformin.   ¶¶171-79.   Such evidence obviates the need for indirect evidence of a price-fixing conspiracy, like price increases.   *Ins. Brokerage Antitrust Litig.*, 618 F.3d at 323–24; *Apple*, 791 F.3d at 315.[10]

---

[10] Ignoring this precedent, Defendants insist that Plaintiffs must plead and prove that prices

Defendants' only response—that this direct evidence of a price-fixing conspiracy (involving meetings, calls, texts and emails) should be disregarded pursuant to Rule 12(f) (Mot. 23)—is absurd, and has been rejected soundly by courts within the Third Circuit, which regularly reject attempts to strike allegations based on related governmental investigations. *See, e.g., Church & Dwight Co. Inc. v. SPD Swiss Precision Diagnostics, GmBH*, 2010 WL 5239238, at *11 (D.N.J. Dec. 16, 2010) (denying motion to strike allegations based on prior antitrust complaint against same defendants); *Gray v. Bayer Corp.*, 2010 WL 1375329, at *3 (D.N.J. Mar. 31, 2010) (denying motion to strike allegations based on FTC complaint).[11]

Absent direct evidence, Plaintiffs "relying on parallel conduct must allege facts that, if true, would establish at least one 'plus factor' . . . ." *In re Ins. Brokerage Antitrust Litig.*, at 323. In other words, Plaintiffs may plead parallel price increases along with "circumstantial facts supporting the *inference* that a conspiracy existed." *Apple*, at 315 (emphasis in original). Here, there *is* direct evidence of collusion, however, as discussed *supra* at Statement of Facts, §II, and the Complaint contains copious facts indirectly demonstrating Allergan's collusive conduct (*id*.)— a conclusion already reached by another court, *see supra* Statement of Facts §VI.B.

Defendants' arguments to the contrary are unavailing. <u>First</u>, the allegations of an underlying conspiracy must be "plausible on [their] face" and not pled "with particularity." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007); *see Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 578 (S.D.N.Y. 2016) ("When a securities fraud action rests on the

---

actually rose for each of the Price-Fixed Drugs (Mot. 23). This is not the law.

[11] Tellingly, Defendants did not formally move to strike the Amended AG Complaint-based allegations. Moreover, the two Second Circuit district court cases cited by Defendants have been questioned within the courts of the Second Circuit. *See., e.g., In re OSG Sec. Litig.*, 12 F. Supp. 3d 619, 621 n.8, 622 (S.D.N.Y. 2014) (allowing plaintiff to amend pleadings with allegations from another lawsuit).

failure to disclose uncharged illegal conduct, the complaint must state a ***plausible*** claim that the underlying conduct occurred.").[12]

Second, the Complaint alleges in detail not only that Defendants had "frequent opportunities" and motive to conspire at industry conferences, but that those opportunities were taken and acted upon to artificially inflate drug prices by up to 7,000%. ¶¶83-105, 140, 141, 143-44, 146-47, 149, 160, 162, 256, 264. Defendants' criticism that the Complaint is deficient for failure to plead direct evidence of price-fixing with respect to propranolol, doxycycline, ursodiol, and desonide (Mot. 24) ignores the fact that "conspiracies are rarely evidenced by explicit agreements but nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators." *Anderson News*, *L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012). This is precisely what the Complaint alleges. The Court should conclude here, as in *Propranolol*, that the Complaint "set[s] forth in detail that defendants' attendees [at trade association meetings] were responsible for setting drug prices" and these meetings provided opportunities to engage in collusive conduct. 249 F. Supp. 3d at 722-23 ("Plaintiffs accordingly have alleged ***far more than the 'mere opportunity to conspire,'*** and so have shown a high level of interfirm communications."). While "admissions of guilt" are not required at the pleading stage (*contra* Mot. 24) the Complaint also includes allegations of guilty pleas implicating Allergan in a price-fixing conspiracy with respect to doxycycline. ¶¶184-85.

