# CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.
## COUNSELLORS AT LAW

CHARLES C. CARELLA
BRENDAN T. BYRNE
JAN ALAN BRODY
JOHN M. AGNELLO
CHARLES M. CARELLA
JAMES E. CECCHI

JAMES D. CECCHI (1933-1995)
JOHN G. GILFILLAN III (1936-2008)
ELLIOT M. OLSTEIN (1939-2014)

JAMES T. BYERS
DONALD F. MICELI
A. RICHARD ROSS
CARL R. WOODWARD, III
MELISSA E. FLAX
DAVID G. GILFILLAN
G. GLENNON TROUBLEFIELD
BRIAN H. FENLON
LINDSEY H. TAYLOR
CAROLINE F. BARTLETT

**5 BECKER FARM ROAD**
**ROSELAND, N.J.  07068-1739**
**PHONE (973) 994-1700**
**FAX (973) 994-1744**
www.carellabyrne.com

PETER G. STEWART
FRANCIS C. HAND
AVRAM S. EULE
CHRISTOPHER H. WESTRICK*
JAMES A. O'BRIEN III**
_____
OF COUNSEL

*CERTIFIED BY THE SUPREME COURT OF
 NEW JERSEY AS A CIVIL TRIAL ATTORNEY
**MEMBER NY AND MA BARS ONLY

RAYMOND J. LILLIE
WILLIAM SQUIRE
STEPHEN R. DANEK
DONALD A. ECKLUND
MEGAN A. NATALE
ZACHARY S. BOWER+
MICHAEL CROSS
CHRISTOPHER J. BUGGY
JOHN V. KELLY III
MICHAEL A. INNES

+MEMBER FL BAR ONLY

May 17, 2019

**VIA ECF**

The Honorable Katherine S. Hayden, U.S.D.J.
United States District Court
Frank R. Lautenberg U.S. P.O. & Courthouse
2 Federal Square, Room 311
Newark, New Jersey 07102

The Honorable Cathy L. Waldor, U.S.M.J.
Martin Luther King, Jr. Federal Bldg. & Courthouse
50 Walnut Street, Room 4040
Newark, New Jersey 07101

    Re:  *In re Allergan Generic Drug Pricing Sec. Litig.*, Civ. No. 2:16-cv-09449 (KSH)(CLW)

Dear Judge Hayden and Judge Waldor:

We represent Lead Plaintiffs Sjunde AP-Fonden and Union Asset Management Holding AG in the above-captioned action (the "Action"). Lead Plaintiffs write in response to the Court's question during yesterday's telephonic conference which Lead Plaintiffs understood to be: how does the complaint filed on May 10, 2019 by 44 states and commonwealths in the United States District Court for the District of Connecticut (the "May 2019 AG Complaint") (attached as **Exhibit A**) impact Defendants' pending motion to dismiss, particularly with respect to the issues raised at pages 9, 10, and 93 of the transcript of the April 11, 2019 oral argument held on Defendants' motion?

We also write to apprise the Court of the latest decision sustaining Section 10(b) claims against one of Allergan's co-conspirators in the price-fixing scheme. *Utesch v. Lannett Co. Inc.*, 2019 WL 2136467 (E.D. Pa. May 15, 2019) ("*Lannett*") (attached as **Exhibit B**).

A.    **The May 10, 2019 AG Complaint**

The 465-page May 2019 AG Complaint brings new claims of substantial antitrust violations against several generic drug makers, including Allergan (Actavis) and Allergan

employees Marc Falkin ("Falkin") and Richard Rogerson ("Rogerson").[1] The May 2019 AG Complaint sets forth a highly detailed account of the Allergan defendants' anti-competitive conduct in connection with as many as **22 generic drugs**, including Propranolol—a drug featured in the SAC. The facts alleged in the May 2019 AG Complaint further refute many of Defendants' arguments advanced in support of dismissal of the Action.

