

**ReedSmith**
Driving progress
through partnership

**Shannon E. McClure**
Direct Phone: +1 215 851 8226
Email: smcclure@reedsmith.com

Reed Smith LLP
Suite 3100
Three Logan Square
1717 Arch Street
Philadelphia, PA 19103
reedsmith.com

May 24, 2019

*VIA ECF*

The Honorable Katharine S. Hayden, U.S.D.J.
United States District Court
Frank R. Lautenberg U.S. P.O. & Courthouse
2 Federal Square, Room 311
Newark, New Jersey 07102

The Honorable Cathy L. Waldor, U.S.M.J.
Martin Luther King, Jr. Federal Bldg &Courthouse
50 Walnut Street, Room 4040
Newark, New Jersey 07102

**Re:   In Re Allergan Generic Drug Pricing Securities Litigation**
       **Civil Action No.: 2:16-cv-09449**

Dear Judge Hayden and Judge Waldor:

Defendants write in response to Lead Plaintiffs' May 17, 2019 letter ("Letter"), which addresses (i) the complaint filed by several State Attorneys General on May 10, 2019 (the "AG Complaint"), (ii) certain allegations contained in the TIAA Opt-Out Action, and (iii) the recent decision in *Utesch v. Lannett Company, Inc.*, 2019 WL 2136467 (E.D. Pa. May 15, 2019) ("*Lannett II*"). As explained below, none of these updates impact the pending motion to dismiss or warrants giving Plaintiffs leave to amend to file a fourth complaint in this action.

**A.  The May 2019 AG Complaint Allegations Do Not Cure the Deficiencies in Plaintiffs' Complaint**

Plaintiffs ask this Court to deny Allergan's pending Motion to Dismiss by relying on allegations in the AG Complaint. But it is "axiomatic" that Plaintiffs cannot defeat a motion to dismiss by asking the Court to consider allegations not contained in their own Complaint. *Commw. of Pa. ex. rel Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("the complaint may not be amended by the briefs in opposition to a motion to dismiss") (internal quotation marks omitted). Nor should Plaintiffs be permitted to formally amend their Complaint—thus creating the fourth complaint in this action. As demonstrated below, any amendment incorporating allegations from the AG Complaint would fail to cure the defects in Plaintiffs' claims and would therefore be futile. *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp*, 908 F.3d 872, 878 (3d Cir. 2018) ("Leave to amend is properly denied if amendment would be

Case 2:16-cv-09449-KSH-CLW   Document 123   Filed 05/24/19   Page 2 of 7 PageID: 3849

The Honorable Katharine S. Hayden, U.S.D.J.
The Honorable Cathy L. Waldor, U.S.M.J.
May 24, 2019
Page 2

ReedSmith

futile, i.e., if the proposed complaint could not withstand a renewed motion to dismiss.") (internal quotation marks omitted).

The most fundamental reason that Plaintiffs cannot rely on the AG Complaint to cure the defects in their SAC is because the AG Complaint asserts antitrust claims, not the securities fraud claims at issue here. As Allergan has previously argued (Dkt. Nos. 87-1, 96), those are different types of claims with different elements, and Plaintiffs cannot simply convert one into the other. Indeed, even confirmed antitrust violations—as opposed to the *alleged* violations in the AG Complaint—are not sufficient to establish a securities fraud claim. *See, e.g., City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 442 F. App'x 672, 676-77 (3d Cir. 2011) (affirming dismissal for lack of scienter despite fact that, unlike here, employees pleaded guilty to price-fixing that, unlike here, "affected a substantial portion of [defendant's] business"). As in *Horizon*, the alleged antitrust violations that Plaintiffs wish to rely on here do not make out the elements of a securities fraud claim.

