NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE ALLERGAN GENERIC DRUG PRICING SECURITIES LITIGATION | Civil Action No. 16-9449 (KSH) (CLW) |
| | **OPINION** |

**Katharine S. Hayden, U.S.D.J.**

In this putative class action under Sections 10(b), 20(a), and 14(a) of the Securities Exchange Act of 1934, plaintiff investors allege that the pharmaceutical company Allergan, six of its top executives—Paul Bisaro, Brenton L. Saunders, R. Todd Joyce, Maria T. Hilado, Sigurdur O. Olafsson, and David A. Buchen, and its Board of Directors (collectively "Allergan") knowingly misled investors about the generic drug market in violation of federal securities laws. Specifically, Allergan is alleged to have participated in a generic drug price-fixing conspiracy that caused the prices of generic drugs sold by Allergan and its co-conspirators "to skyrocket up to 7,000% during the class period," defined as October 2013 to November 2016. (D.E. 91, Opp. Br. 1.)

Before the Court is Allergan's motion to dismiss the second amended complaint under Rule 12(b)(6) (D.E. 87), arguing primarily that the complaint (D.E. 82, 2d Am. Compl.) is not pleaded with the requisite particularity under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, and Rule 9(b) of the Federal Rules of Civil Procedure. For reasons expressed in this opinion, Allergan's motion to dismiss is denied.

## I. Factual Background

The second amended complaint alleges as follows.

## A. The Parties

Lead plaintiffs are Sjunde AP-Fonden, a Swedish state pension fund, and Union Asset Management Holding AG, a German investment group.  (*Id.* ¶¶ 38-39.)  Each alleges that it acquired Allergan stock at artificially inflated prices during the class period and suffered damages as a result of federal securities law violations.  (*Id.*)

Corporate defendant Allergan is a pharmaceutical company incorporated in Ireland with its administrative headquarters located in Parsippany, New Jersey.  (*Id.* ¶ 40.)  In the last five years, Allergan has been involved in two acquisitions.  In November 2014, Allergan was acquired by the corporation Actavis plc, adopting Allergan plc as its new global name.  (*Id.* ¶ 42.)  In July 2015, Teva announced its agreement with Allergan to acquire Actavis Pharma, Allergan's generics business, for $33.75 billion in cash and $6.75 billion in Teva stock, and the acquisition was completed in August 2016.  (*Id.* ¶ 43.)

The six individual defendants are former and current high-ranking corporate officers of Allergan.  Bisaro served as Allergan's CEO and president between October 2013 and July 2014.  (*Id.* ¶ 44.)  Saunders replaced Bisaro in July 2014 and serves as Allergan's current CEO and president.  (*Id.* ¶ 45.)  Joyce served as Allergan's CFO from October 2009 to December 2014, when Hilado assumed the role.  (*Id.* ¶¶ 46-47.)  From April 2012 until June 2014, Olafsson served as director of Allergan and President of Actavis Pharma, the segment that included Allergan's generics business.  (*Id.* ¶ 48.)  Buchen was Allergan's chief legal officer and secretary from April 2012 to July 2014.  The remaining named defendants served on Allergan's Board of Directors in 2014 and 2015 ("Director Defendants").

Under the heading "The Co-Conspirators," defined as "[v]arious other persons, firms, corporations, and entities [that] participated as coconspirators with Allergan in the anti-

competitive conduct alleged [in the complaint]," plaintiffs provide the following non-exhaustive list: "Lannett; Impax; Heritage; Mylan; Epic Pharma, LLC ("Epic"); West-Ward Pharmaceutical Corporation ("West-Ward"); Mutual Pharmaceutical ("Mutual"); Perrigo Company plc ("Perrigo"), Taro Pharmaceutical Industries Ltd. ("Taro"), Aurobindo, and Teva USA." (*Id.* ¶ 66.)

## B. The Generic Drug Market

A generic drug "is essentially an exact substitute for the brand-name drug." (*Id.* ¶ 68.) The Drug Price Competition and Patent Term Restoration Act, commonly known as the Hatch-Waxman Act, was enacted in 1984 to "simplify the regulatory hurdles for bringing generic drugs to market." (*Id.* ¶ 67.) The Act eliminated the requirement that generic drug companies file costly New Drug Applications ("NDAs") to obtain FDA approval, instead allowing generic drug companies to file an Abbreviated NDA, or ANDA, which relies on the data supplied by the original NDA holder for a given drug. (*Id.* ¶¶ 67-68.)

The first generic drug to enter the market is generally priced 15-20% lower than the brand name drug, and the Hatch-Waxman Act provides the generic drug company a 180-day exclusivity period that allows the company to market its version free from competition. (*Id.* ¶ 69.) Following this period, generic competitors enter the market and the price of a generic drug reaches "an equilibrium price point, at or close to the manufacturers' marginal production costs." (*Id.* ¶ 70.) Once that price point is reached, price increases without commercial justification are, according to plaintiffs, "contrary to [a manufacturer's] economic interests because on an open market, each seller risk[s] being undercut by the others, leading to a collapse of market share (and therefore revenue)." (*Id.*)

### C. Governmental Investigations into Allergan's Alleged Anti-Competitive Conduct

This lawsuit was filed after two developments in governmental investigations into the generic pharmaceutical industry: (1) the filing of the first criminal charges in the U.S. Department of Justice's ongoing investigation, filed December 12 and 13, 2016; and (2) the filing of a civil lawsuit brought by the Attorneys General of 20 states, filed December 15, 2016. (2d Am. Compl. ¶¶ 18, 21.) Allergan received a subpoena from the USDOJ in June 2015 (*id.* ¶ 15) and is a defendant in the state AG action (*id.* ¶ 11). Additionally, various civil antitrust actions alleging price-fixing have been consolidated into 18 multidistrict litigations, seven of which name Allergan among the defendants. (*Id.* ¶ 16.)

### D. Allegations as to each of the Six Generic Drugs

Plaintiffs assert price-fixing and anti-competitive conduct that raised the prices of six specific drugs produced by Allergan: propranolol, ursodiol, doxycycline, desonide, verapamil, and glyburide-metformin.

#### 1. Propranolol

On the market since the 1960s, propranolol is a beta-blocker used to treat high blood pressure and irregular heart rate and to prevent migraines. (*Id.* ¶ 106.) Propranolol is on the Core List within the World Health Organization's ("WHO") Model List of Essential Medicines. (*Id.* ¶ 139.) Between December 2014 and December 2015, Allergan, Heritage, Impax, and Mylan raised the price of generic propranolol 10 mg, 20 mg, and 80 mg tablets by as much as 1200%. Plaintiffs allege that these "drastic increase[s] . . . occurred shortly after/and or in conjunction with . . . trade association meetings" attended by representatives from Allergan, Heritage, Impax, and Mylan. (*Id.* ¶¶ 110, 113, 116.)

