James E. Cecchi
Donald A. Ecklund
**CARELLA, BYRNE, CECCHI, OLSTEIN,
BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744

*Liaison Counsel for Lead Plaintiffs and
the Class*

Matthew L. Mustokoff
Margaret E. Mazzeo
Jonathan F. Neumann
**KESSLER TOPAZ
MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Co-Lead Counsel for Lead Plaintiffs and
the Class*

John C. Browne
Lauren A. Ormsbee
Michael Mathai
**BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1448

*Co-Lead Counsel for Lead Plaintiffs and
the Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE ALLERGAN GENERIC DRUG PRICING SECURITIES LITIGATION | Case No. 2:16-cv-09449 (KSH) (CLW) <br><br> **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION** |

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ....................................................................................................1

STATEMENT OF FACTS .........................................................................................................3

PROCEDURAL HISTORY.........................................................................................................5

ARGUMENT ..............................................................................................................................6

I.   Plaintiffs Satisfy Rule 23(a)...............................................................................................7

     A.   The Proposed Class is Numerous ...........................................................................7

     B.   Plaintiffs Raise Common Questions of Law and Fact ...........................................8

     C.   Plaintiffs' Claims are Typical of the Class's Claims ...........................................10

     D.   Plaintiffs are Adequate Class Representatives......................................................11

          1.   Plaintiffs' Interests Are Not Adverse to the Class ....................................12

          2.   Proposed Class Counsel Are Adequate and Satisfy Rule 23(g) ...............14

II.  The Requirements of Rule 23(b)(3) Are Satisfied...........................................................14

     A.   Common Issues of Law and Fact Predominate.....................................................15

          1.   Reliance Is Not an Element of a Section 14(a) Claim ...............................15

          2.   The Section 10(b) Element of Reliance Is Presumed Under the
               Fraud on the Market Doctrine...................................................................16

          3.   The Class is Entitled to a Presumption of Reliance Under *Affiliated
               Ute*.............................................................................................................26

          4.   Damages Are Measurable Using a Common Methodology .......................26

     B.   Class Treatment is Superior to Other Methods of Adjudication............................29

CONCLUSION..........................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Affiliated Ute Citizens v. United States*,
    406 U.S. 128 (1972)..........................................................................................................26, 28

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)..........................................................................................................12, 15

*Amgen, Inc. v. Conn. Ret. Plans and Tr. Funds*,
    568 U.S. 455 (2013)........................................................................................................... passim

*In re Barrick Gold Sec. Litig.*,
    314 F.R.D. 91 (S.D.N.Y. 2016) ..............................................................................................22

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)...........................................................................................................7, 17

*Browning Debenture Holders Comm. v. DASA Corp.*,
    524 F.2d 811 (2d Cir. 1975)....................................................................................................16

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989) ...................................................................................... passim

*Cheney v. Cyberguard Corp.*,
    213 F.R.D. 484 (S.D. Fla. 2003)............................................................................................25

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*,
    No. 12–5275, 2015 WL 5097883 (D.N.J. Aug. 31, 2015).............................................. passim

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)...........................................................................................................27, 28

*In re Constar Int'l Sec. Litig.*,
    585 F.3d 774 (3d Cir. 2009).................................................................................................7, 15

*In re DaimlerChrysler AG Sec. Litig.*,
    216 F.R.D. 291 (D. Del. 2003) ........................................................................................15, 16

*Dartell v. Tibet Pharms., Inc.*,
    No. 14-3620, 2016 WL 718150 (D.N.J. Feb. 22, 2016) ...........................................................8

*Dewey v. Volkswagen Aktiengesellschaft*,
    681 F.3d 170 (3d Cir. 2012)...................................................................................................12

*Dodona I, LLC v. Goldman, Sachs & Co.*,
296 F.R.D. 261 (S.D.N.Y. 2014) ...........................................................................................26

*In re DVI Inc. Sec. Litig.*,
249 F.R.D. 196 (E.D. Pa. 2008)...........................................................................19, 20, 21, 24

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011).................................................................................................10, 15, 17

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976).................................................................................................................7

*Gilbert v. Abercrombie & Fitch, Co.*,
2016 No. 2:15-cv-2854, WL 4159682 (S.D. Ohio Aug. 5, 2016) ...........................................14

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014)...........................................................................................................6, 17

*In re Heckmann Corp. Sec. Litig.*,
No. 10-378, 2013 WL 2456104 (D. Del. June 6, 2013) .................................................. passim

*In re Honeywell Int'l Inc. Sec. Litig.*,
211 F.R.D. 255 (D.N.J. 2002).................................................................................................12

*Johnston v. HBO Film Mgmt.*,
265 F.3d 178 (3d Cir. 2001)....................................................................................................26

*Koppel v. 4987 Corp.*,
191 F.R.D. 360 (S.D.N.Y. 2000) ...........................................................................................16

*Krogman v. Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001) ...............................................................................19, 24, 25

*Lane v. Page*,
272 F.R.D. 558 (D.N.M. 2011)...............................................................................................16

*Li v. Aeterna Zentaris, Inc.*,
No. 14–cv–7081, 2018 WL 1143174 (D.N.J. Feb. 28, 2018).................................................27

*Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,
762 F.3d 1248 (11th Cir. 2014) ..............................................................................................14

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
No. 11 Civ. 3658(SAS), 2013 WL 3486990 (S.D.N.Y. Jul. 11, 2013) ...................................14

*Lumen v. Anderson*,
280 F.R.D. 451 (W.D. Mo. 2012)............................................................................................25

*Marcus v. BMW of N. Am., LLC*,
  687 F.3d 583 (3d Cir. 2012)....................................................................................................7, 8

*In re Merck & Co., Sec., Derivative & ERISA Litig.*,
  2013 WL 396117 (D.N.J. Jan. 30, 2013) ......................................................................... passim

*In re Merck & Co., Vytorin/Zetia Sec. Litig.*,
  No. 08-2177, 2012 WL 4482041 (D.N.J. Sep. 25, 2012) ................................................ passim

*Mills v. Elec. Auto-Lite Co.*,
  396 U.S. 375 (1970)...............................................................................................................16

*Neale v. Volvo Cars of N. Am., LLC*,
  794 F.3d 353 (3d Cir. 2015).................................................................................................27, 28

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  259 F.3d 154 (3d Cir. 2001)....................................................................................................10

*In re NII Holdings, Inc. Sec. Litig.*,
  311 F.R.D. 401 (E.D. Va. 2015) .............................................................................................22

*In re Novo Nordisk Sec. Litig.*,
  No. 3:17-cv-00209, 2020 WL 502176 (D.N.J. Jan. 31, 2020)......................................... passim

*In re PHP Healthcare Corp.*,
  128 F. App'x 839 (3d Cir. 2005) .............................................................................................18

*In re Piedmont Office Trust, Inc. Sec. Litig.*,
  264 F.R.D. 693 (N.D. Ga. 2010)..............................................................................................16

*Reyes v. Netdeposit, LLC*,
  802 F.3d 469 (3d Cir. 2015)......................................................................................................9

*Roofer's Pension Fund v. Papa*,
  333 F.R.D. 66 (D.N.J. 2019)............................................................................................ passim

*In re Schering Plough Corp. ERISA Litig.*,
  589 F.3d 585 (3d Cir. 2009).......................................................................................................9

*In re Schering-Plough Corp./ENHANCE Sec. Litig.*,
  No. 8-397, 2012 WL 4482032 (D.N.J. Sept. 25, 2012)................................................... passim

*Sharp v. Coopers & Lybrand*,
  83 F.R.D. 343 (E.D. Pa. 1979).................................................................................................28

*Skeway v. China Nat. Gas, Inc.*,
  304 F.R.D. 467 (D. Del. 2014) .................................................................................................26

*Strougo v. Barclays PLC*,
    312 F.R.D. 307 (S.D.N.Y. 2016) ............................................................................................27

*Tatz v. Nanophase Techs. Corp.*,
    No. 01 C 8440, 2003 WL 21372471 (N.D. Ill. June 13, 2003) ..............................................25

