**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE ALLERGAN GENERIC DRUG PRICING SECURITIES LITIGATION | Case No. 2:16-cv-09449 (KSH) (CLW) |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AND AUTHORIZATION TO DISSEMINATE NOTICE OF SETTLEMENT**

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................... 1

II.     BACKGROUND ........................................................................................ 3

        A.      Summary Of Lead Plaintiffs' Claims ................................................ 3

        B.      Summary Of The Action .................................................................... 4

        C.      The Mediation/Settlement Process .................................................... 7

III.    SUMMARY OF KEY SETTLEMENT TERMS .................................... 8

IV.     ARGUMENT .............................................................................................. 9

        A.      The Settlement Was Reached Through Extensive Good-Faith, Arm's-Length Negotiations Between Experienced Counsel, And Achieved With An Experienced Mediator's Assistance ................................................ 11

        B.      The Proposed Settlement Is Within The Range Of Possible Approval ............... 12

        C.      The Settlement Treats All Settlement Class Members Fairly ............................. 18

        D.      The Settlement Does Not Excessively Compensate Plaintiffs' Counsel ............. 19

        E.      Lead Plaintiffs Have Identified All Agreements Made In Connection With The Settlement ...................... 20

        F.      The Proposed Settlement Class Satisfies Rule 23 ............................................... 20

                1.      The Settlement Class Satisfies The Requirements Of Rule 23(a) ........... 22

                        a.      The Settlement Class Satisfies Numerosity .................................. 22

                        b.      There Are Common Questions Of Law And Fact ........................ 23

                        c.      Lead Plaintiffs' Claims Are Typical Of Those Of The Settlement Class ................................ 24

                        d.      Lead Plaintiffs Will Fairly And Adequately Protect The Settlement Class ................................ 25

                2.      The Settlement Class Satisfies The Requirements Of Rule 23(b)(3) ....... 26

                        a.      Common Legal And Factual Questions Predominate .................. 26

                        b.      A Class Action Is Superior To Other Methods Of Adjudication ............................................. 27

V.      THE COURT SHOULD APPROVE THE PROPOSED FORM OF NOTICE
        AND PLAN FOR PROVIDING NOTICE TO THE SETTLEMENT CLASS ............... 28

VI.     PROPOSED SCHEDULE OF SETTLEMENT EVENTS ............................................... 29

VII.    CONCLUSION ............................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Affiliated Ute Citizens v. United States*,
    406 U.S. 128 (1972)................................................................................................27

*Alves v. Main*,
    2012 WL 6043272 (D.N.J. Dec. 4, 2012)..............................................................12

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)................................................................................21, 26, 27, 28

*Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*,
    568 U.S. 455 (2013)..........................................................................................26, 27

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988).............................................................................................6, 27

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*,
    2015 WL 5097883 (D.N.J. Aug. 31, 2015) ..................................................22, 23, 25

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)................................................................................................27

*In re DaimlerChrysler AG Sec. Litig.*,
    216 F.R.D. 291 (D. Del. 2003) ..............................................................................27

*Dartell v. Tibet Pharms., Inc.*,
    2016 WL 718150 (D.N.J. Feb. 22, 2016) ..............................................................22

*Ehrheart v. Verizon Wireless*,
    609 F.3d 590 (3d Cir. 2010)....................................................................................9

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011)................................................................................................27

*In re Gen. Instrument Sec. Litig.*,
    209 F. Supp. 2d 423 (E.D. Pa. 2001) ....................................................................18

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995)......................................................................................9

*Gilbert v. Abercrombie & Fitch, Co.*,
    2016 WL 4159682 (S.D. Ohio Aug. 5, 2016).........................................................26

*Girsh v. Jepson*,
    521 F.2d 153 (3d Cir. 1975)...................................................................................10

*In re Heckmann Corp. Sec. Litig.*,
    2013 WL 2456104 (D. Del. June 6, 2013)........................................................22, 25, 27, 28

*In re Ins. Brokerage Antitrust Litig.*,
    297 F.R.D. 136 (D.N.J. 2013)...................................................................................19

*James v. Glob. Tel\*Link Corp.*,
    No. 2:13-CV-04989-WJM-MF, 2020 WL 6197511 (D.N.J. Oct. 22, 2020)............................9

*Jones v. Commerce Bancorp, Inc.*,
    2007 WL 2085357 (D.N.J. July 16, 2007)...................................................................29

*Koppel v. 4987 Corp.*,
    191 F.R.D. 360 (S.D.N.Y. 2000) ..............................................................................27

*Lane v. Page*,
    272 F.R.D. 558 (D.N.M. 2011)................................................................................27

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
    2013 WL 3486990 (S.D.N.Y. Jul. 11, 2013) ...............................................................26

*Marcus v. BMW of N. Am., LLC*,
    687 F.3d 583 (3d Cir. 2012)...................................................................................22

*In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*,
    2013 WL 396117 (D.N.J. Jan. 30, 2013) ...................................................................24

*In re Nat'l Football League Players' Concussion Injury Litig.*,
    301 F.R.D. 191 (E.D. Pa. 2014)..............................................................................12

*In re Nat'l Football League Players Concussion Injury Litig.*,
    821 F.3d 410 (3d Cir. 2016)...................................................................................11

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    259 F.3d 154 (3d Cir. 2001)...................................................................................24

*In re Novo Nordisk Sec. Litig.*,
    2020 WL 502176 (D.N.J. Jan. 31, 2020) ..............................................................22, 23, 24

*In re Piedmont Office Trust, Inc. Sec. Litig.*,
    264 F.R.D. 693 (N.D. Ga. 2010)..............................................................................27

*Pozzi v. Smith*,
    952 F. Supp. 218 (E.D. Pa. 1997) ...........................................................................21

*In re Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions*,
    148 F.3d 283 (3d Cir. 1998)...................................................................................29

*Reyes v. Netdeposit, LLC*,
    802 F.3d 469 (3d Cir. 2015)..................................................................23

*Roofer's Pension Fund v. Papa*,
    333 F.R.D. 66 (D.N.J. 2019) ..............................................23, 24, 26, 28

*In re Sch. Asbestos Litig.*,
    921 F.2d 1330 (3d Cir. 1990)..................................................................9

*In re Schering Plough Corp. ERISA Litig.*,
    589 F.3d 585 (3d Cir. 2009).................................................................23

*In re Schering-Plough Corp./ENHANCE Sec. Litig.*,
    2012 WL 4482032 (D.N.J. Sept. 25, 2012) .....................................25, 26

*Schuler v. Medicines Co.*,
    2016 WL 3457218 (D.N.J. Jun. 24, 2016)............................................11

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
    2021 WL 1540996 (N.D. Cal. Apr. 20, 2021) .......................................26

*In re Telik, Inc. Sec. Litig.*,
    576 F. Supp. 2d 570 (S.D.N.Y. 2008) ...................................................17

*Thomas v. MagnaChip Semiconductor Corp.*,
    2017 WL 4750628 (N.D. Cal. Oct. 20, 2017)..........................................9

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004)....................................................9, 11, 24

## STATUTES AND RULES

15 U.S.C. § 78j(b) ......................................................................................4

15 U.S.C. § 78t(a) ......................................................................................4

15 U.S.C. § 78u-4(e) ................................................................................18

17 C.F.R. § 240.10b-5................................................................................4

Fed. R. Civ. P. 23 .............................................................................. passim

## I.      INTRODUCTION

Lead Plaintiffs Sjunde AP-Fonden ("AP7") and Union Asset Management Holding AG ("Union," and together with AP7, "Lead Plaintiffs"), on behalf of themselves and the Settlement Class (defined below), respectfully submit this memorandum of law in support of their unopposed motion for preliminary approval of the proposed settlement (the "Settlement") of the above-captioned action (the "Action"), as embodied in the Stipulation and Agreement of Settlement dated July 8, 2021 (the "Stipulation").[1] Lead Plaintiffs respectfully request that the Court grant preliminary approval of the Settlement, which provides for the payment of $130 million in cash for the benefit of the Settlement Class, as it easily satisfies the applicable standard set forth in Rule 23(e)(1) of the Federal Rules of Civil Procedure.[2]

