James E. Cecchi
Donald A. Ecklund
**CARELLA, BYRNE, CECCHI,**
**OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744

*Liaison Counsel for Lead Plaintiffs and*
*the Settlement Class*

Matthew L. Mustokoff
Margaret E. Mazzeo
Jonathan F. Neumann
**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Co-Lead Counsel for Lead Plaintiffs and*
*the Settlement Class*

John C. Browne
Lauren A. Ormsbee
Michael Mathai
**BERNSTEIN LITOWITZ BERGER &**
**GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1448

*Co-Lead Counsel for Lead Plaintiffs and*
*the Settlement Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE ALLERGAN GENERIC DRUG PRICING SECURITIES LITIGATION | Case No. 2:16-cv-09449 (KSH) (CLW) |
| | **JOINT DECLARATION OF MATTHEW L. MUSTOKOFF AND JOHN C. BROWNE IN SUPPORT OF (A) LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION; AND (B) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND LITIGATION EXPENSES** |

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................................3

II.  SUMMARY OF LEAD PLAINTIFFS' CLAIMS ...............................................8

III.  PROCEDURAL HISTORY OF THE ACTION AND PLAINTIFFS'
COUNSEL'S LITIGATION EFFORTS................................................................10

    A.  Commencement of the Action and Appointment of Lead Plaintiffs and
Lead Counsel ..............................................................................................10

    B.  Lead Plaintiffs' Investigation and Filing of First Amended Complaint ...............11

    C.  Defendants' Motion to Dismiss the First Amended Complaint...........................12

    D.  The Second Amended Complaint; Defendants' Motion to Dismiss the
Second Amended Complaint; and the Court's Ruling Thereon ..........................14

    E.  Lead Plaintiffs' Extensive Discovery Efforts .........................................16

    F.  Document Discovery from Defendants and Third Parties....................................17

    G.  Document Discovery from Lead Plaintiffs .............................................18

    H.  Written Discovery.....................................................................................19

    I.  Depositions ................................................................................................19

    J.  Lead Counsel's Work with Respect to Experts and Consultants...........................20

    K.  Lead Plaintiffs' Class Certification Motion..........................................21

IV.  THE SETTLEMENT .........................................................................................22

    A.  The Parties' Settlement Negotiations and Mediation ...........................................22

    B.  Preparation of Settlement Documentation and Motion for Preliminary
Approval of Settlement ..............................................................................23

V.  RISKS OF CONTINUED LITIGATION ...........................................................25

    A.  Risks to Prosecuting Securities Class Actions in General ....................................26

    B.  Risks to Establishing Defendants' Liability .........................................29

    C.  Risks Concerning Loss Causation and Damages....................................31

    D.  Statute of Limitations Risks.....................................................................34

    E.  Risks After Trial .......................................................................................34

VI.  COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER
AND REACTION OF THE SETTLEMENT CLASS TO DATE....................................35

VII.  THE PLAN FOR ALLOCATING THE NET SETTLEMENT FUND TO THE
SETTLEMENT CLASS IS FAIR, REASONABLE, AND ADEQUATE.......................39

VIII.  THE FEE AND EXPENSE APPLICATION ..................................................42

i

A.    Lead Counsel's Fee Request Is Fair and Reasonable and Warrants Approval ........................................................................................................43

    1.    The Favorable Settlement Achieved ...........................................................43

    2.    The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases .................................44

    3.    The Time and Labor Devoted to the Action by Plaintiffs' Counsel .........46

    4.    The Quality of Plaintiffs' Counsel's Representation .................................48

    5.    Lead Plaintiffs' Endorsement of the Fee Application...............................49

B.    Lead Counsel's Request for Litigation Expenses Warrants Approval .................49

    1.    Lead Counsel Seek Reimbursement of Plaintiffs' Counsel's Reasonable and Necessary Litigation Expenses from the Settlement Fund ........................................................................................49

    2.    Reimbursement to Lead Plaintiffs Is Fair and Reasonable ......................52

IX.    MISCELLANEOUS EXHIBITS ....................................................................................53

X.    CONCLUSION...............................................................................................................53

We, MATTHEW L. MUSTOKOFF and JOHN C. BROWNE, declare as follows pursuant to 28 U.S.C. § 1746:

1.      We, Matthew L Mustokoff and John C. Browne, are partners of the law firms of Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz") and Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz"), respectively.[1] Kessler Topaz and Bernstein Litowitz (together, Court-appointed "Lead Counsel") represent plaintiffs Sjunde AP-Fonden ("AP7") and Union Asset Management Holding AG ("Union," and together with AP7, Court-appointed "Lead Plaintiffs") in this securities class action lawsuit ("Action"). We have personal knowledge of the matters set forth herein based on our active supervision of and participation in the prosecution and resolution of the Action.

2.      We respectfully submit this Joint Declaration in support of Lead Plaintiffs' motion pursuant to Rule 23(e) of the Federal Rules of Civil Procedure ("Federal Rules" or "Rules") for final approval of the proposed settlement with defendants Allergan plc (before June 15, 2015, known as Actavis plc) (Allergan plc and Actavis plc, collectively, "Allergan" or the "Company"), Paul Bisaro, Brenton L. Saunders, Maria Teresa Hilado, R. Todd Joyce, Sigurdur O. Olafsson, David A. Buchen, James H. Bloem, Christopher W. Bodine, Tamar D. Howson, John A. King, Ph.D, Catherine M. Klema, Jiri Michal, Jack Michelson, Patrick J. O'Sullivan, Ronald R. Taylor, Andrew L. Turner, Fred G. Weiss, Nesli Basgoz, M.D., and Christopher J. Coughlin (collectively, "Defendants") for $130,000,000 in cash ("Settlement"). If approved, the Settlement will resolve all claims asserted in the Action against Defendants on behalf of the Settlement Class, consisting

---

[1] Capitalized terms that are not defined in this Joint Declaration have the same meanings as set forth in the Stipulation and Agreement of Settlement dated as of July 8, 2021 (ECF No. 223-1) ("Stipulation").

of all persons and entities who purchased or otherwise acquired the common and/or preferred stock of Allergan during the period between October 29, 2013 and November 2, 2016, both dates inclusive ("Class Period"), and were damaged thereby.[2] The Court preliminarily approved the Settlement and directed notice thereof to the Settlement Class by Order dated July 30, 2021 (ECF No. 228) ("Preliminary Approval Order").

3.      We also respectfully submit this Joint Declaration in support of: (i) the proposed plan for allocating the net proceeds of the Settlement to eligible Settlement Class Members ("Plan of Allocation"); and (ii) Lead Counsel's motion, on behalf of Plaintiffs' Counsel,[3] for an award of attorneys' fees in the amount of 23.8% of the Settlement Fund;[4] payment of litigation expenses incurred by Plaintiffs' Counsel in the total amount of $2,473,243.51; and, in accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA"), payment of $84,850.00 in the

---

[2] The Settlement Class includes: (i) all persons and entities who held Forest Laboratories, Inc. ("Forest") common stock as of May 2, 2014, and were entitled to vote on the merger between Actavis plc and Forest (the "Forest Merger"), and acquired shares of Allergan common stock in the Forest Merger and were damaged thereby; and (ii) all persons and entities who held Allergan, Inc. common stock as of January 22, 2015, and were entitled to vote on the merger between Actavis plc and Allergan, Inc. (the "Actavis Merger"), and acquired shares of Allergan common stock in the Actavis Merger and were damaged thereby. Excluded from the Settlement Class are: (i) Defendants; (ii) members of the immediate families of the Individual Defendants; (iii) the Company's parents, subsidiaries, and affiliates; (iv) any person who currently is, or was during the Class Period, an officer or director of the Company or any of the Company's parents, subsidiaries, or affiliates and members of the immediate families of such officers and directors; (v) any entity in which any Defendant currently has, or had during the Class Period, a controlling interest; and (vi) the legal representatives, agents, affiliates, heirs, successors, and assigns of any such excluded person or entity. Also excluded from the Settlement Class are any persons or entities who submit a request for exclusion from the Settlement Class that is approved by the Court.

[3] Plaintiffs' Counsel refers collectively to: (i) Lead Counsel Kessler Topaz and Bernstein Litowitz; (ii) Court-appointed Liaison Counsel Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C. ("Carella Byrne"); and (iii) additional counsel The Rosen Law Firm P.A. ("Rosen Law") and Motley Rice LLC ("Motley Rice").

[4] The 23.8% fee request represents a blended rate of 25% of the first $100 million of the $130 million Settlement Amount and 20% of the remaining $30 million of the Settlement Amount, rounded down from 23.846%.

aggregate to Lead Plaintiffs for costs incurred in connection with their representation of the Settlement Class ("Fee and Expense Application").

4.      For the reasons discussed below and in the accompanying memoranda,[5] we, on behalf of Lead Counsel, respectfully submit that: (i) the terms of the Settlement are fair, reasonable, and adequate in all respects and should be approved by the Court; (ii) the proposed Plan of Allocation is fair, reasonable, and adequate and should be approved by the Court; and (iii) the Fee and Expense Application is fair, reasonable, supported by the facts and the law, and should be granted in all respects.[6] Moreover, the Settlement, Plan of Allocation, and Fee and Expense Application have the full support of Lead Plaintiffs—two sophisticated, institutional investors that have actively supervised the Action since its inception. *See* Declaration of Richard A. Gröttheim on behalf of AP7 ("Gröttheim Decl."); Declaration of Jochen Riechwald on behalf of Union ("Riechwald Decl."), attached hereto as Exhibits 1 and 2, respectively.

## I.      INTRODUCTION

5.      Following more than four years of hard-fought litigation as well as protracted, arm's-length negotiations facilitated by an experienced mediator, Lead Plaintiffs and Lead Counsel have succeeded in obtaining a significant common-fund recovery in the amount of $130 million in cash ("Settlement Amount") for the benefit of the Settlement Class.[7] As provided in the Stipulation, in exchange for this substantial consideration, the Settlement resolves all claims

---

[5] In conjunction with this Joint Declaration, Lead Plaintiffs and Lead Counsel are submitting the Memorandum of Law in Support of Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation ("Settlement Memorandum") and the Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses ("Fee Memorandum").

[6] As consented to by the Parties, the Court has referred all settlement proceedings in this Action, including entry of the final judgment, to Magistrate Judge Cathy L. Waldor. ECF No. 225.

[7] Pursuant to the terms of the Stipulation and the Preliminary Approval Order, the Settlement Amount has been fully funded, and is currently being held in the interest-bearing Escrow Account.

asserted in the Action (and related claims) by Lead Plaintiffs and the Settlement Class against Defendants and the other Defendants' Releasees. The Settlement represents a significant portion of the Settlement Class's potential recoverable damages. *See infra* ¶¶ 10, 104. Moreover, to Lead Counsel's knowledge, this Settlement is the first to be achieved among the federal securities cases arising from the antitrust allegations at issue in the Action, which date back over half a decade. It is an outstanding result for the Settlement Class.

6.      Until a resolution was reached in June 2021, this Action was actively and vigorously litigated by the Parties. At the time of settlement, Lead Counsel had, among other things, researched and prepared two detailed complaints, briefed two motions to dismiss and a class certification motion, completed substantial, hard-fought fact discovery—including the review and analysis of over 2.6 million pages of documents, and twenty fact depositions—and were on the verge of exchanging merits expert reports with Defendants. The Settlement is the product of arm's-length negotiations, including a formal mediation before former United States District Judge Layn R. Phillips ("Judge Phillips"), who ultimately made a mediator's recommendation to resolve the Action for a cash payment of $130 million that the Parties accepted. *See infra* ¶¶ 55-57.[8]

7.      In deciding to settle the Action, Lead Plaintiffs and Lead Counsel carefully considered the significant risks associated with advancing their case through a ruling on class certification, the completion of expert discovery, summary judgment, trial, and the inevitable post-trial appeals.

---

[8] *See also* Declaration of Layn R. Phillips in Support of Motion for Final Approval of Settlement ("Phillips Decl") attached hereto as Exhibit 3.