Third, Defendants' argument that the price movements of the Price-Fixed Drugs do not exhibit parallel price movements (Mot. 26-28) is squarely contradicted by graphs in the Complaint

---

[12] Unlike in the cases cited by Defendants (Mot. 22), which have required that the existence of a conspiracy be pleaded with particularity where the plaintiffs failed to allege how the conspiracy actually broke any laws, here the legal violations are clear and have already resulted in multiple criminal prosecutions.

that clearly depict parallel price movements.  ¶¶108, 111, 114, 127, 141, 144, 147, 160.  As an initial matter, whether certain price increases constitute parallel movement is a highly factual question that is inappropriate for resolution on a motion to dismiss.  *See In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *32 (S.D.N.Y. Mar. 28, 2017) ("The choice between two plausible inferences that may be drawn from [alleged price movements] is not a choice to be made by the court on a Rule 12(b)(6) motion.").[13]  Significantly, there were no supply shortages or increased costs during the Class Period to otherwise explain the historic price increases for all four Price-Fixed Drugs.  ¶7.  As Judge Rakoff concluded with respect to Allergan's and its co-conspirators' pricing of propranolol, "Defendants consistently raised prices on a bi-monthly and quarterly basis, which is consistent with an illegal agreement."  *Propranolol*, 294 F. Supp. 3d at 720-22 & n.12 (rejecting defendants' attempts to provide alternative explanations for price increases).  *See also United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 222-23 (1940) (price changes need not be uniform to evidence price fixing).

<u>Fourth</u>, Defendants' attempt to minimize the ongoing criminal DOJ and the State AGs' investigations should be rejected.  Mot. 25-26.  Allergan received a ***criminal*** grand jury subpoena.  ¶182.  That fact, alone, supports an inference of a price-fixing conspiracy and Allergan's potential

---

[13] *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 137 (3d Cir. 1999), cited by Defendants (Mot. 25, 28), is inapposite. As noted in *Propranolol*, *Baby Food* is distinguishable because "[t]here, plaintiffs submitted an expert report in support of their motion for summary judgment that 'never made any reference to the evidence in this case,' [] 'never analyzed the pricing conduct[,]' and included nothing more than 'an abstract statement based on 'economic theory' that the interest in enhancing profits motivated the defendants to conspire' to raise the price of baby food in the United States."  294 F. Supp. 3d at 719-20. While the Third Circuit in *Baby Food* concluded that such "bare opinion of an obvious fact" was insufficient to establish motive, 166 F.3d at 137-38, here, the Complaint "detail[s] a regulatory regime that has historically pushed the price of propranolol downwards and gradually reduced defendants' profits, thereby giving them a common motive to conspire."  294 F. Supp. 3d at 719-720; *see* ¶229.

involvement in it.[14]   In addition, the DOJ has made clear that evidence developed in its investigation implicates and may eventually include "a significant number of the Defendants" and "a significant number of the drugs at issue" in the Generic Drugs MDL.  *See* discussion *supra* at 10-12.  Allergan is a named defendant in the Amended AG Complaint and in seven MDL actions. There can be no doubt that Allergan is also in the DOJ's crosshairs.  And as Judge Rakoff concluded in *Propranolol*, "[t]he presence of an ongoing investigation into the same subject matter as alleged in the pleadings here raises an inference of conspiracy."  249 F. Supp. 3d at 723.

## IV.   The Complaint Adequately Alleges That Defendants Acted with Scienter

To plead scienter, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. §78u-4(b)(2).  A plaintiff has sufficiently pled scienter when "all of the facts [alleged], taken collectively, give rise to a strong inference" of either reckless or conscious behavior; (s)he is not required to show that "any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs. Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-324 (2007) (scienter allegations "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre").  Moreover, as the Third Circuit has explained, the scienter analysis under *Tellabs* is "case specific" and *per se* a matter of factual degree:

> [The scienter analysis] will ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, ***it is at least as likely as not that defendants acted with scienter*** . . . . In assessing the allegations holistically as required by *Tellabs*, the federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective.

---

[14] *See* DOJ, ANTITRUST DIVISION MANUAL (5th ed. 2015) at III-82, §F-1 (when deciding whether to request the initiation of a grand jury investigation, "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution")  (*available at* https://www.justice.gov/atr/file/761141/download).

*Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 269, 272-73 (3d Cir. 2009). A court must consider the factual allegations of the complaint in their entirety, and take into account only those "plausible opposing inferences"—*i.e.*, plausible nonculpable explanations for the defendant's conduct—that may be "rationally drawn from the facts alleged." *Tellabs*, 551 U.S. at 310, 314. Thus, it is the defendant's burden to demonstrate that the allegations give rise to an inference of nonculpable conduct that is *stronger* than the inference of scienter. *Id.*

### A.   There Is a Strong Inference That Defendants Made False Statements Concerning Allergan's Core Business Operations with Scienter

Defendants violated antitrust laws by engaging in an antitrust conspiracy to fix the prices of the Price-Fixed Drugs. *See* discussion *supra* at 6-7, 24-28. These allegations, standing alone, are sufficient to raise a strong inference of scienter with respect to this concealed anticompetitive activity. *See Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) ("Intentional misconduct is easily identified since it encompasses deliberate illegal behavior."); *Aviva Partners LLC v. Exide Techs.*, 2007 WL 789083, at *12 (D.N.J. Mar. 13, 2007) (scienter satisfied through allegations of "conscious wrongdoing, such as intentional fraud or other deliberate illegal behavior.").

Numerous, additional well-pled facts give rise to the inference that Defendants acted knowingly, or at a minimum recklessly, in making their false statements and omissions. First, courts have held that the fact that a fraud, like the one alleged here, involves a company's core operations supports a strong inference of scienter. *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.* ("*Tellabs II*"), 513 F.3d 702, 709, 711 (7th Cir. 2008) (finding it "exceedingly unlikely" that CEO was unaware of problems with the company's two major products where he made numerous false statements about the products); *Campbell Soup*, 145 F. Supp. 2d at 599 ("knowledge may be imputed to individual defendants when the disclosures involve the company's core business").[15]

---

[15] *See also In re Cell Pathways, Inc., Sec. Litig.*, 2000 WL 805221, at *7 (E.D. Pa. June 20, 2000)

The Third Circuit's decision in *Avaya* is especially informative here. In *Avaya*, the plaintiff's "central allegation" was that Avaya, a company whose core business was selling communications products, had misrepresented the pricing competition facing the company, falsely stating that there were no significant changes to the pricing environment when, in fact, the company was engaged in widespread discounting. 564 F.3d at 268-273. The Third Circuit noted that, even absent any evidence of direct knowledge by the CFO, such as a "particular document or conversation," several statements made by the CFO about the stable nature of the company's pricing environment were sufficient to give rise to the strong inference that he knew or was reckless in not knowing about the undisclosed pricing pressures. *Id.* at 268-270.[16] The court found that "the possibility that [the CFO] was ignorant is not necessarily exculpatory" because even if unaware of the pricing competition, "he might be culpable as long as what he knew made obvious the risk that his confident, unhedged denials of unusual discounting would mislead investors." *Id.* at 270.

As in *Avaya*, the Individual Defendants made a series of actionable misrepresentations concerning the sources of Allergan's revenue and generic drug price increases without disclosing that these results were achieved only through an illegal price fixing conspiracy. ¶¶196, 202-07, 210-17. By repeatedly making statements that referenced the "highly competitive" market, the pricing of generic drugs, and the reasons for increased revenues in Allergan's generic drugs business, Defendants demonstrated that these issues were part of the core operations of Allergan

---

("[W]here the alleged fraud relates to the core business of the company, knowledge of the fraud may be imputed to the individual defendants"); *In re RAIT Fin. Trust Sec. Litig.*, 2008 WL 5378164, at *12-13 (E.D. Pa. Dec. 22, 2008) (same); *Providian*, 152 F. Supp. 2d at 818 (same).

[16] Here, the Complaint alleges that the Generic Pricing Department, whose head reported to Defendants Olafsson and Buchen at varying times, and who in turn reported to Defendants Bisaro and Saunders, created and maintained pricing models and approved all pricing changes. ¶¶85-88. These allegations, and *Avaya*'s acknowledgement that a "particular document or conversation" need not be alleged, 564 F.3d at 268, completely refute Defendants' argument regarding the purported lack of specific "reports or statements" presented to Defendants. Mot. 28.

on which the Company's most senior executives focused.  Indeed, Allergan's ability to increase prices for some of its "key product" generic drugs was perhaps the single most important aspect of Allergan's business.  ¶251 (generic revenue accounted for 32%-42% of total revenue and analysts highlighted "pricing pressure for key generics products" as among risks to achieving price target).  The fact that Defendants spoke repeatedly about these core operational issues without disclosing the unlawful price-fixing scheme underlying them suggest they "were at least reckless, which is enough to survive a motion to dismiss under the PSLRA."  *Avaya*, 564 F.3d at 269.