*First*, the May 2019 AG Complaint provides ***direct evidence*** of Allergan's participation in fixing the price of Propranolol, one of the four drugs in the SAC for which Lead Plaintiffs provided compelling indirect evidence of price-fixing (including unprecedented price increases of 1,200%). During last month's oral argument, Defendants argued that the only evidence of Allergan's conspiratorial communications concerned drugs for which there were no allegations that the conspirators ultimately raised prices in accord with the scheme. *See, e.g.*, 4/11/19 Transcript at 14 ("Here we don't have any allegations of actual price-fixing on the part of Allergan with respect to these two drugs [referenced in the earlier AG Complaint], Glyburide and Verapamil."). However, the May 2019 AG Complaint details how Allergan's Falkin—one of the three members of Allergan's generic drug management team—engaged in extensive communications with Teva just prior to and during coordinated increases in the price of Propranolol. *See* May 2019 AG Complaint ¶¶ 893-900. Specifically, the May 2019 AG Complaint catalogues multiple phone calls between Falkin and Teva in furtherance of the price-fixing scheme, which also involved a third company, Mylan. *Id.*

As alleged by Lead Plaintiffs (and now 44 state AGs), the prices of Propranolol were indeed raised during the Class Period, and there was no benign market explanation for these increases, such as supply shortages, an increase in demand, or increased production costs. *See* SAC ¶¶ 107-18. Accordingly, the newly unveiled direct evidence of price collusion between Allergan, Teva, and Mylan nullifies Defendants' argument that the only direct evidence of collusion concerns two drugs (Glyburide and Verapamil) for which no ultimate price increases were alleged.

*Second*, in addition to Propranolol, the May 2019 AG Complaint details direct evidence of Allergan's collusive conduct with respect to **21 additional drugs** that were not identified in the SAC. *See, e.g.*, May 2019 AG Complaint ¶¶ 1162-68, 1303-10, 1382-90; *see also* ¶¶ 328-61, 416, 418, 426, 560-62, 575, 585-88, 664, 742-45, 747-48, 768-81, 845-47, 880-81, 884, 890,

---

[1] As alleged in Lead Plaintiffs' Second Amended Complaint ("SAC") (ECF No. 82), Allergan plc ("Allergan") was formerly known as Actavis plc. Actavis plc acquired Allergan Inc. in March 2015 and changed its name to Allergan plc on June 15, 2015; however, Allergan's generic drug business operated through a division called Actavis Pharma ("Actavis"). *Id.* at ¶ 3, 42, 48. Defendants' counsel's comment during the May 16, 2019 teleconference that the May 2019 AG Complaint does not name Allergan as a defendant—as opposed to Actavis—matters not. Indeed, Actavis was the specific Allergan segment through which the illicit price-fixing occurred; but it was Allergan and its executives (including Defendant Olafsson, the President of Actavis during the Class Period) who made public misrepresentations which had the effect of misleading investors about Allergan/Actavis' collusive activities.

908-09, 911, 913.  The May 2019 AG Complaint alleges that the prices for at least six of these drugs were in fact raised pursuant to the collusion.  *See id.* ¶ 779 (Tamoxifen Citrate and Estazolam), ¶ 845 (Fluocinonide), ¶ 884 (Desmopressin Acetate), ¶ 908 (Ciprofloxacin HCL), and ¶ 911 (Griseofulvin).  Thus, in addition to Propranolol, there is now evidence that Allergan both conspired to raise prices, ***and in fact did raise prices***, for at least six other drugs.  This completely refutes Defendants' contention that there is no direct evidence of price collusion with respect to drugs whose prices were actually raised.[2]

***Third***, the anti-competitive misconduct alleged in the May 2019 AG Complaint does not merely include price-fixing, but also a concerted scheme of market allocation pursuant to which each conspirator was entitled to a certain percentage of market share based on the number of competitors in the particular drug market, with a potential adjustment based on the timing of their entry.  As described in the May 2019 AG Complaint:

> The overarching conspiracy among generic manufacturers, however – which ties together all of the agreements on individual drugs identified in this Complaint – is an agreed upon code that each competitor is entitled to its "fair share" of the market, whether that market is a particular generic drug, or a number of generic drugs.  Coined "fair share," the term is generally understood as an approximation of how much market share each competitor is entitled to, based on the number of competitors in the market, with a potential adjustment based on the timing of entry.  Once a manufacturer has achieved its "fair share," it is generally understood that the competitor will no longer compete for additional business.