*First*, as Defendants demonstrated in prior briefing, Plaintiffs' original allegations failed to support a strong inference of scienter because they gave no indication that the Individual Defendants were involved in or aware of the alleged price-fixing. Br. 28-35. Plaintiffs argue that the AG Complaint fills that gap by naming Marc Falkin and Richard Rogerson as defendants and alleging that they engaged in anticompetitive behavior. But neither Falkin nor Rogerson are Individual Defendants in this Action. Moreover, neither Falkin nor Rogerson are alleged to have made any purportedly false statements to investors. Thus, allegations against them in an antitrust action add nothing to Plaintiffs' scienter allegations here, but, at most, implicate the Individual Defendants' *indirect* subordinates in wrongdoing.[1] The Third Circuit has rejected securities fraud claims even where a defendant's *direct* subordinates have pleaded guilty to price-fixing and implicated their superiors. *Horizon*, 442 F. App'x at 675 & n.5.

To the extent the AG Complaint is at all relevant, it is because the Attorneys General chose not to assert claims against any of the Individual Defendants in this action. Thus, the only inference the AG Complaint supports is that the Individual Defendants were *not* engaged in price-fixing, which undermines any inference of scienter. *See id.* at 675, n.5 (discounting allegation that individual defendants acted in coordination with persons who pleaded guilty because the government did not charge any of the individual defendants with a crime). If anything, the AG Complaint adds credence to Plaintiffs' own admissions that persons other than the Individual Defendants were responsible for the generics pricing (SAC ¶¶ 85-86). The AG Complaint not only fails to support an inference of scienter, it contradicts it. *Fleming v. Impax Labs. Inc.*, 2018 WL 4616291, at *4 (N.D. Cal. Sept. 7, 2018) (finding lack of scienter where complaint "expressly attributes actual pricing activity to Impax's 'generics team'—not to its senior officials").

---

[1] Plaintiffs suggest that the May 2019 AG Complaint also implicated "A.B.," who they believe "upon information and belief" is Andrew Boyer, a non-Defendant Plaintiffs allege was responsible for Actavis's generics pricing. (Letter at 4-5.) However, the May 2019 AG Complaint does not allege that "A.B." entered into any price-fixing agreements, and the Attorneys General chose not to name him as a defendant, which warrants an inference that he was not involved in any alleged price-fixing. In any event, even if Plaintiffs had a basis to implicate "A.B." in price fixing, his knowledge could not be imputed to the Individual Defendants. *Horizon*, 442 F. App'x at 676-77.

Case 2:16-cv-09449-KSH-CLW   Document 123   Filed 05/24/19   Page 3 of 7 PageID: 3850

The Honorable Katharine S. Hayden, U.S.D.J.
The Honorable Cathy L. Waldor, U.S.M.J.
May 24, 2019
Page 3

ReedSmith

*Second*, Plaintiffs suggest that allegations in the AG Complaint regarding price increases for Propranolol and six other drugs—which are not named in the SAC—cure the deficiencies in the SAC allegations of an underlying price-fixing conspiracy.[2] But the same deficiency Allergan identified previously still persists: Plaintiffs cannot rely on unadjudicated allegations from another action. (Br. 23.) Moreover, even ignoring that Plaintiffs are not entitled to copy and paste allegations from another complaint, the allegations in the AG Complaint regarding Propranolol do not square with Plaintiffs' allegations regarding that drug in this action. Specifically, the SAC alleges that Propranolol was sold by Actavis, Heritage, Impax and Mylan (SAC ¶¶ 107-24), whereas the AG Complaint, as described by Plaintiffs, "details how Allergan's Falkin . . . engaged in extensive communications with Teva just prior to and during coordinated increases in the price of Propranolol" (Letter at 2). In other words, the AG Complaint describes a price-fixing conspiracy headed by a company, Teva, that the SAC does not even name as one of the companies that sold the subject drug.