### 2. Ursodiol

Ursodiol is used to treat gallbladder stones and is generally prescribed to patients with small gallstones who cannot undergo gallbladder surgery. (*Id.* ¶ 125.) In Allergan's 2014 Form 10-K,[1] it identified Ursodiol as one of approximately 25 "key products" that "comprised a majority of product sales for North American Generics." (*Id.*) Allergan, Epic, and Lannett, who together accounted for more than 95% of the total market for generic ursodiol 300mg capsules in 2014, raised the prices of this product by as much as 2000% beginning in mid-2014. (*Id.* ¶¶ 126, 133.) Plaintiffs allege that these increases coincided with trade association meetings attended by Allergan and certain co-conspirators. (*Id.* ¶ 129.)

### 3. Doxycycline

Doxycycline is a broad-spectrum antibiotic used to treat a variety of bacterial infections, and when prescribed in combination with quinine, malaria. (*Id.* ¶ 139.) Doxycycline is on the Core List within the WHO's Model List of Essential Medicines, and Allergan included it as one of its "key products" that "comprised a majority of product sales for North American Generics" in both its 2013 and 2014 Form 10-Ks. (*Id.*) Beginning in early 2013, Allergan, Mutual, and West-Ward, who together accounted for more than 95% of the total market for generic doxycycline 50 mg and 100 mg capsules and 100 mg tablets (*id.* ¶ 153), raised the prices of their doxycycline by as much as 7000% (*id.* ¶ 140). Plaintiffs allege that these "drastic" increases occurred in conjunction with the Generic Pharmaceutical Association ("GPhA") 2013 annual meeting in February 2013 and the National Association of Chain Drug Stores ("NACDS") 2013 annual meeting in April 2013. (*Id.* ¶¶ 143, 146, 149.)

---

[1] A Form 10-K is an annual report required by the United States Securities and Exchange Commission that provides a comprehensive summary of a company's financial performance.

### 4. Desonide

Desonide is a mild topical corticosteroid cream that reduces the swelling, itching, and redness symptomatic of a variety of skin conditions.  (*Id.* ¶ 158.)  Allergan entered the market for this drug in September 2013, and listed desonide cream as a "key product" that "comprised a majority of product sales for North American Generics" in its 2013 and 2014 Form 10-Ks.  (*Id.*)  In the six months prior to Allergan's entry into the desonide cream market, Taro and Perrigo raised the price of a 15 gm tube of desonide 0.05% cream by as much as 470%.  (*Id.* ¶ 159.)  Plaintiffs allege that upon Allergan's entry in September 2013, "it joined the conspiracy and offered its version of the drug at the inflated price established by Co-Conspirators Taro and Perrigo."  (*Id.* ¶ 159.)  Plaintiffs assert that the increase in price and Allergan's entrance into the market at an inflated price occurred "shortly after" three trade association meetings attended by representatives from Allergan, Taro, Perrigo, and other co-conspirators: the GPhA 2013 annual meeting in February; the NACDS 2013 annual meeting in April; and the GPhA 2013 CMC Workshop in June.  (*Id.* ¶ 162.)  In 2013 and 2014, Allergan, Taro, and Perrigo accounted for 100% of the total market for 15 gm tubes of desonide 0.05% cream.  (*Id.* ¶ 166.)

### 5. Verapamil and Glyburide-Metformin

Verapamil is used to treat high blood pressure and fast or irregular heartbeats and to prevent angina.  (*Id.* ¶ 172.)  Glyburide-metformin is a combination medication used to control high blood sugar in type 2 diabetes patients.  (*Id.* ¶ 173.)

The allegations related to Allergan's price-fixing activities with respect to verapamil and glyburide-metformin are drawn from the amended state AG complaint, which describes "knowingly collusive activity that was purposefully conducted during in-person meetings, phone calls, and text messages in an effort to conceal proof of the illegal agreements."  (*Id.* ¶ 171.)  As

asserted in the amended AG complaint and allegedly "supported by evidence directly produced to or made available to the Attorneys General, Heritage decided that it wanted to raise prices for these two drugs and set about contacting representatives at each of the competitor companies." (*Id.* ¶ 174.) Heritage's competitors for verapamil were Mylan and Allergan and for glyburide-metformin competitors were Allergan, Teva USA, and Aurobindo. (*Id.*) Plaintiffs allege the timeline of Allergan's involvement as follows:

175. On or around April 22, 2014, an Allergan representative spoke to a member of the Heritage sales team for nine minutes and agreed to increase the prices for Glyburide-Metformin and Verapamil. These agreements between Heritage and Allergan to increase the prices for Verapamil and Glyburide-Metformin were reflected in an August 20, 2014 text message exchange between representatives from Sun and another co-conspirator.

176. Following the April 22, 2014 call with Heritage, the Allergan representative conveyed to the Allergan sales and price teams that Heritage wanted to increase the prices on Verapamil and Glyburide-Metformin. For example, immediately after speaking to the Heritage representative, the Allergan representative contacted two different Allergan Senior Pricing Managers. Thereafter, the information regarding the price increase spread quickly amongst the sales and price teams at Allergan.

177. In an internal Allergan email dated April 28, 2014, an Allergan pricing manager commented on a list of potential price increases for different drugs. Just a few days later, on May 1, 2014, one of the recipients of the internal Allergan email regarding price increases called a representative at Teva USA, which was already a party to the Glyburide-Metformin price-fixing agreement with Heritage. The Allergan and Teva USA representatives spoke three more times on May 6, 2014, including one call that lasted fifteen minutes. Those representatives continued to communicate frequently over the next several months. As detailed in the Amended AG Complaint, Teva USA had more than 330 phone or text message conversations with Allergan during the one-year period from July 2013 to July 2014, including more than 110 phone or text message conversations between May 2014 and July 2014. Representatives from Allergan also had regular contact with representatives from Aurobindo, another competitor in the generic Glyburide-Metformin market, including two phone calls on May 12, 2014 and thirty text messages between May 19, 2014 and May 22, 2014.

178. On May 6, 2014, an Allergan representative who had also received the April 28, 2014 email discussed above called a Mylan representative and left a message. The Mylan representative returned the call on May 9, 2014 and

the ensuing conversation lasted more than three minutes. The Allergan and Mylan representatives spoke again on May 19, 2014 for nearly seven minutes and continued to communicate frequently over the next several months.

(2d Am. Compl. ¶¶ 175-78.)  Plaintiffs assert that "[o]n the basis of these facts, among others, the State Attorneys General named Allergan, Mylan, Heritage, Teva USA and Aurobindo as defendants in the Amended AG Complaint."  (*Id.* ¶ 179.)