*Thomas v. Duralite Co., Inc.*,
    524 F.2d 577 (3d Cir. 1975)....................................................................................................28

*In re Tyson Foods, Inc. Sec. Litig.*,
    No. Civ. A. 01-425-SLR, 2003 WL 22316548 (D. Del. Oct. 6, 2003)...................................14

*Unger v. Amedisys*,
    401 F.3d 316 (5th Cir. 2005) ...........................................................................................19, 24

*United States v. Schiff*,
    602 F.3d 152 (3d Cir. 2010)....................................................................................................21

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
    No. 13-6731, 2016 WL 4138613 (E.D. Pa. Aug. 4, 2016) ...............................................13, 21

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 1702 (2018)..........................................17

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004).....................................................................................................10

*Williams v. Jani-King of Phila., Inc.*,
    837 F.3d 314 (3d Cir. 2016)......................................................................................................7

**STATUTES AND RULES**

17 C.F.R. § 240.10b-5...............................................................................................................5, 26

15 U.S.C. §78j(b) ...........................................................................................................................5

15 U.S.C. §78t(a) ...........................................................................................................................5

17 C.F.R. § 239.13 ........................................................................................................................21

Fed. R. Civ. P. 23 .................................................................................................................. passim

Pursuant to Rule 23 of the Federal Rules of Civil Procedure ("Rule 23"), Plaintiffs Sjunde AP-Fonden ("AP7") and Union Asset Management Holding AG ("Union," and together with AP7, "Plaintiffs") respectfully submit this memorandum of law in support of their Motion for Class Certification (the "Motion").

## PRELIMINARY STATEMENT

Plaintiffs' federal securities fraud claims are ideally suited for class adjudication. Plaintiffs, both institutional investors, were injured by the same course of conduct as all other Class members:  Defendants made material misrepresentations and omissions to the market regarding Allergan plc's[1] ("Allergan" or the "Company") role in an industry-wide conspiracy to fix the prices of generic drugs, resulting in the skyrocketing of drug prices—in some cases as high as between 470% and 7,000%—following years of stable pricing.  When Allergan's role in this colossal cartel came under government scrutiny, the Company's share price plummeted, causing losses to all shareholders in the Class.  Trial of Plaintiffs' claims will focus on issues and evidence common to *all* Class members—falsity, materiality, and loss causation as to the Section 10(b) and Section 14(a) claims; and the additional element of scienter as to the Section 10(b) claims only.  Because Allergan stock traded in an efficient market, the Section 10(b) element of reliance is presumed under the "fraud on the market" doctrine recognized by the U.S. Supreme Court.

"[I]t is well-settled that the class action is a particularly appropriate vehicle for adjudication of federal securities cases."  *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*, 2015 WL 5097883, at *13 (D.N.J. Aug. 31, 2015).[2]   This case is no exception.  Without

---

[1]  Before June 15, 2015, Allergan plc was known as Actavis plc.  Allergan plc and Actavis plc are collectively referred to herein as "Allergan" or the "Company," unless otherwise noted.

[2]  All internal citations are omitted, and all emphasis is added, unless otherwise noted.

certification, many Class members will be deprived of relief.  "[T]he Supreme Court as well as every circuit that has confronted the issue of class certification in the area of securities litigation has recognized its utility and necessity in a society where geographically dispersed shareholders cannot individually challenge violations by powerful and wealthy corporate defendants because of their small holdings and the unyielding costs of securities litigation." *In re Merck & Co., Sec., Derivative & ERISA Litig.*, 2013 WL 396117, at \*13 (D.N.J. Jan. 30, 2013) (quoting 7 W. Rubenstein, A. Conte & H. Newberg, Newberg on Class Actions, § 22:1 (4th ed. 2002)).  Judge Madeleine Cox Arleo of this District recently certified a shareholder class in a parallel securities fraud case alleging that one of Allergan's co-conspirators (Perrigo) concealed its role in the price fixing scheme. *Roofer's Pension Fund v. Papa*, 333 F.R.D. 66 (D.N.J. 2019).

Plaintiffs move for certification of a class (the "Class") consisting of three subclasses:

> (i) as to claims arising under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), all persons and entities who purchased or otherwise acquired Allergan common and/or preferred stock between October 29, 2013 and November 2, 2016, both dates inclusive (the "Class Period"), and were injured thereby; (ii) as to claims arising under Section 14(a) of the Exchange Act in connection with the Forest Merger, all persons and entities who held Forest common stock as of May 2, 2014, and were entitled to vote on the merger between Allergan and Forest, and were damaged thereby; and (iii) as to claims arising under Section 14(a) of the Exchange Act in connection with the Actavis Merger, all persons and entities who held Allergan, Inc. common stock as of January 22, 2015, and were entitled to vote on the merger between Allergan and Actavis, and were damaged thereby.[3]

Plaintiffs satisfy each of Rule 23(a) and 23(b)(3)'s requirements.  As explained in full

---

[3] Excluded from the Class are: (i) Defendants; (ii) members of the immediate families of the Individual Defendants; (iii) the Company's subsidiaries and affiliates; (iv) any person who is or was an officer or director of the Company or any of the Company's subsidiaries or affiliates during the Class Period; (v) any entity in which any Defendant has a controlling interest; and (vi) the legal representatives, heirs, successors, and assigns of any such excluded person or entity.  The Forest Merger and Actavis Merger are defined below.

below, this action involves a widely held security that was actively traded on a major national exchange—the New York Stock Exchange ("NYSE")—by thousands of investors throughout the Class Period; Plaintiffs' and the Class's claims all concern the damages caused by Defendants' alleged misrepresentations and omissions to the investing public; and Plaintiffs are precisely the kind of sophisticated institutional investors that Congress intended to serve as class representatives for such cases. Accordingly, the Rule 23(a) requirements of (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy, and the Rule 23(b)(3) requirements of predominance and superiority, are readily met.

Plaintiffs respectfully request that the Court grant this Motion; certify the Class; appoint Plaintiffs as Class Representatives; and appoint Kessler Topaz Meltzer & Check LLP ("Kessler Topaz") and Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz") as Class Counsel under Federal Rule of Civil Procedure 23(g).

## STATEMENT OF FACTS

Defendant Allergan is a specialty pharmaceutical company that develops, manufactures, markets, and distributes medical aesthetics, biosimilar, and over-the-counter pharmaceutical products worldwide. ¶ 3.[4] Allergan's production of generic drugs was vital to the Company's success during the Class Period, growing from 32% of the Company's total revenues in 2014 to 42% of total revenues in 2015. ¶¶ 28, 221, 251. On July 1, 2014, the Company acquired Forest Laboratories, Inc. ("Forest") (the "Forest Merger") (¶ 41), and in November 2014, Actavis plc announced its intention to acquire Allergan, Inc. (the "Actavis Merger"). ¶ 42. On March 17,

---

[4] References to "¶___" are to paragraphs in Lead Plaintiffs' Consolidated Second Amended Class Action Complaint (the "Complaint"). References to "Ex. __" are to the exhibits appended to the accompanying Declaration of Lauren M. Ormsbee.

2015, Actavis plc completed its acquisition of Allergan Inc. and changed its name to Allergan plc on June 15, 2015.  *Id*.

During the Class Period, Allergan was a central participant in a massive cartel that fixed the prices of generic drugs sold in the U.S.  Beginning in the first half of 2013, Allergan entered into and maintained price fixing agreements with other major generic drug makers, following years of stable prices.  ¶¶ 5-7, 107-116, 126-129, 140-49, 159-62.  These astronomical price increases— in each case by hundreds or thousands of percentage points—typically followed industry meetings attended by senior executives from Allergan and its competitors. ¶¶ 21, 25, 83, 105, 110, 113, 116, 129, 149, 162, 188-89.  Allergan and its co-conspirators had numerous opportunities to meet to plan their conspiracy, at industry meetings, trade shows, and private "industry dinners" among high-level executives.  *Id.*  Allergan's price collusion is also evidenced by telephone calls, text messages, and other records that have been provided to the Attorneys General of Connecticut, New Jersey, and 42 other states.  ¶¶ 171-79.