The Settlement before the Court is the result of Lead Plaintiffs' vigorous prosecution of this Action over the past four years and represents an outstanding result for the Settlement Class in light of the substantial costs and risks to the Settlement Class's recovery from continued litigation. The $130 million Settlement represents a significant portion of Lead Plaintiffs' recoverable damages and, to Lead Plaintiffs' knowledge, is the first to be achieved among the federal securities cases arising from the antitrust allegations at issue here, which date back half a decade or more. It is particularly remarkable in light of the significant challenges that the

---

[1] All capitalized terms used in this memorandum that are not otherwise defined shall have the meanings given to them in the Stipulation, which is attached as Exhibit 1 to Lead Plaintiffs' Motion. Unless otherwise noted, all references to "ECF No. __" are to the docket in the Action, and all references to "¶ __" are to Lead Plaintiffs' Consolidated Second Amended Class Action Complaint (the "Complaint") filed on November 28, 2017 (ECF No. 82).

[2] As reflected in the concurrently-filed Notice, Consent, and Reference of a Civil Action to a Magistrate Judge for Settlement Proceedings, the Parties have consented to have Magistrate Judge Waldor conduct all preliminary and final settlement proceedings in this case, including deciding Lead Plaintiffs' motion for preliminary approval of the Settlement.

Settlement Class would have had to overcome, including the need to prove an antitrust conspiracy—a "case within a case," with all of the challenges and risks that would entail—in order to prevail on the merits and obtain any recovery for the Settlement Class. The Settlement was negotiated at arms-length by properly incentivized parties that were represented by experienced and able counsel, with the assistance of former United States District Court Judge Layn R. Phillips serving as mediator. Further, the Settlement does not unjustly favor any Settlement Class Member, and the anticipated fee and expense application request is reasonable. Accordingly, the Court "will likely be able to" finally approve the Settlement, and so preliminary approval is warranted. Fed. R. Civ. P. 23(e)(1).

The Court also should approve the proposed form and manner of notice of the Settlement to be provided to the Settlement Class because it is the best and most practicable notice under the circumstances and is designed to ensure that Settlement Class Members are notified of the Settlement and informed of their rights to participate therein, object thereto, or seek exclusion from the Settlement Class.

Accordingly, Lead Plaintiffs respectfully request that the Court enter the accompanying [Proposed] Order Preliminarily Approving Settlement and Authorizing Dissemination of Notice of Settlement ("Preliminary Approval Order").[3] The Preliminary Approval Order will, among other things: (1) preliminarily approve the terms of the Settlement as set forth in the Stipulation; (2) approve the form and method for providing notice of the Settlement to the Settlement Class; and (3) schedule a Settlement Hearing at which the Court will consider the request for final approval of: (i) the Settlement set forth in the Stipulation; (ii) the plan for allocating the net proceeds of the Settlement among eligible Settlement Class Members; and (iii) Lead Counsel's

---

[3] The proposed Preliminary Approval Order is attached as Exhibit 2 to the Motion.

application for an award of attorneys' fees and expenses, which may include a request for reimbursement to Lead Plaintiffs for their reasonable costs and expenses as permitted by the Private Securities Litigation Reform Act of 1995 ("PSLRA").

## II.    BACKGROUND

### A.    Summary Of Lead Plaintiffs' Claims

Lead Plaintiffs allege that, during the Class Period (i.e., October 29, 2013 to November 2, 2016, both dates inclusive), Allergan was a central participant in a massive cartel that fixed the prices of generic drugs sold in the U.S. The Complaint alleges that, beginning in the first half of 2013, Allergan entered into and maintained price fixing agreements with other major generic drug makers, following years of stable prices. ¶¶ 5-7, 107-116, 126-129, 140-49, 159-62. The Complaint further alleges that these agreements led to astronomical price increases—hundreds or thousands of percentage points—which typically followed industry meetings attended by senior executives from Allergan and its competitors. ¶¶ 21, 25, 83, 105, 110, 113, 116, 129, 149, 162, 188-89. Lead Plaintiffs further allege that Allergan and its co-conspirators had numerous opportunities to collude, including at industry meetings, trade shows, and private "industry dinners" among high-level executives. *Id.* The Complaint further alleges that collusion also occurred via telephone calls and text messages, records of which were provided to the Attorneys General of Connecticut, New Jersey, and 42 other states and described in complaints the Attorneys General filed alleging antitrust claims against various generic drug companies, including Allergan. *See* ¶¶ 171-79.

Lead Plaintiffs allege that Defendants misled Allergan's shareholders about the Company's role in the conspiracy in several ways, including by: (i) issuing multiple statements that misled investors into believing that Allergan's profits in the generic drug markets were legitimately (and legally) increasing (*see, e.g.*, ¶¶ 195-96, 221); (ii) misrepresenting that Allergan actively competed in the generic drug markets when, in fact, Allergan was colluding with its purported competitors

to artificially inflate drug prices, to the direct detriment of consumers (*see, e.g.*, ¶¶ 195, 197, 199, 201, 209, 211, 219); (iii) misleading investors about Allergan's compliance with antitrust laws and policies prohibiting anticompetitive behavior (*see, e.g.*, ¶ 232); and (iv) continuing to mislead the market about the drivers of the Company's revenues and the risks associated with the U.S. Department of Justice's ("DOJ") investigation after Allergan disclosed that it had been served with a federal grand jury subpoena in 2015 (*see, e.g.*, ¶¶ 213-19).

Lead Plaintiffs allege that the truth about Allergan's anticompetitive conduct began to come to light on August 6, 2015, when Allergan disclosed that the DOJ had served the Company with a subpoena. ¶¶ 234-36. Lead Plaintiffs allege that the truth was fully revealed on November 3, 2016, when investors learned the DOJ's investigation had intensified and gathered enough evidence of criminality such that charges could be filed against Allergan and other co-conspirators, and the media reported that "U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion." ¶ 239. Each of these disclosures was associated with substantial declines in Allergan's stock price. ¶¶ 237, 240.

### B.    Summary Of The Action

The first complaint in this Action was filed on December 22, 2016, alleging violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5). ECF No. 1. On February 2, 2017, this Court issued an Order appointing AP7 and Union as lead plaintiffs. ECF No. 24. On May 1, 2017, Lead Plaintiffs filed an initial Amended Complaint alleging violations of §§10(b), 14(a), and 20(a) of the Exchange Act. ECF No. 36. Defendants moved to dismiss that complaint. That motion was fully briefed when, on October 31, 2017, a consortium of 46 state Attorneys General filed a complaint charging Allergan (Actavis) as a co-conspirator in an antitrust price-fixing conspiracy. This complaint described several "smoking

gun" calls, emails, and text messages between Allergan executives and other co-conspirators. On November 28, 2017, Lead Plaintiffs filed the Complaint, which included newly discovered information, including information revealed in the Attorneys General's complaint. ECF No. 82.

Defendants filed a renewed motion to dismiss on January 22, 2018. The motion was fully briefed in April 2018, but significant supplemental briefing ensued over the next year to alert the Court to developments in the caselaw and in the Attorneys General's prosecution of Allergan and its alleged co-conspirators. ECF Nos. 100-14, 117-18. Defendants' motion to dismiss was argued on April 11, 2019. While the motion to dismiss was still pending, on May 10, 2019, the Attorneys General filed another lawsuit, bringing new claims of substantial antitrust violations against several generic drug makers, including Allergan (Actavis) and Allergan employees Marc Falkin and Richard Rogerson (the "May 2019 AG Complaint"). The May 2019 AG Complaint set forth a highly detailed account of the Allergan defendants' anti-competitive conduct in connection with as many as 22 generic drugs. At the Court's request, the Parties submitted supplemental letter briefing concerning the impact of the May 2019 AG Complaint on Defendants' pending motion to dismiss. ECF Nos. 122, 123.