8.     Here, even if Lead Plaintiffs succeeded on their motion for class certification ("Class Certification Motion"), which was pending at the time of settlement, Lead Plaintiffs faced considerable challenges to their ability to prove Defendants' liability, as well as loss causation and the Settlement Class's full amount of damages, if the Action continued. At summary judgment and trial, Defendants would have argued forcefully, as they did at the motion-to-dismiss stage, that, in order to establish liability, Lead Plaintiffs would have had to prove an underlying antitrust conspiracy against Allergan as a predicate to establishing any alleged securities law violations. Defendants would further have argued that Lead Plaintiffs could not prove that Allergan engaged in any anti-competitive misconduct—and that, in any event, even if such misconduct occurred, Lead Plaintiffs could not establish scienter because the Individual Defendants knew nothing about the alleged anti-competitive conduct and had no reason to believe that Allergan was colluding with its competitors.

9.     In addition to the risks associated with establishing Defendants' liability, Lead Plaintiff faced substantial challenges in proving loss causation and the Settlement Class's full amount of damages. Lead Plaintiffs alleged that Allergan's stock price declined, causing substantial damages to Allergan's shareholders, following "corrective disclosures" on two dates: (i) August 6, 2015, when Allergan announced its receipt of a federal grand jury subpoena from the U.S. Department of Justice Antitrust Division ("DOJ") in connection with the government's investigation of price-fixing in the generic drug markets; and (ii) November 3, 2016, when an article in *Bloomberg* revealed that the DOJ's investigation had intensified and criminal charges were likely. Defendants would have vigorously asserted, as they did throughout the Action, that Lead Plaintiffs would be unable to establish loss causation as to either of the two alleged corrective disclosures because each revealed, at most, that Allergan was *part of an investigation* of

collusion—not that it had been found to have engaged in such misconduct, or even was the focus of such investigation. To support this argument, among other things, Defendants would have underscored the fact that, to date, Allergan has not been criminally charged or found to have committed antitrust violations in connection with the sale of generic drugs during the Class Period. In addition to attacking each of the corrective disclosures on multiple bases (*see infra* ¶¶ 79-81), Defendants would have argued that, even if Allergan employees engaged in antitrust activities, any impact on Allergan's business was miniscule, particularly in light of Allergan's size, and, therefore that the revelation of the "truth" about any antitrust violations could not have caused the significant investment losses alleged by Lead Plaintiffs.

10. Particularly, when viewed in the context of such risks and the delays of continued litigation, the Settlement is an excellent result for the Settlement Class. Indeed, accepting certain (but not all) of Defendants' loss causation and damages arguments concerning the first and second alleged corrective disclosures, the Settlement Amount of $130 million represents between 13.4% and 23.4% of the maximum damages that could be realistically established at trial, as estimated by Lead Plaintiffs' damages consultant.[9] *See infra* ¶ 104. Importantly, this is *before* considering myriad risks to liability involving materiality, falsity, and scienter—any one of which could have resulted in investors recovering less than the Settlement Amount, or nothing at all.

11. To put the significance of this recovery into the appropriate context, economic consulting experts at Cornerstone Research have determined that, in cases with estimated damages

---

[9] The $130 million Settlement represents 13.4% of potentially recoverable damages if Defendants were to have succeeded in eliminating the second alleged corrective disclosure, and represents 23.4% of recoverable damages if, in addition, Defendants were to have succeeded in convincing the factfinder that half of the decline associated with the first alleged corrective disclosure was not fraud-related.

between $500 and $999 million, the median securities class action settlement amount was 2.6% of estimated damages in 2020, and 3.3% of estimated damages for the years 2011 through 2019.[10] Had Lead Plaintiffs reached a settlement in this median recovery range, the Court would be evaluating a settlement somewhere between $14 million and $32 million—not the $130 million Settlement obtained here.

12.     Lead Counsel have worked with the Court-authorized Claims Administrator, A.B. Data, Ltd. ("A.B. Data"), to disseminate notice of the Settlement to Settlement Class Members as directed in the Preliminary Approval Order. In this regard, A.B. Data has mailed over one million copies of the Notice and Claim Form (together, the "Notice Packet") to Settlement Class Members and nominees.[11] Additionally, A.B. Data has posted the Notice and Claim Form, along with other relevant documents, on the website www.AllerganDrugPricingSecuritiesLitigation.com, and has caused the Summary Notice to be published in *The Wall Street Journal* and transmitted over *PR Newswire*. Walter Decl., ¶¶ 9, 11. As ordered by the Court and stated in the notices, objections and requests for exclusion from the Settlement Class are due no later than October 27, 2021. To date, only one potential, generalized objection to Lead Counsel's fee and expense request has been

---

[10] *See* Laarni T. Bulan & Laura E. Simmons, *Securities Class Action Settlements: 2020 Review and Analysis*, Cornerstone Research, 6 (2021), www.cornerstone.com/Publications/Reports/Securities-Class-Action-Settlements-2020-Review-and-Analysis, a copy of which is attached hereto as Exhibit 8 ("Cornerstone Research").

[11] *See* Declaration of Adam D. Walter Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date, attached hereto as Exhibit 4 ("Walter Decl."), at ¶ 8.

received.[12] There have been no objections to the Settlement and Plan of Allocation and there have been no requests for exclusion from the Settlement Class.[13]

## II.    SUMMARY OF LEAD PLAINTIFFS' CLAIMS

13.    Allergan is a specialty pharmaceutical company that develops, manufactures, markets, and distributes medical aesthetics, biosimilar, and over-the-counter pharmaceutical products worldwide. This Action arises out of Allergan's participation in an overarching generic drug price-fixing conspiracy that is the focus of investigations by Congress, the DOJ, and several state Attorneys General. ¶ 2. The Settlement Class's claims in the Action are set forth in the Consolidated Second Amended Class Action Complaint (ECF No. 82) (the "Complaint" or "Second Amended Complaint").[14]

14.    The Complaint alleges that during the Class Period, Allergan was a central participant in a massive cartel that fixed the prices of generic drugs sold in the U.S. More specifically, the Complaint alleges that, beginning in the first half of 2013, Allergan entered into and maintained price-fixing agreements with other major generic drug makers, following years of stable prices. ¶¶ 5-7, 107-16, 126-29, 140-49, 159-62. The Complaint alleges that these agreements led to astronomical price increases which typically followed industry meetings attended by senior

---

[12] The only objection received to date was submitted by Dr. Stephen Francis Schoeman ("Schoeman Objection"). *See* Exhibit 10 attached hereto. As discussed in the accompanying Fee Memorandum, Dr. Schoeman's primary complaint is that the Notice does not provide enough detail regarding counsel's fee and expense request. That complaint, however, is resolved by the detailed lodestar and expense information that is being submitted to the Court today in accordance with the Preliminary Approval Order. Of further note, Dr. Schoeman has not provided any documentation or supporting evidence to establish his membership in the Settlement Class—a threshold standing requirement to object.

[13] Lead Plaintiffs and Lead Counsel will further address Dr. Schoeman's objection and any additional objections received after this submission and any requests for exclusion from the Settlement Class in their reply to be filed on or before November 10, 2021.

[14] All references to "¶ __" in this Section are to the Complaint.

executives from Allergan and its competitors. ¶¶ 21, 25, 83, 105, 110, 113, 116, 129, 149, 162, 188-89. The Complaint also alleges that Allergan and its co-conspirators had numerous opportunities to collude, including at industry meetings, trade shows, and private "industry dinners" among high-level executives. *Id.* The Complaint further alleges that collusion also occurred via telephone calls and text messages, records of which were provided to the Attorneys General of Connecticut, New Jersey, and forty-two other states and described in complaints they filed alleging antitrust claims against Allergan and other generic pharmaceutical companies. ¶¶ 171-79.

15.     Lead Plaintiffs allege that Defendants misled Allergan's shareholders about the Company's role in the conspiracy in several ways, including by: (i) issuing multiple statements that misled investors into believing that Allergan's profits in the generic drug markets were legitimately (and legally) increasing (*see, e.g.*, ¶¶ 195-96, 221); (ii) misrepresenting that Allergan actively competed in the generic drug markets when, in fact, Allergan was colluding with its purported competitors to artificially inflate drug prices, to the direct detriment of consumers (*see, e.g.*, ¶¶ 195, 197, 199, 201, 209, 211, 219); (iii) misleading investors about Allergan's compliance with antitrust laws and policies prohibiting anti-competitive behavior (*see, e.g.*, ¶ 232); and (iv) continuing to mislead the market about the drivers of the Company's revenues and the risks associated with the DOJ investigation after Allergan disclosed that it had been served with a federal grand jury subpoena in 2015 (*see, e.g.*, ¶¶ 213-19).

16.     Lead Plaintiffs allege that the truth about Allergan's anti-competitive conduct began to come to light on August 6, 2015, when Allergan disclosed that the DOJ had served the Company with a grand jury subpoena seeking information on its generic drug pricing (*see* ¶¶ 234-36), and was fully revealed more than a year later, on November 3, 2016, when investors learned

that the DOJ's investigation had intensified and gathered enough evidence of criminality such that charges could be filed against Allergan and other co-conspirators, and the media reported that "U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion." ¶ 239. Each of these disclosures was associated with substantial declines in Allergan's stock price, causing damage to Settlement Class Members. ¶¶ 237, 240-41.[15] This lawsuit followed.

## III.   PROCEDURAL HISTORY OF THE ACTION AND PLAINTIFFS' COUNSEL'S LITIGATION EFFORTS

### A.   Commencement of the Action and Appointment of Lead Plaintiffs and Lead Counsel

17.     On December 22, 2016, the first securities class action complaint, captioned *Forden v. Allergan plc, et al.*, Case No. 2:16-cv-09449-SDW-LDW, was filed in the United States District Court for the District of New Jersey on behalf of a putative class of investors who purchased or otherwise acquired the securities of Allergan between February 25, 2014 and November 2, 2016. ECF No. 1. The initial complaint asserted claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, against Allergan and certain of its senior officers and executives.

18.     On January 3, 2017, AP7 and Union (as well as others) moved to be appointed as lead plaintiff. ECF Nos. 3-13. On February 1, 2017, the Court appointed AP7 and Union as Lead Plaintiffs and approved their selection of Kessler Topaz and Motley Rice as Co-Lead Counsel and

---

[15] In response to the news on August 6, 2015, Allergan's common stock price fell $17.17 per share, or approximately 5%, from its previous closing price to close at $319.47 per share on August 6, 2015, and its preferred stock price fell $39.24 per share, or approximately 3.5%, from its previous closing price to close at $1,084.00 per share on August 6, 2015. ¶ 237. In response to the news on November 3, 2016, Allergan's common share price fell $9.07, or approximately 4.6%, to close at $188.82 on November 3, 2016, and its preferred share price fell $30.03, or approximately 4.1%, to close at $708.45 on November 3, 2016. ¶ 240

Carella Byrne as Liaison Counsel. ECF No. 24. Pursuant to Stipulation and Order Substituting Lead Counsel dated May 17, 2017, Bernstein Litowitz subsequently replaced Motley Rice as one of the Co-Lead Counsel firms in the Action. ECF No. 42.

19.     Following the appointment of Lead Plaintiffs, the Court set a deadline of May 1, 2017 for Lead Plaintiffs to file an amended complaint. ECF No. 29.

**B.     Lead Plaintiffs' Investigation and Filing of First Amended Complaint**

20.     Prior to filing the Consolidated Amended Class Action Complaint (ECF No. 36) ("First Amended Complaint"), Lead Counsel conducted an exhaustive investigation into the facts underlying this Action. As part of their investigation, Lead Counsel reviewed voluminous publicly available information regarding Defendants, including: (i) conference calls and announcements made by Defendants; (ii) Allergan's filings with the United States Securities and Exchange Commission ("SEC"); (iii) wire and press releases published by and regarding Allergan; (iv) analysts' reports and advisories about the Company; (v) IMS pricing data for various generic drugs; (vi) various civil complaints alleging violations of federal and state antitrust and unfair competition laws by Allergan and/or certain of its subsidiaries; and (vii) information readily obtainable on the Internet. In addition, Lead Counsel, through and in conjunction with their in-house investigators, located and conducted interviews with witnesses believed to potentially have information about the claims at issue in the Action, including former Allergan employees. Lead Counsel also retained and consulted extensively with an expert in antitrust matters in order to navigate the complicated antirust claims related to the Action. Prior to filing the First Amended Complaint, Lead Counsel also performed extensive legal research to carefully evaluate exactly which theories of liability Lead Plaintiffs could allege and how to allege them.