The price-fixing scheme here lasted for several years and succeeded in dramatically manipulating the prices of Allergan's "key products" on a nationwide scale.  Such an undertaking could not be done without the knowledge and approval of the Company's senior executives, especially since the members of Allergan's generic drug management team who attended the trade meetings at which price collusion occurred and who were responsible for pricing decisions reported directly to Olafsson and Buchen, who in turn reported directly to Bisaro and Saunders. ¶¶84-88.   Such significant corporate actions could not have been accomplished by rogue employees, but rather required the approval and direction of Allergan's most senior officers.  *See In re Infineon Techs. AG Sec. Litig.*, 2008 WL 11333700, at *7 (N.D. Cal. Jan. 25, 2008) (the "price-fixing conspiracy could not have been perpetrated over such a long period of time without the knowledge and complicity of persons at the highest levels of management at the company"); *Tellabs II*, 513 F.3d at 711 ("[I]t is exceedingly unlikely" that a CEO was "unaware of the problems of his company's two major products and merely repeating lies fed to him by other executives").[17]

---

[17] Plaintiffs do not ask this Court to "simply assume knowledge" based on Defendants' "position within the company."  Mot. 31.  Defendants' cited cases involved alleged schemes that were relatively small in scope or based on technical accounting violations and did not involve obvious phenomena such as inexplicable price hikes of up to 7,000%.  *See In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 141 (3d Cir. 2004) (alleged violation of GAAP and revenue recognition policy);

Second, the astronomical price increases alleged here (and in *Propranolol*) were, absent a price-fixing agreement, clearly against the co-conspirators' self-interest.  In addition to the competitive pressures which would have prevented parallel price increases in an open market, the pricing regime governing the U.S. generic pharmaceutical market limits drug reimbursements from insurance companies if a drug manufacturer raises its prices above an industry-wide cap.  ¶8; *see also* ¶¶72, 118, 131, 151, 164, 245.  Thus, it would not be in any drugmaker's unilateral self-interest to increase the prices of its generic drugs unless it had an agreement with the other drugmakers that they would do the same.   *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 398 (3d Cir. 2015) ("[A]ctions against self-interest means there is evidence of behavior inconsistent with a competitive market."); *Propranolol*, 249 F. Supp. 3d at, at 722 ("plaintiffs have plausibly alleged that the price increases in Propranolol capsules and tablets were against defendants' self-interest").  Both the fact that the price hikes were contrary to Allergan's self-interest and the lack of benign market explanations for the increases (¶¶7, 117, 130, 150, 163) "diminish the plausibility of innocent explanations," and "as the plausibility of [] benign explanations shrinks, the cogency of the culpable explanation"—here, price collusion— "correspondingly grows."  *Avaya* 564 F.3d at 271-72.

Third, on several occasions, Defendants attributed the Company's increased revenues in its generic drugs business to legitimate business practices, even after public scrutiny into generic drug pricing intensified following the October 2014 Congressional hearings.  *E.g.*, ¶¶206-07, 210- 19.  These Defendants either possessed the detailed knowledge they claimed to have concerning

---

*City of Roseville Employees' Retirement System v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 388, 400 (D. Del. 2010) ("*Horizon II*") (revenue up less than 10%, and increase not necessarily suspicious); *Nat'l Junior Baseball League v. Pharmanet Dev. Group Inc.*, 720 F. Supp. 2d 517, 524 (D.N.J. 2010) (allegations concerned backlog and "book-to-bill ratio" figures).

32

the factors that drove the strong performance in the Company's generic drugs business, and thus their statements were knowingly false, or they lied about having this information: either way, scienter is pled. *See Novak*, 216 F.3d at 311 (scienter established where defendants "knew . . . *or had access to* information suggesting that their public statements were not accurate").