May 2019 AG Complaint ¶ 116; *see also id.* ¶¶ 114-28.  These new allegations which implicate Allergan (*see id.* ¶¶ 328-61, 416, 418, 426-27) are significant because market allocation is an independent form of antitrust misconduct that does not depend on raising prices.  Nonetheless, as discussed above, the May 2019 AG Complaint contains direct evidence of price-fixing with respect to at least ***seven drugs*** for which prices were in fact raised.

***Fourth***, in addition to naming Falkin and Rogerson as defendants, the May 2019 AG Complaint identifies direct evidence of price collusion by a third Actavis employee, who is identified by the initials "A.B." and described as "a senior sales and marketing executive at Actavis."  *See, e.g.,* May 2019 AG Complaint ¶ 280; *see also id.* ¶¶ 361, 560, 585-86, 1064,

---

[2] To give the Court a sense of the magnitude of the collusive communications between Allergan and its co-conspirators, the May 2019 AG Complaint alleges that "between August 2013 and July 2016, Defendant Falkin exchanged at least ***2,562 phone calls and text messages*** with his contacts at Defendants Zydus, Teva, Glenmark, Lannett, Aurobindo, Mylan, Lupin, Par, Greenstone, Apotex, Taro, Amneal, Sandoz, and Wockhardt." ¶ 1065.  *See, e.g., In re Propranolol Antitrust Litig.*, 249 F. Supp. 32 712, 722-23 (S.D.N.Y. 2017) ("Plaintiffs [] have alleged far more than the 'mere opportunity to conspire,' and so have shown a high level of interfirm communications.").

May 17, 2019
Page 4

1072, 1075-76, 1090-91 (describing A.B.'s involvement in price-fixing and market allocation). On information and belief, "A.B." is Andrew Boyer, Allergan's Senior Vice President of Generic Sales, Marketing and National Accounts—who, like Falkin and Rogerson, is alleged to have reported *directly* to Defendants Olafsson and Buchen during the Class Period, who in turn reported to Defendants Bisaro and Saunders. SAC ¶ 88. Note that, in addition to Falkin, Rogerson, and Boyer, an earlier complaint filed by the 44 state attorneys general also identified Mike Dorsey, Allergan's Director of National Accounts, and Christine Koleto, an Allergan Senior Pricing Manager, as having been involved in the price-fixing. *See* ECF No. 117 at 2.

### B. Corporate Scienter

The direct involvement of Falkin, Rogerson and Boyer establishes that ***all three members of Allergan's generic drug management team responsible for pricing*** directed Allergan's price-fixing and market allocation schemes during the Class Period. These facts establish the scienter of Defendant Allergan. As discussed in Lead Plaintiffs' letter dated March 29, 2019 (ECF No. 117), the scienter of these multiple management-level individuals is properly imputed to Allergan. *See, e.g., In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2018 WL 3772675, at *33 (D.N.J. Aug. 8, 2018) (noting that the Third Circuit has not squarely decided the issue of corporate scienter, endorsing the approach of the Second, Seventh, and Ninth Circuits, and finding sufficient allegations of corporate scienter); *Sun v. Han*, 2015 WL 9304542, at *12 (D.N.J. Dec. 21, 2015) (corporate scienter alleged where "the pleaded facts [] create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter") (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)); *In re NUI Sec. Litig.*, 314 F. Supp. 2d 388, 412-13 (D.N.J. 2004) (company's scienter sufficiently pled through allegations that assistant general counsel, a ***non-defendant***, had knowledge of omitted and misrepresented information).