*Third*, Defendants demonstrated that Defendants' general statements about the pharmaceutical industry could not have been rendered misleading by the alleged price-fixing because any such misconduct affected an immaterial portion of Allergan's revenues. (Br. 16-20.) Here, again, there is nothing in the AG Complaint that cures that deficiency. The AG Complaint only alleges price increases on six new drugs. Thus, between the SAC and the AG Complaint, there are 10 drugs whose prices were allegedly raised. That is less than 2 percent of Allergan's total generic drug products. (*See* Br. 17.) In addition, although the revenues from these six drugs is not alleged in the AG Complaint, none of the newly-identified six drugs are listed as a "key product" by Allergan in its financial reports, and certain of the "key products" actually alleged in the SAC had total revenues as low as $16 million over a three-year period. See SAC ¶ 160. Thus, even assuming these drugs had similar revenues as certain "key products"—which is unlikely since they are not "key products"—any purported price-fixing still could not render any of the affirmative statements materially misleading.

*Fourth*, none of the allegations in the AG Complaint are relevant to loss causation, and Plaintiffs do not claim otherwise. As Defendants demonstrated, the SAC failed to adequately allege loss causation because it relies solely on Allergan's disclosure of a subpoena and a November 2017 news article that indicated that *someone* under investigation by the DOJ *might* be charged by the end of the year. (Br. 35-36.) Neither event is a valid loss causation event, and both events occurred *after* Allergan had already announced the sale of its entire generics business. The AG Complaint does not speak to this issue at all, and Plaintiffs cannot rely on it to cure this deficiency in their SAC.

*Finally*, Plaintiffs contend that the AG Complaint includes allegations that would support a claim that persons at Actavis were engaged in a "market allocation" scheme, rather than the price fixing scheme Plaintiffs alleged in their SAC. As a threshold matter, any effort by Plaintiffs to shift to this claim is time-barred. Plaintiffs admit this is a "new" and "independent" theory (Letter at 3); as such, it does not relate

---

[2] Plaintiffs highlighted that the AG Complaint purportedly "details direct evidence of Allergan's collusive conduct with respect to *21 additional drugs* that were not identified in the SAC." (Letter at 2 (emphasis in original).) But Plaintiffs concede that the May 2019 AG Complaint only alleges price increases for six of these 21 drugs. *Id.* at 3. The supposed conspiracy for the drugs without price increases fail because they could not have an impact on Allergan's financials.

Case 2:16-cv-09449-KSH-CLW   Document 123   Filed 05/24/19   Page 4 of 7 PageID: 3851

The Honorable Katharine S. Hayden, U.S.D.J.
The Honorable Cathy L. Waldor, U.S.M.J.
May 24, 2019
Page 4

ReedSmith

back to the original complaint, the First Amended Complaint, or the Second Amended Complaint. *See, e.g., Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 866 (D.C. Cir. 2008) (amended complaint does not relate back where new theory of antitrust liability added). Leaving aside the fact that this new theory is untimely, it also is inconsistent with Plaintiffs' allegations. For example, far from agreeing on a set allocation of market share, Plaintiffs' allegations show significant changes in market share from year-to-year in the Propranolol market. SAC ¶ 120.

### B. Corporate Scienter Doctrine Is Inapplicable

Plaintiffs attempt to deal with the fact that the AG Complaint does not implicate **_any_** Individual Defendant by renewing their earlier argument that the "corporate scienter" doctrine should apply. (Letter at 4-5.) As Plaintiffs concede, however, the corporate scienter doctrine has **_never_** been endorsed by the Third Circuit. *Id.* Recently, the Third Circuit ruled that the doctrine's viability was not even worthy of consideration in a case involving a massive financial restatement, an admission of material weaknesses in financial reporting, resignations of individual defendants, and large stock sales by individual defendants. *In re Hertz Glob. Holdings Inc*, 905 F.3d 106, 116 (3d Cir. 2018). Notably, the Third Circuit has called allegations of price-fixing by subordinates of individual defendants a "far cry" from the circumstances that would warrant the invocation of the corporate scienter doctrine, even in a case, unlike this one, where the subordinates pleaded guilty to price-fixing. *Horizon*, 442 F. App'x at 676-77; *see also Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 244 (3d Cir. 2013) (consideration of corporate scienter doctrine not warranted where company's subsidiary regularly engaged in illegal re-labelling at factory that was toured by the company's CEO and CFO).