**E.  Allergan's Statements to Investors**

Plaintiffs have set forth a list of allegedly misleading statements spanning the class period.  (*See* 2d Am. Compl. ¶¶ 195-233.)  These statements can be divided into the following five categories:

1. Statements Explaining Allergan's Participation in the Market.  Allergan's annual reports (Form 10-Ks) contained descriptions of the U.S. pharmaceutical market—for example, describing the market as "highly competitive" and asserting that Allergan "actively compete[s] in the generic pharmaceutical industry."  (*Id.* ¶¶ 197, 199, 209, 219.)  Statements in press releases attached to Allergan's current reports (Form 8-Ks) (*id.* ¶¶ 195, 204), quarterly earnings calls (*id.* ¶¶ 196, 204-05, 211-12), and at the 2016 RBC Capital Markets Healthcare Conference (*id.* ¶ 217) described Allergan's participation in the market, including causes and sources of Allergan's financial performance.

2. Statements Regarding the DOJ Investigation.  On August 6, 2015, defendant Saunders appeared on CNBC's *Mad Money* with Jim Kramer and addressed the announcement that the DOJ issued Allergan a subpoena. (*Id.* ¶ 214.)  He characterized the DOJ investigation as a "red herring" and attributed pricing increases to "supply and demand" influences.  (*Id.*)

3. Statements of Income.  Allergan reported its financial results in annual reports (Form 10-Ks), quarterly reports (Form 10-Qs), and current reports (Form 8-Ks).  (*Id.* ¶ 221.)  Additionally, plaintiffs allege that the 2014 and 2015 proxies incorporated by reference the relevant Form 10Ks and Form 10-Qs.  (*Id.*, n.13, 14.)

4. Sarbanes-Oxley ("SOX") Certifications.  Each of Allergan's Form 10-Ks and Form 10-Qs contained SOX certifications.  Over the class period, Bisaro, Saunders, Joyce, and Hilado signed these certifications.  (*Id.* ¶¶ 224, 226, 228, 230.)

5. Code of Conduct.  Throughout the class period, Allergan's Form 10-Ks represented that Allergan had adopted a Code of Conduct which prohibited employees from "discuss[ing] with, or provid[ing] information to, any competitor about pricing or related matters," and identified "[a]greements or upstanding with competitors on price" as "conduct that violates Actavis policy." (*Id.* ¶ 232.)

## II.     Procedural History

The original two-count complaint (D.E. 1) in this case was filed on December 22, 2016, against Allergan and individual defendants Saunders, Bisaro, Hilado, and Joyce, and alleged violations of Section 10(b) of the Exchange Act and Rule 10b-5 against all defendants, and violations of Section 20(a) of the Exchange Act against the individual defendants.  It was first amended on May 1, 2017 (D.E. 36) to include two additional counts for violations of Section 14(a) of the Exchange Act and Rule 14a-9 against Allergan's 2014 and 2015 Boards of Directors.  The amended complaint also added individual defendants Olafsson and Buchen.[2]

On July 17, 2017, Allergan moved to dismiss all claims in the amended complaint for failure to state a claim upon which relief can be granted (D.E. 59).  In response, plaintiffs filed a motion to supplement and amend (D.E. 79).  The Court granted plaintiffs' motion, and Allergan filed this motion to dismiss the second amended complaint (D.E. 87).  The Court heard oral argument on April 11, 2019.  (D.E. 120, Transcript.)

## III.    Legal Standard

Allergan moves pursuant to Fed. R. Civ. P.  12(b)(6) for failure to state a claim upon which relief can be granted.  To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true" to state a facially plausible claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A plausible claim is one that permits the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).  Fundamentally, the plausibility determination is a

---

[2] On June 7, 2017, the Court filed a stipulation and order (D.E. 47) consolidating *Rosenberg v. Allergan PLC*, No. 17-00189, into the present consolidated action, *In re Allergan Generic Drug Pricing Securities Litigation*, No. 16-9449, for all purposes.

"context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679).

## IV.  Discussion

### A.  Section 10(b) and Rule 10b-5 Claim

Allergan seeks dismissal of Count 1 of the second amended complaint, which asserts violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against Allergan and the individual defendants.  Section 10(b) and Rule 10b–5 address "false or misleading statements or omissions of material fact that affect trading on the secondary market." *Burlington Coat Factory,* 114 F.3d at 1417.  Section 10(b) prohibits the "use or employ[ment], in connection with the purchase or sale of any security, . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ." 15 U.S.C. § 78j(b).  Rule 10b–5, in turn, makes it illegal "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b–5(b).

To state a claim under Section 10(b) and Rule 10b-5, "a plaintiff must demonstrate: (1) a material misrepresentation (or omission); (2) scienter; (3) a connection between the misstatement and the purchase or sale of a security; (4) reliance upon the misstatement; (5) economic loss; and (6) loss causation." *Fan v. StoneMor Partners LP*, 927 F.3d 710, 714 (3d Cir. 2019) (citing *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp,* 908 F.3d 872, 879 (3d Cir. 2018)).

Because a claim brought under Section 10(b) and Rule 10b-5 constitutes a fraud claim, plaintiffs are required to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  "Rule 9(b)'s heightened pleading standard gives defendants notice

of the claims against them, provides an increased measure of protection for their reputations, and reduces the number of frivolous suits brought solely to extract settlements." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997). Moreover, plaintiffs must satisfy the "greater particularity requirements" imposed by the PLSRA, enacted "to supplement the Rule 9(b) standard with a 'uniform and stringent pleading requirement.'" *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 585 (D.N.J. 2001) (Irenas, J.) (quoting S.REP. NO. 104-98, at 15 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 679, 694). The PSLRA sets heightened pleading requirements for the misrepresentation and scienter elements. With respect to misrepresentation, the complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). As to scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

### 1. Price-Fixing Conspiracy

As a threshold issue, Allergan asserts that plaintiffs fail to plausibly allege a price-fixing conspiracy—a predicate to finding any of the categories of purported misstatements false or misleading. (D.E. 87-1, Moving Br. 22; Transcript 26:10-13.)

To adequately plead a price-fixing scheme, a complaint must allege "enough factual matter (taken as true) to suggest that an agreement was made." *Bell Atl. Corp.*, 550 U.S. at 556. "[A] plaintiff must plead either direct evidence of an agreement or circumstantial evidence." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011). "Direct evidence of a conspiracy is 'evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted.'" *Id.* (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 324 (3d Cir. 2010)). Absent direct evidence, a plaintiff may plead parallel price increases along with "circumstantial

facts supporting the inference that a conspiracy existed." *United States v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015); *see also Burtch*, 662 F.3d at 226 ("Circumstantial evidence of parallel behavior must be pled in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.") (internal citations omitted).