Defendants misled Allergan's shareholders about its role in the cartel in several ways. *First*, Defendants issued multiple statements that misled investors into believing that Allergan's profits in the generic drug markets were legitimately (and legally) increasing.  *E.g.*, ¶¶ 195-96; *see also* ¶ 221 (reported revenues).  After Allergan announced that the Company had been served with a federal grand jury subpoena in 2015, Defendants continued to mislead the market about the cause of the Company's revenues and price hikes.  *E.g.*, ¶¶ 213-19.  *Second*, Defendants misrepresented that Allergan actively competed in the generic drug markets, while actively concealing that, in fact, Allergan was colluding with its purported competitors to artificially inflate drug prices, to the direct detriment of consumers.  *E.g.*, ¶¶ 195, 197, 199, 201, 209, 211, 219.  *Third*, Defendants misled investors about Allergan's compliance with antitrust laws and policies prohibiting

anticompetitive behavior.  *E.g.*, ¶ 232.

The truth about Allergan's anticompetitive conduct began to come to light on August 6, 2015.  ¶¶ 234-36.  That day, Allergan disclosed that the U.S. Department of Justice ("DOJ") had served the Company with a grand jury subpoena.  *Id*.  This was the first indication that Allergan was implicated in the DOJ investigation, with *Bloomberg* noting that Allergan was "the biggest company yet to draw scrutiny in the government's widening antitrust probe of the [generic drug] industry," ¶ 235, and other sources reporting on the development.  ¶¶ 236-38.  On this news, Allergan's common stock dropped $17.17 per share—5% from its previous closing price—and Allergan's preferred share price dropped $39.24 per share, or 3.5%.  ¶ 237.

On November 3, 2016, investors learned that the DOJ's investigation had intensified and gathered enough evidence of criminality such that charges could be filed against Allergan and other co-conspirators.  ¶ 239.  The media reported that "U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion."  *Id*.  In response to this news, Allergan's common stock price fell $9.07 per share (roughly 4.6%), and its preferred shares dropped $30.03 per share (roughly 4.1%).  ¶ 240.

<u>**PROCEDURAL HISTORY**</u>

The first complaint in this action was filed on December 22, 2016, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. Sections 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).  ECF No. 1.  On February 2, 2017, this Court issued an Order appointing Plaintiffs as lead plaintiffs. ECF No. 24.

On May 1, 2017, Lead Plaintiffs filed an initial Amended Complaint alleging violations of §§10(b), 14(a) and 20(a) of the Exchange Act.  ECF No. 36.  Defendants moved to dismiss that

complaint.  That motion was fully briefed when, on October 31, 2017, a consortium of 46 state Attorneys General filed a complaint charging Allergan as a co-conspirator in an antitrust price-fixing conspiracy.  This complaint described several "smoking gun" calls, emails and text messages between Allergan executives and other co-conspirators.  On November 28, 2017, Lead Plaintiffs filed the Complaint, which included newly discovered information, including information revealed in the Attorneys General's complaint.  ECF No. 82.

Defendants filed a renewed motion to dismiss on January 22, 2018.  The motion was fully briefed in April 2018, but significant supplemental briefing ensued over the next year to alert the Court to developments in the Attorneys' General prosecution of Allergan and its alleged co-conspirators.  ECF Nos. 100-14, 117-18.  Defendants' motion to dismiss was argued on April 11, 2019.  On May 10, 2019, the Attorneys General of 44 states and commonwealths filed another lawsuit, bringing new claims of substantial antitrust violations against several generic drug makers, including Allergan (Actavis) and Allergan employees Marc Falkin and Richard Rogerson (the "May 2019 AG Complaint").  The May 2019 AG Complaint set forth a highly detailed account of the Allergan defendants' anti-competitive conduct in connection with as many as 22 generic drugs.  At the Court's request, the Parties submitted supplemental letter briefing concerning the impact of the May 2019 AG Complaint on Defendants' pending motion to dismiss.  ECF Nos. 122, 123.

On August 6, 2019, the Court denied Defendants' motion to dismiss.  ECF No. 124.  The case is now proceeding into discovery.

## ARGUMENT

"[F]ederal securities actions are 'well suited' for litigation under Rule 23."  *Merck*, 2013 WL 396117, at *13.  The Supreme Court has repeatedly stressed the importance of the class action device in redressing wrongs under the federal securities laws.  *See Halliburton Co. v. Erica P.*

*John Fund, Inc.*, 573 U.S. 258, 267-68 (2014) ("*Halliburton II*"); *Basic Inc. v. Levinson*, 485 U.S. 224, 229-30, 249-50 (1988); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 196 (1976).

To certify the Class, Plaintiffs must establish that the requirements of Rule 23(a) and at least one subsection of Rule 23(b) are satisfied. *See Amgen, Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 459 (2013); *In re Constar Int'l Sec. Litig.*, 585 F.3d 774, 780 (3d Cir. 2009). As Supreme Court and Third Circuit authority make clear, the inquiry at the class-certification stage is not whether Plaintiffs will ultimately prevail on the merits, but rather whether the requirements of Rule 23 are met. *See Amgen*, 568 U.S. at 465-66; *Williams v. Jani-King of Phila., Inc.*, 837 F.3d 314, 322 (3d Cir. 2016). Thus, "[m]erits questions may be considered to the extent—***but only to the extent***—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 568 U.S. at 466.

## I.    Plaintiffs Satisfy Rule 23(a)

There are four requirements under Rule 23(a) to certify a class: (1) the class must be "so numerous that joinder of all members is impracticable"; (2) "questions of law or fact common to the class" must exist; (3) "the claims or defenses of the representative parties" must be "typical of the claims or defenses of the class"; and (4) "the representative parties" must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Each of these requirements is satisfied.

### A.    The Proposed Class is Numerous

Plaintiffs meet Rule 23(a)(1)'s numerosity requirement because the proposed Class is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). To satisfy this requirement, Plaintiffs need not "offer direct evidence of the exact number and identities of the class members." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 596 (3d Cir. 2012). Rather, "circumstantial evidence specific to the products, problems, parties, and geographic areas actually

covered by the class definition" is sufficient.  *Id.*  "There is no minimum number of members needed for a suit to proceed as a class action," but a showing that the "potential number of plaintiffs exceeds 40" generally satisfies this requirement.  *Id.* at 595.

"Numerosity 'is readily met in securities cases involving an issuer whose stock trades publicly on the NYSE,'" as is the case here.  *In re Novo Nordisk Sec. Litig.*, 2020 WL 502176, at *5 (D.N.J. Jan. 31, 2020) ("*Novo*") (quoting *Prudential*, 2015 WL 5097883, at *8).  During the Class Period, there were between 174 million and 396 million shares of Allergan common stock outstanding.  *See* Expert Report of Chad Coffman, CFA ("Coffman Report") (attached as Ex. A) ¶ 89.  In addition, Allergan offered 5.06 million shares of preferred stock during the Class Period. *Id.* ¶ 91.  Both securities evinced significant weekly trading volume, and both traded publicly on the NYSE, one of the "largest and most liquid security exchanges in the world with billions of shares traded each day."  *Id.* ¶¶ 28, 31-33, 44-45.  These facts easily establish numerosity.  *See Prudential*, 2015 WL 5097883, at *8 (numerosity satisfied where "Prudential stock trade[d] on the NYSE with significant daily volume"); *Dartell v. Tibet Pharms., Inc.*, 2016 WL 718150, at *3 (D.N.J. Feb. 22, 2016) (numerosity satisfied where "there were three million shares of stock sold in the IPO"); *In re Heckmann Corp. Sec. Litig.*, 2013 WL 2456104, at *10 (D. Del. June 6, 2013) (numerosity "clearly" satisfied where "there were between 69 million and 128 million shares of Heckmann stock outstanding, with an average of 3.4 million common shares traded on a weekly basis").