On August 6, 2019, the Court denied Defendants' motion to dismiss. ECF No. 124. From August 2019 through May 2021, Lead Plaintiffs aggressively pursued discovery, obtaining and analyzing more than 430,000 documents from Defendants and more than 30 third parties, totaling more than 2.6 million pages. Lead Plaintiffs took twenty depositions of fact witnesses, including: six of the Individual Defendants (including both of Allergan's former Chief Executive Officers and Chief Financial Officers), ten current and former Allergan employees (including Marc Falkin and Richard Rogerson, former Allergan senior executives who were directly implicated in allegations of collusion in the various Attorneys General complaints), and four depositions of third

parties, including current and former senior executives at several of the drug companies alleged to have conspired with Allergan in the price-fixing scheme.

Lead Plaintiffs filed a motion to certify the class pursuant to Rule 23 on March 20, 2020, together with an opening brief and an expert report from Chad Coffman, CFA. Mr. Coffman's report contained an analysis demonstrating that the Allergan securities at issue in this case traded in an efficient market. *See* ECF Nos. 143, 143-3. Lead Plaintiffs produced documents in connection with class certification, and Defendants deposed representatives from AP7 and Union. On October 14, 2020, Defendants filed their opposition to Lead Plaintiffs' class certification motion (ECF No. 175), asserting that certification was inappropriate for several reasons, including that: (i) Lead Plaintiffs could not rely on the presumption of reliance established in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) because Lead Plaintiffs were aware of the allegedly undisclosed truth at the time they bought or sold their Allergan shares; (ii) even if Lead Plaintiffs were able to establish a presumption of reliance for the first alleged corrective disclosure, they could not do so as to the second corrective disclosure because such disclosure did not provide new, value-relevant information to the market and did not have a statistically significant impact on Allergan's stock price; and (iii) AP7 and Union were inadequate class representatives. Defendants supported their arguments with an expert report from Dr. Allan W. Kleidon, who reviewed and critiqued Mr. Coffman's report and provided his own rebuttal analysis related to price impact. *See generally* ECF No. 175-2.

After deposing Dr. Kleidon, Lead Plaintiffs filed a reply in further support of the class certification motion on November 25, 2020, in which they responded to Defendants' arguments. *See* ECF Nos. 187, 188. Lead Plaintiffs also filed a rebuttal expert report by Mr. Coffman in which he responded to Dr. Kleidon's critiques and analysis. ECF No. 187-1. On December 30, 2020,

Defendants filed a letter seeking leave to submit a sur-reply in further opposition to Lead Plaintiffs' class certification motion, and attaching their proposed sur-reply. *See* ECF Nos. 191, 191-1. Lead Plaintiffs responded to Defendants' request for leave to submit a sur-reply by letter filed on January 14, 2021. *See* ECF No. 193. Both Lead Plaintiffs' class certification motion and Defendants' request for leave to file a sur-reply remain pending.

Fact discovery concluded on April 22, 2021. At the time the Settlement was reached, Lead Plaintiffs were in the midst of preparing expert reports and responding to Defendants' March 31, 2021 contention interrogatories and requests for admission.

### C.    The Mediation/Settlement Process

The Parties retained former United States District Court Judge Layn R. Phillips as mediator and participated in a full-day mediation session on May 11, 2021. Judge Phillips is one of the nation's preeminent mediators, and has significant experience mediating complex disputes—including both securities class actions and antitrust actions. Prior to the mediation, the Parties exchanged over 90 pages of detailed mediation submissions, with each side discussing the strengths and weaknesses of their claims and defenses. The Parties then responded to detailed merits- and damages-related questions from Judge Phillips and his staff during the mediation session. Among other things, the submissions and mediator questions probed the strengths and weaknesses of Lead Plaintiffs' claims, the evidentiary record Lead Plaintiffs had developed through the course of discovery, and the Parties' anticipated arguments at summary judgment and trial.

Although the Parties made substantial progress over the course of the May 11 session, they were unable to reach agreement that day, and they agreed to continue settlement discussions, with the assistance of Judge Phillips and his staff, over the following weeks. After approximately four weeks of further negotiations, during which the Parties continued to challenge one another's

arguments and engaged in multiple rounds of bids and offers, the Parties got closer to a deal, but remained unable to reach agreement. On June 6, 2021, Judge Phillips issued a mediator's recommendation that the case settle for $130 million in cash, which the Parties ultimately determined to accept. The Parties memorialized their agreement in principle in a confidential Term Sheet executed on June 15, 2021. Thereafter, the Parties negotiated a formal Stipulation and Agreement of Settlement, executed on July 8, 2021.

## III.    SUMMARY OF KEY SETTLEMENT TERMS

Allergan has agreed to pay or cause to be paid $130 million in cash, to be deposited within fifteen business days after preliminary approval into an interest-bearing escrow account controlled by Lead Counsel. Lead Counsel may pay the cost of notice to the Settlement Class from the deposited funds.

The Settlement Class sought to be certified in connection with the Settlement is as follows:

(i) as to claims arising under Sections 10(b) and 20(a) of the Exchange Act, all persons and entities who purchased or otherwise acquired Allergan plc[4] common and/or preferred stock between October 29, 2013 and November 2, 2016, both dates inclusive (the "Class Period"), and were damaged thereby; (ii) as to claims arising under Section 14(a) of the Exchange Act in connection with the merger between Actavis plc and Forest Laboratories, Inc. ("Forest") (the "Forest Merger"), all persons and entities who held Forest common stock as of May 2, 2014, and were entitled to vote on the Forest Merger, and acquired shares of Allergan common stock in the Forest Merger and were damaged thereby; and (iii) as to claims arising under Section 14(a) of the Exchange Act in connection with the merger between Actavis plc and Allergan, Inc. (the "Actavis Merger"), all persons and entities who held Allergan, Inc. common stock as of January 22, 2015, and were entitled to vote on the Actavis Merger, and acquired shares of Allergan common stock in the Actavis Merger and were damaged thereby.

The Settlement is not a claims-made settlement. The Settlement Class will receive the full benefit of the $130 million payment net of Court-approved fees and expenses. There will be no

---

[4] Before June 15, 2015, Allergan plc was known as Actavis plc. Allergan plc and Actavis plc are collectively referred to herein as "Allergan."

reversion of funds to Defendants or their insurers if the Settlement becomes final. Prior to final approval, members of the Settlement Class will be provided the opportunity to opt-out of the Settlement Class. As is standard in securities class actions, in connection with the Settlement, Lead Plaintiffs and Allergan have also entered into a confidential Supplemental Agreement regarding requests for exclusion from the Settlement Class. *See* Stipulation ¶ 36.[5]

## IV.    ARGUMENT

In the Third Circuit, there is a "strong presumption in favor of voluntary settlement agreements," which is "especially strong in 'class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation.'" *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 594-45 (3d Cir. 2010) (quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995)); *see also, e.g.*, *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) ("[T]here is an overriding public interest in settling class action litigation, and it should therefore be encouraged."); *In re Sch. Asbestos Litig.*, 921 F.2d 1330, 1333 (3d Cir. 1990); *James v. Glob. Tel*Link Corp.*, No. 2:13-CV-04989-WJM-MF, 2020 WL 6197511, at *4 (D.N.J. Oct. 22, 2020).