21.     Based upon Lead Counsel's thorough investigation, Lead Plaintiffs filed the 112-page First Amended Complaint on May 1, 2017 against Defendants. ECF No. 36. The First

Amended Complaint detailed Defendants' alleged violations of Sections 10(b), 14(a), and 20(a) of the Exchange Act, and the rules and regulations promulgated thereunder, including Rule 10b-5 and SEC Rule 14a-9.

### C.    Defendants' Motion to Dismiss the First Amended Complaint

22.    On July 17, 2017, Defendants moved to dismiss the First Amended Complaint in its entirety pursuant to Federal Rule 12(b)(6). ECF No. 59. In their motion to dismiss, Defendants argued that the First Amended Complaint failed to describe any misrepresentations to investors, included no allegations indicating an intention to mislead investors, and identified no harm to investors. Among other things, Defendants specifically asserted that:

- Lead Plaintiffs failed to plead any material misrepresentations or omissions, as Allergan was under no generalized duty to disclose un-adjudicated allegations of price-fixing, its "failure" to do so was not an actionable omission under Section 10(b), and the proceeds of any alleged antitrust activity were quantitatively immaterial to Allergan;

- Lead Plaintiffs' allegations failed to raise a "strong inference of scienter" as required by the PSLRA, as many of Lead Plaintiffs' allegations were misdirected (i.e., they purported to show an intent to engage in price-fixing, as opposed to an intent to mislead investors), and all of the allegations rested on assumption and speculation;

- Lead Plaintiffs failed to adequately plead loss causation, and the public records Lead Plaintiffs' pointed to as disclosing the "truth" of Actavis plc's involvement in price-fixing did no such thing;

- Lead Plaintiffs' Section 20(a) claim should be dismissed because there was no viable underlying Section 10(b) claim as well as no allegations of culpable participation by the Individual Defendants;

- Lead Plaintiffs' Section 14(a) claims should be dismissed as they did not identify specific misstatements or describe how they were false, but rather made generalized assertions that Allergan's proxy statements were misleading; and

- Lead Plaintiffs' claims on behalf of preferred shareholders should be dismissed because neither Lead Plaintiff was alleged to have purchased preferred shares.

23.     Upon receiving Defendants' motion to dismiss the First Amended Complaint, Lead Counsel reviewed and analyzed the supporting briefing, accompanying exhibits, and the legal authority cited therein. Lead Counsel also conducted additional legal research into Defendants' arguments and Lead Plaintiffs' responses thereto. On September 15, 2017, Lead Plaintiffs filed their opposition to Defendants' motion to dismiss. ECF No. 67. In this filing, Lead Plaintiffs argued that:

- The First Amended Complaint contained particularized allegations of numerous false statements relating to, other things: (i) Allergan's pricing and competition; (ii) Allergan's financial results (which were allegedly inflated by Defendants' anti-competitive practices); and (iii) the supposedly legitimate sources of Allergan's revenues;

- The First Amended Complaint contained detailed allegations of parallel price movements in the price-fixed drugs (Propranolol, Ursodiol, Doxycycline, and Desonide), and contained similarly detailed allegations supporting the "plus factors" that allow a fact-finder to infer a conspiracy;

- The First Amended Complaint particularized facts giving rise to a strong inference that the Individual Defendants (each of whom, as Lead Plaintiffs alleged, made false statements) either knew about Allergan's participation in the vast price-fixing conspiracy, or were reckless in not knowing, and acted with the requisite scienter; and

- Defendants' attacks on the corrective disclosure dates alleged in the First Amended Complaint were unavailing, especially in light of the Third Circuit's practical approach to loss causation at the pleading stage.

24.     On October 6, 2017, Defendants filed a reply in support of their motion to dismiss. ECF No. 74. In their reply, Defendants advanced further arguments in support of their purported bases for dismissing the First Amended Complaint, including that: (i) the misstatements at issue were not false or misleading as a matter of law; (ii) Lead Plaintiffs did not adequately allege that Defendants acted with the requisite scienter; and (iii) Lead Plaintiffs failed to adequately plead loss causation.

25.     Thereafter, on October 31, 2017, while Defendants' motion to dismiss was fully briefed and pending, a consortium of forty-six Attorneys General filed a complaint charging Allergan (in the form of Actavis, Allergan's former generic drugs business) as a co-conspirator in an antitrust price-fixing conspiracy. The Attorneys General's complaint described several "smoking guns" calls, emails, and text messages between Allergan executives and other co-conspirators.

26.     In light of this information, on November 22, 2017, Lead Plaintiffs moved, pursuant to Federal Rule 15, for leave to supplement and amend the First Amended Complaint. ECF No. 79. The Court granted Lead Plaintiffs' request on November 27, 2017. ECF No. 81.[16]

### D.     The Second Amended Complaint; Defendants' Motion to Dismiss the Second Amended Complaint; and the Court's Ruling Thereon

27.     On November 28, 2017, Lead Plaintiffs filed the operative complaint in the Action—the Second Amended Complaint. ECF No. 82. The Second Amended Complaint included newly discovered information, including information revealed in the Attorneys General's complaint.

28.     On January 22, 2018, Defendants moved to dismiss the Second Amended Complaint in its entirety pursuant to Federal Rule 12(b)(6). ECF No. 87. Defendants' motion to dismiss the Second Amended Complaint advanced arguments previously made in their motion to dismiss the First Amended Complaint. *See supra* ¶ 22.

---

[16] During this time, the Action was reassigned from the Honorable Judge Susan D. Wigenton and Magistrate Judge Leda D. Wettre to the Honorable Judge Katherine S. Hayden and Magistrate Judge Cathy L. Waldor on November 6, 2017. ECF No. 78.

29.     On March 23, 2018, Lead Plaintiffs opposed Defendants' motion to dismiss the Second Amended Complaint. ECF No. 91. Defendants filed their reply in further support of their motion to dismiss on April 23, 2018. ECF No. 96.

30.     Over the next year, the Parties submitted significant supplemental briefing to alert the Court to developments in case law and in the Attorneys General's prosecution of Allergan and its alleged co-conspirators. ECF Nos. 100-14, 117-18.

31.     The Court heard oral argument on Defendants' motion to dismiss the Second Amended Complaint on April 11, 2019. ECF Nos. 119-20.

32.     Following oral argument and while Defendants' motion to dismiss was still pending, on May 10, 2019, the Attorneys General filed another lawsuit, bringing new claims of substantial antitrust violations against several generic drug makers, including former Actavis employees Marc Falkin and Richard Rogerson ("May 2019 AG Complaint"). The May 2019 AG Complaint set forth a highly detailed account of Defendants' anti-competitive conduct in connection with as many as twenty-two generic drugs. At the Court's request, the Parties submitted supplemental letter briefing concerning the impact of the May 2019 AG Complaint on Defendants' pending motion to dismiss. ECF Nos. 122-23.

33.     On August 6, 2019, the Court denied Defendants' motion to dismiss the Second Amended Complaint in full (ECF Nos. 124-25) ("MTD Order"). In the MTD Order, the Court made several key findings. *First*, the Court rejected Defendants' argument that Lead Plaintiffs failed to adequately allege an underlying price-fixing scheme, holding that Lead Plaintiffs alleged both direct and indirect evidence of an agreement between Allergan and other drug manufacturers to fix the prices of generic drugs. ECF No. 124, at 13. *Second*, the Court found that Lead Plaintiffs adequately alleged five different categories of false statements, which were rendered misleading

by Defendants' failure to disclose the price-fixing scheme: "(1) statements explaining Allergan's participation in the [generic drug] market; (2) statements regarding the DOJ investigation; (3) statements of income; (4) SOX certifications; and (5) Allergan's Code of Conduct." *Id*. at 14-15. *Third*, in concluding that Lead Plaintiffs adequately pled scienter, the Court focused on the ongoing government investigations into Defendants' price-fixing scheme and also applied the so-called "core operations" doctrine, which allows knowledge of fraud to be imputed to individual defendants where the alleged fraud relates to the core business of the company. *Id*. at 21-24. *Finally*, the Court rejected Defendants' loss causation arguments at the pleading stage. *Id*. at 24-27

34.     On September 13, 2019, Defendants filed their answer to the Second Amended Complaint, denying its allegations and asserting numerous defenses to the sustained claims. ECF No. 129.

### E.     Lead Plaintiffs' Extensive Discovery Efforts

35.     From August 2019 through May 2021, both Lead Plaintiffs and Defendants aggressively pursued discovery. The discovery process was highly contested, and numerous disputes arose among the Parties regarding the scope of discovery.

36.     Through their efforts, Lead Counsel obtained more than 430,000 documents from Defendants and numerous third parties, totaling more than 2.6 million pages. As described below, Lead Counsel reviewed and analyzed these documents, as well as discovery responses, in order to engage experts, prepare for depositions, and ultimately develop the record for trial. Lead Plaintiffs also took advantage of other discovery tools available under the Federal Rules, including written discovery. These discovery efforts provided Lead Counsel with a thorough understanding of the strengths and weaknesses of Lead Plaintiffs' claims and assisted Lead Counsel in considering and evaluating the fairness of the Settlement. A summary of Lead Counsel's discovery efforts follows.

### F.      Document Discovery from Defendants and Third Parties

37.      As noted above, Lead Plaintiffs obtained and reviewed more than 2.6 million pages of documents from Defendants and third parties in this Action. Lead Plaintiffs served their first set of requests for production of documents (consisting of sixteen requests) on Defendants on September 27, 2019.[17] After Defendants served their responses and objections to Lead Plaintiffs' document requests on November 11, 2019, the Parties met and conferred extensively to negotiate the scope and parameters of Defendants' document collection and production. Lead Plaintiffs served their second set of requests for production of documents (consisting of four requests) on Defendants on February 28, 2020 and served their third set of requests for production of documents (consisting of five requests and bringing the total requests to twenty-five) on Defendants on May 6, 2020. Defendants served their responses and objections to Lead Plaintiffs' second and third sets of document requests on May 14, 2020 and June 5, 2020, respectively.

38.      In addition, during fact discovery, the Parties served at least fifty document subpoenas on third parties, including several of the alleged co-conspirators in the price-fixing scheme such as Teva Pharmaceuticals USA, Inc. ("Teva"), Sandoz Inc., and Mylan Pharmaceuticals Inc. Lead Counsel met and conferred with counsel for many of these third parties to negotiate the scope and terms of their respective document productions. In total, Lead Counsel obtained more than 2 million pages of documents from approximately thirty-four third parties.

39.      To facilitate the document review, Lead Counsel developed a detailed review protocol. Initially, Lead Counsel created a comprehensive coding manual, with explanatory notes covering: (i) the key facts at issue in the Action; (ii) relevance coding instructions; and (iii) "tags" covering relevant issues and sub-issues. Next, Lead Counsel assembled a team of experienced

---

[17] The Parties prepared and exchanged initial disclosures pursuant to Federal Rule 26(a)(1) on November 1, 2019.

attorneys to review and analyze the documents received in discovery. This team of associates and staff attorneys reported directly to senior associates and partners at Kessler Topaz and Bernstein Litowitz, circulating detailed notes on "hot" documents on a weekly basis and participating in regular meetings to discuss their findings. Through these efforts, Lead Counsel developed a thorough understanding of the evidentiary record, which they used to identify key issues for further analysis and inform Lead Plaintiffs' theories of liability.

40.     Beyond these formal processes, the attorneys involved in reviewing and analyzing documents for this matter communicated frequently to ensure that coding decisions were applied consistently and that all team members were apprised of important developments with respect to the document review and development of case theories. In addition, these attorneys were responsible for preparing presentations and memoranda on key factual issues and potential deponents, as well as preparing deposition kits identifying the relevant documents to introduce with deponents.

### G.     Document Discovery from Lead Plaintiffs

41.     Lead Plaintiffs also responded to document requests from Defendants. Defendants served their first request for production of documents (consisting of forty-four requests) on Lead Plaintiffs on February 26, 2020. Lead Plaintiffs timely served responses and objections to Defendants' documents requests on March 27, 2020. The Parties met and conferred extensively over the scope and parameters of Lead Plaintiffs' document productions in response to Defendants' requests. In responding to Defendants' document requests, Lead Plaintiffs performed diligent and reasonable searches and document collections, reviewed all potentially relevant documents for responsiveness and privilege, and produced over 64,700 pages of documents to Defendants.[18]

---

[18] Lead Plaintiffs' market-efficiency expert produced an additional 56,700+ pages of documents.