Fourth, the fact that (i) Allergan has been named a defendant and co-conspirator in the Amended AG Complaint and (ii) a grand jury issued a subpoena *duces tecum* to Allergan as part of the DOJ's wide-reaching criminal price-fixing investigation, strongly supports an inference of scienter. "[C]ourts have considered a governmental investigation as one piece of the puzzle when taking a 'holistic' view of the purported facts as they relate to scienter." *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013); *Lipow v. Net 1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 164 (S.D.N.Y. 2015) ("the existence of an investigation . . . may be considered by the Court as part of its analysis"); *In re Xcel Energy, Inc.*, 364 F. Supp. 2d 980, 995 (D. Minn. 2005) (noting that governmental investigations "into the primary allegations of securities fraud" in a private case are included among the "usual indicia of securities fraud"); *In re Syncor Int'l Corp. Sec. Litig.*, 327 F. Supp. 2d 1149, 1162 (C.D. Cal. 2004) (finding it "appropriate to consider the SEC investigation" in evaluating scienter). In dismissing this evidence as speculative (Mot. 29), Defendants ignore (i) the scope of the related criminal and civil investigations, (ii) the particularized facts in the Complaint about Defendants' conspiracy derived from evidenced adduced in the government probes, and (iii) the fact that the governmental investigations are likely to expand to yet-to-be-named drugs, pharmaceutical companies and executives. ¶¶182-90. In fact, the DOJ unequivocally stated in the Generic Drugs MDL that uncharged senior executives of the targeted pharmaceutical companies are implicated in the scheme, specifically noting the significant overlap in defendants and drugs between their investigations and the MDL. *See supra* at 12.

The Third Circuit's decision in *In re Suprema Specialties, Inc. Securities Litigation*, 438 F.3d 256, 278 (3d Cir. 2006), is informative here.  In *Suprema*, the plaintiff alleged that three of the company's "key customers pled guilty to fraud charges in connection with a round-trip sales scheme and admitted in their plea allocutions that they [had engaged in this fraud] at the direction and ***with the participation of Suprema's management***."  *Id.* at 278.  Here, the Heritage CEO/Chairman and President, both of whom pled guilty to generic drug price-fixing, specifically admitted to conspiring with other competitors who, while at the time not yet named as defendants, "participated as co-conspirators in the offenses charged" by the DOJ.  ¶¶184-86.  Moreover, the DOJ and the State AGs have recently affirmed that new charges are likely.  *Supra*, at 12.

Fifth, the Amended AG Complaint details specific instances where Allergan representatives engaged in numerous and frequent telephone and text message communications with representatives from certain of its co-conspirators throughout the Class Period, during which the companies' representatives discussed their desire to raise or maintain prices with respect to specific drugs.  ¶¶171-79.  The Amended AG Complaint also makes clear that Allergan and its co-conspirators often took "overt and calculated steps to destroy evidence" of any written communications documenting the collusive arrangements.  This behavior indicates knowledge of the unlawfulness of their conduct.

### B.     The Motive Allegations Strengthen the Inference of Scienter

Motive and opportunity "are to be considered along with all other allegations in the complaint" in assessing whether scienter has been adequately alleged, and, when insider stock sales are "unusual in scope or timing, they may support an inference of scienter."  *Avaya*, 564 F.3d at 276-79.  The Complaint alleges that Defendants were motivated to mislead the public.

First, Plaintiffs allege a unique, industry-specific motive, namely, the fact that the prices for generic drugs had stabilized or "bottomed out" as a result of the regulatory pricing regime for

34

generic drugs, prompting Defendants and their industry rivals to collude on prices. *See, e.g.*, ¶246 (Price-Fixed Drug prices had leveled off, creating "a common motive to conspire to raise prices"); *cf. Propranolol*, 249 F. Supp. 3d at 720 (finding "common motive to conspire").

Second, collectively, Bisaro, Joyce, Olafsson, and Buchen sold over 118,000 shares of stock for $20.1 million during the Class Period. ¶¶257, 261, 265, 267. Under the totality of the circumstances alleged here, these sales are probative of scienter. *See Suprema*, 438 F.3d at 277-78. Defendants argue that the lack of sales by Saunders and Hilado somehow negate entirely the inference to be drawn from the sales of the other four Defendants. Mot. 33. However, Saunders and Hilado did not assume leadership positions at Allergan until July and December 2014, respectively. *Id.* It is reasonable to assume that the commencement of the Congressional investigation into price-fixing preempted any stock sales after October 2, 2014, and so it makes no sense to interpret these Defendants' lack of trading as exculpatory. Defendants' argument that the lack of any insider sales in and after 2014 negates scienter (*id.* at 34-35) should be rejected for the same reason—heightened scrutiny likely prevented any unusual stock sales.[18] Finally, Defendants' attacks on "[t]he scope of the sales" are meritless. *Id.* at 34. Sales of $20.1 million of stock, comprising 8%, 37%, 25% and 33% of the four Individual Defendants' holdings respectively, are suspicious. Indeed, courts regularly find that insider sales of a magnitude significantly less than those at issue in this action provide a strong inference of scienter.[19]

---

[18] Defendants' accusation that Plaintiffs have "[l]engthen[ed] the Class Period . . . to sweep as many stock sales into their totals as possible" (Mot. at n.16) is also baseless. The Class Period reflects the period during which Defendants issued their false and misleading statements, and Defendants do not raise any unique arguments with respect to the earlier-issued statements.