As discussed in that submission, a district court sustained claims of corporate scienter based on far less incriminating allegations concerning pricing managers in the parallel securities fraud action against Allergan's alleged co-conspirator, Taro. In *Speakes v. Taro Pharm. Ind., Ltd.*, the court held that plaintiffs successfully pled corporate scienter based on allegations concerning individuals with "high-level positions with Taro" who allegedly "knew about the conspiracy because they attended trade meetings close in time to the price increases, [and] participated in pricing discussions at Taro"—just as Lead Plaintiffs allege here with respect to Falkin, Rogerson and Boyer. 2018 WL 4572987, at *9-10 (S.D.N.Y. Sept. 24, 2018). As the court explained, although "Defendants complain that Perfetto and Aprahamian are neither named defendants nor are they alleged to have made any of the misstatements at issue . . . the scienter of '***management level' employees*** can be attributed to the corporation." *Id.* at *9 (emphasis added; citations omitted).[3]

---

[3] Several courts in this District have held that the culpable mental state of management personnel may be imputed to the corporate defendant, whether or not they participated in "making" the misstatement. *See, e.g., Sun*, 2015 WL 9304542, at *12 ("[T]he Third Circuit . . . has indicated that it may be possible to plead scienter against a corporation without pleading scienter against

May 17, 2019
Page 5

*Taro* is much more akin to this case than either *City of Roseville Employees' Retirement System v. Horizon Lines, Inc.*, 442 F. App'x 672 (3d Cir. 2011), or *Rahman v. Kid Brands, Inc.*, 736 F.3d 237 (3d Cir. 2013) (cited by Defendants)—in which the Third Circuit declined to reject or adopt the corporate scienter doctrine. Indeed, recently, in upholding allegations of corporate scienter, Judge Walls expressly distinguished *City of Roseville* and *Rahman* as cases involving "***rogue employees perpetuating fraud and concealing it from corporate management***." *Cognizant*, 2018 WL 3772675, at *33 (emphasis added). Here, by contrast, it cannot be said that Allergan's participation in illicit price-fixing and market allocation was carried out by rogue employees—rather, it was executed by the generic drug management team for the entire company, which reported directly to at least two of the Individual Defendants. SAC ¶ 88. Corporate scienter is therefore present here. *See also* 4/11/19 Transcript at 140-41.

**C.  Scienter of Defendants Bisaro and Olafsson**

As discussed at the oral argument (4/11/19 Transcript at 93-95, 138-39), in addition to the conduct of the generic drug management team of Falkin, Rogerson and Boyer, a confidential witness who served as Allergan's Global Vice President of Finance and Operations between 2011 and August 2016 recounted that Defendants Bisaro and Olafsson personally attended pricing meetings held by Falkin, Rogerson, and Boyer, and "weigh[ed] in and exert[ed] influence on pricing decisions." Complaint filed in *TIAA-CREF Large-Cap Growth Fund v. Allergan PLC*, 2:17-cv-11089-KSH-CLW (D.N.J.), ECF No. 1, at ¶ 104. This witness added that he/she "was aware of these details because he/she attended the pricing meetings during which the data used for pricing decisions was evaluated and received the pricing models that were used to determine the prices." *Id.*; *see Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 263 (3d Cir. 2009) (where plaintiff "adequately describe[s] the duration of each C[onfidential] W[itness]'s employment, the time period during which the CWs acquired the relevant information, and how each CW had access to such information," that information will be credited).