Plaintiffs try to escape this holding in *Horizon* by relying on the District Court decision in *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2018 WL 3772675, at *33 (D.N.J. Aug. 8, 2018) to argue that *Horizon* only applies where there are allegations that the wrongdoing was done by "rogue employees." Having served as class counsel in *Horizon*, however, Plaintiffs' counsel here is aware that the plaintiffs in *Horizon* alleged that the Horizon employees who pleaded guilty to price-fixing made explicit statements at their criminal sentencing "implicat[ing] the other individual defendants as conspirators in the price-fixing scheme." *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 397 (D. Del. 2010), *aff'd*, 442 F. App'x 672 (3d Cir. 2011). The *Cognizant* court's reference to "rogue employees" was simply to the fact that—despite the *Horizon* plaintiffs' allegations—the inference that the guilty employees were "rogue" was stronger than the inference that they involved the individual defendants. *Cognizant*, 2018 WL 3772675, at *27. Here, in contrast to *Horizon* where there were allegations that the guilty employees implicated their superiors, there are no allegations that Rogerson or Falkin, or anyone else, has implicated any of the Individual Defendants in price fixing, and thus dismissal is certainly warranted.

Further, even if *Horizon* was somehow inapposite—it is not—the *Cognizant* decision itself demonstrates why the corporate scienter doctrine is inapplicable here. There, Judge Walls "emphasize[d] that corporations may not be held liable for the knowledge of every employee, or even every member of senior management." *Cognizant*, 2018 WL 3772675, at *34. Instead, there needs to be "circumstantial evidence creating a strong inference that someone ***involved in the making of the misstatement*** was aware of its falsity." *Id.* (emphasis added). There, the Court ruled that the Plaintiffs had adequately alleged that the company's ***president*** was engaged in wrongdoing and that it was likely that the president "participated

The Honorable Katharine S. Hayden, U.S.D.J.
The Honorable Cathy L. Waldor, U.S.M.J.
May 24, 2019
Page 5

ReedSmith

in the preparation of financial statements." *Id.* In contrast to a company president, Rogerson and Falkin are multiple levels lower in the organization than those individuals responsible for the company's financial statements.[3] Therefore, their knowledge does not give rise to a strong inference that someone involved in making the alleged misstatement would have been aware of any falsity.

### C. The TIAA Allegations Undermine Plaintiffs' Claim

Plaintiffs argue they can meet their burden on scienter based on allegations, attributed to a confidential witness in the TIAA Opt-Out Action, that Individual Defendants Bisaro and Olafsson attended pricing meetings. That argument fails for multiple reasons. As a preliminary matter, these allegations were included in the TIAA complaint when it was publicly filed on November 3, 2017—weeks before Plaintiffs filed their SAC, which copied other allegations from the TIAA complaint. Plaintiffs should not be permitted to return to that complaint now to add allegations they were aware of well over a year ago. *Jones v. Brennan*, 2019 WL 1615120, at *5 (D.N.J. Apr. 16, 2019) (undue delay is basis for denying leave to amend); *Berger v. Edgewater Steel Co.*, 911 F.2d 911, 924 (3d Cir. 1990) (affirming district court's decision to deny leave to amend where basis for amendment was known for over four months before leave was sought); *In re Merck Mumps Vaccine Antitrust Litig.*, 2018 WL 1693348, at *3 (E.D. Pa. Apr. 6, 2018) ("delay can also be undue when a party has delayed moving to amend, despite having known the factual basis for a new claim for many months").