Plaintiffs' brief in opposition to defendants' motion to dismiss summarizes the allegations of an underlying price-fixing conspiracy as follows:

> Beginning in 2013, the prices for several commonly prescribed generic drugs skyrocketed. During the Class Period, Allergan and its co-conspirators increased the prices of propranolol, ursodiol, doxycycline, and desonide between 470% and 7,000%, following years of stable pricing. ¶¶107, 126, 140, 159. There was no commercial justification for these price increases. ¶¶117, 130, 150, 163. Indeed, absent collusion, price increases of these magnitudes would have been contrary to Allergan's and each of its co-conspirators' economic interests because on an open market, each seller risked being undercut by the others, leading to a collapse of market share (and therefore revenue). ¶¶118, 131, 151, 164. As set forth below, these astonishing price increases were due to an illicit price-fixing conspiracy.

> Indeed, the Amended AG Complaint details specific communications between executives from Allergan and other drug companies—including Heritage Pharmaceuticals Inc. ("Heritage"), whose former President and Chief Executive Officer both pled guilty to charges of antitrust violations—concerning their agreement to fix the prices of two additional generic drugs, as well as text messages and emails confirming these agreements. ¶¶171-79.

> In addition to this direct evidence of collusion, the [present] Complaint includes extensive allegations of circumstantial evidence of collusion. The price-fixing conspiracy was possible because the markets for each of Allergan's Price-Fixed Drugs were highly susceptible to collusion: the market for each Price-Fixed Drug was highly concentrated; there were considerable barriers to entry, a lack of possible substitutes, and a high degree of interchangeability (meaning that each of Allergan's Price-Fixed Drugs could be substituted for another manufacturer's version of the same drug); and the markets for the Price-Fixed Drugs were dominated by Allergan and its coconspirators such that the conspiracy could not be threatened by so-called fringe sellers. ¶¶76-82, 119-24, 132-38, 152-57, 165-70.

> Moreover, senior executives from Allergan and its co-conspirators had regular opportunities to discuss these price hikes in person. Representatives from Allergan—including Bisaro and Olafsson, as well as senior members of Allergan's generics business during the Class Period—routinely attended conferences, meetings, and pharmaceutical trade shows, as well as informal face-to-face

meetings during "industry dinners" and other events, all of which provided numerous opportunities to meet and devise the price-fixing scheme. ¶¶83-104, 141, 143-44, 146-47, 149, 160, 162, 256, 264. And witnesses, including Allergan's former Associate Director of Finance, confirmed that the Allergan executives who attended the industry events—many of which preceded these unprecedented price hikes—were responsible for the generic drug pricing at the Company. ¶¶85-86. As depicted in the graphs in the Complaint, parallel price increases of the Price-Fixed Drugs occurred shortly after and/or in conjunction with these trade meetings. ¶¶108- 16, 127-29, 141-49, 160-61.

(Opp. Br. 6-7.)

At the motion to dismiss stage, plaintiffs' allegations suffice to adequately plead the existence of an agreement to fix prices. The complaint alleges both direct and indirect evidence of an agreement. For example, plaintiffs point to communications between executives of different companies regarding price increases, at least two of whom pleaded guilty to violating antitrust laws. Plaintiffs also point to various opportunities to collude, including a host of communications and various trade association meetings; relevant market conditions and attributes; and the timing of parallel price increases. At this stage, no more is required.

The Court moves on to whether the elements of plaintiffs' Section 10(b) claim have been adequately pleaded.

### 2. Material Misrepresentations

Allergan argues that the complaint fails to allege "an affirmative statement rendered false and misleading by the alleged price-fixing." (Moving Br. 14.) "To prevail on a § 10(b) claim, a plaintiff must show that the defendant made a statement that was '*misleading* as to a *material* fact.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)) (emphasis in original); 17 C.F.R. § 240.10b-5(b). "[T]he misleading nature of a statement is evaluated 'in the light of the circumstances under which' it is made." *City of Cambridge Ret. Sys.*, 908 F.3d at 882 (quoting 17 C.F.R. § 240.10b–5(b)). "A

statement or omission is *materially* misleading if there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available' to that investor." *De Vito v. Liquid Holdings Grp., Inc.*, No. 15-6969, 2018 WL 6891832, at *28 (D.N.J. Dec. 31, 2018) (McNulty, J.) (quoting *Matrixx Initiatives, Inc.*, 563 U.S. at 38) (emphasis added). Because materiality is a fact-specific issue, courts have determined it is "better resolved by the fact finder." *Id.* at *28 (citing *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 274 (3d Cir. 2004) ("Materiality is ordinarily an issue left to the factfinder and is therefore not typically a matter for Rule 12(b)(6) dismissal.")). To restate, the PSLRA's particularized pleading standard requires that "the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1).

According to plaintiffs, Allergan's statements specified in the complaint qualify as misrepresentations because they omit the fact that Allergan was participating in anticompetitive conduct in the generic drug market. As explained above, the Court has found that conduct to be sufficiently pleaded to survive a motion to dismiss. Therefore, when analyzing whether these statements are materially misleading, the Court will apply the materiality standard articulated by the Supreme Court in *Basic Inc. v. Levinson*, and determine whether "the disclosure [that Allergan was engaged in anti-competitive conduct in the generic drug market] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available' to that investor." 485 U.S. at 231-32.

The complaint identifies various statements allegedly made materially misleading by Allergan's failure to disclose its underlying wrongdoing. These statements fall into five categories: (1) statements explaining Allergan's participation in the market; (2) statements

regarding the DOJ investigation; (3) statements of income; (4) SOX certifications; and (5) Allergan's Code of Conduct.

### a)  Statements Explaining Allergan's Participation in the Market

The first and largest category of statements relates to "the competitive nature of the generic drug market and the source of Allergan's revenues." (2d Am. Compl. ¶ 194.) For example, with respect to competition in the generic drug market, Allergan stated the following in its 2013 and 2014 Form 10-Ks:

### Competition

**The pharmaceutical industry is highly competitive.** In our Actavis Pharma and Actavis Specialty Brands businesses, we compete with different companies depending upon product categories, and within each product category, upon dosage strengths and drug delivery systems. Such competitors include the major brand name and generic manufacturers of pharmaceutical products. In addition to product development, other competitive factors in the pharmaceutical industry include product quality and price, reputation and service and access to proprietary and technical information.
* * *
**We actively compete in the generic pharmaceutical industry.**
* * *
**[T]he level of market share, revenues and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market, pricing** and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches.
* * *
In addition to competition from other generic drug manufacturers, **we face competition from brand name companies in the generic market.** Many of these companies seek to participate in sales of generic products by, among other things, collaborating with other generic pharmaceutical companies or by marketing their own generic equivalent to their brand products as Authorized Generics. Our major competitors include Teva Pharmaceutical Industries, Ltd., Mylan Inc. and Sandoz, Inc. (a division of Novartis AG).