### B.   Plaintiffs Raise Common Questions of Law and Fact

Rule 23(a)(2)'s commonality requirement is met where, as here, there are "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  This requirement is "not particularly demanding," *Prudential*, 2015 WL 5097883, at *8, and is satisfied where proposed class

representatives share "at least one question of fact or law with the grievances of the prospective class." *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015); *see also Novo*, 2020 WL 502176, at *5 ("The threshold for establishing commonality is straightforward: 'The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class.'") (quoting *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 596-97 (3d Cir. 2009)).

This common contention need only be "'of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Merck*, 2013 WL 396117, at *4. "Courts in this Circuit have recognized that securities fraud cases often present a paradigmatic common question of law or fact of whether a company omitted material information or made misrepresentations that inflated the price of its stock." *Roofer's Pension Fund v. Papa*, 333 F.R.D. 66, 74–75 (D.N.J. 2019). Such is the case here.

The Complaint details a common course of conduct arising from materially false and misleading statements and omissions that Defendants made to the investing public in Allergan's SEC filings and during conference calls and media appearances, and the Complaint's allegations concern all Class members. Accordingly, this action is replete with questions that are common to the Class, including: (1) whether Defendants violated Sections 10(b), 14(a) and 20(a) of the Exchange Act; (2) whether public statements made by Defendants during the Class Period misrepresented or omitted material facts; (3) whether Defendants knew or were deliberately reckless in not knowing that their statements and/or omissions were false and misleading; (4) whether the prices of Allergan common and preferred stock were artificially inflated; and (5) whether Defendants' conduct caused the members of the Class to sustain damages. *See* ¶ 272.

Each of these questions demonstrates a common theory of recovery for Plaintiffs and the Class, which satisfies the commonality requirement. *See Merck*, 2013 WL 396117, at \*4; *see also Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011) ("*Halliburton I*") (holding that materiality and loss causation present common questions); *Amgen*, 568 U.S. at 470 ("the question of materiality is common to the class"); *Novo*, 2020 WL 502176, at \*5 (commonality established where "the Amended Complaint alleges a common course of conduct arising from materially false and misleading statements and omissions Defendants made to the investing public in . . . SEC filings and press releases and on conference calls"); *Prudential*, 2015 WL 5097883, at \*8 ("the issues of materiality and loss causation both present common questions of law and fact and can be proven with common evidence"); *In re Merck & Co., Vytorin/Zetia Sec. Litig.*, 2012 WL 4482041, at \*4 (D.N.J. Sep. 25, 2012) (same); *In re Schering-Plough Corp./ENHANCE Sec. Litig.*, 2012 WL 4482032, at \*4 (D.N.J. Sept. 25, 2012) (same).

## C.    Plaintiffs' Claims are Typical of the Class's Claims

Plaintiffs satisfy Rule 23(a)(3)'s typicality requirement because Plaintiffs' claims are "typical" of the claims of the proposed Class.  Fed. R. Civ. P. 23(a)(3).  "The standard for demonstrating typicality is undemanding and requires that 'the claims of the named plaintiffs and putative class members involve the same conduct by the defendant.'"  *Papa*, 333 F.R.D. at 75 (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183-84 (3d Cir. 2001)).  Typicality "does not require that the putative class members all share identical claims." *Papa*, 333 F.R.D. at 75 (citing *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 531-32 (3d Cir. 2004)).  Typicality is easily established here.

Like every other member of the Class, Plaintiffs purchased Allergan stock during the Class Period.  *See* ¶¶38-39; Declaration of Dr. Carsten Fischer and Jochen Riechwald on Behalf of Union

Asset Management AG in Support of Lead Plaintiffs' Motion for Class Certification ("Union Decl.") (attached as Ex. B), ¶ 3; Declaration of Richard Gröttheim on Behalf of Sjunde AP-Fonden in Support of Lead Plaintiffs' Motion for Class Certification ("AP7 Decl.") (attached as Ex. C), ¶ 3. As explained above, the claims of both Plaintiffs and all absent Class members arise from the same misconduct and the same legal theories, i.e., Defendants' material misstatements and omissions during the Class Period in violation of the federal securities laws. Moreover, the injury Plaintiffs suffered is the same injury suffered by the putative Class as a whole, as all Class members—including Plaintiffs—purchased or acquired Allergan common and/or preferred stock at prices that were artificially inflated by Defendants' fraud. *See* Coffman Report, ¶¶ 104-06.

In short, because "Plaintiffs' claims arise from the very same alleged Exchange Act violations as those that give rise to the claims of the absent class members," typicality is satisfied. *Merck*, 2013 WL 396117, at *5; *see also Novo*, 2020 WL 502176, at *6 ("[T]ypicality is clearly satisfied because Plaintiffs' claims arise from the same course of conduct that gave rise to the claims of all other Class members and are based on the same legal theory."); *Prudential*, 2015 WL 5097883, at *9 (typicality satisfied in class action alleging § 10(b) and § 20(a) violations where "[t]he factual and legal predicates of [the proposed class representative's] claims are the same as those for the class members"); *Heckmann*, 2013 WL 2456104, at *11 (same); *Schering-Plough*, 2012 WL 4482032, at *5 (same).

### D.     Plaintiffs are Adequate Class Representatives

Plaintiffs' demonstrated ability and continuing willingness to fairly and adequately protect the interests of absent Class members satisfies the adequacy requirement of Rule 23(a)(4). Fed. R. Civ. P. 23(a)(4). The adequacy prerequisite has two prongs: (1) "the class representatives' interests are not adverse to those of other members of the class"; and (2) "the class representative

is represented by attorneys who are qualified, experienced, and generally able to conduct the litigation." *Schering-Plough*, 2012 WL 4482032, at *6.

### 1.    Plaintiffs' Interests Are Not Adverse to the Class

The adequacy requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Schering-Plough*, 2012 WL 4482032, at *6 (quotation marks omitted).  The crux of this inquiry is whether the proposed class representatives are "part of the class and possess the same interest and suffer the same injury as the class members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 594-95 (1997).  The alignment of interests and incentives between the class representatives and absent class members is the "'linchpin'" of the adequacy inquiry.  *In re Honeywell Int'l Inc. Sec. Litig.*, 211 F.R.D. 255, 261 (D.N.J. 2002).

However, the adequacy requirement "does not mandate that the interests of all class members be identical." *Schering-Plough*, 2012 WL 4482032, at *6.  Indeed, some divergence between the representative parties and the class will not defeat adequacy so long as those conflicts are not "fundamental," which exists only where "'some class members claim to have been harmed by the same conduct that benefitted other members of the class.'"  *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 184 (3d Cir. 2012).

Here, there are no fundamental conflicts between Plaintiffs and the putative Class.  Rather, the interests of Plaintiffs are perfectly aligned with those of the Class.  Like all Class members, Plaintiffs purchased Allergan common or preferred stock at inflated market prices during the Class Period and were injured by Defendants' misconduct. Moreover, Plaintiff AP7 acquired Allergan shares in connection with the Forest Merger and the Actavis Merger and was injured by Defendants' misconduct.  Plaintiffs are thus incentivized to establish Defendants' liability and maximize their recovery, and by doing so, Plaintiffs will necessarily do the same for the absent

Class members.  *See Schering-Plough*, 2012 WL 4482032, at *6 ("'[W]hen Lead Plaintiffs have a strong interest in establishing liability under federal securities law, and seek similar damages for similar injuries, the adequacy requirement can be met.'"); *see also id.* (adequacy satisfied where plaintiffs "purchased Schering securities during the Class Period and have been injured by the allegedly wrongful course of conduct at issue").