Federal Rule of Civil Procedure 23(e) requires judicial approval of class action settlements. The procedure for approval of a proposed class action settlement is a well-established, two-step process. *First*, the Court performs a preliminary review of the settlement to determine whether to grant preliminary approval and authorize plaintiffs to send notice of the proposed settlement to the

---

[5] The Supplemental Agreement sets forth the conditions under which Allergan may terminate the Settlement if the requests for exclusion exceed an agreed-upon, confidential opt-out threshold. This type of termination agreement is standard in securities class actions, customarily remains confidential, and does not impact the fairness of the Settlement. *See, e.g.*, *Thomas v. MagnaChip Semiconductor Corp.*, 2017 WL 4750628, at *7 (N.D. Cal. Oct. 20, 2017) (an agreement permitting defendant to terminate the settlement if an opt-out threshold is reached "does not render the settlement unfair").

members of the class. *See* Fed. R. Civ. P. 23(e)(1). *Second*, following distribution of the notice, and after a hearing, the Court determines whether to grant final approval of the settlement. *See* Fed. R. Civ. P. 23(e)(2).

The Federal Rules of Civil Procedure instruct that a court should grant preliminary approval to authorize notice of a settlement upon a finding that it "will likely be able" to (i) finally approve the settlement under Rule 23(e)(2), and (ii) certify the class for purposes of the settlement. *See* Fed. R. Civ. P. 23(e)(1)(B). In considering final approval of the Settlement, Federal Rule 23(e)(2) provides that the Court consider whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). As detailed below, the facts and circumstances concerning the Settlement reached here readily satisfy Rule 23(e)(2), and the Settlement warrants preliminary approval.[6]

---

[6] At final approval, the Court will also consider the following factors, many of which overlap with those in Rule 23(e)(2): "(1) the complexity, expense and likely duration of the litigation . . . ; (2) the reaction of the class to the settlement . . . ; (3) the stage of the proceedings and the amount of discovery completed . . . ; (4) the risks of establishing liability . . . ; (5) the risks of establishing damages . . . ; (6) the risks of maintaining the class action through the trial . . . ; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery . . . ; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation." *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) (citation omitted).

A. **The Settlement Was Reached Through Extensive Good-Faith, Arm's-Length Negotiations Between Experienced Counsel, And Achieved With An Experienced Mediator's Assistance**

A proposed class action settlement is considered presumptively fair where, as here, the parties have engaged in arm's-length negotiations following years of litigation that has included extensive fact and expert discovery and consultation with experts. *See In re Nat'l Football League Players Concussion Injury Litig.,* 821 F.3d 410, 436 (3d Cir. 2016) ("NFL Players"); *Warfarin,* 391 F.3d at 535.

As noted above, after the close of discovery and while Lead Plaintiffs' motion for class certification was pending, the Parties participated in mediation before Judge Phillips, a preeminent mediator of complex litigation (and, in particular, securities litigation), which involved Defendants' production of Allergan's insurance policies, the exchange of detailed opening and reply mediation statements together with hundreds of exhibits (previewing many of the competing sides' strongest arguments at summary judgment and trial), an all-day mediation session on May 11, 2021, and weeks of continued mediation negotiations resulting in a mediator's settlement recommendation of $130 million in cash. *See, supra,* Section II.C. The intensive arm's-length negotiations and the involvement of an experienced mediator in achieving the Settlement support the conclusion that the Settlement is fair and was achieved free of collusion. *See Schuler v. Medicines Co.,* 2016 WL 3457218, at *7 (D.N.J. Jun. 24, 2016) (finding that "Lead Counsel had ample information to evaluate the prospects for the Class and to assess the fairness of the Settlement" where it had reviewed publicly-available information, conducted an extensive investigation, consulted with an expert, drafted the initial and amended complaints, briefed an opposition to defendants' motion to dismiss, and engaged in mediation).

In addition, Lead Plaintiffs, each an institutional investor of the type favored by Congress to lead securities class actions under the PSLRA, and each with substantial experience serving as

a lead plaintiff in significant securities class action cases, supervised this litigation throughout and recommend that the Settlement be approved. Moreover, Lead Counsel Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz") and Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz"), two nationwide leaders in securities class actions, who have prosecuted this case from 2017 through the close of discovery in 2021 and have a thorough understanding of the factual and legal issues in the Action, also support the Settlement. These facts weigh strongly in favor of preliminary approval. *See Alves v. Main,* 2012 WL 6043272, at *22 (D.N.J. Dec. 4, 2012) ("[C]ourts in this Circuit traditionally attribute significant weight to the belief of experienced counsel that settlement is in the best interest of the class.") (internal quotations omitted).

## B.   The Proposed Settlement Is Within The Range Of Possible Approval

At the preliminary approval stage, the Court need only determine whether it will "likely be able" to approve the Settlement, Fed. R. Civ. P. 23(e)(1), or, in other words, whether the Settlement is "within the range of possible approval." *In re Nat'l Football League Players' Concussion Injury Litig.,* 301 F.R.D. 191, 198 (E.D. Pa. 2014) (citation omitted). Because the proposed $130 million Settlement represents an excellent recovery for the Settlement Class in light of the risks of non-recovery in connection with further prosecution of the Action, the Settlement falls well within the range of possible approval.

The proposed Settlement provides for an immediate, cash payment of $130 million for the benefit of the Settlement Class. This is an excellent result for Settlement Class Members, especially considering the significant risks of continued litigation and the expense and length of continued litigation through trial and appeals. Although Lead Plaintiffs' allegations were sufficiently supported to survive Defendants' motion to dismiss, Lead Plaintiffs faced significant risks in overcoming Defendants' anticipated summary judgment motions, and, if they prevailed

there, in proving their claims at trial. They also faced significant risks in connection with establishing recoverable damages. Several of those risks are discussed below.

*First*, the need to prove an antitrust "case within a case" to establish liability—specifically, the falsity of Defendants' public statements that Allergan was not involved in anti-competitive conduct—greatly amplified the litigation risks Lead Plaintiffs faced. Defendants have taken the position that, in order to establish liability, Lead Plaintiffs would have had to prove an underlying antitrust conspiracy against Allergan before it could establish any alleged securities law violations. Defendants likely would have further argued that, on the factual record, Lead Plaintiffs could not establish that Allergan engaged in a wide-ranging antitrust conspiracy, or that the dramatic price increases alleged in the Complaint were the product of collusion rather than legitimate business reasons, such as supply shortages, increased demand for the products, increased costs, and the like. Further, Defendants would likely have contended that any arguments Lead Plaintiffs raised at summary judgment or trial based on a "market-allocation" theory—i.e., a theory that Defendants conspired to divide up generic drug markets with their competitors in an attempt to maintain supracompetitive pricing without specifically agreeing on what prices to charge—represented a shift from Lead Plaintiffs' original theory of liability as pled in the Complaint, and in any event were based on the false premise that competitors could not independently decide to seek roughly equivalent market share. While Lead Plaintiffs believe they had strong arguments in response, it is clear that, if the Court or a jury were to have credited such arguments at summary judgment or trial, any class recovery could have been eliminated outright.

*Second*, this case carried significant risks with respect to Lead Plaintiffs' ability to prove scienter (or intent to defraud). Defendants have argued that, in order to prevail at trial on the Section 10(b) claims, Lead Plaintiffs would have to show that the Individual Defendants were

-13-

aware of underlying collusive activity involving Allergan employees and other pharmaceutical competitors, or were at least reckless in making allegedly false statements about Allergan's generic drug business. Defendants have argued, and likely would have continued to argue, that the evidence shows none of the Individual Defendants knew about the alleged anti-competitive conduct or had reason to believe such conduct was occurring. Specifically, Defendants were likely to argue that there was no evidence that the Individual Defendants themselves were involved in any collusive communications with competitors, the Individual Defendants had reason to believe that Allergan's generic drug price changes were driven by legitimate business reasons, the Individual Defendants adopted policies prohibiting anti-competitive behavior, and that any anti-competitive conduct (if any) was limited in scope such there was no reason for the Individual Defendants to suspect that their statements to the market were materially misleading. While Lead Plaintiffs believe they had strong arguments in response, including that Defendants were on notice of investigations of anti-competitive conduct in the generic pharmaceuticals industry (and Allergan specifically), if Defendants had prevailed on their scienter arguments, Lead Plaintiffs would have been unable to recover on their Section 10(b) claims, dramatically reducing damages for would-be class members.