## H.     Written Discovery

42.     Lead Plaintiffs also served requests for written discovery on Defendants. Lead Plaintiffs served four sets of interrogatories (consisting of nine total interrogatories) on Allergan on September 27, 2019, May 29, 2020, August 12, 2020, and September 1, 2020, to which Allergan served written, verified responses and objections on November 11, 2019, March 13, 2020 (supplemental), June 29, 2020, September 11, 2020, October 1, 2020, and December 18, 2020 (supplemental). Also on March 24, 2020, Lead Plaintiffs served seventy-six requests for admission on Allergan. Allergan served responses and objections to Lead Plaintiffs' requests for admission on June 8, 2020. Lead Plaintiffs' analyses of these written discovery responses informed their approaches later in the litigation, including in preparing for depositions.

43.     Lead Plaintiffs also responded to written discovery propounded by Defendants. Defendants served eleven interrogatories on Lead Plaintiffs on November 17, 2020, to which Lead Plaintiffs timely served written and verified responses and objections on January 15, 2021, after performing all the research and review necessary to provide such responses. Defendants served eight contention interrogatories on Lead Plaintiffs on March 31, 2021. Additionally, on March 31, 2021, Defendants served twenty-nine requests for admission on Lead Plaintiffs. Lead Plaintiffs were in the process of preparing responses to these contention interrogatories and requests for admission at the time the Parties reached the Settlement.

## I.     Depositions

44.     Lead Plaintiffs reviewed and analyzed all of the documents produced by Defendants and third parties, as well as all written discovery responses Defendants provided. Bringing these voluminous materials to bear, Lead Plaintiffs deposed twenty fact witnesses. Among others, Lead Plaintiffs deposed: (i) six of the Individual Defendants (including both of Allergan's former Chief Executive Officers and Chief Financial Officers, the President of the

Actavis plc generic drug unit, and the Company's Chief Legal Officer); (ii) ten current and former Allergan employees (including Marc Falkin and Richard Rogerson, former Allergan senior executives who were directly implicated in allegations of collusion in the various Attorneys General complaints); and (iii) four third parties (including current and former senior executives at several of the drug companies alleged to have conspired with Allergan in the price-fixing scheme). Lead Counsel devoted substantial time strategically preparing for and participating in these depositions.

45.     Fact discovery concluded on April 22, 2021.

**J.     Lead Counsel's Work with Respect to Experts and Consultants**

46.     Lead Counsel also worked extensively with experts and consultants in this Action.

47.     Lead Counsel retained and worked with Chad Coffman, CFA of Global Economics Group, LLC, who provided expert opinions both in connection with class certification and at the merits stage. Mr. Coffman's expert report regarding market efficiency and a model for measuring Settlement Class Members' damages in accordance with Lead Plaintiffs' theory of liability was submitted to the Court along with Lead Plaintiffs' Class Certification Motion on March 20, 2020. ECF No. 143-3. Lead Counsel prepared and defended Mr. Coffman at his deposition on July 16, 2020. Mr. Coffman also evaluated the rebuttal report of Defendants' expert, Allan W. Kleidon, Ph.D. ("Dr. Kleidon"), and, in coordination with Lead Counsel, submitted a rebuttal expert report related to the Class Certification Motion on November 25, 2020. ECF No. 187-1, Ex. A. Lead Counsel also worked closely with Mr. Coffman in preparing for mediation with Judge Phillips and, after reaching the Settlement, Mr. Coffman and his team at Global Economics Group, LLC assisted Lead Counsel in developing the proposed plan for allocating the settlement proceeds to eligible Settlement Class Members as set forth in the Notice.

48.     Lead Counsel also retained and worked with Greylock McKinnon Associates ("Greylock"), an economic consulting firm that specializes in antitrust matters, at different stages of the litigation. Specifically, Lead Counsel consulted with Greylock in analyzing pricing data used in the First and Second Amended Complaints and worked with Greylock as it prepared an expert report describing the economic evidence underlying the alleged price-fixing conspiracy.

### K.     Lead Plaintiffs' Class Certification Motion

49.     While continuing to pursue merits discovery, on March 20, 2020, Lead Plaintiffs filed their Class Certification Motion, seeking the Court's certification of a class consisting of three subclasses. ECF No. 143. The Class Certification Motion was supported by a market efficiency and damages methodology analysis and report prepared by Lead Plaintiffs' expert, Mr. Coffman, who opined that both Allergan common stock and Allergan preferred stock traded in an efficient market during the Class Period and that damages for both Lead Plaintiffs' Section 10(b) claims and Section 14(a) claims could be calculated on a class-wide basis utilizing a common methodology.

50.     Defendants opposed the Class Certification Motion on October 14, 2020. ECF No. 175. In their opposition, Defendants argued that certification was inappropriate for several reasons, including that: (i) Lead Plaintiffs could not rely on the presumption of reliance established in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), because Lead Plaintiffs were aware of the allegedly undisclosed truth at the time they bought or sold their Allergan shares; (ii) even if Lead Plaintiffs were able to establish a presumption of reliance for the first alleged disclosure, they could not do so as to the second corrective disclosure because such disclosure did not provide new, value-relevant information to the market and did not have a statistically significant impact on Allergan's stock price; and (iii) AP7 and Union were inadequate class representatives. Defendants supported their arguments with an expert report from Dr. Kleidon, a Senior Vice President at Cornerstone

Research, who reviewed and critiqued Mr. Coffman's report and provided his own rebuttal analysis related to price impact. *See generally* ECF No. 175-2.

51.    In connection with the Class Certification Motion, Lead Plaintiffs produced documents, and Defendants deposed a representative from AP7 on July 9, 2020 and a representative from Union on October 9, 2020. Defendants deposed Mr. Coffman on July 16, 2020, and Lead Counsel deposed Dr. Kleidon on November 17, 2020.

52.    Following Dr. Kleidon's deposition, Lead Plaintiffs filed a reply in further support of the Class Certification Motion, including a rebuttal expert report from Mr. Coffman, on November 25, 2020. ECF Nos. 187, 188.

53.    On December 30, 2020, Defendants filed a letter seeking leave to submit a sur-reply in further opposition to the Class Certification Motion, and attaching their proposed sur-reply. ECF No. 191. Lead Plaintiffs responded to Defendants' request for leave to submit a sur-reply by letter filed on January 14, 2021. ECF No. 193.

54.    Both Lead Plaintiffs' Class Certification Motion and Defendants' request for leave to file a sur-reply were pending when the Parties agreed to resolve the Action.

## IV.    THE SETTLEMENT

### A.    The Parties' Settlement Negotiations and Mediation

55.    After the close of fact discovery and while Lead Plaintiffs' Class Certification Motion was pending, the Parties agreed to explore the possibility of resolving the Action through a private mediator. To that end, the Parties retained a former United States District Judge, Judge Phillips of Phillips ADR, to serve as mediator. Judge Phillips is one of the nation's foremost mediators of complex litigation—including specifically both securities and antitrust actions.

56.    On May 11, 2021, the Parties participated in a full-day mediation session before Judge Phillips. The mediation was conducted using the Zoom videoconferencing platform and was

attended by Lead Counsel, representatives of AP7 and Union, Defendants' Counsel, representatives of Allergan, and representatives from Defendants' insurance carriers. In advance of the mediation, the Parties prepared and exchanged over ninety pages of detailed mediation submissions, with each side discussing the strengths and weaknesses of their claims and defenses, informed by the voluminous evidentiary record developed in the course of discovery. At the mediation, the Parties responded to detailed merits- and damages-related questions from Judge Phillips and his staff. Although the Parties made substantial progress during the mediation session, they remained too far apart in their respective positions to reach agreement that day and agreed to continue their settlement negotiations with Judge Phillips and his staff. *See generally* Phillips Decl., ¶¶ 6-10.

57.    After approximately four weeks of further negotiations and multiple rounds of bids and offers, Judge Phillips issued a mediator's recommendation that the case be resolved for $130 million in cash. *Id.* at ¶ 9. The Parties ultimately accepted the recommendation and memorialized their agreement in principle to settle the Action in a confidential term sheet executed on June 15, 2021 ("Term Sheet").

### B.    Preparation of Settlement Documentation and Motion for Preliminary Approval of Settlement

58.    After the Parties reached their agreement in principle to settle the Action, they spent additional weeks negotiating the final terms of the Settlement, including the Stipulation (and the exhibits thereto) as well as a confidential supplemental agreement regarding requests for exclusion ("Supplemental Agreement"),[19] and exchanged multiple drafts of these documents.

---

[19] The Supplemental Agreement sets forth the conditions under which Allergan may terminate the Settlement in the event that requests for exclusion from the Class exceed an agreed-upon, confidential opt-out threshold. Pursuant to its terms (and as is typical in cases like this (*see, e.g., In re Signet Jewelers Ltd. Sec. Litig.*, 2020 WL 4196468, at *13 (S.D.N.Y. July 21, 2020)), the

59.     During this same time, Lead Counsel requested and reviewed detailed bids obtained from several organizations specializing in class action notice and claims administration, and conducted follow-up communications with certain of these organizations. As a result of this bidding process, Lead Counsel selected A.B. Data to serve as the Claims Administrator for the Settlement. Lead Counsel also worked closely with Lead Plaintiffs' damages expert to develop the proposed Plan of Allocation. *See infra* Section VII.

60.     On July 8, 2021, the Parties executed the Stipulation and Supplemental Agreement setting forth their binding agreement to settle the Action.

61.     Thereafter, on July 9, 2021, Lead Plaintiffs filed their Unopposed Motion for Preliminary Approval of Settlement and Authorization to Disseminate Notice of Settlement ("Preliminary Approval Motion"), which included a copy of the Stipulation and a memorandum in support. ECF No. 223. On July 14, 2021, the Court entered a Consent Order permitting Magistrate Judge Cathy L. Waldor to conduct all settlement proceedings in the case, including final approval of the settlement. ECF No. 225.

62.     On July 30, 2021, the Court entered the Order Preliminarily Approving Settlement and Authorizing Dissemination of Notice of Settlement granting Lead Plaintiffs' Preliminary Approval Motion and finding that "it will likely be able to finally approve the Settlement under Rule 23(e)(2) as being fair, reasonable, and adequate to the Settlement Class, subject to further consideration at the Settlement Hearing." Preliminary Approval Order, ¶ 4. The Court set the Settlement Hearing for November 17, 2021, at 1:00 p.m. *Id.*, ¶ 5.

---

Supplemental Agreement is not being made public but may be submitted to the Court *in camera* or under seal.

## V.      RISKS OF CONTINUED LITIGATION

63.     At the time the Parties reached their agreement in principle to resolve the Action, Lead Plaintiffs and Lead Counsel had reviewed extensive materials and were well-positioned to evaluate the strengths and weaknesses of the claims alleged in the Second Amended Complaint. Lead Counsel's exhaustive legal analysis and discovery efforts—including reviewing and analyzing more than 2.6 million pages of discovery, taking twenty fact depositions, and consulting with various experts—provided them with a comprehensive understanding of the strengths and weaknesses of the claims in the Action.

64.     This understanding, complemented by Defendants' various legal and factual arguments advanced in seeking dismissal of the First and Second Amended Complaints, opposing class certification, and during the Parties' settlement negotiations, informed Lead Plaintiffs and Lead Counsel that, while their case against Defendants had merit and was sufficient to survive a motion to dismiss, there were several factors that made the outcome of continued litigation—including, for example, overcoming Defendants' anticipated summary judgment motion and proving their claims at trial—uncertain.[20] Additionally, Lead Plaintiffs' Class Certification Motion was pending at the time the Settlement was reached. An adverse ruling by the Court on that motion would have altered the landscape of this case altogether.

65.     Below is a discussion of some of the most serious litigation risks faced by the Settlement Class. Lead Plaintiffs and Lead Counsel carefully considered each of these risks during

---

[20] There have been many securities fraud class actions that have survived motions to dismiss only to be defeated in connection with *Daubert* motions or at summary judgment. *See, e.g.*, *In re Barclays Bank PLC Sec. Litig.*, 2017 WL 4082305 (S.D.N.Y. Sept. 13, 2017), *aff'd,* 756 F. App'x 41 (2d Cir. 2018) (summary judgment granted after eight years of litigation); *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554-55 (S.D.N.Y. 2008), *aff'd,* 597 F.3d 501 (2d Cir. 2010) (summary judgment granted after six years of litigation and millions of dollars spent by plaintiffs' counsel).

the pendency of the Action and before and during their settlement discussions with Defendants. Ultimately, consideration of the risks and unique complexities of the claims, thoroughly vetted during the settlement discussions, informed Lead Plaintiffs' and Lead Counsel's determination that the Settlement represents an excellent result for the Settlement Class.