[19] *See, e.g.*, *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1168-69 (C.D. Cal. 2003) (sale of 7.6%); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 647 (E.D. Va. 2000) (sales of as little as 2.2% indicative of scienter).

## V.     The Complaint Adequately Alleges Loss Causation

The Complaint adequately alleges two loss causation events: the August 6, 2015 disclosure that Allergan had "received a subpoena from the DOJ" and the November 3, 2016 disclosure that the DOJ may press criminal charges against generic drug manufacturers, both of which were followed by significant declines in the price of Allergan securities.  ¶¶234-42.

The Third Circuit does not impose an overly rigorous requirement on the pleading of loss causation.  This Circuit has adopted a "practical approach [to loss causation], in effect applying general causation principles."  *McCabe v. Ernst & Young LLP*, 494 F.3d 418, 426 (3d Cir. 2007). Under this standard, a plaintiff need only show that "the misrepresentation ***touches upon*** the reasons for the investment's decline in value." *Id.* at 428.  Further, it is well-established that "loss causation [] can be predicated on a series of partial disclosures," *In re Merck & Co., Inc., Deriv., & ERISA Litig.,* 2011 WL 3444199, at *31 (D.N.J. Aug 8, 2011), and "the market does not have to learn of possible fraud from the company itself."  *In re DVI, Inc. Sec. Litig.,* 2010 WL 3522090, at *6-7 (E.D. Pa. Sept. 3, 2010).

Numerous courts in this Circuit have upheld corrective disclosures premised upon announcements of regulatory investigations, *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828-29 (D.N.J. 2006), or through "whistleblowers, analysts questioning financial results, resignation of CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspapers and journals, etc.'" *In re Intelligroup SEC Litig.,* 527 F. Supp. 2d 262, 297 n.18 (D.N.J. 2007).  *See also Hull v. Global Digital Solutions, Inc.*, 2017 WL 6493148, at *14-15 (D.N.J. Dec. 19, 2017) (citing *Bradley* and finding that SEC complaint corrected the fraud); *Merck*, 2011 WL 3444199, at *31 (third party scientists and analysts unaffiliated with Defendant partially corrected the fraud).

36

In the face of these well-settled principles, Defendants argue that the announcement of a subpoena is mere "speculation" that as a matter of law cannot support an allegation of loss causation. Mot. 35. This argument fails. Indeed, Judge Hochberg reached the opposite conclusion in *Bradley*, rejecting this argument and holding that the disclosure of an informal SEC inquiry accompanied by a significant stock decline constituted a disclosure event. 421 F. Supp. 2d at 828-29 (reasoning that the securities laws do not operate in a "vacuum," and that "Defendants' contention that the announcement of the SEC inquiry did not satisfy Dura's 'revelation of the truth' requirement fails to acknowledge the significance of the market reaction to the . . . disclosure").

The decision in *Martin v. GNC Holdings, Inc.*, 2017 WL 3974002, at *18 (W.D. Pa. Sept. 8, 2017), on which Defendants rely (Mot. 36), is contrary to the weight of authority, which holds that "an announcement regarding a governmental investigation into the precise subject matter which forms the basis of the fraudulent practices at issue can qualify as a partial corrective disclosure for purposes of loss causation." *Gentiva*, 932 F. Supp. 2d at 388 (E.D.N.Y. 2013). As the court in *Gentiva* stated:

> [T]he Court rejects the idea that the disclosure of an investigation, absent an actual revelation of fraud, is not a corrective disclosure. To embrace this notion would be to preclude any type of action such as this, where there has been no conclusive finding of fraud by a government agency, or a criminal charge initiated, or a formal corrective disclosure the defendant.

*Id.* at 387.