Thus, while Defendants have previously argued that the SAC should be dismissed because there are no facts suggesting that the Individual Defendants were involved in the pricing decisions, such facts actually *do* exist—and through our continuing investigation, Lead Plaintiffs' counsel have confirmed the veracity of the allegation in the *TIAA-CREF* Complaint. With these facts, this Action falls in line with the other securities fraud complaints based on the price-fixing conspiracy that have been sustained. *See Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *21-22 (D.N.J. July 27, 2018) ("*Perrigo*") (scienter adequately pled where

---

an individual. . . . the Court will not dismiss Plaintiff's claims against [the corporate defendant] at the juncture for failing to plead scienter as to a specific individual related to the [corporate] Defendant."); *Li v. Aeterna Zentaris, Inc.*, 2016 WL 3583821, at *2 (D.N.J. June 30, 2016) (corporate executive's scienter imputed to corporate defendant with respect to statements executive did not make); *see also In re Merck & Co. Sec., Deriv. & ERISA Litig.*, 2013 WL 396117, at *14 (D.N.J. Jan. 30, 2013) ("Defendants have provided no binding authority holding that a corporation's liability under § 10(b) for its alleged false statements and omissions is circumscribed by the imputed scienter of identifiable corporate agents.").

May 17, 2019
Page 6

individual defendants "were high-ranking executives allegedly involved in the pricing decisions")[4]; *Taro*, 2018 WL 4572987, at *9 (scienter adequately pled where a "confidential witness attest[ed] to the individual Defendants'—then CEO and CFO at Taro—involvement in pricing decisions"); *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *17 (S.D.N.Y. Mar. 28, 2018) (same).

Given the scienter of Defendants Bisaro and Olafsson, scienter is imputed to Allergan **_without dependence on the corporate scienter doctrine_**. *See Monk v. Johnson & Johnson*, 2011 WL 6339824, at *25 (D.N.J. Dec. 19, 2011) ("Having concluded that Plaintiff has sufficiently pled scienter with respect to at least one [defendant] corporate officer, I further conclude that scienter has been pled against J&J.")

**D.    The May 15, 2019 Decision in *Lannett*__**

Just two days ago, Judge Wendy Beetlestone of the Eastern District of Pennsylvania sustained the securities fraud complaint against Allergan's co-conspirator, Lannett. *Lannett*, 2019 WL 2136467. This is the **fourth** Section 10(b) case—and the second in this Circuit—arising out of the price-fixing conspiracy to be sustained. Of particular relevance to this submission, the Court found that the two individual defendants had scienter without an allegation that they were personally involved in the pricing decisions. *Id.* at *9 ("While [plaintiffs'] allegations do not directly mention Defendants Bedrosian and Galvan, knowledge of the conduct at issue can be 'imputed' to them because it involves 'core business' activities.").

Similar to Judge Arleo's reasoning in *Perrigo*, Judge Beetlestone relied heavily on the individual defendants' statements themselves—denials of anti-competitive conduct similar to Defendants' statements here. *See* SAC ¶¶ 211-12, 214, 217 ("the DOJ investigation really is a **red herring**"; prices increases solely due to "supply and demand"). As the court put it in words directly applicable here:

> "[T]he most powerful evidence of scienter is the content and context" of the misleading statements. And, as the Third Circuit explained in *Avaya*, that contextual analysis makes it significant when a high-ranking officer "evinc[es] certitude" as to a matter, particularly where the underlying substance is being publicly questioned. Defendants' statements that the market was "highly

---

[4] As noted during the oral argument (4/11/19 Transcript at 91-93, 141-42), in *Perrigo*, notwithstanding Judge Arleo's statement about the individual defendants' involvement in the pricing decisions, 2018 WL 3601229, at *21, the complaint in that case does not contain any allegations that the individual defendants were personally involved in the pricing decisions. Lead Plaintiffs submit that, upon closer examination of the *Perrigo* decision, Judge Arleo's finding of scienter was based primarily on the individual defendants' "repeated[] respon[ses] to pointed analyst questions regarding pricing pressure in the Generic Rx division . . . [which] indicated personal knowledge on the subject" *id*., a fact also present here. *See, e.g.,* SAC ¶¶ 211-12, 214, 217. **Regardless**, as discussed above, here there are facts suggesting that two of the Individual Defendants—Bisaro and Olafsson—were involved in the pricing decisions.