The allegations from the TIAA complaint, even if Plaintiffs were not too late in asserting them, would not help Plaintiffs establish scienter. In fact, the allegations undermine scienter. *First*, the CW confirms that Boyer, not the Individual Defendants, had authority over "final pricing decisions." TIAA Compl. ¶ 104; *see Impax*, 2018 WL 4616291, at *4 (finding lack of scienter where complaint "expressly attributes actual pricing activity to Impax's 'generics team'—not to its senior officials").

*Second*, contrary to Plaintiffs' suggestion that there were "widespread" price increases that Defendants should have been aware of, the CW states that "pricing stayed flat for the most part." TIAA Compl. ¶ 106. In addition to undermining Plaintiffs' scienter allegations, this admission also undermines Plaintiffs' allegations that statements about pricing in the marketplace were untrue because of supposed widespread price increases. *See, e.g.*, SAC ¶ 211 (alleging statement that Allergan had not "seen much of a change" in generic drug pricing "despite all the fanfare").

*Third*, although the CW attended the pricing meetings, he/she never suggests that the pricing was impacted by any collusive agreements. *See* TIAA Compl. ¶¶ 104-106. In fact, he/she explicitly states that "[a]ll generic pricing was generated using the analytics maintained by Rogerson's team" and that he/she "received the pricing models that were used to determine the prices." *Id.* ¶ 104. Similarly, despite alleging that "there was typically an agenda of who went and what was discussed" at the industry conferences, there is not a whiff from the CW that price-fixing was ever discussed. *Id.* ¶ 105. The logical

---

[3] Once again, Plaintiffs attempt to argue that Boyer was also implicated in the May 2019 AG Complaint. However, as mentioned above, Boyer is not named as a defendant, and, in any case, like Rogerson and Falkin, he was not as senior as the president in *Cognizant* and no more senior than the non-speaker defendants who pleaded guilty in *Horizon*.

Case 2:16-cv-09449-KSH-CLW   Document 123   Filed 05/24/19   Page 6 of 7 PageID: 3853

The Honorable Katharine S. Hayden, U.S.D.J.
The Honorable Cathy L. Waldor, U.S.M.J.
May 24, 2019
Page 6

ReedSmith

inference from this glaring omission is that it was not discussed. *Local No. 38 Intern. Broth. of Elec. Workers Pension Fund v. American Exp. Co.*, 724 F. Supp. 2d 447, 462 (S.D.N.Y. 2010) ("Indeed, if 'detailed' reports were circulated regularly among AMEX's senior management, CW12 should be able to identify the names and contents of these documents, ***or recount specific meetings at which the Individual Defendants actually received contradictory information***.") (emphasis added).

Attending meetings where price-fixing was ***not discussed*** cannot result in an inference that Defendants were aware of price-fixing based on attendance at those meetings. *Jackson v. Halyard Health, Inc.*, 2018 WL 1621539, at *9 (S.D.N.Y. Mar. 30, 2018) (finding lack of scienter where complaint did not "include any specific allegations as to the information actually discussed at the alleged meetings"); *In re Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 486 (S.D.N.Y. 2006) ("Notably absent are allegations that Greenberg attended the meetings in which [the alleged misconduct] was discussed"). Just the opposite: The fact that there is no allegation that price-fixing was ever discussed at the pricing meetings—notwithstanding the apparent availability of a confidential informant who attended those meetings—suggests that, to the extent Falkin and Rogerson engaged in price-fixing, they hid it from their superiors.

### D. The Lannett Decision Is Inapplicable

Plaintiffs rely on the recent decision in *Lannett II*. But that decision is premised on an entirely different theory than Plaintiffs have pursued here. By contrast, an earlier decision by the same court granted a motion to dismiss based on allegations closely analogous to Plaintiffs' allegations in the SAC. *Utesch v. Lannett Co., Inc.*, 316 F. Supp. 3d 895, 898 (E.D. Pa. 2018) ("*Lannett I*"). The second amended complaint in *Lannett* alleged, like here, that Defendants failed to disclose that Defendants themselves had engaged in anti-competitive conduct including price-fixing. *Lannett II*, 2019 WL 2136467, at *4. *Lannett I* granted the motion to dismiss because it found the scienter allegations did not "give rise to a strong inference that Defendants acted with fraudulent intent – that is knew or recklessly disregarded that Lannett was committing antitrust violations – in representing that the market for Generic Drugs was price competitive or that Lannett had effective internal controls over its financial reporting." *Lannett I*, 316 F. Supp. 3d at 902.