(*Id.* ¶¶ 199, 208 (emphasis in 2d Am. Compl.).) Allergan's 2015 Form 10-K contained similar language, but acknowledged the sale of its generics business to Teva:

As a result of the Teva Transaction, the Company's global generics business is classified as discontinued operations. **Our discontinued operations actively competes** [sic] **in the generic pharmaceutical industry.**

(*Id.* ¶ 219 (emphasis in 2d Am. Compl.).)

The complaint additionally details statements about the source of Allergan's revenue and how Allergan participated in the generic drug market. For example, in a press release attached to Allergan's 3Q 2013 Form 8-K, Bisaro stated:

> **Strong global growth in our Actavis Pharma segment was driven by our ability to capitalize on product opportunities from our industry leading R&D pipeline.** In the U.S., we launched generic versions of Lidoderm® and Opana® ER and received FDA approval of a generic version of Lamictal® ODT. We also confirmed that we have initiated U.S. patent challenges on such important products as generic versions of Nucynta ER® and Suboxone® Sublingual Film.

(*Id.* ¶ 195.) In a quarterly earnings call on October 29, 2013, discussing these same third quarter results, Olafsson stated:

> With regard to the generic pricing outlook at a high level, what has happened probably over the last two years is it has been more common that obviously there is a price erosion in the market due to the consolidation. **But there is opportunities [sic] to take pricing increases;** and that is what has changed since maybe five years ago when there wasn't an opportunity. **These pricing increases have been in products where there has been manufacturing problems or stock-out situation.** So I think that has been a fact in the US generic market, that there is an opportunity to take price increases. But also at the same time with the environment on the consolidation of the customers, clearly there is a pricing pressure overall in the market.

(*Id.* ¶ 196.)

A similar press release was attached to Allergan's 2Q 2014 Form 8-K, where Bisaro credited Allergan's "exceptional performance" to "double digit revenue growth in both our North American brand and generics business and Anda distribution," and attributed the "strong growth within [Allergan's] generics business" to its "strong base business along with continued strong sales of the generic versions of Lidoderm® and Cymbalta®." (*Id.* ¶ 204.) In the related quarterly

earnings call on August 5, 2014, an analyst from Leerink Partners inquired about the "US generic pricing outlook for 2014 and 2015" and asked whether Allergan had "factored any aggressive pricing increases" into the Company's guidance numbers. (*Id.*) Saunders credited Allergan's "strong supply chain and the reliability of high-quality supply" for providing Allergan with "more opportunities to take price [increases]." (*Id.*) Buchen added that Allergan's "diverse portfolio" allowed the company to "react very quickly when there are pricing opportunities and the ability to take more share." (*Id.* ¶ 205.)

On a May 11, 2015 conference call, an analyst from Guggenheim Securities LLC asked for Allergan's thoughts on "generic drug pricing given that there have been concerns that it may not be as favorable going forward." (*Id.* ¶ 211.) Saunders responded: "There are obviously a few products that go up but the model for generics is price decreases as more competitors come into the market. That is just the way the business works." (*Id.*) Bisaro followed up Saunders's statement by explaining that Allergan's "pipeline and product line gives us a bit of an advantage because of the uniqueness of it and allows us to be somewhat insulated from the general reduction of prices." (*Id.* ¶ 212.)

Finally, the complaint alleges that at the RBC Capital Markets Healthcare Conference in February 2016, Saunders claimed: "We have never been aggressive price takers. . .[W]e have always explained that this is a customer long-term relationship and to the extent you poke them in the eye over and over again, they are going to poke back." He further noted:

> We look to take price increases as we believe we can, but we have never done it in a significant way because our products don't lend themselves to that in large part. But also our business model and our philosophy doesn't lend itself to that.
> ***
> And this idea that you can just take price increases as you see fit is really not true. There are anomalies and there are companies that have figured out how to exploit that system, but the reality is every price increase comes with a reaction.

They are highly negotiated and the system does, for the most part, work. There are, again, anomalies to it, but it does work.

(*Id.* ¶ 217.)

The complaint alleges that these statements are materially false and misleading because Allergan failed to disclose that it engaged in anti-competitive conduct. (*Id.* ¶ 220.) More specifically, it asserts that "[b]y electing to speak publicly about Allergan's generic drug business—specifically, pricing and competition for generic drugs and revenue from those drugs—and thereby putting these subjects into play during earnings calls with shareholders and in SEC filing, Defendants had a duty to fully, completely, and truthfully disclose all material facts regarding generic drug pricing, competition, and revenues so as not to mislead investors." (*Id.*) Allergan argues that the "pages of Allergan's general comments about its growth and future prospects . . . not a single one of which mentioned any of the drugs at issue in this case" were merely "general and vague statements of optimism, known as 'puffery,'" which do not create Section 10(b) liability. (Moving. Br. 16.)

The Third Circuit has held that "[c]ertain vague and general statements of optimism" may not be actionable because they "constitute no more than 'puffery' and are understood by reasonable investors as such." *Burlington Coat Factory*, 114 F.3d at 1428 n.14. In accord, Allergan relies on *Galati v. Commerce Bancorp, Inc.*, where the court found that "statements concerning the Company's 'dramatic deposit growth,' 'strong performance,' and 'unique business model,' constitute[d] nothing more than mere 'puffery,' insufficient to sustain a Rule 10b–5 claim." 220 F. App'x 97, 102 (3d Cir. 2007).

But while some of Allergan's statements might be facially similar to the statements discounted in *Galati*, they must be considered within the context of Allergan's statements attributing its generics business's revenue, growth, and pricing strategy to legitimate business

factors and conditions. These statements fall outside the bounds of mere puffery and are actionable. *See Roofer's Pension Fund v. Papa*, No. 16-2805, 2018 WL 3601229, at *12 (D.N.J. July 27, 2018) (Arleo, J.) (defendants' statements regarding the competitiveness in the generic drug market were actionable where an underlying price-fixing scheme was sufficiently pleaded); *see also In re Sotheby's Holdings, Inc. Sec. Litig.*, No. 00-1041, 2000 WL 1234601, at *3 (S.D.N.Y. Aug. 30, 2000) (statement that competition was "intense" despite colluding with competitor was actionable); *In re Mylan N.V. Sec. Litig.*, No. 16-7926, 2018 WL 1595985, at *7 (S.D.N.Y. Mar. 28, 2018) ("If, as plaintiffs allege, Mylan was engaged in a variety of anticompetitive practices—often in collusion with Mylan's competitors—then these statements [about competitive generic drug market] are misleading in the absence of a disclosure of that anticompetitive conduct.")