In addition, each Plaintiff has demonstrated its willingness and ability to serve as a Class Representative.  Both Union and AP7 are large institutional investors and understand their fiduciary duties to the Class. *See* Union Decl., ¶ 7; AP7 Decl., ¶ 7.  Each Plaintiff has also demonstrated its commitment to this litigation through its active participation in the pleading and discovery processes, including by receiving and reviewing periodic updates and other correspondence from counsel; reviewing pleadings and other documents in this case; and participating in discussions with counsel regarding case strategy and significant developments in the litigation.  *See* Union Decl., ¶¶ 5-6; AP7 Decl., ¶¶ 5-6.  Moreover, Plaintiffs are in the process of reviewing and responding to Defendants' First Request for Production of Documents served on Plaintiffs on February 26, 2020.  Plaintiffs have amply demonstrated their commitment to monitoring and participating in the prosecution of this action, which "is all that is required."  *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2016 WL 4138613, at *10 (E.D. Pa. Aug. 4, 2016) (adequacy satisfied where "[p]laintiffs have testified that they have communicated with their lawyers, reviewed filings prior to their submission to the Court, [] have aided counsel in responding to discovery requests," and "have shown a basic understanding of the facts and claims underlying this litigation").

Finally, Plaintiffs' status as institutional investors further supports a finding of adequacy because "both Congress and the courts have recognized that [large institutional] investors are

generally preferred as class representatives in securities litigation." *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1260 (11th Cir. 2014); *see also In re Tyson Foods, Inc. Sec. Litig.*, 2003 WL 22316548, at \*6 (D. Del. Oct. 6, 2003) (express intent of Congress was "to favor institutional investors"). In sum, Plaintiffs—large institutional investors who have been faithfully overseeing this litigation and safeguarding Class members' best interests—are adequate.

### 2.    Proposed Class Counsel Are Adequate and Satisfy Rule 23(g)

To satisfy the adequacy requirement, class counsel must be "qualified, experienced, and generally able to conduct the proposed litigation." *Schering-Plough*, 2012 WL 4482032, at \*6. Plaintiffs here have retained attorneys who satisfy this requirement. *See* Exs. D, E (Firm Resumes of Bernstein Litowitz and Kessler Topaz). This Court has recognized that there is "no doubt" Bernstein Litowitz is "qualified, experienced, and generally able to conduct [securities class action] litigation." *Schering-Plough*, 2012 WL 4482032, at \*6. Kessler Topaz has been similarly recognized for being "highly qualified," *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 2013 WL 3486990, at \*2 (S.D.N.Y. Jul. 11, 2013), and "skilled in shareholder and transactional litigation, focusing on such a practice over the past 24 years." *Gilbert v. Abercrombie & Fitch, Co.*, 2016 WL 4159682, at \*6 (S.D. Ohio Aug. 5, 2016). Because Bernstein Litowitz and Kessler Topaz have devoted substantial time and resources to this action and will continue to do so, the firms satisfy Rule 23(g) and should be appointed as Class Counsel.

## II.    The Requirements of Rule 23(b)(3) Are Satisfied

In addition to satisfying the four requirements of Rule 23(a), a plaintiff seeking class certification must also satisfy at least one subsection of Rule 23(b). *See Amgen*, 568 U.S. at 459; *Constar*, 585 F.3d at 780. Here, Plaintiffs seek class certification under Rule 23(b)(3) because, as

set forth below, "questions of law or fact common to the class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

### A.    Common Issues of Law and Fact Predominate

"The Rule 23(b) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem*, 521 U.S. at 623.  This inquiry is satisfied where "***questions*** of law or fact common to the class will 'predominate over any questions affecting only individual members' as the litigation progresses."  *Amgen*, 568 U.S. at 467; *see also Papa*, 333 F.R.D. at 78-79 ("[T]he predominance inquiry turns on whether the evidence necessary to prove the essential elements of the underlying claims will vary from class member to class member, causing the Court to engage in individual treatment of the issues.").  It does ***not*** permit inquiry into whether those common questions "will be answered, on the merits, in favor of the class."  *Amgen*, 568 U.S. at 459.  Thus, while the inquiry "begins . . . with the elements of the underlying cause of action," *Halliburton I*, 563 U.S. at 809, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."  *Amgen*, 568 U.S. at 466.

### 1.    Reliance Is Not an Element of a Section 14(a) Claim

Plaintiffs' burden to establish predominance as to their Section 14(a) claims is a low one. Section 14(a) does not require Plaintiffs to plead or prove reliance, as it is not an element of the claim.  *See Heckmann*, 2013 WL 2456104, at *10 (certifying Section 10(b) and 14(a) claims, noting that "[u]nlike a claim for a violation under § 10(b), to recover damages under § 14(a) of the Securities Exchange Act, plaintiff need not prove reliance because it is not an element of the claim"); *In re DaimlerChrysler AG Sec. Litig.*, 216 F.R.D. 291, 296 & n.2, 300 (D. Del. 2003) (certifying Section 14(a) class and holding that "courts have concluded that questions of reliance

are not relevant to the determination of class certification" for Section 14(a) claims); *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 383 (1970); *Browning Debenture Holders Comm. v. DASA Corp.*, 524 F.2d 811, 815 (2d Cir. 1975) ("[T]he broad, prophylactic purposes of [Section] 14(a) would be frustrated if plaintiffs were required to prove . . . reliance.").

The remaining elements of Plaintiffs' Section 14(a) claim—materiality, falsity, and loss causation—all present paradigmatic common questions, as noted *supra* at § 1.B.  Given the straightforward legal nature of Section 14(a) claims, courts routinely hold that class certification is appropriate.  *See, e.g.*, *Heckmann*, 2013 WL 2456104, at \*10; \*14; *DaimlerChrysler*, 216 F.R.D. at 300; *Koppel v. 4987 Corp.*, 191 F.R.D. 360, 365-66 & n.9 (S.D.N.Y. 2000) (certifying Section 14(a) class and holding that "courts have been particularly 'unwilling to consider individual issues of . . . reliance' as barriers to class certification . . . in cases alleging material omissions in proxy solicitations"); *Lane v. Page*, 272 F.R.D. 558, 580 (D.N.M. 2011); *In re Piedmont Office Trust, Inc. Sec. Litig.*, 264 F.R.D. 693, 701-02 (N.D. Ga. 2010).

### 2.   The Section 10(b) Element of Reliance Is Presumed Under the Fraud on the Market Doctrine

Predominance is also satisfied with respect to Plaintiffs' Section 10(b) claim.  The elements of a Section 10(b) claim are: "'(1) a material misrepresentation or omission by the defendant[s]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"  *Amgen*, 568 U.S. at 460-61.  There can be no serious dispute that falsity, scienter, materiality, and loss causation are issues common to the Class because "failure of proof" on any of these elements "would end the case" for all Class members.  *See id.* at 467 ("materiality is a 'common questio[n]' for purposes of Rule 23(b)(3)"); *id.* at 475 ("this Court has held that loss causation and the falsity or misleading nature of the defendant's alleged statements or omissions

are common questions that need not be adjudicated before a class is certified"); *Halliburton I*, 563 U.S. at 813 (holding that plaintiff need not prove loss causation at class certification).

Reliance will also be proven by evidence common to the Class. Specifically, Plaintiffs and the Class are entitled to presume reliance under the fraud-on-the-market theory because Allergan common and preferred stock each traded in an efficient market throughout the Class Period. The premise of the fraud-on-the-market theory is that, "'in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.'" *Basic*, 485 U.S. at 241-42; *see also Halliburton II*, 573 U.S. at 270 ("'[T]he market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations.'") (*quoting Basic*, 485 U.S. at 246); *Amgen*, 568 U.S. at 466 ("in an efficient market, all publicly available information is rapidly incorporated into, and thus transmitted to investors through, the market price"). Accordingly, "'reliance on any public material misrepresentations . . . may be **presumed** for purposes of a Rule 10b-5 action.'" *Halliburton II*, 573 U.S. at 268 (*quoting Basic*, 485 U.S. at 246-47).