*Third*, Lead Plaintiffs' Section 14(a) claims faced serious statute of limitations risks. Claims under Section 14(a) must be brought within one year of the discovery of the claim, and Defendants have argued, and likely would have continued to argue, that the information underlying Lead Plaintiffs' Section 14(a) claims was disclosed at least by August 6, 2015, when Allergan revealed to shareholders that it had received a subpoena from the Department of Justice in connection with an investigation into generic drug pricing. Because the Complaint was filed more than one year later, Defendants have argued (and would have continued to argue) that the Section

-14-

14(a) claims were time-barred. If Defendants prevailed on this argument at either summary judgment or at trial, it would have eliminated Lead Plaintiffs' Section 14(a) claims entirely.

*Fourth*, Lead Plaintiffs would have had to overcome significant challenges in proving loss causation and establishing damages. To start, Defendants argued at the motion-to-dismiss stage, and likely would have argued at summary judgment and trial, that Lead Plaintiffs could not establish loss causation as to either of the two alleged corrective disclosures because each revealed, at most, that Allergan was ***part of*** an ***investigation*** of collusion—not that it had been found to have engaged in such misconduct, or even was the focus of such an investigation. Defendants would likely have bolstered this argument by pointing to the fact that, to date, Allergan has not been criminally charged or found to have committed antitrust violations in connection with the sale of generic drugs during the Class Period. Defendants were likely to argue that, in light of those facts, the alleged corrective disclosures in this case did not reveal (and could not have revealed) any relevant "truth" about Allergan's (or its employees') purported anti-competitive conduct.

In addition, Defendants argued, and likely would have continued to argue, that, even if Allergan employees engaged in antitrust activities, any impact on Allergan's overall business was vanishingly small, particularly in light of Allergan's size—and, therefore, the revelation of the supposed truth about those activities could not, as a matter of financial economics, have resulted in large investment losses. As Defendants previewed at the motion-to-dismiss stage, Defendants were likely to argue that the revenues associated with the drugs that were allegedly subject to collusive agreements were small in total, and that the actual amount of revenues derived from collusion—if any—was much smaller still.

Further, Defendants likely would have made significant "truth on the market" arguments to attack loss causation. Defendants were likely to argue that in advance of the first alleged

corrective disclosure on August 6, 2015, the market was well aware of collusion allegations related to the generic drugs industry, and even of Allergan's potential involvement—because, among other reasons, Allergan was specifically targeted in an October 2, 2014 press release issued by the United States House of Representatives' Committee on Oversight and Reform that described an investigation by Senator Bernie Sanders and the late Representative Elijah Cummings into "staggering" price increases for generic drugs. In addition, Defendants were likely to argue that Lead Plaintiffs would be required to (and would be unable to) isolate any impact of the news of Allergan's potential involvement in generic drug pricing collusion from other Allergan-specific information released that day, such as news that the Company was unlikely to pursue another merger until 2016 and would not provide updated guidance until at least September 2015.

In addition, Defendants were likely to continue to press several significant arguments regarding the second alleged corrective disclosure on November 3, 2016, which was responsible for an outsized proportion of the Settlement Class's recoverable damages. Among other things, Defendants would have argued that (i) any allegedly concealed truth was fully disclosed by the first alleged corrective disclosure on August 6, 2015, discussed above; (ii) the second alleged corrective disclosure—a *Bloomberg* article discussing the ongoing DOJ investigation—did not reveal any new facts; (iii) any alleged facts revealed by the second corrective disclosure were rendered moot by the fact that Allergan had sold its generic drug business (and associated liabilities) to Teva Pharmaceuticals USA, Inc. ("Teva") by the time the disclosure was made; and (iv) consistent with (iii), market participants appeared to have been confused about the status of the liability transfer between Allergan and Teva, and when Allergan clarified that confusion after the market close on November 3, 2016, its stock price rebounded the next trading day—with the

-16-

result that the alleged corrective disclosure did not evince a statistically significant stock price decline.

While Lead Plaintiffs believe that they had meaningful responses to each of the foregoing damages arguments, those arguments presented significant risks at summary judgment and trial—and in any event, the resolution of those issues likely would have come down to an inherently unpredictable and fiercely disputed "battle of the experts." *In re Telik, Inc. Sec. Litig.,* 576 F. Supp. 2d 570, 579-80 (S.D.N.Y. 2008) (in a "battle of experts, it is virtually impossible to predict with any certainty which testimony would be credited"). Thus, in the absence of a settlement, there was a very real risk that the Court or a jury would have ended up crediting Defendants' arguments in whole or in part, and, consequently, the Settlement Class would have recovered an amount far less than the Settlement Amount—or may not have recovered anything at all.

On all of these and other issues, Lead Plaintiffs would have had to prevail at several stages of litigation, including at summary judgment and trial—and then again on the appeals that would likely have followed. Each of these stages posed meaningful risks and could have taken years. The Settlement avoids these risks and will provide a prompt and certain benefit to the Settlement Class, rather than risk a smaller recovery—or none at all—after additional years of litigation.

The Settlement is also reasonable when considered in relation to the range of potential recoveries for the Settlement Class had Lead Plaintiffs prevailed at trial and on any appeals (which, as noted above, was far from certain). For example, accepting certain (but not all) of the substantial loss causation and damages arguments described above concerning the first and second alleged corrective disclosures, Lead Plaintiffs' damages expert estimates that the $130 million Settlement here represents between 13.4% (should defendants prevail on their defense concerning the second corrective disclosure) to 23.4% (should defendants also partially prevail on their defense

concerning the impact of non-fraud related news on the first corrective disclosure date and establish that only half of the stock price decline on that date was caused by the revelation of fraud) of the maximum damages that could be realistically established at trial *before* considering myriad risks to liability involving materiality, falsity or scienter—any one of which could have resulted in investors recovering less or nothing.[7]

### C.   The Settlement Treats All Settlement Class Members Fairly

The Settlement does not improperly grant preferential treatment to Lead Plaintiffs or any segment of the Settlement Class. Rather, all Settlement Class Members will receive a distribution from the Net Settlement Fund in accordance with a plan of allocation to be approved by the Court.

At the final Settlement Hearing, Lead Plaintiffs will ask the Court to approve the proposed Plan of Allocation for the Net Settlement Fund (the "Plan," which is stated in full in the Notice). The Plan of Allocation provides for distribution of the Net Settlement Fund to Settlement Class Members demonstrating a loss on their transactions in Allergan common and/or preferred stock. The formula to apportion the Net Settlement Fund among Settlement Class Members was developed by Lead Counsel in consultation with Lead Plaintiffs' damages expert and is based on the estimated amount of artificial inflation in the prices of Allergan common and preferred stock during the Class Period allegedly caused by Defendants' alleged misconduct.[8] Once the Claims

---

[7] These percentages are based off of estimated inflationary damages using a combined institutional and proportional two-trader damages model.

[8] The calculation of "Recognized Loss Amounts" under the Plan will depend on when the claimant purchased and/or sold the eligible securities, whether the claimant held the securities through the statutory 90-day look-back period, *see* 15 U.S.C. § 78u-4(e), and the value of the securities when the claimant purchased, sold, or held them. Under the Plan, a claimant's "Recognized Claim" will be the sum of the claimant's Recognized Loss Amounts, and the Net Settlement Fund will be allocated to Settlement Class Members on a *pro rata* basis based on the relative size of their Recognized Claims. *See In re Gen. Instrument Sec. Litig.,* 209 F. Supp. 2d 423, 431 (E.D. Pa. 2001) (plan of allocation "even handed" where "claimants are to be reimbursed on a *pro rata* basis

Administrator has processed all submitted claims, it will make distributions to eligible Settlement Class Members, until additional redistributions are no longer cost effective. Any remaining balance will be contributed to non-sectarian, not-for-profit, 501(c)(3) organization(s) approved by the Court.