### A.      Risks to Prosecuting Securities Class Actions in General

66.      In recent years, securities class actions have become riskier and more difficult to prove given changes in the law, including numerous United States Supreme Court decisions. In fact, well-known firm NERA Economic Consulting found that, in 2020, "both the number of cases settled and the number of cases dismissed reached 10-year record levels—settled cases reaching a record low and dismissed cases reaching a record high," and further that over 77% of the case resolutions in 2020 were in favor of Defendants. *See* Janeen McIntosh & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2020 Full-Year Review*, NERA Economic Consulting, 1, 11-12 (Jan. 25, 2021), attached hereto as Exhibit 9.

67.      Even when they have survived motions to dismiss, securities class actions can be defeated either at the class certification stage, in connection with *Daubert* motions, or at summary judgment. For example, class certification has been denied in several recent securities class actions. *See Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *18 (N.D. Ohio Aug. 14, 2018) (holding that "[a] theory that statements maintained an inflated stock price is not evidence that can refute otherwise overwhelming evidence of no price impact"); *In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244 (N.D. Cal. Dec. 5, 2017), *reconsideration denied*, 2018 WL 3472334 (N.D. Cal. Jan. 18, 2018), *and leave to appeal denied*, *Okla. Firefighters Pension & Ret. Sys. v. Finisar Corp.*, 2018 WL 3472714 (9th Cir. July 13, 2018); *Gordon v. Sonar Cap. Mgmt. LLC*, 92 F. Supp. 3d 193 (S.D.N.Y. Mar. 19, 2015); *Sicav v. Wang*, 2015 WL 268855 (S.D.N.Y. Jan. 21, 2015); *IBEW Local 90 Pension Fund v. Deutsche Bank AG*,

2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013); *George v. China Auto. Sys., Inc.*, 2013 WL 3357170

(S.D.N.Y. July 3, 2013); *Colman v. Theranos, Inc.*, 325 F.R.D. 629, 651 (N.D. Cal. 2018); *Smyth

v. China Agritech, Inc.*, 2013 WL 12136605 (C.D. Cal. Sept. 26, 2013); *In re STEC Inc. Sec. Litig.*,

2012 WL 6965372 (C.D. Cal. Mar. 7, 2012).

       68.      Multiple securities class actions also recently have been dismissed at the summary

judgment stage. *See, e.g.*, *Murphy v. Precision Castparts Corp.*, 2021 WL 2080016, at *6 (D. Or.

May 24, 2021) (granting summary judgment after approximately five years of litigation); *In re

Retek Inc. Sec. Litig.*, 621 F. Supp. 2d 690 (D. Minn. 2009) (granting summary judgment on a

motion for reconsideration on loss causation grounds after seven years of litigation); *Barclays*,

2017 WL 4082305 (summary judgment granted after eight years of litigation); *Omnicom*, 541 F.

Supp. 2d at 554-55 (summary judgment granted after six years of litigation and millions of dollars

spent by plaintiffs' counsel); *see also In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448 (D. Conn.

2013), *aff'd*, *Dalberth v. Xerox Corp.*, 766 F.3d 172 (2d Cir. 2014); *Fosbre v. Las Vegas Sands

Corp.*, 2017 WL 55878 (D. Nev. Jan. 3, 2017), *aff'd sub nom.*, *Pompano Beach Police &

Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*, 732 F. App'x 543 (9th Cir. 2018); *Perrin v. Sw.

Water Co.*, 2014 WL 10979865 (C.D. Cal. July 2, 2014); *In re Novatel Wireless Sec. Litig.*, 830 F.

Supp. 2d 996, 1015 (S.D. Cal. 2011); *In re Oracle Corp. Sec. Litig.*, 2009 WL 1709050 (N.D. Cal.

June 19, 2009), *aff'd*, 627 F.3d 376 (9th Cir. 2010); *In re Bos. Sci. Corp. Sec. Litig.*, 708 F. Supp.

2d 110, 113 (D. Mass. 2010), *aff'd sub nom., Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp.*, 649

F.3d 5 (1st Cir. 2011); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202 (S.D. Cal. 2010). And

even cases that have survived summary judgment have been dismissed prior to trial in connection

with *Daubert* motions. *See, e.g.*, *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse

First Bos.*, 853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd*, 752 F.3d 82 (1st Cir. 2014) (granting

summary judgment *sua sponte* in favor of defendants after finding that plaintiffs' expert was unreliable).

69.     Even when securities class action plaintiffs are successful in certifying a class, prevailing at summary judgment, overcoming *Daubert* motions, and have gone to trial, there are still very real risks that there will be no recovery or substantially less recovery for class members. For example, in *In re BankAtlantic Bancorp, Inc. Securities Litigation*, a jury rendered a verdict in plaintiffs' favor on liability in 2010. 2011 WL 1585605, at *6 (S.D. Fla. Apr. 25, 2011). In 2011, the district court granted defendants' motion for judgment as a matter of law and entered judgment in favor of the defendants on all claims. *Id*. at *38. In 2012, the Eleventh Circuit affirmed the district court's ruling, finding that there was insufficient evidence to support a finding of loss causation. *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 725 (11th Cir. 2012).

70.     There is also the increasing risk that an intervening change in the law can result in the dismissal of a case after significant effort has been expended. The Supreme Court has heard several securities cases in recent years, often announcing holdings that dramatically changed the law in the midst of long-running cases. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014); *Comcast Corp. v Behrend*, 569 U.S. 27 (2013); *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011); *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010). As a result, many cases have been lost after thousands of hours have been invested in briefing and discovery. For example, in *In re Vivendi Universal, S.A. Securities Litigation*, after a verdict for class plaintiffs finding Vivendi acted recklessly with respect to fifty-seven sets of statements, the district court granted judgment for defendants following a change in the law announced in *Morrison*. 765 F. Supp. 2d 512, 524, 533 (S.D.N.Y. 2011), *aff'd*, 838 F.3d 223 (2d Cir. 2016). Changes in law at

28

the Circuit level has similarly upended pending cases; for example, in *Precision Castparts*, the court reconsidered its denial of summary judgment and granted it for defendants based explicitly on an intervening Ninth Circuit decision. 2021 WL 2080016, at *6.

71.     The risk of an intervening change in the law was particularly salient in this case. On June 21, 2021, the Supreme Court held that courts may consider evidence of the generic nature of alleged misstatements in evaluating price impact at the class certification stage. *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1955, 210 L. Ed. 2d 347 (2021) ("The generic nature of a misrepresentation often is important evidence of price impact that courts should consider at class certification, including in inflation-maintenance cases."). Here, Defendants had argued that many of the statements at issue were non-actionable because they were generic (*see, e.g.*, *In re Allergan Generic Drug Pricing Sec. Litig.*, 2019 WL 3562134, at *9 (D.N.J. Aug. 6, 2019)). While Lead Plaintiffs defeated those arguments at the motion-to-dismiss stage, there was a risk that, in the absence of settlement, Defendants could have raised this argument again if the Action continued.

72.     In sum, securities class actions face serious risks of dismissal and non-recovery at all stages of the litigation.

**B.     Risks to Establishing Defendants' Liability**

73.     While Lead Plaintiffs and Lead Counsel believe their claims were meritorious, they also faced substantial risks in establishing liability had the Action continued.

74.     For example, the need to prove an antitrust "case within a case" to establish liability—specifically, the falsity of Defendants' public statements that Allergan was not involved in anti-competitive conduct—greatly amplified Lead Plaintiffs' litigation risks. Defendants have taken the position that, in order to establish liability, Lead Plaintiffs would have had to prove an underlying antitrust conspiracy against Allergan before it could establish any alleged securities

law violations. Defendants likely would have further argued that, on the factual record, Lead Plaintiffs could not establish that Allergan engaged in a wide-ranging antitrust conspiracy, or that the dramatic price increases alleged by Lead Plaintiffs were the product of collusion rather than legitimate business reasons, such as supply shortages, increased demand for the products, increased costs, and the like. Further, Defendants would likely have contended that any arguments Lead Plaintiffs raised at summary judgment or trial based on a "market-allocation" theory—i.e., a theory that Defendants conspired to divide up generic drug markets with their competitors in an attempt to maintain supra-competitive pricing without specifically agreeing on what prices to charge—represented a shift from Lead Plaintiffs' original theory of liability as pled in the Complaint, and in any event were based on the false premise that competitors could not independently decide to seek roughly equivalent market share. While Lead Plaintiffs believe they had strong arguments in response, it is clear that, if the Court or a jury were to have credited such arguments at summary judgment or trial, any class recovery could have been eliminated outright.

75.     Further, even if Lead Plaintiffs were to have succeeded in establishing that Allergan engaged in anti-competitive conduct, Defendants likely would have argued that any impact of such conduct was vanishingly small, particularly in light of Allergan's size—and therefore that any alleged misstatements were immaterial. Specifically, as Defendants previewed at the motion-to-dismiss stage, Defendants were likely to argue that the revenues associated with the drugs that were allegedly subject to collusive agreements were small in total, and that the actual amount of revenues derived from collusion—if any—was much smaller still.

76.     Defendants also would have mounted a potentially powerful defense around the element of scienter. Throughout the Action, Defendants argued that, in order to prevail at trial on the Section 10(b) claims, Lead Plaintiffs would have to show that the Individual Defendants were

aware of underlying collusive activity involving Allergan employees and other pharmaceutical competitors, or were at least reckless in making allegedly false statements about Allergan's generic drug business. Defendants also argued, and likely would have continued to argue, that the evidence shows none of the Individual Defendants knew about the alleged anti-competitive conduct or had reason to believe such conduct was occurring. Specifically, Defendants were likely to argue that there was no evidence that the Individual Defendants themselves were involved in any collusive communications with competitors, the Individual Defendants had reason to believe that Allergan's generic drug price changes were driven by legitimate business reasons, the Individual Defendants adopted policies prohibiting anti-competitive behavior, and that any anti-competitive conduct (if any) was limited in scope such there was no reason for the Individual Defendants to suspect that their statements to the market were materially misleading. While Lead Plaintiffs believe they had strong arguments in response, including that Defendants were on notice of investigations of anti-competitive conduct in the generic pharmaceuticals industry (and Allergan specifically), if Defendants had prevailed on their scienter arguments, Lead Plaintiffs would have been unable to recover on their Section 10(b) claims, dramatically reducing damages for would be Settlement Class Members.

### C. Risks Concerning Loss Causation and Damages

77.    Even if successful at establishing Defendants' liability, Lead Plaintiffs would still have had to overcome significant challenges in proving loss causation and damages. To start, Defendants argued at the motion-to-dismiss stage, and likely would have argued at summary judgment and trial, that Lead Plaintiffs could not establish loss causation as to either of the two alleged corrective disclosures because each revealed, at most, that Allergan was *part of an investigation* of collusion—not that it had been found to have engaged in such misconduct, or even was the focus of such an investigation. Defendants would likely have bolstered this argument by

asserting that, to date, Allergan has not been criminally charged or found to have committed antitrust violations in connection with the sale of generic drugs during the Class Period. Defendants were likely to argue that, in light of those facts, the alleged corrective disclosures did not reveal (and could not have revealed) any relevant "truth" about Allergan's or its employees' purported anti-competitive conduct.

78.     In addition, Defendants were again likely to argue that any collusion was quantitatively immaterial to Allergan's results—and, therefore, that the revelation of the supposed truth about those activities could not, as a matter of financial economics, have resulted in large investment losses.

79.     Further, Defendants likely would have made significant "truth on the market" arguments to attack loss causation. Defendants were likely to argue that, in advance of the first alleged corrective disclosure on August 6, 2015, the market was well aware of collusion allegations related to the generic drugs industry, and even of Allergan's potential involvement—because, among other reasons, Allergan was specifically targeted in an October 2, 2014 press release issued by the United States House of Representatives' Committee on Oversight and Reform that described an investigation by Senator Bernie Sanders and the late Representative Elijah Cummings into "staggering" price increases for generic drugs.