The majority of courts have reached the same practical conclusion. *See, e.g.*, *Bradley*, 421 F. Supp. 2d at 828-29; *Public Empls' Ret. Sys. of Mississippi v. Amedisys, Inc.*, 769 F.3d 313, 324 (5th Cir. 2014) (reversing dismissal and rejecting "an overly rigid rule that government investigations can never constitute a corrective disclosure in the absence of a discovery of actual fraud"); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 288 (S.D.N.Y. 2008) ("The Court has found little support for a per se rule holding that the announcement of an SEC

investigation cannot form the basis for loss causation allegations."); *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 282 (S.D.N.Y. 2012) (loss causation alleged based on SEC announcement of investigation and complaint); *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 361 (S.D.N.Y. 2009) (summary judgment on loss causation rejected when one corrective disclosure was announcement of investigation by French regulators); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 164 (S.D.N.Y. 2008) (loss causation alleged based on announcement of FBI investigation); *Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 230-31 (S.D.N.Y. 2009) (news that the "SDNY [US Attorney] and the SEC were investigating" "alone suffices to show" loss causation); *Chamberlain*, 757 F. Supp. 2d at 717 (DOJ investigation announcement was corrective disclosure); *Greater Pa. Carpenters Pension Fund v. Whitehall Jewelers, Inc.*, 2005 WL 61480, at *5 (N.D. Ill. Jan. 10, 2005) (crediting as "partial disclosures of prior misrepresentations and omissions" press release announcing SEC and DOJ investigations).[20]

Defendants' fallback argument that loss causation is negated because Allergan had already sold Actavis to alleged co-conspirator Teva by November 3, 2016 (Mot. 36) is highly factual and inappropriate at the pleadings stage. *See In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 655 (E.D. Pa. 2015) ("the issue of causation is 'usually reserved for the trier of fact.'") (quoting *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 885 (3d Cir. 2000)). In any event,

---

[20] *GNC Holdings* is flawed for the additional reason that it completely disregards "materialization of the risk" as a viable loss causation theory, 2017 WL 3974002 at * 19. Courts, including courts in this District, have long recognized that a plaintiff may establish loss causation by pleading the materialization of a concealed risk linked to material information that a defendant had failed to properly disclose. *See, e.g.*, *In re Tellium, Inc. Sec. Litig.*, 2005 WL 2090254, at *3 (D.N.J. Aug. 26, 2005) ("'Where the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss, it is the materialization of the undisclosed condition or event that causes the loss'"); *Mineworkers' Pension Scheme v. First Solar Incorporated*, 881 F.3d 750 (9th Cir. 2018); *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016).

it is more than plausible that the market was reacting to management's concealment of and engagement in wrongdoing, negative information which would have impacted Allergan's stock, not Teva's stock.[21]   Furthermore, the acquisition price of Actavis—which was fixed as of July 2015, well before the revelation of the DOJ subpoena—has *nothing* to do with losses suffered by Allergan shareholders as a result of the revelation of the concealed price collusion.

## VI.   Defendants' Remaining Arguments Fail

*The Complaint States Claims Under Section 14(a)*:  A claim under Section 14(a) requires that "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction."  *Shaev v. Saper*, 320 F.3d 373, 379 (3d Cir. 2003).  Scienter is not required.  *Id*.  These claims do not "sound in fraud" and are subject to no heightened pleading standard (Mot. 38-39) because all allegations of fraud are disavowed, the claims are segregated and "are expressly pled in negligence."  *Suprema*, 438 F.2d at 272-74 (distinguishing *Chubb*, 394 F.3d at 161 (cited by Defendants)).  Defendants contend that the Complaint does not allege which statements were false in the May 6, 2014 and January 27, 2015 Proxies.  Mot. 37-38.  However, the Complaint clearly identifies false financial statements in the Proxies, ¶221, and otherwise alleges that the Proxies incorporated by reference the 2013 Form 10-K, and the 1Q, 2Q, and 3Q 2014 Forms 10Q, *id*., n.13-14.[22]

---

[21]   Defendants' other argument that the November 3, 2016 disclosure does not establish loss causation because Allergan's stock price increased on the following day is also unavailing at the pleading stage.  (Mot. 36, n.17.)  As the Second Circuit held in *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 39 (2d Cir. 2012), "the fact that the price rebounded does not, at the pleading stage, negate the plaintiff's showing of loss causation" because "determining why a stock's price rebounded after an initial drop requires the court to consider a competing theory of causation and raises factual questions not suitable for resolution on a motion to dismiss."