May 17, 2019
Page 7

> competitive," that they faced "strong competition" were made without equivocation in the context of an ongoing set of investigations initiated by multiple law enforcement and oversight bodies, significant public evidence that price patterns were not following ordinary trends, and ongoing questions in the press about collusive conduct. **Defendants' statements denying any such anti-competitive conduct**—made with such "certitude"—when viewed in the "context" of such persistent and significant underlying questions, is suggestive that they were made with the requisite scienter.

*Lannett*, 2019 WL 2136467, at *8 (quoting *Avaya*, 564 F.3d at 270); *accord Perrigo*, 2018 WL 3601229, at *21.[5]  As part of its "holistic" analysis, the court also relied on the "ongoing investigations into anticompetitive pricing in the market" as a "'piece of the puzzle'" and the fact that "there were no external factors (that is, 'supply or production issues' . . .) that could have caused the price spike[s]." *Lannett*, 2019 WL 2136467, at *9.

The court also sustained the plaintiffs' allegations of loss causation which are ***identical*** to those pled by Lead Plaintiffs here.  *Id*. at *10 ("Plaintiffs have adequately pleaded loss causation by alleging that . . . prices dropped immediately after . . . the revelation of an investigation into the pricing of Digoxin, the revelation that Lannett had received grand jury subpoenas relating to anti-competitive conduct across the generic pharmaceutical industry, and the revelation that criminal charges would likely be filed against many competitors in the industry . . . ").  Of particular note, the court rejected the defendants' reliance on *Loos v. Immersion Corp.*, 762 F.3d 880 (9th Cir. 2014)—the same case relied upon by Defendants at last month's argument (*see* 4/11/19 Transcript at 38)—in arguing that "these corrective disclosures do not plead loss causation because the decline in price could be based only on 'market speculation about whether fraud has occurred,' not on a genuine 'revelation' of a false statement." *Lannett*, 2019 WL 2136467, at *10 (quoting *Loos*, 762 F.3d at 889-90).  In addition to noting that "*Loos* has subsequently been limited" by the Ninth Circuit, Judge Beetlestone reasoned as follows:

> Defendants' legal argument proves too much: taken at its terms, **Defendants' argument would mean that loss causation could only be proven through a criminal conviction**—the point at which the fraud is no longer "speculative."  **<u>But that is not the law</u>**.  Instead, any "exposure of the fraudulent representation . . . is the critical component of loss causation.

*Lannett*, 2019 WL 2136467, at *10.  The court further noted that "courts across the country have rejected Defendants' theory as '***overly rigid***.'"  *Id*. (citations omitted).

* * *

---

[5] The plaintiffs in *Lannett* allege that the company colluded to raise the prices for Ursodial—one of the drugs featured in the SAC.  SAC ¶¶ 125-38.

May 17, 2019
Page 8

      Should the Court find that the allegations in the SAC are insufficient to withstand Defendants' motion to dismiss, Lead Plaintiffs respectfully request that the Court grant Lead Plaintiffs leave to amend the SAC pursuant to Fed. R. Civ. P. 15 to add the new facts discussed herein.

      Thank you for your attention to this matter. If the Court has any questions, we are available at your convenience.

      Respectfully Submitted,

| | |
|---|---|
| */s/ Matthew L. Mustokoff* | */s/James E. Cecchi* |
| Matthew L. Mustokoff | James E. Cecchi |
| | |
| **KESSLER TOPAZ MELTZER & CHECK, LLP** | **CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.** |
| 280 King of Prussia Road | 5 Becker Farm Road |
| Radnor, PA  19087 | Roseland, NJ 07068 |
| Telephone:  (610) 667-7706 | Telephone: (973) 994-1700 |
| Facsimile:  (610) 667-7057 | Facsimile: (973) 994-1744 |
| mmustokoff@ktmc.com | jcecchi@carellabyrne.com |
| | decklund@carellabyrne.com |

John C. Browne
Lauren McMillen Ormsbee
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY  10020
johnb@blbglaw.com
laurenm@blbglaw.com

#669938v1