Following dismissal of the second amended complaint, the *Lanett* plaintiffs filed a third amended complaint which "d[id] not rely on the theory that Defendants misrepresented their own anticompetitive conduct. Rather, Plaintiffs' theory of liability in the Third Amended Complaint is that Defendants misled investors by stating that price increases were the result of legitimate and competitive market forces, despite Defendants' knowledge that the market was being driven by ***antitrust violations being committed by Defendants' competitors***." *Lannett II*, 2019 WL 2136467, at *4 (emphasis added). In fact, the Court found that the plaintiffs had waived the theory that "Defendants misrepresented their own anticompetitive conduct." *Id.* at *4 & n.4. Thus, the *Lannett II* decision has no applicability here where Plaintiffs' allegations are that Defendants misrepresented their own allegedly anticompetitive conduct. The relevant decision is *Lannett I*, which dismissed for lack of scienter.

*Lannett II* is distinguishable on other grounds as well. For example, the Court found that it was reasonable to infer that Defendants had knowledge of the pricing on the at-issue drugs because they "made up as much as 72% of Lannett's sales." *Lannett II*, 2019 WL 2136467, at *9. Here, by contrast, the at-

Case 2:16-cv-09449-KSH-CLW   Document 123   Filed 05/24/19   Page 7 of 7 PageID: 3854

The Honorable Katharine S. Hayden, U.S.D.J.
The Honorable Cathy L. Waldor, U.S.M.J.
May 24, 2019
Page 7

ReedSmith

issue drugs make up a small fraction of Allergan's sales. (Br. 17.) In addition, the court in *Lannett II* found loss causation arising out of public disclosures that named a specific drug alleged to have been price fixed. *Id.* at *10. None of the purported loss causation events here relate to a specific drug.

Finally, *Lannett II* distinguished the Ninth Circuit's decision in *Loos v. Immersion Corp.*, 762 F.3d 880, (9th Cir. 2014), but did not engage with the numerous other authorities similarly holding that the disclosure of a subpoena cannot establish loss causation. *E.g.*, *Sapssov v. Health Mgmt. Assocs., Inc.*, 608 F. App'x 855, 863 (11th Cir. 2015) ("Revelation of the... investigation, including issuance of subpoenas, does not show any actual wrongdoing and cannot qualify as a corrective disclosure."); *Martin v. GNC Holdings*, Inc., 2017 WL 3974002, at *18 (W.D. Pa. Sept. 8, 2017) ("The Oregon AG Complaint contains allegations of unproven misconduct, thus it is not a corrective disclosure which revealed GNC's alleged fraudulent conduct to the market."). It also did not engage with the *Impax* case, which faithfully applied *Loos* in dismissing a similar securities class action premised on the nondisclosure of an alleged price-fixing conspiracy in the generic drug industry. *See Impax*, 2018 WL 4616291, at *4-5 (dismissing for lack of loss causation where plaintiffs relied on "disclosures includ[ing] reports that federal prosecutors might file criminal charges against Impax for unlawfully colluding to fix generic drug prices").

### E. Conclusion

Plaintiffs filed this action nearly three years ago, and they have since amended their complaint twice. They should not now be permitted to revise their allegations once again by cutting and pasting from someone else's antitrust complaint as a means of salvaging their deficient securities fraud claims. The SAC fails to adequately allege scienter, falsity, and loss causation. And there is nothing in the AG Complaint that cures any of those defects. The SAC should be dismissed with prejudice.

Respectfully submitted,

*/s/ Shannon E. McClure*

Shannon McClure