Allergan made repeated representations that its ability to take price increases was due to factors such as its "strong supply chain and the reliability of high-quality supply" (*id.* ¶ 204), "diverse portfolio" (*id.* ¶ 205), and the "uniqueness" of its "pipeline and product line" (*id.* ¶ 212). Plaintiffs assert that "[t]hese statements were false and misleading when made because, unknown to investors, [Allergan's] price-fixing scheme was a factor driving the revenue and market share of [its] generics business and the price increases for its generic drugs." (Opp. Br. 19.) While there is generally "no . . . duty on the part of a company to provide the public with all material information," *Burlington Coat* Factory, 114 F.3d at 1432, the Third Circuit has recognized that a duty to disclose arises when there is "an inaccurate, incomplete or misleading prior disclosure," *Oran v. Stafford*, 226 F.3d 275, 285-86 (3d Cir. 2000). Courts have held that statements crediting revenues to legitimate business factors put the source of the revenue at issue, thereby making the company's failure to disclose a source of that revenue misleading. *See Steiner v. MedQuist Inc.*,

No. 04-5487, 2006 WL 2827740, at *16 (D.N.J. Sept. 29, 2006) (Simandle, J.) (statements attributing revenues to legitimate business factors such as increased sales were misleading because they failed to disclose defendants' illicit billing scheme); *City of Roseville Emps. Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 416 (D. Del. 2009) (falsely "attributing [financial] performance to only lawful conduct falls below the level of honesty required by the securities laws.").

Here, Allergan's statements regarding the sources of its revenue were misleading because they failed to disclose facts about its anticompetitive conduct—facts that are material, as they "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic*, 485 U.S. at 231-32.

### b) Statements Regarding the DOJ Investigation

On August 6, 2015, Saunders appeared on CNBC's show, *Mad Money*. (*Id.* ¶ 214.) Addressing the market reaction to the issuance of the DOJ subpoena, Saunders told the host, Jim Kramer, that "the DOJ investigation really is a red herring" and, in the context of Allergan, was "not that significant." Saunders claimed that any pricing increases that caught the DOJ's attention were solely attributable to "supply and demand" influences. (*Id.*) Plaintiffs allege that "[t]hese statements were false and misleading because Allergan was engaged in a scheme to fix the prices of its generic drugs." (Opp. Br. 18.)

Allergan stresses that the DOJ subpoena "did not involve any of the drugs at issue in the Complaint" (Moving Br. 20), as if that fact somehow vitiates any possibility that Saunders's statements regarding the subpoena were materially misleading. But as plaintiffs allege through the entirety of the complaint, if Allergan was engaged in a price-fixing conspiracy involving *any* drugs, then Saunders's statements describing a criminal investigation of anticompetitive conduct

in the generic drug market as "not that significant" and "a red herring" are, in fact, misleading. Allergan's additional argument—that these statements were "immaterial because Allergan had already announced the sale of the entire generics business to Teva"— also fails.  That an alleged co-conspirator agreed to acquire Allergan's generic business has no bearing on the materiality or falsity of Saunders's statements regarding the government's investigation of illegal price-fixing.

### c)  Statements of Income, SOX Certifications, and Code of Conduct

Allergan argues that the complaint falls short of adequately pleading material falsehood or misleading statements in its statements of income, SOX certifications, and code of conduct.  The Court disagrees.  Plaintiffs have effectively pleaded anti-competitive conduct with factual assertions about dramatic price increases and a wide range of investigatory efforts and events that plausibly belie Allergan's justifications.  These three categories are natural corollaries to the alleged conduct, and surgical removal risks confusion and is not required at this pleading stage. The allegations are preserved.

In sum, the second amended complaint adequately pleads that Allergan's statements about its participation in the generic drug market and Saunders's statements in response to the DOJ investigation announcement were false or misleading, satisfying the material misrepresentation element.

### 3.  Scienter

Allergan argues that plaintiffs' Section 10(b) claim fails because "there are no particularized allegations supporting a strong inference that Allergan acted with scienter." (Moving Br. 28.)  "Scienter" stands for the "mental state [of] intent to deceive, manipulate or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976).  To sufficiently plead scienter, a plaintiff must "state with particularity facts giving rise to a strong inference that the

defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007); yet the Supreme Court has stopped short of requiring an "irrefutable" inference, "*i.e.* of the 'smoking-gun' genre," *id.* at 324. "Rather, in conducting the scienter analysis, courts must analyze the complaint holistically to determine whether its allegations, 'taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.' " *In re Hertz Glob. Holdings Inc*, 905 F.3d 106, 114 (3d Cir. 2018) (quoting *Tellabs*, 551 U.S. at 323). Taking the factual allegations in the complaint collectively and as true, plaintiffs have adequately pled scienter.

"[O]ngoing investigations into anticompetitive pricing in the market may represent 'a piece of the puzzle when taking a 'holistic' view of the purported facts as they relate to scienter.' " *Utesch v. Lannett Co., Inc.*, No. 16-5932, 2019 WL 2136467, at *9 (E.D. Pa. May 15, 2019) (quoting *In re Gentiva Sec. Litig.*, 932 F. Supp.2d 352, 380 (E.D.N.Y. 2013)). Here, they are a significant piece of the puzzle. Allergan is currently a named defendant and co-conspirator in the Amended AG Complaint and has received a subpoena as part of the DOJ's criminal price-fixing investigation—each action an investigation into whether anti-competitive conduct led to the recent increases in generic drug prices. Additionally, the DOJ and the state AGs have confirmed the likelihood of new and expanded charges in these probes. (2d Am. Compl. ¶¶ 24, 192-93.) Allergan's minimization of the import of these related civil and criminal investigations ignores the scope of the investigations and the particularized facts and evidence already derived from them.

Additionally, the complaint affirmatively alleges that "there was no reasonable explanation for the price hikes"—no supply shortages were reported, nor were there significant

increases in demand for the drugs. Yet Allergan's officers repeatedly represented that the price increases were attributable to benign market explanations, such as supply and demand issues (*see, e.g.*, 2d Am. Compl. ¶ 196 ("These pricing increases have been in products where there has been manufacturing problems or stock-out situation."); *id.* ¶ 214 (Saunders in his *Mad Money* appearance attributing pricing increases among Allergan's generic drugs to "supply and demand").)