To invoke the presumption of reliance at this stage, Plaintiffs need only show that Defendants' false statements were publicly made and that Allergan common and preferred securities each traded in an efficient market during the Class Period. *Halliburton II*, 573 U.S. at 277-78; *Merck*, 2013 WL 396117, at *12. "[T]he Supreme Court has suggested that the burden required to establish market efficiency 'is not an onerous one.'" *Waggoner v. Barclays PLC*, 875 F.3d 79, 97 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 1702 (2018).

Here, there is no dispute that the alleged misrepresentations were publicly made in SEC filings, press releases, and conference calls. *See* ¶¶ 194-233.  Moreover, as discussed below, each of the pertinent legal inquiries establishes that, during the Class Period, Allergan common and preferred stock traded in efficient markets.[5]

### a.      The NYSE Is an Efficient Market

As an initial matter, Allergan common and preferred stock traded on the NYSE, "one of the most efficient capital markets in the world." *In re PHP Healthcare Corp*., 128 F. App'x 839, 848 (3d Cir. 2005). *See* ¶¶ 3, 40, 269; Coffman Report, ¶¶ 44-46.  Courts in the Third Circuit have held that securities traded on the NYSE are "'well suited for application of the fraud on the market theory.'" *Merck*, 2013 WL 396117, at *11; *see also Merck/Vytorin*, 2012 WL 4482041, at *5 ("securities traded on the NYSE are routinely recognized as trading in an efficient market").  The Class Period markets for Allergan common and preferred stock are no exception.

### b.      The *Cammer/Krogman* Factors Confirm Market Efficiency

To assess market efficiency, courts in this Circuit look to the exchange listing and the five factors identified in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).  *See, e.g*., *Prudential*, 2015 WL 5097883, at *6.  The *Cammer* factors are: "(1) the company's average weekly trading volume; (2) the number of securities analysts following and reporting on the company; (3) the number of market makers in the company's stock; (4) whether the company is eligible to file the Form S-3 Registration Statement with the SEC; and (5) whether there is a demonstrable cause and

---

[5]   Common questions also predominate as to Plaintiffs' Section 20(a) control person claim because it is derivative of the Section 10(b) claim, and the individual "Defendant[s'] alleged exercise of control over [Allergan] and whether [their] conduct constitutes culpable participation in [Allergan's] Rule 10b-5 violations" is provable by "common evidence."  *Merck*, 2013 WL 396117, at *13.

effect relationship between the release of information about the company and movements in the stock price."  *Id.*  Some courts also consider the three additional factors identified in *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001), and *Unger v. Amedisys*, 401 F.3d 316 (5th Cir. 2005): (1) market capitalization; (2) bid-ask spread; and (3) float.  *See, e.g.*, *Prudential*, 2015 WL 5097883, at *6.  As Mr. Coffman establishes, all of these factors—from both *Cammer* and *Krogman/Unger*—demonstrate that Allergan securities traded in efficient markets.  *See* Coffman Report, § VII.  Therefore, reliance is presumed.

### (i)   *Cammer* One: Weekly Trading Volume.

A high weekly trading volume supports a finding of market efficiency because "'many investors are executing trades on the basis of newly available or disseminated corporate information.'"  *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 208 (E.D. Pa. 2008) (quoting *Cammer*, 711 F. Supp. at 1286).

Here, Allergan common and preferred stock traded on the NYSE, the average weekly trading volume of Allergan common stock was 15.3 million shares, amounting to 5.05% of shares outstanding, and the average weekly trading volume of Allergan preferred stock was 234.2 thousand shares, amounting to 4.82% of shares outstanding.  Coffman Report ¶¶ 28 & n.37, 31-32, Exs. 1, 3, 3-P.  As courts in this Circuit recognize, such levels of trading volume supports "a strong presumption that the market . . . is an efficient one . . . ."  *Cammer*, 711 F. Supp. at 1286; *see also Papa*, 333 F.R.D. at 81 ("[T]rading volume of two percent or more justifies a strong presumption of market efficiency.");  *Merck/Vytorin*, 2012 WL 4482041 at *5 (weekly trading volume of 2.8% "justif[ied] a 'strong presumption'" of market efficiency).

### (ii)    *Cammer* Two: Wide Analyst Coverage

"Extensive coverage by securities analysts likewise indicates market efficiency, since the price of a company's security is often affected by analysts' reports of information learned through their own investigation and analysis." *DVI*, 249 F.R.D. at 209 (citing *Cammer*, 711 F. Supp. at 1286). Here, at least 41 securities analysts covered Allergan during the Class Period, including well-known firms such as RBC, UBS, JP Morgan, and Morgan Stanley. Coffman Report ¶ 37. Moreover, there were several additional sources disseminating information about Allergan during the Class Period, including publicly available financial information, news articles, and SEC filings. *Id.* ¶ 39-40. This factor supports market efficiency. *See Merck/Vytorin*, 2012 WL 4482041, at \*5 (coverage by "well known firms such as A.G. Edwards, Bear Stearns, Citibank, JP Morgan, and Merrill Lynch" weighed in favor of market efficiency); *DVI*, 249 F.R.D. at 210 (coverage by three analysts "sufficient to favor a finding of market efficiency").

### (iii)    *Cammer* Three: Numerous Market Makers Facilitated Efficient Trading of Allergan Securities

"[T]he existence of market makers and arbitrageurs . . . ensure[s] completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1286-87. Because Allergan common and preferred stock traded on the NYSE, the Court need not consider the existence of market makers. *See Merck/Vytorin*, 2012 WL 4482041 at \*5 n.1 (finding this factor "'not relevant'" in the context of securities traded on the NYSE); *see also* Coffman Report ¶¶ 44-45 (concerns about liquidity and information dissemination—which motivate the market makers analysis—"are generally not applicable to stocks trading on large, modern exchanges such as the NYSE . . . , which are presumed to be efficient, report volume and trade details, and tend to have rules that virtually guarantee a liquid market"). Nonetheless, this factor

favors a finding of market efficiency, because there were at least 173 market makers for Allergan common stock during the Class Period.  *See* Coffman Report ¶ 46.

### (iv)    *Cammer* Four: Allergan Was Eligible to File Form S-3 Registration Statements

A company is eligible to file an SEC Form S-3 Registration Statement if it has filed SEC reports for 12 consecutive months and has at least $75 million of float.  *See* 17 C.F.R. § 239.13. A company's eligibility to file a Form S-3 is indicative of market efficiency because the ability to file these forms indicates that the company is easily able to issue new securities.  *DVI*, 249 F.R.D. at 210 & n.23.  Here, Allergan filed several forms S-3 and S-3ASR, both during the Class Period and soon thereafter.  *See* Coffman Report ¶ 49; *Merck/Vytorin*, 2012 WL 4482041 at *5 (finding market efficient and plaintiffs entitled to presumption of reliance based in part on defendant company's eligibility to file Forms S-3 during class period).

### (v)    *Cammer* Five: Allergan's Securities' Prices Reacted to Company-Specific News Demonstrating a Cause-and-Effect Relationship

One of the most convincing ways to demonstrate market efficiency is by illustrating, "over time, a cause and effect relationship between company disclosures and resulting movements in stock price."  *Cammer*, 711 F. Supp. at 1291.  However, market efficiency does not require that this factor (or any other single *Cammer* factor) be satisfied.  *See W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2016 WL 4138613, at *13 (E.D. Pa. Aug. 4, 2016).

To assess this factor, Mr. Coffman conducted event studies on daily common stock and preferred stock prices (and related analyses).  Coffman Report ¶¶ 51-87; *id*. Exs. 5-9, 5-P-9-P.  An event study provides "a statistical regression analysis that examines the effect of an event on a dependent variable, such as a corporation's stock price."  *DFC Global*, 2016 WL 4138613, at *13 (quoting *United States v. Schiff*, 602 F.3d 152, 173 n.29 (3d Cir. 2010)).  "[T]here is no dispute

that [an event study] is widely accepted in the academic community and in the courts" to prove the cause-and-effect relationship contemplated by *Cammer*. *Prudential*, 2015 WL 5097883, at \*6.