The proposed Plan is thus a fair and reasonable method for allocating the Net Settlement Fund to eligible Settlement Class Members and merits approval at the Settlement Hearing.

### D.    The Settlement Does Not Excessively Compensate Plaintiffs' Counsel

The proposed Settlement also does not grant excessive compensation to Plaintiffs' Counsel.[9]  The Settlement does not provide for *any* specific award to Plaintiffs' Counsel, and Lead Counsel will be compensated solely out of the Settlement Fund as may be approved by the Court.

In Lead Counsel's fee and expense application, Lead Counsel will seek a fee of no more than 24% of the Settlement Fund for all Plaintiffs' Counsel—an amount that is well within the fee percentage range that courts in the Third Circuit approve in securities class actions. *See In re Ins. Brokerage Antitrust Litig.*, 297 F.R.D. 136, 155 (D.N.J. 2013) ("Courts within the Third Circuit often award fees of 25% to 33% of the recovery").

Lead Counsel's fee and expense application will be filed with the Court, and all supporting papers will also be posted on a website (the "Settlement Website") where Settlement Class Members can review them, as provided by the Preliminary Approval Order. By granting preliminary approval, the Court does not in any way pass upon the reasonableness of the fee or expense application, which will be decided *de novo* at the Settlement Hearing.

---

for their recognized losses based largely on when they bought and sold their shares of General Instrument stock").

[9] Plaintiff's Counsel consists of Lead Counsel Kessler Topaz and Bernstein Litowitz, as well as liaison counsel for Lead Plaintiffs, Carella Byrne Cecchi Brody Agnello, P.C. ("Carella Byrne").

**E.      Lead Plaintiffs Have Identified All Agreements Made In Connection With The Settlement**

In addition to the Stipulation (and preceding Term Sheet), Lead Plaintiffs and Allergan have entered into a confidential Supplemental Agreement regarding requests for exclusion from the Settlement Class (opt-outs). *See* Stipulation ¶ 36. This agreement establishes the conditions under which Allergan may terminate the Settlement if the opt-outs received exceed an agreed-upon threshold. As is standard in securities class actions, agreements of this kind are not made public to avoid incentivizing the formation of a group of opt-outs for the sole purpose of leveraging the opt-out threshold to exact individual settlements. In accordance with its terms, the Supplemental Agreement may be submitted to the Court in camera.

**F.      The Proposed Settlement Class Satisfies Rule 23**

In determining whether to grant preliminary approval, the Court should also determine whether it "will likely be able to" certify the proposed Settlement Class for purposes of the Settlement at final approval. Fed. R. Civ. P. 23(e)(1)(B). The proposed Settlement Class, which has been stipulated to by the Parties, consists of:

> (i) as to claims arising under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), all persons and entities who purchased or otherwise acquired Allergan plc[10] common and/or preferred stock between October 29, 2013 and November 2, 2016, both dates inclusive (the "Class Period"), and were damaged thereby; (ii) as to claims arising under Section 14(a) of the Exchange Act in connection with the merger between Actavis plc and Forest Laboratories, Inc. ("Forest") (the "Forest Merger"), all persons and entities who held Forest common stock as of May 2, 2014, and were entitled to vote on the Forest Merger, and acquired shares of Allergan common stock in the Forest Merger and were damaged thereby; and (iii) as to claims arising under Section 14(a) of the Exchange Act in connection with the merger between Actavis plc and Allergan, Inc. (the "Actavis Merger"), all persons and

---

[10] Before June 15, 2015, Allergan plc was known as Actavis plc. Allergan plc and Actavis plc are collectively referred to in this notice as "Allergan."

entities who held Allergan, Inc. common stock as of January 22, 2015, and were entitled to vote on the Actavis Merger, and acquired shares of Allergan common stock in the Actavis Merger and were damaged thereby.

Stipulation ¶ 1(qq).[11]

Courts have long acknowledged the propriety of certifying a class solely for purposes of a class action settlement. *See, e.g., Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 619-22 (1997); *see also Pozzi v. Smith,* 952 F. Supp. 218, 221 (E.D. Pa. 1997) ("The Third Circuit has declared that class actions created for the purpose of settlement are recognized under the general scheme of Federal Rule of Civil Procedure 23, provided that the class meets the certification requirements under the Rule."). A settlement class, like other certified classes, must satisfy all the requirements of Rules 23(a) and (b), although the manageability concerns of Rule 23(b)(3) are not at issue. *See Amchem,* 521 U.S. at 593 ("Whether trial would present intractable management problems . . . is not a consideration when settlement-only certification is requested[.]"). While the Court need only determine at this preliminary approval stage whether it "will likely be able to" certify the Settlement Class at final approval, as demonstrated below (as well as in Plaintiffs' Motion for Class Certification (ECF Nos. 143, 187, 188, 193)), certification of the proposed Settlement Class for purposes of the Settlement is appropriate here.

---

[11] Excluded from the Settlement Class are: (i) Defendants; (ii) members of the immediate families of the Individual Defendants; (iii) the Company's parents, subsidiaries, and affiliates; (iv) any person who currently is, or was during the Class Period, an officer or director of the Company or any of the Company's parents, subsidiaries or affiliates and members of the immediate families of such officers and directors; (v) any entity in which any Defendant currently has, or had during the Class Period, a controlling interest; and (vi) the legal representatives, agents, affiliates, heirs, successors, and assigns of any such excluded person or entity. Also excluded from the Settlement Class are any persons or entities who submit a request for exclusion from the Settlement Class that is approved by the Court. Stipulation ¶ 1(qq).

1.      **The Settlement Class Satisfies The Requirements Of Rule 23(a)**

Certification is appropriate under Rule 23(a) if "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

a.      **The Settlement Class Satisfies Numerosity**

Lead Plaintiffs meet Rule 23(a)(1)'s numerosity requirement because the proposed Settlement Class is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). "There is no minimum number of members needed for a suit to proceed as a class action," but a showing that the "potential number of plaintiffs exceeds 40" generally satisfies this requirement. *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 595 (3d Cir. 2012). "Numerosity 'is readily met in securities cases involving an issuer whose stock trades publicly on the NYSE,'" as is the case here. *In re Novo Nordisk Sec. Litig.*, 2020 WL 502176, at *5 (D.N.J. Jan. 31, 2020) ("*Novo*") (quoting *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*, 2015 WL 5097883, at *8 (D.N.J. Aug. 31, 2015)). There were between 174 million and 396 million shares of Allergan common stock outstanding, and Allergan offered 5.06 million shares of preferred stock during the Class Period. Both securities evinced significant weekly trading volume, and both traded publicly on the NYSE, one of the "largest and most liquid security exchanges in the world with billions of shares traded each day."  ECF No. 187-1, Ex. A ¶¶28, 44-45. These facts easily establish numerosity. *See Prudential*, 2015 WL 5097883, at *8 (numerosity satisfied where "Prudential stock trade[d] on the NYSE with significant daily volume"); *Dartell v. Tibet Pharms., Inc.*, 2016 WL 718150, at *3 (D.N.J. Feb. 22, 2016) (numerosity satisfied where "there were three million shares of stock sold in the IPO"); *In re Heckmann Corp. Sec. Litig.*, 2013 WL 2456104, at

*10 (D. Del. June 6, 2013) (numerosity "clearly" satisfied where "there were between 69 million and 128 million shares of Heckmann stock outstanding, with an average of 3.4 million common shares traded on a weekly basis").