80.     In addition, Defendants were likely to argue that Lead Plaintiffs would be required (and would be unable) to isolate any impact of the news of Allergan's potential involvement in generic drug pricing collusion from other Allergan-specific information released that day, such as news that the Company was unlikely to pursue another merger until 2016 and would not provide updated earnings guidance until at least September 2015—and, at a minimum, that such alternative

causes for the decline would substantially diminish damages associated with the first alleged corrective disclosure.

81.     In addition, Defendants were likely to continue to press several significant arguments regarding the second alleged corrective disclosure on November 3, 2016, which was responsible for an outsized proportion of the Settlement Class's recoverable damages. Among other things, Defendants would have argued that: (i) no investor could have been misled following the first alleged corrective disclosure on August 6, 2015, discussed above; (ii) the second alleged corrective disclosure—a *Bloomberg* article discussing the ongoing DOJ investigation—did not actually reveal any new facts, but rather served as a journalistic characterization of already-public facts; (iii) any alleged facts revealed by the second corrective disclosure were rendered moot by the fact that Allergan had sold its generic drug business (and associated liabilities) to Teva by the time the disclosure was made; and (iv) consistent with (iii), market participants appeared to have been confused about the status of the liability transfer between Allergan and Teva, and when Allergan clarified that confusion after the market close on November 3, 2016, its stock price rebounded the next trading day—with the result that the alleged corrective disclosure did not evince a statistically significant stock price decline.

82.     While Lead Plaintiffs believe that they had meaningful responses to each of these loss causation and damages arguments, those arguments presented significant risks at summary judgment and trial—and in any event, the resolution of those issues likely would have come down to an unpredictable and fiercely disputed "battle of the experts." Accordingly, Lead Plaintiffs and Lead Counsel recognized that the Court and the jury would have been presented with very different opinions from highly qualified experts. If the Court or a jury had found Defendants' expert

testimony to be more credible, it is very likely Lead Plaintiffs and the Settlement Class could have recovered nothing at all.

### D.   Statute of Limitations Risks

83.   In addition, Lead Plaintiffs' Section 14(a) claims faced serious statute of limitations risks. Claims under Section 14(a) must be brought within one year of the discovery of the claim, and Defendants have argued (and likely would have continued to argue) that the information underlying Lead Plaintiffs' Section 14(a) claims was disclosed at least by August 6, 2015, when Allergan revealed to shareholders that it had received a grand jury subpoena from the DOJ in connection with an investigation into generic drug pricing. Because the initial complaint was filed more than one year later, Defendants have argued (and would have continued to argue) that the Section 14(a) claims were time-barred. If Defendants prevailed on this argument at either summary judgment or at trial, it would have eliminated Lead Plaintiffs' Section 14(a) claims entirely.

### E.   Risks After Trial

84.   Had Lead Plaintiffs prevailed at summary judgment and at trial, Defendants would likely have appealed the judgment—leading to many additional months, if not years, of further litigation. On appeal, Defendants would have renewed their host of arguments as to why Lead Plaintiffs had failed to establish liability, loss causation, and damages, thereby exposing Lead Plaintiffs to the risk of having any favorable judgment reversed or reduced below the Settlement Amount after years of litigation.[21]

---

[21] There are numerous instances where jury verdicts for plaintiffs in securities class actions were overturned after appeal. *See, e.g., Glickenhaus & Co. v. Household Int'l, Inc*., 787 F.3d 408 (7th Cir. 2015) (reversing and remanding jury verdict of $2.46 billion after thirteen years of litigation); *Oracle*, 2009 WL 1709050 (granting summary judgment to defendants after eight years of litigation); *Robbins v. Koger Props., Inc*., 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict after nineteen-day trial and dismissing case with prejudice); *Anixter v. Home-Stake Prod. Co*., 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades

85.     Moreover, even if a judgment in Lead Plaintiffs' favor was affirmed on appeal, Defendants could then have challenged the reliance and damages of each class member, including Lead Plaintiffs, in an extended series of individual proceedings. That process could have taken multiple additional years, and could have severely reduced any recovery to the class as Defendants "picked off" class members. For example, in *Vivendi*, the district court acknowledged that in any post-trial proceedings, "Vivendi is entitled to rebut the presumption of reliance on an individual basis," and that "any attempt to rebut the presumption of reliance on such grounds would call for separate inquiries into the individual circumstances of particular class members." 765 F. Supp. 2dat 583-84 (citations omitted). Over the course of several years, Vivendi indeed successfully challenged several class members' damages in individual proceedings.

86.     Thus, even if Lead Plaintiffs and the Settlement Class prevailed at trial, the subsequent processes of an appeal and challenges to individual class members could have severely reduced or even eliminated any recovery—and, at minimum, could have added several years of further delay.

## VI.    COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER AND REACTION OF THE SETTLEMENT CLASS TO DATE

87.     The Parties have stipulated to certification of the Settlement Class, for purposes of the Settlement only. Stipulation, ¶ 2.  In its Preliminary Approval Order, the Court found, pursuant to Rule 23(e)(1)(B)(ii) of the Federal Rules of Civil Procedure, that it "will likely be able to certify the Settlement Class for purposes of the proposed Settlement" and "will likely be able to certify Lead Plaintiffs AP7 and Union as Class Representatives for the Settlement Class and appoint Lead Counsel Bernstein Litowitz Berger & Grossmann LLP and Kessler Topaz Meltzer & Check, LLP

---

of litigation); *In re Apple Comp. Sec. Litig.*, 1991 WL 238298 (N.D. Cal. Sept. 6, 1991) ($100 million jury verdict vacated on post-trial motions).

as Class Counsel for the Settlement Class pursuant to Rule 23(g) of the Federal Rules of Civil Procedure." Preliminary Approval Order, at 3-4. In connection with final approval of the Settlement, the Court will be asked to finally certify the Settlement Class and finally approve the appointment of Lead Plaintiffs AP7 and Union as Class Representatives for the Settlement Class and the appointment of Bernstein Litowitz and Kessler Topaz as Class Counsel for the Settlement Class. As Lead Plaintiffs apprised the Court in its Preliminary Approval Motion and Exhibit 3 thereto, ECF No. 223-4, at 26 n.12, counsel for a competing lead plaintiff movant (which was not appointed) in an unrelated case raised questions about Bernstein Litowitz's hiring of a former employee of the lead plaintiff (SEB). Following discovery and extensive briefing, the court found that the evidence did not establish any quid pro quo, and allowed Bernstein Litowitz to continue as Class Counsel. *See SEB Inv. Mgmt. AB v. Symantec Corp.*, 2021 WL 1540996, at *1-2 (N.D. Cal. Apr. 20, 2021). The court in *Symantec* nevertheless ordered Bernstein Litowitz to bring its order to the attention of any court in which Bernstein Litowitz seeks appointment as class counsel, *see id.* at *2, as we did in connection with Preliminary Approval and do so again here. Lead Plaintiffs note that the parties in *Symantec* recently agreed to settle those claims for $70 million, and the court preliminary approved that settlement on September 16, 2021.

     88.    By its Preliminary Approval Order, the Court authorized Lead Counsel to retain A.B. Data as the Claims Administrator to supervise and administer the notice procedure in connection with the Settlement, as well as the processing of Claims. Preliminary Approval Order, ¶ 7. In accordance with the Preliminary Approval Order, A.B. Data, working under Lead Counsel's supervision: (i) mailed by First-Class mail, or emailed, a copy of the Notice Packet to potential Settlement Class Members at the addresses provided by or caused to be provided by Allergan, or who otherwise was identified through further reasonable effort; (ii) mailed a copy of the Notice

Packet to the brokers and nominees ("Nominees") contained in the Claims Administrator's Nominee database; (iii) published the Summary Notice in *The Wall Street Journal* and transmitted it over the *PR Newswire*; and (iv) established a website for the Settlement, www.AllerganDrugPricingSecuritiesLitigation.com, to provide information about the Settlement, including downloadable copies of the Notice and Claim Form. Walter Decl., ¶¶ 5-11.

89. The Notice contains important information concerning the Action and the Settlement, including the definition of the Settlement Class, a description of the proposed Settlement, information regarding the claims asserted in the Action, and the proposed Plan of Allocation. The Notice also provides information for Settlement Class Members to determine whether to: (i) participate in the Settlement by completing and submitting a Claim Form; (ii) request exclusion from the Settlement Class; or (iii) object to any aspect of the Settlement, the Plan of Allocation, or the Fee and Expense Application. The Notice also informs recipients of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 24% of the Settlement Fund and payment of Litigation Expenses incurred in connection with the institution, prosecution, and resolution of the Action in an amount not to exceed $4,000,000, which amount may include an application for reimbursement of the reasonable costs and expenses incurred by Lead Plaintiffs directly related to their representation of the Settlement Class. *See* Walter Decl., Ex. A.

90. In accordance with the Preliminary Approval Order, A.B. Data began mailing Notice Packets to potential Settlement Class Members and Nominees on August 27, 2021. Walter Decl., ¶ 5. To date, A.B. Data has disseminated 1,033,602 Notice Packets to potential Settlement Class Members and Nominees. *Id*., ¶ 8. In addition, A.B. Data caused the Summary Notice to be

published in *The Wall Street Journal* and transmitted over *PR Newswire* on September 13, 2021. *Id*., ¶ 9.[22]

91.     Following issuance of the Notice, counsel for the Attorney General for the State of Connecticut contacted Lead Counsel seeking to confirm Lead Plaintiffs' understanding that the definition of "Released Plaintiffs' Claims" in the Stipulation, which clearly states that any released claim must, among other things, "relate to the purchase or sale of Allergan common and/or preferred stock during the Class Period," did not release any current or potential claims brought by the Attorney General for violations of state or federal antitrust laws. Lead Plaintiffs confirmed their understanding that this was clear from the plain language of the Stipulation in a letter to the Connecticut Attorney General on October 7, 2021, attached hereto as Exhibit 5.

92.     Contemporaneously with the mailing of the Notice Packet, A.B. Data developed and currently maintains the Settlement Website to provide Settlement Class Members and other interested parties with information concerning the Settlement and important dates and deadlines in connection therewith, as well as downloadable copies of the Notice, Claim Form, Stipulation, Preliminary Approval Order, and Second Amended Complaint. Walter Decl., ¶ 11. Additionally, A.B. Data maintains a toll-free telephone number and interactive voice-response system to respond to inquiries regarding the Settlement. *Id*., ¶ 10. Settlement Class Members with questions regarding the Settlement can also contact A.B. Data by sending an e-mail to the Settlement-specific e-mail address, info@AllerganDrugPricingSecuritiesLitigation.com.

93.     As noted above and as set forth in the Notice and Summary Notice, the deadline for Settlement Class Members to request exclusion from the Settlement Class or to submit an objection

---

[22] In accordance with the Stipulation, Defendants mailed notice of the Settlement pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715 et seq. on July 15, 2021. ECF No. 230-1.

to the Settlement, the Plan of Allocation, or the Fee and Expense Application is October 27, 2021.

To date, not one request for exclusion has been received and, as noted above, there has been only

one objection. Should any requests for exclusion or additional objections be received, Lead

Counsel will address them in their reply to be filed on or before November 10, 2021.

## VII.   THE PLAN FOR ALLOCATING THE NET SETTLEMENT FUND TO THE SETTLEMENT CLASS IS FAIR, REASONABLE, AND ADEQUATE

94.     In accordance with the Preliminary Approval Order, and as explained in the Notice,

Settlement Class Members who wish to participate in the distribution of the Net Settlement Fund

(i.e., the Settlement Fund less: (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any

Litigation Expenses awarded by the Court; (iv) any attorneys' fees awarded by the Court; and (v)

any other costs or fees approved by the Court) must submit a valid Claim Form and all required

supporting documentation to the Court-authorized Claims Administrator, A.B. Data, postmarked

(if mailed), or online through the Settlement Website, no later than December 27, 2021. As

provided in the Notice, the Net Settlement Fund will be distributed to Authorized Claimants[23] in

accordance with the plan for allocating the Net Settlement Fund among Authorized Claimants

approved by the Court.

95.     The plan of allocation proposed by Lead Plaintiffs (the "Plan of Allocation" or

"Plan") is attached as Appendix A to the Notice. *See* Walter Decl., Ex. A. The Plan is designed to

achieve an equitable and rational distribution of the Net Settlement Fund. However, calculations

made pursuant to the Plan do not represent a formal damages analysis and are not intended to

measure the amounts that Settlement Class Members could recover after a trial.