[22] Defendants' argument that the Section 14(a) claims are untimely because Plaintiffs were on inquiry notice of the alleged price fixing as of the filing of Allergan's Form 10-Q on August 6,

***The Complaint States Claims Under Section 20(a)***: A Section 20(a) claim requires (i) a primary securities law violation by the controlled entity, (ii) defendant's control of the primary violator, and (iii) culpable participation by the defendant.  *Suprema*, 438 F.3d at 284 n.16. Defendants do not dispute that the Individual Defendants controlled Allergan, and the Complaint pleads their culpable participation in Allergan's violations of Sections 10(b) and 14(a).  *See supra*.

***Plaintiffs Have Standing To Bring Preferred Share Claims***:  Plaintiffs have standing to bring claims on behalf of common and preferred shareholders, even if they purchased only one class of stock.  *See In re Schering-Plough Corp./Enhance Sec. Litig.*, 2012 WL 4482032, at *9-10 (D.N.J. Sept. 25, 2012).  Defendants' authority for excluding preferred shares claims is entirely inapposite, involving an aspiring lead plaintiff who purchased no shares during the class period and admitted that it was unqualified to serve as lead plaintiff.  Mot. 39-40 (citing *In re Cent. European Distrib. Corp. Sec. Litig.*, 2012 WL 5465799 (D.N.J. Nov. 8, 2012)).

## VII.    In the Event of Partial or Full Dismissal, Leave to Amend Should Be Granted

In the event that the Court grants Defendants' Motion in full or part, Plaintiffs respectfully request the Court grant leave to amend the Complaint pursuant to Federal Rule of Civil Procedure 15; *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015).

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motion should be denied in its entirety.

---

2015—which disclosed that Actavis had received a subpoena from the DOJ Antitrust Division— is inappropriate at this stage of the litigation, particularly when Plaintiffs have pleaded subsequent disclosures of alleged wrongdoing.  *See Cal. Pub. Emps' Ret. Sys. v. Chubb Corp.*, 2002 WL 33934282, at *25-26 (D.N.J. June 26, 2002) ("[T]he question of when the plaintiffs should have known of the alleged violation often requires a fact sensitive inquiry that is not appropriate at this early stage of the proceedings.").

Dated: January 23, 2018                    Respectfully submitted,

                                           _____/s/ James E. Cecchi_____
                                           James E. Cecchi
                                           Donald A. Ecklund
                                           **CARELLA, BYRNE, CECCHI, OLSTEIN,**
                                           **BRODY & AGNELLO, P.C.**
                                           5 Becker Farm Road
                                           Roseland, NJ 07068
                                           Telephone: (973) 994-1700
                                           Facsimile: (973) 994-1744
                                           jcecchi@carellabyrne.com
                                           decklund@carellabyrne.com

                                           *Liaison Counsel for Lead Plaintiffs and the Class*

                                           Matthew L. Mustokoff
                                           Kimberly A. Justice
                                           Margaret E. Onasch
                                           Jonathan F. Neumann
                                           **KESSLER TOPAZ**
                                           **MELTZER & CHECK, LLP**
                                           280 King of Prussia Road
                                           Radnor, PA 19087
                                           Telephone: (610) 667-7706
                                           Facsimile: (610) 667-7056
                                           mmustokoff@ktmc.com
                                           kjustice@ktmc.com
                                           monasch@ktmc.com
                                           jnewmann@ktmc.com

                                           *Co-Lead Counsel for Lead Plaintiffs and*
                                           *the Class*

                                           John C. Browne
                                           Lauren A. Ormsbee
                                           Abe Alexander
                                           Michael Mathai
                                           **BERNSTEIN LITOWITZ BERGER &**
                                           **GROSSMANN LLP**
                                           1251 Avenue of the Americas
                                           New York, New York 10020
                                           Telephone: (212) 554-1400
                                           Facsimile: (212) 554-1448
                                           johnb@blbglaw.com
                                           lauren@blbglaw.com

abe.alexander@blbglaw.com
michael.mathai@blbglaw.com

*Co-Lead Counsel for Lead Plaintiffs and
the Class*