Finally, a "core operations" inference may be made under the circumstances. This allows knowledge of fraud to be imputed to individual defendants where the alleged fraud relates to the core business of the company. *See Campbell Soup Co.*, 145 F. Supp. 2d at 599 (reasoning that "[w]hile asserting that defendants approved or helped prepare public disclosure is insufficient to establish knowledge of all aspects of the company's business . . . knowledge may be imputed to individual defendants when the disclosures involve the company's core business."). Plaintiffs have asserted that Allergan's generic drug sales comprised a substantial portion of its revenues and operations during the class period, accounting for 32% of 2014's total revenues and jumping to 42% in 2015. (2d Am. Compl. ¶ 251.) Therefore, they contend, it is "implausible that the Individual Defendants, who were the Company's senior-most executives, were unaware of the historically colossal price increases and the price-fixing agreements with Co-Conspirators." (*Id.*)

Allergan argues that "[t]he 'core operations' doctrine does not apply where, as here, the products at issue do not make up a significant portion of the core operations' revenue," citing *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 247 (3d Cir. 2013), in support. (Moving Br. 32 n.15.) One of the reasons put forth in *Kid Brands* why the core operations doctrine did not apply was that the company's undisclosed customs violations resulted in anticipated liabilities of $10 million, an amount deemed too insignificant to "be regarded as affecting the 'core operations' of

a company that had hundreds of millions of dollars in annual net sales." 736 F.3d at 247. The Court disagrees with how Allergan has extrapolated the holding in *Kid Brands.* The case does not, as Allergan asserts, require "the products at issue" to "make up a significant portion of the core operations' revenue"; the court was analyzing whether the dollar value of the liabilities resulting from the customs violations were such that they impacted the company's core operations. More to the point, plaintiffs' allegations that Allergan's generic drug sales comprised a substantial portion of its revenues and operations during the class period (2d Am. Compl. ¶ 251) and that Allergan has designated three of the six drugs identified in the complaint as among its 25 "key products" (*id.* ¶¶ 125, 139, 158), support the contention that the alleged price-fixing conspiracy is fraud related to Allergan's core business.

### 4. Loss Causation

Allergan argues that plaintiffs have failed to adequately plead loss causation, which is the "causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). In *Dura,* the Supreme Court rejected the Ninth Circuit's "inflated purchase price" approach to proving causation and loss.

The PSLRA does not impose any heightened pleading standards on the element of loss causation; ordinary pleading rules apply. *Id.* at 347. The Third Circuit has adopted "a practical approach, in effect applying general causation principles," which requires the plaintiff to show "that the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss." *McCabe v. Ernst & Young, LLP.*, 494 F.3d 418, 426 (3d Cir. 2007) (internal citations omitted).

Plaintiffs allege two loss causation events: (1) the August 6, 2015 disclosure that Allergan had "received a subpoena from the DOJ seeking information related to the marketing and pricing

of certain of the Company's generic products and communications with competitors about such products," and (2) the November 3, 2016 disclosure that the DOJ may press criminal charges against generic drug manufacturers. (2d Am. Compl. ¶¶ 234-42.) Plaintiffs assert that both events "were followed by significant declines in the price of Allergan securities" (Opp. Br. 36), with the common stock dropping $17.17 per share after the announcement of the DOJ subpoena and $9.07 per share after the news that the DOJ probe had intensified and charges might be filed against Allergan (*id.* 2).

Allergan argues that the announcement of a subpoena or possible charges "does not permit the conclusion wrongdoing actually occurred, which means any resultant stock drop was caused by speculation, not misrepresentation," citing *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014), among others. (Moving Br. 35.) A later decision by the Ninth Circuit, *Lloyd v. CVB Financial Corp.*, noted that "*Loos* made clear that the announcement of a government investigation, without more, cannot meet the loss causation requirement, but much more is alleged here," and held that "an investigation can form the basis for a viable loss causation theory if the complaint also alleged a subsequent corrective disclosure by the defendant," 811 F.3d 1200, 1210 (9th Cir. 2016).

As plaintiffs note, numerous courts have "upheld corrective disclosures premised upon announcements of regulatory investigations." (Opp. Br. 36 (citing *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828-29 (D.N.J. 2006) (Hochberg, J.) (finding that the announcement of an SEC inquiry, which caused a significant negative market reaction, satisfied the loss causation requirement "at this [motion to dismiss] stage of litigation.")); *Hull v. Global Digital Sols., Inc.*, No. 16-5153, 2017 WL 6493148, at *14-15 (D.N.J. Dec. 19, 2017) (Wolfson,

J.) (finding that the complaint adequately alleged loss causation based on the SEC complaint as a corrective disclosure).)

In *Hull*, the defendants argued that the plaintiff "[could not] rely on the unproven allegations in the SEC Complaint as a corrective disclosure in order to plead the market's discovery of Defendants' alleged fraud." 2017 WL 6493148, at *14. Judge Wolfson disagreed, guided by "the Supreme Court's general principle, announced in *Dura Pharms.*, that a corrective disclosure need not take a particular form; it is the exposure of the falsity of the fraudulent representation that is the critical component"—a principle which, she notes, has led "various courts [to hold] that allegations that a company was the subject of SEC investigations are sufficient to meet the pleading requirement for loss causation." *Id.*, at *14-15 (collecting cases); *see also, e.g.*, *In re Take–Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 287 (S.D.N.Y. 2008) (holding that a single notice that the SEC was conducting an informal, non-public investigation coupled with a 7.5% stock price drop the next day created a sufficient causal connection to plead loss causation); *Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 230-31 (S.D.N.Y. 2009) (news that the "SDNY [US Attorney] and the SEC were investigating" "alone suffices to show" loss causation); *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 256 (D. Mass. 2006) (finding loss causation adequately pled where the plaintiffs had alleged that the company's disclosure of an SEC investigation relating to defendants' alleged misleading statements had "shocked the market" and caused the stock price to drop). Reasoning that "so long as the plaintiff alleges that the public disclosure reveals that the defendant company made false claims, and that based on those disclosures, a corresponding drop in stock price occurred, loss causation is adequately pled," the *Hull* court concluded:

> Because, here, Plaintiff alleges that the SEC Complaint contains information that
> directly reveals the truth regarding the alleged false statements made by Defendants

in their various press releases, and because the SEC's disclosure caused a drop in stock price, I find that SEC Complaint can be the basis for a corrective disclosure.

2017 WL 6493148, at *15.

Here, plaintiffs similarly allege that the disclosures of Allergan's involvement in the antitrust investigation by the Justice Department revealed the truth regarding the alleged false statements Allergan made in press releases and caused a drop in stock price. That DOJ investigation can be the basis for a corrective disclosure, and as a consequence, supports the plaintiffs' loss causation theory.