Mr. Coffman's event studies strongly demonstrate "clear cause-and-effect relationships between new public information about Allergan and the market prices of Allergan Securities." Coffman Report ¶ 53.[6] As detailed in his report, Mr. Coffman demonstrates through a statistical, empirical analysis that Allergan's common and preferred stock prices reacted in an efficient manner when new information was released about the Company. Coffman Report ¶¶ 61-69, 79-87. Using a well-established methodology, Mr. Coffman first created regression models to control for market and industry wide factors that influenced the price of Allergan common and preferred stocks. *Id.* ¶¶ 53-54 & nn.68-69. These models allowed him to isolate the change in Allergan securities prices that can be attributed to Company-specific news by finding the difference between the actual price movement on a given day and the movement predicted by the regression model, which controls for market and industry factors. *Id*.

With this data in hand, Mr. Coffman then examined the price changes and volume in Allergan common and preferred stock on two sets of days: (1) days on which Allergan announced earnings ("news days"), and (2) days during the analysis period that were identified as having the least amount of news ("no-news days"). *Id.* ¶¶61-68 & nn. 74-82, ¶¶79-86 & nn.100-08. Because it is more likely that material, new information about the Company would be released to the market on days with earnings announcements than on no-news days, in an efficient market one would expect to find a greater percentage of news days with a statistically significant stock price

---

[6] Mr. Coffman's methodology has been accepted by numerous courts under the current state of the law. *See, e.g., In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 412 (E.D. Va. 2015); *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 104-06 (S.D.N.Y. 2016).

movement—i.e., a movement that could not be accounted for by random chance alone. *Id.* ¶¶ 64-65 & nn 77-81, 82-83 & nn. 103-07.

Indeed, Mr. Coffman found a statistically significant difference in the percentage of days with significant price movements when comparing the two sets of "news" versus "no-news" days. With respect to common stock, Allergan common stock exhibited a statistically significant price change on 46.67% of news days, but had no significant price changes on any of the no-news days. *Id.* ¶ 64.[7]  In addition, both the magnitude of the average change in the price of Allergan common stock and the daily trading volume were statistically significantly higher on news days as compared to no-news days. *Id.* ¶¶65-68 & nn. 81-82.  Based on this analysis, Mr. Coffman concluded that there was a causal connection between new material information and appropriate movements in the price of Allergan common stock during the Class Period. *Id.* ¶ 69.

Similarly, with respect to Allergan preferred stock, Allergan preferred stock exhibited a statistically significant price change on 42.86% on news days—almost 7 times more frequently than on no-news days, which exhibited significant changes only 6.67% of the time. *Id.* ¶ 82.  In addition, both the magnitude of the average change in the price of Allergan preferred stock and the daily trading volume were statistically significantly higher for news days as compared to no-news days. *Id.* ¶¶ 83-86 & nn. 107-08.  Based on this analysis, Mr. Coffman concluded that there was a causal connection between new material information and appropriate movements in the price of Allergan preferred stock during the Class Period. *Id.* ¶ 87.

---

[7] Mr. Coffman considered a price change at the 95% confidence level, i.e., a price change of approximately two or more standard deviations from the average change, to be statistically significant. *Id.* ¶¶ 59, 77.  In other words, on days for which Mr. Coffman considered the price movement to be statistically significant, there was less than a 5% chance that the price movement could be attributed to random fluctuations alone. *Id*.

In sum, each of the *Cammer* factors support a finding of market efficiency for both common and preferred stock. Thus, Plaintiffs and the Class may rely on the "fraud-on-the-market" presumption to establish reliance.

### (vi)    The *Krogman* Factors Further Confirm Market Efficiency

In addition to the five *Cammer* factors, courts have identified three additional factors that are also indicative of market efficiency. *See Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001); *Unger v. Amedisys*, 401 F.3d 316 (5th Cir. 2005). These factors, commonly referred to as the *Krogman* factors, are: (1) the company's market capitalization; (2) the typical bid-ask spread; and (3) the security's float. Like the *Cammer* factors, each *Krogman* factor is indicative of market efficiency in this case.

*Market Capitalization.* "'Market capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations.'" *DVI*, 249 F.R.D. at 212 (quoting *Krogman*, 202 F.R.D. at 478). During the Class Period, Allergan's common stock market capitalization averaged $81.9 billion, and its market capitalization was larger than 96% to 99% of all companies trading on the NYSE and NASDAQ. Coffman Report ¶ 90. Similarly, Allergan's preferred stock market capitalization averaged $4.8 billion during the Class Period, and it was larger than 78% to 83% of NYSE- and NASDAQ-listed companies. *Id*. ¶ 91. These factors support market efficiency. *See id.* ¶ 92; *see also DVI*, 249 F.R.D. at 212 (market capitalization ranging "between $300 million to $12 million" indicative of market efficiency).

*Bid-Ask Spread.* "The bid-ask spread is 'the difference between the price that potential buyers are willing to pay and the price at which potential sellers are willing to sell.'" *Prudential*, 2015 WL 5097883, at *6. "A large bid-ask spread is indicative of an inefficient market, because

it suggests that the stock is too expensive to trade." *Krogman*, 202 F.R.D. at 478. Here, the bid-ask spread of Allergan common stock ranged from 0.013% to 0.078%, and the bid-ask spread for Allergan preferred stock ranged from 0.057% to 0.20%. Coffman Report ¶¶ 94-95. These spreads are much smaller than the bid-ask spreads for comparable NYSE- and NASDAQ-listed stocks and are thus supportive of market efficiency. *Id*.

> ***Public Float and Institutional Ownership.*** During the Class Period, the overwhelming majority of Allergan common stock shares—on average, more than 99%—were held by non-insiders, and on average, more than 89% of that public float was held by institutions. Coffman Report ¶¶ 96-97. These figures are likewise supportive of market efficiency. *See Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 502 (S.D. Fla. 2003) (95% float indicative of market efficiency); *Lumen v. Anderson*, 280 F.R.D. 451, 460 (W.D. Mo. 2012) (institutional holdings of 29%–71% of outstanding shares supported efficiency); *Tatz v. Nanophase Techs. Corp.*, 2003 WL 21372471, at *7 (N.D. Ill. June 13, 2003) (that institutions held "11% to 13% of the total outstanding common stock" supported efficiency).

### (vii)   Additional Factors Also Confirm Market Efficiency

Mr. Coffman analyzed two further factors, both of which suggest that the markets for Allergan common and preferred stock were efficient. Mr. Coffman looked at the degree of "autocorrelation," i.e., the extent to which a stock's price is pegged to previous price movements, and amount of options trading. *See* Coffman Report  ¶¶ 98-103. These additional factors further favor a finding of market efficiency here. *Id*. ¶¶ 101-03.

*     *     *     *     *

All told, the *Cammer* and *Krogman* factors, as well as additional evidence, support the conclusion that Allergan common and preferred stock traded in efficient markets during the Class

Period.

### 3. The Class is Entitled to a Presumption of Reliance Under *Affiliated Ute*

In addition to the fraud-on-the-market presumption, reliance is also presumed under *Affiliated Ute* because Plaintiffs' claims are premised on the omission of material information from Defendants' disclosures. *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972); *Johnston v. HBO Film Mgmt.*, 265 F.3d 178, 192 (3d Cir. 2001). In such cases, "positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material[.]" *Affiliated Ute*, 406 U.S. at 153.

The Court need not reach this issue if it finds, as Plaintiffs believe it should, that reliance is presumed under the fraud-on-the-market doctrine. However, to the extent necessary, reliance can also be presumed under *Affiliated Ute* because Plaintiffs' allegations are premised on Defendants' failure to disclose that Allergan's generics unit and several of its pharmaceutical industry peers colluded to fix generic drug prices and, consequently, Allergan's revenues during the Class Period were in part the result of illegal conduct. ¶¶ 26, 195-96, 198, 200-07, 210, 213, 215-16, 221-22. Because this case involves Defendants' failure to disclose facts "necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading," 17 C.F.R. § 240.10b-5(b), the *Affiliated Ute* presumption applies. *See, e.g.*, *Skeway v. China Nat. Gas, Inc.*, 304 F.R.D. 467, 475 (D. Del. 2014) (applying *Affiliated Ute* where securities claims "involve[d] primarily a failure to disclose" by persons with a duty to disclose); *Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 269-70 (S.D.N.Y. 2014) (finding *Affiliated Ute* presumption applicable).