> **b.      There Are Common Questions Of Law And Fact**

Rule 23(a)(2)'s commonality requirement is met where, as here, there are "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2). This requirement is "not particularly demanding," *Prudential*, 2015 WL 5097883, at *8, and is satisfied where proposed class representatives share "at least one question of fact or law with the grievances of the prospective class." *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015); *see also Novo*, 2020 WL 502176, at *5 ("The threshold for establishing commonality is straightforward: 'The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class.'") (quoting *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 596-97 (3d Cir. 2009)). "Courts in this Circuit have recognized that securities fraud cases often present a paradigmatic common question of law or fact of whether a company omitted material information or made misrepresentations that inflated the price of its stock." *Roofer's Pension Fund v. Papa*, 333 F.R.D. 66, 74–75 (D.N.J. 2019). Such is the case here.

The Complaint details a common course of conduct arising from materially false and misleading statements and omissions that Defendants made to the investing public in Allergan's SEC filings and during conference calls and media appearances, and the Complaint's allegations concern all Settlement Class Members. Accordingly, this Action is replete with questions that are common to the Settlement Class, including: (1) whether Defendants violated Sections 10(b), 14(a) and 20(a) of the Exchange Act; (2) whether public statements made by Defendants during the Class Period misrepresented or omitted material facts; (3) whether Defendants knew or were deliberately reckless in not knowing that their statements and/or omissions were false and

misleading; (4) whether the prices of Allergan common and preferred stock were artificially inflated; and (5) whether Defendants' conduct caused the members of the Settlement Class to sustain damages. Each of these questions demonstrates a common theory of recovery for Lead Plaintiffs and the Settlement Class, which satisfies the commonality requirement. *See In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 2013 WL 396117, at *4 (D.N.J. Jan. 30, 2013).

### c. Lead Plaintiffs' Claims Are Typical Of Those Of The Settlement Class

Lead Plaintiffs satisfy Rule 23(a)(3)'s typicality requirement because Lead Plaintiffs' claims are "typical" of the claims of the Settlement Class. Fed. R. Civ. P. 23(a)(3). "The standard for demonstrating typicality is undemanding and requires that 'the claims of the named plaintiffs and putative class members involve the same conduct by the defendant.'" *Papa*, 333 F.R.D. at 75 (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183-84 (3d Cir. 2001)). Typicality "does not require that the putative class members all share identical claims." *Papa*, 333 F.R.D. at 75 (citing *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 531-32 (3d Cir. 2004)). Typicality is easily established here.

Here, Lead Plaintiffs' claims are typical of the claims of the Settlement Class because all claims are based on Defendants' alleged wrongful conduct and all members of the Settlement Class were similarly affected by such alleged conduct. Like all Settlement Class Members, Lead Plaintiffs purchased or acquired publicly-traded Allergan common and/or preferred stock during the Class Period and claim to have suffered damages when Defendants' misstatements and omissions were revealed. In short, because "Plaintiffs' claims arise from the very same alleged Exchange Act violations as those that give rise to the claims of the absent class members," typicality is satisfied. *Merck*, 2013 WL 396117, at *5; *see also Novo*, 2020 WL 502176, at *6 ("[T]ypicality is clearly satisfied because Plaintiffs' claims arise from the same course of conduct

that gave rise to the claims of all other Class members and are based on the same legal theory."); *Prudential*, 2015 WL 5097883, at *9 (typicality satisfied in class action alleging § 10(b) and § 20(a) violations where "[t]he factual and legal predicates of [the proposed class representative's] claims are the same as those for the class members"); *Heckmann*, 2013 WL 2456104, at *11 (same); *In re Schering-Plough Corp./ENHANCE Sec. Litig.*, 2012 WL 4482032, at *5 (D.N.J. Sept. 25, 2012) (same).

> **d.    Lead Plaintiffs Will Fairly And Adequately Protect The Settlement Class**

Rule 23(a)(4) mandates that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy prerequisite has two prongs: (1) "the class representatives' interests are not adverse to those of other members of the class"; and (2) "the class representative is represented by attorneys who are qualified, experienced, and generally able to conduct the litigation." *Schering-Plough*, 2012 WL 4482032, at *6. This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Schering-Plough*, 2012 WL 4482032, at *6 (quotation marks omitted). Here, Lead Plaintiffs are sophisticated institutional investors that have and will continue to represent the interests of the Settlement Class fairly and adequately, and there is no antagonism or conflict of interest between Lead Plaintiffs and the other Settlement Class Members.

Moreover, Lead Plaintiffs have retained counsel highly experienced in securities litigation who have successfully prosecuted many securities and other complex class actions throughout the United States. Lead Plaintiffs are thus adequate representatives of the Settlement Class, and their counsel are qualified, experienced, and capable of prosecuting this Action. This Court has recognized that there is "no doubt" Bernstein Litowitz is "qualified, experienced, and generally

able to conduct [securities class action] litigation." *Schering-Plough*, 2012 WL 4482032, at *6.[12]

Kessler Topaz has been similarly recognized for being "highly qualified," *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 2013 WL 3486990, at *2 (S.D.N.Y. Jul. 11, 2013), and "skilled in shareholder and transactional litigation, focusing on such a practice over the past 24 years." *Gilbert v. Abercrombie & Fitch, Co.*, 2016 WL 4159682, at *6 (S.D. Ohio Aug. 5, 2016).

### 2.    The Settlement Class Satisfies The Requirements Of Rule 23(b)(3)

Rule 23(b)(3) authorizes class certification if "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The proposed Settlement Class meets these requirements.

### a.    Common Legal And Factual Questions Predominate

"The Rule 23(b) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. This inquiry is satisfied where "***questions*** of law or fact common to the class will 'predominate over any questions affecting only individual members' as the litigation progresses." *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 467 (2013); *see also Papa*, 333 F.R.D. at 78-79 ("[T]he

---

[12] Exhibit 3 to the Motion is a copy of an order in an unrelated action where Bernstein Litowitz has been serving as Lead Counsel for SEB Investment Management AB ("SEB"), and Class Counsel for the certified Class. *See SEB Inv. Mgmt. AB v. Symantec Corp.*, 2021 WL 1540996 (N.D. Cal. Apr. 20, 2021). As reflected in the order, counsel for a competing lead plaintiff movant (which was not appointed) raised questions about Bernstein Litowitz's hiring of a former employee of the lead plaintiff in that case, SEB. Following discovery and extensive briefing, the court found that the evidence did not establish a *quid pro quo*, and allowed Bernstein Litowitz to continue as Class Counsel. *See id*. at *1-2. The court nevertheless ordered Bernstein Litowitz to bring the order to the attention of any court in which Bernstein Litowitz seeks appointment as class counsel. *See id.* at *2. Since the formal appointment of class counsel under Rule 23 is deferred to this Court's ruling at the final approval stage, Lead Counsel do not believe that the issue raised by the court in *Symantec* is currently joined, but are providing the order to the Court in an abundance of caution.

predominance inquiry turns on whether the evidence necessary to prove the essential elements of the underlying claims will vary from class member to class member, causing the Court to engage in individual treatment of the issues."). This "test [is] readily met in certain cases alleging . . . securities fraud." *Amchem,* 521 U.S. at 625.