---

[23] As defined in ¶ 1(d) of the Stipulation, an "Authorized Claimant" is a Settlement Class Member who submits a Claim to the Claims Administrator that is approved by the Court for payment from the Net Settlement Fund.

96.    Lead Counsel developed the Plan in consultation with Lead Plaintiffs' damages consultant, Mr. Coffman, and his team at Global Economics Group, LLC. The Plan creates a framework for the equitable distribution of the Net Settlement Fund among Settlement Class Members who suffered economic losses as a result of Defendants' alleged violations of the federal securities laws set forth in the Second Amended Complaint, as opposed to economic losses caused by market or industry factors or company-specific factors unrelated thereto. To that end, Lead Plaintiffs' damages consultant calculated the estimated amount of alleged artificial inflation in the per share price of Allergan common stock and Allergan preferred stock (together, "Allergan Securities") over the course of the Class Period that was allegedly proximately caused by Defendants' alleged materially false or misleading statements and omissions.

97.    As set forth in the Plan, a Claimant's Recognized Loss Amount will depend upon several factors, including whether the Claimant purchased Allergan common stock or Allergan preferred stock, the date(s) when the Claimant purchased or acquired his, her, or its shares of Allergan Securities during the Class Period, and whether such shares were sold (and if so, when and at what price).[24] In order to have a Recognized Claim under the Plan, a Claimant must have suffered damages proximately caused by the disclosure of the relevant truth concealed by Defendants' alleged fraud. Specifically, shares of Allergan Securities purchased or otherwise acquired during the Class Period (i.e., between October 29, 2013 and November 2, 2016, both dates inclusive) must have been held through at least one of the alleged corrective disclosures on August 6, 2015 and November 3, 2016 that removed alleged artificial inflation related to that information.

---

[24] The calculation of a Recognized Loss Amount also takes into account the PSLRA's statutory limitation on recoverable damages. *See* Section 21D(e)(1) of the Exchange Act.

98.     A.B. Data, as the Claims Administrator, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund by dividing the Authorized Claimant's Recognized Claim (i.e., the sum of the Claimant's Recognized Loss Amounts as calculated under the Plan) by the total Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. Lead Plaintiffs' losses will be calculated in the same manner.

99.     Once A.B. Data has processed all submitted Claim Forms and provided Claimants with an opportunity to cure any deficiencies in their Claims or challenge the rejection of their Claims, Lead Counsel will file a motion for approval of A.B. Data's determinations with respect to all submitted Claims and authorization to distribute the Net Settlement Fund to Authorized Claimants. As set forth in the Plan, if seven (7) months after the initial distribution, there is a balance remaining in the Net Settlement Fund (whether by reason of uncashed checks, or otherwise), and if it is cost-effective to do so, Lead Counsel will conduct a re-distribution of the funds remaining after payment of any unpaid fees and expenses incurred in administering the Settlement, including the costs for such re-distribution, to Authorized Claimants who have cashed their initial distribution checks and would receive at least $10.00 from such re-distribution. Re-distributions will be repeated until it is determined that re-distribution of the funds remaining in the Net Settlement Fund would no longer be cost effective. Thereafter, any remaining balance will be contributed to non-sectarian, not-for-profit organization(s), to be recommended by Lead Counsel and approved by the Court.

100.    As discussed in the Settlement Memorandum, the structure of the Plan is similar to the structure of plans of allocation that have been used to apportion settlement proceeds in numerous other securities class actions. To date, no objections to the Plan have been filed. In sum, Lead Counsel believe that the Plan provides a fair and reasonable method to equitably distribute

the Net Settlement Fund among Authorized Claimants, and respectfully submits that the Plan should be approved by the Court.

## VIII.   THE FEE AND EXPENSE APPLICATION

101.   In addition to seeking final approval of the Settlement and approval of the Plan of Allocation, Lead Counsel, on behalf of Plaintiffs' Counsel, are applying for an award of attorneys' fees and payment of expenses incurred by Plaintiffs' Counsel during the course of the Action. Specifically, Lead Counsel are applying for attorneys' fees in the amount of 23.8% of the Settlement Fund and for Litigation Expenses in the total amount of $2,558,093.51.[25] This total expense amount *includes* reimbursement in the aggregate amount of $84,850.00 to Lead Plaintiffs (i.e., $13,600.00 for AP7 and $71,250.00 for Union) for costs incurred directly in connection with their representation of the Settlement Class in accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(4). *See* Gröttheim Decl., ¶ 16 & Riechwald Decl., ¶ 16. As noted above, Lead Counsel's Fee and Expense Application is consistent with the amounts set forth in the Notice and, to date, only one potential objection regarding Lead Counsel's request for attorneys' fees and expenses has been received.

102.   As set forth in the accompanying Fee Memorandum at § IV.B., the Schoeman Objection should be rejected by the Court. Dr. Schoeman has not demonstrated that he is even a

---

[25] The lodestar and expense submissions of: (i) Matthew L. Mustokoff, on behalf of Kessler Topaz ("Kessler Topaz Fee and Expense Decl."); (ii) John C. Browne, on behalf of Bernstein Litowitz ("Bernstein Litowitz Fee and Expense Decl."); (iii) James E. Cecchi on behalf Carella Byrne ("Carella Byrne Fee and Expense Decl."); (iv) Phillip Kim on behalf of Rosen Law ("Rosen Law Fee and Expense Decl."); and Gregg S. Levin on behalf of Motley Rice ("Motley Fee and Expense Decl."), are attached hereto as Exhibits 6A through 6E. These declarations set forth the names of the attorneys and professional support staff members who worked on the Action and their hourly rates, the lodestar value of the time expended by such attorneys and professional support staff, the expenses incurred by Plaintiffs' Counsel, and the background and experience of the firms.

Settlement Class Member and has failed to satisfy the basic requirements for submitting an objection. And, even if Dr. Schoeman could establish standing, his objection is baseless.

103.    Below is a summary of the primary factual bases for Lead Counsel's Fee and Expense Application. A full analysis of the factors considered by courts in this Circuit when evaluating requests for attorneys' fees and expenses from a common fund, as well as the supporting legal authority, is presented in the accompanying Fee Memorandum.[26]

### A.    Lead Counsel's Fee Request Is Fair and Reasonable and Warrants Approval

#### 1.    The Favorable Settlement Achieved

104.    Courts have consistently recognized that the result achieved is a key factor to be considered in making a fee award. *See* Fee Memorandum, § IV.A. As described above, when viewed in absolute terms, the $130 million Settlement is a significant result—representing between 13.4% and 23.4% of the Settlement Class's maximum damages that could be realistically established at trial as estimated by Lead Plaintiffs' damages expert. This range of percentage recovery exceeds the median recovery of investor losses as a percentage of damages in comparably sized securities cases by many multiples. *See supra* ¶ 11. This result is also significant when considered in view of the substantial risks and obstacles to obtaining a larger recover (or, any recovery) were the Action to continue towards trial, as well as the fact that this is, to Lead Plaintiffs' knowledge, the first securities class action case arising out of the antitrust allegations at issue here to achieve resolution. Here, as a result of the Settlement, numerous Settlement Class

---

[26] The Third Circuit has noted that a district court should consider the following factors, among others, in determining a fee award: "(1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases." *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000) (citations omitted). *See also* Fee Memorandum, § IV.

Members will immediately benefit and receive compensation for their losses and avoid the substantial risks to recovery in the absence of settlement.

### 2. The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases

105.    The risks faced by Lead Counsel in prosecuting this Action are highly relevant to the Court's consideration of an award of attorneys' fees, as well as its approval of the Settlement. Here, Defendants adamantly deny any wrongdoing and, if the Action had continued, would have aggressively litigated their defenses through summary judgment, a trial, and the appeals that would likely follow. As detailed in Section V above, Lead Counsel and Lead Plaintiffs faced significant risks to proving Defendants' liability, loss causation, and damages at all stages of litigation.

106.    These case-specific litigation risks are in addition to the risks accompanying securities litigation generally, such as the fact that this Action is governed by stringent PSLRA requirements and case law interpreting the federal securities laws and was undertaken on a contingent-fee basis. From the outset, Lead Counsel understood that this would be a complex, expensive, and potentially lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and financial expenditures that vigorous prosecution of the case would require. In undertaking that responsibility, Lead Counsel were obligated to ensure that sufficient resources (in terms of attorney and support-staff time) were dedicated to prosecuting the Action, and that funds were available to compensate vendors and consultants and to cover the considerable out-of-pocket costs that a case like this typically demands. With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an hourly, ongoing basis. Lead Counsel alone have dedicated nearly 38,000 hours in prosecuting this Action for the benefit of the Settlement Class, yet have received no compensation for their efforts.

107.    Lead Counsel also bore the risk that no recovery would be achieved. Lead Counsel are aware that despite the most vigorous and competent efforts, a law firm's success in contingent litigation such as this is never guaranteed. Moreover, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to persuade sophisticated defendants to engage in serious settlement negotiations at meaningful levels. Lead Counsel are aware of many hard-fought lawsuits in which, because of the discovery of facts unknown when the case commenced, or changes in the law during the pendency of the case, or a decision of a judge or jury following a trial on the merits, excellent professional efforts by a plaintiff's counsel produced no fee for counsel.

108.    The United States Supreme Court and numerous other courts have repeatedly recognized that the public has a strong interest in having experienced and able counsel enforce the federal securities laws through private actions. *See, e.g., Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (private securities actions provide "'a most effective weapon in the enforcement' of the securities laws and are a 'necessary supplement to [SEC] action.'") (citations omitted); *see also* Fee Memorandum, § I. Vigorous private enforcement of the federal securities laws can only occur if private investors can obtain some parity in representation with that available to large corporate defendants. If this important public policy is to be carried out, courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action as well as the economics involved.

109.    Plaintiffs' Counsel's efforts, in the face of substantial risks and uncertainties, have resulted in what Lead Counsel believe to be a significant and certain recovery for the Settlement Class. In these circumstances, and in consideration of Plaintiffs' Counsel's hard work and the

favorable result achieved, Lead Counsel believe the 23.8% fee request is fair and reasonable and should be approved.

### 3. The Time and Labor Devoted to the Action by Plaintiffs' Counsel

110. Lead Counsel and the other Plaintiffs' Counsel firms devoted substantial time to the prosecution of the Action. As more fully described above, Lead Counsel: (i) conducted an exhaustive investigation into the Settlement Class's claims; (ii) monitored various investigations and related litigation involving Allergan; (iii) researched and prepared two detailed complaints, including the operative Second Amended Complaint; (iv) opposed two motions to dismiss; (v) served document requests, requests for admission, and interrogatories on Defendants, as well as subpoenas on approximately fifty third parties, and engaged in numerous meet and confers regarding the scope of the discovery requested and the objections thereto; (vi) reviewed and analyzed the resulting productions of more than 2.6 million pages of documents; (vii) responded to Defendants' document requests, requests for admissions, and interrogatories; (viii) prepared and defended the depositions of both Lead Plaintiffs; (ix) prepared for and took twenty fact witness depositions and one expert deposition and defended the deposition of Lead Plaintiffs' expert; (x) consulted with various experts and consultants, including a consultant on antitrust matters; (xi) moved for class certification; and (xii) prepared for and engaged in settlement negotiations with Defendants, including a formal mediation session facilitated by Judge Phillips. *See supra* ¶¶ 20-61. Here, Lead Counsel's efforts were driven and focused on advancing the litigation to achieve the most successful outcome for the Settlement Class, whether through settlement or trial, by the most efficient means possible.

111. Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this Action. As the lead partners on the case, we personally monitored and maintained control of the work

performed by other lawyers at Kessler Topaz and Bernstein Litowitz throughout the litigation. Other experienced attorneys at Lead Counsel were also involved in the drafting of pleadings, motion papers, and in the settlement negotiations. More junior attorneys and paralegals worked on matters appropriate to their skill and experience level.

112.    The time devoted to this Action by Plaintiffs' Counsel is set forth in the Fee and Expense Declarations attached hereto as Exhibits 6A through 6E. Included with the Fee and Expense Declarations are schedules that summarize the time expended by the attorneys and professional support staff employees at each firm, as well as expenses ("Fee and Expense Schedules"). The Fee and Expense Schedules report the amount of time spent by each attorney and professional support staff employee who worked on the Action and their resulting "lodestar," i.e., their hours multiplied by their hourly rates.