Contrary to Allergan's argument, the sale of Actavis to Teva does not immunize Allergan shareholders from the losses suffered by the disclosure of the DOJ investigation any more than the sale releases Allergan from the investigation. As plaintiffs note, "it is more than plausible that the market was reacting to management's concealment of and engagement in wrongdoing, negative information which would have impacted Allergan's stock, not Teva's stock." (Opp. Br. 39.) Where defendants assert that it took two trading days for Allergan's stock to recover after the price drop on November 3, 2016, negating loss causation, plaintiffs counter that this argument is unavailing at the pleading stage, citing *Acticon AG v. China N.E. Petroleum Holdings Ltd.*, 692 F.3d 34, 39 (2d Cir. 2012). The Court agrees that at this stage of litigation, factual issues such as the market's rate of recovery are inappropriate for consideration.

Loss causation has been adequately pleaded for purposes of withstanding Allergan's motion to dismiss.

## B. Section 20(a) Claim: Liability of Individual Defendants

Allergan seeks to dismiss Count 2 of the second amended complaint, which asserts a claim for violations of Section 20(a) of the Exchange Act against individual defendants Bisaro, Saunders, Joyce, Hilado, Olafsson, and Buchen. Plaintiffs' Section 20(a) claim is premised on the theory

that the individual defendants "were controlling persons of the Company during the Class Period, due to their senior executive positions with the Company and their direct involvement in the Company's day-to-day operations, including their power to control or influence the policies and practiced giving rise to the securities violations alleged herein, and exercised the same."  (2d Am. Compl. ¶ 284.)

Section 20(a) of the Exchange Act creates a cause of action against individuals who exercise control over a "controlled person," including a corporation, who has committed a Section 10(b) violation.  15 U.S.C. § 78t(a); *see also In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 284 (3d Cir. 2006) ("Section 20(a) of the Exchange Act imposes joint and several liability upon one who controls a violator of Section 10(b).")  Additionally, the Third Circuit requires that the defendant "must have been a culpable participant in the act or acts constituting the violation or cause of action" for Section 20(a) liability to attach.  *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 484 (3d Cir. 2013).

Allergan argues that plaintiffs fail to state a Section 20(a) claim because "plaintiffs have failed to properly allege a 10(b) violation."  (Moving Br. 36.)  Allergan also argues that "for the same reasons Plaintiffs cannot plead scienter, they cannot plead culpable participation."  (*Id.* 37.) These arguments lack merit because the Court has concluded that plaintiffs have adequately pleaded a claim under Section 10(b).  Accordingly, Allergan's motion to dismiss plaintiffs' Section 20(a) claim is denied.

### C.  Section 14(a) and Rule 14a-9 Claims

Allergan further seeks to dismiss Counts 3 and 4 of the second amended complaint, which assert violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder against the 2014 and 2015 Boards of Directors respectively, on the grounds that they

are time-barred.  Allergan also argues that plaintiffs fail to allege a material misstatement or omission in the proxy statements, to plead fraud with the required particularity, and to adequately allege loss causation.  (Moving Br. 38-39.)  The latter three arguments are meritless for the same reasons discussed above in connection with plaintiffs' Section 10(b) claim. And as discussed below, the claims will not be dismissed on timeliness grounds.

To state a claim under Section 14(a) and Rule 14a-9, plaintiffs must allege that "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Tracinda Corp. v. Daimler ChryslerAG*, 502 F.3d 212, 228 (3d Cir. 2007).  The statute of limitations for a Section 14(a) claim is one year from when the plaintiff discovered, or a plaintiff in the exercise of reasonable diligence would have discovered, the facts essential to the violation.  *Westinghouse Elec. Corp. v. Franklin*, 993 F.2d 349, 353 (3d Cir. 1993).

With respect to timeliness, Allergan asserts that "because the initial complaint was filed on November 11, 2016, the Section 14(a) claims are untimely if they were discovered, or reasonably should have been discovered, on or before November 10, 2015."  Therefore, Allergan argues that under plaintiffs' own theory—that Allergan's public disclosure on August 6, 2015, that it received a subpoena from the Department of Justice "revealed 'THE TRUTH' that Actavis had engaged in price-fixing" (Moving Br. 39 (citing 2d Am. Compl. ¶ 234))—the Section 14(a) claim is time-barred.  In oral argument, Allergan underlined its position, stating: "[Plaintiffs] cannot now go back and say, oh, well, wait a second.  This is sufficient to establish loss causation in a securities fraud claim, but not sufficient to put us on notice that the statute has begun to run."  (Transcript 41:2-7.)

The second amended complaint does not plead a single corrective disclosure revealing "a full-throated fraud" (*id.* 121:18-21); rather, plaintiffs allege "multiple partial corrective disclosures" (*id.* 122:3-4), demonstrating that "the misconduct has been . . . leaked out over time" (*id.*120:7-8). Thus, plaintiffs argue that the August 6, 2015 subpoena announcement did not reveal information sufficient for a reasonable investor "to conclude that there was fraud here" (*id.* 120:22-25), and accordingly, cannot serve as the date on which the limitations clock began to run. Instead, plaintiffs contend that "[t]he statute of limitations does not begin to run until the facts constituting every element could have been discovered." (Transcript 120:14-16.) This accords with *Hull*. 2017 WL 6493148, at *9 (concluding that public disclosures that satisfied the loss causation element did not mark the start of the limitations period).

Further, the Court agrees with plaintiffs' assertion that a finding of untimeliness is "inappropriate at this stage of the litigation" because whether plaintiffs were on "inquiry notice of the alleged price fixing as of the filing of Allergan's Form 10-Q on August 6, 2015" is a fact-sensitive inquiry. (Opp. Br. 39 n.22 (citing *California Pub. Employees' Ret. Sys. v. Chubb Corp.*, No. 00-4285, 2002 WL 33934282, at *25 (D.N.J. June 26, 2002) (Brown, J.) ("In the context of a motion to dismiss . . . the question of when the plaintiffs should have known of the alleged violation often requires a fact sensitive inquiry that is not appropriate at this early stage of the proceedings.").) Heeding the Third Circuit's ruling that "if a statute of limitations bar 'is not apparent on the face of the complaint, then it may not serve as the basis for a dismissal of the complaint under Rule 12(b)(6),' " *Rycoline Products, Inc. v. C & W Unlimited,* 109 F.3d 883, 886 (3d Cir. 1997) (internal citations omitted)), the Court denies Allergan's motion to dismiss the Section 14(a) claim for untimeliness.

**V.      Conclusion**

For the reasons set forth above, the Court denies Allergan's motion to dismiss.  An appropriate order will follow.

/s/ Katharine S. Hayden_____

Date: August 6, 2019

Katharine S. Hayden, U.S.D.J