### 4. Damages Are Measurable Using a Common Methodology

The Third Circuit has made clear that "it is a misreading of *Comcast* to interpret it as

preclud[ing] certification under Rule 23(b)(3) in any case where the class members' damages are not susceptible to a formula for classwide measurement." *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 375 (3d Cir. 2015) (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 34-38 (2013)) (alterations in original)[8]; *see also Novo*, 2020 WL 502176, at *9 (certifying class and noting that the court "need not assess the validity of Plaintiffs' damages model at this stage"). Indeed, "Plaintiffs are not required to produce a detailed damages model" at the class certification stage. *Li v. Aeterna Zentaris, Inc.*, 2018 WL 1143174, at *2 (D.N.J. Feb. 28, 2018). Nevertheless, Plaintiffs demonstrate that per-share damages can be determined class-wide under Sections 10(b) and 14(a) of the Exchange Act, further establishing predominance.

As an initial matter, damages in securities fraud causes are particularly susceptible to calculation through a common, class-wide methodology. *See, e.g.*, *Strougo v. Barclays PLC*, 312 F.R.D. 307, 313 (S.D.N.Y. 2016) ("Issues and facts surrounding damages have rarely been an obstacle to establishing predominance in section 10(b) cases."). This action is no different—the methodology by which damages will be measured is common to all Class members, is widely-accepted, and relates directly to Plaintiffs' class-wide theory of liability such that common issues regarding damages will predominate.

With respect to the Section 10(b) claim, Plaintiffs allege that Class members suffered damages by purchasing Allergan stock at prices that were artificially inflated by Defendants' material misrepresentations and omissions. As Mr. Coffman explains, damages arising from the

---

[8] *See also id*. at 374 ("*Comcast* is inapposite to the case before us. *Comcast* held that an antitrust litigation class could not be certified because the plaintiffs' damages model did not demonstrate the theory of antitrust impact that the district court accepted for class-action treatment. . . . A close reading of the text . . . makes it clear that the predominance analysis was specific to the antitrust claim at issue."); *Papa*, 333 F.R.D. at 87 (same).

artificial inflation in Allergan's common and preferred stock prices during the Class Period can be determined for any member of the Class by applying the widely accepted "out-of-pocket" measure of damages.  Coffman Report ¶ 104; *see also Sharp v. Coopers & Lybrand*, 83 F.R.D. 343, 347 (E.D. Pa. 1979) ("[t]he out-of-pocket method is in fact the traditional method employed in securities fraud cases for calculating damages") (citing *Affiliated Ute*, 406 U.S. 128; *Thomas v. Duralite Co., Inc.*, 524 F.2d 577 (3d Cir. 1975)).

As set forth in the Coffman Report, damages can be calculated by first determining the inflation in Allergan common and preferred stock based on the alleged corrective disclosures in combination with fundamental valuation methodologies and then estimating the share price inflation on each day during the Class Period.  Coffman Report ¶¶ 104-06.  Damages for an individual Class member can then be computed formulaically based upon information collected in the claims process (i.e., the investor's purchase and sale history for the security). *Id*. ¶ 106.  While the actual amount of damages sustained will differ depending on each Class member's transactions in Allergan common stock, the Third Circuit has emphasized that "individual damages calculations do not preclude class certification under Rule 23(b)(3)," a recognition that is "'well nigh universal.'" *Neale*, 794 F.3d at 374-75 (quoting *Comcast*, 569 U.S. at 41 (2013) (Ginsburg, J. & Breyer, J., dissenting)).

With respect to the Section 14(a) claim, Mr. Coffman's proposed approach to damages is similarly based on the diminution in the value of Allergan shares caused by the false and misleading statements in Allergan's proxy statements, as measured by the stock price declines following the alleged corrective disclosures.  Coffman Report ¶ 105; *see, e.g., Heckmann*, 2013 WL 2456104, at *14 ("[P]laintiff's damage theory is consistent with Section 14(a) precedent because it is based on the diminution in the value of their shares caused by the false and misleading

statements in the Proxy.").

In short, questions of damages common to the Class will overwhelm any issues unique to individual members, thus satisfying Rule 23(b)'s predominance requirement.

### B. Class Treatment is Superior to Other Methods of Adjudication

The superiority requirement of Rule 23(b)(3) requires that class treatment be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In making this assessment, courts must consider: (1) the interests of members of the class in individually controlling the prosecution of separate actions; (2) whether other litigation has already commenced; (3) the desirability of concentrating claims in one forum; and (4) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D). Superiority "'is easily satisfied in securities fraud cases where there are many individual plaintiffs who suffer damages too small to justify a suit against a large corporate defendant.'" *Heckmann*, 2013 WL 2456104, at *8. Indeed, courts in this District have recognized that "[a] class action is certainly the superior method for adjudicating" securities fraud claims because "[g]enerally, 'as a practical matter, investors defrauded by securities law violations have no recourse other than class relief.'" *Papa*, 333 F.R.D. at 78.

Here, the Class members' interests in individually controlling the prosecution of separate actions are minimal. Aside from the action filed by a single institutional investor, which is now coordinated for the purposes of discovery with this Action (*see* ECF No. 133), Plaintiffs are not aware of any related individual actions. In addition, "individual damages may well be small enough to render individual litigation prohibitively expensive," particularly in light of the high hurdles—and corresponding litigation costs—set by the Private Securities Litigation Reform Act. *Schering-Plough*, 2012 WL 4482032, at *7. Also, the maintenance of a consolidated class action

will avoid "needless waste of both private and judicial resources" that would result from the prosecution of thousands of "individual actions that would involve similar if not identical evidence and certainly identical legal theories . . . ." *Merck*, 2013 WL 396117, at \*13.  Class treatment here will also avoid "the risk of inconsistent adjudications." *Id.*

Finally, Plaintiffs do not foresee any management difficulties that will preclude this action from being maintained as a class action.  In fact, the alternative of numerous individual actions by each Allergan shareholder of record during the Class Period would be, at best, impracticable to manage.  Thus, class certification in this case appears to be superior to other available methods of fairly and efficiently adjudicating the controversy.  *Schering-Plough*, 2012 WL 4482032, at \*7.

<h2 style="text-align:center"><u>CONCLUSION</u></h2>

Based on the foregoing, Plaintiffs respectfully request that the Court grant this Motion, certify the proposed Class, appoint Plaintiffs as Class Representatives, and appoint Bernstein Litowitz and Kessler Topaz as Class Counsel and Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C. as Liaison Counsel.

Dated: March 20, 2020                    Respectfully submitted,

                                 /s/ James E. Cecchi
                         James E. Cecchi
                         Donald A. Ecklund
                         **CARELLA, BYRNE, CECCHI, OLSTEIN,**
                         **BRODY & AGNELLO, P.C.**
                         5 Becker Farm Road
                         Roseland, NJ 07068
                         Telephone: (973) 994-1700
                         Facsimile: (973) 994-1744
                         jcecchi@carellabyrne.com
                         decklund@carellabyrne.com

                         *Liaison Counsel for Plaintiffs and the Class*

                         Matthew L. Mustokoff
                         Margaret E. Mazzeo

Jonathan F. Neumann
**KESSLER TOPAZ
MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
mmustokoff@ktmc.com
mmazzeo@ktmc.com
jneumann@ktmc.com

*Co-Lead Counsel for Lead Plaintiffs and
the Class*

John C. Browne
Lauren A. Ormsbee
Michael Mathai
**BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1448
johnb@blbglaw.com
lauren@blbglaw.com
michael.mathai@blbglaw.com

*Co-Lead Counsel for Lead Plaintiffs and
the Class*