Here, the predominance standard is easily met, because the core factual and legal questions in the Action are common to all Settlement Class Members. Indeed, courts have held that the elements of materiality, falsity, and loss causation are all paradigmatic common questions for both the Section 10(b) and Section 14(a) claims at issue here. *See, e.g.*, *Amgen*, 568 U.S. at 467 ("materiality is a 'common questio[n]' for purposes of Rule 23(b)(3)"); *id*. at 475 ("this Court has held that loss causation and the falsity or misleading nature of the defendant's alleged statements or omissions are common questions that need not be adjudicated before a class is certified"); *Erica P. John Fund, Inc. v. Halliburton Co.,* 563 U.S. 804, 813 (2011) ("*Halliburton I"*) (holding that plaintiff need not prove loss causation at class certification); *Heckmann*, 2013 WL 2456104, at *10, 14; *In re DaimlerChrysler AG Sec. Litig.*, 216 F.R.D. 291, 300 (D. Del. 2003); *Koppel v. 4987 Corp.*, 191 F.R.D. 360, 365-66 & n.9 (S.D.N.Y. 2000); *Lane v. Page*, 272 F.R.D. 558, 580 (D.N.M. 2011); *In re Piedmont Office Trust, Inc. Sec. Litig.*, 264 F.R.D. 693, 701-02 (N.D. Ga. 2010).[13]

  **b.**  **A Class Action Is Superior To Other Methods Of Adjudication**

Rule 23(b)(3) provides the following non-exhaustive factors to be considered in determining whether class certification is the superior method of litigation: "(A) the class

---

[13] For purposes of certification of the Settlement Class, Defendants do not dispute that the predominance requirement is met with respect to the Settlement Class. In any event, for the reasons set discussed further in Lead Plaintiffs' class certification papers, the predominance requirement is met here because reliance can be presumed under the presumptions set forth in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) and *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), and damages are measurable using a common methodology as required by *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).

-27-

members' interests in individually controlling the prosecution . . . of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by . . . class members; [and] (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum[.]" Fed. R. Civ. P. 23(b)(3).[14] Superiority "is easily satisfied in securities fraud cases where 'there are many individual plaintiffs who suffer damages too small to justify a suit against a large corporate defendant.'" *Heckmann*, 2013 WL 2456104, at *8. Indeed, courts in this district have recognized that "[a] class action is certainly the superior method for adjudicating" securities fraud claims because "[g]enerally, 'as a practical matter, investors defrauded by securities law violations have no recourse other than class relief.'" *Papa*, 333 F.R.D. at 78.

## V.  THE COURT SHOULD APPROVE THE PROPOSED FORM OF NOTICE AND PLAN FOR PROVIDING NOTICE TO THE SETTLEMENT CLASS

As outlined in the proposed Preliminary Approval Order, if the Court grants preliminary approval, the Claims Administrator will mail the Notice and Claim Form (Exhibits A-1 and A-2 to the Preliminary Approval Order) to all Settlement Class Members who can be identified with reasonable effort, as well as post the Notice and the Claim Form on the Settlement Website.[15] The Claims Administrator will utilize a proprietary list of the largest and most common banks, brokerage firms, and nominees that purchase securities on behalf of beneficial owners to facilitate the dissemination of notice. The Notice will advise Settlement Class Members of (i) the pendency of the class action, (ii) the essential terms of the Settlement, and (iii) information regarding Lead

---

[14] As noted above, manageability is not an element relevant to the certification of a settlement class. *See Amchem*, 521 U.S. at 593 ("Whether trial would present intractable management problems . . . is not a consideration when settlement-only certification is requested."). In any event, this case presents no manageability concerns.

[15] Lead Plaintiffs request that the Court approve retention of A.B. Data, Ltd. ("A.B. Data"), as the Claims Administrator for this case. A.B. Data has successfully administered numerous complex securities class action settlements in this Circuit and elsewhere. *See* https://abdataclassaction.com.

Counsel's application for attorneys' fees and expenses. The Notice will also provide specifics on the date, time, and place of the Settlement Hearing and state the procedures for objecting to the Settlement, the proposed Plan of Allocation, and the motion for attorneys' fees and expenses, and for requesting exclusion from the Settlement Class. The Summary Notice will be published in *The Wall Street Journal* and transmitted via PR Newswire.

The form and manner of providing notice to the Settlement Class satisfy the requirements of due process, Rule 23, and the PSLRA. The Notice and Summary Notice "provide[] all of the required information concerning the class members' right[s] and obligations under the settlement." *In re Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 328 (3d Cir. 1998). The manner of providing notice, which includes individual notice by mail to all Settlement Class Members who can be reasonably identified, represents the best notice practicable under the circumstances and satisfies the requirements of due process and Rule 23. *See Jones v. Commerce Bancorp, Inc.*, 2007 WL 2085357, at *5 (D.N.J. July 16, 2007) ("the proposed distribution of notice to class members by first class mail is reasonable because no alternative method of distribution is more likely to notify class members"). Lead Plaintiffs respectfully request that the proposed notice procedures be approved.

## VI.  PROPOSED SCHEDULE OF SETTLEMENT EVENTS

The Parties respectfully propose the following schedule for proceeding with final approval of the Settlement. If the Court agrees, the Parties request that Court schedule the Settlement Hearing for a date 110 calendar days after entry of the Preliminary Approval Order, or at the Court's earliest convenience after that date. The illustrative dates provided below assume that the Court enters the Preliminary Approval Order by July 16, 2021, and sets the Settlement Hearing for on or about November 3, 2021. Please note that the Court need only enter the date of the Settlement Hearing at paragraph 5 of the accompanying proposed Preliminary Approval Order, as all other

dates or deadlines referenced below will be set based on either (a) the date of entry of the Preliminary Approval Order or (b) the date chosen by the Court for the Settlement Hearing.

| Event | Proposed Timing | Example Date |
|---|---|---|
| Deadline for mailing the Notice and Claim Form to Settlement Class Members (which date shall be the "Notice Date") | No later than 20 business days after entry of Preliminary Approval Order (Preliminary Approval Order ¶ 7(b)) | August 13, 2021 |
| Deadline for publishing the Summary Notice | No later than 10 business days after the Notice Date (Preliminary Approval Order ¶ 7(d)) | August 27, 2021 |
| Deadline for filing of papers in support of final approval of the Settlement, Plan of Allocation, and Lead Counsel's motion for attorneys' fees and expenses) | 35 calendar days before the date set for the Settlement Hearing (Preliminary Approval Order ¶ 28) | September 29, 2021 |
| Deadline for receipt of requests for exclusion or objections | 21 calendar days before the date set for the Settlement Hearing (Preliminary Approval Order ¶¶ 14, 18) | October 13, 2021 |
| Deadline for filing reply papers | 7 calendar days before the Settlement Hearing (Preliminary Approval Order ¶ 28) | October 27, 2021 |
| Settlement Hearing | 110 calendar days after entry of the Preliminary Approval Order, or at the Court's earliest convenience thereafter (Preliminary Approval Order ¶ 5) | November 3, 2021 |
| Postmark deadline for submitting Claim Forms | 120 calendar days after the Notice Date (Preliminary Approval Order ¶ 11) | December 13, 2021 |

## VII.   CONCLUSION

For the forgoing reasons, Lead Plaintiffs respectfully request that the Court (i) preliminarily approve the proposed Settlement, (ii) approve the proposed form and manner of notice to putative Settlement Class Members, and (iii) schedule a date and time for the Settlement Hearing to consider final approval of the Settlement and related matters.

Dated: July 9, 2021                    Respectfully submitted,

/s/ *James E. Cecchi*
James E. Cecchi
Donald A. Ecklund
**CARELLA, BYRNE, CECCHI, OLSTEIN,**
**BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
decklund@carellabyrne.com

*Liaison Counsel for Lead Plaintiffs and the*
*Settlement Class*

Matthew L. Mustokoff
Margaret E. Mazzeo
Jonathan F. Neumann
**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
mmustokoff@ktmc.com
mmazzeo@ktmc.com
jneumann@ktmc.com

*Co-Lead Counsel for Lead Plaintiffs and*
*the Settlement Class*

John C. Browne
Lauren A. Ormsbee
Michael M. Mathai
Nicholas R. Gersh
**BERNSTEIN LITOWITZ BERGER &**
**GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1448
johnb@blbglaw.com
lauren@blbglaw.com
michael.mathai@blbglaw.com
nicholas.gersh@blbglaw.com

*Co-Lead Counsel for Lead Plaintiffs and the*
*Settlement Class*

-31-