113.    The hourly rates of Plaintiffs' Counsel here range from $700 to $1,300 per hour for partners, $350 to $925 per hour for other attorneys, $225 to $400 per hour for paralegals and law clerks, and $275 to $500 per hour for in-house investigators. *See* Kessler Topaz Fee and Expense Decl., Ex. 1; Bernstein Litowitz Fee and Expense Decl., Ex. 1; Carella Byrne Fee and Expense Decl., Ex. 1; Rosen Fee and Expense Decl., Ex. 1; and Motley Rice Fee and Expense Decl., Ex. 1. These hourly rates are reasonable for this type of complex litigation.

114.    In total, from the inception of this Action through October 6, 2021, Plaintiffs' Counsel expended over 38,971 hours on the investigation, prosecution, and resolution of the claims against Defendants for a total lodestar of $18,852,455.25.[27] Thus, pursuant to a lodestar "cross-

---

[27] Lead Counsel will continue to perform legal work on behalf of the Settlement Class should the Court approve the Settlement. Additional resources will be expended assisting Settlement Class Members with their Claim Forms and related inquiries and working with the Claims Administrator, A.B. Data, to ensure the smooth progression of claims processing. No additional legal fees will be sought for this work.

check," Lead Counsel's fee request of 23.8% of the Settlement Fund (or $30,940,000 plus interest), if awarded, would yield a multiplier of approximately 1.64 on Plaintiffs' Counsel' lodestar, which falls well within the range of fee multipliers typically awarded in comparable securities class actions and in other class actions involving significant contingency fee risk, in this Circuit and elsewhere. *See* Fee Memorandum, § III.B.

### 4.      The Quality of Plaintiffs' Counsel's Representation

115.     The skill and diligence of Plaintiffs' Counsel also supports the requested fee. As demonstrated by the firm résumés included as Exhibits 4 and 3 to the Kessler Topaz Fee and Expense Decl. and the Bernstein Litowitz Fee and Expense Decl., respectively, Lead Counsel Kessler Topaz and Bernstein Litowitz are among the most experienced and skilled law firms in the securities litigation field, with a long and successful track record representing investors in such cases, and are consistently ranked among the top plaintiffs firms in the country. The other Plaintiffs' Counsel's firms are also highly experienced in complex litigation. *See* Carella Byrne Fee and Expense Decl., Ex. 3; Rosen Fee and Expense Decl., Ex. 3; Motley Rice Fee and Expense Decl., Ex. 3. The substantial result achieved for the Settlement Class here reflects the superior quality of this representation.

116.     The quality of the work performed by Plaintiffs' Counsel in obtaining the Settlement should also be evaluated in light of the quality of opposing counsel. Defendants in this case were represented by experienced counsel from the nationally prominent litigation firm Quinn Emanuel Urquhart & Sullivan, LLP. This firm vigorously and ably defended the Action for over four years. In the face of this formidable defense, Lead Counsel were nonetheless able to develop a case that was sufficiently strong to persuade Defendants to settle the Action on terms that are favorable to the Settlement Class.

### 5.      Lead Plaintiffs' Endorsement of the Fee Application

117.      Lead Plaintiffs AP7 and Union are sophisticated institutional investors that have closely supervised, monitored, and actively participated in the prosecution and settlement of the Action. Lead Plaintiffs have evaluated and fully support Lead Counsel's fee request. The 23.8% fee request is also authorized by and made pursuant to agreements made between Lead Plaintiffs and Lead Counsel. As set forth in the declarations submitted on behalf of AP7 and Union, Lead Plaintiffs have concluded that the requested fee has been earned based on the efforts of Plaintiffs' Counsel and the favorable recovery obtained for the Settlement Class in a case that involved serious risk. *See* Gröttheim Decl., ¶¶ 11-13; Riechwald Decl., ¶¶ 11-13. Accordingly, Lead Plaintiffs' endorsement of Lead Counsel's fee request further demonstrates its reasonableness and this endorsement should be given meaningful weight in the Court's consideration of the fee award.

### B.      Lead Counsel's Request for Litigation Expenses Warrants Approval

### 1.      Lead Counsel Seek Reimbursement of Plaintiffs' Counsel's Reasonable and Necessary Litigation Expenses from the Settlement Fund

118.      Lead Counsel seek payment from the Settlement Fund of $2,473,243.51 for expenses that were reasonably and necessarily incurred by Plaintiffs' Counsel in connection with the Action. The Notice informs the Settlement Class that Lead Counsel will apply for payment of Litigation Expenses in an amount not to exceed $4,000,000, which amount may include an application for reimbursement of the reasonable costs and expenses incurred by Lead Plaintiffs directly related to their representation of the Settlement Class in accordance with 15 U.S.C. § 78u-4(a)(4). The amount of Litigation Expenses requested by Lead Counsel, along with the aggregate amount requested by Lead Plaintiffs (i.e., $84,850.00), is substantially below the maximum expense amount set forth in the Notice.

119.     From the inception of this Action, Plaintiffs' Counsel were aware that they might not recover any of the expenses they incurred in prosecuting the claims against Defendants and, at a minimum, would not recover any expenses until the Action was successfully resolved. Plaintiffs' Counsel also understood that, even assuming the Action was ultimately successful, an award of expenses would not compensate counsel for the lost use or opportunity costs of funds advanced to prosecute the claims against Defendants. Plaintiffs' Counsel were motivated to, and did, take appropriate steps to avoid incurring unnecessary expenses and to minimize costs without compromising the vigorous and efficient prosecution of the Action.

120.     Lead Counsel maintained strict control over the expenses in this Action. Indeed, many of the expenses incurred were paid out of a litigation fund created by Lead Counsel and maintained by Kessler Topaz ("Litigation Fund"). Kessler Topaz and Bernstein Litowitz collectively contributed $800,000.00 to the Litigation Fund. A description of the payments from the Litigation Fund by category is included in the individual firm declaration submitted on behalf of Kessler Topaz. *See* Kessler Topaz Fee and Expense Decl., ¶ 11, Ex. 3. Currently, a balance of $708.09 remains in the Litigation Fund. This amount has been credited to Kessler Topaz and removed from its expense request so as to avoid any double counting of expenditures. *See Id.*

121.     Plaintiffs' Counsel's expenses are summarized in Exhibit 7 hereto, which identifies each category of expense and the amount incurred for each category. Plaintiffs' Counsel's expenses include charges for, among other things: (i) experts and consultants in connection with various stages of the litigation; (ii) establishing and maintaining a database to house the documents produced in discovery; (iii) deposition-related expenses; (iv) online factual and legal research; (v)

mediation; and (vi) document reproduction.[28] Courts have consistently found that these kinds of expenses are payable from a fund recovered by counsel for the benefit of a class.

122.    The largest component of Plaintiffs' Counsel's expenses (i.e., $2,058,245.65, or approximately 83% of their total expenses) was incurred for experts and consultants. As noted above, Lead Counsel consulted with experts in the fields of antitrust and securities economics during their investigation and the preparation of the First and Second Amended Complaints, in preparation for mediation, and in connection with the development of the proposed Plan of Allocation. *See supra* ¶¶ 46-48. These experts and consultants were essential to the prosecution of the Action.

123.    The next largest expense (i.e., $151,942.72, or approximately 6% of Plaintiffs' Counsel's total expenses) was incurred for legal and factual research. This amount includes charges for computerized research services such as Lexis, Westlaw, and PACER. It is standard practice for attorneys to use online services to assist them in researching legal and factual issues, and indeed, courts recognize that these tools create efficiencies in litigation and ultimately save money for clients and the class. This amount also includes charges for data obtained from information analytics companies. This data provided pricing and sales volume information for the generic drugs subject to discovery and was analyzed by Lead Plaintiffs' experts during the course of the litigation.

---

[28] Plaintiffs' Counsel's expenses are listed in detail in their firm's respective declarations. *See* Exhibits 6A through 6E. As set forth in the firms' Fee and Expense Declarations, the expenses incurred by each Plaintiffs' Counsel's firm are reflected on the books and records maintained by the firm. These books and records are prepared from expense vouchers, check records, and other source materials, and are an accurate record of the expenses incurred. These expense items are billed separately and are not duplicated in each firm's hourly rates.

124.    Plaintiffs' Counsel also incurred a total of $127,256.30 for document hosting and management/litigation support. In addition, Lead Counsel incurred $38,821.25 for charges related to mediation with Judge Phillips.

125.    The other expenses for which Lead Counsel seek payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, court fees, telephone costs, copying, and postage and delivery expenses. All of the litigation expenses incurred by Plaintiffs' Counsel were reasonable and necessary to the successful litigation of the Action, and have been approved by Lead Plaintiffs. *See* Gröttheim Decl., ¶ 12; Riechwald Decl., ¶ 12.

### 2.    Reimbursement to Lead Plaintiffs Is Fair and Reasonable

126.    The PSLRA specifically provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4). Accordingly, Lead Plaintiffs seek reimbursement of their reasonable costs incurred directly for their work representing the Settlement Class in the aggregate amount of $84,850.00. Specifically, AP7 seeks reimbursement of $13,600.00 for 40 hours expended in connection with the Action by its Chief Executive Officer (*see* Gröttheim Decl., ¶¶ 14-16), and Union seeks reimbursement of $71,250.00 for 190 hours expensed in connection with the Action by its General Counsel, Assistant General Counsel, a Senior Legal Counsel, and two members of its information technology group who assisting Union in its document collection efforts (*see* Riechwald Decl., ¶¶ 14-16).

127.    As discussed in the Fee Memorandum and in Lead Plaintiffs' supporting declarations, AP7 and Union have been fully committed to pursuing the Settlement Class's claims since they became involved in the litigation. Both AP7 and Union have provided valuable assistance to Lead Counsel during the prosecution and resolution of the Action. Moreover, the

efforts expended by Lead Plaintiffs during the course of this Action, as set forth in the Gröttheim Decl., ¶¶ 7-9 and the Riechwald Decl., ¶¶ 7-9, including communicating with Lead Counsel, reviewing pleadings and motion papers, gathering and reviewing documents in response to discovery requests, preparing for deposition and being deposed, and participating in the settlement negotiations, are precisely the types of activities courts have found to support reimbursement to class representatives, and fully support the request for reimbursement here.

## IX.  MISCELLANEOUS EXHIBITS

128.    Attached to this Joint Declaration are copies of the following documents cited in the Fee Memorandum:

(a)      Exhibit 11:  Unreported Order Awarding Plaintiffs' Counsel Attorneys' Fees and Litigation Expenses, *Alaska Electrical Pension Fund v. Pharmacia Corp.*, Case No. 3:03-cv-01519-AET-TJB (D.N.J. Jan. 30, 2013) (ECF No. 405);

(b)      Exhibit 12:  Unreported Order Awarding Attorneys' Fees and Litigation Expenses, *In re Snap Inc. Sec. Litig.*, Case No. 2:17-cv-03679-SVW-AGR (C.D. Cal. Mar. 9, 2021) (ECF No. 400); and

(c)      Exhibit 13:  Unreported Order Awarding Attorneys' Fees and Litigation Expenses, *In re Brocade Sec. Litig.*, Case No. 3:05-cv-02042-CRB (N.D. Cal. Jan. 26, 2009) (ECF No. 496).

## X.  CONCLUSION

129.    For all the reasons set forth above, Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate. Lead Counsel further submit that the requested fee in the amount of 23.8% of the Settlement Fund should be approved as fair and reasonable, and the request for Plaintiffs' Counsel's Litigation Expenses in the amount of $2,473,243.51, and Lead Plaintiffs' costs in the aggregate amount of $84,850.00, should also be approved.

130.   We declare, under penalty of perjury, that the foregoing is true and correct.

Executed in Radnor, Pennsylvania this 13th day of October 2021.

_____
Matthew L. Mustokoff

Executed in New York, New York this 13th day of October 2021.

_____
John C. Browne

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on October 13, 2021, I caused a true and correct copy of the foregoing Joint Declaration of Matthew L. Mustokoff and John C. Browne in Support of (A) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (B) Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses to be electronically filed with the Clerk of the Court using the ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: October 13, 2021

*s/ James E. Cecchi*
James E. Cecchi
**CARELLA, BYRNE, CECCHI, OLSTEIN,
BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com

*Liaison Counsel for Lead Plaintiffs and
the Settlement Class*